**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STATE OF GEORGIA, *et al.*,

    Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
JUSTICE,

    Defendant.

Case No. 1:21-cv-3138 (TNM)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

   I.   The United States and Other Plaintiffs Challenge Georgia's Voting Law ........................ 2

   II.   Georgia's FOIA Request and the Resulting Litigation ..................................................... 3

LEGAL STANDARD ............................................................................................................ 4

ARGUMENT ......................................................................................................................... 6

   I.   Both CRT and OIP Conducted an Adequate Search. ....................................................... 6

      A. CRT Conducted an Adequate Search. .................................................................... 7

         1.   CRT Searched 20 Custodians for Communications
            with the 62 Entities. ......................................................................................... 7

         2.   CRT Searched 20 Custodians for Communications with Congress ................. 8

         3.   CRT Consulted with Voting Section Leadership to Locate
            Internal Guidance. ........................................................................................... 9

      B. OIP Also Conducted an Adequate Search. ............................................................. 10

         1.   OIP Searched 82 Custodians for Communications with the 62 Entities. ........ 10

         2.   OIP Also Searched Custodians for Communications with Congress. ........... 11

         3.   OIP Searched 82 Custodians for Internal Guidance ....................................... 12

   II.   CRT Properly Withheld Information Pursuant to the Attorney Work-Product
      and Deliberative Process Privilege Components of FOIA Exemption 5. ......................... 12

      A. Exemption 5 Applies to the Withheld Material—and Work Product Doctrine
         and Deliberative Process Privilege Continue to Apply—Because the Withheld
         Material Comprises Communications Within the Common Interest Group. ............... 13

         1.   Exemption 5's Threshold "Inter-Agency or Intra-Agency"
            Requirement Is Met for Withheld Communications Within
            the Common Interest Group. .......................................................................... 14

         2.   The Attorney Work-Product Doctrine Continues to Apply
            to Material Shared Within the Common Interest Group. .............................. 18

i

B. CRT Properly Withheld Material Protected by the Attorney Work-Product Doctrine Created in Preparation for the Ongoing Litigation, Including Litigation Strategy Information. .................................................................... 21

C. CRT Also Properly Withheld Information Protected by the Deliberative Process Privilege Which Would Reveal CRT's Deliberative Process in Making Litigation Decisions. ................................................................... 24

III.   CRT Properly Released All Reasonably Segregable Information. ................................. 27

CONCLUSION ................................................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Am. Oversight v. Dep't of the Treasury*,
   474 F. Supp. 3d 251 (D.D.C. 2020).........................................................................17

*Am. Oversight v. Dep't of Transportation*,
   No. CV 18-1272 (CKK), 2022 WL 103306 (D.D.C. Jan. 11, 2022).........................17

*Am. Oversight, Inc. v. Dep't of Health & Hum. Servs.*,
   No. CV 17-827(EGS/DAR), 2022 WL 1719001 (D.D.C. May 27, 2022) ..............17

*Am. Small Bus. League v. Dep't of Defense*,
   372 F. Supp. 3d 1018 (N.D. Cal. 2019) ..................................................................19

*August v. FBI*,
   328 F.3d 697 (D.C. Cir. 2003).................................................................................4

*Baker & Hostetler LLP v. Dep't of Commerce*,
   473 F.3d 312 (D.C. Cir. 2006).................................................................................5

*Brayton v. Office of U.S. Trade*,
   Rep., 641 F.3d 521 (D.C. Cir. 2011).......................................................................5

*Coalition for Good Governance v. Raffensperger*,
   No. 1:21-cv-2070 (N.D. Ga., May 17, 2021) ...................................................3, 19

*Coastal States Gas Corp. v. DOE*,
   617 F.2d 854 (D.C. Cir. 1980).................................................................................25

*Davis v. Dep't of Justice*,
   460 F.3d 92 (D.C. Cir. 2006)...................................................................................5

*Dudman Commc'ns Corp. v. Dep't of Air Force*,
   815 F.2d 1565 (D.C. Cir. 1987)...............................................................................27

*DOI v. Klamath Water Users Protective Ass'n*,
   532 U.S. 1 (2001)........................................................................................15, 17, 24

*Dow Jones & Co., Inc. v. DOJ*,
   917 F.2d 571 (D.C. Cir. 1990).................................................................................17

*Formaldehyde Inst. v. HHS*,
   889 F.2d 1118 (D.C. Cir. 1989)..........................................................................15, 25

*FTC v. Grolier Inc.*,
    462 U.S. 19 (1983) ........................................................................................ 24

*Gilliam v. DOJ*,
    128 F. Supp. 3d 134 (D.D.C. 2015) ............................................................. 5

*Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
    762 F. Supp. 2d 123 (D.D.C. 2011) ............................................................. 25

*Heggestad v. DOJ*,
    182 F. Supp. 2d 1 (D.D.C. 2000) ................................................................. 21

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ...................................................................................... 22

\* *Hunton & Williams v. DOJ*,
    590 F.3d 272 (4th Cir. 2010) ........................................................... 16, 18, 20

*In re Lindsey*,
    158 F.3d 1263 (D.C. Cir. 1998) .................................................................... 18

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ...................................................................... 24

*In re Sealed Case*,
    676 F.2d 793 (D.C. Cir. 1982) ...................................................................... 18

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) .................................................................................. 4, 5

*Jordan v. DOJ*,
    591 F.2d 753 (D.C. Cir. 1978) ...................................................................... 22

*Juarez v. DOJ*,
    518 F.3d 54 (D.C. Cir. 2008) ........................................................................ 27

*Jud. Watch Inc. v. Export-Import Bank*,
    108 F. Supp. 2d 19 (D.D.C. 2000) ............................................................... 25

*Jud. Watch, Inc. v. DHS*,
    926 F. Supp. 2d 121 (D.D.C. 2013) ............................................................. 22

*Jud. Watch, Inc. v. DOD*,
    715 F.3d 937 (D.C. Cir. 2013) ...................................................................... 6

*Jud. Watch, Inc. v. DOE*,
    412 F.3d 125 (D.C. Cir. 2005) ...................................................................... 15

iv

*Jud. Watch, Inc. v. DOJ*,
    432 F.3d 366 (D.C. Cir. 2005) ..................................................................... 22, 28

*Jud. Watch, Inc. v. U.S. Postal Serv.*,
    297 F. Supp. 2d 252 (D.D.C. 2004) ........................................................... 18

*Leopold v. DOJ*,
    487 F. Supp. 3d 1 (D.D.C. 2020) ............................................................... 21, 24

*McKinley v. Bd. of Governors of Fed. Reserve Sys.*,
    647 F.3d 331 (D.C. Cir. 2011) ................................................................... 15, 21

*Mil. Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) ................................................................... 6

*Miller v. DOJ*,
    872 F. Supp. 2d 12 (D.D.C. 2012) ............................................................ 5

*Nation Mag. v. U.S. Customs Serv.*,
    71 F.3d 885 (D.C. Cir. 1995) ..................................................................... 5, 6

*Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Att'ys*,
    844 F.3d 246 (D.C. Cir. 2016) ................................................................... 12

* *Nat'l Inst. of Military Justice v. DOD*,
    [NIMJ], 512 F.3d 677 (D.C. Cir. 2008) ................................................. 14, 15, 16

*Nat'l Sec. Archive Fund, Inc. v. CIA*,
    402 F. Supp. 2d 211 (D.D.C. 2005) ........................................................... 27

*Nat'l Sec. Archive v. CIA*,
    752 F.3d 460 (D.C. Cir. 2014) ................................................................... 27

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ................................................................................... 12, 26

*Oglesby v. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) ..................................................................... 5, 6

*Pfeiffer v. CIA*,
    721 F. Supp. 337 (D.D.C. 1989) ............................................................... 25

*Pub. Citizen, Inc. v. DOJ*,
    111 F.3d 168 (D.C. Cir. 1997) ................................................................... 15

*Russell v. Dep't of Air Force*,
    682 F.2d 1045 (D.C. Cir. 1982) ................................................................. 24

*Ryan v. DOJ*,
   617 F.2d 781 (D.C. Cir. 1980) .............................................................. 14, 15, 16, 26

*SafeCard Servs. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ........................................................................ 6, 7

*Schrecker v. DOJ*,
   349 F.3d 657 (D.C. Cir. 2003) ............................................................................. 6

*Steinberg v. DOJ*,
   23 F.3d 548 (D.C. Cir. 1994) ............................................................................... 7

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ......................................................................... 27

*Tax Analysts v. Internal Revenue Serv.*,
   117 F.3d 607 (D.C. Cir. 1997) ..................................................................... 21, 28

*United States v. AT & T Co.*,
   642 F.2d 1285 (D.C. Cir. 1980) ......................................................................... 18

*United States v. Georgia*,
   No. 1:21-cv-2575(JPB), 2021 WL 8085963 (N.D. Ga. June 25, 2021) .......................... 1, 2, 19

*United States v. Nixon*,
   418 U.S. 683 (1974) ......................................................................................... 26

*VoteAmerica v. Raffensperger*,
   No. 1:21-CV-01390-JPB, 2022 U.S. Dist. LEXIS 116155 (N.D. Ga. June 30, 2022) ............. 2

*Weisberg v. DOJ*,
   627 F.2d 365 (D.C. Cir. 1980) ............................................................................. 5

*Wisdom v. United States Tr. Program*,
   266 F. Supp. 3d 93 (D.D.C. 2017) ...................................................................... 23

## **Statutes**

5 U.S.C. § 552(a)(4)(B) ........................................................................................ 5

5 U.S.C. § 552(b) ............................................................................................... 27

5 U.S.C. § 552(b)(5) ...................................................................................... 12, 14

## **Rules**

Fed. R. Civ. P. 26(b)(3) ...................................................................................... 21

**Regulations**

28 CFR § 0.50 ......................................................................................................... 1

**Other Authorities**

Georgia Senate Bill 202 (March 25, 2021) .......................................................... 2, 3, 19

## **INTRODUCTION**

In June 2021, the United States filed a lawsuit against the state of Georgia challenging a recent Georgia election law under the Voting Rights Act.  *See generally United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. complaint filed June 25, 2021).  The Civil Rights Division (CRT) of the Department of Justice (DOJ), and in particular its component the Voting Section, have led the lawsuit, as the Voting Section is responsible for enforcing the civil provisions of federal voting rights laws.  *Cf.* 28 CFR § 0.50.  Seven other groups of plaintiffs also filed lawsuits challenging the same Georgia election law, and six of the cases—including that of the United States—were consolidated for discovery purposes.  In addition to coordinating with the other plaintiff-groups for consolidated filings, CRT has also coordinated with the other plaintiff-groups to develop litigation strategy, share legal research, and discuss upcoming litigation decisions based on the plaintiffs' common interest in enforcing the Voting Rights Act and prevailing in their lawsuits. The various groups of plaintiffs have memorialized their shared interests through several common interest agreements.  All eight cases currently remain ongoing.

The state of Georgia and its Secretary of State (collectively, Georgia), filed a FOIA request on the Department seeking, *inter alia*, communications between Department personnel and the other plaintiffs in the other seven Georgia voting rights lawsuits.  DOJ's Mail Referral Unit forwarded the request to CRT and to DOJ's Office of Information Policy (OIP), which processes FOIA requests on behalf of the Offices of the Attorney General (OAG), Deputy Attorney General (ODAG), Associate Attorney General (OASG), Legislative Affairs (OLA), Legal Policy (OLP), and Public Affairs (OPA).  Both CRT and OIP conducted searches in response to Georgia's request.  Combined, CRT and OIP produced hundreds of pages to Georgia, subject to only limited withholdings, and those primarily by CRT under FOIA Exemption 5.

Generally speaking, CRT used Exemption 5 only to withhold material that would reveal the substance of CRT's litigation strategy coordination with the other plaintiff-groups or CRT's deliberative processes.  These materials are within the core of Exemption 5, which preserves to the government the ordinary litigation privileges enjoyed by non-government litigants.  FOIA provides no basis to compel CRT to reveal its litigation strategy decisions to opposing counsel, or to prevent CRT from the benefit of common interest agreements and coordination with co-litigants.  Because CRT and OIP conducted reasonable searches, and because each of CRT's withholdings is justified under Exemption 5, the Court should grant Defendant summary judgment.

## **BACKGROUND**

### I.    **The United States and Other Plaintiffs Challenge Georgia's Voting Law**

In June 2021, the United States filed a lawsuit against the state of Georgia challenging a recent Georgia election law, sometimes known as SB 202, under the Voting Rights Act.  *See generally United States v. Georgia*, 21-cv-2575 (N.D. Ga. complaint filed June 25, 2021).  The complaint alleged that certain provisions of the Georgia election law, including provisions limiting the availability of and restricting the use of absentee ballots, and provisions prohibiting the distribution of food and water to people waiting in line to vote, would have a disproportionate effect "on Black voters' ability to participate in the political process on an equal basis with white voters."  Compl. ¶¶ 1-2, *United States v. Georgia*, 21-cv-2575, ECF No. 1.

Seven other groups of plaintiffs also filed lawsuits challenging the same Georgia election law, and all eight cases were assigned to Judge Boulee in the Northern District of Georgia.  Six of the cases—including the one brought by the United States—were consolidated as *In re Georgia Senate Bill 202*, 21-mi-55555 (N.D. Ga.) for discovery purposes.  Two additional cases remain before Judge Boulee but were not consolidated for discovery purposes.  *See VoteAmerica v.*

*Raffensperger*, 21-cv-01390 (N.D. Ga.); *Coalition for Good Gov. v. Raffensperger*, 21-cv-02070 (N.D. Ga.). Judge Boulee ordered plaintiffs in the various cases to coordinate, including making combined filings. Decl. of John A. Russ, IV (Russ Decl). Ex. 4, Order at 9, attached as Exhibit 1. All eight cases remain pending before Judge Boulee.

Plaintiffs' counsel in seven of the eight cases (except *Coalition for Good Governance v. Raffensperger*, No. 1:21-cv-2070 (N.D. Ga., complaint filed May 17, 2021)), memorialized a common interest agreement in an email of July 28, 2021, stating that the parties "share a common interest in the successful prosecution of this litigation, and that they may share (but are not required to share) privileged communications and other litigation material between and among them without waiving the attorney-client privilege, the work product protection or any other privilege or protection." Russ Decl. ¶ 8 & Ex. 2. That email noted that the agreement included "any other counsel associated with [the recipients], in the suits they have filed challenging the Georgia law known as SB 202." Russ Decl. ¶ 9 & Ex. 2. In February 2022, plaintiffs in all eight of the Georgia election lawsuits further entered into an additional, more formal common interest agreement. Russ Decl. ¶ 10 & Ex. 3.

## II.    Georgia's FOIA Request and the Resulting Litigation

At the end of August in 2021, Georgia and its Secretary of State sent DOJ a FOIA request seeking three categories of records: (1) communications between DOJ and 62 listed non-governmental entities about Georgia's election law, (2) communications between DOJ and Congress about Georgia's election law, and (3) internal guidance documents "that DOJ uses to determine when, in DOJ's opinion, a provision of a state's election law violates the VRA." FOIA Request, Declaration of Kilian Kagle (Kagle Decl.), Ex. A, attached as Exhibit 2. 59 of the 63 non-governmental entities that Georgia asked about in its request are involved in the eight Georgia

3

voting lawsuits: 45 are plaintiffs or plaintiffs' counsel in the six Georgia voting cases consolidated by the Judge Boulee for discovery, 11 are plaintiffs or plaintiffs' counsel in the two Georgia voting cases that were not consolidated for discovery, 1 appears to be affiliated with a named plaintiff in a consolidated case, and 2 were formerly plaintiffs or plaintiff's counsel before exiting the litigation. Russ Decl. ¶ 18. The three remaining entities are not involved in any of the documents where Exemption 5 withholdings were taken in this case. Russ Decl. ¶ 18.

In response to Georgia's request, CRT searched the email accounts of 20 custodians in CRT's front office and CRT's Voting Section. Kagle Decl. ¶ 14. CRT also coordinated with Voting Section leadership to search for internal guidance responsive to Georgia's request. Kagle Decl. ¶ 28. CRT ultimately produced 596 pages to Georgia in full; produced 282 pages with redactions pursuant to FOIA Exemptions 5, 6, and 7; and withheld 112 pages pursuant to FOIA Exemption 5. Kagle Decl., Ex. E (*Vaughn* index).

OIP searched the email accounts and files of 82 custodians at OAG, ODAG, OASG, and OLA and searched the Department Executive Secretariat after determining that those offices were where responsive records would most likely be located. Declaration of Vanessa R. Brinkmann (Brinkmann Decl.) ¶ 15, attached as Exhibit 3; Brinkmann Decl. ¶¶ 20-22. OIP ultimately produced 23 pages to Georgia with redactions pursuant to FOIA Exemption 6. Brinkmann Decl. ¶¶ 9, 11. OIP did not withhold any pages in full.

## LEGAL STANDARD

The Freedom of Information Act contains "nine enumerated exemptions . . . designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)). These exemptions are necessary to

strike the balance determined by Congress "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency*, 493 U.S. at 152-53 (citations omitted).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)). Summary judgment is warranted when an agency "demonstrates that no material facts are in dispute, [that] it has conducted an adequate search for responsive records, and [that] each responsive record that it has located has either been produced to the plaintiff or is exempt from disclosure." *Miller v. DOJ*, 872 F. Supp. 2d 12, 18 (D.D.C. 2012) (citing *Weisberg v. DOJ*, 627 F.2d 365, 368 (D.C. Cir. 1980)). Courts review agency responses to FOIA requests *de novo*. 5 U.S.C. § 552(a)(4)(B).

An agency has performed an adequate search for records responsive to a FOIA request when it "make[s] 'a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (quoting *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). The "adequacy of an agency's search is measured by a standard of reasonableness," *Davis v. Dep't of Justice*, 460 F.3d 92, 105 (D.C. Cir. 2006), and may be established by "reasonably detailed, nonconclusory affidavits describing [the agency's] efforts." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006).

As to an agency's withholdings, a court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and

that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).  Agency declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal citations omitted).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Jud. Watch, Inc. v. DOD*, 715 F.3d 937, 941 (D.C. Cir. 2013) (citation omitted) (per curiam).

## ARGUMENT

Here, summary judgment for Defendant is appropriate because CRT and OIP conducted searches reasonably calculated to locate all responsive records, and because CRT's withholdings pursuant to FOIA Exemption 5 are justified.[1]

### I.    Both CRT and OIP Conducted an Adequate Search.

The adequacy of any FOIA search is "dependent upon the circumstances of the case." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003).  When conducting a search in response to a FOIA request, an agency must conduct a "reasonable search."  *Oglesby*, 920 F.2d at 68.  An agency is not required to search every records system, but need only search those systems in which it believes responsive records are likely located.  *Id*.  A FOIA search is sufficient if the agency makes "a good faith effort to conduct a search for the requested records, using methods which can

---

[1] The parties conferred and Georgia indicated that it intended to challenge the agency's searches and the application of FOIA Exemption 5.  Accordingly, this briefing does not address the agency's application of FOIA Exemptions 6 and 7, which Georgia does not challenge.  OIP did not withhold any material on the basis of Exemption 5, and thus its withholdings are not addressed in detail.

be reasonably expected to produce the information requested." *Nation Mag.*, 71 F.3d at 890 (citations omitted). The adequacy of the search is determined by whether it was "reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *SafeCard Servs.*, 926 F.2d at 1201.

To demonstrate the reasonableness of its search, the agency typically submits affidavits that explain in reasonable detail the scope and method of the agency's search. *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994). To be sufficiently detailed, an agency's affidavits must describe "what records were searched, by whom, and through what process." *Id*. at 552. These affidavits are afforded a "presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs.*, 926 F.2d at 1200 (citations and internal quotation marks omitted).

Here, Georgia's request sought three categories of records: (1) communications between DOJ personnel and 62 non-governmental entities about Georgia's election law, (2) communications between DOJ and Congress about Georgia's election law, and (3) any internal guidance documents used by DOJ to determine when state election laws violate the Voting Rights Act. FOIA Request, Kagle Decl., Ex. A. As described in their declarations, both CRT and OIP conducted searches that were reasonably calculated to locate all responsive records for each part of Georgia's request.

### A. <u>CRT Conducted an Adequate Search.</u>

#### 1. <u>CRT Searched 20 Custodians for Communications with the 62 Entities.</u>

CRT identified 20 custodians reasonably expected to have engaged in communications with individuals outside DOJ about Georgia's election law. The 20 custodians included 8 individuals currently or formerly working in CRT's front office, and 12 current or former employees in the Voting Section who, based on their job responsibilities and work regarding

Georgia's voting law, might have engaged in communications with those outside DOJ about the law.  Kagle Decl. ¶¶ 14, 16.  The list of custodians was developed in coordination with CRT's Chief of Staff and Senior Counsel Shaylyn Cochran, as well as the managers of the Voting Section. Kagle Decl. ¶¶ 8-12, 14.

CRT conducted two separate searches of all 20 custodians' email accounts to identify potentially responsive records.  An email account search was selected because Georgia's request sought communications between DOJ and the listed entities.  Kagle Decl. ¶ 15.  First, a search was performed to find any emails that included a specified domain names and keywords relating to Georgia's voting law. Kagle Decl. ¶¶ 17-19.  Where Georgia provided a domain name for an entity in its request, that domain name was used, and CRT additionally added other domain names itself. Kagle Decl. ¶ 18.  Second, a separate search was performed for a different set of keywords alone, irrespective of the domain name an email was sent or received from.  Kagle Decl. ¶¶ 17, 20.  This set of keywords included names of several of the 62 entities (for example, where a domain name for that entity was unavailable) as well as the names of Senators Ossoff and Warnock, who Georgia specifically mentioned in its request.  Kagle Decl. ¶ 20.  This second set of keywords was selected to fill any gaps left by the domain-name search and identify potentially responsive records while avoiding voluminous false positives.  Kagle Decl. ¶ 20.  By using both of these searches, CRT designed its search to identify all potentially responsive records.  Kagle Decl. ¶¶ 17-20.

### 2.    CRT Searched 20 Custodians for Communications with Congress.

CRT determined that same 20 custodians, based on their job responsibilities and work regarding Georgia's voting law, were the only custodians reasonably expected to have records responsive to Georgia's request for communications between DOJ and Congress about Georgia's election law.  Kagle Decl. ¶ 14.  The two previously described email searches were also designed

to locate any communications between DOJ and Congress regarding Georgia's voting law.  The domain name and keyword search included the domain names @mail.house.gov and @mail.senate.gov to capture communications sent to or from the House or Senate, Kagle Decl. ¶ 18, and the previously-mentioned second search with a separate list of additional keywords included the keywords "Ossoff" and "Warnock" to capture communications sent to or from Senators Ossoff and Warnock—including before each joined the Senate—as specifically requested by Georgia, Kagle Decl. ¶ 20.   In addition, Georgia's request was also referred to CRT's Correspondence Unit, which applied search terms relating to Georgia's election law to CRT's congressional correspondence.  Kagle Decl. ¶ 29.

### 3.   CRT Consulted with Voting Section Leadership to Locate Internal Guidance.

To locate records potentially responsive to Georgia's request for internal guidance documents "that DOJ uses to determine when, in DOJ's opinion, a provision of a state's election law violates the VRA," FOIA Request, Kagle Decl., Ex. A, CRT consulted with three managers in CRT's Voting Section, Deputy Chief Robert Berman, Chief Chris Herren, and Principal Deputy Chief Rebecca Wertz, Kagle Decl. ¶ 10.   These three individuals are the senior managers of the Voting Section, which is the CRT section that enforces the civil provisions of federal voting rights laws, including the Voting Rights Act of 1965.  Kagle Decl. ¶ 28.   Accordingly, if internal DOJ guidance existed that was used to determine whether a state election laws violated the Voting Rights Act, Mr. Berman, Mr. Herren, and Ms. Wertz would be expected to be aware of that guidance.  Mr. Berman was sent Georgia's FOIA request and a questionnaire, and was specifically asked if responsive guidance documents existed.   Kagle Decl. ¶ 10.   No such guidance was identified, including after Mr. Berman further consulted with Mr. Herren and Ms. Wertz.  Kagle Decl. ¶ 10.

\*      \*      \*

In sum, CRT searched all locations reasonably expected to have records responsive to any part of Georgia's request and its searches were reasonably calculated to identify all responsive records.

### B. OIP Also Conducted an Adequate Search.

#### 1. OIP Searched 82 Custodians for Communications with the 62 Entities.

OIP determined that custodians in OAG, ODAG, and OASG were the only custodians reasonably expected to have records potentially responsive to Georgia's request for communications between DOJ and the 62 non-governmental entities about Georgia's election law based on the duties of those offices. OIP identified 14 custodians in OAG, 38 custodians in ODAG, 22 custodians in OASG, for a total of 74 custodians. Brinkmann Decl. ¶¶ 14-15. These custodians were selected because they comprised all of the individuals in OAG, ODAG, and OASG except for those in roles clearly unrelated to Georgia's request or those excluded by Georgia.[2] Brinkmann Decl. ¶ 15. Given that Georgia's request specifically sought communications, OIP determined that email accounts and the Departmental Executive Secretariat were the most likely locations for responsive records. Brinkmann Decl. ¶ 16; Brinkmann Decl. ¶¶ 20-22. Out of an abundance of caution, OIP searched the OAG, ODAG, and OASG custodians' electronic files in addition to email accounts, but did not identify any additional responsive records there. Brinkmann Decl. ¶ 16. To locate responsive communications, OIP searched for the combination of an email participant search string and an email subject line and text body search string. Brinkmann Decl. ¶ 16. For the email participant search strings, the domain names for the 62 non-governmental

---

[2] After consultation with Georgia, some custodians from these offices were excluded by Georgia and thus not searched. Brinkmann Decl. ¶ 15.

entities provided by Georgia were used, as well as names for the non-governmental entities where they could be determined.  Brinkmann Decl. ¶ 16.  For the email subject line and text body search string, subject-specific terms relating to Georgia's election law were used.  Brinkmann Decl. ¶ 16. Files were only identified if they contained both one of the participant search strings and one of the email subject line and text body search strings.  Brinkmann Decl. ¶ 16.  In addition, OIP searched the Departmental Executive Secretariat (DES) for keywords relating to Georgia's election law.  Brinkmann Decl. ¶¶ 20-22.  The DES is an official repository of records of OAG, ODAG, and OASG and contains their formal, controlled, unclassified correspondence as well as some records from OLA.  Brinkmann Decl. ¶ 20.

### 2.    OIP Also Searched Custodians for Communications with Congress.

OIP determined that custodians in OLA were the custodians reasonably expected to have records potentially responsive to Georgia's request for communications between DOJ and Congress about Georgia's election law because OLA "is the office within the Department which routinely communicates with Congress" and is responsible for advancing DOJ's interests relating to Congress.  Brinkmann Decl. ¶ 17.  OIP identified 8 custodians in OLA who it reasonably expected might have responsive records, which comprised all individuals working in OLA at the relevant time.  Brinkmann Decl. ¶¶ 15, 17.  OIP searched the custodians' emails and electronic records for a combination of keyword search terms within the subject line and body of emails relating to Georgia's election law,  and the presence of "@mail.house.gov," "@senate.gov," "Ossoff" or "Warnock"[3] in the to, from, cc, or bcc filed of the email.  Brinkmann Decl. ¶ 17.  In

---

[3] "Ossoff" and "Warnock" were used as search terms in addition to the House and Senate domain names because Georgia specifically requested communications with Senators Ossoff or Warnock, including before they joined the Senate.  Brinkmann Decl. ¶ 17 n.3.

addition, OIP searched the DES, which contains records of formal DOJ correspondence with Congress, for keywords relating to Georgia's election law.  Brinkmann Decl. ¶¶ 20-22.

### 3.    OIP Searched 82 Custodians for Internal Guidance.

To locate records potentially responsive to Georgia's request for any internal guidance documents "that DOJ uses to determine when, in DOJ's opinion, a provision of a state's election law violates the VRA," FOIA Request, Kagle Decl., Ex. A, OIP searched the email accounts and electronic files of the 82 custodians at OAG, ODAG, OASG, and OLA for keyword search strings relating to guidance, analysis, or violations of the Voting Rights Act.  Brinkmann Decl. ¶ 18.  No records were identified as a result of this search.  Brinkmann Decl. ¶ 18.

*        *        *

In sum, OIP searched all locations reasonably expected to have records responsive to any part of Georgia's request, and its searches were reasonably calculated to identify all responsive records.

## II.    CRT Properly Withheld Information Pursuant to the Attorney Work-Product and Deliberative Process Privilege Components of FOIA Exemption 5.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The exemption ensures that members of the public cannot obtain through FOIA records that would be "normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Accordingly, Exemption 5 "allows the government to withhold records from FOIA disclosure under at least three privileges: the deliberative-process privilege, the attorney-client privilege, and the attorney work-product privilege."  *Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Att'ys*, 844 F.3d 246, 249 (D.C. Cir. 2016).

12

Here, CRT's Voting Section, in its role as the enforcer of the Voting Rights Act's civil provisions, is leading litigation on behalf of the United States against the state of Georgia. The Voting Section has also been coordinating and developing legal strategy with other plaintiff-groups that are likewise engaged in litigation against Georgia concerning Georgia's law, in pursuit of their common interest in enforcing the Voting Rights Act and prevailing in their lawsuits. In part, this is because the United States and the plaintiffs in the other lawsuits challenging Georgia's election law, hereinafter the Common Interest Group, have a shared interest in prevailing in their lawsuits and enforcing the Voting Rights Act and other federal voting rights laws. Russ Decl. ¶¶ 25-26. In part, it is also because Judge Boulee in the Northern District of Georgia consolidated six of the cases for discovery purposes and ordered the plaintiffs, including the Voting Section, to make coordinated filings. Russ Decl. ¶¶ 11-13.

It is thus unsurprising that CRT has withheld some material from its communications with the Common Interest Group pursuant to Exemption 5. Exemption 5 permits the government the deliberative process privilege and the same litigation privileges enjoyed by other litigants, including the attorney work-product doctrine. While CRT has endeavored to segregate the documents and release as much information as possible to Georgia, the remaining, withheld material is properly protected by those two components of Exemption 5.

A. **Exemption 5 Applies to the Withheld Material—and Work Product Doctrine and Deliberative Process Privilege Continue to Apply—Because the Withheld Material Comprises Communications Within the Common Interest Group.**

Exemption 5 applies with full force where, as here, government attorneys coordinate on attorney work-product and deliberative process privilege protected materials with attorneys outside the federal government with whom they share a common interest.

The "inter-agency or intra-agency" threshold requirement of Exemption 5 is met where the government consults with outsiders in service of a common purpose shared by the government and

the outsiders.  The threshold requirement has been found to be satisfied in a variety of factual circumstances, including where agencies sought review of journal articles and where agencies collaborated with Congress to develop new legislation.  This case—where the Voting Section and the Common Interest Group had memorialized their common interest in prevailing in litigation through common interest agreements—presents a particularly clear example.  Likewise, the attorney work-product doctrine still applies to materials that are shared with outsiders, so long as the group shares a common interest, as they do here.  Both of these conclusions are well-supported in the case law, and also follow logically from the basic principle that Exemption 5 should preserve to the government the same basic litigation privileges enjoyed by others.  To narrow Exemption 5's construction would negatively affect the government's ability to coordinate litigation, seek legal advice from outsiders, or develop joint legal strategies with co-litigants.

>    1.    **Exemption 5's Threshold "Inter-Agency or Intra-Agency" Requirement Is Met for Withheld Communications Within the Common Interest Group.**

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  It is "well established" that "a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency'" for purposes of Exemption 5's threshold requirement that it be "inter-agency or intra-agency."  *Nat'l Inst. of Military Justice v. DOD* [*NIMJ*], 512 F.3d 677, 684 (D.C. Cir. 2008).  Rather, "the language of Exemption 5 clearly embraces" certain situations in which an agency consults with entities that "are not agencies within the meaning of the FOIA."  *Ryan v. DOJ*, 617 F.2d 781, 789 (D.C. Cir. 1980).

The D.C. Circuit has used the term "consultant corollary" to describe these situations where communications between an agency and a nonagency qualify as "intra-agency" communications for Exemption 5 purposes.   In *Ryan*, the D.C. Circuit held that senators' responses to a questionnaire from the Attorney General about "procedures for selecting and recommending potential [judicial] nominees" were "exempt from FOIA disclosure under Exemption 5" because the senators were serving as "temporary consultants," and to expose the communications "would inhibit frank discussion of policy matters and likely impair the quality of decisions."  617 F.2d at 784, 791, 789-90 (citation omitted).

The D.C. Circuit reaffirmed the holding and reasoning from *Ryan* in a series of cases.  *See Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1120 (D.C. Cir. 1989) (protecting comments sent to HHS from an epidemiology journal's outside reviewers); *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168, 169, 171 (D.C. Cir. 1997) (protecting communications relating to presidential records between two former presidents and two agencies); *Jud. Watch, Inc. v. DOE*, 412 F.3d 125, 130-31 (D.C. Cir. 2005) (protecting documents shared with or received from a presidentially established entity that was not an agency); *NIMJ*, 512 F.3d at 678 (protecting "records containing the opinions and recommendations of non-governmental lawyers" who were advising the Department of Defense about terrorist trial commissions).  In *Klamath*, the Supreme Court acknowledged—and expressly declined to overrule—the consultant corollary line of cases.  *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 n.4 (2001) (holding only that "the intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants," and explaining that such a holding did not require reassessing *Ryan* or *Public Citizen*).  And the D.C. Circuit has reaffirmed *Ryan* and its progeny on at least three occasions since *Klamath*.  *See Jud. Watch, Inc.*, 412 F.3d at 130 (noting "the principle, well

15

established in this circuit, that a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency'"); *NIMJ*, 512 F.3d at 684 (noting the continuation of the consultant corollary post-*Klamath*); *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 336-37 (D.C. Cir. 2011) (applying the consultant corollary).

Here, the withheld communications between the Voting Section attorneys and attorneys at the Common Interest Group fit squarely within this model.  The Voting Section attorneys communicated with the Common Interest Group to develop litigation strategy, share legal research, and discuss potential approaches to the ongoing litigation regarding Georgia's voting law.  *See, e.g.*, Russ Decl. ¶ 28-29, 40; *see generally Vaughn* Index, Kagle Decl., Ex. E.  These communications occurred as part of the common project of enforcing the Voting Rights Act and prevailing in the ongoing litigation brought by the United States and the others in the Common Interest Group, as memorialized in the several common interest agreements.  Russ Decl. ¶¶ 8-10, 25-26.  Communications with the Common Interest Group aided the Voting Section in developing litigation strategy, avoiding burdening the judge with duplicative testimony or witnesses with uncoordinated outreach, and coordinating for joint filings.  *See, e.g.*, Russ Decl. ¶¶ 28-30, 40-41. This is analogous to, for example, the coordination of governmental lawyers and nongovernmental lawyers on potential regulations for terrorist trial commissions, which the D.C. Circuit found protected by Exemption 5 in *NIMJ*.  512 F.3d at 679-87.

Accordingly, the Voting Section's communications coordinating litigation decisions and strategies with the Common Interest Group, where the government and the Group share common litigation interests, fall within the threshold requirement of Exemption 5.  "Because the common interest doctrine requires the agency to determine that the public interest and the litigation partner's interest have converged, communications between the agency and its partner can be understood as

'intra-agency' for purposes of Exemption 5.  By cooperating with the agency in pursuit of the agency's own litigation aims, the litigation partner in a limited sense becomes a part of the enterprise that the agency is carrying out."  *Hunton & Williams v. DOJ*, 590 F.3d 272, 280 (4th Cir. 2010) (citing *Ryan*, 617 F.2d at 789).

Indeed, courts in this circuit have recognized that the consultant corollary is satisfied even when the government coordinates for shared benefit with outsiders using less formal structures than existed here.  *See, e.g.*, *Am. Oversight, Inc. v. Dep't of Health & Hum. Servs.*, No. CV 17-827(EGS/DAR), 2022 WL 1719001, at *12-15 (D.D.C. May 27, 2022) (holding that materials shared between the Department of Health and Human Services (HHS) and congressional entities were protected from disclosure by Exemption 5 because HHS's work with the congressional entities on proposed health care reform legislation satisfied the consultant corollary doctrine); *Am. Oversight v. Dep't of Transportation*, No. CV 18-1272 (CKK), 2022 WL 103306, at *2-6 (D.D.C. Jan. 11, 2022) (holding that materials shared between the Department of Transportation and congressional entities were protected from disclosure by Exemption 5 because their work together on draft legislation satisfied the consultant corollary doctrine); *Am. Oversight v. Dep't of the Treasury*, 474 F. Supp. 3d 251, 262-68 (D.D.C. 2020) (recognizing that materials shared between the Department of the Treasury and congressional entities were protected from disclosure by Exemption 5 because the cooperative relationship between Treasury and the congressional entities in developing tax reform legislation satisfied the consultant corollary doctrine).

Nor does any exception to the consultant corollary apply.  The withheld communications here are "part and parcel of the agency's deliberative process," *Dow Jones & Co., Inc. v. DOJ*, 917 F.2d 571, 575 (D.C. Cir. 1990), because the Voting Section used the communications as part of its decisionmaking process regarding litigation strategy.  *Infra* Part II.C.  Nor is this the case where

the Common Interest Group is "seeking a Government benefit at the expense of other applicants," which the Supreme Court cautioned in *Klamath* might void the intra-agency requirement.  532 U.S. at 12 n.4.  To the contrary, the Voting Section's coordination with the Common Interest Group is for the purpose of pursuing the shared project of enforcing the Voting Rights Act and prevailing in the Georgia lawsuits.

> **2.    The Attorney Work-Product Doctrine Continues to Apply to Material Shared Within the Common Interest Group.**

Similarly, because the Voting Section and the Common Interest Group were pursuing a common interest, the attorney work-product doctrine continues to apply to the materials they exchanged.  Although the attorney-work product doctrine can be waived if "the work product is disclosed to a third party who does not share a 'common interest in developing legal theories and analyses of documents' with the primary party," it is not waived where the "disclosure to a third party [] promotes the client's trial strategy and is consistent with maintaining secrecy against trial opponents." *Jud. Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 268 (D.D.C. 2004) (quoting *In re Sealed Case*, 676 F.2d 793, 817 (D.C. Cir. 1982) and citing *In re Lindsey*, 158 F.3d 1263, 1282 (D.C. Cir. 1998) and *United States v. AT & T Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)). That is because "[i]t would eviscerate the meaning of Exemption 5 if we were to read it to exclude communications between federal agencies and their litigation partners where those communications advance an interest that is both common and, in the government's considered view, critical to the public's interest." *Hunton & Williams*, 590 F.3d at 279.

The United States and the rest of the Common Interest Group share a common interest in "enforcing the U.S. Constitution and federal voting rights laws" as well as prevailing in their lawsuits against Georgia's voting law.   Russ Decl. ¶¶ 25-26.   This common interest was memorialized in several places.  For one, a July 28, 2021 email among plaintiffs' counsel in seven

of the cases[4] confirmed the understanding that they "share a common interest in the successful prosecution of this litigation, and that they may share (but are not required to share) privileged communications and other litigation material between and among them without waiving the attorney-client privilege, the work product protection or any other privilege or protection."  Russ Decl. ¶ 8 & Ex. 2.  That email noted that the agreement included "any other counsel associated with [the recipients], in the suits they have filed challenging the Georgia law known as SB 202."  Russ Decl. ¶ 9 & Ex. 2.  In February 2022, plaintiffs in the seven previously-mentioned cases and the eighth of the Georgia cases (*Coalition for Good Governance v. Raffensperger*, No. 1:21-cv-2070 (N.D. Ga., complaint filed May 17, 2021)), further entered into an additional, more formal common interest agreement.  Russ Decl. ¶ 10 & Ex. 3.

Here, therefore, the withheld materials, which were developed in coordination between Voting Section attorneys and attorneys at the Common Interest Group, remain protected by the attorney work-product doctrine.  *See, e.g.*, *Am. Small Bus. League v. Dep't of Def.*, 372 F. Supp. 3d 1018, 1030 (N.D. Cal. 2019) (concluding that the attorney client privilege and attorney work-product doctrine components of Exemption 5 could protect information exchange between the government and a private litigant pursuant to a joint litigation strategy because "FOIA does not strip the government of its civil discovery privileges" (citation omitted)); *see also infra* Part II.B (explaining the application of the attorney work-product doctrine).

---

[4] The seven cases are: *New Georgia Project v. Raffensperger*, No. 1:21-cv-1229; *Georgia NAACP v. Raffensperger*, No. 1:21-cv-1259 (N.D. Ga., complaint filed Mar. 28, 2021); *Sixth District of the AME Church v. Kemp*, No. 1:21-cv-1284 (N.D. Ga., complaint filed Mar. 29, 2021); *AAAJ v. Raffensperger*, No. 1:21-cv-1333 (N.D. Ga., complaint filed April 1, 2021); *VoteAmerica v. Raffensperger*, No. 1:21-cv-1390 (N.D. Ga., complaint filed April 7, 2021); *Concerned Black Clergy of Metro Atlanta v. Raffensperger*, No. 1:21-cv-1728 (N.D. Ga., complaint filed April 27, 2021); and *United States v. Georgia*, No. 1:21-cv-2575.  Russ Decl. ¶ 9 & Ex. 2.

\*      \*      \*

As the facts of this case demonstrate, the application of Exemption 5 to privileged material reflecting coordination between government attorneys and outside attorneys in pursuant of a common interest makes perfect sense in light of the important policy objectives served by Exemption 5.  It is the "clear thrust" of Exemption 5 "to ensure that FOIA does not deprive the government of the work-product and attorney-client protections otherwise available to it in litigation." *Hunton & Williams*, 590 F.3d at 278.

If the government lost the ability to rely on the ordinary litigation privileges enjoyed by other litigants, it "would cause grave injury to the United States' ability to pursue complex litigation involving multiple plaintiffs all pursuing the enforcement of the Voting Rights Act and other federal voting rights statutes," Russ Decl. ¶ 34, by revealing "litigation strategy decisions," "harm[ing] future cooperation among the plaintiffs," and giving the defendants in the Georgia voting lawsuits "insight . . . on the Department's litigation strategy," Russ Decl. ¶ 32; *see also* Russ Decl. ¶¶ 35-37.  In addition, losing the ability to coordinate in a privileged fashion would ultimately harm the efficient operation of the courts, which often call upon the Department to coordinate with others, particularly in complex Voting Rights Act cases.  Russ Decl. ¶¶ 33-34. Indeed, "[n]othing in the 'inter-agency or intra-agency' language in Exemption 5 demands that the government, alone among all litigants, be stripped of civil discovery privileges when it has done nothing more than communicate with other litigating parties with whom it shares a singular and unitary litigation interest.  [T]hose deliberative privileges that other litigants enjoy . . . are widely recognized as necessary 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Hunton & Williams*, 590 F.3d at 278 (citation omitted); *see also id.* at 278-79 ("[O]ne

side in litigation cannot play by one set of rules and another side play by a more privileged set of rules. . . . Further, in the absence of coordination, the government—or any party whose interests align with the government's—might find its position strafed inadvertently by 'friendly fire.' These are just a few of the problems created when one litigant is denied privileges accorded to all others. FOIA does not require the government to litigate on such distinctly disadvantageous terms."). Accordingly, this Court should not narrow the D.C. Circuit's reading of Exemption 5 to impose such an undesirable result.

**B. CRT Properly Withheld Material Protected by the Attorney Work-Product Doctrine Created in Preparation for the Ongoing Litigation, Including Litigation Strategy Information.**

CRT withheld limited information from its productions on attorney work-product grounds because the material comprised discussions developing litigation decisions, litigation strategy, and legal research for the cases brought by the Common Interest Group to challenge Georgia's voting law.

"The attorney work product privilege 'shields materials prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).'" *Leopold v. DOJ*, 487 F. Supp. 3d 1, 10-11 (D.D.C. 2020) (quoting *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 341 (D.C. Cir. 2011)). It protects "factual materials prepared in anticipation of litigation, as well as mental impressions, conclusions, opinions, and legal theories." *Heggestad v. DOJ*, 182 F. Supp. 2d 1, 8 (D.D.C. 2000) (citing *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 620 (D.C. Cir. 1997)); *cf.* Fed. R. Civ. P. 26(b)(3) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).").

The purpose of the doctrine is to protect the adversarial litigation process by insulating attorneys' preparations from scrutiny. *See Jud. Watch, Inc. v. DHS*, 926 F. Supp. 2d 121, 142 (D.D.C. 2013) ("[T]he purpose of the privilege is to encourage effective legal representation within the framework of the adversary system by removing counsel's fears that his thoughts and information will be invaded by his adversary." (quoting *Jordan v. DOJ*, 591 F.2d 753, 775 (D.C. Cir. 1978)). Accordingly, the attorney work-product doctrine "should be interpreted broadly and held largely inviolate." *Jud. Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005); *see also id.* at 369-70 ("[I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)). Were a lawyer's "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other [forms of attorney work product]" "open to opposing counsel on mere demand," then lawyers would have to avoid creating such materials and "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. . . . And the interests of the clients and the cause of justice would be poorly served." *Id.* at 370 (quoting *Hickman*, 329 U.S. at 510-11).

Here, the material withheld pursuant to the attorney work-product doctrine was "prepared by attorneys for the United States or attorneys for the Common Interest Group," Russ Decl. ¶ 28, and exchanged in communications between them. *See generally Vaughn* Index, Kagle Decl., Ex. E. The material was created for use regarding the ongoing lawsuit; indeed, all of the withheld material was created after the United States already filed its lawsuit concerning Georgia's election law. Russ Decl. ¶ 28.

The withheld materials include discussions of "legal strategy, potential witnesses, types of discovery needed, division of labor in a case that would likely be consolidated, and the efficient

presentation of the case," as well as "legal research and attorney notes" and "related communications among Department attorneys and the Common Interest Group regarding litigation strategy." Russ Decl.¶ 28; *see generally Vaughn* Index, Kagle Decl. Ex. E; *see also, e.g.*, *Vaughn* Index entry for GA000601, Kagle Decl., Ex. E ("Redacted material comprises litigation strategy topics and discussion thereof that precedes DOJ's litigation decisions and reflects material created by attorneys for ongoing litigation[.]"); *Vaughn* Index entry for GA000649, Kagle Decl., Ex. E (noting that redacted material comprises "discussions [between CRT attorneys and non-governmental common interest attorneys] about a possible response to inquiries and litigation strategy related to research, potential positions on related claims and interviews"); *Vaughn* Index entry for GA000872, Kagle Decl., Ex. E ("This draft document . . . contains legal research related to the litigation and is marked 'privileged and confidential,' 'attorney work product' and 'common interest privilege.'"). This is classically attorney work-product material, the disclosure of which would reveal the mental impressions and preparations of the attorneys in the Common Interest Group, and should therefore be kept confidential.

Publicly revealing these materials would cause foreseeable harm by negatively affecting DOJ's ability to conduct the ongoing Georgia voting lawsuit. Russ Decl. ¶¶ 29-30. Like any litigant, DOJ benefits from the ability to discuss litigation strategy without revealing its plans to its adversary. *Cf.* Russ Decl. ¶ 32. Furthermore, courts presiding over Voting Rights Act cases in particular frequently order the United States to coordinate with other litigants—for example, to coordinate discovery or submit combined filings—and compelling DOJ to publicly reveal communications about these communications would impede DOJ's ability to participate in such coordination and ultimately negatively affect the efficiency of the judicial system. Russ Decl. ¶¶ 30-37. And here, the lawsuits against Georgia concerning Georgia's voting law are currently

ongoing, which means that the "need to protect attorney work product is at its greatest." *Wisdom v. United States Tr. Program*, 266 F. Supp. 3d 93, 108 (D.D.C. 2017) (quoting *FTC v. Grolier Inc.*, 462 U.S. 19, 30 (1983)).  Accordingly, courts in this circuit have recognized that withholding attorney work product protected material satisfies the foreseeable harm standard because disclosure would "indirectly reveal the mental impressions, assessments, and thought processes of the attorneys involved in the investigation" which would "inhibit the flexibility" of attorneys to pursue future investigations.  *Leopold v. DOJ*, 487 F. Supp. 3d 1, 10 n.4 (D.D.C. 2020).

### C. CRT Also Properly Withheld Information Protected by the Deliberative Process Privilege Which Would Reveal CRT's Deliberative Process in Making Litigation Decisions.

CRT also withheld limited information pursuant to the deliberative process privilege, because the information would reveal CRT's deliberative process in making litigation decisions in the ongoing lawsuit.

The deliberative process privilege protects "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citation omitted).  "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."  *Klamath*, 532 U.S. at 8-9 (citations omitted).  The privilege also "protects the public from the confusion that would result from premature exposure to discussions occurring before" a final decision has been made and ensures "the integrity of the decision-making process itself by confirming that officials should be judged by what they decided, not for matters they considered before making up their minds."

*Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quotation marks, alterations, and citation omitted).

To come within the scope of the deliberative process privilege, a document must be both predecisional and deliberative. *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980). A document is predecisional if "it was generated before the adoption of an agency policy," and it is deliberative if "it reflects the give-and-take of the consultative process." *Id.* "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Jud. Watch Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst.*, 889 F.2d at 1223). Accordingly, "even if an internal discussion does not lead to the adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process." *Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135-36 (D.D.C. 2011) (citation omitted). When evaluating deliberative process claims, courts "must give considerable deference to the agency's explanation of its decisional process, due to the agency's expertise in determining what confidentiality is needed to prevent injury to the quality of agency decisions, while the decisionmaking process is in progress." *Pfeiffer v. CIA*, 721 F. Supp. 337, 340 (D.D.C. 1989) (citation omitted).

The material CRT withheld pursuant to the deliberative process is both predecisional and deliberative. This material is predecisional because it preceded DOJ's ultimate litigation decisions in the Georgia voting lawsuit. Russ Decl. ¶ 40. The information formed an integral part of the Voting Section's "process for making litigation strategy and coordination decisions," including

"decisions about witnesses to call in the presentation of the Department's case to the court and arguments to make on legal issues."  Russ Decl. ¶ 40.

At all stages of the Georgia voting lawsuit, the Voting Section has faced and continues to face a number of decisions regarding litigation strategy and how to proceed with its case.  While lawyers in the Voting Section frequently consulted purely among DOJ personnel on these issues (and such communications would not be responsive to Georgia's request), Voting Section lawyers also at times consulted with the Common Interest Group on these deliberations, in order to execute a combined strategy, coordinate litigation approaches, or simply gain input on the deliberations at hand.  The materials withheld pursuant to the deliberative process privilege were exchanged between "staff attorneys at the Voting Section" and members of the Common Interest Group.  Russ Decl. ¶ 40.  The withheld material included discussions of "legal strategy, potential witnesses, types of discovery needed, the division of labor among members of the Common Interest Group, legal research, and attorney notes."  Russ Decl. ¶ 40; *see, e.g.*, *Vaughn* index entry for GA000698, Kagle Decl., Ex. E ("Emails between CRT attorneys and non-governmental common interest attorneys with partial subject line and email body redactions of communications about possible response to inquiries and litigation strategy related to research, potential positions on related claims and interviews."); *Vaughn* index entry for GA000878, Kagle  Decl., Ex. E ("Emails between CRT attorneys and non-governmental common interest attorneys redacted for deliberative discussions of interviews and legal strategy.").  The withheld material was used to make "litigation strategy and coordination decisions, including decisions about witnesses to call in the presentation of the Department's case to the court and arguments to make on legal issues" by the decisionmakers for those processes, who were in some cases the staff attorneys at the Voting Section who sent and received the emails, and in other cases Voting Section leadership.  Russ Decl. ¶ 40.  Accordingly,

these emails formed "an integral part of [the agency's] deliberative process," and are exempt from disclosure. *Ryan v. DOJ*, 617 F.2d 781, 789 (D.C. Cir. 1980).

Requiring CRT to disclose the withheld material would frustrate the purpose of the deliberative process privilege and cause foreseeable harm. As the Supreme Court has long recognized, "those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision making process." *Sears, Roebuck & Co.*, 421 U.S. at 150-51 (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)). The deliberative process privilege thus protects agencies from "operat[ing] in a fishbowl," and preserves "the frank exchange of ideas and opinions" that is necessary for effective decision-making. *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014) (quoting *Dudman Commc'ns. Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1567 (D.C. Cir. 1987)). Here, disclosing the withheld information would chill VOT's ability to engage in deliberations about litigation strategy, and "impede the Department's ability to consult with counsel sharing a common interest about such litigation strategy issues, which would harm the Department's decision-making processes in shared litigation matters by reducing the free flow of information and coordination among entities sharing a common interest." Russ Decl. ¶ 41. At bottom, the disclosure of the sensitive information that Georgia seeks would cause foreseeable harm by impairing the government decisionmaking that the deliberative process privilege is meant to protect.

## III.   CRT Properly Released All Reasonably Segregable Information.

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). But an agency need not disclose records in which the nonexempt information remaining is meaningless. *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d

211, 220-21 (D.D.C. 2005).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  And a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated."  *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008).

In addition, segregation between factual and deliberative material is not required when material is protected by the attorney work-product doctrine.  Indeed, "[a]ny part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5."  *Jud. Watch, Inc. v. DOJ*, 432 F.3d at 371 (quoting *Tax Analysts*, 117 F.3d at 620).  Nonetheless, in the interests of transparency for the public, CRT has endeavored to release the greatest amount possible of each responsive record, generally choosing to produce redacted versions rather than withhold material in full.  CRT conducted a careful line-by-line review of each record and released all information that could be segregated out and disclosed.  Kagle Decl. ¶ 36; Russ Decl. ¶ 42.  The six records that CRT withheld in full were draft documents containing litigation strategy and plans and legal research, which are protected in their entirety by the deliberative process privilege and attorney-work product doctrine.  *See Vaughn* Index, Kagle Decl., Ex. E (see entries for records GA000618, GA000671, GA000702, GA000839, GA000872, and GA000942).  Defendant has therefore complied with its segregability obligations.

## **CONCLUSION**

For the previously stated reasons, Defendant respectfully requests that this Court grant its motion for summary judgment.

Dated: August 25, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Rebecca  Kopplin*
REBECCA KOPPLIN
Trial Attorney (California Bar No. 313970)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C.  20005
Telephone:  (202) 514-3953
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Defendant*