**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF GEORGIA, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:21-cv-3138 (TNM) |
| UNITED STATES DEPARTMENT OF JUSTICE, | |
| Defendant. | |

**DECLARATION OF BRIAN J. FIELD**

I, Brian James Field, declare as follows:

1.      All facts set forth herein are based on my personal knowledge.

2.      I am an attorney with Schaerr | Jaffe PLLC, and I serve as counsel for Plaintiffs in the above-captioned action.

3.      Attached hereto as Exhibit 1 is a true and accurate copy of the First Amended Complaint filed in *Asian Americans Advancing Justice–Atlanta v. Raffensperger*, No. 1:21-cv-01333-JPB (N.D. Ga. filed Apr. 27, 2021).

4.      Attached hereto as Exhibit 2 is a true and accurate copy of the Complaint filed in *Concerned Black Clergy of Metropolitan Atlanta, Inc. v. Raffensperger*, No. 1:21-cv-01728-JPB (N.D. Ga. filed Apr. 27, 2021).

5.      Attached hereto as Exhibit 3 is a true and accurate copy of the First Amended Complaint filed in *Sixth District of the African Methodist Episcopal Church v. Kemp*, No. 1:21-cv-01284-JPB (N.D. Ga. filed May 24, 2021).

6.      Attached hereto as Exhibit 4 is a true and accurate copy of the First Amended Complaint filed in *The New Georgia Project v. Raffensperger*, No. 1:21-cv-01229-JPB (N.D. Ga. filed May 17, 2021).

7.    Attached hereto as Exhibit 5 is a true and accurate copy of the First Amended Complaint filed in *Georgia State Conference of the NAACP v. Raffensperger*, No. 1:21-cv-01259-JPB (N.D. Ga. filed May 28, 2021).

8.    Attached hereto as Exhibit 6 is a true and accurate copy of the Complaint filed in *United States v. Georgia*, No. 1:21-cv-02575-JPB (N.D. Ga. filed June 25, 2021).

9.    Attached hereto as Exhibit 7 is a true and accurate copy of the Complaint filed in *VoteAmerica v. Raffensperger*, No. 1:21-cv-01390-JPB (N.D. Ga. Apr. 7, 2021).

10.   Attached hereto as Exhibit 8 is a true and accurate copy of the First Amended Complaint filed in *Coalition for Good Governance v. Kemp*, No. 1:21-cv-2070-JPB (N.D. Ga. filed June 11, 2021).

11.   Attached hereto as Exhibit 9 is a true and accurate copy of the State Defendants' Consolidated Statement on Consolidation of *SB 202* Cases, *Asian Americans Advancing Justice-Atlanta v. Raffensperger*, No. 1:21-cv-01333-JPB (N.D. Ga. filed Dec. 14, 2021).

I declare under penalty of perjury that the foregoing is true and correct.

$\underline{9/29/22}$
Date

Brian J. Field

2

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA, STEVEN J. PAIK, DEEPUM PATEL, NORA AQUINO, THUY HANG TRAN, THAO TRAN, and ANJALI ENJETI-SYDOW, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; REBECCA SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID WORLEY, in his official capacity as a member of the Georgia State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board; and ANH LE, in her official capacity as a member of the Georgia State Election Board, CLAYTON COUNTY BOARD OF ELECTIONS AND REGISTRATION, DARLENE JOHNSON, DIANE GIVENS, CAROL WESLEY, DOROTHY F. HALL, and PATRICIA PULLAR, Members of the Clayton County Board of Elections and Registration, in their official capacities, SHAUNA DOZIER, Clayton County Elections Director, in her official | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 1:21-CV-01333-JPB  **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1

capacity, COBB COUNTY BOARD
OF ELECTIONS AND
REGISTRATION, PHIL DANIELL,
FRED AIKEN, PAT GARTLAND,
JESSICA M. BROOKS, and DARRYL
O. WILSON, JR., Members of the Cobb
County Board of Elections and
Registration, in their official capacities,
JANINE EVELER, Director of the
Cobb County Board of Elections and
Registration, in her official capacity,
DEKALB COUNTY BOARD OF
REGISTRATIONS AND
ELECTIONS, ANTHONY LEWIS,
SUSAN MOTTER, DELE L. SMITH,
SAMUEL E. TILLMAN, and BAOKY
N. VU, Members of the DeKalb County
Board of Registrations and Elections, in
their official capacities, ERICA
HAMILTON, Director of Voter
Registration and Elections in DeKalb
County, in her official capacity,
FORSYTH COUNTY BOARD OF
VOTER REGISTRATIONS AND
ELECTIONS, BARBARA LUTH,
MATTHEW BLENDER, JOEL NATT,
CARLA RADZIKINAS, and RANDY
INGRAM, Members of the Forsyth
County Registration and Elections
Board, in their official capacities,
MANDI B. SMITH, Director of the
Forsyth County Board of Elections and
Registration, in her official capacity,
FULTON COUNTY REGISTRATION
AND ELECTIONS BOARD, ALEX
WAN, MARK WINGATE,
KATHLEEN D. RUTH, VERNETTA

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2

K. NURIDDIN, and AARON V. )
JOHNSON, Members of the Fulton )
County Registration and Elections )
Board, in their official capacities, )
RICHARD L. BARRON, Director of )
the Fulton County Registrations and )
Elections board, in his official capacity, )
GWINNETT COUNTY BOARD OF )
REGISTRATIONS AND )
ELECTIONS, ALICE O'LENICK, )
WANDY TAYLOR, STEPHEN W. )
DAY, JOHN MANGANO, GEORGE )
AWUKU, and SANTIAGO )
MARQUEZ, Members of the Gwinnett )
County Board of Registrations and )
Elections, in their official capacities, )
LYNN LEDFORD, Director of the )
Gwinnett County Board of )
Registrations and Elections, in her )
official capacity. )
)
)

       Defendants.

_____

# FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND
## DECLARATORY RELIEF

       Plaintiffs ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA ("Advancing Justice–Atlanta"), STEVEN J. PAIK, DEEPUM PATEL, NORA AQUINO, THUY HANG TRAN, THAO TRAN, and ANJALI ENJETI-SYDOW (collectively, "Plaintiffs") file this First Amended Complaint for Declaratory and Injunctive Relief against Defendants BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State (the "Secretary"); REBECCA

SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID WORLEY, MATTHEW MASHBURN, and ANH LE, each in their official capacity as a member of the Georgia State Election Board; CLAYTON COUNTY BOARD OF ELECTIONS AND REGISTRATION, DARLENE JOHNSON, DIANE GIVENS, CAROL WESLEY, DOROTHY F. HALL, and PATRICIA PULLAR, Members of the Clayton County Board of Elections and Registration, in their official capacities; SHAUNA DOZIER, Clayton County Elections Director, in her official capacity; COBB COUNTY BOARD OF ELECTIONS AND REGISTRATION, PHIL DANIELL, FRED AIKEN, PAT GARTLAND, JESSICA M. BROOKS, and DARRYL O. WILSON, JR., Members of the Cobb County Board of Elections and Registration, in their official capacities; JANINE EVELER, Director of the Cobb County Board of Elections and Registration, in her official capacity; DEKALB COUNTY BOARD OF REGISTRATIONS AND ELECTIONS, ANTHONY LEWIS, SUSAN MOTTER, DELE L. SMITH, SAMUEL E. TILLMAN, and BAOKY N. VU, Members of the DeKalb County Board of Registrations and Elections, in their official capacities; ERICA HAMILTON, Director of Voter Registration and Elections in DeKalb County, in her official capacity; FORSYTH COUNTY BOARD OF VOTER REGISTRATIONS AND ELECTIONS, BARBARA LUTH, MATTHEW BLENDER, JOEL NATT, CARLA RADZIKINAS, and RANDY INGRAM, Members of the Forsyth County Registration and Elections Board, in their official capacities; MANDI B. SMITH, Director of the Forsyth County Board of Elections and Registration, in her official capacity; FULTON COUNTY REGISTRATION AND ELECTIONS BOARD, ALEX WAN, MARK WINGATE, KATHLEEN D. RUTH, VERNETTA K. NURIDDIN, and AARON V. JOHNSON, Members of the

Fulton County Registration and Elections Board, in their official capacities; RICHARD L. BARRON, Director of the Fulton County Registrations and Elections board, in his official capacity; GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS, ALICE O'LENICK, WANDY TAYLOR, STEPHEN W. DAY, JOHN MANGANO, GEORGE AWUKU, and SANTIAGO MARQUEZ, Members of the Gwinnett County Board of Registrations and Elections, in their official capacities; LYNN LEDFORD, Director of the Gwinnett County Board of Registrations and Elections, in her official capacity, and allege as follows:

## I.      INTRODUCTION

1.      Georgia voters' performance in the 2020 election cycle was a triumph for American democracy. In the face of numerous obstacles, including a global pandemic, Georgia held a safe and secure election, in which millions of Georgians were able to make their voices heard. Asian American and Pacific Islander ("AAPI") voters personified Georgia's successes. AAPI voter turnout in Georgia nearly *doubled* between the 2016 and 2020 elections. The widespread availability of absentee-by-mail ballots, also known as mail-in ballots, played a key role in this record turnout. During the 2020 election cycle, AAPIs voted by absentee-by-mail ballot at a higher rate than any other racial group in Georgia. Local election officials and civic groups, such as Plaintiff Advancing Justice–Atlanta, played a key role in helping AAPI voters exercise their rights to participate in the democratic process.

2.      Rather than celebrate and build upon these successes, the Georgia legislature has emphatically rejected them. Senate Bill 202 ("SB 202"), adopted in the immediate aftermath of record turnout from AAPI and other voters of color, systematically undermines or outright prohibits the election procedures that helped

facilitate AAPI participation in the 2020 Presidential election ("General Election") and subsequent 2021 U.S. Senate runoff elections ("Runoff Elections"). SB 202 perpetrates explicit and per se voter suppression. In particular, SB 202 erects new obstacles to voting that burden the rights of AAPI voters and other voters of color.

3.    Unfortunately, these tactics are familiar. Georgia's long history of racially discriminatory election procedures is well-established, and the rhetoric and circumstances around SB 202's passage place the bill squarely in the lineage of prior attempts to suppress non-white voters. But from poll taxes to "white primaries" to literacy tests, courts have rejected past efforts to deny Georgia voters of color equal access to the democratic process. SB 202 should meet the same fate on the scrap heap of history.

4.    SB 202's discriminatory overhaul of Georgia's election procedures is particularly harmful to AAPI voters with respect to the numerous ways in which it restricts absentee-by-mail voting. SB 202 dramatically reduces the time during which voters may request and return absentee-by-mail ballots, eliminates drop-off locations, bars local and state officials from proactively mailing absentee ballot applications, imposes new, burdensome voter identification requirements, and criminalizes certain handling and return of completed absentee ballot applications.

5.    No community will feel SB 202's baseless restrictions on absentee voting more forcefully than AAPI voters. During the General Election, AAPI voters relied on absentee-by-mail voting at a rate higher than all groups of voters. Approximately 40% of AAPI voters cast absentee-by-mail ballots, compared to the overall absentee-by-mail voting rate of around 26%. Similarly, during the Runoff Elections, approximately 34% of AAPI voters cast absentee ballots by mail, compared to the overall absentee voting rate of around 24%. Further demonstrating

a preference for mail-in voting, roughly one-third of Georgia's AAPI registered voters requested absentee ballots in the General Election—a higher rate of application than the average across all racial groups.

6.      As these statistics reflect, absentee-by-mail ballots facilitate greater AAPI participation in Georgia's elections. The Asian American community has a higher proportion of foreign-born residents compared to other racial groups in Georgia, and limited English proficiency ("LEP") remains common in the Georgia Asian American community. Newly naturalized citizens, first time voters, and LEP voters often need more time to review their ballot materials and/or seek assistance from persons authorized under Georgia law. Absentee-by-mail voting allows these voters crucial time and resources that may be less available or accessible through in-person voting.

7.      The hurdles that absentee-by-mail voting aim to overcome have only been exacerbated for the AAPI community by the COVID-19 pandemic. The global pandemic has contributed to a surge in anti-AAPI violence, due in part to use of racist slurs like "China virus" or "kung flu" to refer to coronavirus. Incidents of violence or harassment against the AAPI community are not a new phenomenon but jumped by almost 150% in 2020. Nearly 3,800 anti-AAPI hate incidents were reported from March 19, 2020 to February 28, 2021, the majority of which were reported by AAPI women. This alarming escalation in threats and harassment has created a climate in which many Asian Americans fear for their safety in unfamiliar public places, further complicating the participation of Asian American voters in 2020 and 2021.

8.      These fears were heartbreakingly realized on March 16, 2021, when a white gunman murdered six women of Asian descent at Asian-owned spas in the

Atlanta area. In the wake of that mass shooting, and in light of frequent and continuing reports across the country of AAPI-targeted assaults and killings, many Asian American voters in Georgia feel much less safe in public spaces. Given this ongoing spate of anti-Asian violence, the accessibility of absentee-by-mail voting has taken on particular importance for the AAPI community.

9.     Especially considering the continuing and compelling need for maintaining the absentee voting procedures Georgia employed in the 2020 election cycle, SB 202's sponsors have provided no justification for undermining those procedures. Despite having the most scrutinized state election count in a generation, Georgia election officials found no significant irregularities or fraud in any method of voting, including the extensive use of absentee-by-mail voting. Claims disputing the validity of absentee ballots have been repeatedly rejected by Georgia officials and the courts. The most recent elections were, in the words of Secretary Raffensperger, "secure, reliable, and efficient."

10.     In contrast to the well-documented integrity of Georgia's most recent elections, SB 202's sponsors have put forth no credible evidence to justify their sweeping overhaul of Georgia's election procedures. Through a rushed and closed-door legislative process, the General Assembly ignored numerous public outcries warning that the bill would disproportionately impact Georgia's voters of color. While the state legislature chose to disregard the discriminatory effects of SB 202, the courts should not.

11.     SB 202's challenged provisions deny AAPI voters a full and equal opportunity to participate in the political process. By both purposeful intent and resulting impact, the challenged provisions violate Section 2 of the Voting Rights

Act ("VRA") of 1965, as well as the rights of voters of color under the Fourteenth and Fifteenth Amendments to the United States Constitution.

12.     The challenged provisions further violate the right to vote of all Georgia voters under the First and Fourteenth Amendments to the United States Constitution. Any state restriction on the right to vote, no matter how slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quotation marks omitted). In addition to its impermissible discriminatory impacts, SB 202 imposes severe burdens on all voters' fundamental rights, without any relevant and legitimate state interest to justify them.

13.     After the record-setting turnout in the 2020 election cycle by voters of color, including AAPI voters, SB 202 is an obvious attempt to roll back the clock to the racially-restrictive voting practices of Georgia's discredited past. That attempt should be categorically rejected. Accordingly, this Court should declare the challenged sections of SB 202 unlawful and unconstitutional and permanently enjoin their enforcement.

## II.     JURISDICTION AND VENUE

14.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

15.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

16.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

17.     Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) and under Local Civ. R. 3.1 because, *inter alia*, several defendants reside in this district and this division, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district. Plaintiffs also operate and/or reside within this district and division.

18.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

### III.   PARTIES

19.     By carrying out the challenged provisions of SB 202, Defendants cause organizational and individual harm to Plaintiffs.

20.     Plaintiff Advancing Justice–Atlanta is a nonpartisan, nonprofit organization founded in 2010 and located in Norcross, Georgia. Advancing Justice–Atlanta is dedicated to protecting the civil rights of AAPIs and other immigrant communities in Georgia through policy advocacy, civic engagement and organizing, legal services, and litigation. As part of its civic engagement and organizing work, Advancing Justice–Atlanta engages in voter registration, get out the vote ("GOTV"), and election protection activities in local, state, and federal elections, with a primary focus on AAPI communities.[1] Advancing Justice–Atlanta conducts its GOTV work

---

[1] Plaintiffs recognize myriad diversities among and within Asian American, Asian and Asian immigrant, and Native Hawaiian and Pacific Islander communities, including distinct characteristics, histories, and experiences of these groups, and differences in how they encounter discrimination in Georgia and beyond. Plaintiff uses the term "Asian American" or "AAPI" (Asian American Pacific Islander) generally in reference to the communities with whom it works currently in Georgia, and in the context of aggregated data that does not distinguish between Asian American and the Native Hawaiian and Pacific Islander communities.

and other voter protection work across the state, including in the counties in which Defendants operate. Advancing Justice–Atlanta conducts all of its election-related activities in English and multiple non-English languages. Its GOTV efforts for the June 2020 primary, General Election, and Runoff Elections included outreach to thousands of Georgia voters in Korean, Chinese, Vietnamese, Hindi, and Spanish encouraging them to vote early in person or by mail. Advancing Justice–Atlanta also assists voters with navigating different steps of the voting process, including helping them return completed absentee ballot applications.

21.    SB 202 will impair Advancing Justice–Atlanta's ability to engage in its projects by forcing the organization to divert resources and undertake significant efforts to counteract and stem the negative impact that SB 202 will have on AAPI voters and other LEP voters' ability to vote absentee-by-mail.[2] These efforts will include educating voters on new restrictions related to voting by mail, such as the shortened time window for requesting an absentee ballot; the new photo ID requirement for requesting an absentee ballot; limitations upon absentee ballot drop-off locations; prohibitions on who can return a completed absentee ballot application; and further information that voters must provide on their absentee ballots. SB 202 will require Advancing Justice–Atlanta to expend additional voter-education efforts, such as producing significant print and digital materials;

---

[2] Throughout this First Amended Complaint, references to "absentee-by-mail voting," "absentee voting," "mail-in voting," and all similar variations refer to mailing an absentee ballot using the postal service, hand delivering an absentee ballot to the county registrar, or dropping off an absentee ballot at an official drop box. The terms do not refer to early in-person voting using the ballot marking device voting machines.

translating these materials into multiple languages; and distributing them through various channels, including social media, traditional media, ethnic media, and text messaging platforms. Advancing Justice–Atlanta will need to train staff and educate its community partners on SB 202's changes to the voting by mail process.

22.    Advancing Justice–Atlanta will also need to help AAPI and other LEP voters navigate or resolve higher voting hurdles they will face under SB 202. For example, Advancing Justice–Atlanta will need to identify and assist voters whose absentee ballot applications are rejected for failure to submit required ID documents or voters whose absentee ballots are rejected because of missing or mismatching identifying information on their ballots. Advancing Justice–Atlanta will also be required to create, translate, and distribute guides to AAPI communities explaining how voters can cure these errors.

23.    All of these efforts will require Advancing Justice–Atlanta to divert significant financial and organizational resources to minimize the harmful effects that SB 202, particularly its changes to absentee-by-mail voting, will have on AAPI communities. This diversion of resources will deplete the already limited resources Advancing Justice–Atlanta otherwise devotes to existing GOTV and election protection efforts.

24.    Plaintiff Steven J. Paik is a 69-year-old Korean American and registered voter in Gwinnett County. Mr. Paik voted for the very first time in the General Election. In the past, Mr. Paik did not vote because his limited English proficiency made navigating the voting process challenging. In the General Election, however, he was able to apply for and cast a mail-in ballot with the help of Advancing Justice–Atlanta. Advancing Justice–Atlanta provided Mr. Paik with information in Korean on how to vote by mail, which he used to complete and submit

his absentee ballot. In the Runoff Elections, Mr. Paik had to apply for an absentee ballot twice. When his ballot did not arrive after he requested it the first time, he contacted Advancing Justice–Atlanta for assistance; he eventually received his mail-in ballot approximately two weeks before Election Day. Mr. Paik opted to vote absentee-by-mail primarily to reduce language barriers, minimize health risks, and avoid long lines. Mr. Paik decided to use a drop box in Dacula to vote in both the General and Runoff Elections because of the convenience and reliability.

25.    Plaintiff Deepum Patel is an Indian American and registered voter in Fulton County. During the last few elections in Georgia, Mr. Patel wanted to vote by mail in part because he is the primary caretaker of his young child. Although he applied to vote by mail for the August 2020 primary runoff ("Primary Runoff"), Mr. Patel did not receive his absentee ballot in time and so had to vote in person. In September 2020, Mr. Patel requested an absentee-by-mail ballot to vote in the General Election. He elected to return his ballot to a drop box because he believes drop boxes are the most secure, reliable, and convenient way of voting. For the General Election, Mr. Patel dropped off his ballot at a drop box at the Ponce De Leon Branch Library ahead of Election Day, sometime after early voting hours for that day had already ended. During the Runoff Elections, Mr. Patel again voted by dropping his mail-in ballot off at the drop box outside of the Ponce De Leon Branch Library.

26.    Plaintiff Nora Aquino is a Filipina American and registered voter in DeKalb County. At 82 years old, she is a retired nurse who previously worked at the VA hospital for over 20 years. During the 2020 election cycle, Ms. Aquino wanted to vote by mail because of her age and the fact that she is unable to drive. Although Ms. Aquino requested an absentee ballot with the help of her daughter for the

General Election, she never received it. As a result, her daughter had to drive her, during the middle of her work day, to a polling location on the last day of early voting so Ms. Aquino could vote in person. For the Runoff Elections, Ms. Aquino successfully applied for an absentee mail-in ballot with assistance from her daughter. She voted by dropping her ballot at a drop box at Brookhaven City Hall after business hours.

27.    Plaintiff Thuy ("Angie") Hang Tran is a Vietnamese American and registered voter in Gwinnett County. In the General Election, Ms. Angie Tran and her mother voted early in person in the evening after they both finished work. They waited in line for approximately 30 minutes and cast their ballots at approximately 7 p.m. For the Runoff Elections, Ms. Angie Tran elected to vote absentee-by-mail to accommodate her long and unpredictable working hours and to minimize health risks during a global pandemic. She submitted her ballot at a drop box at Shorty Howell Park on a Saturday afternoon. Ms. Angie Tran also assisted her LEP mother, Plaintiff Thao Tran, in applying for and completing an absentee ballot. Since the Runoff Elections, Ms. Angie Tran's preference for absentee-by-mail voting increased due to greater fear of in-person voting amid a dangerous rise in anti-Asian violence.

28.    Plaintiff Thao Tran is an LEP Vietnamese-American refugee and registered voter in Gwinnett County. She is employed as a caretaker, and her job requires her to work long hours, from approximately 8:30 a.m. to 6:00 p.m. Monday through Friday. For the General Election, which was only the second election in which she has ever voted, Ms. Thao Tran went with her daughter, Plaintiff Angie Tran, to an early voting location at the end of her work day. Ms. Thao Tran opted to vote absentee-by-mail in the Runoff Elections for greater flexibility and to avoid the

stress and inconvenience of voting in person. With assistance from her daughter, Ms. Thao Tran successfully applied for and received an absentee ballot. Ms. Thao Tran's daughter also assisted her in filling out the ballot. Her daughter also dropped off their ballots at the drop box at Shorty Howell Park on a Saturday afternoon.

29.     Plaintiff Anjali Enjeti-Sydow is an Indian American and registered voter in Fulton County. She regularly engages in efforts to increase Asian American voter turnout in Georgia. She worked as a Fulton County poll worker during the Primary Runoff, General Election, and Runoff Elections. Ms. Enjeti-Sydow, together with her husband and daughter, voted by absentee-by-mail ballot for all three elections, using a drop box outside of the Ocee Library in Johns Creek each time. During each election, Ms. Enjeti-Sydow's family dropped off their ballots on Sundays, when the library was closed. Ms. Enjeti-Sydow opted to use absentee-by-mail ballots because she believes they are the most secure way to vote, particularly given the convenience and reliability of drop boxes.

30.     As discussed further below, SB 202 will harm Plaintiffs Paik, Patel, Aquino, Angie Tran, Thao Tran, and Enjeti-Sydow in the future by further restricting their ability to apply for, receive, and cast mail-in ballots, including by using drop boxes.

31.     Defendant Brad Raffensperger is Georgia's Secretary of State. He is sued in his official capacity. As Secretary of State, Defendant Raffensperger is Georgia's chief elections official, O.C.GA. § 21-2-210. He is responsible for administering and implementing Georgia's election laws and regulations as well as coordinating Georgia's compliance with the National Voter Registration Act of 1993 (52 U.S.C. § 20507, *et seq.*). He routinely issues guidance to Georgia's county election officials on elections procedures and requirements.

32.     Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le are members of the State Election Board and are named herein in their official capacities. As members of the State Election Board, they are responsible for promulgating rules and regulations "conducive to the fair, legal, and orderly conduct of primaries and elections"; "to obtain uniformity in the practices and proceedings of [elections officials], as well as the legality and purity in all primaries and elections"; and "to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state." *See* O.C.G.A. § 21-2-31.

33.     Defendant Clayton County Board of Elections and Registration is responsible for the conduct of primary and general elections in Clayton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

34.     Defendants Darlene Johnson, Diane Givens, Carol Wesley, Dorothy Foster Hall, and Patricia Pullar are the Members of the Clayton County Board of Elections and Registration, reside in Clayton County, and are sued in their official capacities.

35.     Defendant Shauna Dozier is the Clayton County Elections Director and is sued in her official capacity. Defendant Dozier is responsible for the day-to-day operations of running elections in Clayton County, to the extent such power does not conflict with the power of the Secretary of State.

36.     Defendant Cobb County Board of Elections and Registration is responsible for the conduct of primary and general elections in Cobb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

37.     Defendants Phil Daniell, Fred Aiken, Pat Gartland, Jessica M. Brooks, and Darryl O. Wilson, Jr. are the Members of the Cobb County Board of Elections and Registration, reside in Cobb County, and are sued in their official capacities.

38.     Defendant Janine Eveler is the Director of the Cobb County Board of Elections and Registration and is sued in her official capacity. Defendant Eveler is responsible for the day-to-day operations of running elections in Cobb County, to the extent such power does not conflict with the power of the Secretary of State.

39.     Defendant DeKalb County Board of Registration and Elections is responsible for the conduct of primary and general elections in DeKalb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

40.     Defendants Anthony Lewis, Susan Motter, Dele Lowman Smith, Samuel E. Tillman, and Baoky N. Vu are the Members of the DeKalb County Board of Registration & Elections, reside in DeKalb County, and are sued in their official capacities.

41.     Defendant Erica Hamilton is the Director of Voter Registration and Elections in DeKalb County and is sued in her official capacity. Defendant Hamilton is in charge of the day-to-day operations of running elections in DeKalb County, to the extent such power does not conflict with the power of the Secretary of State.

42.     Defendant Forsyth County Board of Voter Registrations and Elections is responsible for the conduct of primary and general elections in Forsyth County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

43.     Defendants Barbara Luth, Matthew Blender, Joel Natt, Carla Radzikinas, and Randy Ingram are the Members of the Forsyth County Board of

Voter Registrations and Elections, reside in Forsyth County, and are sued in their official capacities.

44.     Defendant Mandi B. Smith is the Director of the Forsyth County Board of Voter Registrations and Elections and is sued in her official capacity. Defendant Smith is responsible for the day-to-day operations of running elections in Forsyth County, to the extent such power does not conflict with the power of the Secretary of State.

45.     Defendant Fulton County Registration and Elections Board is responsible for the conduct of primary and general elections in Fulton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

46.     Defendants Alex Wan, Mark Wingate, Kathleen D. Ruth, Vernetta Keith Nuriddin, and Aaron V. Johnson are the Members of the Fulton County Registration and Elections Board, reside in Fulton County, and are sued in their official capacities.

47.     Defendant Richard L. Barron is the Director of the Fulton County Registration and Elections Board and is sued in his official capacity. Defendant Barron is responsible for the day-to-day operations of running elections in Fulton County, to the extent such power does not conflict with the power of the Secretary of State.

48.     Defendant Gwinnett County Board of Registrations and Elections is responsible for the conduct of primary and general elections in Gwinnett County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

49.     Defendants Alice O'Lenick, Wandy Taylor, Stephen W. Day, John Mangano, George Awuku, and Santiago Marquez are the Members of the Gwinnett County Board of Registrations and Elections, reside in Gwinnett County, and are sued in their official capacities.

50.     Defendant Lynn Ledford is the Director of the Gwinnett County Board of Registrations and Elections and is sued in her official capacity. Defendant Ledford is responsible for the day-to-day operations of running elections in Gwinnett County, to the extent such power does not conflict with the power of the Secretary of State.

## IV.     FACTUAL ALLEGATIONS

### A. Georgia AAPI Voters and the Recent Elections

51.     Due in large part to efforts of organizations like Advancing Justice–Atlanta to advance voter participation, including by ensuring access to absentee- by-mail voting, AAPI voters in Georgia were able to turn out in record numbers during the recent elections—nearly doubling AAPI voter turnout from 2016. Many who voted did so for the first time; in one district in Georgia, as many as two out of five AAPI voters were first-time voters.

52.     This is no small feat. Although AAPIs are among the fastest growing racial groups in Georgia, they generally have lower voter turnout than other racial groups. This is in part due to the fact that limited English proficiency and linguistic isolation (that is, not having any household member over 14 who speaks English) are common among AAPI communities, and linguistic isolation has long been recognized as a barrier for civic participation, including voting. For context, more than one in five AAPI households in Georgia are LEP households. And while Asian Americans make up less than five percent of Georgia's total population, they form

approximately one quarter (24.39%) of the state's LEP population. Thus, obstacles that affect LEP voters disproportionately impact AAPI voters.

53.     In addition to linguistic challenges, AAPIs endure socioeconomic ones, which the pandemic has only exacerbated. For example, according to one report, over 17% of Asian Americans in Georgia lack health insurance. And more than 25% of Georgia's Pacific Islanders live in poverty, in comparison to the overall poverty rate of about 15%.

54.     Moreover, since 2020, the Asian American community has experienced an alarming surge in anti-Asian American violence. Although overall 2020 reported hate crimes decreased by 7% from the previous year, anti-Asian hate crimes increased by nearly 150% in the same period. From March 2020 to February 2021 alone, there were almost 3,800 reported hate incidents targeting the Asian American community, with the majority committed against women. In March 2021, a white gunman murdered six women of Asian descent at Asian-owned spas in the Atlanta area. Despite widespread public condemnation of such violence following the Atlanta-area murders and other incidents, anti-Asian attacks continue at crisis levels.

55.     Against this backdrop, the steep increase in AAPI voter participation in the General and Runoff Elections is a testament to the active, multi-year efforts of community groups—primarily Advancing Justice–Atlanta, which serves as a trusted and respected community resource for culturally and linguistically specific voter outreach and education. For example, Advancing Justice–Atlanta monitored and offered nonpartisan voter assistance at over 40 voting locations during the General Election and nearly 30 locations during the Runoff Elections, across multiple counties and including during the early voting periods. Advancing Justice–Atlanta trained hundreds of volunteers to both cover election protection shifts and provide

interpretation in multiple languages. Additionally, through its multi-lingual hotline, the organization informed hundreds of Georgia voters of their rights in their preferred languages and, upon request, provided language assistance to those who voted by mail or in person.

56.     AAPI voters also relied on effective local elections administrators who worked with community organizations like Advancing Justice–Atlanta to increase voting access to AAPIs, particularly LEP voters, in their jurisdictions. In the General Election, DeKalb County made available sample ballots in an Asian language, Korean, for the first time in Georgia's history. In the Runoff Elections, Cobb County did the same.

57.     Voting analyses show two notable trends with respect to how AAPIs cast their votes in Georgia. *First*, AAPI voters rely disproportionately on absentee ballots to vote. Recent data show that Georgia's AAPI voters vote absentee-by-mail at rates higher than every other racial group. During the General Election, nearly 40% of AAPI voters used mail-in voting, compared to about 26% of all voters on average. And during the Runoff Elections, over 34% of AAPI voters voted by mail, compared to less than 24% of all voters on average. *Second*, AAPIs disproportionately apply for absentee ballots in Georgia; AAPI absentee-by-mail ballot application rates exceeded the average in the Runoff Elections and the General Election, including during the ten days prior to the General Election Day. The percentage of AAPI voters who applied for mail-in ballots during that ten-day period was significantly higher than for all voters.

58.     At the same time, AAPI voters faced particular challenges to absentee-by-mail voting. The absentee ballot applications that Secretary Raffensperger mailed to Georgia voters ahead of the June 2020 primary were in English only. And despite

the wide use of absentee-by-mail ballots in the June 2020 primary, Secretary Raffensperger decided not to mail absentee ballot applications to voters again for the General Election. As a result, elections officials in certain counties, including DeKalb and Fulton County, stepped in to mail absentee ballot applications to voters in their counties. Election officials in Gwinnett County voted to do the same, but the county commission opposed the measure. Advancing Justice–Atlanta also urged county officials to mail absentee ballot applications in certain Asian languages in precincts with significant AAPI LEP populations, but to no avail. In the General Election, AAPI absentee ballot applications were rejected at a rate more than two times higher than the average.

59.     There is widespread consensus that voting by mail is a safe and secure form of voting. But in the lead-up to and in the aftermath of the General and Runoff Elections, critics attacked the integrity of Georgia's elections. The litany of legal challenges that ensued—nearly all of which attempted to cast doubt on the legitimacy of mail-in ballots—were repeatedly rejected, serving to further establish that the Georgia elections were secure and fairly administered.

60.     Indeed, Secretary Raffensperger, whose office conducted a thorough audit and investigation into claims of wrongdoing, explained to the U.S. Congress that "there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia" and that his office did not "see[] anything out of the ordinary scope of regular post-election issues." Governor Brian Kemp also refuted claims of fraud (calling them "simply a distraction"), and Lieutenant Governor Geoff Duncan similarly characterized such claims as "misinformation that continues to fly around."

## B. Racial Discrimination and Voting in Georgia

61.    SB 202 is the latest iteration of Georgia's decades-long campaign to disenfranchise non-white voters through racially discriminatory voting laws. As the federal courts have repeatedly observed, "[t]he history of [Georgia's] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994). *See also Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560).

62.    In recognition of the state's history of racial discrimination, Georgia became a covered jurisdiction under Section 5 of the VRA in 1965, which prohibited Georgia from making changes to its election practices or procedures until the federal government determined that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304. Of the states previously subject to the VRA's preclearance requirements, Georgia is the only state that enacted voting restrictions across five major categories studied by the U.S. Commission on Civil Rights: voter

identification requirements, documentary proof of citizenship, voter purges, cuts to early voting, and polling place closures or relocations.

63.     In 2013, however, the U.S. Supreme Court's decision in *Shelby County v. Holder* invalidated the coverage provision that determined which jurisdictions were subject to the Section 5 of the VRA—effectively barring enforcement of the preclearance requirement.  570 U.S. 529 (2013).  As a result, Georgia's lawmakers and other state officials immediately instated a wave of amendments to its elections laws and policies in an unveiled effort to suppress communities of color, including the AAPI community. Several post-*Shelby* examples are particularly relevant to understanding how SB 202 builds on a sustained pattern of state governmental efforts to disenfranchise Georgia's AAPI community, among other communities of color.

64.     ***First***, in advance of the November 2018 general election, the Secretary of State, in administering the "exact match" protocol, froze approximately 53,000 voter registrations, 80% of which belonged to people of color.  The "exact match" protocol, which has existed in Georgia in some iteration since 2008, is a voter registration protocol that places would-be voters in "pending" status if their voter registration data does not exactly match the same information as it appears in other state databases. In 2009, the U.S. Department of Justice (DOJ) criticized Georgia's protocol as "flawed" and "frequently subject[ed] a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and . . . erroneous burdens on the right to register to vote." The DOJ found that AAPI applicants were more than twice as likely as their white counterparts to be flagged under "exact match."

65.     The "exact match" protocol has been the subject of extensive litigation. And although in 2019 the Georgia General Assembly largely ended the protocol with regard to identity data, eligible Georgia voters continue to be burdened by the "citizenship match" portion of the protocol, which flags voters as potential noncitizens based on data known to be outdated from the Department of Driver Services. Many of the affected voters are AAPI, as they are often voters who recently naturalized as citizens and/or obtained a Georgia driver's license prior to naturalization.

66.     *Second*, in the wake of the *Shelby County* decision, Georgia's Secretary of State has been emboldened to aggressively purge voter registration rolls in a way that disproportionately harms AAPI voters. In 2019 alone, the state removed 313,000 voters from the rolls on the grounds that they moved from their voter registration address. A subsequent analysis revealed that 63.3% of the voters had not moved at all and that the flawed purge process predominantly impacted non-white voters in the Metro Atlanta region, where the majority of AAPI voters in Georgia reside.

67.     *Third*, up until 2018, Georgia law illegally restricted who could assist LEP voters as an interpreter in state and local elections. This policy imposed a disproportionate burden on AAPI voters, given the high rates of limited English proficiency in AAPI communities. Only in response to recent litigation does Georgia now permit LEP voters access to assistance in all Georgia elections.

68.     *Fourth*, the Georgia legislature has also repeatedly attempted to pass laws that adversely impact the AAPI community's ability to vote. For example, in 2016, 2018, 2019, and 2021, the General Assembly tried to pass bills that would have required driver's licenses for noncitizens to be stigmatized with terms like "INELIGIBLE VOTER," "NOT VOTER ID," "NO LAWFUL STATUS," and

"NOT ACCEPTABLE FOR OFFICIAL PURPOSES," which would require newly naturalized citizens to obtain new identification just to vote.

69.     *Fifth*, the legislature has also routinely attempted to make English the state's official language or otherwise prohibit government agencies from offering services in any other language. Between 2014 and 2018, the Georgia Senate introduced four different "English only" resolutions. All would have prohibited the dissemination of ballots and other election-related documents in any language other than English, which would not only discriminate against LEP voters but also violate federal law.

70.     SB 202 joins this long line of discriminatory attempts to target and disenfranchise voters of color and LEP voters. Following the 2020 election cycle, proponents of voting restrictions such as SB 202 have relied on racially charged rhetoric to push for further voting restrictions that would disenfranchise AAPI communities. Explicitly invoking discriminatory stereotypes to argue in favor of restricting ballot access to AAPI voters, Representative Barry Fleming, the Chairman of the House Special Committee on Election Integrity and regular sponsor of other voting omnibus bills, referred to absentee ballots as being from the "shady" part of town where you could get "shanghaied." Tellingly, Fleming's longstanding history as a legislator includes the aforementioned "exact match" system in 2017 that led to the freezing of 53,000 voter registrations; the reduction of early voting periods for municipal elections in 2014; and an attempt to codify the offense of "conspiracy to commit election fraud" in 2005, despite no evidence of widespread voter fraud.

71.     More broadly, recent Georgia political campaigns have also been rife with racial overtones. In 2020, Georgia Senator David Perdue belittled Vice

President Kamala Harris's name—which is of Asian origin—saying "Ka-ma-la, Ka-ma-la, Kamala-mala-mala, I don't know, whatever[.]" And in 2014, Asian American candidate Tim Hur and Black candidate Renita Hamilton were the subject of robocalls asking voters if they wanted to vote for "an Asian businessman or Africa-American [sic] swim mom."

72.    In fact, Georgia's political candidates have been attacked for having names that merely sounded Asian. For example, Georgia Senator Jon Ossoff was even attacked during his campaign for having a foreign-sounding name: "If someone is going down the list, they're gonna vote for somebody who is familiar… If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim?  Is he Lebanese? Is he Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."

## C. The Challenged Laws

### 1.  SB 202's Legislative History

73.    After Georgians elected Jon Ossoff and Raphael Warnock—the first Jewish American and Black U.S. Senators, respectively, to represent Georgia—the Georgia General Assembly embarked on a relentless campaign to amend the state's voting laws. It formed the House Special Committee on Election Integrity, a 14-member committee comprised overwhelmingly of white legislators with no AAPI or Latine members. And during the 2021–22 legislative session, state legislators introduced over 50 different bills that would restrict access to voting.

74.    Through a rushed and close-doored legislative process that involved virtually no input from AAPI state legislators, the Georgia General Assembly passed SB 202 on March 25, 2021, just 79 days after the Runoff Elections, restricting voting access for, *inter alia*, Georgia's AAPI community.

27

75.     The first version of SB 202, introduced on February 18, 2021, was a two-page bill that aimed to restrict the mailing of absentee ballot applications to voters who had not previously requested, received, or submitted an absentee ballot. In other words, at its core, SB 202 was set on curbing and seriously limiting the ability of Georgia's voters to cast absentee ballots.

76.     In fact, from the start, state legislators made no attempt to veil their true intent behind SB 202. Notably, Georgia House Speaker David Ralston stated that he did not want every registered voter to receive an absentee ballot because that would "certainly drive up turnout." Given that voters of color—especially AAPI voters— used absentee-by-mail ballots at high rates in the General and Runoff Elections, Speaker Ralston's comments evinced the legislator's intent to deprive *non-white voters* of ballot access.

77.     Unsurprisingly, the legislative process itself was also racially tinged. General Assembly members consistently thwarted groups representing communities of color from participating in the legislative process. For example, the NAACP Legal Defense & Educational Fund was not permitted to testify at two House Committee hearings held on February 22 and 23, 2021, despite formally requesting an opportunity to testify on multiple occasions beforehand.

78.     The General Assembly was on notice that SB 202 would disparately impact communities of color. For example, the Southern Poverty Law Center Action Fund warned legislators that the bill was a calculated attempt to adversely impact minoritized groups, citing provisions such as the photo ID requirement for absentee ballots as disproportionately affecting people of color. In addition to public outcry over SB 202, government committees such as the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections stated their "concern[s] that

the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."

79. On March 22, 2021, Advancing Justice–Atlanta submitted written testimony opposing the restrictions on absentee voting outlined in SB 202, highlighting the harm they would cause to AAPI voters in Georgia. The testimony included data on the high rates of voting by mail within the AAPI community; the already high rates of rejection of absentee ballot applications of AAPI voters; and descriptions of the specific harms that would befall LEP voters and new or first-time voters.

80. Nevertheless, the General Assembly jammed SB 202 through the legislative process without notice to advocates, voters, or, at times, even other legislators. Few non-white legislators—and no AAPI legislators—were involved in the drafting of the bill or able to offer amendments. Ignoring testimony by Advancing Justice–Atlanta and other civil rights and community interest groups, the General Assembly rushed SB 202 through the House and Senate in a process that deviated from common practice. The House passed SB 202 on March 25, 2021 and immediately transmitted the bill to the Senate without convening a conference committee. The Senate brought the bill to a vote just hours later, over objections by state Senators. What began as a two-page bill had, by then, ballooned into a nearly hundred-page bill with countless provisions aimed to disenfranchise voters of color, including AAPI voters.

81. On March 25, 2021, Governor Brian Kemp signed SB 202 into law in, quite literally, a closed-door ceremony. State Representative Park Cannon, a Black woman, was arrested and forcibly removed from the State Capitol by state troopers after knocking on Governor Kemp's office door to try to witness the bill signing.

## 2. Impact of SB 202 Provisions on the AAPI Community

### a. Restricted Timeframes to Request and Receive Absentee Ballots

82.    For decades, Georgians have relied on absentee-by-mail voting procedures. Mail-in voting affords voters more time to study the issues and candidates on the ballot; allows vote-casting even when a voter has an inflexible work schedule or other obligations on Election Day; enables voters to comfortably access language assistance; and obviates the need for special transit arrangements to a polling place. Absentee-by-mail voting has been and continues to be a crucial means to advance equitable participation in Georgia's political processes.

83.    Prior to SB 202's enactment, a voter could request an absentee ballot by providing certain basic information, such as the current address at which they are registered to vote, their signature or the signature of the eligible relative requesting the ballot on their behalf, and, if applicable, the signature of the person assisting them. Additionally, before SB 202, voters could request an absentee ballot from 180 days prior to an election through the Friday before Election Day.

84.    In addition, county boards of registrars were previously required to mail absentee ballots to eligible applicants between 45 to 49 days prior to presidential and general primary elections, other than municipal elections, and special elections in which a candidate for federal office appears on the ballot.

85.    SB 202 restricts the timeframes for absentee-by-mail voting in two key ways. *First*, Section 25 of SB 202 delays and compresses the time period during which a voter may request an absentee ballot. Unless a voter is hospitalized, SB 202 reduces the time a voter can request an absentee ballot from 180 days to 78 days prior to an election and requires that the application be received by the county

election administrator at least 11 days prior to the election. ***Second***, Section 27 of SB 202 delays the issuance of absentee ballots by 20 days; now, the board of registrars need only mail absentee ballots to eligible applicants 25 to 29 days prior to a qualifying election.

86.    By shortening the window in which a voter may request an absentee ballot, and delaying the issuance of absentee ballots to eligible applicants, SB 202 restricts access to absentee-by-mail voting. Such a restriction discriminates against and disproportionately impedes the franchise of AAPIs, who vote by mail at higher rates than any other racial group in Georgia.

87.    During the General Election, AAPI voters relied on absentee-by-mail voting at a rate higher than any other racial group. Approximately 40% of AAPI voters cast absentee-by-mail ballots, compared to the statewide absentee-by-mail voting rate of around 26%. Similarly, during the Runoff Elections, approximately 34% of AAPI voters cast absentee-by-mail ballots, compared to the statewide absentee-by-mail voting rate of around 24%.

88.    AAPI voters, who are more likely to be LEP or first-time voters, often require more time and language assistance to review ballot materials and cast their ballots. This is the case for certain Plaintiffs who required assistance from family members and/or organizations such as Advancing Justice–Atlanta. In the event that the board of registrars or absentee ballot clerk identifies a mismatch regarding records of a voter's identifying information, that voter will, under SB 202, have less time to cure the discrepancy. A reduced timeline to apply for and receive an absentee ballot severely burdens or outright denies AAPI voters the right to vote.

89.    Moreover, historically, Georgia's AAPI absentee-by-mail applicants more often submitted absentee ballot applications in the ten-day period before

Election Day, when compared to overall rates of submission of Georgia vote-by-mail applications. Thus, a reduction in the application submission window has a disproportionate impact on their ability to participate in elections. All Georgia voters will be affected by SB 202's limitations on the opportunity to apply for and receive absentee ballots, but the law has a disproportionate, discriminatory impact on AAPI voters.

90.   In light of the current climate of anti-Asian violence and the historical record of threats against people of color in Georgia, AAPIs are disproportionately harmed by the restriction of this voting option. Many AAPIs have been fearful or reluctant to go to the polls or other public places because of the anti-Asian sentiment and outright violence that has escalated and publicly pervaded since the outbreak of the COVID-19 pandemic. The option to apply for and receive an absentee ballot by mail has therefore been an essential means by which AAPIs can vote safely and securely without risking their lives, or enduring harassment or physical violence.

91.   Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for compressing the time frame for requesting an absentee ballot, nor for shortening the window that an eligible voter has to review absentee ballot materials before the election. According to multiple statements by Governor Kemp, Lieutenant Governor Duncan, Secretary Raffensperger, and former Georgia voting systems implementation manager Gabriel Sterling (current chief operating officer for the Secretary), there was no evidence of widespread vote-by-mail fraud in Georgia, nor has there ever been.

### b.   Barriers to Access Secure Ballot Drop Boxes

92.     Before SB 202, Georgia voters enjoyed the ability to safely and securely cast their ballots in one of 330 drop boxes in Georgia, most of which were freestanding outside of a building and often accessible 24 hours a day.

93.     Before SB 202, drop box locations were permitted to open as early as 49 days before Election Day, and did not close until 7:00 p.m. on Election Day.

94.     In the 2020 election cycle, counties were required to monitor each drop box through 24/7 video surveillance to ensure security of drop box voting and mandated to retain the video footage for 30 days following certification of an election.  Elections officials were also required to collect ballots from each drop box at least once every 24 hours and complete documentation indicating the time, date, location, and number of ballots collected.

95.     The statewide use of drop boxes in the 2020 election cycle ensured voters had meaningful and continuous access to secure ballot drop-off locations. By using drop boxes, voters did not have to assume the risk of mail delays but could still avoid the crowds and long lines associated with in-person voting. Drop boxes were and continue to be necessary to providing equitable voting options for Georgia voters, including AAPIs.

96.     SB 202 restricts access to these drop boxes by limiting their locations, mandating they be placed indoors, and restricting their dates and hours of operation.

97.     *First*, Section 26 of SB 202 diminishes the availability of drop boxes to one per county, plus the lesser of one per every 100,000 "active registered voters" in the county or one per advance voting location in the county. This numerical limit severely reduces drop boxes in counties across Georgia, affecting both densely and sparsely populated counties.

98.    *Second*, SB 202 requires drop boxes to be established in the office of the board of registrars or absentee ballot clerk or inside an advance voting location. Only during Governor-declared emergencies may drop boxes be located outside.

99.    *Third*, SB 202 restricts drop boxes to be open only during the hours of operation of a registrar's office or advance voting location, mandating that they otherwise be closed. Also under the newly signed law, advance voting is only required between the hours of 9:00 a.m. through 5:00 p.m. on weekdays and certain weekend days, commencing on the fourth Monday prior to an election and ending the Friday before Election Day. County registrars *may* in their discretion extend the hours, but only to, at maximum, 7:00 a.m. to 7:00 p.m. This restriction would impact the individual named Plaintiffs who used ballot drop boxes after business hours during the General and/or Runoff Elections.

100.   Indeed, these restrictions disproportionately impose a discriminatory and unnecessary burden on voters of color, including AAPI voters, by reducing safe, convenient, and reliable means to return mail-in ballots in populous, metro counties with significant non-white populations. For example, in Gwinnett County, whose population is approximately 50% non-white and 12.5% AAPI, there were 23 ballot drop boxes during the 2020 election cycle. Under SB 202, that number will dwindle; likely, only six drop boxes will be permitted for a county of over 936,000 residents. Similarly, Fulton County, a county with over one million residents and the second largest AAPI population in the state, offered 36 drop boxes during the 2020 election cycle. But SB 202 would force Fulton County to cut the number of drop boxes to as few as nine.

101.   Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for reducing access to ballot drop boxes. There is no evidence that drop boxes were unsafe, ineffective, or susceptible to voter fraud.

### c.   Prohibition Against Proactive Mailing of Ballot Applications

102.   In advance of the June 2020 primary election, in the midst of a global pandemic, Secretary Raffensperger authorized the state's mailing of absentee ballot applications to all registered voters in Georgia.

103.   In recent elections, when the state declined to, election officials in Fulton County and DeKalb County opted to mail absentee ballot applications to all eligible voters within county lines. The proactive mailing of absentee ballot applications increased voting access, particularly for AAPI voters, who are more likely to be LEP or first-time voters unfamiliar with processes to request ballots.

104.   Now, Section 25 of SB 202 prohibits all election officials from sending absentee ballot applications except upon the request of a voter or authorized relative. Prohibiting election officials from proactively mailing absentee ballot applications significantly and disproportionately harms AAPI and other LEP voters. To request an absentee ballot, voters must now access and navigate the website of the Secretary of State or their election superintendent and registrar. Since the Secretary of State's website and most county board of elections' websites are available exclusively in English, the application request process is severely burdensome for AAPI LEP voters.

105.   This provision of SB 202 also harms Advancing Justice–Atlanta and other community organizations who engage in GOTV efforts with AAPI communities. If election officials proactively mailed absentee ballot applications to

all eligible Georgia voters, Advancing Justice–Atlanta would not need to devote significant resources to educating voters on how to request absentee ballots and assisting voters in that process.

106.   Moreover, SB 202 imposes significant burdens on nongovernmental organizations—such as Advancing Justice–Atlanta—who send absentee ballot applications to LEP voters or other voters who need assistance with navigating the voting process. With the passage of SB 202, Advancing Justice–Atlanta must now ensure that absentee ballot applications they distribute are accompanied by a disclaimer form that is subject to particular text, formatting, and color contrast requirements.

107.   Advancing Justice–Atlanta must also obtain and assess election data to ensure that it does not mail absentee ballot applications to any voters who have already "requested, received, or voted" an absentee ballot. Even if a voter has not timely received an absentee ballot, Advancing Justice–Atlanta will not be able to send them an application if they still require a ballot due to an unfulfilled request.

108.   Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for outright banning state and local election officials from proactively mailing ballot applications to eligible voters. There is no evidence of fraud associated with increased access to applications. Indeed, as has been the case since long before SB 202, ballot applications are subject to a thorough process in order to verify the voting eligibility of the applicant.

### d.  Additional and Burdensome Identification Requirement

109.   SB 202 also imposes burdensome voter identification requirements for mail-in voting. Specifically, Section 25 of SB 202 newly requires that, when requesting an absentee-by-mail ballot, the voter provide their Georgia's driver's

license or Georgia state identification card number, in addition to their registration address and date of birth. SB 202 further demands that a voter who does not have a Georgia driver's license or state ID card instead provide a photocopy or electronic image of a utility bill, bank statement, government check, paycheck, or other government document containing the name and address of the voter.

110.   AAPIs are less likely than white Americans to have state-issued licenses or identification cards, forcing more AAPI voters requesting a mail-in ballot to collect and present by photocopy or electronic image additional information, even after they have already provided unique identifying data. These extra steps add cost and hardship to the voting process and increase the likelihood that an eligible voter will have their ballot application disqualified due to mistakes or confusion regarding these additional procedural requirements.

111.   By requiring those who lack state-issued identification to clear additional procedural hurdles to vote by mail, this provision of SB 202 inflicts a substantial burden on voters. That burden falls disproportionately on LEP voters, who are both more likely to be required to provide the additional documentation and more likely to require assistance to understand how to meet the additional identification requirements.

112.   Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for imposing this onerous, additional identification requirement. There is no evidence that the prior requirements of registration address, date of birth, and signature comparison were insufficient to guard against voting fraud.

### e.  Criminalization of Assistance in Returning Completed Ballot Applications

113.   In previous election cycles, as a part of their voter registration and GOTV efforts, Advancing Justice–Atlanta volunteers and staff provided blank absentee applications to voters; assisted voters with completing the applications as needed; and, to minimize the burden on voters, returned completed absentee ballot applications to elections officials. SB 202 now criminalizes aspects of Advancing Justice–Atlanta's voter assistance to community members.

114.   Specifically, SB 202 criminalizes any person or entity's "handling" or returning of a voter's completed ballot application, subject to limited exceptions. This provision would criminalize the efforts of an Advancing Justice–Atlanta staff member who assists an eligible voter with returning their application, despite obtaining the consent of the voter, unless that staff member is a relative of the voter or the voter is LEP or physically disabled and receiving assistance.

115.   SB 202's criminalization of application return assistance places an undue burden on eligible voters, limiting the available means by which they can submit their completed applications and obtain an absentee ballot. Such restrictions on assistance are especially harmful to first-time or LEP voters who are unfamiliar with or may be intimidated by voting protocols; voters who are elderly, physically disabled, or otherwise have limited mobility; and voters with limited access to transportation or mail services, including rural voters. The harm is only compounded by the other provisions of SB 202 that further shorten and complicate the absentee-by-mail voting process.

116.   This provision of SB 202 also imposes burdens on Advancing Justice–Atlanta and other community organizations which engage in GOTV efforts with

AAPI communities. Under SB 202, Advancing Justice–Atlanta will need to devote more resources to educating voters on the narrow circumstances under which anyone other than the voter is authorized to return or handle their completed absentee ballot applications.

117.   Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for constraining the means by which a absentee ballot application may be submitted. There is no evidence of fraud associated with assistance in returning absentee ballot applications, including by nonpartisan organizations like Advancing Justice–Atlanta.

## CLAIMS FOR RELIEF

### COUNT ONE
**Violation of Section 2 of the Voting Rights Act
52 U.S.C. § 10301, *et seq.*
(Intentional Racial Discrimination and Discriminatory Results)**

118.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

119.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"

120.   Section 2 requires a "totality of the circumstances" analysis that includes factors such as:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the

> exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Thornburg v. Gingles*, 478 U.S. 30, 44–45 (1986). In violation of the rights of Individual Plaintiffs' right to vote and Organizational Plaintiff's right to not be burdened with the expenditure and diversion of limited organizational resources to address discriminatory restrictions on the right to vote, SB 202 (1) restricts the timeframe to request and receive absentee ballots; (2) limits access to secure drop boxes; (3) prohibits election officials' proactive mailing of ballot applications; (4) imposes burdensome and unnecessary additional identification requirements for requesting absentee ballots; and (5) criminalizes certain return of completed ballot applications.

121. SB 202 violates Section 2 of the VRA because the challenged provisions were adopted for the purpose of denying voters of color full and equal access to the political process.

122. SB 202 further violates Section 2 of the VRA because, given the totality of the circumstances alleged herein, the challenged provisions, individually and cumulatively, will disproportionately deny voters of color an equal opportunity to participate in the political process and to elect representatives of their choice by denying or abridging their right to vote. Specifically, SB 202 interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent voters of color, particularly AAPI voters, from having an equal opportunity to participate in the political process on account of their race or color.

## COUNT TWO
### Fourteenth and Fifteenth Amendments
### U.S. Const. amend., XIV; 42 U.S.C. §1983
### (Intentional Race Discrimination)

123.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

124.   42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

125.   Section 1 of the Fourteenth Amendment to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

126.   Section 1 of the Fifteenth Amendment to the United States Constitution provides:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

127.   Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

128.   SB 202 violates the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because it was purposefully enacted and

operates to deny, abridge, or suppress the right to vote of otherwise eligible voter on account of race or color.

129.   SB 202 violates the Fifteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because Defendants intentionally enacted and operate the law to deny, abridge, or suppress the right to vote on account of race or color.

130.   The facts alleged herein reveals that SB 202 was enacted, at least in part, with a racially discriminatory intent to disenfranchise AAPI voters and other voters of color in violation of the United States Constitution.

131.   Georgia's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB 202, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB 202, and the tenuousness of the stated justifications for SB 202 raise a strong inference of a discriminatory purpose in violation of the Fourteenth Amendment.

<div align="center">

**COUNT THREE**
**First and Fourteenth Amendments**
**U.S. Const. amend. XIV; 42 U.S.C. §1983**
**(Undue Burden on the Right to Vote)**

</div>

132.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

133.   State election administration practices may not place burdens upon a plaintiff's First and Fourteenth Amendment rights to vote unless relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and character of the burdens imposed. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The more a challenged law

burdens the right to vote, the more strictly must it be scrutinized. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019). Even slight burdens must be justified by relevant and legitimate state interests of sufficient weight. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.).

134.   The challenged provisions of SB 202 collectively and individually impose severe and, at a minimum, significant burdens on eligible Georgia voters' right to vote. In particular, SB 202 imposes additional barriers to voting absentee-by-mail. These barriers disproportionately affect AAPI voters, who heavily rely upon absentee-by-mail voting.

135.   It is well established that absentee voter fraud in Georgia—the purported justification for these restrictive measures—is virtually non-existent. According to the Arizona State University, there have been only six instances of absentee voter fraud alleged in Georgia from 2000-2012, and only four of those resulted in a plea, consent order, or conviction. That study was updated in 2016, and again found a negligible rate of voter fraud that resulted in a successfully prosecution.

136.   SB 202 imposes additional and superfluous identification requirements for absentee voters; restrictions on outdoor drop boxes that curb the availability of safe and reliable methods of returning absentee ballots; and restrictions preventing election officials and organizations from even distributing absentee ballot *applications* or assisting voters in returning them.

137.   None of the burdens imposed by the challenged provisions of SB 202 are reasonably related to, let alone necessary to achieve, any sufficiently weighty legitimate state interest. The burdens imposed by the challenged provisions of SB 202 accordingly lack any constitutionally adequate justification, and must be enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.   Declare that the challenged provisions of SB 202 violate the Fourteenth and Fifteenth Amendment to the U.S. Constitution and Section 2 of the Voting Rights Act's prohibitions on discriminatory purpose;

2.   Declare that the challenged provisions in SB 202 violate the results prong of Section 2 of the Voting Rights Act;

3.   Declare that the challenged provisions of SB 202 violate the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

4.   Enjoin Defendants, their agents, officers, employees, successors, and all persons acting in concert with them from enforcing or giving any effect to the challenged provisions of S.B. 202, including enjoining Defendants from conducting any elections utilizing those provisions;

5.   Award Plaintiffs their costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

6.   Grant such other and further relief as may be just and equitable.

Respectfully submitted this 27th day of April, 2021.

*/s/ Phi Nguyen*

PHI NGUYEN (Georgia Bar No. 578019)
HILLARY LI (Georgia Bar No. 898375)
**ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA**
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
404 585 8446 (Telephone)
404 890 5690 (Facsimile)
*pnguyen@advancingjustice-atlanta.org*
*hli@advancingjustice-atlanta.org*


EILEEN MA*
**ASIAN AMERICANS ADVANCING JUSTICE–ASIAN LAW CAUCUS**
55 Columbus Avenue
San Francisco, CA 94111
415 896 1701 (Telephone)
415 896 1702 (Facsimile)
*eileenm@advancingjustice-alc.org*

NIYATI SHAH*
TERRY AO MINNIS*°
**ASIAN AMERICANS ADVANCING JUSTICE–AAJC**
1620 L Street, NW, Suite 1050
Washington, DC 20036
202 815 1098 (Telephone)
202 296 2318 (Facsimile)
*nshah@advancingjustice-aajc.org*
*tminnis@advancingjustice-aajc.org*


LEO L. LAM*
R. ADAM LAURIDSEN*
CONNIE P. SUNG*
CANDICE MAI KHANH NGUYEN*
**KEKER, VAN NEST AND PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400 (Telephone)
415 397 7188 (Facsimile)
*llam@keker.com*
*alauridsen@keker.com*
*csung@keker.com*
*cnguyen@keker.com*


*Attorneys for Plaintiffs*
*\*Admitted pro hac vice*
*° Not admitted in D.C.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; REBECCA SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID WORLEY, in his official capacity as a member of the Georgia State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board; and ANH LE, in her official capacity as a member of the Georgia State Election Board, et al. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Civil Action No. 1:21-cv-01333-JPB

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: April 27, 2021

/s/ Phi Nguyen
PHI NGUYEN
Counsel for Plaintiff
ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA

1676357

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ASIAN AMERICANS ADVANCING        )
JUSTICE–ATLANTA,                 )
                                 )
    Plaintiff,                   )
                                 )
    v.                           )
                                 )
BRAD RAFFENSPERGER, in his       )
official capacity as the Georgia )
Secretary of State; REBECCA      )
SULLIVAN, in her official capacity as )   Civil Action No. 1:21-cv-01333-JPB
the Vice Chair of the Georgia State )
Election Board; DAVID WORLEY, in )       **CERTIFICATE OF SERVICE**
his official capacity as a member of the )
Georgia State Election Board;    )
MATTHEW MASHBURN, in his         )
official capacity as a member of the )
Georgia State Election Board; and )
ANH LE, in her official capacity as a )
member of the Georgia State Election )
Board, et al.                    )
                                 )
    Defendants.                  )

_____

**CERTIFICATE OF SERVICE**

    I hereby certify that on April 27, 2021, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated: April 27, 2021

                  */s/ Phi Nguyen*_____
                  PHI NGUYEN
                  Counsel for Plaintiff
                  ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA

1676381

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., a Georgia nonprofit corporation, THE JUSTICE INITIATIVE, INC., a Georgia nonprofit corporation, SAMUEL DEWITT PROCTOR CONFERENCE, INC., a nonprofit corporation, MIJENTE, INC., a nonprofit corporation, SANKOFA UNITED CHURCH OF CHRIST LIMITED, a Georgia nonprofit corporation, NEW BIRTH MISSIONARY BAPTIST CHURCH, INC., a Georgia nonprofit corporation, METROPOLITAN ATLANTA BAPTIST MINISTERS UNION, INC., a Georgia nonprofit corporation, FIRST CONGREGATIONAL CHURCH, UNITED CHURCH OF CHRIST INCORPORATED, a Georgia nonprofit corporation, GEORGIA LATINO ALLIANCE FOR HUMAN RIGHTS, INC., a Georgia nonprofit corporation, FAITH IN ACTION NETWORK, a nonprofit corporation, GREATER WORKS MINISTRIES NETWORK, INC., a Georgia nonprofit corporation, EXOUSIA LIGHTHOUSE INTERNATIONAL C.M., INC., a Georgia nonprofit corporation, | Civil Action No. **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State;
REBECCA SULLIVAN, in her official
capacity as the Vice Chair of the Georgia
State Election Board; DAVID WORLEY,
in his official capacity as a member of the
Georgia State Election Board; MATTHEW
MASHBURN, in his official capacity as a
member of the Georgia State Election
Board; and ANH LE, in her official
capacity as a member of the Georgia State
Election Board,

Defendants.

## I.     INTRODUCTION

1.      "When the [voter] is relaxed, make them toil. When full, starve them.
When settled, make them move."  Sun-Tzu & Samuel B. Griffith, *The Art of War*
(1964).  On March 25, 2021, Governor Brian Kemp and members of the Georgia
legislature engaged in legislative warfare against their own constituents.  Behind
closed doors, surrounded by white men only, and sitting in front of a plantation
portrait Governor Kemp signed into law Senate Bill 202 ("SB 202") – a law that
instantly attacks and, in no uncertain terms, criminalizes traditional organizing
methods used by Black and Latinx groups to encourage an inclusive and diverse
democracy.  The law compromises access to the ballot box and targets Georgia's
diverse and growing electorate.

2.      Black eligible voters account for nearly half of Georgia's electorate growth since 2000.[1]  Since 2016, Black, Latinx[2] and Asian voters have comprised the majority of newly registered voters, while white non-Latino voters have been on a steady decline.[3]  Indeed, Georgia is slated to become a majority minority state by 2028.[4]

3.      Plaintiffs, representing several predominantly Black Georgia churches and faith-based organizations, and Latinx organizations, now bring this action to protect and preserve the voting rights of their members, constituents and similarly situated Georgia citizens who have been imperiled by SB 202's severe, unjustifiable, and discriminatory provisions.  At its core, SB 202 violates their rights under the United States Constitution and federal voting rights statutes.  The

---

[1] https://www.pewresearch.org/fact-tank/2020/12/15/black-eligible-voters-have-accounted-for-nearly-half-of-georgia-electorates-growth-since-2000/, last visited April 23, 2021

[2] The term "Latinx" will refer to the group that the Census Bureau designates as "Hispanic or Latino." Specifically, the Census Bureau defines "Hispanic or Latino" as "a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." U.S. Census Bureau, Hispanic Origin, available at: https://www.census.gov/topics/population/hispanic-origin/about.html.

[3] https://www.pewresearch.org/fact-tank/2020/12/21/black-latino-and-asian-americans-have-been-key-to-georgias-registered-voter-growth-since-2016/, last visited April 23, 2021

[4] https://www.ajc.com/blog/politics/the-jolt-georgia-could-majority-minority-2028/nDKuQJp4yJ2PxCWTfL2pQM/, last visited April 23, 2021.

Georgia legislature's clear attempt to deny, dilute, and abridge the fundamental right to vote of many Georgians, especially Black voters and other voters of color, must be curtailed before further damage is done to our democracy.

4.      The recent election cycle in Georgia was a historic triumph for democracy.  In a record turnout, five million Georgians—two-thirds of eligible voters—exercised their right to vote in the 2020 general election.  Nearly 4.5 million did so again in the 2021 runoff elections for two seats in the United States Senate.

5.      Georgia achieved this unprecedented turnout, in part, by affording its voters several options for exercising their constitutional right to vote, not only in person on Election Day, but also using early voting, mail-in (absentee) ballot, voting in mobile voting units in the state's largest county, or depositing their ballots at secure drop-off boxes.  In the general election, more than 1.3 million absentee ballots were returned.  About 2.7 million Georgians voted early in the general election, and more than two million did so in the runoff elections.

6.      Thirty percent of the voters in the 2020 general election were Black, and Black voter registration increased 25% in 2020 as compared to 2016.  Black voters in particular took advantage of alternative ways to participate in the elections.  Nearly 30% of Black voters, for example, cast their ballots by mail in

4

2020.  Largely due to popular church-sponsored "Souls to the Polls" programs, 36.5% of Sunday early voters were Black.

7.    The historic turnout, combined with the changing demographics of Georgia voters, produced historic results.  For the first time since 1992, the Democratic candidate for President won the state of Georgia.  Voters also elected Georgia's first Black and first Jewish United States Senators.

8.    Rather than celebrate this zenith of Georgians' participation in their democracy, the General Assembly immediately launched a clandestine, culturally biased campaign aimed at taming Black, Latinx and Asian participation at the polls.  The result was SB 202—rushed through the legislative process with little notice to the public, without consideration of its impact on Black voters and others of color, and without justification for its anti-democratic encroachment on the right to vote.

9.    Under the guise of ensuring the integrity of future elections, the legislation imposes new burdens on Georgia voters, especially those already facing the biggest challenges in casting their votes.  SB 202 targets voting practices disproportionately used by Black voters and other voters of colors.  It suppresses votes and drastically limits participation in democracy.

10.    Although entitled the "Election Integrity Act of 2021," SB 202 is anything but an election integrity measure.  Instead, it is a surgical attempt to cut Black, Latinx and Asian voters from the voting process.  Georgia's election system has withstood extraordinary public scrutiny since Election Day 2020.  In both the general and runoff elections, it proved to be secure, reliable, and efficient. Indeed, in a letter to Congress, Secretary of State Raffensperger reported that he had independently authenticated the legitimacy of the 2020 election, finding nothing "out of the ordinary scope of regular post-election issues…"

11.    House Speaker Ralston, similarly, conceded: "The facts are we've had [two] recounts.  We've had an audit and…I know there's at least six lawsuits that have been filed, all of which have been dismissed.  Which kind of begs the question if there were, in fact, significant wrongdoing would it not have been disclosed?"

12.    No recount, no audit, and no court has found any evidence to support repeated claims of widespread voter fraud.  Indeed, allegations in Georgia and elsewhere that the 2020 election was "rigged" or "stolen" have come to be widely known as "the Big Lie."  SB 202, born of these false, corrosive, and polarizing allegations of fraud, serves no legitimate state interest in ensuring reliable election results or instilling voter confidence in Georgia's election system.

6

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

14.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a), 42 U.S.C. §§ 1983 and 1988(a), and 52 U.S.C. § 10308(f) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

15.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

16.    This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

17.    Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), and in this division under Local Civ. R. 3.1, because several Defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

### III.    PARTIES

18.    Plaintiff The Concerned Black Clergy of Metropolitan Atlanta, Inc. ("CBC") is a Georgia nonprofit corporation that has been active in voting rights work, registering people to vote, mobilizing voters, providing forums for officials, voter education and voter empowerment for nearly 40 years.  CBC is composed of 90% African American members and 10% Latinx, Middle Eastern, Asian, and Caucasian members.

19.    CBC partners with other organizations to support voting activities, including Get Out The Vote ("GOTV"), ensuring the comfort of voters in lines by providing food, water or other necessities ("line warming"), transportation, registration, distribution of educational materials and voter education.

20.    While CBC is primarily focused on the counties surrounding metropolitan Atlanta, in the 2018 and 2020 elections, including the Senate runoffs in 2020, CBC was engaged statewide in organizing pastors and providing them with training on voter education, voter registration and voter mobilization.

21.    CBC has members and a network of its members across Georgia whose right to vote will be burdened or denied as a result of SB 202.  CBC will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threaten to undermine its mission.

8

CBC brings these claims on its own behalf, as well as on behalf of its member voters and constituents.

22.     Plaintiff THE JUSTICE INITIATIVE, INC. ("The Justice Initiative") is a Georgia nonprofit corporation dedicated to providing clear information and instruction to support and empower citizens to exercise their right to vote.  The Justice Initiative invests in funds for voting rights work in Georgia, including GOTV work, and partners with an affiliated entity in its voting rights work.

23.     From October 2020 through January 2021, the organization worked with another nonprofit organization to do voter advocacy and voter empowerment work.  As part of this effort, members of the organization traveled by bus to smaller rural counties to get additional people out to vote.

24.     Members of the Justice Initiative traveled by bus to 70 counties in south and central Georgia to encourage voters in black and rural communities to vote.  The Justice Initiative participated in non-partisan voter advocacy throughout the entire state of Georgia.

25.     The Justice Initiative also does voter registration work, phone/text banking, line warming, assisting voters at the polls and to cure their ballots, and in the preparation and distribution of educational materials on voting.

26.     The Justice Initiative will be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202.  The Justice Initiative brings these claims on its own behalf, as well as on behalf of its member voters.

27.     Plaintiff THE SAMUEL DEWITT PROCTOR CONFERENCE, INC. ("SDPC") is a 501(c)(3) nonprofit corporation based in Chicago, Illinois, with a significant network of members and activity based in Georgia.

28.     SDPC represents a cross section of progressive African American faith leaders and their congregations in the United States and specifically throughout Georgia.

29.     SDPC is dedicated to registering eligible Georgians statewide to vote and to helping them become more civically engaged. SDPC also engages in voter education and registration activities in communities across the state to reach voters and help them to register, and eventually, to vote.  SDPC invests substantial funds statewide for Georgians to vote.  Since 2019, SDPC has engaged heavily in GOTV programs, phone and text banking campaigns to increase voter participation, voter registration and the creation of toolkits of educational resources about voting.  In addition, SDPC provided voting resources to other organizations that distributed resources door to door.

10

30.     SDPC also provided transportation to voters to cast their ballots, including to drop boxes for absentee voting.

31.     A minimum of 100,000+ constituents and voters were contacted, impacted and served in Georgia alone based on SDPC voting rights efforts. The majority of voters registered by SDPC were people of color, young voters, first-time voters (due to age or being newly naturalized citizens), and/or members of other underrepresented and vulnerable populations, including Georgians with disabilities and the elderly.  SDPC plans to continue to conduct its multi-faceted voting rights work in future elections.

32.     SDPC has members and a network of its members across Georgia, whose right to vote will be burdened or denied as a result of SB 202.  SDPC will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission. SDPC brings these claims on its own behalf, as well as on behalf of its member voters and their church or organization members.

33.     Plaintiff MIJENTE, INC. ("Mijente") is an Arizona 501(c)(4) nonprofit corporation, digital and grassroots resource for Latinx and Chicanx movement building and organizing.

34.     Mijente is a national organization that has membership and active

programs in Georgia.  The organization launched voter outreach programs in 2018

to engage Latinx voters in the midterm federal election.

35.     In 2020, through Mijente PAC, its political action committee, Mijente

contacted every Latinx voter in the state of Georgia, totaling over 300,000 voters.

In partnership with the Georgia Latino Alliance for Human Rights (GLAHR)

Action network, Mijente ran a vast outreach program during the Senate runoff

campaign, making sure to reach every Latinx voter, including those living in rural

South and middle Georgia.  In addition, during the 2020 General Election and in

the 2021 Runoff Election, Mijente trained over 50 voter protection volunteers to

provide non-partisan information at polling places around the state.

36.     During the 2020 General Election in Georgia, in partnership with

GLAHR Action Network, Mijente conducted text message outreach to 169,000

Latinx voters in four counties in Georgia to inform them about absentee voting by

mail.  Mijente also conducted digital outreach to Latinx Georgians to educate them

about their voting rights.  The organization created culturally relevant memes,

info-graphics, and other digital media content to combat disinformation and

provide voters with important information regarding their rights.  Lastly, Mijente

placed educational materials at the homes of 100,0000 Latinx voters and conducted

12

60,000 phone calls to inform people about the importance of voting down-ballot elections.

37.     Mijente plans to continue its GOTV programs, educational forums on voting, digital advertising and graphics for educational purposes, phone and text banking, poll monitoring, and efforts to assist voters to cure their ballots during all future elections in Georgia.  In the last year, Mijente has spent about $2.5 million on voter outreach efforts in Georgia, including staffing, training, advertising, and printing.

38.     As a result of SB 202, which threatens to undermine the organization's mission, Mijente must divert scarce resources away from its traditional voter education and turnout programs toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting options imposed by SB 202.

39.     Plaintiff SANKOFA UNITED CHURCH OF CHRIST LIMITED ("Sankofa UCC") is a Georgia nonprofit corporation and an Afrikan-centered Christian Ministry.  Among other things, Sankofa UCC invests its funds for voting rights work in Georgia

40.     Sankofa UCC members, including members with disabilities, have expressed concern that the new restrictions on absentee voting by mail, drop boxes, and limitations on times to vote may impact their ability to cast their ballots.

41.     Sankofa UCC has members and a network of its members across Georgia, whose right to vote will be burdened or denied as a result of SB 202. Sankofa UCC will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission. Sankofa UCC brings these claims on its own behalf, as well as on behalf of its member voters.

42.     Plaintiff NEW BIRTH MISSIONARY BAPTIST CHURCH, INC., ("New Birth") is a Georgia nonprofit corporation with a long-standing commitment to the fight for civil rights and social justice.

43.     New Birth is a predominantly African American church with over 18,000 members.  New Birth operates statewide with a focus on metro Atlanta and DeKalb County.

44.     New Birth hosts voter registration drives once per quarter and includes voter registration forms in its new members orientation.  New Birth dedicates significant time during its worship services and community outreach initiatives to voter education and voter mobilization and offers transportation to the

14

polls during early voting and on election day, including during the 2019 and 2020 election cycles and 2020 Senate runoff.  Its campus also serves as a polling place on election day.  In addition, New Birth has partnered with organizations to ensure the comfort of voters waiting in line on its campus.

45.     New Birth has members and a network of its members across Georgia, whose right to vote will be burdened or denied as a result of SB 202.  New Birth will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission.  New Birth brings these claims on its own behalf, as well as on behalf of its member voters.

46.     Plaintiff METROPOLITAN ATLANTA BAPTIST MINISTERS UNION, INC. ("MABMU" or "The Union") is a Georgia nonprofit corporation founded approximately 100 years ago. MABMU serves as a support organization that networks over 80 clergy of Baptist churches in the greater Atlanta area. Voting and social justice ministry have been a component of their work for decades.

47.     MABMU creates and distributes voting information materials throughout its membership as well as to related faith-based networks.  They have served as a coordinating hub and provider for voter outreach and assistance.

15

MABMU has various committees that focus on education, civic and social action, and empowerment that impact the city of Atlanta and the state of Georgia communities.

48.     MABMU sponsors voting machine training, voter suppression education, voter verification and status education training, how to organize "Souls to the Polls" events, transportation, and Turnout Sunday Lawyers and Collars participation among many other creative voting activities.  MABMU also provided transportation for residents of many senior high-rise facilities during early voting.

49.     MABMU has members and a network of its members across Georgia, whose right to vote will be burdened or denied as a result of SB 202.  MABMU will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission. MABMU brings these claims on its own behalf, as well as on behalf of its member voters.

50.     Plaintiff FIRST CONGREGATIONAL CHURCH, UNITED CHURCH OF CHRIST INCORPORATED ("First Church") is one of the oldest African American Congregational churches in the United States and is a predominately African American church of about five hundred members.

51.     First Church routinely shares information about voting and its importance, and distributes instructional materials about how and when and where to vote.  The church was the contact point to help the infirm and others with transportation challenges get to the polls.  First Church also had a church-wide GOTV program.

52.     First Church has an older congregation, members with disabilities, members that are shift workers, including weekend and evening workers, and other members that will be negatively impacted as a result of SB 202.  First Church has members and constituents across Georgia, whose right to vote will be burdened or denied as a result of SB 202.  First Church will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission.  First Church brings these claims on its own behalf, as well as on behalf of its member voters.

53.     Plaintiff GEORGIA LATINO ALLIANCE FOR HUMAN RIGHTS ("GLAHR") educates, organizes and trains the Latinx community in Georgia to defend and promote their civil and human rights.  Established in 2001, GLAHR is a community organization that develops grassroots leadership in all Latinx immigrant communities in the state of Georgia.

54.    In 2020, GLAHR ran a vast outreach program in partnership with Mijente during the Senate runoff campaign, making sure to reach every Latinx voter, including those living in rural South and middle Georgia.  This program entailed training GLAHR members on GOTV outreach, publishing guides for newly eligible voters on every process of voting from registration to casting a ballot, traveling to several community forums to speak about the importance of voting, and creating voter education materials for digital media.

55.    As a result of SB 202, which threatens to undermine the organization's mission, GLAHR must divert scarce resources away from its traditional voter education and turnout programs toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting options imposed by SB 202.

56.    Plaintiff FAITH IN ACTION NETWORK ("Faith in Action") is a California nonprofit corporation and a non-partisan, multi-faith, and multi-racial network of faith-rooted community organizations that since 2012 has held 3.5 million face-to-face, on-the-porch, and on-the-phone conversations with voters about their rights, the voting process, and why it is important to cast a ballot.

57.    In preparation for the 2021 runoff election in Georgia, Faith in Action hosted a network-wide phone bank to provide Latinx and Spanish speaking

18

Georgia voters key information about the elections. The organization also created digital content to highlight this voting information and published it across multiple social media platforms. Finally, Faith in Action sent organizers as Poll Chaplains to watch the polls in an effort to ensure equal access.

58. Faith in Action partners with a local organization to fund voting rights work throughout the state. Voting activities in tandem with its local partner have been planned through 2022. These plans include, but are not limited to, voter registration efforts, distributing voter education materials, and incorporating GOTV programs into community forums at houses of worship.

59. As a result of SB 202, which threatens to undermine the organization's mission, Faith in Action must divert scarce resources away from its traditional voter education and turnout programs toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting options imposed by SB 202.

60. Plaintiff GREATER WORKS MINISTRIES NETWORK INC. ("GWM") is a church and faith community in the Metropolitan Atlanta area, primarily including Fulton, Cobb, DeKalb, Henry, Clayton, and Rockdale Counties. GWM and its members have promoted and facilitated voter registration

19

for the past 10 years, and have assisted thousands of people registering to vote and voting.

61.     GWM members also conducted line-warming activities such as passing out water to voters waiting in line to vote.  GWM has also worked with leaders across the state of Georgia to combat long lines and inoperable voting machines.

62.     GWM has members and a network of its members across Georgia, whose right to vote will be burdened or denied as a result of SB 202.  GWM will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission. GWM brings these claims on its own behalf, as well as on behalf of its member voters.

63.     Plaintiff EXOUSIA LIGHTHOUSE INTERNATIONAL C.M., INC. ("Exousia") is a Georgia nonprofit corporation and church that has facilitated voting registration and assisted at the polls as poll workers.  Exousia has members with disability and transportation issues, who will be impacted by provisions of SB 202, including accessibility to drop boxes, the limitation on early voting, banning of mobile polling places, and the criminalizing of line warming.

64.     Exousia is part of the Gatekeepers Pastors' Fellowship—consisting of about 46 churches in metro Atlanta area—that meet monthly to share resources, ideas and ways of advocating.  Exousia's role in this fellowship is focused on social justice and voting rights issues.

65.     Exousia has members and a network of its members across Georgia, whose right to vote will be burdened or denied as a result of SB 202.  Exousia will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission. Exousia brings these claims on its own behalf, as well as on behalf of its member voters.

66.     Defendant BRAD RAFFENSPERGER is Georgia's Secretary of State. He is sued in his official capacity.  As Secretary of State, Defendant Raffensperger is Georgia's chief elections official. O.C. GA. § 21-2-210.  He is responsible for administering and implementing Georgia's election law and regulations as well as coordinating Georgia's compliance with the National Voter Registration Act of 1993, 52 U.S.C. § 20507 *et seq.*  He routinely issues guidance to Georgia's county election officials on election procedures and requirements.

67.     Defendants REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN AND ANH LE are members of the State Election

21

Board and are sued in their official capacities.  As members of the State Election

Board, they are responsible for promulgating rules and regulations "conducive to

the fair, legal, and orderly conduct of primaries and election"; "to obtain

uniformity in the practices and proceedings of [election officials], as well as the

legality and purity in all primaries and elections"; and "to define uniform and

nondiscriminatory standards concerning what constitutes a vote and what will be

counted as a vote for each category of voting system used in this state."  See

O.C.G.A. § 21-2-31.

## IV.   FACTUAL ALLEGATIONS

### Georgia Has a History of Racial Discrimination in Voting

68.     Georgia has a long and well-documented history of voting

discrimination against its communities of color.  As the judiciary has recognized,

"Georgia has a history chocked full of racial discrimination at all levels.  This

discrimination was ratified into the state constitution, enacted into state statutes,

and promulgated in state policy.  Racism and race discrimination were apparent

and conspicuous realities, the norm rather than the exception." *Ga. State Conf. of*

*the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D.

Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d

1336 (11th Cir. 2015).

69.     Georgia's history of implementing election laws that suppress non-white voters began shortly after Black men first gained the right to vote in 1868 through the ratification of the Fifteenth Amendment.

70.     Georgia was the first state to enact a poll tax in 1871.  In 1877, Georgia made the tax permanent and required that citizens pay all back taxes to vote.  White citizens were regularly able to evade paying taxes due to targeted exemptions.

71.     In 1908, Georgia adopted a constitutional amendment that allowed only white voters to participate in primary elections, known as "white primaries."

72.     In the same year, Georgia enacted a statute that restricted the registration of voters to a person who served in any war on behalf of the United States or the Confederate states, or who was a lawful descendant of a person who fought in those wars (the "grandfather clause"); a person of "good character" who understood the duties and obligations of citizenship; a person who was able to read and write correctly any paragraph of either the federal or state constitutions; or a person who owned 40 acres of land or $500.00 worth of taxable property.  These laws were enacted with the express purpose of making it more difficult for non-white voters to register.

23

73.    Although the poll tax was repealed in 1945, Georgia continued to implement other means of disenfranchising black and minority voters.

74.    In 1949, Georgia adopted a new law that required all voters to re-register under a new literacy test, which required citizens to demonstrate their ability to read and write or answer at least 10 of 30 factual questions correctly ("understanding" or "literacy tests").  In 1958, Georgia increased the required number of correct answers from 10 to 20 questions, including questions about what qualifications were needed to run for the Georgia General Assembly, how the writ of habeas corpus can be suspended, or what procedures were required to amend the U.S. Constitution.  These types of disenfranchising measures led to the passage of the Voting Rights Act of 1965 (VRA).

75.    The VRA required "covered jurisdictions," with a history of using unconstitutional tests and devices and low voter registration turnout rates, like Georgia, to submit changes in voting laws or procedures to the Department of Justice ("DOJ") or a federal court.

76.    As a "covered jurisdiction," Georgia was prohibited from making changes to its election laws or procedures unless the DOJ or a federal court found that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  52 U.S.C. § 10304.  The

VRA also abolished the literacy test for voter registration employed by Georgia and other jurisdictions, primarily in the South.

77.    Under the preclearance requirement, from 1965 to 2012, the federal government blocked 187 proposed changes to election law by Georgia and its counties and municipalities, finding in each case that the change would have a retrogressive impact on voters of color in Georgia.

78.    The VRA's preclearance requirement and the elimination of literacy tests or devices led to substantial gains in black and minority registration in Georgia until the Supreme Court's 2013 decision in *Shelby County v. Holder,* which effectively nullified the preclearance requirement.

79.    Following *Shelby County*, Georgia immediately began to impose restrictions on voting rights that resembled the state's racially discriminatory requirements before the adoption of the VRA.

80.    These measures involved voting restrictions across multiple categories, including the imposition of one of the strictest registration deadlines in the country, exact match voter identification requirements, documentary proof of citizenship, mass purges of registered voters, restrictions to early voting, and closures or relocations of polling locations despite an overall increase in registered

voters. In fact, of all jurisdictions previously covered by Section 5 of the VRA, Georgia is the only one to have enacted all of these restrictive measures.

81.    These barriers have had a disproportionate impact on voters of color, and other historically marginalized communities.

## Racial and Ethnic Demographics of Voting in Georgia

82.    Since 1990, the Black population in Georgia has almost doubled, increasing from 1.8 million to 3.5 million in 2019.  Similarly, the Latinx and Asian voting populations in Georgia have experienced significant growth, nearly tripling in size from 2000 to 2019. By the end of 2020, 270,000 Latinx Georgians were registered to vote.

83.    As a result of this growth, and outreach initiatives focused on engaging voters of color, Georgia added almost a quarter-million Black and Latinx voters to its registration rolls between October 2016 and October 2020. Notably, in advance of the general election in 2020, Black voter registration increased by 25 percent.

84.    By contrast, over the last 20 years, the proportion of white registered voters has decreased from each presidential election to the next.

85.    Although white voters still make up a majority of the Georgia electorate, that number decreased from 62% to 59% over the last four years.

26

86.     In line with the national trend, Black and Latinx populations in Georgia experience lower socioeconomic status than their white counterparts.  As an example, the 2019 median income for white households was $70,832, compared to the median for Black households of $47,096, and Latinx households of $52,661.

87.     Georgia's voting patterns are consistently polarized by race.  For example, in the 2018 gubernatorial election, 93 percent of Black voters preferred one candidate, while only 25 percent of white voters supported that candidate.

**The General Assembly Rushed SB 202 Through the Legislative Process, Ignoring the Obvious Impact on Georgia Voters, Especially Voters of Color**

88.     The legislative process by which the General Assembly and Governor Kemp passed and enacted SB 202 was marked by significant and concerning irregularities.

89.     Since the first version of SB 202, then a two-page bill limiting the mailing of absentee ballot applications to voters, was introduced on February 18 of this year, state legislators have made no bones about the intent of the bill.  Their motivation was perhaps best captured by Georgia House Speaker David Ralston, who said that he does not want every registered voter to receive an absentee ballot because it would "certainly drive up turnout"—that is, alternatives to in-person voting on Election Day apparently allow for *too much* democracy.

90.     The legislative history of S.B. 202 reveals that the bill's passage was rushed, irregular, secretive, and an abuse of ordinary legislative process.  It evidences a calculated effort to avoid public scrutiny of a bill whose obvious goal was voter suppression.  In response to record turnout by voters of color, and against a backdrop of false, racially charged allegations of widespread voter fraud, the General Assembly passed SB 202 just 79 days after the 2021 runoff elections.

91.     SB 202 is predicated on the wholly false notion of voter fraud, which has become a common scheme to justify blocking access to the ballot—particularly for voters of color on the heels of record turnout during the 2020 general election. Representative Barry Fleming, Chair of the House Special Committee on Election Integrity, wrote in an op-ed: "If elections were like coastal cities, absentee balloting would be the shady part of town down near the docks you do not want to wander into because the chance of being shanghaied is significant."

92.     Among the fanciful allegations were that voting machines were somehow programmed to "switch" votes, that voter signatures on absentee ballots were not property verified, that "suitcases" of fake ballots were counted, that large numbers of ineligible voters cast votes, and that deceased persons' identities were used to cast illegal votes.  Georgia election officials, including defendant Raffensperger, repeatedly debunked these rumors, conspiracy theories, and tropes.

28

Secretary Raffensperger described Georgia's election as secure, honest, and efficient.  He reported to Congress that his office had confirmed the presidential contest results by a hand audit, a candidate-requested recount, an audit of voting machines, and an audit of absentee ballot signatures in Cobb County.  According to the Secretary of State's office: "At the end of the day many of these bills are reactionary to a three-month disinformation campaign that could have been prevented."

93.     Following Secretary of State Raffensperger's defense of the integrity of the 2020 general election and 2021 runoff election, and his refusal to "find" votes for President Trump and overturn the will of Georgia's voters, SB 202 removes the Secretary of State as both chair and voting member of the State Election Board, demoting him to an ex officio, nonvoting member of the Board.

94.     After the general election, other Georgia election officials warned that these false allegations about the integrity of the election could themselves suppress turnout in the runoff elections.

95.     Governor Kemp described these allegations as a mere "distraction." Lieutenant Governor Geoff Duncan was even more explicit.  He reported that his office had seen no credible examples of systemic voter fraud.  According to the Lieutenant Governor: "The conversations around election reform were rooted in

misinformation that the former president and those around him spread […] All

because they wanted to overturn a fair election that unfortunately didn't turn out

the way that we Republicans wanted it to."  Washington Post, 4/13/21, at A19.

96.    Allegations of voter fraud found no support in court.  Lawsuits

challenging Georgia's election results were repeatedly rejected by state and federal

judges, as were dozens of other lawsuits in states carried by the Democratic

candidate for President.  Not a single court found any evidence that the election

results in Georgia were tainted by any "integrity" issues, much less voter fraud.

97.    Although SB 202 purports to ensure the integrity of the democratic

process, the General Assembly rushed the bill to passage and signature with little

opportunity for voters to be heard.  The legislative committees tasked with

assessing election bills did not provide open, transparent, or inclusive practices for

public testimony.  Neither the Senate Committee on Ethics nor the House Special

Committee on Election Integrity announced clear guidelines for providing and

receiving public input before any hearings.

98.    For example, basic information about who could testify, how to sign

up to testify, or how testimony would be conducted often was not provided in

advance of hearings.

99. When guidance was provided about public testimony, it was often inconsistent. For example, prior to a February 19, 2021 House Committee hearing, the Committee told the public that remote testimony via videoconferencing technology would not be available. But during the hearing, Chair Fleming invited certain witnesses to testify remotely. Only in response to a question during the hearing did Chair Fleming agree for the first time that remote public testimony was possible. This opportunity, however, was offered only to members of the public who were specially invited by House Committee members or staff to testify.

100. Some witnesses were denied the opportunity to testify despite repeatedly filing written requests. Chair Fleming inaccurately proclaimed at the end of the February 23, 2021 hearing that everyone who signed up to testify had been afforded an opportunity to do so.

101. The committees repeatedly failed to publicly post agendas for committee hearings, or even the version of the bill that would be discussed at a hearing. In some cases, amended versions of bills were revealed just hours before hearings to consider the amendments; in other cases, amendments were not posted before hearings at all. Members of the public and even some legislators were left to guess whether and how the bill had been amended, leaving them little opportunity for timely comment.

31

102.   Lengthy bills were often provided to the public with little or no time to read them, much less analyze them, before the hearings.  Updated versions of the bill were almost never promptly uploaded to the General Assembly website. Many committee hearings were held on versions of the bills that had not been posted online for the public's consideration.  This made it impossible for legislators and members of the public to comment meaningfully on the pending versions of election bills.

103.   For example, the original version of House Bill 531 ("HB 531"), provisions of which were incorporated into the final version of SB 202, was first made available, through postings on social media, mere hours before some members of the Committee convened for a hearing on February 18, 2021.  Then, less than 24 hours later, the House Committee held another hearing before all its members.  The House Committee continued to amend HB 531 and hold hearings on amended versions of the bill without making amendments or substitute versions publicly available.

104.   Many committee hearings related to elections bills were scheduled and held with little to no advance notice.  Some of these hearings were not even live-streamed for the public to participate.

32

105.   The Senate Committee held numerous hearings, including on February 25, 2021, at either 7:00 a.m. or 7:30 a.m., significantly outside of traditional business hours.  This unusual schedule limited public attendance and scrutiny.

106.   Although concerns were raised by members of the public about the potential racial impact of proposed election changes during House and Senate Committee hearings, it appears that the Committees conducted no analysis to evaluate the racial impact of any of the election bills they considered, including those that went on to be passed by the General Assembly.

107.   On March 8, 2021, the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections issued a statement that it was "concerned that the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."

108.   Nevertheless, SB 202 was rushed through the legislative process. What began as a two-page bill passed over from the Senate to the House on March 9, 2021 swelled to more than 90 pages in two weeks.  After the Georgia House of Representatives passed a substituted version of SB 202 on March 25, 2021, it was immediately transmitted to the Georgia Senate.  No conference committee was convened.  The bill was brought to the floor of the Senate for a vote

hours later.  SB 202 was rushed to signature by the Governor, with little time for the public to weigh in.  Mere hours after the House and Senate voted on the now 98-page version of SB 202, Governor Kemp signed the bill into law in a closed-door signing ceremony.

109.   Even legislators were shut out of the signing.  Most egregiously, Representative Park Cannon was arrested and forcibly removed from the State Capitol when she knocked on the Governor's door, requesting that the public be allowed to witness the SB 202's signing.

### SB 202 Places Undue Burdens on the Exercise of the Right to Vote, Especially for Black Voters and Other Voters of Color

110.   The challenged provisions of SB 202, both individually and collectively, place undue obstacles on the constitutional right to vote, effectively disenfranchising or deterring large segments of the electorate.  These obstacles have such a pronounced disparate impact on Black voters and other voters of color that this impact can only have been intentional.  These historically disenfranchised voters disproportionately prefer early voting on weekends, lack the requisite ID for obtaining absentee ballots, rely on accessible drop boxes, cast provisional out-of-precinct ballots, and experience long lines when voting in person. SB 202

systematically and purposefully targets these voters, intending to suppress their votes or inevitably doing so.

111.   Proponents of these measures offered no reliable factual evidence that they were necessary to ensure the integrity of elections or to restore confidence in the election.  The General Assembly purposefully disregarded evidence that SB 202 would severely burden the right to vote of Georgia citizens, especially Georgians of color.

## SB 202 Erects New Obstacles to Absentee Voting

112.   Before SB 202, a Georgia voter could request an absentee ballot as early as 180 days before an election and as late as the Friday before Election Day. SB 202 compresses this time period by more than 100 days: a voter may request an absentee ballot no more than 78 days before an election, and an application must be received by the county election administrator at least 11 days before the election.

113.   Prior to SB 202's passage, a Georgia voter requesting an absentee ballot still had to provide identifying factors.

114.   SB 202 now imposes additional identification requirements to request an absentee ballot that directly impact Plaintiffs' members.  A voter must provide a Georgia driver's license or Georgia state identification card number.  A voter who

does not have either, such as many of Plaintiffs' members, must instead submit a photocopy or electronic image of a utility bill, bank statement, government check, paycheck, or other government document containing the voter's name and address.

115.   Under Section 27 of SB 202, a voter seeking to cast an absentee ballot must now add personal ID information on the outside of the ballot.  This information includes a Georgia driver's license number or Georgia state ID card number, the voter's date of birth, and, if the voter does not have a Georgia driver's license or state ID card, the last four digits of the voter's Social Security number.

116.   Under Section 28, if the voter does not have a Georgia driver's license, state ID card, or Social Security number, he or she must produce a photocopy of a utility bill, bank statement, government check, paycheck, or other government document containing the voter's name and address.

117.   A voter seeking to cast an absentee vote must also swear an oath, under criminal penalty, that he or she has completed the ballot in secret—even from the voter's child under 18 years of age or any child under 12 years of age.

118.   These new requirements for mail-in voting potentially affect all Georgia voters.  But data from recent years demonstrates that while Black voters comprise 30% of Georgia's voting population, they account for almost 42% of the requests for absentee ballots.  Per the Georgia Secretary of State's own data, Black

voters are more likely to vote by mail than any other racial demographic. According to one national study, as many as 25% of Black voters do not have a current and valid form of government-issued photo ID, compared to 11% of voters of all races.

119.   Other communities, including immigrant, poor, elderly, and student voters, including Plaintiffs' members, have likewise relied disproportionately on absentee voting, particularly during the general and runoff elections.  For instance, immigrant voters and voters with disabilities who often need translation services or other assistance to complete a ballot often prefer to vote by mail so they have more time to complete their ballot.

120.   SB 202 will disparately impact Plaintiffs' member voters.  It will force them to vote more heavily in person when in-person voting may not be tenable, and to overcome additional burdens that result from long lines, grueling waits, and greater risks of having one's ballot rejected.

121.   There is no credible evidence that mail-in ballots have been used fraudulently in Georgia or that curtailing mail-in voting is necessary to ensure the integrity of future elections.

### SB 202 Limits Access to Drop Boxes

122.   Before SB 202, Georgia voters could cast their ballot at one of 330 drop boxes in the state.  Many of these drop boxes were located outdoors and accessible 24 hours a day.

123.   Before SB 202, many county election administrators kept drop boxes open after business hours, beyond the advance voting period, and until the polls closed at 7:00 p.m. on Election Day.  They were nonetheless effectively secured according to an emergency rule promulgated by the State Election Board.  Few, if any, instances of tampering or interference with drop boxes, indoors or outdoors, were reported in the 2020 election cycle.

124.   In the 2020 election cycle, many of Plaintiffs' member voters preferred the use of drop boxes to avoid well-publicized mail delays.

125.   Section 26 of SB 202 limits the number of drop boxes to the lesser of one per every 100,000 "active registered voters" in the county or one per advance voting location in the county.  This drastically reduces the number of available drop boxes, especially in the most populous counties.

126.   In Gwinnett County, for example, there were 23 drop boxes available in the 2020 election cycle; SB 202 would reduce that number to six, in a county approaching one million residents.  According to the New York Times, total drop

boxes for Fulton, Cobb, DeKalb, and Gwinnett counties would be reduced from 94 to at most 23.

127.   SB 202 also prohibits the use of outdoor drop boxes, except during emergencies declared by the Governor.  Under SB 202, drop boxes are allowed only inside the office of the board of registrars or absentee ballot clerk or inside an advance voting location.

128.   SB 202 limits the use of drop boxes to the hours of operation of that office or advance voting location.  That is, drop boxes will no longer be an option for submitting ballots at night or otherwise outside normal business hours.  Many of Plaintiffs' members use the drop boxes at night or otherwise outside of normal business hours.

129.   Before SB 202, drop boxes were already required to be under video surveillance 24 hours per day, seven days per week.  SB 202 now mandates that all drop boxes be under constant surveillance by a person: an election official, law enforcement officer, or licensed security guard.

130.   SB 202's restrictions on the location, availability, and operating hours of ballot drop boxes will disproportionately burden Black, Asian, and Latinx voters, and voters with disabilities.  Georgia voters—especially in these historically disenfranchised communities—have come to rely on drop boxes as a

safe and an important option for casting a ballot.  For many voters—especially

those with childcare or work commitments that limit their availability during

normal voting hours, as well as those with medical conditions or other

disabilities—casting an in-person ballot during advance voting or on Election Day

may be difficult or impossible.  Widely reported and continuing failures and delays

at the United States Postal Service have left many voters justifiably concerned

about whether absentee ballots returned by mail will be received in time by their

county election officials.  For these voters, secure drop boxes provide a reliable

and accessible option, and the enacted restrictions severely burden their rights to

vote by forcing them to navigate more onerous paths to voting, if they are able to

vote at all.

131.   The new mandate for in-person constant surveillance of secure drop

boxes by an election official, licensed security guard, or law enforcement official,

will also raise concerns about voter intimidation for Black voters and other voters

of color, who are routinely and unfairly targeted by law enforcement.  Without any

evidence that in-person law enforcement surveillance is necessary to repel fraud or

misconduct, the surveillance enacted by SB 202 recalls past practices of Jim Crow-

era efforts to deter Black voters from casting their ballots.  The new restrictions on

40

drop boxes raise all of the same threats and burdens to many of Plaintiffs' members.

132.   There is no evidence that drop boxes have been used fraudulently in Georgia or that limiting the availability of drop boxes is necessary to ensure the integrity of future elections.

## SB 202 Prohibits Mobile Voting Units

133.   Before SB 202, Georgia law permitted county election administrators to provide mobile polling facilities for both early voting and voting on Election Day.

134.   In the 2020 election, two Fulton County mobile voting units made stops at twenty-four locations, including several Black churches.  More than 11,200 people voted at these two facilities.

135.   Section 20 of SB 202 effectively outlaws the regular use of mobile voting units, which are used by many of Plaintiffs to serve their members and/or by Plaintiffs' members.  It provides that "buses and other readily movable facilities" may be used only in an emergency declared by the Governor. Section 26, similarly, restricts early voting to "a building."

136.   The elimination of all mobile voting units except in an emergency declared at the sole discretion of the Governor unduly burdens voters, especially

voters of color. Mobile voting units with four to eight voting stations were provided in the general election by Fulton County, where a majority of the population is nonwhite, as a safe and secure option for all voters in the county. Fulton County, like other Atlanta metro area counties, has a history of both long voting lines and backlogs of requests for absentee ballots. Like so many of the voting options restricted by SB 202, mobile voting units enabled many more Georgians to cast their votes and participate in their democracy. Indeed, the turnout in Fulton County in the 2020 general election was more than 77% overall, the highest in 28 years.

137.   There is no credible evidence that mobile voting facilities have been used fraudulently in Georgia or that prohibiting their use is necessary to ensure the integrity of future elections.

## SB 202 Restricts Early Voting in Runoff Elections

138.   SB 202 short-ended the period for all runoff elections, which must now be held 28 days after the general or primary election. Section 28 reduces the advance voting period for runoffs from three weeks to one week. It also gives county boards of election unfettered discretion to eliminate all Sunday early voting days; early voting may be conducted on one or two Sundays, but only "if the registrar or absentee ballot clerk so chooses."

42

139.   Advance voting opportunities and particularly weekend voting opportunities are essential to ensuring that voters can safely, securely, and freely participate in our democracy.  They give voters the option to cast their ballots without facing the crowds and long lines on Election Day, and offer the flexibility to balance family and work obligations that make voting on Election Day problematic for thousands of Georgians.

140.   Shortening early voting in runoff elections imposes both direct and secondary burdens upon Georgians' right to vote, including those who vote on Election Day such as many of Plaintiffs' members.  Most directly, restricting the early voting period forces voters who need to vote early to do so on fewer days. This restriction operates to prevent some voters from voting altogether. Secondarily, the restriction adds to the long lines and wait times at the early voting polls on those fewer days—deterring, burdening, and in some cases preventing those voters from casting their ballots. The same secondary effects flow through to Election Day.  Simply put, the fewer days available to vote, the more onerous voting becomes.

141.   The change in Sunday voting from guaranteed to discretionary is obviously targeted to Black voters and Plaintiff churches and faith-based organizations.  It is widely known that "Souls to the Polls" programs effectively

43

organize and encourage Black church parishioners to vote after Sunday services, increasing overall turnout among Black voters. Plaintiff churches and faith-based organizations coordinated Souls to the Polls and such a change in the law impacts the access to the ballot for those Plaintiffs' members.

142. There is no credible evidence that reducing the time for runoff elections or limiting early voting days in runoff elections is necessary to ensure the integrity of future elections in Georgia.

### SB 202 Makes "Line Warming" a Criminal Offense

143. In the lead-up to the 2021 runoff elections, Defendant Raffensperger sent an Official Election Bulletin aimed at suppressing so-called "line warming" via enforcement of the State's ban on buying votes, Ga. Code Ann. § 21-2-570. SB 202 bill now modifies the Georgia Code's provisions on electioneering.

144. SB 202 bans "giv[ing], offer[ing] to give, or participat[ing] in the giving of … gifts, including, but not limited to, food and drink," to any voter standing in line at a polling place. As such, it equates an offer of comfort with "the giving of any money or gifts" to a voter.

145. More specifically, SB 202 criminalizes an offer to provide free food and drink to voters standing within 150 feet of a polling place. It also prohibits a

volunteer from coming within 25 feet of any voter standing in line, even outside of the 150-foot zone.

146.   As SB 202 itself acknowledges, in-person voting in Georgia is plagued by "long-term problems of lines." SB 202 § 2(7).  According to the Bipartisan Policy Center, Georgia had the single longest average wait time to vote in 2018.

147.   Long lines to vote are corrosive to democracy.  They force voters to choose between their health, their time, or their job and exercising their fundamental right to cast a ballot.  A long line to vote does not just discourage people from casting a ballot that day: it also discourages them from voting in the future.  Statistical evidence shows nearly 200,000 people failed to vote in the 2014 elections due to long lines in 2012.

148.   Defendants' structuring of Georgia's elections helps create these lines. More than half of Georgia's 2,655 precincts are assigned more than 2,000 voters, the recommended maximum. In rural counties, over 22,000 voters can be assigned to a single polling place.  The average polling place serves over three thousand voters, 47% more than they did in 2012, and far more than the recommended number.

149.   The burdens of these lines do not fall evenly on Georgia voters. Rather, like so many deterrents to voting, they are disproportionately felt by Black voters and other voters of color.  As one national study found, "the more voters in a precinct who are non-white, the longer the wait times."

150.   Since 2012, almost two million people have registered to vote in Georgia, making up more than a quarter of total registered voters in 2020.  Many of these new voters are younger, nonwhite, and based in the nine counties making up metropolitan Atlanta.  In the same period, rather than accommodating this increase by establishing sufficient polling locations to serve them, the state has cut polling locations by nearly 10%.  The surge in registration in majority Black precincts means that these cuts disproportionately harm those voters.

151.   In the June 2020 primary elections, hundreds of voters were forced to choose: wait in line for hours, with temperatures pushing 90 degrees, or sacrifice their right to vote.  According to an Atlanta-Journal-Constitution analysis, Black voters bore the brunt of these long lines: only 61% of majority Black precincts close on time compared with 80% of mostly white precincts.  Whether a precinct closes on time indicates whether there was a line of voters still waiting to cast their ballots.  Some voters in Union City, Fulton County, which is 88% Black, waited in line until 12:37 a.m. to vote.

152.   Lines were long in the General Election in Georgia as well, with wait times of five hours common in metro Atlanta and some voters waiting over 11 hours.

153.   Because state officials allow these lines to occur year after year, many non-partisan volunteer organizations, in what is sometimes called "line warming," offer water, snacks, chairs, and other assistance to voters waiting in line.  Plaintiff churches and faith-based organizations provide line warming throughout the state of Georgia during elections.

154.   Providing voters with food and drink is consistent with the best values of our democracy and the basic principles of the mission for many of the Plaintiffs. It encourages voters to stay in line and emphasizes that every vote matters.  This humane service also helps reaffirm the dignity of Black voters, who are disproportionately affected by longer lines.

155.   There is no evidence that the offer of food or drink to voters waiting in line, without partisan electioneering or quid pro quo, has been used fraudulently in Georgia or that limiting such humane gestures is necessary to ensure the integrity of future elections.

**SB 202 Invalidates Out-of-Precinct Provisional Ballots**

156.   Before SB 202, if an otherwise eligible voter cast a provisional ballot in the county of his or her residence, but at the wrong precinct, the ballot would be counted for every race on that ballot in which the voter was qualified to vote.

157.   More than 11,000 voters cast a provisional ballot in the 2020 general election and more than 10,000 voters cast a provisional ballot in the 2021 runoff elections. Most of these provisional ballots were "out-of-precinct" ballots.

158.   SB 202 now disenfranchises all out-of-precinct provisional ballot voters who cast a ballot before 5:00 p.m. on Election Day.  SB 202 requires poll officials to inform a voter that his or her vote is invalidated for *all* of the races on that ballot.

159.   While a ballot may include precinct-specific elections, it may similarly encompass congressional and other races that are not precinct-specific. Under the new law, however, Georgia election officials will discard the entire ballot cast in the incorrect precinct, regardless of whether the ballot also contains eligible votes.  That is, rather than counting the ballot's votes for eligible races as was done in the past, S.B. 202 will *require* the entire ballot to be thrown away— even if it was cast by an eligible registered voter, and even if it was cast in a timely

48

manner and otherwise qualified to be counted.  This provision nullifies properly cast votes by qualified voters.

160.   This new practice will disproportionately affect Black voters, and other historically disenfranchised communities, including many of Plaintiffs' members, who are proven to be more likely than white voters to cast an out-of-precinct ballot since they are more likely to have moved within their county than white voters, and thus more likely to arrive at an incorrect precinct.

161.   Recent research demonstrates that Black voters in Georgia disproportionately live in neighborhoods with much higher rates of in-county moves.  Not only does the data reflect that the population with the most in-county moves is 47% Black, relative to 37% non-Hispanic white, but the population with the *least* in-county moves is only 22% Black, compared to 64% non-Hispanic white.  Requiring election officials to discard ballots cast in the wrong precinct will thus not only disenfranchise a substantial number of Georgia voters each year, but it will do so disproportionately within Georgia's Black community, as well as immigrant, minority, student, and poor populations that are more prone to relocation.

162.   There is no evidence that categorically invalidating a broad range of provisional ballots is necessary to ensure the integrity of future elections.

**SB 202 Allows Unlimited Challenges to the Qualifications of Voters**

163.   SB 202 subjects Georgia voters to the risk of having to defend their vote against an unlimited number of public challenges by any person who wishes to disenfranchise them, with or without merit.

164.   Baseless accusations of voter fraud have been used against voters of color to deter them from exercising their right to vote.  SB 202 needlessly exposes voters to abusive duplicative, frivolous, and potentially unlimited challenges to their eligibility before a government review board.  It places another disparate burden on voters of color.  It does so without any standard of what constitutes probable cause to question a particular voter.

165.   There is no legitimate state interest that justifies these severe burdens. State permission, or even encouragement, to bring an unlimited number of voter challenges only operates to enable serial vote suppressors to identify and harass voters, and particularly voters of color, based on racist and xenophobic tropes about "suspicious" voter conduct.

**SB 202 Permits the State Election Board to Take Over County Election Administration**

166.   SB 202 heightens the power of the party that controls the majority in the Georgia General Assembly to control county-level election administration.

Section 5 of SB 202 replaces Secretary of State Raffensperger, who is elected at-large statewide, as chair of the State Election Board with an individual selected by the General Assembly.  With this change, the General Assembly will appoint three of the State Election Board's five members.

167.   In turn, Section 6 of the bill grants a new power to the State Election Board: the power to suspend local election superintendents and replace them with an individual of the State Election Board's choosing, who will wield all the powers and duties of an election superintendent, including personnel decisions.

168.   This takeover provision is subject to the criteria in Section 7, which are merely that an election superintendent to be suspended have violated Georgia election statutes, rules, or regulations three times in the last two election cycles, no matter how technical the violations, or showed gross negligence, malfeasance, or nonfeasance in their role administering elections.

169.   In addition to this low bar triggering potential suspension and replacement of an election superintendent, there are scarce temporal constraints on when the State Election Board may choose to "disappear" an election superintendent.  Section 7 only provides that the Board's suspension hearing take place between thirty and ninety days after receiving a petition—and the Board may petition itself for a suspension hearing. There is no limitation preventing such a

51

suspension from taking place one week prior to Election Day or at any other crucial juncture in an election calendar where election officials' need to "seek 'order, rather than chaos' in their elections" is most heightened. *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1281 (2020).

170.   Following the 2020 general election and 2021 runoff election, Secretary of State Raffensperger repeatedly attested to the integrity of these elections and assured the public that there was no evidence of widespread voter fraud that would cast doubt on the legitimacy of the vote counts.

171.   Four days before the U.S. Congress was scheduled to certify the results of the 2020 presidential election, Secretary of State Raffensperger received an extraordinary telephone call from then-President Trump, insisting that he had won the state of Georgia in the election and urging the Secretary of State to "find" 11,780 votes and overturn the will of a majority of Georgia's voters. Mr. Raffensperger properly declined the President's invitation, telling him "the data you have is wrong."

172.   On the heels of Mr. Raffensperger's assurances that the results of the general and runoff elections were correct and reliable, SB 202 ousts the Secretary of State from his chairmanship of, and even his voting membership on, the State

Election Board and awards these positions to a chairperson chosen by the state legislature rather than the voting citizens of Georgia.

## **FIRST CLAIM FOR RELIEF**

**Violation of Section 2 of the Voting Rights Act 52 U.S.C. § 10301, et seq.
(Intentional Racial Discrimination & Discriminatory Results)**

173.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 172 above as though fully set forth herein.

174.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"

175.   Discriminatory intent is not required to prove a violation of Section 2. A violation is established "if, based on the totality of circumstances," election processes "are not equally open to participation" by protected classes of citizens, in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

176.   SB 202 sets new voting laws, policies, and practices.  Among other things, it: (1) bans mobile voting units for advance voting and election day, except "in emergencies declared by the Governor pursuant to Code Section 38-3-51 to

supplement the capacity of the polling place where the emergency circumstance occurred"; (2) imposes restrictive ID requirements for both requesting and casting an absentee ballot; (3) limits the availability of secure drop boxes; (4) restricts the timeline for early voting during runoff elections; (5) criminalizes "line warming," including offers of free food and water to voters standing in line; (6) empowers the State Election Board, newly reconstituted with a voting majority selected by the General Assembly, to near-arbitrarily suspend and replace local election superintendents; and (7) disenfranchises eligible voters who cast out-of-precinct provisional ballots before 5:00 PM.

177.   SB 202 violates Section 2 of the Voting Rights Act because these provisions result in the denial of voters of color full and equal access to the electoral process.

178.   SB 202 further violates Section 2 of the Voting Rights Act because, given the "totality of the circumstances," *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986), including the long history of race discrimination in Georgia, these provisions, individually and cumulatively, will disproportionately deny voters of color, and particularly Black voters, an equal opportunity to participate in the political process and to elect representatives of their choice.

## SECOND CLAIM FOR RELIEF

**Fourteenth Amendment**
**U.S. Const. amend., XIV; 42 U.S.C. § 1983 (Intentional Race Discrimination)**

179.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 178 above as though fully set forth herein.

180.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…"

181.   SB 202 violates the Fourteenth Amendment to the United States Constitution because it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voter on account of race or color.

182.   SB 202 was enacted, at least in part, with a racially discriminatory intent to discriminate against Black voters and other voters of color in violation of the United States Constitution.

183.   Discriminatory intent, for purposes of a constitutional violation, may be established by proof that race was a motivating factor in the decisions of the

defendants. *Village of Arlington Heights v. Metro Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977).

184.   Georgia's long history of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB 202, the bill's legislative history, and the tenuousness of the stated justifications for SB 202 raise a strong inference of a discriminatory purpose in violation of the Fourteenth Amendment.

## THIRD CLAIM FOR RELIEF

**Fifteenth Amendment**
**U.S. Const. amend., XV; 42 U.S.C. § 1983**
**(Intentional Race Discrimination in Voting)**

185.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 184 above as though fully set forth herein.

186.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…"

187.   Section 1 of the Fifteenth Amendment to the United States Constitution prohibits states from abridging the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude."

188.   Any burden on the constitutional right to vote "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion County Election Board,* 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.).  "The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law."  *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312 1318-19 (11th Cir. 2019).

189.   SB 202 violates the Fifteenth Amendment to the United States Constitution because Defendants intentionally enacted and operate the law to deny, abridge, or suppress the right to vote on account of race or color.  SB 202 embodies unjustifiable, irrelevant and illegitimate state interests.

## FOURTH CLAIM FOR RELIEF

### First and Fourteenth Amendments
### U.S. Const. amend. XIV; 42 U.S.C. § 1983
### (Undue Burden on the Right to Vote)

190.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 189 above as though fully set forth herein.

191.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…"

192.   The right to vote is a fundamental constitutional right protected by both the due process and equal protection clauses of the Fourteenth Amendment. *See, e.g., Bush v. Gore,* 531 U.S. 98, 104-105 (2000); *Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze,* 460 U.S. 780, 786-87 (1983).

193.   The challenged provisions of SB 202 individually and collectively impose severe and, at a minimum, significant burdens on eligible Georgia voters' right to vote, including on Plaintiffs and members of Plaintiffs' organizations. Even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden.  *Common Cause/Ga. v. Billups,* 554 F.3d 1340, 1352 (11th Cir. 2009).  The more a challenged law burdens the right to vote, the closer the scrutiny courts will apply when examining that law.  *Stein v. Ala. Sec. of State,* 774 F.3d 689,694 (11th Cir. 2014).

194.   None of the burdens imposed by the challenged provisions of S.B. 202 are necessary to achieve, or reasonably related to, any sufficiently weighty legitimate state interest.  The burdens imposed by the challenged provisions of SB 202 accordingly lack any constitutionally adequate justification.

## FIFTH CLAIM FOR RELIEF

### Freedom of Speech / Expression
### U.S. Const. amend. I; 42 U.S.C. § 1983

195.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 194 above as though fully set forth herein.

196.   SB 202 makes it a criminal misdemeanor to "give, offer to give, or participate in the giving of . . . gifts, including, but not limited to, food and drink," to voters.  The law applies within 150 feet of a polling place or within 25 feet of any voter standing in line to vote.  *Id.* These provisions are overbroad, unconstitutionally burden Plaintiffs' First Amendment rights of speech and expression, and are not supported by any sufficient nor compelling, government purpose.

## SIXTH CLAIM FOR RELIEF

**Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.
(Discrimination Against Individuals with Disabilities)**

197.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 196 above as though fully set forth herein.

198.   The Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, guarantees equal access for qualified individuals to the benefits of the services, programs, or activities of a public entity.  42 U.S.C. § 12132.

199.   Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

200.   In providing aids, benefits, or services, public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may public entities provide qualified individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others.  28 C.F.R. § 35.130(b)(1)(ii)-(iii).

201.   Public entities must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants,

60

participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  28 C.F.R. § 35.160(b)(1).

202.   The Georgia State Election Board, as an agency or instrumentality of the State of Georgia, is a public entity under Title II of the ADA.

203.   Voting, including absentee voting, is a service, program, or activity provided by the Georgia State Election Board.

204.   Plaintiffs have members and/or constituents that are qualified individuals with disabilities under the ADA and will be directly impacted by SB 202.

205.   SB 202 sets new voting law, policies, and practices. Among other things, it (1) bans mobile voting units for advance voting and election day, except "in emergencies declared by the Governor pursuant to Code Section 38-3-51 to supplement the capacity of the polling place where the emergency circumstance occurred"; (2) imposes restrictive ID requirements for both requesting and casting an absentee ballot; (3) limits the availability of secure drop boxes; (4) restricts the timeline for early voting during runoff elections; (5) criminalizes "line warming," including offers of free food and water to voters standing in line; and

(6) disenfranchises eligible voters who cast out-of-precinct provisional ballots before 5:00 PM.

206.   The challenged provisions of SB 202 individually and collectively fail to provide Georgia voters with disabilities, including members and/or constituents of Plaintiffs, equal access and ability to vote as Georgia voters without disabilities.

207.   If the law is unchanged, Georgia eligible voters with disabilities, including members and/or constituents of Plaintiffs, will be denied their right to vote as effectively as others in future elections.

## V.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

208.   Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, declaring that the challenged provisions of SB 202 are unconstitutional and in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution;

209.   Permanently enjoin Defendants, their agents, employees, and those persons acting in concert with them from enforcing or giving any effect to the

challenged provisions of SB 202, including enjoining Defendants from conducting any elections utilizing those provisions;

210.   Order Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

211.   Grant such other and further relief as may be just and equitable.

Respectfully submitted this 27th day of April 2021.

Respectfully submitted,

 /s/ Kurt Kastorf
Kurt Kastorf
KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, GA  30307
Telephone:  404-900-0330
kurt@kastorflaw.com

Judith Browne Dianis*
Gilda R. Daniels
Georgia Bar No. 762762
Jorge Vasquez*
Esperanza Segarra*
Sabrina Khan*
Jess Unger*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC  20005
Telephone:  (202) 728-9557
Jbrowne@advancementproject.org

Gdaniels@advancementproject.org
Jvasquez@advancementproject.org
Esegarra@advancementproject.org
Skhan@advancementproject.org
Junger@advancementproject.org

Clifford J. Zatz*
Britton D. Davis*
Nkechi Kanu*
William Tucker*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 624-2500
CZatz@crowell.com
BDavis@crowell.com
NKanu@crowell.com
WTucker@crowell.com

Chahira Solh*
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA  92614
Telephone:  (949) 263-8400
CSolh@crowell.com

Warrington Parker*
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA  94111
Telephone:  (415) 986-2827
WParker@crowell.com

*Applications for admission p*ro hac vice* to
be filed

*Counsel for Plaintiffs*

64

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization, GEORGIA MUSLIM VOTER PROJECT, a Georgia nonprofit organization, WOMEN WATCH AFRIKA, a Georgia nonprofit organization, LATINO COMMUNITY FUND GEORGIA, a Georgia nonprofit organization, DELTA SIGMA THETA SORORITY, INC., a Washington D.C. nonprofit organization on behalf of 7000+ Sorors residing in Georgia, THE ARC OF THE UNITED STATES, a Washington D.C. nonprofit organization, GEORGIA ADAPT, a Georgia nonprofit organization, GEORGIA ADVOCACY OFFICE, a Georgia nonprofit organization, SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE, a Georgia nonprofit organization, | CIVIL ACTION NO. 1:21-CV-01284-JPB |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT** |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, BRAD RAFFENSPERGER, Secretary of State of Georgia, in his official capacity, GEORGIA STATE ELECTION BOARD, REBECCA SULLIVAN, DAVID WORLEY, MATTHEW MASHBURN, and ANH LEE, Members of the Georgia State Election Board, in their official | |

capacities, FULTON COUNTY
REGISTRATION AND ELECTIONS
BOARD, ALEX WAN, MARK
WINGATE, KATHLEEN D. RUTH,
VERNETTA K. NURIDDIN, and
AARON V. JOHNSON, Members of
the Fulton County Registration and
Elections Board, in their official
capacities, RICHARD L. BARRON,
Director of the Fulton County
Registrations and Elections board, in
his official capacity, DEKALB
COUNTY BOARD OF
REGISTRATIONS AND
ELECTIONS, ANTHONY LEWIS,
SUSAN MOTTER, DELE L. SMITH,
SAMUEL E. TILLMAN, and BAOKY
N. VU, Members of the DeKalb
County Board of Registrations and
Elections, in their official capacities,
GWINNETT COUNTY BOARD OF
REGISTRATIONS AND
ELECTIONS, ALICE O'LENICK,
WANDY TAYLOR, STEPHEN W.
DAY, and GEORGE AWUKU,
Members of the Gwinnett County
Board of Registrations and Elections,
in their official capacities, KELVIN
WILLIAMS, Acting Elections
Supervisor of the Gwinnett County
Board of Registrations and Elections,
in her official capacity, COBB
COUNTY BOARD OF ELECTIONS
AND REGISTRATION, PHIL
DANIELL, FRED AIKEN, PAT
GARTLAND, JESSICA M. BROOKS,
and DARYL O. WILSON, JR.,
Members of the Cobb County Board of
Elections and Registration, in their
official capacities, JANINE EVELER,

Director of the Cobb County Board of
Elections and Registration, in her
official capacity, HALL COUNTY
BOARD OF ELECTIONS AND
REGISTRATION, TOM SMILEY,
DAVID KENNEDY, KEN
COCHRAN, CRAIG LUTZ, and
GALA SHEATS, Members of the Hall
County Board of Elections and
Registration, in their official capacities,
LORI WURTZ, Director of Hall
County Elections, in her official
capacity, CLAYTON COUNTY
BOARD OF ELECTIONS AND
REGISTRATION, DARLENE
JOHNSON, DIANE GIVENS,
CAROL WESLEY, DOROTHY F.
HALL, and PATRICIA PULLAR,
Members of the Clayton County Board
of Elections and Registration, in their
official capacities, SHAUNA DOZIER,
Clayton County Elections Director, in
her official capacity, RICHMOND
COUNTY BOARD OF ELECTIONS,
TIM MCFALLS, SHERRY T.
BARNES, MARCIA BROWN,
TERENCE DICKS, and BOB
FINNEGAN, Members of the
Richmond County Board of Elections,
in their official capacities, LYNN
BAILEY, Richmond County Elections
Director, in her official capacity, BIBB
COUNTY BOARD OF ELECTIONS,
MIKE KAPLAN, HERBERT
SPANGLER, RINDA WILSON,
HENRY FICKLIN, and CASSANDRA
POWELL, Members of the Bibb
County Board of Elections, in their
official capacities, and JEANETTA R.

WATSON, Bibb County Elections
Supervisor, in her official capacity,
BIBB COUNTY BOARD OF
REGISTRARS, VERONICA SEALS,
Bibb County Chief Registrar, in her
official capacity, CHATHAM COUNTY
BOARD OF ELECTIONS, THOMAS J.
MAHONEY, MALINDA HODGE,
MARIANNE HEIMES, and ANTAN
LANG, Members of Chatham County
Board of Elections, in their official
capacities, CHATHAM COUNTY
BOARD OF REGISTRARS, COLIN
MCRAE, WANDA ANDREWS,
WILLIAM L. NORSE, JON PANNELL,
and RANDOLPH SLAY, Members of
the Chatham County Board of Registrars
in their official capacities, CLARKE
COUNTY BOARD OF ELECTION
AND VOTER REGISTRATION,
WILLA JEAN FAMBROUGH,
HUNAID QADIR, ANN TILL, ROCKY
RAFFLE, and ADAM SHIRLEY,
Members of the Clarke County Board of
Election and Voter Registration, in their
official capacities, CHARLOTTE
SOSEBEE, Clarke County Board of
Election and Voter Registration Director
in her official capacity, COLUMBIA
COUNTY BOARD OF ELECTIONS,
ANN CUSHMAN, WANDA DUFFIE,
and LARRY WIGGINS, Members of the
Columbia County Board of Elections, in
their official capacities, COLUMBIA
COUNTY BOARD OF REGISTRARS,
NANCY L. GAY, Columbia County
Chief Registrar, in her official capacity,

Defendants.

## INTRODUCTION

1.      As the United States Supreme Court has explained, the right to vote is "a fundamental matter in a free and democratic society." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966).  "No right," the Court has held, "is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  That is because voting is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

2.      The full promise of the right to vote, however, remains elusive for Black voters, other voters of color, people with disabilities, and especially for voters of color with disabilities.  These marginalized groups face both intentional and targeted discrimination on the basis of race, as well as the thoughtless, "benign neglect" forms of discrimination most commonly experienced by people with disabilities.

3.      A central lesson of our democracy is that the right to vote is powerful—but voter access, like democracy itself, can be fragile and must be guarded with vigilance.

4.      Senate Bill 202 ("S.B. 202") is the latest iteration of Georgia's ongoing record of racial discrimination in voting, following the centuries-long and ongoing efforts by Georgia elected officials and legislators to curtail, severely burden, and restrict ballot access for voters of color.  Whether this outcome is

intentional or not, provisions in S.B. 202 will also illegally restrict the voting rights of people with disabilities.

5.     Publicly available data reflects that for more than two decades, Georgia has experienced a significant demographic change, and Georgia may become a state comprised of a majority of people of color ("majority-minority") by 2030.  Because of this shift, voters of color—particularly Black voters—currently and will continue to make up a larger portion of Georgia's electorate.  Black eligible voters, for example, account for nearly half (48%) of Georgia's 1.9 million-person growth in the electorate since 2000.  And since 2016, Black voter registration has increased by 25%, the largest increase among racial or ethnic eligible voter demographic groups.  In the metro-Atlanta county of Gwinnett, for example, the voting-age population has shifted from majority white to majority-minority.

6.     But consistent with Georgia's history, legislators and other elected officials have responded to these recent racial demographic shifts with unrelenting efforts to suppress the political participation of people of color.  Since the Supreme Court's 2013 decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), which eliminated the federal preclearance requirements of the Voting Rights Act of 1965 ("VRA"), these efforts have intensified and Georgia legislators have devised a myriad of changes to state election laws.  In fact, of the states previously covered by the preclearance requirement, Georgia is the only state that has enacted voting

restrictions across five major categories studied by the U.S. Commission on Civil Rights:  voter identification ("ID") requirements, documentary proof of citizenship requirements, voter purges, cuts to early voting, and polling place closures or relocations.  These barriers have made voting materially more difficult for historically disenfranchised communities, including people of color as well as voters with disabilities, older voters, students, and poor voters.

7.     Despite these barriers, however, more than 5 million Georgians exercised the right to vote in the 2020 General Election ("General Election"). Nearly 4.5 million did so again in the 2021 Runoff Elections ("Runoff Elections") for two seats in the United States Senate.  A record number of votes were cast in both elections.

8.     Consistent with recent patterns, voters of color—in particular Black voters—made their voices heard in the General Election and Runoff Elections. And while Black turnout has dropped in previous special elections, Black voters turned out in historic numbers in the Runoff Elections; Black turnout in the Runoff Elections was almost 92% of that in the General Election, a higher percentage than for white voters.

9.     People with disabilities also turned out to vote in the 2020 General Election and Runoff Elections at higher rates than in past elections.  Disability voter turnout in Georgia increased from 57.8% in the 2016 general election to 62.8% in the General Election.

10.     This record participation is all the more remarkable given that it occurred in two elections that took place in the middle of a global pandemic—a pandemic that has disproportionately harmed people of color and people with disabilities.

11.     The COVID-19 pandemic was not the only challenge facing voters of color this past election cycle.  In both the General Election and the Runoff Elections, historically disenfranchised and other voters overcame substantial barriers, in part due to the efforts of Plaintiffs and other organizations that expended efforts and resources to ensure that Georgians could cast their lawful vote using voting methods that have been in place for decades and across multiple elections.

12.     Countless Black Georgians—including those who have disabilities—waited for hours in needlessly long lines, where they were comforted and sustained by free water and refreshments offered by an array of civic and religious organizations, including parishioners of Plaintiff Sixth District of the African Methodist Episcopal Church ("AME Church"), sorors of Plaintiff Delta Sigma Theta Sorority, Inc. ("the Deltas"), and volunteers of Plaintiffs The Arc of the United States ("The Arc") and Georgia ADAPT.

13.     Other Georgians, who could not wait in long lines because of a disability, or because they work long days and multiple jobs and could not wait in such lines, returned their ballots to secure, video-monitored drop boxes—an option

they learned about from Plaintiff Georgia Muslim Voter Project ("GAMVP"), the Deltas, and other Plaintiff organizations.

14.     People with disabilities—hoping to avoid long lines, but still vote in person—showed up at advance voting locations, often with transportation support from Plaintiffs Georgia ADAPT and The Arc of Georgia.  Still others, such as the young immigrant women and other Georgians who receive support from Plaintiffs Women Watch Afrika ("WWA") and the Deltas, took advantage of early voting, eager and proud to cast a lawful ballot in their new country.

15.     Many Spanish-speaking Latinx[1] Georgians, meanwhile, were able to confidently cast absentee ballots after receiving in-language voter education materials from Plaintiff Latino Community Fund Georgia ("LCF Georgia").

16.     Plaintiffs Georgia Advocacy Office ("GAO") and The Arc of Georgia provided absentee ballot applications to nursing home residents and other people with disabilities who find it difficult or impossible to go to the polls to vote.  In turn, many of these people with disabilities, including nursing home residents, needed—and received—assistance in returning both the application for the absentee ballot, and the absentee ballot itself.

17.     In both the General Election and Runoff Elections, individuals across the State of Georgia—from Columbus to Augusta, from Valdosta to Blairsville,

---

[1] The term "Latinx" is a non-gender-binary term that refers to people of Latin American origin or descent.

from Atlanta to Macon, and everywhere in between—cast votes using a host of

lawful means.  They voted in person, during early voting and on Election Day;

they voted by mail, returning absentee ballots to secure drop boxes and to the

United States Postal Service; and some, in Fulton County, Georgia's most

populous county, voted in mobile voting units.

18.     The General Election and Runoff Elections in Georgia were

celebrated not only because of record participation (as well as the election of the

first Black Senator and first Jewish Senator from Georgia), but also because of

their integrity.  The losing presidential candidate and his allies launched an

unsubstantiated attack on the integrity of the election and sought to reverse its

results, claiming that it was beset by fraud.  But each of the baseless allegations

underlying this attack was rebuked, both by judges and by Georgia's own state and

local election officials.  Defendant Secretary of State affirmed that the election was

"secure, reliable, and efficient."  Indeed, his office conducted a comprehensive

audit and investigation of the claims of wrongdoing, which showed, as Defendant

Secretary wrote to Congress, "that there is nowhere close to sufficient evidence to

put in doubt the result of the presidential contest in Georgia," and that they were

not "seeing anything out of the ordinary scope of regular post-election issues."

Defendant Governor has disputed unsubstantiated claims of election fraud in

Georgia, calling those conspiracy theories "simply a distraction."  The Lieutenant

Governor also pushed back against the "amount of misinformation that continues

to fly around."  Specifically, he explained that he was troubled that "some folks are willing, just for the sole intent of flipping an election, of spreading misinformation."  The Georgia Voting Systems Manager also refuted allegations and conspiracy theories of election fraud, stating that "[e]verybody's vote did count [in November]."

19.     In short, in a safe and secure election, a record number of Georgians—in particular, those of color—performed democracy's most vital act: they voted.

20.     Then, in response to the historic and increasing political participation of voters of color, on March 25, 2021, the Georgia General Assembly and Defendant Governor made that most vital act more difficult.

21.     Increased voter turnout, celebrated by many, is too often taken by some, including Georgia's legislature, as invitation to devise new or recycled ways to constrict access to the ballot.

22.     With no valid justification—and with little opportunity for any, let alone meaningful, public input and review—the Georgia General Assembly enacted S.B. 202, a sweeping series of provisions that makes it harder, if not impossible, for certain Georgians, including historically disenfranchised groups, to vote.  These provisions—purported solutions in search of a problem—include:  (a) an unnecessary restriction on the use of mobile voting units; (b) new and burdensome ID requirements that force voters to provide ID or other sensitive

personal information each time they request an application for an absentee ballot and each time they cast an absentee ballot ("ID Requirements"); (c) a delayed and compressed time period for requesting absentee ballots; (d) limitations on the use of secure drop boxes as a means of returning absentee ballots; (e) a drastic reduction in early voting in runoff elections; (f) a cruel and inhumane ban—with criminal penalties—on anyone who provides free food and water or other assistance and relief to Georgians as they wait in line to vote ("Line Relief Ban"); (g) the complete disenfranchisement of some voters who cast out-of-precinct, but in-county provisional ballots ("in-county provisional ballots"); and (h) the restriction, enforced by criminal penalties, of who is allowed to assist people in submitting an application for an absentee ballot and in submitting the absentee ballot itself.

23.     These provisions will affect and severely burden all Georgia voters. But consistent with Georgia's long and ongoing record of racial discrimination, the harms will be disproportionately felt by voters of color, especially Black voters. These historically disenfranchised voters lack IDs or will be severely burdened in obtaining access to them; they use early and weekend voting, especially on Sundays, when Plaintiff AME Church and other churches encourage voting through "Souls to the Polls" events; they require access to secure drop boxes; they rely on water and other relief to withstand the long lines they disproportionately wait in to vote; and they are more likely to move and cast provisional ballots.

24.     Voters with disabilities have received scant attention in Georgia's battles over voting rights.  But each of the voting restrictions imposed by S.B. 202 also restricts access for and discriminates against people with disabilities.  Georgia voters with disabilities are less likely to drive, and more likely to rely on others to get to the polls.  They are also the least likely to be able to withstand long lines at the polling place.  As a result, they rely most heavily on early voting and absentee voting in order to cast a ballot.  In 2016, 68.2% of disabled voters either voted by mail or voted early.  Only 31.8% went to the polls on Election Day.  In 2020, the numbers are even more stark.  While 88.1% of voters with disabilities went to the polling place early or voted by mail in the General Election, only 11.9% braved the lines to vote at a polling place on Election Day itself.

25.     Each of S.B. 202's challenged provisions independently makes it more difficult, if not impossible, for historically disenfranchised communities to vote.  Cumulatively, however, the burden is even more severe—by restricting absentee voting, limiting the availability of drop boxes, restricting the use of mobile voting units, and shortening advance voting for federal runoff elections, S.B. 202 will force more voters to the polls on Election Day.  For some Georgians, this may be simply a manageable—though unnecessary—inconvenience.  But for voters of color and other historically disenfranchised communities—who *already* endure disproportionately longer lines than white voters—the challenges created by long lines could be determinative.  For voters with inflexible jobs, limited

access to transportation, and caregiving responsibilities, long lines present a potentially insurmountable obstacle.  For many voters with disabilities, who cannot stand in lines for long periods (or who need supports to do so), who face greater transportation barriers to get to the polls, or who face architectural access barriers once they get there and require assistance from others to vote, the extra burdens and "inconveniences" are not just significant, but discriminatory, denying access to the electoral process.  And rather than receive a simple bottle of water while waiting in an even longer line, those voters may now be forced to wait without assistance for hours, and those who seek to alleviate voters' exhaustion by providing a seat, water, or other refreshments risk criminal prosecution.

26.     This severe burden is not an accident.  Nor is it legal.  S.B. 202's challenged provisions deny voters of color a full and equal opportunity to participate in the political process.  By design and as a result, these provisions— both on their own and in their aggregate effect—violate Section 2 of the VRA and the rights of voters of color under the Fourteenth and Fifteenth Amendments to the United States Constitution.

27.     S.B. 202's challenged provisions further violate the right to vote of *all* Georgia voters, as protected by the First and Fourteenth Amendments to the United States Constitution.  Any state restriction on the right to vote, no matter how slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191

(2008) (quotation marks omitted).  S.B. 202 imposes a severe burden on this

fundamental right—yet there are no state interests that justify that burden.

28.     S.B. 202's Line Relief Ban violates another of Georgians'

constitutional rights:  their right to political speech and expression, as protected by

the First Amendment.  Through providing water and other resources, Plaintiffs

AME Church, the Deltas, and others throughout Georgia engage in "the type of

interactive communication concerning political change that is appropriately

described as 'core political speech.'"  *Meyer v. Grant*, 486 U.S. 414, 422–23

(1988).  This is protected speech under the First Amendment, and S.B. 202's

attempt to restrict that speech—via the imposition of criminal penalties—is

unconstitutional.

29.     S.B. 202's challenged provisions also violate the Americans with

Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973

("Section 504") by denying Georgians with disabilities a full and equal opportunity

to participate in the State's voting programs.  The ADA is a landmark civil rights

legislation meant to address centuries of discrimination against people with

disabilities that persists in all spheres of public life.  Congress enacted the ADA "to

provide a clear and comprehensive national mandate for the elimination of

discrimination against individuals with disabilities" and to integrate them into the

economic and social mainstream of society.  The ADA, which was based on

Section 504 and imposes nearly identical legal obligations on covered entities,

does not address only discrimination based on outright animus, but broadly prohibits anything that unnecessarily denies individuals with disabilities an equal opportunity to benefit from or participate in a government program, service, or activity (among other provisions).  Indeed, the ADA's implementing regulations prohibit eligibility criteria that screen out, or tend to screen out, people with disabilities as well as "methods of administration" that have the "effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."

30.    S.B. 202 imposes eligibility criteria that will tend to screen out people with disabilities.  For example, it imposes additional, unnecessary, and burdensome requirements to apply for and submit an absentee ballot.  S.B. 202 also imposes methods of administration that defeat the objectives of the absentee and in-person voting programs.  For example, it restricts drop box locations and times and imposes criminal penalties for providing unauthorized assistance to individuals with disabilities in returning an absentee ballot.  Additionally, by pushing voters to vote in person on Election Day, and yet prohibiting any supports for those waiting in long lines, S.B. 202 discriminates outright against voters with disabilities who need food, water, seating, or shade to endure the rigors the State is imposing on their right to cast a ballot.

31.    For each of these reasons, S.B. 202's challenged provisions violate federal law and the United States Constitution.  But the harm extends even further:

these provisions are an attack on democracy itself.  Voting is our most sacred right

as citizens.  "Other rights, even the most basic, are illusory if the right to vote is

undermined."  *Wesberry*, 376 U.S. at 17.  With the enactment of S.B. 202, the State

of Georgia has undermined that right, especially for voters of color.  That

enactment must be enjoined.

## PARTIES

### Plaintiffs

32.     Plaintiff AME Church is a nonprofit religious organization.  As the

Sixth District of the national AME Church, AME Church covers all of Georgia.

The national AME Church traces its roots to 1816 as the first independent

Protestant denomination founded by Black people in response to segregation and

discrimination in the Methodist Episcopal Church.  Today, there are more than 500

membership-based churches that are part of the AME Church in Georgia, with 36

congregations and tens of thousands of members in Atlanta alone, a majority of

whom are Black and many of whom are registered Georgia voters.

33.     The national AME Church has always placed a strong emphasis on

social justice initiatives.  Many civil rights leaders and activists have been among

its most prominent members, including the anti-lynching journalist Ida B. Wells-

Barnett, and Oliver Brown, the AME minister who sued on behalf of his school-

age daughter in the landmark Supreme Court case *Brown v. Board of Education*.

Encouraging and supporting civic participation among its members is a core aspect

of the AME Church's work.  Advocating for the right to vote, regardless of whom that vote is for, and encouraging the AME Church's eligible members to vote has been a priority of the church.  The civil rights march from Selma to Montgomery in Alabama was organized in and began at the steps of Brown Chapel AME Church in Selma.  After they were beaten by Alabama State Troopers on the Edmund Pettus Bridge on "Bloody Sunday," the wounded marchers fled back to the sanctuary of Brown Chapel.  AME Church's activities in support of voter participation reflect this history.  Those activities are, and have always been, conducted on a nonpartisan basis.  During the Civil Rights Movement, AME member churches served as organizational centers for Black civil rights leaders. Today, AME Church continues to encourage civic participation by holding "Souls to the Polls" events to transport churchgoers to polling locations during advance voting periods, registering voters for elections, hosting "Get Out the Vote" ("GOTV") efforts to increase voter turnout, and providing food, water, encouragement, and assistance to voters waiting in lines at polling locations.  Prior to the General Election, AME Church approached Defendant Secretary to offer up every single one of its Georgia churches to serve as polling sites if needed.

34.     By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, implementing the Line

Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members across Georgia.  Moreover, S.B. 202 makes it substantially more difficult for AME Church to continue in its civic-engagement activities and further its mission.  AME Church will be forced to divert much-needed and limited resources from its day-to-day activities to combat the suppressive effects of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes to the law; developing new training materials and public education documents; and reallocating resources during the crucial run-up to an election.  S.B. 202 will also require AME Church to divert time, money, and other resources away from its voter engagement activities, such as transporting voters to the polls and public outreach efforts to rural voters in Georgia, as well as away from other non-voting priorities that advance its social justice mission, such as its food bank programs. As a result, due to S.B. 202, AME Church is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

35.     Specifically, AME Church will have to divert more time, money, and other resources towards educating voters across the State about the provisions of S.B. 202, especially the new ID Requirements for casting absentee ballots.  In order to fund these new public education efforts, officials of AME Church will

have to not only divert resources from other initiatives but also spend more time

seeking grants and outside funding.  By spending more time and staff resources on

these S.B. 202-specific public education efforts, AME Church will have less

resources available to educate its members about other voting-related issues.  AME

Church will also have less time, money, and other resources to coordinate, oversee,

manage, and plan for other GOTV efforts, such as transporting voters to the polls

and engaging in outreach efforts for rural voters.

36.     Not only will AME Church have to educate its members about the

new ID Requirements, it will also have to help members who do not have any S.B.

202-approved ID or documentation to obtain these materials for absentee ballot

applications or for submission of the absentee ballot itself.  In some cases, this will

require AME Church to transport members to a Georgia Department of Drivers

Services office, transport them back to their residence, and help members

photocopy documents required for applications and ballots.  These activities will

also divert time, money, and resources away from other public education efforts.

37.     AME Church will also have to dedicate more time money, and other

resources towards understanding the new legal requirements of S.B. 202, and how

these requirements may impact AME Church's existing voter engagement efforts

such as its activities supporting voters waiting in line.  AME Church anticipates

that it may need to hire outside counsel to help better understand the legal

requirements of S.B. 202.  This financial burden will mean that AME Church has

less money for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

38.     AME Church will have to spend more time, money, and other resources on existing training programs provided to pastors at AME congregations across the State.  These training programs, which help pastors organize voter engagement efforts for members, will need to undergo substantial revisions in light of S.B. 202.  Time and resources spent overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities.  In addition, more training will need to be focused on the provisions of S.B. 202 and how they affect AME Church's voter engagement efforts.  Less time will be available to train pastors on other core civic and voter engagement work.  Finally, AME Church anticipates that there will be more inquiries from pastors and members relating to S.B. 202, which will mean that AME Church will be able to devote less time to its other work.

39.     Provisions in S.B. 202 which compress the timeframe for voters to apply for absentee ballots and limit the availability of drop boxes will also force AME Church to divert resources from turnout and GOTV efforts in the critical period leading up to an election.  AME Church will have to devote time, money, and other resources in the weeks leading up to an election to assist voters in complying with absentee ballot requirements and transporting voters to drop boxes, which will be less accessible due to S.B. 202.  This will result in less time, money,

and other resources available to AME Church for public education efforts and transportation to the polls.

40.     Plaintiff GAMVP is a nonpartisan, nonprofit organization whose mission is to activate and elevate the voices of Muslim voters in Georgia regardless of which candidates or issues they support.  GAMVP was founded in late 2015, in response to the growing anti-Muslim rhetoric that was prevalent in mainstream politics and the low rates of civic engagement in the Muslim community.  Thus, voter registration and voter education programs, as well as combatting voter suppression, are some of the organization's top social action priorities.  In light of the upcoming post-census redistricting cycle, GAMVP has and will continue to provide public education and training about the importance of the decennial census and its impact on redistricting, the allocation of funding, and policy-making.

41.     In furtherance of this mission, GAMVP holds voter registration drives, civic engagement workshops, voter education forums, and participates in GOTV efforts, including the provision of food and drink to voters waiting in line to cast a ballot, in Bibb, Chatham, Clarke, Cobb, Columbia, DeKalb, Fulton, Gwinnett, and Richmond Counties and is actively seeking to expand its efforts statewide.  GAMVP also provides resources to Muslim voters in advance on in-person voting, drop box voting, and voting by mail through their phone-banking and text-banking programs and through use of other multimedia.  GAMVP has and continues to serve Muslims of all races and ethnic backgrounds, including the

growing Black Muslim community in Georgia.  GAMVP also works with a wide range of age groups.  For instance, GAMVP has held civic engagement workshops for teenagers at Islamic schools as well as voter education sessions at mosques with a focus on their elder members.

42.     By severely restricting mobile voting for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the advance voting period in runoff elections, implementing the Line Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members and many of the communities that GAMVP works with will be directly impacted and harmed by the unlawful provisions of S.B. 202.

43.     Moreover, S.B. 202 makes it substantially more difficult for GAMVP to carry out its civic-engagement mission.  GAMVP will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes; developing new training materials and public education documents; and reallocating resources to serve voters during the crucial run-up to an election.  S.B. 202 will also force GAMVP to divert time,

money, and other resources from other activities, such as their census and redistricting education workshops, to assist Georgia voters who are burdened by the provisions of S.B. 202.  As a result, due to S.B. 202, GAMVP is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

44.   Specifically, GAMVP will have to divert more time, money, and other resources towards educating voters across the State about the provisions of S.B. 202.  To engage in these public education efforts, GAMVP will have to not only divert resources from other initiatives, but also spend more time seeking outside funding.  By spending more time and staff resources on these S.B. 202-specific public education efforts, GAMVP will have fewer resources available to educate its members about other voting-related issues.  GAMVP will also have less time, money, and other resources to coordinate, oversee, manage, and plan for other GOTV efforts, such as poll monitoring and engaging in outreach efforts to voters.

45.   GAMVP will also have to dedicate more time, money, and other resources towards understanding the new legal requirements of S.B. 202 and how these requirements may impact GAMVP's existing voter engagement efforts such as its activities supporting voters waiting in line.  As a result, the GAMVP will have fewer resources for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

46.     GAMVP will have to spend more time, money, and other resources on existing training programs provided to its members across the state.  These training programs, which help members educate and assist other voters, will need to undergo substantial revisions in light of S.B. 202.  Time and resources spent overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities and non-voting related work. Finally, GAMVP anticipates that there will be more inquiries from members and the communities they serve relating to S.B. 202, which will mean that GAMVP will be able to devote less time to other core activities and non-voting related work.

47.     Plaintiff WWA is a nonpartisan, nonprofit organization that seeks to promote the social and economic development and health equity of women and girls, and the acculturation of immigrants and refugees arriving to the United States from 23 African nations.  In furtherance of its mission, WWA provides social services, advocacy, health and legal education, know your rights workshops, citizenship preparation, legal services, domestic violence/female genital mutilation prevention, and civic engagement.

48.     By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, implementing the Line Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional

ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members and many of the communities that WWA works with will be directly impacted and harmed by the unlawful provisions of S.B. 202.

49.    Moreover, S.B. 202 makes it substantially more difficult for WWA to engage in its mission to provide civic engagement for the refugee and immigrant community of newly naturalized citizens (both male and female), and to promote the social and economic development of women and girls of those communities. WWA will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including informing itself about S.B. 202 and its scope to be able to assist its members and those that it serves to comply with the many changes to the voting process; helping its members and those it serves understand the changes; developing new training materials and public education documents; and reallocating resources to serve voters during the crucial run-up to an election.  S.B. 202 will also force the WWA to divert time, money, and other resources from other activities—such as WWA's Domestic Violence Prevention and End Female Genital Mutilation programs, its Citizenship Preparation classes, the WWA Safe Birth Initiative, which provides cultural sensitivity training to healthcare workers that serve refugee women, and its Health Advocates Program, which has trained over 600 refugee and immigrant women in becoming health advocates—to assist Georgia voters who are burdened by the

provisions of S.B. 202.  As a result, due to S.B. 202, WWA is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

50.     Specifically, WWA will have to divert more time, money, and other resources towards educating voters across the State about the provisions of S.B. 202.  To engage in these public education efforts, WWA will have to not only divert resources from other initiatives, but also spend more time seeking outside funding.  By spending more time and staff resources on these S.B. 202-specific public education efforts, WWA will have fewer resources available to educate its members about other voting-related issues.  WWA will also have less time, money, and other resources to coordinate, oversee, manage, and plan for other GOTV efforts, such as poll monitoring and engaging in outreach efforts to voters.

51.     WWA will also have to dedicate more time, money, and other resources towards understanding the new legal requirements of S.B. 202 and how these requirements may impact WWA's existing voter engagement efforts such as its activities supporting voters waiting in line.  As a result, WWA will have fewer resources for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

52.     WWA will have to spend more time, money, and other resources on existing training programs provided to its members across the State.  These training programs, which help members educate and assist other voters, will need

to undergo substantial revisions in light of S.B. 202.  Time and resources spent overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities and non-voting related work. Finally, WWA anticipates that there will be more inquiries from members and the communities they serve relating to S.B. 202, which will mean that WWA will be able to devote less time to its other work.

53.     LCF Georgia is an organization comprised of 30 Latinx-led organizations serving Latinx communities across Georgia.  Its mission is to be a catalyst for investment and collaborative work with and within the Latinx community.  As part of this mission, LCF Georgia provides critical resources to Spanish-speaking and Portuguese-speaking voters across the state, including the translation of materials, civic engagement training, voter education materials regarding absentee voting, early voting, and voting by drop box.  For instance, LCF Georgia launched and coordinated the "Latinos for Democracy" coalition, which reached every Latinx voter in Georgia at least twice in the 2020 primaries and provided support to voters on Election Day as part of its election protection program.  LCF Georgia also operates and coordinates an active text-to-vote and phone-banking operation, sends bilingual mailers with voting information, and runs a canvass program, which provides information to voters in English and Spanish.

54.     By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, implementing the Line Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members across Georgia and many of the communities that LCF Georgia works with will be directly impacted and harmed by the unlawful provisions of S.B. 202.

55.     Moreover, S.B. 202 makes it substantially more difficult for LCF Georgia to engage in its mission to provide civic engagement for the refugee and immigrant communities of newly naturalized citizens (both male and female), and to promote the social and economic development of women and girls of those communities.  LCF Georgia will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes; developing new training materials and public education documents; and reallocating resources to serve voters during the crucial run-up to an election.  S.B. 202 will also force LCF Georgia to divert time, money, and other resources from other activities—such its low-fee or free skill-building and

technical assistance to Latinx-serving nonprofits and their staff—to assist Georgia voters who are burdened by the provisions of S.B. 202.  As a result, due to S.B. 202, LCF Georgia is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

56.    Specifically, LCF Georgia will have to divert more time, money, and other resources towards educating voters across the State about the provisions of S.B. 202.  To engage in these public education efforts, LCF Georgia will have to not only divert resources from other initiatives, but also spend more time seeking outside funding.  By spending more time and staff resources on these S.B. 202-specific public education efforts, LCF Georgia will have fewer resources available to educate its members about other voting-related issues.  LCF Georgia will also have less time, money, and other resources to coordinate, oversee, manage, and plan for other GOTV efforts, such as poll monitoring and engaging in outreach efforts to voters.

57.    LCF Georgia will also have to dedicate more time, money, and other resources towards understanding the new legal requirements of S.B. 202 and how these requirements may impact LCF Georgia's existing voter engagement efforts such as its activities supporting voters waiting in line.  As a result, LCF Georgia will have fewer resources for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

58.    LCF Georgia will have to spend more time, money, and other resources on existing training programs provided to its members across the State. These training programs, which help members organize voter engagement efforts and educate and assist other voters, will need to undergo substantial revisions in light of S.B. 202.  Time and resources spent overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities and non-voting related work.  Finally, LCF Georgia anticipates that there will be more inquiries from members and the communities they serve relating to S.B. 202, which will mean that LCF Georgia will be able to devote less time to its core activities and other, non-voting related work.

59.    Plaintiff the Deltas is a national, nonpartisan, not-for-profit membership service organization, comprised predominately of Black women, that was founded in 1913 on the campus of Howard University and incorporated under the laws of the District of Columbia.  Six weeks after the organization was initially formed in 1913, several of its founding members marched in the historic Suffragist March under the Delta Sigma Theta Sorority, Inc. banner—the Deltas' first public act.  The Deltas' participation in the march involved personal risk and indignity, as they were not welcomed by some white suffragists, who insisted that the Black women march at the end of the procession.  Civic engagement has remained a core tenet of the Deltas' mission since its founding, as democracy and justice can only be achieved through voting.  Thus, voter registration and voter education

programs, as well as combatting voter suppression, are some of the organization's top social action priorities.  In light of the upcoming post-census redistricting cycle, the Deltas have and will continue to provide public education and training about the importance of the decennial census and its impact on redistricting, the allocation of funding, and policy-making.  The organization has 58 chapters that include alumnae and college chapters and approximately 7,587 members in Georgia, most of whom are registered voters in Georgia.

60.   Consistent with its mission, the Deltas have hosted candidate forums and informational events on voting, including on how to regain the right to vote in Georgia after a felony conviction.  In 2014, shortly after the 2013 *Shelby County* decision immobilized an effective voting protection, the Deltas, along with other organizations, successfully opposed one of many efforts the Georgia legislature attempted to drastically reduce early voting.  In the recent electoral cycles, including the General Election and Runoff Elections, the Deltas dedicated resources to help organize a civic engagement and education campaign in the State, including voter registration drives, reminders to voters to request absentee ballots, and purchases of billboards and yard signs with reminders to vote.  During the 2021 legislative cycle, the Deltas, specifically members of the Decatur Alumnae Chapter, testified in opposition to Senate Bills 29, 67, 70, 71, and 73, which, similar to S.B. 202, proposed to restrict absentee voting or the ability to participate

in runoff elections.  The Deltas' testimony forewarned that such restrictions would disproportionately harm voters of color in Georgia.

61.     By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections implementing the Line Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members across Georgia.

62.     Moreover, S.B. 202 makes it substantially more difficult for the Deltas to engage in its civic engagement mission.  Deltas will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes; developing new training materials and public education documents; and reallocating resources to serve voters during the crucial run-up to an election.  S.B. 202 will also force the Deltas to divert time, money, and other resources from its voter-engagement activities, such as its voter registration and voter education efforts, including related to the post-census redistricting cycle, to assist Georgia voters who are burdened by the provisions of S.B. 202, as well as other activities that advance its

social-justice mission.  As a result, due to S.B. 202, the Deltas is limited, and will

continue to be limited, in the resources that it can devote to its other core

organizational goals.

63.    Not only will the Deltas have to educate its members about the new

ID Requirements, it will also have to help members who do not have any S.B. 202-

approved ID or documentation to obtain these materials for absentee ballot

applications or for submission of the absentee ballot itself.  In some cases, this will

require the Deltas to transport members to a Georgia Department of Drivers

Services office, transport them back to their residence, and help members

photocopy documents required for applications and ballots.  These activities will

also divert time, money, and resources away from other public education efforts.

64.    The Deltas will also have to dedicate more time, money, and other

resources towards understanding the new legal requirements of S.B. 202 and how

these requirements may impact the Delta's existing voter engagement efforts such

as its activities supporting voters waiting in line.  As a result, the Deltas will have

less resources for other core activities, including voter turnout and GOTV efforts in

addition to non-voting related social justice activities.

65.    The Deltas will have to spend more time, money, and other resources

on existing training programs provided to its members across the state.  These

training programs, which help members organize voter engagement efforts for

members, will need to undergo substantial revisions in light of S.B. 202.  Time and

resources spent overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities.  In addition, more training will need to be focused on the provisions of S.B. 202 and how they affect the Deltas' voter engagement efforts.  Finally, the Deltas anticipates that there will be more inquiries from members and the communities they serve relating to S.B. 202, which will mean that the Deltas will be able to devote less time to its other work.

66.     Provisions in S.B. 202 which compress the timeframe for voters to apply for absentee ballots and limit the availability of drop boxes will also force the Deltas to divert resources from turnout and GOTV efforts in the critical period leading up to an election.  The Deltas will have to devote time, money, and other resources in the weeks leading up to an election to assist voters in complying with absentee ballot requirements and transporting voters to drop boxes, which will be less accessible due to S.B. 202.  This will result in less time, money, and other resources available to the Deltas for public education efforts and transportation to the polls.

67.     Plaintiff Georgia ADAPT is a self-advocacy organization founded in 1987 that is run by and for Georgians with disabilities.  It has dual missions:  (1) to use civil resistance and principled nonviolence to end institutional bias against Georgians with disabilities, and (2) to empower the disability community by encouraging use of their voice and vote, as well as to educate candidates about how

to reach and serve the disability community.  Georgia ADAPT has several regional chapters and members across the State.  In furtherance of its mission, Georgia ADAPT engages in voter education work, helps community members apply for absentee ballots, and puts on GOTV programs.  Its voter education work includes paying for American Sign Language interpreters to communicate voting-related information to the Deaf community and translating election information into Braille.  In 2020, Georgia ADAPT provided hundreds of rides to polling locations for people with disabilities through their Native 2 Native ("N2N") and Disability 2 Disability ("D2D") programs.  Georgia ADAPT members also offered water, food, personal protective equipment, and limited seating to voters waiting in line in several counties.

68.    By eliminating mobile voting, placing additional identification requirements and restrictions on requesting and casting an absentee ballot, reducing the time period for requesting absentee ballots, limiting the number, availability, and accessibility of drop boxes, reducing the early voting period in runoff elections, implementing the Line Relief Ban, disenfranchising otherwise eligible voters who cast in-county provisional ballots, and restricting and penalizing provision of assistance with the absentee balloting process, S.B. 202 will severely burden or deny the right to vote of the organization's members across Georgia.

69.     Moreover, S.B. 202 makes it substantially more difficult for Georgia

ADAPT to provide its civic-engagement activities and further its mission.  In order

to combat the suppressive effect of S.B. 202, including informing itself about S.B.

202 and its scope to be able to assist its members and those that it serves to comply

with the many changes; helping its members and those it serves to better

understand the changes; and developing new, costly training materials and public

education documents to educate its members and eligible voters it serves about the

changes, Georgia ADAPT will be forced to divert resources from its other core

activities such as helping to de-institutionalize Georgians with disabilities, helping

people with disabilities obtain home- and community-based services, and

providing people with disabilities support with Medicaid issues.  As a result, due to

S.B. 202, Georgia ADAPT is limited, and will continue to be limited, in the

resources that it can devote to its other core organizational goals.

70.     Plaintiff Georgia Advocacy Office ("GAO") is a private, non-profit

Georgia corporation.  GAO has been designated by the State of Georgia since 1977

as its protection and advocacy system to protect the legal and human rights of

individuals with disabilities in the state of Georgia pursuant to the Protection and

Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq*., the

Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §

15041 *et seq*., and the Protection and Advocacy for Individual Rights Program of

the Rehabilitation Act, 29 U.S.C. § 794e.

71.     GAO's mission is to work with and for oppressed and vulnerable individuals in Georgia who are labeled as disabled or mentally ill to secure protection and advocacy.  Central to this mission is empowering Georgians with disabilities to participate fully and independently as active and engaged citizens.

72.     GAO operates seven programs, including one specifically geared towards protecting the disability vote (Protection and Advocacy for Voting Access).  Each of GAO's programs uses a combination of supporting self-advocacy, citizen involvement, staff advocacy, and legal advocacy to protect and advocate for the rights of Georgians with disabilities.

73.     GAO plays a role in enforcing the Help America Vote Act of 2002, 52 U.S.C. § 20901 *et seq.*, by educating voters with disabilities and responding to violations of voting rights of Georgians with disabilities.  In particular, GAO seeks to expand the electoral participation of individuals with disabilities who reside in congregate care settings.  GAO's voter education efforts include creating and sharing educational videos and written guidance, answering voter questions, and providing information about voting processes and voting rights to all individuals with disabilities, including people in nursing homes or psychiatric facilities.  GAO also contributes funds to GOTV programs operated by Plaintiff The Arc, providing money for GOTV programs.  Additionally, GAO runs a nonpartisan election protection hotline to support voters with disabilities who experience problems while voting.  GAO attorneys field calls from this hotline and, when necessary,

escalate complaints to the Secretary of State or testify before the state legislature about the problems reported by voters with disabilities.

74.     GAO's advocacy around voting is cross-programmatic, as it involves a fundamental right for all Americans, including Americans with disabilities.  As a result, staff members across multiple programs participate in its voting-related activities.

75.     Because of the additional burdens on voting that S.B. 202 imposes, GAO will need to completely overhaul and expand its voter education program. For example, GAO staff will have to spend additional time during visits to nursing homes and psychiatric facilities to talk with voters about the burdens imposed by S.B. 202 and to assist them in formulating and executing a plan to vote, and to answer questions from residents about voting.  Staff have limited time during facility visits—primarily focusing on preventing abuse and neglect—and spending increased time on voting issues will necessarily mean they can spend less time working with residents on other critical issues.

76.     Due to the restrictions on absentee voting that S.B. 202 imposes, GAO also expects to have to devote resources to securing transportation for residents of congregate care facilities to the polls, diverting such resources from its other programs.

77.     By eliminating mobile voting, placing additional identification requirements and restrictions on requesting and casting an absentee ballot,

reducing the time period for requesting absentee ballots, limiting the number, availability, and accessibility of drop boxes, reducing the early voting period in runoff elections, implementing the Line Relief Ban, disenfranchising otherwise eligible voters who cast county provisional ballots, and restricting and penalizing provision of assistance with the absentee balloting process, S.B. 202 will discriminate against and deny access to many voters with disabilities, making it substantially more difficult for the people GAO serves to vote.

78.    S.B. 202 will also make it substantially more difficult for GAO to carry out its mission to protect the rights of people with disabilities.  In order to combat the suppressive effect of S.B. 202, including informing itself about S.B. 202 and its scope to be able to assist people with disabilities to comply with the many changes; helping people with disabilities to better understand the changes; and developing new, costly training materials and public education documents to educate people with disabilities about the changes, GAO will have to expend more time, money, and other resources on its efforts to educate and assist voters as described above.  These burdens will force GAO to divert resources from its other core activities including investigating and addressing allegations of abuse and neglect, advocating for appropriate assistive technology, and providing information and resources related to employment, inclusive education and other civil rights for people with disabilities.  As a result, due to S.B. 202, GAO is limited, and will

continue to be limited, in the resources it can devote to its other core organizational goals.

79.     Plaintiff The Arc is a private, nonprofit organization, founded in 1950 to promote and protect the human rights of people with intellectual and developmental disabilities ("IDD").  The Arc engages in public policy advocacy and develops programs to support people with IDD to learn, live, and work inclusively in their communities.  Protecting the right of people with disabilities to vote and participate in civic engagement has been a priority of The Arc for over 70 years.

80.     The Arc's Georgia office, known as The Arc Georgia, serves individuals with IDD and their families through a central office in East Point, Georgia, and through 10 locally affiliated chapters across the state.  The local affiliated chapters are membership organizations and dues-paying affiliates of The Arc of the United States.  For its Georgia office, The Arc has identified protecting the rights of voters with IDD through voter outreach, education, and registration as a priority.

81.     In furtherance of its mission, The Arc Georgia leads the Register, Educate, Vote—Use your Power ("REV UP") Georgia program, a statewide volunteer coalition of advocacy organizations seeking to foster civic engagement and protect the voting rights of Georgians with IDD.  As part of this work, The Arc Georgia provides education and outreach to people with IDD to help them

understand the voting process, including resources to explain things like voter registration, and assists with voter mobilization for Georgia ID requirements, transportation, guardianship and voting laws, voting by mail, and ballot access for deaf, hard-of-hearing, blind, and low-vision voters.

82.     As part of its voting access programming, The Arc Georgia also regularly convenes a group of "Grassroots Connectors" consisting of disability rights advocates from across the State.  These Grassroots Connectors support and advocate for voters with IDD, with a particular focus on supporting Black voters with IDD in rural communities.  Specifically, during the General Election and Runoff Elections, The Arc Georgia supported voters with disabilities by coordinating transportation to the polls and to drop box locations, providing food and water to voters waiting in long lines, educating voters on the absentee ballot process, assisting voters with IDD with applying for and filling out absentee ballots, engaging in a GOTV postcard campaign, arranging two virtual presidential election town halls focused on issues relevant to voters with disabilities, organizing a virtual Senate candidate disability forum that was broadcast to over 8,000 viewers in Georgia and beyond, and engaging in voter registration outreach and assistance.

83.     By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, reducing the time period for requesting absentee ballots,

limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, implementing the Line Relief Ban, disenfranchising in-county provisional ballots, and restricting and penalizing provision of assistance with the absentee balloting process, S.B. 202 will deny access to the right to vote for many members of The Arc Georgia and the voters that it supports.

84.     Moreover, S.B. 202 makes it substantially more difficult for The Arc Georgia to engage in its civic engagement mission.  In order to combat the suppressive effect of S.B. 202, including serving as a plaintiff in this lawsuit to challenge some of S.B. 202's provisions; informing itself about S.B. 202 and its scope to be able to assist people with disabilities to comply with the many changes; helping people with disabilities to better understand the changes; and developing new, costly training materials and public education documents to educate people with disabilities about the changes, The Arc will have to expend more time, money, and resources on its efforts to educate and assist voters as described above. These burdens will force The Arc to divert resources from its other core activities, including advocating for appropriate assistive technology, and providing information and resources related to housing, homelessness, and healthcare for people with disabilities.  As a result, due to S.B. 202, The Arc is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

85.     Plaintiff Southern Christian Leadership Conference ("SCLC") is a national and international, nonpartisan, not-for-profit membership organization, comprised predominantly of Black Americans.  In 1957, under the leadership of Dr. Martin Luther King, Jr., more than 60 Black ministers and civil rights leaders met in Atlanta, Georgia and founded SCLC with the goal of redeeming "the soul of America" through direct action, including boycotts, marches, and other forms of nonviolent resistance, to abolish legalized segregation and end the disenfranchisement of Black southerners.  Among its work, SCLC played a leading role in the planning and organizing of the iconic March on Washington in 1963 and spearheaded the Birmingham Movement, the Selma Voting Rights Campaign, the transformative Selma to Montgomery March, the Chicago Freedom Movement in 1966, and the Poor People's Campaign in 1968.  SCLC also spearheaded the Citizenship Education Program, which was a voter education program aimed at identifying and registering potentially eligible Black voters.  Voter education and mobilization, as well as increasing voter registration, have remained core components of SCLC's mission since its founding.  In Georgia, SCLC has three chapters and more than 260 members, most of whom are registered voters in Georgia.

86.     Under the leadership of its national office, based in Atlanta, Georgia, SCLC has been actively engaged in voter engagement and voter outreach. Consistent with its mission, SCLC provides critical resources to voters throughout

the State, including through voter education materials, voter registration, voter education forums, and conducting GOTV efforts during early voting and on Election Day.  In 2020, SCLC launched SCLC Votes, which provided online community education sessions about voting rights and procedures in Georgia, as well as partnered with a number of organizations and coalitions to conduct GOTV efforts in Southern Georgia.  By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in runoff elections, implementing the Line Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, many of SCLC's Georgia members and the voters they serve will be directly impacted and harmed by the unlawful provisions in S.B. 202.

87.    SCLC will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes; developing new training materials and public education documents; and relocating resources during the crucial run-up to an election.  S.B. 202 will also force SCLC to divert time, money, and other resources from its voter-engagement activities, such as its voter registration and voter education efforts, as

well as other activities that advance its social-justice mission, including advocacy, organizing, and conducting activities that address criminal justice reform, homelessness, and affordable housing.  As a result, due to S.B. 202, SCLC is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

88.     Specifically, SCLC will have to divert more time, money, and other resources towards educating voters across the state about the provisions of S.B. 202, especially the new ID Requirements for requesting and casting absentee ballots.  To engage in these public education efforts, officials of SCLC will have to not only divert resources from other initiatives, but also spend more time seeking outside funding.  By spending more time and staff resources on these S.B. 202-specific public education efforts, SCLC will have less resources available to educate its members about other voting-related issues.  SCLC will also have less time, money, and other resources to coordinate, oversee, manage, and plan for other GOTV efforts, such as transporting voters to the polls and engaging in outreach efforts to voters.

89.     Not only will SCLC have to educate its members about the new ID Requirements, it anticipates it will also have to help members who do not have any S.B. 202-approved ID or documentation to obtain these materials for absentee ballot applications or for submission of the absentee ballot itself.  In some cases, this may require SCLC to transport members to a Georgia Department of Drivers

Services office, transport them back to their residence, and help members photocopy documents required for applications and ballots. These activities will also divert time, money, and resources away from other public education efforts.

90.    SCLC will also have to dedicate more time, money, and other resources towards understanding the new legal requirements of S.B. 202 and how these requirements may impact SCLC's existing voter engagement efforts such as its activities supporting voters waiting in line. As a result, SCLC will have less resources for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

91.    SCLC will have to spend more time, money, and other resources on existing training programs provided to its members across the state. These training programs, which help members organize voter engagement efforts for members, will need to undergo substantial revisions in light of S.B. 202. In addition, more training will need to be focused on the provisions of S.B. 202 and how they affect SCLC's voter engagement efforts. Finally, SCLC anticipates that there will be more inquiries from members and the communities they serve relating to S.B. 202, which will mean that SCLC will be able to devote less time to its other work.

92.    Provisions in S.B. 202 which compress the timeframe for voters to apply for absentee ballots and limit the availability of drop boxes will also force SCLC to divert resources from turnout and GOTV efforts in the critical period leading up to an election. SCLC will have to devote time, money, and other

resources in the weeks leading up to an election to assist voters in complying with absentee ballot requirements and transporting voters to drop boxes, which will be less accessible due to S.B. 202. This will result in less time, money, and other resources available to SCLC for public education efforts and transportation to the polls.

## **Defendants**

93.     Defendant Brian Kemp is the Governor of the State of Georgia, and is sued in his official capacity. Defendant Kemp has the chief executive power of the state, Ga. Const. art. 5, § 2, and signed the challenged statutes into law on March 25, 2021. As Governor, Defendant Kemp has sole authority to declare that a state of emergency or disaster exists, O.C.G.A. § 38-3-51.

94.     Defendant Brad Raffensperger is the Secretary of State of Georgia and the chief elections official of the State, O.C.G.A. § 21-2-210. Secretary of State Raffensperger is responsible for implementing elections statutes and routinely issues guidance to the county election officials of all 159 counties on various elections procedures and requirements. Secretary of State Raffensperger is named as a Defendant in his official capacity.

95.     Defendant Georgia State Election Board (the "State Election Board") is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and

regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent."  O.C.G.A. § 21-2-31(2).

96.     Defendants Rebecca Sullivan, David Worley, Matthew Mashburn, and Anh Le are members of the State Election Board and are named as Defendants in their official capacities.  The members of the State Election Board are responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1).

97.     Defendant Fulton County Registration and Elections Board is responsible for the conduct of primary and general elections in Fulton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

98.     Defendants Alex Wan, Mark Wingate, Kathleen D. Ruth, Vernetta Keith Nuriddin, and Aaron V. Johnson are the Members of the Fulton County Registration and Elections Board, reside in Fulton County, and are sued in their official capacities.

99.     Defendant Richard L. Barron is the Director of the Fulton County Registration and Elections Board, and is sued in his official capacity.  Defendant Barron is responsible for the day-to-day operations of running elections in Fulton

County, to the extent such power does not conflict with the power of the Secretary of State.

100.   Defendant DeKalb County Board of Registration & Elections is responsible for the conduct of primary and general elections in DeKalb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

101.   Defendants Anthony Lewis, Susan Motter, Dele Lowman Smith, Samuel E. Tillman, and Baoky N. Vu are the Members of the DeKalb County Board of Registration & Elections, reside in DeKalb County, and are sued in their official capacities.

102.   Defendant Erica Hamilton is the Director of Voter Registration and Elections in DeKalb County, and is sued in her official capacity.  Defendant Hamilton is in charge of the day-to-day operations of running elections in DeKalb County, to the extent such power does not conflict with the power of the Secretary of State.

103.   Defendant Gwinnett County Board of Registrations and Elections is responsible for the conduct of primary and general elections in Gwinnett County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

104.   Defendants Alice O'Lenick, Wandy Taylor, Stephen W. Day, and George Awuku are the Members of the Gwinnett County Board of Registrations and Elections, reside in Gwinnett County, and are sued in their official capacities.

105.   Defendant Kelvin Williams is the Acting Elections Supervisor of the Gwinnett County Board of Registrations and Elections, and is sued in her official capacity.  Defendant Ledford is responsible for the day-to-day operations of running elections in Gwinnett County, to the extent such power does not conflict with the power of the Secretary of State.

106.   Defendant Cobb County Board of Elections and Registration is responsible for the conduct of primary and general elections in Cobb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

107.   Defendants Phil Daniell, Fred Aiken, Pat Gartland, Jessica M. Brooks, and Darryl O. Wilson, Jr. are the Members of the Cobb County Board of Elections and Registration, reside in Cobb County, and are sued in their official capacities.

108.   Defendant Janine Eveler is the Director of the Cobb County Board of Elections and Registration, and is sued in her official capacity.  Defendant Eveler is responsible for the day-to-day operations of running elections in Cobb County, to the extent such power does not conflict with the power of the Secretary of State.

109.   Defendant Hall County Board of Elections and Registration is responsible for the conduct of primary and general elections in Hall County,

O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

110.   Defendants Tom Smiley, David Kennedy, Ken Cochran, Craig Lutz, and Gala Sheats are the Members of the Hall County Board of Elections and Registration, reside in Hall County, and are sued in their official capacities.

111.   Defendant Lori Wurtz is the Hall County Elections Director, and is sued in her official capacity.  Defendant Wurtz is responsible for the day-to-day operations of running elections in Hall County, to the extent such power does not conflict with the power of the Secretary of State.

112.   Defendant Clayton County Board of Elections and Registration is responsible for the conduct of primary and general elections in Clayton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

113.   Defendants Darlene Johnson, Diane Givens, Carol Wesley, Dorothy Foster Hall, and Patricia Pullar are the Members of the Clayton County Board of Elections and Registration, reside in Clayton County, and are sued in their official capacities.

114.   Defendant Shauna Dozier is the Clayton County Elections Director, and is sued in her official capacity.  Defendant Dozier is responsible for the day-to-day operations of running elections in Clayton County, to the extent such power does not conflict with the power of the Secretary of State.

115.    Defendant Richmond County Board of Elections is responsible for the conduct of primary and general elections in Richmond County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

116.    Defendants Tim McFalls, Sherry T. Barnes, Marcia Brown, Terence Dicks, and Bob Finnegan are the Members of the Richmond County Board of Elections, reside in Richmond County, and are sued in their official capacities.

117.    Defendant Lynn Bailey is the Richmond County Elections Director and the Richmond County Chief Registrar, and is sued in her official capacity. Defendant Bailey is responsible for the day-to-day operations of running elections in Richmond County, to the extent such power does not conflict with the power of the Secretary of State.

118.    Defendant Bibb County Board of Elections is responsible for the conduct of primary and general elections in Bibb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

119.    Defendants Mike Kaplan, Herbert Spangler, Rinda Wilson, Henry Ficklin, and Cassandra Powell are the Members of the Bibb County Board of Elections, reside in Bibb County, and are sued in their official capacities.

120.    Defendant Jeanetta R. Watson is the Bibb County Elections Supervisor, and is sued in her official capacity.  Defendant Watson is responsible

for the day-to-day operations of running elections in Bibb County, to the extent such power does not conflict with the power of the Secretary of State.

121.   Defendant Bibb County Board of Registrars is responsible for the registration of voters in Bibb County, consistent with state statutes and the guidance of the Secretary of State.

122.   Defendant Veronica Seals is the Chief Registrar of Bibb County, and is sued in her official capacity.

123.   Defendant Chatham County Board of Elections is responsible for the conduct of primary and general elections in Chatham County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

124.   Defendants Thomas J. Mahoney, Malinda Hodge, Marianne Heimes, and Antan Lang are the Members of the Chatham County Board of Elections, reside in Chatham County, and are sued in their official capacities.

125.   Defendant Chatham County Board of Registrars is responsible for the registration of voters in Chatham County, consistent with state statutes and the guidance of the Secretary of State.

126.   Defendants Colin McRae, Wanda Andrews, William L. Norse, Jon Pannell, and Randolph Slay are the Members of the Chatham County Board of Registrars, reside in Chatham County, and are sued in their official capacities.

127.   Defendant Clarke County Board of Election and Voter Registration is responsible for the conduct of primary and general elections in Clarke County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

128.   Defendants Willa Jean Fambrough, Hunaid Qadir, Ann Till, Rocky Raffle and Adam Shirley are the Members of the Clarke County Board of Election and Voter Registration, reside in Clarke County, and are sued in their official capacities.

129.   Defendant Charlotte Sosebee is the Director of the Clarke County Board of Election and Voter Registration, and is sued in his official capacity. Defendant Sosebee is responsible for the day-to-day operations of running elections in Clarke County, to the extent such power does not conflict with the power of the Secretary of State.

130.   Defendant Columbia County Board of Elections is responsible for the conduct of primary and general elections in Columbia County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

131.   Defendants Ann Cushman, Wanda Duffie, and Larry Wiggins are the Members of the Columbia County Board of Elections, reside in Columbia County, and are sued in their official capacities.

132.    Defendant Columbia County Board of Registrars is responsible for the registration of voters in Columbia County, consistent with state statutes and the guidance of the Secretary of State.

133.    Defendant Nancy L. Gay is the Chief Registrar of Columbia County, and is sued in her official capacity.

## JURISDICTION AND VENUE

134.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States of America.

135.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a), 42 U.S.C. §§ 1983 and 1988(a), and 52 U.S.C. § 10308(f) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, the Civil Rights Act of 1964, 52 U.S.C. § 10101, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.

136.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

137.    This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

138.    Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), and under Local Civ.

R. 3.1, because several Defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.  Plaintiffs AME Church, GAMVP, WWA, the Deltas, LCF Georgia, The Arc, Georgia ADAPT, GAO, and SCLC all operate within this district and division.

## FACTUAL ALLEGATIONS

### A. Georgia has a long history and ongoing record of racial discrimination in voting.

139.   S.B. 202 is the latest iteration of a long line of official acts of racial discrimination.  Georgia's history of racially discriminatory voting practices is well-established and judicially-recognized.  *See*, *e.g.*, *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379-1380 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chock full of racial discrimination at all levels.  This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism

and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560).

140.   Georgia's long history of voter suppression dates back to the post-Civil War period when the Ku Klux Klan used widespread violence to intimidate Black and Republican voters to re-establish white supremacy.  Georgia's Black voters have historically been disenfranchised through a variety of election laws, including grandfather clauses, literacy tests, poll taxes, and the adoption of "white primaries."

141.   The Fourteenth Amendment granted Black men the right to vote in 1868.  That same year, 33 Black members were elected to the Georgia General Assembly, who were subsequently expelled.

142.   Congress passed the Fifteenth Amendment on February 26, 1869.  By late 1870, all the former Confederate states had been readmitted to the Union, and the Republican Party controlled most state legislatures, due primarily to the support of Black voters.

143.   In response to the Reconstruction Amendments and following the end of Reconstruction in 1877, Georgia and other southern states enacted literacy tests, grandfather clauses, poll taxes and other discriminatory voter registration practices in a deliberate effort to disenfranchise Black voters.

144.   In 1877, Georgia authorized a cumulative poll tax, but most white voters bypassed the provision through exemptions for those whose ancestors

fought in the Civil War or who could vote before the war.  Thus, Georgia became the first state to enact a "poll tax" to disenfranchise many poor Black voters.  The poll tax was only abolished in 1945, after it had been in effect for nearly 75 years.

145.   The Democratic Party in Georgia adopted "white primaries" in 1900, which as the name suggests, allowed only white voters to vote in primaries.  This practice continued in Georgia until it was held unconstitutional 45 years later in *King v. Chapman*, 62 F. Supp. 639, 650 (M.D. Ga. 1945) ("The defendants acting as the duly constituted authorities of the Democratic Party, in refusing to permit plaintiff to vote in the Primary of July 4, 1944, solely on account of his race and color, deprived the plaintiff of a right secured to him by the Constitution and laws of the United States, and was in violation of the Fourteenth, Fifteenth and Seventeenth Amendments."), *aff'd*, 154 F.2d 460 (5th Cir. 1946).

146.   In 1908, Georgia adopted a constitutional amendment with the express purpose of disenfranchising Black voters by writing into the constitution the principle of "white primaries."  Hoke Smith ran successfully for governor in 1906 with this constitutional amendment as a key part of his campaign platform:  "I favor a constitutional amendment which will insure a continuation of white supremacy . . . [and] the protection of the white primaries."

147.   In addition to racially discriminatory laws and racist campaigns, Black Georgians also endured—and were at consistent risk of—physical violence by state and private actors, including white supremacist groups.  Violent attacks

against Black Georgia residents resulted in hundreds of deaths and fostered an environment of fear that deterred eligible Black voters from casting ballots, especially in counties with significant Black populations.  As an example, after a lynching in Forsyth County in 1912, white terror groups distributed leaflets demanding that all Black people leave the county or suffer deadly consequences. Many Black families did so.  The Equal Justice Initiative documented 589 known lynchings in Georgia from 1877 until 1950, the second highest among states.

148.   In 1958, Georgia passed a new voter registration act that required those who were illiterate to satisfy "understanding tests" by correctly answering 20 of 30 questions related to citizenship posed by the voting registrar.

149.   Terrell County, Georgia, was the subject of the first court action under the Civil Rights Act of 1957, in which a challenge to literacy tests for voting was found to have subjected Black voters to "distinctions in the registration process on the basis of their race and color."

150.   In 1961, the U.S. Commission on Civil Rights reported that "the problem of denials of the right to vote because of race appears to occur in only eight Southern States—Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee."  The report noted that in many rural counties of Georgia, there was "total exclusion from the suffrage" for Black voters. The report concluded that "[t]he right to vote without distinctions of race or

color—the promise of the 15th amendment—continues to suffer abridgment," and that there was evidence of "discriminatory disenfranchisement" in Georgia.

151.   Beginning in 1965, with the passage of the VRA, Georgia was one of nine states whose records of voter obstruction required them, under Section 4(b) of the VRA, to get federal preclearance for changes to their election rules.  Georgia's inclusion in this group was based on the State's enforcement of unconstitutional tests or devices and low voter registration and turnout rates.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 312-13 (1966) ("Section 4(b) of the Act also embraces [Georgia]" due to "evidence of actual voting discrimination.").

152.   From 1965 to 2012, Georgia's racially discriminatory voting schemes necessitated federal intervention 187 times, including over 91 objections since the 1982 reauthorization of Section 5 of the VRA.

153.   In 2013, the Supreme Court in *Shelby County* invalidated the coverage provision that determined which jurisdictions were subject to the VRA's preclearance requirement.  570 U.S. 529.  Georgia, a formerly covered jurisdiction, immediately began to impose restrictions on voting rights without first obtaining approval from the Department of Justice or the United States District Court for the District of Columbia and satisfying their burden that the law did not worsen the ability to vote of communities of color.

154.   Since *Shelby County* was decided, Georgia has regularly sought to suppress the vote of people of color, and Black voters in particular.  In 2020, on the

seventh anniversary of *Shelby County*, the late Representative John Lewis warned,

"A rampant war is being waged against minorities' voting rights in my home state

of Georgia."

155.   Indeed, in many respects, the state's legacy of voter suppression is

unparalleled.  Georgia is the only state formerly covered by the VRA's

preclearance requirement that has enacted voting restrictions across five major

categories studied by the U.S. Commission on Civil Rights: voter ID requirements,

documentary proof of citizenship, voter purges, cuts to early voting, and polling

place closures or relocations.  Since 2011, more voting rights lawsuits have been

filed against Georgia and its officials than any other state except Texas.

156.   After *Shelby County*, state and local officials and lawmakers have

sought to curtail the voting rights of Black voters at every stage of the process,

from registration, to early voting, to Election Day itself.  The examples catalogued

below are but a sampling of the race-based voter suppression in Georgia.

157.   ***Registration Deadlines***.  Georgia's registration deadline—29 days

before an election—is one of the strictest in the country.  In 2018, a

disproportionate number of the 87,000 voters who became ineligible due to late

registration were people of color.  In one congressional district, the number of

ineligible voters was nearly 14 times the margin of victory.

158.   ***Exact Match Registration Rejections***.  From 2010 to 2016, Georgia

employed an administrative policy that disproportionately rejected voter

registrations from people of color.  Under Georgia's "exact match" policy, a

voter's registration application would not be accepted if the information therein did

not perfectly match—down to a hyphen, an accent mark, or the inclusion of a

middle initial—records held by the Georgia Department of Drivers Services or the

Social Security Administration.  By race, the population of voters attempting to

register was 47.2% white, 29.4% Black, 3.6% Hispanic, and 2.6% Asian, but

among applicants who failed the exact match verification procedure, only 13.6%

were white, while 63.6% were Black, 7.9% were Hispanic, and 4.8% were Asian.

Georgia maintained this policy despite its awareness of the policy's discriminatory

impact gleaned through the preclearance processes, litigation, and public

testimony.  Georgia agreed to process approximately 34,000 applications that had

been suspended under this policy only in response to litigation.

159.   But in 2017, Georgia enacted legislation codifying a version of the

"exact match" protocol.  Shortly before Georgia's 2018 gubernatorial election

between then-Secretary of State Brian Kemp and former state representative

Stacey Abrams, the Associated Press reported that the Secretary of State's office

had placed on hold more than 50,000 voter registrations due to the exact match

law.  And although Georgia's population was 32% Black, nearly 70% of the

affected applications belonged to Black voters.

160.   ***Voter Purges***.   Georgia's refusal to register eligible voters goes hand in hand with its aggressive purges of registered voters from the voter rolls.  Few states have removed voters as aggressively as Georgia.

161.   In 2010, nearly 379,000 voters were removed from Georgia's rolls. After *Shelby County*, Georgia escalated the purges:  by 2014, the number of voters whose registrations were cancelled rose to 517,000.  Georgia purged approximately 1.5 million voters between the 2012 and 2016 election, which was twice as many as it had between the 2008 and 2012 election.  On a single day in July 2017, Georgia removed 560,000 voters—8% of Georgia's registered voters— from the rolls.  Of the removed voters, 107,000 were taken off the rolls merely because they had not voted in prior elections, not because they had moved or otherwise become ineligible.  The purge, according to the *Atlanta Journal-Constitution*, may have been "the largest mass disenfranchisement in U.S. history."

162.   Voter purges disproportionately affect Black voters and voters of color.  Among those eliminated from voter rolls in 2017, Black voters were canceled at a higher rate than white voters likely because they had not voted in prior elections. Based on a review of all voter-purge data from 2017, an American Public Media ("APM") Report found Black voters were canceled at a higher rate than white voters for inactivity in six of every ten counties across Georgia, and were removed at a rate of 1.25 times greater than white voters in more than a quarter of those counties.

163.   The purges, moreover, have an extraordinarily high error rate.  In 2019, the Secretary of State purged 313,000 voters from the rolls on the grounds that they had moved from the address provided in their registration.  An expert study concluded that 198,000 of these voters, or 63.3%, had not actually moved.  A disproportionate number of voters whose registrations were erroneously canceled were Black or nonwhite.

164.   ***Eligibility Challenges***.  Almost a week into early voting during the Runoff Elections, True the Vote, a Texas-based organization that has perpetuated the myth of voter fraud, in coordination with some Georgia voters, initiated mass challenges to the voting eligibility of more than 360,000 Georgia voters.  Tens of thousands of Georgia voters were ultimately subjected to baseless, untimely, and potentially discriminatory challenges.  Counties dismissed the overwhelming majority of these challenges for lack of probable cause.  But that didn't end the matter: some counties faced a second and even third wave of baseless mass voter challenges.  These mass challenges are not new to Georgia voters.  As just one example, in 2015, in the runup to municipal elections, registered voters in the City of Sparta were subjected to mass challenges to their eligibility.  Nearly all the challenged voters were Black, despite comprising less than 20% of the City's electorate.

165.   ***Criminal Investigations***.  In 2014, then-Secretary of State Kemp launched a criminal investigation into the New Georgia Project after the voter

engagement group registered 85,000 new voters.  The State found purported problems with only 0.03% of the registrations, and no charges were filed.  The State recently renewed similar criminal investigations in response to the historic turnout in the General Election.  The State has again targeted the New Georgia Project along with individual voters, many of whom are voters are color.

166.   Four years earlier, the Secretary of State's office and Georgia Bureau of Investigation launched a formal investigation following purported concerns about increases in Black absentee voter participation during Brooks County elections in 2010, which flipped the Brooks County School Board from majority-white to majority-Black.  Shortly thereafter, twelve Black City of Quitman residents—mostly Black women—were arrested and faced varying felony charges relating to alleged voter fraud and unlawful possession of absentee ballots.  In 2014, a jury acquitted one woman, Lula Smart, of all the felony charges that she faced following a trial.  Georgia dropped the remaining charges against the other 10 residents (the twelfth person passed away) in 2014, and the State Election Board dismissed any remaining potential cases in 2016.

167.   *Changes to Election Dates*.  In 2012, the Georgia legislature changed the dates of nonpartisan county elections from November to July.  The city of Augusta attempted to exempt itself, passing a local law providing that Augusta conducted elections as a municipality, not a county.  A Georgia lawmaker proposed a "clean-up" bill that would have deemed all consolidated Georgia

governments as counties for election purposes.  In December 2012, the U.S.
Department of Justice blocked the bill under the VRA preclearance process.  But
after *Shelby County*, state lawmakers successfully rescheduled Augusta's
nonpartisan elections to July, against the wishes of the city council.  From the
outset, it was clear that moving the election date would disproportionately affect
the ability of Black voters to participate.

168.   ***Cuts to Early Voting***.  It is well-established that Black voters, both in
Georgia and nationally, regularly vote early when possible and comprise a
disproportionate number of early voters.  Nonetheless, the Georgia legislature has
repeatedly pushed to restrict the availability of early voting.  Starting in 2011,
Georgia cut early voting in half, from 45 days to 21 days.

169.   A few years later, and after *Shelby County*, in 2014, Georgia
lawmakers proposed a bill that would have further reduced early voting to just 6
days for small, consolidated cities.  That same year, one lawmaker explained that
he opposed Sunday voting at a local mall because it was "dominated by African
American shoppers" and was "near several large African American mega
churches" and that he "prefer[red] more educated voters than a greater increase in
the number of voters."

170.   During the next legislative session in 2015, Georgia legislators
unsuccessfully sought to further reduce early in-person voting from 21 days to 12

days.  That same bill would have restricted the availability of Sunday voting, which is disproportionately used by Black voters.

171.   In 2018, legislators proposed to shorten voting hours on Election Day in Atlanta, which is majority-Black and the most populous city in Georgia, from 8:00 p.m. to 7:00 p.m.  A legislator in the House of Representative also proposed a version of this bill that would have effectively eliminated early voting on the Sunday before Election Day statewide.

172.   ***Polling Place Closures***.  Counties across the state have closed polling locations despite an overall increase in registered voters.  One study found that since 2013, 10% of Georgia's polling locations have been shuttered.

173.   Examples of polling place closures that disproportionately burden voters of color are legion.  From 2012 to 2018, county election officials closed 214 polling locations, or nearly 8% of the state's polling places, as a result of precinct consolidation.  Many of these closures occurred in communities with substantial minority populations, making it more difficult for Black voters and other voters of color to cast their ballots.

174.   In 2015, election officials in Macon-Bibb County proposed reducing the number of precincts from 40 to 26.  Many of the proposed closures were once again located in predominantly Black communities.  Under the proposal, several majority Black precincts would have had more than 5,000 voters.  No majority white precincts would have reached that threshold, and most had thousands fewer

voters than the proposed precincts in Black communities.  In response to community opposition, the County did not close as many precincts as it had proposed initially, but the majority of the eventual closures still disproportionately affected Black voters.

175.   In 2016, the polling place for a precinct with significant numbers of Black voters was relocated to a sheriff's office.  Civil rights organizations and Macon-Bibb County residents raised concerns about how siting a polling location at a law enforcement office would intimidate and deter voters from exercising their voting rights, especially Black voters.  These organizations and residents eventually succeeded in blocking the relocation, and the polling place was moved to a church-owned facility.  But when the organizers complained, they were told that "if people weren't criminals, they shouldn't have a problem voting inside of a police station."

176.   In 2018, the Randolph County Board of Elections and Registration proposed eliminating seven out of nine polling places in the predominantly Black county in part under the unsubstantiated and erroneous view that such closures were necessary to make voting accessible to people with disabilities.  The proposal was made on the advice of a consultant hired by the county board after its elections supervisor abruptly quit.  The consultant had been "highly recommended" by the Secretary of State's office.  At the time, Black Georgians constituted 32% of the population of the State but 61% of the population of Randolph County.  One of the

polling places that the Board sought to close served a population that was 97% Black. After public outcry and the threat of litigation, the county backtracked.

177.   In 2020, Cobb County—Georgia's third largest county—decided to cut the number of early voting sites for the Runoff Elections from 11 to 5, despite the need to serve more than 537,000 voters. The closures were concentrated in communities of color: most of the county's Black and Latinx voters lived in an area that had previously had four polling places; Cobb County consolidated these sites into a single location. Black and Latinx voters are more likely to live in poverty than other residents and to have more difficulty traveling long distances due to limited public transportation options. The polling place closures would have disproportionately deterred voters of color from participating in the runoffs. After public outcry and the threat of litigation, Cobb County added two sites and moved the location of a third. Cobb County was just one of several in Georgia that sought to close polling locations for the Runoff Elections.

178.   ***Long Wait Times***. Polling place closures have led to failures in election administration, especially unacceptably long wait times. Voters of color, moreover, are more likely than white voters to experience long lines. Studies have repeatedly confirmed the racial disparity in voting wait times. For instance, one study found that Black and Latinx voters waited 45% longer than white voters— and that the racial waiting gap could not be explained by the level of resources across counties.

179.   The nationwide trend holds true in Georgia, as well.  During one election, the average wait time after 7:00 p.m. was 6 minutes in polling places that were 90% white and 51 minutes in polling places that were 90% nonwhite.  In other words, the wait times for nonwhite voters were 8.5 times longer than the wait times for white voters.

180.   In Cobb County, whose voters are 27.6% Black, 13% Latinx, and 5.4% Asian, early voters during the General Election encountered lines up to 10 hours long.  As noted, however, the county persisted in reducing early voting sites for the Runoff Elections.

181.   *Vote Dilution*.  In addition to erecting outright barriers to the franchise, Georgia has also systematically attempted to dilute the votes of nonwhite voters.  In 2015, Georgia enacted H.B. 566, which redrew certain legislative districts for the Georgia House of Representatives.  Two of those districts were challenged as racial gerrymanders:  after an influx of voters of color, their boundaries were redrawn to prevent voters of color from electing candidates of their choice and ensuring the election of white incumbents.

### B. Georgians with disabilities have also experienced historical and widespread discrimination

182.   Georgians with disabilities have also endured widespread historical and continuing discrimination and neglect in all spheres of public life.  They face barriers to accessing education, employment, healthcare, housing, transportation, living independently, and even in receiving informational services from state and

local entities.  Similarly, Georgians with disabilities face many obstacles to participating in the electoral process.

183.   Georgians with disabilities are among the most isolated and disenfranchised in the state.  Disabilities are more prevalent in groups that experience other forms of marginalization.  Black Georgians experience disability at a higher rate than other ethnic groups.  Disability tends to increase with age, and in Georgia more than one-quarter of the population over 65 has a disability.  Georgians with disabilities are over twice as likely to live in poverty than their peers without disabilities, due in large part to lower rates of employment.  In 2020, only 17.9 percent of people with disabilities were employed, compared with 61.8 percent of those without disabilities.

184.   Even before S.B. 202's enactment, Georgians with disabilities faced many barriers in exercising their right to vote.  They are twice as likely not to have internet access, and extremely unlikely to own a printer.  Lack of internet access makes it harder to learn of new voting requirements, polling place locations, where to register, and how to request an absentee ballot.  Registering to vote can be a challenge for voters who do not have state-issued identification.  Few voters have been able to obtain the "free" identification cards required to be made available by counties pursuant to Ga. Code Ann. § 21-2.417.1.  Remaining registered to vote is also a challenge due to housing instability.  As compared to other voters over the age of 35, voters with disabilities are significantly more likely to move frequently.

Voters with disabilities are thus at disproportionately high risk of being purged from voting rolls.

185.   ***In-person voting*** – While many Georgians with disabilities want to vote in person, they face significant barriers to doing so, often resulting in a denial of access.  Getting to the polls may be the first challenge; because of the cumulative effects of disability and poverty, people with disabilities are less likely to drive or own a vehicle and are thus dependent on other forms of transportation. Vast parts of the State have little or no accessible public transportation, and the public transportation that does exist outside of metropolitan areas often operates infrequently.  Paratransit services are scarce.  Thus, many people with disabilities rely on others to get them to the polls.  Poll closures can exacerbate existing transportation challenges, requiring voters with disabilities to arrange to travel even further to access the ballot box.  The attempted poll closures in Randolph County in 2018, for example, would have required voters to travel an additional 10 miles to reach the nearest polling place.

186.   Once a voter with disabilities is able to arrive at the polls, they often face obstacles on the path of travel to the polling place and in the building itself. Common barriers include a lack of accessible parking spots, nonexistent or inadequate ramps, and doors too heavy for a wheelchair user to open.  Polling places that have an accessible route often lack the signage or staff to direct people with mobility disabilities along that route.

187.   Accessible voting machines are critical for people with print disabilities (such as those who are blind, have dyslexia, or have limited hand or arm mobility).  But the federally required accessible voting machines are often not operating, and staff are frequently ill-trained to help make them work.  Moreover, despite the disability community's numerous requests for more appropriate assistive technologies, the "accessible" voting machines currently in use do not afford many disabled voters a private and independent voting experience.

188.   Given the challenges facing voters with disabilities at their polling places, some people with disabilities wish to exercise their right to have a person of their choosing assist them in the voting process.  But the State has, in the past, targeted people who have provided such assistance.  In 2012, a Black Coffee County woman helped her nephew, a first-time voter, figure out how to use the voting machine.  She was subjected to a three-year-long State Election Board investigation and ultimately, indicted on felony charges.  While the assistor was quickly acquitted by a jury, local elected officials have acknowledged that this very public prosecution has made Georgians reluctant to ask for or provide needed help.

189.   Among the biggest barriers to in-person voting for people with disabilities are the long lines at polling places.  In recent elections, voters— including people with disabilities—have had to wait in hours-long lines to vote in parts of Georgia.  For people with disabilities (including chronic illnesses), and older voters, such lines are difficult if not impossible to endure.  Long and

unpredictable waits may be dangerous for people who cannot stand for long periods and whose disabilities require regular access to food and water. Even shorter waits of 15 to 20 minutes can be taxing and dangerous to their health. A significant percentage of people with disabilities use early voting to avoid election day lines. But even early voting locations have had long waits.

190.   ***Voting by mail*** – Because of these multiple barriers to in-person voting, a substantial number of people with disabilities choose to vote by mail. While many states allow people to opt-in to permanently receive an absentee ballot, Georgia requires its citizens to apply for an absentee ballot for each election. (Voters who designate themselves as disabled or seniors have the option of applying for an absentee ballot only once per federal election cycle.) So, in Georgia, voting by mail requires separate steps to apply for, receive, complete and return the absentee ballot. Because the process is cumbersome, disability rights organizations, such as GAO, frequently help with the first step, by bringing applications for absentee ballots to people with disabilities, especially those in congregate settings such as nursing homes.

191.   Unlike some states, Georgia does not provide an accessible absentee ballot marking process. Voters with print disabilities (such as people who are blind, have dyslexia, or have limited use of their hands), need to find in-person assistance to fill out an absentee ballot. Many voters with disabilities seek help

from family, friends, caregivers and neighbors to enable them to apply for and return their absentee ballots.

192.   Given the barriers to obtaining transportation and inaccessibility of some registrar's offices, Georgians with disabilities greatly benefited from the opportunity to personally drop off their ballot in a secure, outdoor drop box location—or, alternatively, to ask someone they knew to drop off their ballot via drop box at whatever time and location was most convenient to them.

193.   Residents of nursing homes or other congregate living facilities, in particular, rely on voting by mail because few facilities provide transportation for residents to reach the polling place.  Many residents in nursing homes do not have cell phones and have inconsistent or unreliable access to the internet.  A facility staff member is typically in charge of distributing incoming mail and picking up outgoing mail.  Accordingly, it can take a few days for residents to receive absentee ballots delivered to the facility, or to be able to have absentee ballots put in the mail.

### C. Georgia has an increasing number of voters of color.

194.   Against the backdrop of these discriminatory provisions, historically disenfranchised groups—including most especially Georgia voters of color—have sought to play a more active role in the political process.

195.   Georgia is home to an increasing population of Black voters and other voters of color.  In the past 30 years, Georgia's Black population has nearly

doubled—from 1.8 million in 1990 to 3.5 million in 2019.  Of Georgia's total

population of approximately 10.6 million, as of July 2019, 60.2% are white, 32.6%

are Black, 9.9% are Latinx, and 4.4% are Asian.

196.   Between October 2016 and October 2020, Georgia added nearly a

quarter-million Black and Latinx voters to its voter registration rolls.  Meanwhile,

the white share of the state's electorate declined, dropping by ten percentage points

since 2008.

197.   Black eligible voters account for nearly half of Georgia's electorate

growth since 2000.  Between 2000 and 2019, Georgia saw the largest percentage

increase among Black voters of any state in the country.  The population of Black

voters in the State reached a record high of 2.5 million eligible voters in 2019—a

third of the State's total electorate.

198.   Latinx and Asian people also make up a growing share of the Georgia

electorate.  The Latinx and Asian voting populations in the State more than tripled

in size from 2000 to 2019.

199.   This growth among nonwhite voters has been especially prominent in

the Atlanta metro area.  Metro Atlanta is home to 3.9 million registered voters—

over half of the State's electorate in 2020.  Between 2016 and 2020, the area saw

an increase of 115,000 Black voters, 64,000 Latinx voters, and 53,000 Asian

voters.  During that same time period, Latinx and Asian people increased as a share

of the electorate in every Atlanta metro area county.

200.   According to the 2019 American Community Survey ("ACS"), the following counties are home to a sizeable population of color: Bibb County (54.4% Black, 3.3% Latinx, 2% Asian); Clayton County (69.3% Black, 13.2% Latinx, 5.1% Asian); Cobb County (27.6% Black, 13% Latinx, 5.4% Asian); DeKalb County (54.0% Black, 8.5% Latinx, 6.1% Asian); Fulton County (44.1% Black, 7.2% Latinx, 7.1% Asian); Gwinnett County (27.8% Black, 21.2% Latinx, 11.6% Asian); Hall County (7.2% Black, 28.4% Latinx, 1.8% Asian); and Richmond County (56.5% Black, 4.9% Latinx, 1.9% Asian).

201.   Despite their increasing population growth, the Black and Latinx populations in Georgia still trail behind the white population on many socioeconomic measures.

202.   According to the ACS, Black and Latinx residents experience poverty (18.8% and 19.1% of those populations, respectively)at nearly twice the rate of white residents (10%).  White per capita income ($38,435) is significantly greater than Black ($24,215) and Latinx ($20,066) per capita income.  The 2019 median income for white households was $70,832, compared to the median of Black households of $47,096, and Latinx households of $52,661.

203.   Black and Latinx households in Georgia are also substantially less likely to own a vehicle: 11.7% of Black households and 7.2% of Latinx households lack a vehicle, as compared to 3.6% of white households.  Relatedly, as compared to white residents, Black residents are more than four times as likely and Latinx

residents are more than twice as likely to use public transportation to commute to work.

204.   According to the ACS, Black households in Georgia are also more than 1.5 times as likely to live without broadband internet access than white households.

205.   These inequalities have contributed to the limited number of candidates of color elected to state-wide offices, despite the State's changing demographics and the increasing number of such candidates running for office since 2000.  For example, no Black candidate has ever been elected as Georgia's Governor.

206.   Voting in Georgia is highly racially polarized.  For example, in the 2008 presidential election, Barack Obama secured 98% of Black voter support in Georgia and only 23% of white voter support.  Similarly, 93% of Black voters supported Stacey Abrams for governor in 2018, compared to only 25% of white voters.  And in the Runoff Elections, Black voters' candidates of choice, Reverend Raphael Warnock and Jon Ossoff, won with roughly 94% of Black voter support compared to 29% of white voter support.  The majority of Latinx and Asian voters also choose candidates different than their white counterparts in the state.  For instance, Warnock and Ossoff received double the share of the Latinx (64%) and Asian (60%) vote than the white vote.

### D. Black voter participation reached historic levels in the 2020 primary election, General Election, and the Runoff Elections.

207.   In June 2020, Georgians faced innumerable obstacles to cast ballots in a primary election for President, U.S. Senate, and many local offices.  As just a few examples, Georgia voters—especially majority-minority counties—endured a combination of hours-long wait times in the summer heat, problems with voting equipment, and insufficient available ballots at polling locations.

208.   Fulton County voters, 40% of whom are Black, experienced some of the longest lines in the primary election.

209.   To mitigate these concerns in the General Election, voting rights and election protection organizations continued to advocate for more equitable voting options, which were granted by certain elections officials and included additional polling places and drop boxes, easier processes for voters to request absentee ballots, and the doubling of voter education and line relief efforts in anticipation of even higher turnout in the General Election.

210.   In both the General Election and the Runoff Elections, Georgia voters turned out in record numbers.  While turnout typically declines significantly for runoff elections (specifically among Black voters, and particularly as compared to elections where a presidential election is on the ballot), that was not true in January 2021.  More than 4.4 million Georgians returned to the polls for the Runoff Elections.  Black voter turnout was 91.8% of that in November's General Election.

211.   A significant driver of the record-breaking turnout in both elections was the historic participation of Black voters.  Of the over 5 million Georgians who voted in the General Election, 30% were Black.  This followed a 25% increase in Black voter registration in 2020 as compared to 2016.

212.   Much of this increase in turnout is attributable to higher rates of absentee voting.  In the General Election, more than 1.3 million absentee ballots were cast.  That marks a five-fold increase over the number of absentee ballots cast in the State in 2016.  Nearly 30% of Black voters cast their ballot by mail in 2020, compared to only 24% of white voters.  Candidates preferred by Black voters received a higher percentage of absentee votes relative to their overall percentage of the final vote count.

213.   The high rates of voting by mail, and the lack of evidence of voter fraud, illustrate that additional voting options are not only safe but also necessary.  These additional voting options help, for example, alleviate lines during in-person early voting and decrease in-person voting demand on Election Day.  These options remain necessary to ensure that voters from historically disenfranchised communities who, for a variety of reasons, depend on alternatives to in-person voting on Election Day, can exercise their right to vote.

214.   The increase in absentee voting was due, in part, to the use of drop boxes.  They allow voters to submit their absentee ballots in advance of Election Day, avoiding the risks of delay or loss attendant to sending a ballot through the

mail.  Drop boxes were used with high frequency in majority-minority counties. Fulton County voters used drop boxes for more than half of the absentee ballots cast in the General Election.

215.   Early in-person voting was another major driver of increased turnout. Approximately 2.7 million Georgians voted early in person in the General Election.  More than 2 million voters cast early in-person ballots in the Runoff Elections.  Early voting turnout was particularly high in counties with large minority populations, with some counties seeing upward of a 500% increase.

216.   Yet, despite the unprecedented use of absentee voting, long lines remained at many polling places both during early voting and on Election Day. This was markedly true at polling places serving neighborhoods primarily comprised of Black people.  While on Election Day polls closed at 7:00 p.m., individuals who are in line by the time the polls close are allowed to vote, and the vast majority of polling places that had to stay open late to ensure those waiting in line could cast their ballots were in majority-Black neighborhoods.  Some voters waited hours to vote.

217.   As part of an effort to help voters sustain their strength and make it to the voting booth despite these long lines, Georgia organizations brought and then provided free food and water to polling places.  These efforts contributed to turnout numbers in neighborhoods described above, where wait-times sometimes stretched for hours.

218.   Together, these opportunities—in concert with efforts by organizations focused on increasing minority voter participation and registration—resulted in historic electoral outcomes.  Black voters' preferred presidential candidate won Georgia's electoral votes for the first time in three decades.  Black voters also successfully elected their candidates of choice in the Runoff Elections, including Reverend Raphael Warnock, elected as the first Black person to represent Georgia in the United States Senate.  Exit polls following the Runoff Elections indicated that over 90% of Black voters supported Reverend Warnock and fellow Democratic candidate Jon Ossoff, who was elected to Georgia's other Senate seat.

### E.   The Georgia General Assembly passed S.B. 202 immediately following historic Black voter participation in the General Election and Runoff Elections, in a flawed and nontransparent process.

219.   In response to increasing Black voter participation and record election participation in recent elections, the Georgia General Assembly passed S.B. 202, only 79 days after the Runoff Elections.  S.B. 202 placed restrictions on many of the safe and secure options by which Black voters, voters of color, immigrant voters, poor voters, student voters, older voters, and voters with disabilities exercised their right to vote.

1. ***S.B. 202 was passed in a hostile, racially charged environment following the General Election and Runoff Elections***

220.   S.B. 202 was passed against the backdrop of a racially charged environment created by misinformation and conspiracy theories spread during the 2020 campaign and in the weeks following Election Day.  In the months leading up to the General Election, election officials in multiple states raised concerns about deliberate misinformation efforts targeting minority—and in particular—Black voters.  A robocall targeted Black voters in Detroit "using racially charged-stereotypes and false information to deter voting by mail," according to Michigan's Secretary of State.  On social media, Black and Latinx voters were reportedly flooded with ads designed to discourage them from voting altogether.

221.   Following the General Election, certain elected officials, news organizations, and campaign aides and lawyers levied unfounded claims of voter fraud, as dozens of lawsuits were filed to invalidate hundreds of thousands of ballots cast in cities with large Black voter populations including Milwaukee, Philadelphia, Detroit, and Atlanta.

222.   In Georgia, allegations targeting the integrity of the election included groundless, false assertions that voter signatures were not adequately verified on absentee ballots, that "suitcases" full of fake ballots were counted in the final tally, that ineligible voters participated in the election, and that the identities of deceased individuals were used to cast votes.

223.   Georgia's election officials repeatedly addressed and debunked these claims of voter fraud.

224.   In post-election litigation, state and federal judges rejected at least four lawsuits challenging Georgia's election results based on dubious claims of voter fraud.  By mid-December, dozens of state and federal judges across the country rejected post-election lawsuits challenging the results of the General Election.

225.   In the wake of the General Election, legislatures across the country sought to restrict voting access in yet another attempt to suppress Black political participation and disenfranchise Black voters.  According to a report from the NYU School of Law's Brennan Center for Justice, in the first 50 days of 2021, state legislators in 43 states filed over 250 bills that would restrict voting access—seven times as many restrictive voting laws as proposed during the same period in 2020.

226.   In Georgia, the effort to restrict voting began days after the Runoff Elections.  Georgia held the Runoff Elections to fill its two U.S. Senate seats, and Jon Ossoff and Raphael Warnock were declared the projected winners the next day.  Two days after Election Day and a day after the insurrection, in the early hours of January 7, 2021, the U.S. Congress certified President Joe Biden and Vice President Kamala Harris, the first Black and Asian-American Vice President, as the winners of the General Election after the process was delayed by a violent mob

of rioters who stormed the U.S. Capitol.  Later that day, Georgia House Speaker David Ralston announced that he would form a Special Committee on Election Integrity.  Representative Barry Fleming serves as the Chair of the 14-member Special Committee, and Representative Alan Powell serves as its vice-chair.

227.   At the start of the legislative session, the Chair of the Gwinnett County Elections Board indicated why she wanted the Georgia General Assembly to impose new restrictions on voting: "They don't have to change all of them, but they've got to change the major parts of them so that we at least have a shot at winning."  The U.S. Supreme Court has warned that measures designed to harm racial minority voters for political interests can run afoul of the federal Constitution.  *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1473 n.7 (2017) (citing *Miller v. Johnson*, 515 U.S. 900, 914 (1995)).

228.   Georgia House Speaker David Ralston stated that he does not want every registered voter to receive an absentee ballot because it would "certainly drive up turnout."  He also has baselessly invoked concerns about voter fraud and election fraud as reasons why vote-by-mail should not be acceptable.

> **2.** ***The Georgia General Assembly passed S.B. 202 with little process or regard for the ideals of an open democracy***

229.   Neither legislative committee tasked with assessing S.B. 202, its precursors, Senate Bill ("S.B. 241") and House Bill ("H.B. 531"), and other elections bills with provisions added to S.B. 202 provided open, transparent, or inclusive practices for public testimony.  For example, neither the Senate

Committee on Ethics ("Senate Committee") nor the House Special Committee on Election Integrity ("House Committee") publicly announced basic information about who could testify, how to sign up for testimony, or how testimony would be conducted in advance of hearings.

230.   When guidance was provided about public testimony, it was often inconsistent.  For example, prior to a February 19, 2021 House Committee hearing, the House Committee indicated to members of the public that remote testimony via videoconferencing technology would not be available.  But during the hearing, Chair Fleming invited certain witnesses to testify remotely.  Only in response to a question during the hearing did Chair Fleming indicate publicly for the first time that remote public testimony would be available.  However, this opportunity was only offered to members of the public who were specially invited by House Committee members or staff to testify.

231.   On some occasions, witnesses were denied the opportunity to testify despite repeatedly filing written requests to testify.  For example, the NAACP Legal Defense & Educational Fund ("LDF"), counsel for Plaintiffs, was unable to testify at two House Committee hearings held on February 22 and 23, 2021, despite formally requesting in writing an opportunity to testify on multiple occasions beforehand.  Despite this, Chair Fleming inaccurately proclaimed at the end of the February 23, 2021 hearing that everyone who signed up to testify had been afforded an opportunity to do so.

232.    Members of the disability community were often shut out of the legislative process entirely.  For example, Gaylon Tootle, the First Vice President for the National Federation of the Blind-Georgia, a member of Plaintiff The Arc of Georgia, and a Black resident of Georgia with a visual disability, attempted to testify multiple times at hearings on elections bills about the impact of proposed changes on voters with disabilities but was denied each time.

233.    Updated versions of the bill were almost never uploaded to the General Assembly website in a timely manner.  Many committee hearings on elections bills took place even though the version of the bill being discussed had not been uploaded online for the public's consideration and legislators explained during the start of committee hearings that the bill being reviewed would likely change after substantive changes were discussed among legislators.  This made it impossible for legislators and members of the public to meaningfully offer comments and engage with the substance of elections bills.

234.    For example, during a February 25, 2021 Senate Committee hearing, Senate Committee Chair Max Burns, the author of S.B. 202, announced that a substitute version of S.B. 241 incorporating a significant set of amendments, would be provided by the next day.  Doing so was particularly important, he explained, because members should have an opportunity to review the amended text before the next Senate Committee meeting on March 1, 2021.  However, a substitute version of the bill was never provided the following day, nor at any time prior to

the meeting to consider the amendments.  Instead, the final amendments, which would ultimately form the basis for S.B. 202, were only publicly disclosed and discussed for the first time *during* the March 1, 2021 meeting.  One senator even complained at the March 1, 2021 meeting that it was her first time reading the proposed changes.  That same day, the Senate Committee held a vote on an amended version of the same bill, which was then sent to the Senate floor.

235.   Between March 17, 2021, when the House Committee first considered the more than ninety pages of amendments to the substituted version of S.B. 202, and March 22, 2021, when the House Committee recommended S.B. 202 for passage, the House Committee held three public hearings to discuss the bill and produced four substitute versions.  The operative version of the bill was never publicly posted on the Georgia General Assembly website before the hearing, depriving members of the public the opportunity to review and discuss.

236.   In the House Committee, when Chair Fleming was challenged about the lack of transparency in the legislative process at a hearing held on March 18, 2021 to discuss S.B. 202, he responded that his office was willing to send a copy of an updated bill to anyone who asked for it.  This would require a member of the public to follow all hearings, know that there was a change in a bill, know from watching the March 18, 2021 hearing that one could request a copy of the bill, and have the time and knowledge to reach out to a legislative staffer to request a copy of the bill, which had grown from three pages the previous day to ninety.

237.   Lengthy bills were often provided to the public with little or no time to read them, much less analyze them, before the House and Senate Committees convened hearings on them.  For example, the original version of H.B. 531, provisions of which were incorporated into the final version of S.B. 202, was only made available through postings on social media mere hours before members of the House Committee convened for a hearing on February 18, 2021.  Then, less than 24 hours later, the House Committee held another hearing before all its members at 9:30 a.m.  The House Committee continued to amend H.B. 531 and hold hearings on amended versions of the bill without making amendments or substitute versions publicly available.

238.   Many committee hearings related to elections bills were scheduled and held with little to no advance notice.  For example, members of the House Committee were given three hours' notice that S.B. 202 would be discussed at a House Committee hearing on March 17, 2021.  And only after the agenda was circulated did those members receive the substitute version of S.B. 202 which had grown from three to over ninety pages. Despite insufficient notice to his own Committee members, much less any notice to the public, Chair Fleming held a full hearing on eighty-seven pages of amendments mere hours later.

239.   Some of these hearings were not live-streamed for the public to participate.  Often, testimony was limited only to those members of the public who

could attend these hearings in-person.  This requirement was often enforced even as the COVID-19 pandemic was ravaging the state.

240.   The Senate Committee, in which S.B. 202 was introduced and which heard precursors S.B. 241 and H.B. 531, held numerous hearings early in the morning at either 7:00 a.m. or 7:30 a.m., including on February 25, 2021.  These hearings took place in a building that was not officially open to the public until 7:00 a.m., which forced members of the public to arrive late or miss part of the meeting.  The scheduling of these hearings, ninety minutes before the start of traditional business hours and at the beginning of the building's opening hours, appear calculated to avoid scrutiny and exclude members of the public.

241.   Although concerns were raised by members of the public about the potential racial impact of proposed elections changes during House and Senate Committee hearings, it appears that no analysis was ever conducted by the Committees to evaluate the racial impact of any of the elections bills considered or passed by the General Assembly.  Neither Committee ever responded to written requests from LDF and the Southern Poverty Law Center ("SPLC"), also serving as a counsel to Plaintiffs, to produce a racial impact analysis.  In fact, when directly asked on March 17, 2021 in oral testimony by a representative of the SPLC whether the Senate Committee would conduct a racial impact analysis, the Committee members refused to respond.

242.    On March 8, 2021, the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections issued a statement stating it was "concerned that the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."

243.    S.B. 202 was rushed out of the Georgia General Assembly. Amendments were still being added to S.B. 202 in the Rules Committee the same morning that the House of Representatives was set to consider the bill on the chamber floor.  After the House passed a substituted version of S.B. 202 on March 25, 2021, it was immediately transmitted to the Senate.  No conference committee was convened.  The bill was brought to the floor of the Senate for a vote mere hours later.  Prior to the Senate vote, State Senator Elena Parent requested that the bill's fiscal impact be determined before passage.  Within minutes, Lieutenant Governor Duncan denied this request and ruled that no fiscal determination needed to be made because S.B. 202's fiscal impact would not exceed $5 million.  No evidence was provided to support this on-the-spot determination, despite evidence submitted in both the House and Senate Committees that several provisions of S.B. 202 would have significant fiscal impact.

244.    S.B. 202 was rushed into being signed into law with little time for the public to weigh in.  Mere hours after the House and Senate voted on the now 98-page version of S.B. 202, Governor Brian Kemp signed the bill into law in a closed-door signing ceremony.  During the time between passage of S.B. 202 in

the General Assembly and when the Governor signed the bill into law, the

Governor's office did not accept any messages by phone.  S.B. 202 moved from

the House to the Senate and was signed into law by the Governor in less than seven

hours.

245.   Even legislators were forcibly shut out of the process of the Governor

signing S.B. 202 into law.  Representative Park Cannon was arrested and forcibly

removed from the State Capitol when she knocked on the Governor's office door,

requesting that the public be allowed to witness the announcement of the bill

signing that was under way.

### F. The challenged provisions of S.B. 202 place limitations on opportunities for voters to exercise their right to vote.

#### 1. *Sections 20 & 26, mobile voting unit restrictions*

246.   Prior to the enactment of S.B. 202, Georgia law permitted county

election administrators to procure and provide portable or movable polling

facilities, also known as "mobile voting units," as supplemental polling locations

during the advance voting period and on Election Day.

247.   In the 2020 election cycle, these mobile voting units were deployed to

mitigate the shortage of accessible and secure polling locations that resulted in

long lines of voters at existing and traditional polling locations.  Fulton County, for

instance, purchased two mobile voting units which made stops at twenty-four

different locations, including several Black churches, during the advance voting

period ahead of the General Election.

248.   Despite the absence of any facts to indicate the mobile voting units used in the 2020 election cycle were not secure, caused confusion, or generated any other voter access or election administration issues, Section 20 of S.B. 202 restricts the use of mobile voting units to situations where an emergency is declared by the Governor.  Such an emergency declaration may only occur under a narrow set of conditions and only after particular procedures are taken, including a convening of a special session of the General Assembly.  Relatedly, Section 26 of S.B. 202 additionally restricts the use of mobile voting units to supplement existing polling locations during the advance voting period.

> **2.    *Section 25, new identification requirements, timing parameters, and wet signature requirements for requesting an absentee ballot***

249.   Georgia has relied on vote-by-mail procedures for decades.  Prior to S.B. 202's enactment, a voter could request an absentee ballot by providing certain information, such as the current address at which they are registered to vote and the voter's signature or the signature of the eligible relative requesting the ballot on behalf of the voter, and the signature of the person providing assistance to the voter, if applicable.  Additionally, before S.B. 202, voters could request an absentee ballot 180 days prior to an election through the Friday prior to the election.

250.   Section 25 of S.B. 202 now requires, in addition to the voter's registration address, that the voter provide their date of birth and Georgia driver's

license or state ID card number.  S.B. 202 further demands that a voter who does not have a Georgia driver's license or state ID card instead provide a photocopy or electronic image of other acceptable ID, such as a utility bill, bank statement, government check, paycheck, or other government document containing the name and address of the voter.

251.   Section 25 of S.B. 202 further requires voters to add their signature to the absentee ballot application in "pen and ink."  Voters who had previously applied to vote absentee entirely online will now have to obtain a hard copy of an absentee ballot application.

252.   Section 25 of S.B. 202 still requires that the voter or a relative assisting or requesting the absentee ballot sign the absentee ballot application with "his or her usual signature."

253.   Section 25 of S.B. 202 requires that Georgia election officials verify the identity of the voter by comparing the voter's name, date of birth, and Georgia driver's license or state ID card (or other identifying record) with the information in the voter's voter registration record.

254.   Section 25 of S.B. 202 also delays and compresses the time period during which a voter may request an absentee ballot.  Unless a voter is hospitalized, S.B. 202 reduces the time a voter can request an absentee ballot to 78 days prior to an election and requires that the application be received by the county election administrator 11 days prior to the election.

### 3.  *Sections 27 & 28, new identification requirements for casting an absentee ballot*

255.   Under Section 27 of S.B. 202, a voter must now provide additional personal ID information on the outside of the absentee ballot mailing envelope to complete their absentee ballot submission.  This information includes a Georgia driver's license number or state ID card number, the voter's date of birth, and the last four digits of the voter's social security number if the voter does not possess a Georgia driver's license or state ID card.

256.   According to Section 28 of S.B. 202, if the voter does not possess a Georgia driver's license, state ID card, or social security number, the voter must include a photocopy of other acceptable identification—such as a utility bill, bank statement, government check, paycheck, or other government document containing the voter's name and address with their returned absentee ballot.

257.   The voter must additionally sign an oath in their "usual signature" swearing, under criminal penalty, that they have completed their ballot in secret. S.B. 202 § 27.

258.   Section 28 of S.B. 202 requires that Georgia election officials, in order to confirm the identity of the voter, compare the information on the absentee mailing envelope—namely, the voter's Georgia driver's license number or state ID card number, the voter's date of birth, and, if the voter does not possess a Georgia driver's license or state ID card, the last four digits of the voter's social security number—with the information contained in the voter's registration records.

259.   If the identifying information does not match, Section 28 of S.B. 202 requires that Georgia election officials reject the voter's absentee ballot.

### 4.   *Section 26, secure drop box limitations*

260.   Before S.B. 202's enactment, Georgia voters enjoyed the ability to safely and securely cast their ballot by drop box in one of the existing 330 drop boxes in Georgia, many of which were freestanding and installed outside of a building.

261.   Before S.B. 202, many county election administrators chose to exercise their discretion to keep drop boxes open after business hours and beyond the advance voting period and up until the polls closed at 7:00 p.m. on Election Day.

262.   In the 2020 election cycle, which includes the January 2021 runoffs, pursuant to emergency regulations passed by Defendant State Election Board, counties were required to monitor each drop box through 24/7 video surveillance to ensure security of drop box voting.

263.   The statewide use of drop boxes in the 2020 election cycle provided the flexibility necessary to ensure voters had meaningful access to secure drop boxes, minimized crowding, alleviated the risk of long lines during in-person voting, and helped address voter concerns about mail delivery.  Drop boxes were and continue to be necessary to providing equitable voting options.

264.   First, Section 26 of S.B. 202 curtails the availability of drop boxes to the lesser of one per every 100,000 "active registered voters" in the county or one per advance voting location in the county.  This drastically reduces the number of drop boxes available in the most populous counties, but also in smaller counties. For instance, voters in Richmond County would go from having 5 drop boxes (with the option for more) to having only 1, or from 35 to 5 and 36 to 8 in DeKalb and Fulton Counties, respectively.

265.   Second, S.B. 202 requires drop boxes to be established inside of the office of the board of registrars or absentee ballot clerk or inside of an advance voting location.  Only during Governor-declared emergencies are drop boxes permitted to be located outside.

266.   Third, S.B. 202 limits the hours in which a drop box is available to the hours of operation of that office or advance voting location.

267.   Fourth, S.B. 202 replaces the 24/7 human surveillance requirement with a mandate that all drop boxes be under constant surveillance by an election official, law enforcement officer, or licensed security guard.

### 5.   *Section 28, runoff early voting restriction*

268.   S.B. 202 forces all runoff elections to take place 28 days after the general or primary election and Section 28 of S.B. 202 drastically reduces the advance voting period for runoffs from three weeks to one week, with no mandatory weekend voting days, including Sunday voting.

### 6.    *Section 33, Line Relief Ban*

269.    Section 33 of S.B. 202—the Line Relief Ban—criminalizes volunteers who provide free food, seating, and water, or any other "gifts," as well as other practices and materials associated with line relief, to voters standing within 150 feet of the outer edge of a polling place.

270.    Because S.B. 202 also prohibits a volunteer from coming within 25 feet of any voter standing in line, even outside of the 150-foot zone, it covers conduct hundreds of feet in distance from the polling place entrance.  It would prevent a volunteer from getting close enough to offer the loan of a folding chair (or umbrella for shade) to an older or disabled voter.

### 7.    *Sections 34 & 35, out-of-precinct provisional ballot*

271.    Prior to S.B. 202, if an otherwise eligible voter casts a provisional ballot in the county in which they reside but at a different precinct than the one assigned to them ("out-of-precinct"), their ballot would be counted for every race on that ballot in which the voter was qualified to vote.

272.    Over 11,000 voters cast a provisional ballot in the General Election and more than 10,000 voters cast a provisional ballot in the Runoff Elections. Most of these provisional ballots comprised out-of-precinct ballots.

273.    Sections 34 and 35 of S.B. 202 now prohibit election officials from counting provisional ballots cast by Georgia voters who cast a ballot before 5:00 p.m. on Election Day, if they cast their ballot in a different precinct, even if it is

located within the same county in which the voter resides.  Rather than count their votes for all of the races to which the voter was qualified and otherwise eligible to vote on that precinct's provisional ballot, S.B. 202 requires poll officials to inform such person that their vote is invalidated for all of the races on that ballot.

### 8. *Section 47, felony punishment for acceptance of an absentee ballot for delivery or return if not a family member or caregiver*

274.   Prior to S.B. 202, a limited set of people were technically authorized to assist voters with disabilities in returning their absentee ballot:  caregivers, household members, and certain family members.  O.C.G.A. § 21-2-385.  S.B. 202 now criminalizes the provision of such assistance in returning a ballot by mail or personal delivery.  Even though state and federal law allows voters with disabilities to receive assistance in voting from a person of their choice (except an employer or union steward), S.B. 202 now criminalizes such assistance from anyone who is not a family member or "caregiver."

### G. S.B. 202 severely burdens all voters, and discriminates against Black voters, other voters of color, disabled voters, and other historically disenfranchised communities, in particular.

275.   The challenged provisions of S.B. 202 independently and cumulatively establish obstacles that severely burden or outright deny Plaintiffs' members' right to vote.  By closing off options to vote at mobile voting sites, by mail, by drop box, or through early voting (where runoffs are concerned), the provisions of S.B. 202 funnel voters toward in-person voting on Election Day.  For

voters that are able to access this option, they are forced to stand in long lines, for long periods of time, made longer by the elimination of alternatives that funnel other voters to do the same.  Once these voters are in line, S.B. 202 raises the cost of queueing to cast a ballot by prohibiting line relief volunteers from offering voters a drink of water or something to eat.  And even after these voters reach the front of these lines to cast as ballot, S.B. 202 effectively disenfranchises many of them who happen to appear at the wrong precinct, or at the very least, imposes additional severe burdens upon these voters that require them to repeat the performance a second time, if that is even possible.

276.   S.B. 202 thus imposes cascading burdens, whose cumulative effect on Georgia voters as a whole is even more severe and significant than any of its individual parts.  These burdens, moreover, fall upon *all* Georgia voters, including those who are willing and able to bear the additional costs to exercise their right to vote.  This is because S.B. 202's obstacles raise the cost of voting for every voter, requiring all eligible Georgia voters to expend more resources and incur greater opportunity costs to cast a ballot—including, for example, expenditures for transportation and childcare, and the costs of foregoing employment opportunities—even where a voter is not completely deterred or prevented from voting.

### 1.   *Elimination of mobile voting units*

277.   The elimination of all mobile voting units except at Defendant Governor Kemp's discretion in the event of "emergencies" unduly and especially burdens voters of color and voters with disabilities.  Mobile voting units consist of buses specially outfitted to provide four to eight additional, secure voting stations. In the General Election, these mobile voting units were used within Fulton County, where the majority of the population is nonwhite and with Black voters comprising more than 40% of registered voters, to provide accessible voting.  Fulton County's own website notes that "the County's new Mobile Voting Unit is an accessible voting unit that will create a simple, secure voting experience for voters of all ages and voters with disabilities."  The most populous county in Georgia, Fulton—along with the other Atlanta metro area counties—has an established history of long voting lines and backlogs of absentee ballot requests, which disproportionately affect voters of color in Georgia.  Indeed, these impediments to voting during the June 2020 primary led Fulton County to double its budget for elections, secure grants, and procure the two mobile voting units that were used in the General Election.  The efforts by Fulton County were successful and posed no election security risks.  The General Election saw the largest voter turnout in 28 years, with an overall turnout rate of 77.92%.  With the historic voter turnout in the General Election, which Georgia's election officials have universally confirmed was secure and accurate, it is clear that these mobile voting units contributed to the ability of

Fulton County voters who would otherwise not have been able to vote, to cast their votes.  These mobile voting units, moreover, helped reduce barriers to voting that disproportionately affect voters of color.  By eliminating mobile voting units, S.B. 202 will disproportionately burden the majority nonwhite citizens of Fulton County and Fulton County voters with disabilities who relied on these units to participate in the General Election.

### 2.   *Additional requirements for absentee voting*

278.   The ID Requirements impose a severe burden on Georgia voters, and most acutely voters of color and with disabilities.  Absentee voting has been critical to ensuring that all voters, and especially voters with disabilities, have equitable and safe access to the ballot box.  The addition of the ID Requirements for absentee voting will dramatically limit absentee ballot access by imposing discriminatory and unnecessary burdens on or barriers to voting for voters who do not have one of a few limited forms of acceptable ID.  Moreover, people with disabilities are much less likely to have access to the internet, to own a home computer, or even to own a smartphone.  Voters who lack access to printers, scanners, copiers, or the internet would find it difficult if not impossible to make copies of alternative documents in order to comply with this absentee voting requirement.

279.   These harms will not be borne equally among different voting populations.  Instead, they will fall disproportionately on people of color, people

with disabilities, older people, poor people, rural residents, and students—all populations who face heightened challenges accessing DMV offices, photocopiers, and the ability to pay for photocopies, or a polling place to vote in-person.

280.   For instance, a disproportionate number of people with disabilities do not drive and therefore are less likely to possess a state driver's license or other ID card.  Voters with disabilities face significant transportation barriers.  They own their own vehicles less frequently, depend on others for rides more frequently, and limit their travel to daytime trips.  A 2017 survey by the U.S. Department of Transportation's Bureau of Transportation Statistics found that 12.2% of people with disabilities aged 18-64 who are employed and 22.5% of people with disabilities in the same age group who are not employed live in households without a vehicle, compared to 3.9% of people without disabilities who are employed and 9.5% of those who are not employed.  The same survey found that, even for those who had access to a vehicle, only 60.4% of people with disabilities drove, compared with 91.7% of those without disabilities.  The same survey found that people without disabilities took 83.9% of trips by personal vehicle, while people with disabilities took only 74.6% of trips in a personal vehicle.

281.   In addition, approximately 16.6% of Georgia's voting-age citizens who lack access to a vehicle live more than 10 miles from a state office that issues IDs.  Almost all of these citizens live in rural areas where public transportation is unavailable.  These areas also house high concentrations of people of color, people

with disabilities, and people living in poverty.  In Georgia's "Black Belt," there are 21 contiguous and predominantly Black rural counties where all State driver's license offices are open two days per week or fewer.  The same populations would face similar challenges in accessing a photocopier to copy their ID, which S.B. 202 would require of voters without a driver's license or state ID.  For older people, people with disabilities, students, and others who cannot physically cast a ballot in-person and therefore rely on vote-by-mail, the discriminatory nature of the ID Requirements is particularly acute.

282.   Moreover, the ID Requirements would exacerbate existing racial disparities in absentee ballot rejections.  As it stands, without these additional requirements that Black and other voters of color will be disproportionately unable or burdened to satisfy, there are well-documented and long-standing racial disparities in absentee ballot rejections in Georgia.  Data from recent elections reported by the Brennan Center for Justice reflects that racial disparities continue, consistent with previous literature.

283.   Such exacerbating factors and their impact on people of color and other historically disenfranchised communities have led to similarly stringent ID Requirements adopted by other states to be invalidated as violating the U.S. Constitution, Section 2 of the VRA, or both.

284.   The General Election and Runoff Elections featured historically high turnout fueled by broad reliance upon absentee voting.  Data from these elections

show that nonwhite voters used mail-in voting at unprecedented rates even higher than white voters.  For example, nearly 30% of Black voters voted by mail in the 2020 General Election, compared to 24% of white voters.

285.   In the absence of any recorded or statistically significant evidence of absentee voter fraud in Georgia—an Arizona State University study found just eight isolated instances of alleged absentee voter fraud in Georgia that actually resulted in a plea or consent order between 2000 and 2012, a rate of less than 0.00003% during the covered time period, and dozens of state and federal courts, as well as state election officials, reaffirmed the absence of voter fraud in the aftermath of Georgia's General Election—there is simply no sufficiently weighty justification, let alone a rational or compelling need, for imposing the onerous ID Requirements on absentee ballot voters that will disproportionately burden minority, poor, older voters, rural populations, voters with disabilities, and student voters.  Given that these voters disproportionately rely on absentee voting by necessity rather than choice, the ID Requirements—by erecting new and unwarranted barriers to absentee voting—will deprive them of an equal opportunity to participate in the electoral process and elect representatives of their choosing.  Moreover, these ID Requirements pose security risks to voters, as absentee ballots and ballot applications will now be known to include significant personally identifying information.  Immigrant voters, voters with disabilities, and

voters of color are particularly vulnerable to identity theft scams based on their need for additional language and other assistance to complete forms.

### 3.   *Restrictions on distribution of absentee ballots*

286.   Data from recent years demonstrates that while Black voters comprise 30% of Georgia's voting population, these voters account for almost 42% of the request for absentee ballots.  Per the Georgia Secretary of State's own data, Black voters are more likely to vote by mail than any other racial demographic.  This is not because Black voters simply prefer to vote by mail; they face unique obstacles to voting in person because they are more likely to lack access to transportation and to work in jobs that do not allow them to take time off during business hours. Other communities, including people with disabilities, immigrants, the poor, older people, and students, have likewise relied disproportionately on absentee voting, particularly during the General Election and Runoff Elections.  For instance, immigrant voters who often need translation services to complete a ballot often prefer to vote by mail so they have more time to complete their ballot.  Voters with disabilities often need to vote by mail because they have difficulty leaving their homes, have little or no access to transportation, face architectural or other barriers at the polling place, or have difficulty waiting in long lines to vote in person.

287.   Because S.B. 202 will severely restrict access to absentee ballots, including by explicitly restricting their distribution by state and local officials and voter outreach organizations, the severe burdens imposed by the law will

disparately impact and discriminate against these voters, including by forcing them to vote more heavily in-person when in-person voting may not be a tenable option, and under circumstances where in-person voting involves overcoming additional burdens that result from long lines, grueling waits, and greater risks of having one's ballot rejected—burdens that are already disproportionately visited upon voters of color.

### 4. *Restrictions on drop boxes*

288.   S.B. 202's restrictions on the location, availability, and operating hours of ballot drop boxes will disproportionately burden Black, Asian, and Latinx voters, as well as voters with disabilities.  Georgia voters—especially in these historically disenfranchised communities—have come to rely on drop boxes as a safe and an important option for casting a ballot.  Many voters have caregiving or strict (and/or unpredictable) work commitments that limit their availability during normal voting hours, as well as those with medical conditions or other disabilities—and voters of color compose a disproportionately large share of these groups.  For these voters, casting an in-person ballot during advance voting or on Election Day may be an untenable option.  In addition, widely reported and continuing failures at the United States Postal Service have raised justifiable concerns about relying on the Postal Service to cast a ballot.  Finally, voters of color are more likely to use ballot drop boxes.  For these voters, secure drop boxes provide a reliable and accessible option, and the enacted restrictions severely

burden their right to vote and deny their access to vote by forcing them to navigate more onerous paths to voting, if they are able to vote at all.

289.   The requirement that drop boxes all be moved inside a building poses a particular barrier for voters with mobility disabilities.  Many registrar's offices are physically inaccessible due to a lack of adequate accessible paths of travel to building entrances, entrances that are themselves inaccessible, or other barriers.  If an accessible route is available, it may be hard to find, and poorly marked.  Because of S.B. 202, voters with mobility disabilities can no longer drive (or be driven) to a drop box on the street and submit the ballot from the car.  Instead, they must find an accessible parking spot, exit the vehicle (which is often time consuming and difficult), navigate an accessible route to the building entrance, find the registrar's office, and repeat the entire process for the return.  In other words, they must face many of the challenges that make voting in person difficult for them and that make absentee voting a better option for them.

290.   The new mandate for in-person "constant surveillance" of secure drop boxes by an election official, licensed security guard, or law enforcement official also poses serious voter intimidation concerns for Black voters and other voters of color whom law enforcement routinely and unfairly target.  Without any evidence that (potentially armed) law enforcement surveillance is necessary to repel fraud or misconduct, S.B. 202's needless surveillance mandate recalls Jim Crow era voter intimidation deployed to deter Black voters in particular from casting a ballot.  The

new drop box restrictions raise the same threats and burdens, and fall most heavily upon communities of color, and do not increase the security of Georgia elections.

### 5.   *Prohibiting provisional ballots cast in the wrong precinct*

291.   S.B. 202 also outright *disenfranchises* eligible Georgia voters who cast ballots in the wrong precinct—the most severe burden there is.  Under the new law, Georgia election officials must discard the entire ballot cast in the incorrect precinct, even if the ballot contains eligible votes.  For example, while local races on a ballot may be precinct-specific, ballots also contain congressional and federal races which are not precinct-specific.  Yet rather than counting the ballot's votes for eligible races as was done in the past, S.B. 202 *requires* the entire ballot to be thrown away—even if it was cast by an eligible registered voter, and even if it was cast in a timely manner and otherwise qualified to be counted—disenfranchising voters from participating in elections in which they have a right to vote.

292.   This new practice will disproportionately affect Black voters, and other historically disenfranchised communities, who are proven to be more likely than white voters to cast an out-of-precinct ballot.  Such voters are more likely to have moved within their county than white voters, and thus more likely to arrive at an incorrect precinct.  Recent research specifically demonstrates that Black voters in Georgia disproportionately live in neighborhoods with much higher rates of in-county moves.  Not only does the data reflect that the population with the most in-county moves is 47% Black, relative to 37% non-Hispanic white, but the

population with the *least* in-county moves is only 22% Black, compared to 64% non-Hispanic white.  Requiring election officials to discard ballots cast in the wrong precinct will thus not only disenfranchise a substantial number of Georgia voters each year, but it will do so disproportionately within Georgia's Black community, as well as other similarly situated immigrant, minority, student, and poor populations prone to the same pressures that require regular relocation.

293.   This practice will also place additional burdens on voters with disabilities, many of whom do not have their own vehicles and who rely on public transportation, paratransit, or rides from family members, friends, or outside organizations to get to the polls.  These voters, if they arrive at the wrong polling place, cannot easily go to the correct polling place, as they may not be able to obtain another ride to that polling place, might face a lengthy journey on public transportation, or may not be able to access the correct polling place.  These voters will be effectively disenfranchised if they cannot cast a provisional ballot at the polling place where they arrive.

### 6.   *The early voting runoff restrictions*

294.   S.B. 202 dramatically reduces both the timeframe for runoff elections and the early voting period available during those elections, including by eliminating the guarantee of an opportunity to vote early on the weekend. Advance voting opportunities and particularly weekend voting opportunities are essential to ensuring voters can safely, securely, and freely participate in our

democracy—particularly for voters of color, who are more likely than white voters to be employed in jobs that do not allow scheduling flexibility.  They are important mechanisms that give voters the option to cast their ballots without facing the crowds and long lines on Election Day, as well as the flexibility to balance family and work obligations that make voting on Election Day untenable for thousands of Georgians, and especially voters of color.

295.   Eliminating opportunities to vote early imposes direct and secondary burdens upon Georgians' right to vote, including those that vote on Election Day. Most directly, restricting the early vote period forces voters who need to vote early to do so on fewer days.  This restriction functionally prevents some voters from voting altogether.  And even for those who do vote early anyway, the restriction has the secondary effect of adding to the long lines and wait times at the early voting polls on those fewer days, which has the effect of deterring, burdening, and in some cases functionally eliminating those voters' right to vote.  The same secondary effects flow through to Election Day, where some voters who prefer but do not need to vote early are pushed due to overcrowding during the early vote period.  Simply put, the fewer days available to vote, the more onerous voting becomes.

### 7.   *The Line Relief Ban*

296.   In addition to curbing voters' opportunities to vote absentee, at mobile voting units, or during early voting, S.B. 202's Line Relief Ban imposes *criminal*

*liability* on any volunteer who offers food, water, or seating to voters standing in long lines at in-person polling places—oftentimes for hours—to vote.

297.   This burden is most severely felt by Black voters and other voters of color, who disproportionately experience significantly longer wait times and longer lines during in-person voting.  The line waits experienced in majority nonwhite precincts of Georgia are staggering.  During early voting for the General Election in Gwinnett County, for example, early voting lines began forming at 4:00 a.m., three hours prior to the opening of polls, and during midday reported wait times of five to eight hours.  Six of Gwinnett County's seven most congested polling places serve predominantly nonwhite neighborhoods.  This is not an isolated incident, but in fact a regular occurrence across Georgia.

298.   The Line Relief Ban also creates burdens and barriers for voters with disabilities, many of whom cannot wait in long lines for hours without supports such as food, water, folding chairs, and shade.  These include voters with mobility disabilities, diabetes, chronic pain, and other chronic conditions.  Black people are disproportionately diagnosed with diabetes, heart conditions, and asthma—all disabilities that make waiting in line without a chair, shade, food, or water not just uncomfortable, but dangerous.

### 8.    *Criminalizing the acceptance of an absentee ballot for delivery or return*

299.   Section 47 of S.B. 202 makes it a felony offense to knowingly accept an absentee ballot "from an elector for delivery or return to the board of registrars"

except as authorized by Ga. Code. Ann. § 21-2-385(a).  This code section provides that only certain family members, household members, and caregivers can mail or deliver absentee ballots on behalf of voters with disabilities.

300.   Numerous Georgians with disabilities regularly receive assistance from people who do not clearly fall within these categories in returning their voted absentee ballots.  Staff of nursing facilities, for example, include people who are not nurses or otherwise considered to be "caregivers," who may collect absentee ballots from residents and post them in the mail.  Meanwhile, Georgians with disabilities living in the community often seek assistance from neighbors, friends, distant family members, or trusted acquaintances to return their ballots.

301.   By criminalizing this type of assistance—on top of imposing ID and wet signature requirements for voting absentee—S.B. 202 disproportionately burdens, discriminates against, and denies access to voters with disabilities and their chosen assistors.  People who are otherwise allowed to help a voter with a print disability apply for and mark their absentee ballots will no longer be able to help ensure that the voted ballot gets received by election officials.  Voters with disabilities may be required to identify additional people they trust to help them with the final step of mailing or personally delivering their voted ballots.  And whether they are authorized to or not, fewer people overall will be willing to assist voters with disabilities with the absentee balloting process, due to the new, severe penalty for violation of Ga. Code. Ann. § 21-2-385(a).

## 9.   *The cumulative effects of the challenged provisions*

302.   As S.B. 202 itself acknowledges, in-person voting in Georgia is plagued by "long-term problems of lines."  S.B. 202 § 2(7).  According to the Bipartisan Policy Center, in 2018, Georgia had the single longest average wait time to vote out of all fifty states.  Long lines are corrosive to democracy.  These lines force voters to choose between their health, their time, or their job and exercising their fundamental right to cast a ballot. A long line to vote does not just discourage people from casting a ballot that day: it also discourages them from voting in the future.  Statistical evidence shows nearly 200,000 people failed to vote in the 2014 elections due to long lines in 2012.

303.   Defendants' structuring of Georgia's elections helps create these lines. More than half of Georgia's 2,655 precincts are assigned more than 2,000 voters, the recommended maximum.  In rural counties, over 22,000 voters can be assigned to a single polling place.  The average polling place serves over three thousand voters, 47% more than they did in 2012, and far more than the recommended number.

304.   The burdens of these lines do not fall evenly on Georgia voters.  As one national study found, "the more voters in a precinct who are non-white, the longer the wait times."

305.   Georgia is no exception: at polling places that were 10% or less white, the average waiting time was 51 minutes.  At polling places that were 90% white,

the average waiting time was six minutes.  Even though only one-third of

Georgia's polling places are in majority Black neighborhoods, in the June 2020

primary election, two-thirds of the polling places that had to be kept open late to

accommodate voters waiting in line were in majority Black neighborhoods.

306.   Since 2012, almost two million people have registered to vote in

Georgia, making up more than a quarter of total active registered voters in 2020.

Many of these new voters are younger, nonwhite, and based in the nine counties

making up metropolitan Atlanta.  In the same period, rather than accommodating

this increase by establishing sufficient polling locations to serve them, the State has

cut polling locations by nearly 10%.  Although the cuts happened across

neighborhoods, the surge in registration in majority Black precincts means they

disproportionately harm those voters.

307.   In the June 2020 primary elections, hundreds of voters were forced to

choose: wait in line for hours, with temperatures pushing 90 degrees, or sacrifice

their right to vote.  According to an *Atlanta-Journal-Constitution* analysis, Black

voters, many of whom have disabilities including chronic illnesses, heart

conditions, and asthma, bore the brunt of these long lines: only 61% of majority

Black precincts closed on time compared with 80% of mostly white precincts.

Whether a precinct closes on time indicates whether there was a line of voters still

waiting to cast their ballots.  Some voters in Union City, Fulton County, which is

88% Black, waited in line until 12:37 a.m. to vote.

308.   Voters and journalists documented hundreds of voters waiting in the rain and hot sun in lines extending as far as the eye can see, telling a compelling story of the magnitude of the problem.  *See, e.g.*, Emma Hurt (@Emma_Hurt), Twitter (June 9, 2020),

https://twitter.com/Emma_Hurt/status/1270500551487295488.



309.   Long lines were a feature of the General Election in Georgia as well, with wait times of five hours common in metro Atlanta and some voters waiting over 11 hours.

310.   Because state officials allow these lines to occur year after year, Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, step up to help affected voters in Georgia, who are predominantly Black voters and voters with disabilities condemned to wait in these long lines, overcome the burdens and barriers those lines impose upon their exercise of the right to vote.  They engage in

line relief efforts, providing voters water, snacks, chairs, and other assistance to voters waiting in line to vote.

311.   Volunteers from Plaintiff organizations offer water bottles and snacks to voters waiting in line.  For example, during the lunchtime rush, when the polling site is busiest and the weather is hottest, Plaintiff AME Church's volunteers, who are generally AME Church parishioners, offer people water bottles out of coolers. As they do so, they encourage people verbally to stay in line and answer questions about the process.

312.   Providing voters with the supplies they need encourages them to stay in line, reminds them of the importance of casting a ballot, and affirms their value as a person and a voter.  Volunteers offering line relief create a sense of community, reminding voters that voting is a joyful thing and a civic responsibility.  For Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, providing support to voters in line is critical to their speech, including conveying the message of the importance of staying in line, the importance of voting, and underscoring each person's value.  For Plaintiff AME Church, providing this support is living up to the tenets of the Gospel: "For I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink."  Matthew 25:35 (NIV).  Additionally, Plaintiffs AME Church and the Deltas believe that line relief helps reaffirm the dignity of Black voters, who are

disproportionately affected by longer lines, and who should not be forced to wait in long lines without necessities like food and water.

313.   Because many member churches of Plaintiff AME Church serve as polling sites, those are frequently the sites of the line relief activity its volunteers offer.  These activities are deeply tied with the mission of AME Church and, in addition to members' private contributions, it uses its food pantry inventory to support these activities.

314.   Voters overwhelmingly thank Plaintiffs for these efforts.

315.   S.B. 202's Line Relief Ban targets this practice with criminal penalties.  It bans "giv[ing], offer[ing] to give, or participat[ing] in the giving of … gifts, including, but not limited to, food and drink" to any voter standing in line at a polling place.  Ga. Code Ann. § 21-2-414(a).

316.   In the lead-up to the Runoff Elections, Defendant Secretary of State sent an Official Election Bulletin aimed at suppressing line relief activities via enforcement of the State's ban on buying votes, Ga. Code Ann. § 21-2-570.  This bill now modifies the State's provisions on electioneering.

317.   But Plaintiffs are not bribing voters and they are not electioneering. Line relief is not partisan:  Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, give all voters, regardless of how they plan to cast their ballot, encouragement and support.  Plaintiffs do not ask voters for whom they are voting, and indeed give out their supplies to all voters without knowing what candidates

any given voter intends to support.  Their message is not to stay in line for a particular cause or candidate, nor is it to offer a bribe to take a certain action.

318.   Instead, it is merely to encourage people to vote and remind people how precious that right is.  In doing so, Plaintiffs try to remedy a situation caused in part by Defendants.  Plaintiffs go to the polling sites with the longest lines and support whatever voters they find there.  Their activities facilitate, rather than hinder, the free exercise of voters' rights.

319.   The Line Relief Ban will thus not only result in the arrests of Black clergymen, lay leaders, and other volunteers.  It will materially aggravate the already severe burdens that this legislation inflicts specifically and disparately upon Black voters, as well as other poor voters of color from similarly situated communities, who rely on line relief to make it through interminable delays to cast a ballot.

10.   *S.B. 202's provisions deny qualified individuals with disabilities an equal opportunity to participate in and benefit from voting*

320.   The challenged provisions of S.B. 202 collectively and individually discriminate against people with disabilities in exercising their right to vote, including against Plaintiffs' members and/or constituents.

321.   Provisions of S.B. 202, including provisions requiring an absentee ballot applicant to either have a Georgia ID or to provide copies of identifying documents (which many will also not have), and to sign the application in pen and

ink, impose eligibility criteria that will screen out or tend to screen out people with disabilities from the absentee voting program.  Other provisions, including those restricting the ability of voters to cast provisional ballots in the wrong precinct, establish such eligibility criteria with respect to the in-person voting program.

322.   Provisions of S.B. 202, including provisions shortening advance voting times, restricting who may provide assistance to people with disabilities in the process of voting an absentee ballot, and the Line Relief Ban, limit the ability of people with disabilities to enjoy the same opportunity as others to participate in absentee voting and in-person voting.

323.   The multiple restrictions S.B. 202 imposes on opportunities for people with disabilities to access the ballot constitute methods of administering state and local voting programs that will screen out or tend to screen out people with disabilities from voting and/or will defeat or substantially impair the purpose of a voting program—to allow eligible voters to cast their ballots.

### 11.   *The disparate burdens and barriers imposed by individual provisions of S.B. 202 and the combined effect of the provisions will exponentially harm voters with multiple and/or intersecting race and disability identities*

324.   Not only will each provision of S.B. 202 disparately impact and discriminate against Black voters, other voters of color, voters with disabilities, and other historically disenfranchised communities, voters with multiple of those identities—many of whom are Plaintiffs' members—will face compounded burdens, in scale and degree.

325.   The ID Requirements pose severe barriers to voters of color with disabilities.  A voter of color is less likely to have a Georgia driver's license or state ID card.  A voter of color with a disability may be even less likely to have ready access to and be able to photocopy or upload another form of acceptable ID, such as a utility bill, because they live in a congregate setting.

326.   Voters of color disproportionately rely on public transportation. Voters of color with disabilities may require accessible, paratransit public transportation.  This type of transportation can be even more difficult to obtain and is less reliable than public transportation.

327.   The negative impact of S.B. 202's drop box restrictions are particularly acute for voters of color with disabilities.  Some registrar's offices inaccessible, and family members or other assistors may have strict or unpredictable work commitments that limit their availability during normal business hours.  Voters of color with disabilities may be unable to rely on these assistors for transportation to a drop box or to vote early during the now-limited runoff advance voting period.

328.   The cumulative negative effects of S.B. 202's provisions in creating long lines will be exponentially felt by voters of color with disabilities.  Black voters who are more likely to face long lines to vote in-person will experience compounding burdens if they also have disabilities that impede their ability to wait in long lines to cast a ballot.  As a result of S.B. 202's criminalization of line relief

efforts, the cost of waiting in long lines to vote will be dramatically higher for voters of color with disabilities.

## FIRST CLAIM FOR RELIEF
### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301, *et seq.*
### (Intentional Racial Discrimination & Discriminatory Results)

329.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

330.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"

331.   In violation of the rights of Plaintiffs' members to vote free from racial discrimination and the rights of Plaintiffs to not be burdened with the expenditure and diversion of limited organizational resources to address discriminatory restrictions on the right to vote, S.B. 202 (1) adopts and/or operates bans on mobile voting units for advance voting and election day other than "used in emergencies declared by the Governor pursuant to Code Section 38-3-51 to supplement the capacity of the polling place where the emergency circumstance occurred"; (2) imposes new, restrictive ID Requirements for requesting an absentee ballot; (3) imposes new, restrictive ID Requirements for casting an absentee ballot; (4) limits access to secure drop boxes; (5) restricts the timeline for advance voting

during runoff elections; (6) implements the Line Relief Ban; and (7) disenfranchises eligible voters who cast in-county provisional ballots.

332.   S.B. 202 violates Section 2 of the VRA because the above-listed sections were adopted for the purpose of denying voters of color full and equal access to the political process.

333.   S.B. 202 further violates Section 2 of the VRA because, given the totality of the circumstances alleged herein, the above-listed provisions, individually and cumulatively, will disproportionately deny voters of color an equal opportunity to participate in the political process and to elect representatives of their choice by denying their right to vote.  Specifically, S.B. 202 interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent voters of color, and particularly Black voters, from having an equal opportunity to participate in the political process on account of their race or color.

### SECOND CLAIM FOR RELIEF
**Fourteenth and Fifteenth Amendments
U.S. Const. amend., XIV, XV; 42 U.S.C. §1983
(Intentional Race Discrimination)**

334.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

335.   S.B. 202 violates the Fourteenth and Fifteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, because S.B. 202's provisions that (1) adopt and/or operate bans on mobile voting units for advance voting and election day other than "used in emergencies declared by the Governor

pursuant to Code Section 38-3-51 to supplement the capacity of the polling place where the emergency circumstance occurred"; (2) impose new, restrictive ID Requirements for requesting an absentee ballot; (3) impose new, restrictive ID Requirements for casting an absentee ballot; (4) limit access to secure drop boxes; (5) restrict the timeline for advance voting during runoff elections; (6) implements the Line Relief Ban; and (7) disenfranchise eligible voters who cast in-county provisional ballots were it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voter on account of race or color.

336.   The facts alleged herein reveals that S.B. 202 was enacted, at least in part, with a racially discriminatory intent to discriminate against Black voters and other voters of color in violation of the United States Constitution.

337.   Georgia's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of S.B. 202, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of S.B. 202, and the tenuousness of the stated justifications for S.B. 202 raise a strong inference of a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments.

### THIRD CLAIM FOR RELIEF
**First and Fourteenth Amendments**
**U.S. Const. amend. XIV; 42 U.S.C. §1983**
**(Undue Burden on the Right to Vote)**

338.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

339.   State election administration practices may not place burdens upon a plaintiff's First and Fourteenth Amendment rights to vote unless relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and character of the burdens imposed.  The more a challenged law burdens the right to vote, the more strictly must it be scrutinized.  Even slight burdens must be justified by valid state interests of sufficient weight.

340.   The challenged provisions of S.B. 202 collectively and individually impose severe and, at a minimum, significant burdens on eligible Georgia voters' right to vote, including on Plaintiffs and members of Plaintiffs' organizations.

341.   None of the burdens imposed by the challenged provisions of S.B. 202 are necessary to achieve, let alone reasonably related to, any sufficiently weighty legitimate state interest.  The burdens imposed by the challenged provisions of S.B. 202 accordingly lack any constitutionally adequate justification, and must be enjoined.

## FOURTH CLAIM FOR RELIEF
### Freedom of Speech / Expression
### U.S. Const. amend. I; 42 U.S.C. §1983

342.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

343.   This action is brought pursuant to 42 U.S.C. § 1983 to enforce Plaintiffs' rights under the First Amendment, as applied to the states by the Fourteenth Amendment, to engage in protected speech and expression.

344.   Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, provide food, water, and other support to these voters, as part of conveying their message of the importance of staying in line, the value of each individual's vote, and their inherent value as a person.

345.   Plaintiffs' line relief goes to the heart of the First Amendment. Encouraging people to participate in the political process, despite the barriers placed in front of them, is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988).

346.   This message cannot be split out from Plaintiffs' expressive conduct. Line relief volunteers tell people that voting is important verbally—and they prove it through their actions.  The act of line relief cannot be split away from its message of political engagement, and the First Amendment sees no difference between the two.  *See Meyer*, 486 U.S. at 424 ("The First Amendment protects [the] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").

347.   This law creates a criminal misdemeanor to "give, offer to give, or participate in the giving of . . . gifts, including, but not limited to, food and drink," to voters.  Ga. Code Ann. § 21-2-414(a).  These provisions apply "[w]ithin 25 feet of any voter standing in line" to vote.  *Id.*  These provisions are squarely aimed at

the activities of Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, to support voters waiting in line.

348.   These provisions unconstitutionally burden Plaintiffs' First Amendment rights of speech and expression, and are not supported by any sufficient, let alone compelling, government purpose.

## FIFTH CLAIM FOR RELIEF
### Title II of the Americans with Disabilities Act
### 42 U.S.C. §§ 12131, et seq.
### (Discrimination on the Basis of Disability by State and Local Government Entities

349.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

350.   Title II of the Americans with Disabilities Act ("ADA") prohibits state and local government entities from denying qualified individuals with disabilities an equal opportunity to benefit from the entity's services, programs, or activities.  42 U.S.C. § 12132.  The ADA's protections extend to all aspects of voting, including in-person voting on Election Day, advance voting, and absentee voting.  The changes made by S.B. 202 exclude qualified disabled citizens from exercising these rights, further disenfranchising an already marginalized community.

351.   Plaintiffs' members and/or constituents include individuals with disabilities within the meaning of the ADA.   These individuals have impairments that substantially limit one or more of their major life activities, including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating,

sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  These individuals are qualified for the programs, services, and activities being challenged herein in that they are registered voters otherwise eligible to request and cast a ballot, including an absentee ballot through the mail or at a drop box, in Georgia elections, and are qualified to participate in Defendants' programs and activities related to voting.  42 U.S.C. § 12131(2).

352.   All state and local Defendants are public entities as defined by Title II of the ADA, and individual Defendants are the public officials responsible for running these public entities and supervising their operations.  42 U.S.C. § 12131(1).

353.   The ADA's implementing regulations provide that public entities must not "impose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the programs, services or activities of state and local governments."  28 C.F.R. § 35.130(b)(8).

354.   The ADA's implementing regulations also provide that public entities may not provide aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded "equal opportunity to obtain the same result . . . as that provided to others," or are "otherwise limit[ed] . . . in the enjoyment of any right, privilege, advantage, or

opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R.
§ 35.130(b)(1).

355.   Further, the ADA's implementing regulations prohibit "methods of
administration that . . . defeat or substantially impair accomplishment" of the
program's objectives. 28 C.F.R. § 35.130(b)(3).

356.   Under the ADA, a public entity must "make reasonable modifications
in policies, practices, or procedures when the modifications are necessary to avoid
discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

357.   The challenged provisions of S.B. 202 collectively and individually
discriminate against people with disabilities in exercising their right to vote,
including on members and/or constituents of Plaintiffs' organizations.

358.   S.B. 202 imposes burdensome requirements to apply for and submit
an absentee ballot by, for example, reducing the time period to request an absentee
ballot and adding burdensome identification requirements, as well as criminal
penalties to neighbors, friends, or institutional staff who provide even the most
basic of assistance to individuals with disabilities in returning an absentee ballot.
S.B. 202 further disenfranchises disabled voters who go to the wrong precinct
within the right county, and who do not have the resources (physical or financial)
to travel to the correct precinct. By limiting the locations, number, and
accessibility of the drop box program, S.B. 202 essentially makes the program
unavailable to many disabled voters. Finally, by pushing voters to in-person

voting, S.B. 202 will create even longer lines, and further obstacles to people with disabilities, while prohibiting any supports for those waiting in long lines.

359.   Defendants have included no systemic provisions to provide reasonable modifications to individuals with disabilities in order to avoid these illegal and discriminatory effects.

360.   Therefore, S.B. 202 discriminates against qualified Georgia voters with disabilities who wish to participate in the electoral process and violates the ADA by denying them a full and equal opportunity to participate in the State's voting programs.

**<u>SIXTH CLAIM FOR RELIEF</u>**
**Section 504 of the Rehabilitation Act**
**29 U.S.C. § 794**
**(Discrimination on the Basis of Disability by Recipients of Federal Financial Assistance)**

361.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

362.   Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits discrimination against people with disabilities by any program or activity receiving federal financial assistance.  Under Section 504, otherwise qualified individuals with disabilities may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any such program.  29 U.S.C. § 794(a).  A program or activity includes "all of the operations of a

department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1).

363.   Plaintiffs' members and/or constituents include individuals with disabilities within the meaning of Section 504.  These individuals have impairments that substantially limit one or more of their major life activities, including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(A). These individuals are qualified for the programs and activities being challenged herein in that they are registered voters otherwise eligible to request and cast a ballot, including an absentee ballot through the mail or at a drop box, in Georgia elections, and are qualified to participate in Defendants' programs and activities related to voting.  29 U.S.C. § 794(a).

364.   Defendants receive "Federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

365.   The operations of defendants are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)–(B).

366.   Section 504 prohibits covered entities from imposing or applying eligibility criteria that screen out or tend to screen out people with disabilities from fully and equally enjoying the benefits of the programs or activities of a covered entity.

367.   Section 504 also prohibits covered entities from providing aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded equal opportunity to obtain the same result as that provided to others, or are otherwise limited in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

368.   Further, Section 504 prohibits methods of administration that defeat or substantially impair accomplishment of the program's objectives.

369.   Finally, under Section 504, a covered entity must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

370.   The challenged provisions of S.B. 202 collectively and individually discriminate against people with disabilities in exercising their right to vote, including on members and/or constituents of Plaintiffs' organizations.  S.B. 202 imposes burdensome requirements to apply for and submit an absentee ballot by, for example, reducing the time period to request an absentee ballot and adding burdensome identification requirements, as well as criminal penalties to neighbors, friends, or institutional staff who provide even the most basic of assistance to individuals with disabilities in returning an absentee ballot.  S.B. 202 further disenfranchises disabled voters who go to the wrong precinct within the right county, and who do not have the resources (physical or financial) to travel to the

correct precinct.  By limiting the locations, number, and accessibility of the drop box program, S.B. 202 essentially makes the program unavailable to many disabled voters.  Finally, by pushing voters to in-person voting, S.B. 202 will create even longer lines, and further obstacles to people with disabilities, while prohibiting any supports for those waiting in long lines.

371.   Therefore, S.B. 202 discriminates against qualified Georgia voters with disabilities who wish to participate in the electoral process and violates Section 504 by denying them a full and equal opportunity to participate in the State's voting programs.

### SEVENTH CLAIM FOR RELIEF
**Violation of the Civil Rights Act of 1964**
**52 U.S.C. §10101, 42 U.S.C. § 1983**

372.   Section 10101(a)(2)(B) of the Civil Rights Act prohibits anyone, acting under color of law, from "deny[ing] the right to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

373.   S.B. 202 requires that Georgia election officials confirm the identity of an absentee voter by matching the information provided on a voter's absentee ballot with information in the voter's voter registration record.  If the information does not match, S.B. 202 requires that Georgia election officials reject that

absentee ballot.  If the voter does not cure the rejected ballot, that voter's ballot will not be counted.

374.   Under S.B. 202, Georgia election officials will reject absentee ballots because of an "error or omission [that] is not material" to determining whether a Georgia voter is eligible to vote.

375.   For instance, under S.B. 202, a voter who receives an absentee ballot has already been recognized as qualified to vote.  When that voter casts their absentee ballot, they are required, at a minimum, to list their Georgia driver's license number or state ID card number *and* date of birth.  If that voter inadvertently omits their date of birth, or makes an error in writing their date of birth, Georgia election officials will reject the absentee ballot solely because the date of birth on the absentee ballot does not match the date of birth in the voter's voter registration records.

376.   Such a rejection violates 52 U.S.C. § 10101(a)(2)(B), because the rejection of that voter's ballot is based on an "error or an omission [that] is not material" to determining whether that voter is eligible to vote.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.   Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that the challenged provisions of S.B. 202 are illegal and unconstitutional as described above, in

violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, the

Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), Title II of the Americans

with Disabilities Act of 1990, 42 U.S.C. § 12132, Section 504 of the Rehabilitation

Act, and the First, Fourteenth, and Fifteenth Amendments to the United States

Constitution;

2.     Grant Plaintiffs permanent injunctive relief enjoining Defendants,

their agents, employees, and those persons acting in concert with them from

enforcing or giving any effect to the challenged provisions of S.B. 202, including

enjoining Defendants from conducting any elections utilizing those provisions;

3.     Retain jurisdiction pursuant to Section 3(c) of the Voting Rights Act,

42 U.S.C. § 1973a(c), for such a period of time as the Court deems appropriate and

decree that, during such period, no voting qualification or prerequisite to voting or

standard, practice, or procedure with respect to voting different from that in force

at the time this proceeding was commenced shall be enforced unless and until the

Court finds that such qualification, prerequisite, standard, practice, or procedure

does not have the purpose and will not have the effect of denying or abridging the

right to vote on account of race or color, or in contravention of the voting

guarantees set forth in section 1973b(f)(2) of the Voting Rights Act.

4.     Issue an order requiring Defendants to pay Plaintiffs' costs, expenses,

and reasonable attorneys' fees incurred in the prosecution of this action, as

authorized by, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

5.      Grant such other and further relief as may be just and equitable.

Respectfully submitted, this 24th day of May 2021.

/s/ *Nancy G. Abudu*
Nancy G. Abudu (Bar 001471)
*nancy.abudu@splcenter.org*
Pichaya Poy Winichakul (Bar 246858)
*poy.winichakul@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
P.O. Box 1287
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857


/s/ *Adam S. Sieff*
Adam S. Sieff (pro hac vice)
*adamsieff@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Telephone: (213) 633-6800
Facsimile:  (213) 633-6899

David M. Gossett (pro hac vice)
*davidgossett@dwt.com*
Courtney T. DeThomas (pro hac vice)
*courtneydethomas@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C.  20005-7048
Telephone: (202) 973-4288
Facsimile:  (202) 973-4499

Kate Kennedy (pro hac vice)
*katekennedy@dwt.com*
Matthew Jedreski (pro hac vice)
*mjedreski@dwt.com*
Grace Thompson (pro hac vice)
*gracethompson@dwt.com*
Jordan Harris (pro hac vice)

/s/ *Sean J. Young*
Sean J. Young (Bar 790399)
*syoung@acluga.org*
Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060


/s/ *Sophia Lin Lakin*
Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Theresa J. Lee (pro hac vice)
*tlee@aclu.org*
Dale E. Ho (pro hac vice)
*dho@aclu.org*
Ihaab Syed (pro hac vice)
*isyed@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005

*jordanharris@dwt.com*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

*Attorneys for Plaintiffs*
*Georgia Muslim Voter Project, Women*
*Watch Afrika, Latino Community Fund*
*Georgia, and The Arc of the United*
*States*

Telephone: (202) 731-2395

/s/ *Leah C. Aden*
Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

/s/ *Debo P. Adegbile*
Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
Ilya Feldsherov (pro hac vice)
*ilya.feldsherov@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
Webb Lyons (pro hac vice)
*webb.lyons@wilmerhale.com*

WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs*
*Sixth District of the African Methodist*
*Episcopal Church, Delta Sigma Theta*
*Sorority, Georgia ADAPT, Georgia Advocacy*
*Office, and Southern Christian Leadership*
*Conference*

# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE NEW GEORGIA PROJECT,
BLACK VOTERS MATTER FUND,
RISE, INC., ELBERT SOLOMON,
FANNIE MARIE JACKSON GIBBS, and
JAUAN DURBIN,

                Plaintiffs,

    v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State;
REBECCA SULLIVAN, in her official
capacity as the Vice Chair of the Georgia
State Election Board; DAVID WORLEY,
in his official capacity as a member of the
Georgia State Election Board; MATTHEW
MASHBURN, in his official capacity as a
member of the Georgia State Election
Board; ANH LE, in her official capacity as
a member of the Georgia State Election
Board; MARGARET BENTLEY, in her
official capacity as Chairman of the
SPALDING County Board of Elections
and Voter Registration; GLENDA
HENLEY, in her official capacity as
Secretary of the SPALDING County Board
of Elections and Voter Registration;
BETTY BRYANT, VERA MCINTOSH,
and ROY MCCLAIN, in their official
capacities as Members of the SPALDING
County Board of Elections and Voter
Registration; CHARLES DAVE, in his
official capacity as BROOKS County

Civil Action No. 1:21-cv-01229-JPB

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

Elections Superintendent; ZURICH DESHAZIOR, DON DISTEFANO, and KAREN MURRAY in their official capacities as members of the BROOKS County Board of Elections;  ALEX WAN, in his official capacity as Chairman of the FULTON County Registration and Elections Board; MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH NURIDDIN, and AARON JOHNSON, in their official capacities as Members of the FULTON County Registration and Elections Board; KEITH GAMMAGE, in his official capacity as the Solicitor General of FULTON County; and GREGORY W. EDWARDS, in his official capacity as the District Attorney for DOUGHERTY County,

                              Defendants.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs THE NEW GEORGIA PROJECT, BLACK VOTERS MATTER FUND, RISE, INC., ELBERT SOLOMON, FANNIE MARIE JACKSON GIBBS, and JAUAN DURBIN file this Complaint for Declaratory and Injunctive Relief against Defendants BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State (the "Secretary"); REBECCA SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID WORLEY, MATTHEW MASHBURN, and ANH LE, each in their official capacity as a

2

member of the Georgia State Election Board; MARGARET BENTLEY, in her official capacity as Chairman of the SPALDING County Board of Elections and Voter Registration; GLENDA HENLEY, in her official capacity as Secretary of the SPALDING County Board of Elections and Voter Registration; BETTY BRYANT, VERA MCINTOSH, and ROY MCCLAIN, in their official capacities as members of the SPALDING County Board of Elections and Voter Registration; CHARLES DAVE, in his official capacity as BROOKS County Elections Superintendent; ZURICH DESHAZIOR, DON DISTEFANO, and KAREN MURRAY in their official capacities as members of the BROOKS County Board of Elections; ALEX WAN, in his official capacity as Chairman of the FULTON County Registration and Elections Board; MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH NURIDDIN, and AARON JOHNSON, in their official capacities as members of the FULTON County Registration and Elections Board; KEITH GAMMAGE, in his official capacity as the Solicitor General of FULTON County; and GREGORY W. EDWARDS, in his official capacity as the District Attorney for DOUGHERTY County, and allege as follows:

## NATURE OF THE CASE

1.      Over the past year, Georgia voters turned out in record-shattering numbers. In the 2020 general election, nearly five million Georgians voted,

3

compared to 4.16 million in the 2016 general election. In the January 2021 runoff elections for both of Georgia's U.S. Senate seats, nearly 4.5 million voters cast ballots. The sky-high turnout in the runoff election bucked past trends, when voter participation typically dropped from the general election.

2.      The record-high turnout also led to a sea change in election outcomes at the statewide level. The Democratic nominee for president won Georgia's electoral votes for the first time in 28 years, and Georgia voters elected both Democratic candidates to the U.S. Senate, which means Georgia is now represented by two Democratic Senators for the first time since 2003. For the first time in state history, Georgia voters elected a Black U.S. Senator.

3.      After the high-turnout general election, officials conducted multiple recounts and audits. Supporters of former President Donald J. Trump filed several lawsuits seeking to overturn the general election results, falsely alleging widespread fraud and misconduct on the part of election officials. No court in any of these lawsuits found support for these litigants' fanciful claims. After the senatorial runoff elections, Secretary Raffensperger declared in a nationally televised interview that Georgia "had safe, secure, honest elections."

4.      Despite nationwide scrutiny of Georgia's elections, which only confirmed the absence of any fraud, insecurity, or wrongdoing, Republican members

of the General Assembly voted to pass sweeping omnibus legislation ("SB 202" or the "Voter Suppression Bill") that is clearly intended to and will have the effect of making it harder for lawful Georgia voters to participate in the State's elections. And it will impose these unjustifiable burdens disproportionately on the State's minority, young, poor, and disabled citizens. Among its provisions, the Voter Suppression Bill:

- Imposes unnecessary and burdensome new identification requirements for absentee voting;

- Moves the dates for absentee ballot distribution closer to the election by 20 days, reducing the time absentee voters have to cast their ballots;

- Repeals a law requiring counties to mail absentee ballots to unregistered eligible voters who submit an absentee ballot application and then return their registration card by the deadline;

- Unduly restricts the use of absentee ballot drop boxes;

- Bans mobile polling places;

- Prohibits state and local government officials from distributing unsolicited absentee ballot applications;

- Burdens voters with the risk of disenfranchisement due to meritless challenges that require an immediate defense of their qualifications;

- Invalidates ballots cast by lawful voters before 5:00 p.m. in a precinct other than the one to which they were assigned, regardless of the reason or their ability to travel to another location (or wait until after 5:00 p.m.) to cast their ballot;

- Bans any non-poll worker from giving food or drink, including water, to voters waiting in line; and

- Compresses the time period for a federal runoff election and reduces the number of required early voting days during any runoff election.

5.      This hodgepodge of unnecessary restrictions targets almost every aspect of the voting process but serves no legitimate or compelling state interest and advances no unifying goal other than to make absentee, early, and election-day voting more difficult—especially for minority voters.

6.      Sponsors and supporters of the Bill insist that one of its primary purposes is to restore voters' confidence in Georgia's election administration, but these provisions do no such thing. Many of the restrictions the Bill imposes on Georgia voters—for instance, the absolute prohibition on handing out *any* food or drink to voters waiting in line at a polling place—have nothing to do with the integrity of the ballot.

7.    To the extent there are concerns about voters' "confidence" in Georgia's elections, they are the result of a cynical and thoroughly rebuked misinformation campaign—not based in reality.

8.    As Secretary Raffensperger acknowledged in January, Georgia experienced "safe, secure, honest elections." He even characterized many proposed laws from which the Bill originates as "reactionary to a three[-]month disinformation campaign that could have been prevented," referring to the period during which former President Trump and his supporters attempted to disrupt the democratic process by baselessly casting doubt on the results of Georgia's elections.

9.    The Bill's supporters also claim that it will "ensure" election integrity. But legislators and the Secretary himself have admitted that Georgia's elections are *already* safe and secure. The Secretary has described the State's election administration system as the "gold standard" for the United States. At no point during the 2020 election cycle did any election official, any lawsuit, or any voter reveal anything in Georgia's election administration requiring any of the challenged provisions in the Voter Suppression Bill to "ensure" election integrity. Notably, this was not for want of trying.

10.    None of the Bill's burdensome and discriminatory changes to Georgia's election code will increase the public's confidence in the State's election

administration or ensure election integrity. The grab bag of voting restrictions that populate SB 202 make clear that the Bill was animated by an impermissible goal of restricting voting among Black voters, young voters, and others whose access to the ballot box Georgia legislators wish to impede.

11.     Taken together, these unjustified measures will individually and cumulatively operate to impose unconstitutional burdens on the right to vote, to deny or abridge the voting rights of Black Georgians, to deny Black voters in Georgia an equal opportunity to participate in the electoral process and elect candidates of their choice in violation of Section 2 of the Voting Rights Act, to unconstitutionally restrict and criminalize protected speech, and to deny the right to vote on the basis of an immaterial error or omission in violation of the Civil Rights Act.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

13.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

14.    This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

15.    Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) and under Local Civ. R. 3.1 because, *inter alia*, several defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district. Plaintiffs The New Georgia Project, Black Voters Matter Fund, and Rise, Inc. all operate within this district and division. Plaintiff Elbert Solomon is a registered voter in Spalding County and Plaintiff Jauan Durbin is a registered voter in Fulton County.

16.    This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

17.    Plaintiff THE NEW GEORGIA PROJECT ("NGP") is a nonpartisan, community-based nonprofit organization based in Fulton County, Georgia. NGP is dedicated to registering eligible Georgians statewide to vote and to helping them become more civically engaged through voter education and engagement. NGP engages in voter education and registration activities in communities across the state to reach voters and help them to register, and eventually, to vote. It also encourages

voters to cast their ballots by, among other things, coordinating efforts to distribute food and drink at the polls.

18.    NGP's mission is to register and civically engage all eligible citizens of color in Georgia. As of May 2021, NGP has registered more than 500,000 Georgians in all 159 counties in the state.

19.    The majority of voters registered by NGP are people of color, young voters, first-time voters (due to age or being newly naturalized citizens), and/or members of other underrepresented and vulnerable populations, including Georgians with disabilities and the elderly. NGP considers these half a million individuals it has registered to be a core part of its constituency.

20.    NGP has members and constituents across Georgia, whose right to vote will be burdened or denied as a result of the Voter Suppression Bill. NGP will also be forced to divert resources from its day-to-day voter registration activities to educate voters about and otherwise combat the suppressive effects of the Voter Suppression Bill. Likewise, the Voter Suppression Bill threatens to undermine NGP's mission of civically engaging Georgians because, under the Bill, even eligible and registered voters are denied the ability to vote or may not have their ballots counted. Finally, under the Voter Suppression Bill, NGP will be prevented from encouraging voters to stay in line to vote by coordinating distribution of food

10

and drink at the polls. NGP brings these claims on its own behalf, as well as on behalf of its member voters and constituents.

21.    Plaintiff BLACK VOTERS MATTER FUND ("Black Voters Matter") is a nonpartisan civic organization whose goal is to increase power in communities of color. Effective voting allows a community to determine its own destiny, but communities of color often face barriers to voting that other communities do not. Black Voters Matter focuses on removing those barriers. It does so by increasing voter registration and turnout, advocating for policies to expand voting rights and equity, and conducting organizational development and training. One of the ways that Black Voters Matter encourages voters to cast their ballots is by distributing food and water at the polls, both directly and in partnership with other organizations. Black Voters Matter is active statewide, particularly in communities that tend to have less access to national, state, and local resources and that have low-income and working-class populations.

22.    As a result of the Voter Suppression Bill, which threatens to undermine the organization's mission, Black Voters Matter must divert scarce resources away from its organizational development and training programs, as well as its traditional voter education and turnout programs, toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting

11

options imposed by the Voter Suppression Bill. Furthermore, the Voter Suppression Bill prevents Black Voters Matter from encouraging voters to stay in line to vote by coordinating distribution of food and water at the polls.

23.     Plaintiff RISE, INC. ("Rise") is a student-led 501(c)(4) nonprofit organization that runs statewide advocacy and voter mobilization programs in Georgia, as well as on a number of campuses nationwide. Rise's mission is to fight for free higher education, end student hunger and homelessness, and increase voting access for college students. Rise operates student-led advocacy campaigns, training programs, and volunteer networks across Georgia to further its mission. To meet its goal of expanding students' access to the franchise in particular, Rise's student organizers and volunteers engage in grassroots voter registration, education, and turnout activities, including on-campus get-out-the-vote drives and canvasses. Rise volunteers also distribute food and water at polling locations to encourage voters to cast their ballots.

24.     The Voter Suppression Bill directly harms Rise by making it more difficult for Georgia students who have joined the Rise movement to vote. The Voter Suppression Bill also frustrates Rise's mission and forces the organization to divert resources, as well as shift the focus of its day-to-day activities. Specifically, Rise and its student organizers will be forced to divert resources and day-to-day attention

from their college affordability, hunger, and homelessness advocacy programs in Georgia and elsewhere to implement effective voter education and mobilization efforts. Finally, the Voter Suppression Bill prevents Rise volunteers from encouraging voters to stay in line to vote by distributing food and water at the polls.

25.     Plaintiffs NGP, Black Voters Matter, and Rise encourage voters to stay in line and vote by distributing food and water at polling locations in counties throughout Georgia, including in Fulton and Dougherty Counties.

26.     Plaintiff ELBERT SOLOMON is a United States citizen and registered Georgia voter in Spalding County. Mr. Solomon is a 70-year-old Black man living in Griffin, Georgia who has worked as a farmer, teacher, and chemical engineer. He currently runs his own business creating curriculums that focus on character education and parental involvement with their children's education. Voting is extremely important to Mr. Solomon because it is how he expresses himself as a citizen. He especially cherishes voting because it is something his grandparents were unable to do in the Jim Crow South and his parents were able to do only after Jim Crow-era restrictions like the literacy test were ruled unconstitutional.

27.     In November 2020, Mr. Solomon put his absentee ballot in a drop box at the local elections office. In January, he physically handed his absentee ballot to the elections worker at the office because he wanted to be sure his vote was received.

13

Mr. Solomon prefers to vote absentee[1] because his age and health make it difficult for him to wait to vote should he encounter the long lines that have become all too common for Georgia voters, but he returns his ballot in person since he has encountered issues with mail delivery and does not want to risk his vote being lost. The Voter Suppression Bill will force Mr. Solomon to comply with additional burdensome identification requirements, restrict Mr. Solomon's access to drop boxes in upcoming elections, reduce the amount of time Mr. Solomon has to obtain and submit his absentee ballot (particularly during the compressed runoff election schedule), and should he instead decide to vote in person to avoid the increased burdens of voting absentee, will make it all the more difficult for Mr. Solomon to wait in line to exercise his right to vote.

28.     Plaintiff FANNIE MARIE JACKSON GIBBS is a United States citizen and registered voter in Brooks County. Ms. Gibbs is a 67-year-old Black woman living in Valdosta, Georgia. She has been an advocate for voting rights and civil rights since as early as the 1960s when she and her father took people to the polls to register to vote. Ms. Gibbs's family members and community have experienced

---

[1] By "vote absentee," "absentee voting," and "absentee ballot" and similar terms used in this Amended Complaint, Plaintiffs refer to the casting of a paper absentee ballot generally described in Article 10 of Chapter 2 of Title 21 of the Official Code of Georgia, but not to "advance voting," sometimes known as "early voting," as described in O.C.G.A. § 21-2-385(d) and which takes place in person.

voter suppression and intimidation, which still resonate among voters in her community today. Because Ms. Gibbs has disabilities that make it difficult for her to travel to an in-person voting location without assistance, she voted absentee by mail in both the November 2020 general election and the January 2021 runoff. In the June 2020 primary, she dropped her absentee ballot off at an outdoor drop box. The Voter Suppression Bill will force Ms. Gibbs to comply with additional burdensome identification requirements to vote absentee, restrict her access to drop boxes in upcoming elections, reduce the amount of time that she has to obtain and submit her absentee ballot in runoff elections, and will make it more difficult for her to wait in line at a polling place in the event that she needs to vote in person (as she has been forced to do in the past when her absentee ballot was not delivered).

29.     Plaintiff JAUAN DURBIN is a United States citizen and registered voter in Fulton County. He is a 22-year-old recent graduate of Morehouse College who lives in Atlanta, Georgia. Mr. Durbin has seen the power of voting firsthand, and he is committed to ensuring that all eligible voters are registered and able to vote. During both the November 2020 and January 2021 elections, Mr. Durbin voted early in person. He prefers to vote in person because he has encountered issues with mail security in the past and does not want to risk his vote not being counted. The Voter Suppression Bill will force Mr. Durbin to cast his ballot on a compressed

timeline for future runoff elections. Mr. Durbin travels frequently, and the significant decrease in in-person voting days for runoff elections will make it difficult for Mr. Durbin to cast his ballot. In the event the timeline for voting in person is incompatible with Mr. Durbin's schedule and he must vote absentee, the Voter Suppression Bill will force him to comply with additional identification requirements, restrict his access to drop boxes, and reduce the amount of time that he has to obtain and submit his absentee ballot.

30.     Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia, the State's chief elections official, O.C.G.A. § 21-2-210, and is named as a Defendant in his official capacity. In his official capacity, he is responsible for the administration and implementation of election laws in Georgia, including the Voter Suppression Bill. *See id.*; *see also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("[I]it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system. . . ."). Among other responsibilities, the Bill tasks the Secretary of State with designing and making available the state's absentee ballot application form, which "shall require the elector" to supply the newly mandated proof of identification. SB 202, § 25.

31.    Defendant REBECCA SULLIVAN is the Vice Chair of the Georgia State Elections Board (the "SEB") and is named as a Defendant in her official capacity. As a member of the SEB, she is responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1). The SEB is specifically responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at (2). The SEB is also responsible for "promulgat[ing] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state" and "tak[ing] such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* at (7), (10). Among other responsibilities, the Voter Suppression Bill tasks the SEB with enforcing county compliance with the new voter challenge provisions. SB 202, §§ 15, 16. The Vice Chair, personally and through the conduct of her employees,

17

officers, agents, and servants, acted under color of state law at all times relevant to this action.

32.     Defendants DAVID WORLEY, MATTHEW MASHBURN, and ANH LE are each members of the SEB and are named as Defendants in their official capacities ("SEB Member Defendants"). As SEB members, they are responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1). The SEB is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at (2). As SEB members, they are responsible for "promulgat[ing] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state" and "tak[ing] such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* at (7), (10). Among other responsibilities, the Voter Suppression Bill tasks the SEB

with enforcing county compliance with the new voter challenge provisions. SB 202, §§ 15, 16. The SEB Member Defendants, personally and through the conduct of their employees, officers, agents, and servants, acted under color of state law at all times relevant to this action.

33.    Defendant MARGARET BENTLEY is the Chairman of the SPALDING County Board of Elections and Voter Registration; Defendant GLENDA HENLEY is the Secretary of the SPALDING County Board of Elections and Voter Registration; and Defendants BETTY BRYANT, VERA MCINTOSH, and ROY MCCLAIN are each Members of the SPALDING County Board of Elections and Voter Registration. Ms. BENTLEY, Ms. HENLEY, Mr. BRYANT, Ms. MCINTOSH, and Mr. MCCLAIN (collectively, the "Spalding Defendants") are sued in their official capacities only and are appointed officials in Spalding County who are responsible for administering elections in that county. Four members are appointed by county executive committees, and the fifth member is selected by the other four members of the board. *See* H.B. 820, 1987 Ga. Laws § 2, p. 4432. The Spalding Defendants are responsible for the conduct of primary and general elections in Spalding County. *See, e.g.*, *id.* § 1; O.C.G.A. § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of

19

primaries and elections, voter registration, and absentee balloting procedures); *id*. § 21-2-70 (describing broad authority of superintendents); *id*. § 21-2-381 (absentee ballot applications); *id*. § 21-2-384 (preparing and delivering absentee mail-in ballots). Among other responsibilities, the Voter Suppression Bill tasks county election officials with enforcing the new identification requirements for voting by absentee ballot, SB 202, § 25; issuing absentee ballots during the condensed distribution period, *id.*; and holding hearings on voter registration challenges, *id.* §§ 15, 16.

34.     Defendant CHARLES DAVE is the BROOKS County Elections Superintendent. Defendants ZURICH DESHAZIOR, DON DISTEFANO, and KAREN MURRAY are each Members of the BROOKS County Board of Elections. These individuals (collectively, the "Brooks Defendants") are sued in their official capacities only. The Brooks Defendants are responsible for administering elections in Brooks County. *See, e.g.*, O.C.G.A. § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee balloting procedures); *id*. § 21-2-70 (describing broad authority of superintendents); *id*. § 21-2-381 (absentee ballot applications); *id*. § 21-2-384 (preparing and delivering absentee mail-in ballots). Among other

20

responsibilities, the Voter Suppression Bill tasks county election officials with enforcing the new identification requirements for voting by absentee ballot, SB 202, § 25; issuing absentee ballots during the condensed distribution period, *id.*; and holding hearings on voter registration challenges, *id.* §§ 15, 16.

35.     Defendant ALEX WAN is the Chairman of the FULTON County Registration and Elections Board. Defendants MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH NURIDDIN, and AARON JOHNSON are each Members of the FULTON County Registration and Elections Board. Mr. WAN, Mr. WINGATE, Ms. RUTH, Ms. NURIDDIN, and Mr. JOHNSON (collectively, the "Fulton Defendants") are sued in their official capacities only and are appointed officials in Fulton County who are responsible for administering elections in that county. Four members are appointed by county executive committees, and the fifth member is selected by the governing authority of Fulton County. *See* H.B. 656, 2019 Ga. Laws § 2, p. 4181. The Fulton Defendants are responsible for the conduct of primary and general elections in Fulton County. *See, e.g.*, *id.*; H.B. 837, 1989 Ga. Laws § 1, p. 4578; O.C.G.A. § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee balloting procedures); *id*. § 21-2-70 (describing broad

21

authority of superintendents); *id.* § 21-2-381 (absentee ballot applications); *id.* § 21-2-384 (preparing and delivering absentee mail-in ballots). Among other responsibilities, the Voter Suppression Bill tasks county election officials with enforcing the new identification requirements for voting by absentee ballot, SB 202, § 25; issuing absentee ballots during the condensed distribution period, *id.*; and holding hearings on voter registration challenges, *id.* §§ 15, 16.

36.    Defendant KEITH E. GAMMAGE is the Solicitor General of Fulton County, and is named as a Defendant in his official capacity. As Solicitor General, Mr. GAMMAGE is responsible for prosecuting misdemeanors, including violations of SB 202's criminal ban on the private distribution of food or water to people waiting in line to vote. *See* O.C.G.A. § 15-18-66.

37.    Defendant GREGORY W. EDWARDS is the District Attorney for Dougherty County, and is named as a Defendant in his official capacity. As Dougherty County District Attorney, Mr. EDWARDS is responsible for prosecuting felonies and misdemeanors, including violations of SB 202's criminal ban on the private distribution of food or water to people waiting in line to vote. *See* O.C.G.A. § 15-18-66.

## STATEMENT OF FACTS AND LAW

### The 2020 Election in Georgia

38.    After Black voters narrowly failed to elect their candidate of choice in Georgia's 2018 gubernatorial election, efforts to mobilize Black voters for the 2020 election cycle redoubled. Organizations such as Plaintiffs NGP, Black Voters Matter, and Rise launched to register new voters—with an emphasis on voters of color and young voters—and to ensure these individuals would have their voices heard in the 2020 elections.

39.    The results were historic. Even as the COVID-19 pandemic raged, Georgia voters participated in the democratic process at record rates, showing, in particular, unprecedented enthusiasm for absentee voting.

40.    In the June 2020 primary election, nearly 1.1 million absentee ballots were returned for counting.

41.    In the November 2020 general election, more than 1.3 million absentee ballots were returned and accepted. Nearly 30% of Black voters cast their ballot by mail in 2020, compared to only 24% of white voters.

42.    To ensure their absentee ballots were received by election officials, and to avoid mail-delivery errors or delays, voters relied heavily on drop boxes—secure

receptacles on government property under 24/7 video surveillance where absentee ballots could be submitted.

43.     In Fulton County, for example, which is majority nonwhite, more than half of the 146,000 absentee ballots cast in the November election were submitted in one of almost 40 drop boxes located throughout the County.

44.     Fulton County's embrace of drop boxes contrasted sharply with the approach in counties like Forsyth, where less than five percent of the population is Black, and which implemented only one drop box.

45.     To accommodate historically high voter turnout, Fulton County also offered mobile voting units. These specially outfitted buses held eight to ten voting stations and were deployed across the county to make the voting process efficient and accessible in communities where it otherwise would not have easily been. Fulton County's mobile voting units were a great success, stopping at dozens of locations and enabling thousands of voters to cast their ballots.

46.     Notably, Fulton County has the largest Black population in Georgia, and it was the only county to use mobile voting units during the general and runoff elections.

47.    Fulton County's mobile voting units were so successful that, in early November, the Douglas County Board of Commissioners unanimously voted to purchase a mobile voting unit for its future elections.

48.    Douglas County has one of the fastest-growing Black populations in Georgia and, as of mid-2019, nearly 50% of the population in Douglas County was Black.

49.    In addition to absentee voting, approximately 2.7 million Georgians voted early in person in the 2020 general election; more than 2 million voters cast early in-person ballots in the U.S. Senate runoff elections.

50.    The high turnout among in-person voters resulted in long lines at many polling places—especially at polling places located in Black neighborhoods.

51.    While majority-Black neighborhoods comprise only one-third of Georgia's polling places, they account for two-thirds of the polling places that had to stay open late for the June primary to accommodate long lines.

52.    A recent study found that the average wait time in Georgia during the June primary after polls were scheduled to close was six minutes in neighborhoods that were at least 90% white, and 51 minutes in places that were at least 90% nonwhite.

25

53.    To ease the burden of these wait times, organizers delivered free food and water to polling places with long lines, and counties offered extended early voting hours, outdoor drop boxes, and mobile voting units to give voters additional opportunities to cast a ballot, hoping to minimize the number of voters who attempted to vote but were disenfranchised as a result of widespread extremely long lines.

54.    This successful mobilization effort was widely heralded as crucial in facilitating Black voter turnout and determining electoral outcomes.

55.    The presidential candidate preferred by Black voters won Georgia's electoral votes for the first time since 1992, and for only the second time since Georgia-native Jimmy Carter was on the ballot in 1980.

56.    Black voters also successfully elected their candidates of choice in runoff elections for both of Georgia's U.S. Senate seats, including Reverend Raphael Warnock, who became the first Black person ever to represent Georgia in the Senate.

57.    Not everyone shared the same enthusiasm over Black voter turnout and electoral success, however. Following the historic runoff, the paramount concern among leaders of the Republican Party was to prevent these results from repeating in future elections.

58.   As Alice O'Lenick, Chairwoman of the Gwinnett County Board of Registrations and Elections, explained to fellow Republicans, 2020 was a "terrible elections cycle" for the Republican Party. She said, "I'm like a dog with a bone. I will not let them end this session without changing some of these laws. They don't have to change all of them, but they've got to change the major parts so that we at least have a shot at winning."

59.   To justify the proposed voting restrictions, Republican Party leaders resorted to the exhaustively refuted canard of voter fraud. The same debunked falsehoods had been weaponized by Republican politicians across the country, including most visibly by former President Trump himself, in his and his allies' unsuccessful attempts to overturn his election loss. These efforts were repeatedly fueled by trumpeting unfounded accusations about illegal voting in heavily Black cities such as Philadelphia, Detroit, Milwaukee, and Atlanta.

60.   These efforts took on a special intensity in Georgia, where at least six different lawsuits challenged the legitimacy of, first, Georgia's November general election, and then the January runoff elections. Not a single one of those cases, however, was able to withstand even the slightest scrutiny. State and federal courts determined that the factual allegations of these lawsuits were unsubstantiated, and the legal contentions lacked merit.

61.    Meanwhile, Republican Secretary of State Brad Raffensperger explained in a letter to Congress that he had independently authenticated the legitimacy of Georgia's 2020 election. He reported:

> [M]y office has taken multiple steps to confirm that the result is accurate, including conducting a hand audit that confirmed the results of the Presidential contest, a recount requested by President Trump that also confirmed the result, an audit of voting machines that confirmed the software on the machine was accurate and not tampered with, and an audit of absentee ballot signatures in Cobb County that confirmed that process was done correctly. Law enforcement officers with my office and the Georgia Bureau of Investigation have been diligently investigating all claims of fraud or irregularities and continue to investigate. **Their work has shown me that there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia**. . . . While there is no such thing as a perfect election, our law enforcement officers are not seeing anything out of the ordinary scope of regular post-election issues that will be addressed by the State Election Board after the investigations are complete. There will end up being a small amount of illegal votes (there always is in any election because federal and state law err on the side of letting people vote and punishing them after the fact), but nowhere near the amount that would put the result of the presidential election in question.

(Emphasis added).

62.    Secretary Raffensperger went on to include a "point by point refutation of false claims" related to voter fraud. He explained that the audit of Cobb County found "no fraudulent absentee ballots" with a 99% confidence threshold, and further confirmed that "the number of illegal voters in Georgia alleged by the President's allies are not accurate or reliable."

63.     None of these facts have had any impact on Georgia lawmakers'
calculated efforts to make voting more difficult in Georgia generally, and for
Georgia's Black voters in particular.

64.     Two days after Republicans lost the U.S. Senate runoff elections,
Republican Georgia House Speaker David Ralston announced he would appoint a
"Special Committee on Election Integrity."

65.     But even Speaker Ralston, in a moment of candor, recognized that the
premise of the Special Committee—that the integrity of the 2020 election had
somehow been compromised—was fiction. He said: "Let's look at the facts here.
The facts are we've had [two] recounts. We've had an audit and we've had more
than six—I've lost count. I know there's at least six lawsuits that have been filed, all
of which have been dismissed. Which kind of begs the question if there were, in fact,
significant wrongdoing would it not have been disclosed?"

66.     But the absence of fraud was irrelevant to the Committee's creation and
its subsequent efforts to make voting unjustifiably more difficult, particularly for
Black voters.

**The Challenged Laws**

67.     In the wake of general and runoff elections that saw Black-preferred
candidates prevail in the presidential and U.S. Senate races for the first time in

29

decades, Republican majorities in the Georgia General Assembly passed several restrictions on voting rights.

68.   *First*, the General Assembly enacted a requirement that voters requesting an absentee ballot submit with their application their driver's license number, their personal identification number on a state-issued personal identification card, or a photocopy of other specified forms of identification, along with their date of birth and other information. Voters who choose to vote absentee must comply with substantially similar requirements a second time when they cast their ballot. Any omissions or errors will result in the application or ballot being rejected.

69.   These provisions will disproportionately affect voters who are young, elderly, indigent, or from minority communities.

70.   According to one national study, as many as 25% of Black voters do not possess a current and valid form of government issued photo ID, compared to 11% of voters of all races.

71.   Voters in Georgia also do not have equal access to state offices that issue IDs on a full-time basis, with minorities bearing the brunt of these limitations. For instance, minority voters have greater difficulty getting to a state office that issues ID because minority households are less likely to have access to a vehicle than

white households (i.e., a full 11% of minority households lack access, versus only 4% of white households).

72.   Compounding these problems, affected voters are more likely to lack ready access to the internet or to a computer in order to print out proof of identification.

73.   A recent study about the effects of remote learning showed that, as of May 2020, "88 percent of white households with students enrolled in public or private K-12 education in Georgia reported having regular access to a computer for educational purposes, compared to 75 percent of Black households and 68 percent of Latino households . . . . During that same time period, 90 percent of white families reported having reliable internet access, compared to 85 percent of Black families and 72 percent of Latino families."[2]

74.   Further, "[h]ouseholds in [Georgia's] Black Belt are twice as likely as households outside the region to lack access to high-speed Internet."[3] *Id.*

---

[2] Maureen Downey, *Tech Gaps Limit Some Students' Contact with Teachers*, The Atlanta Journal-Constitution (Feb. 12, 2021), https://www.govtech.com/education/tech-gaps-limit-some-students-contact-with-teachers.html.
[3] *Id.*

75.    Young voters, especially college students who are registered to vote in Georgia but grew up elsewhere, are less likely to have state-issued ID and less likely to possess a driver's license than other age groups.

76.    *Second*, the General Assembly moved the dates for absentee ballot distribution in many elections closer to the election by 20 days, reducing the window for most absentee voters to complete and cast their ballots.

77.    This change will again disproportionately affect Black voters in Georgia, who voted absentee at a higher rate than white voters in the 2020 general and 2021 runoff elections, and who are more likely than white voters to need additional time to obtain the necessary identification documents.

78.    The change will also burden affected voters—not to mention election officials—by narrowing the period in which voters can cure issues with their ballots.

79.    Black and other minority voters will be disproportionately affected because, in past elections, their mail-in ballots have been rejected at significantly higher rates than those of white voters.

80.    In the 2020 primary election, for example, 1.6% of Black voters' mail-in ballots were rejected or marked as spoiled, compared with just 0.9% of white voters' mail-in ballots. Black voters in Georgia also saw their mail-in ballots rejected at disproportionately high rates in the 2016, 2018, and 2020 general elections, when

the rejection rate for mail-in ballots returned by Black voters was between 67% and 79% greater than the comparable rate for white voters.

81.     *Third*, the General Assembly repealed a law that required counties to mail absentee ballots to unregistered eligible voters who apply for an absentee ballot and then return their registration card by the deadline. Unregistered eligible voters may now have to apply for an absentee ballot twice or risk losing the opportunity to vote absentee.

82.     *Fourth*, the General Assembly effectively prohibited the use of portable or mobile polling facilities, which are now permitted only in emergencies the Governor declares and only to supplement the capacity of the polling place where the emergency circumstance occurred.

83.     Fulton County, which is more than 44% Black and has the largest Black population in Georgia, successfully deployed mobile voting units, each with eight to ten voting stations, in the November general and January runoff elections. It was the only Georgia county to use mobile voting units in those elections, although Douglas County—which is nearly 50% Black—subsequently announced its intent to use mobile voting units in the future.

84.     By banning mobile voting units, the Voter Suppression Bill plainly targeted Fulton and Douglas Counties, and by extension, their Black voters.

85.     *Fifth*, the General Assembly dramatically cut back the availability and accessibility of drop boxes, which had been used successfully in Georgia's primary, general, and runoff elections in 2020 and 2021.

86.     The use of drop boxes during the November elections contributed to an approximately 80 percent reduction in the rate of absentee ballots rejected for being received after the Election Day deadline.

87.     The availability of drop boxes significantly benefitted Black voters. The seven counties—Fulton, DeKalb, Gwinnett, Cobb, Clayton, Chatham, Richmond—that collectively contain a majority of Black Georgians averaged nearly 19 drop boxes per county in the November and January elections, while the 16 counties that collectively contain a majority of white Georgians averaged eight drop boxes per election. Outside the seven counties where most Black Georgians reside, the other 152 counties averaged just *one drop box* per election.

88.     Drop boxes are especially valuable for eliminating the problem of mail delays. In the 2016, 2018, and 2020 general elections, Black voters had their mail-in ballots rejected for being late at disproportionately high rates. For example, the late-ballot rejection rate for Black voters was nearly 50% higher than the rate for white voters in the November 2020 general election.

89.     With the Voter Suppression Bill, the General Assembly has now barred counties from establishing drop boxes that are 1) outdoors or 2) available outside of regular business hours. These changes eliminated two drop box features that had previously accommodated voters unable to vote in person.

90.     The General Assembly also ordered counties to close drop boxes the Friday before the election, and it added a new requirement that drop boxes—which previously were required to be under 24/7 video surveillance—"be under constant surveillance by an election official or his or her designee, law enforcement official, or licensed security guard." SB 202 § 26(c)(1).

91.     Finally, the General Assembly limited the number of county-wide drop boxes to "the lesser of either one drop box for every 100,000 active registered voters in the county or the number of advance voting locations in the county," *id.*, far less than the U.S. Election Assistance Commission's recommendation of "one drop box for every 15,000–20,000 registered voters."

92.     The U.S. Election Assistance Commission recommends the use of drop boxes as a "secure and convenient means for voters to return their mail ballot," noting specifically that they guard against disenfranchisement of voters whose ballots are delayed in the mail, and where voters want to consider all of the

information available to them as close to the election as possible before voting their ballot.

93.     Georgia's new drop box restrictions directly undermine the benefits of having drop boxes for countless voters, including those voters who wait to vote their ballot until close to Election Day.

94.     Black voters are particularly likely to be negatively impacted by the changes, not least of all because they are more likely to work hourly jobs without flexible schedules, or even multiple jobs, making it harder for them to access drop boxes if they are not offered outside of regular business hours. Simply put, eliminating before- and after-hours voting opportunities will disproportionately burden their electoral participation.

95.     *Sixth*, the General Assembly prohibited the State from distributing unsolicited absentee ballot applications to voters, as it did before the 2020 primary elections due to the COVID-19 pandemic.

96.     *Seventh*, the General Assembly prohibited any person from offering food or drink to voters waiting in line at a polling place and makes any violation a misdemeanor.

97.    This prohibition will directly impact voters who are forced to wait in long lines at polling places, particularly in Black neighborhoods where polling locations are more likely to experience congestion.

98.    According to a study of Georgia's 2020 primary elections, the average wait time in Georgia after polls were scheduled to close was six minutes in neighborhoods that were at least 90% white, and 51 minutes in places that were at least 90% nonwhite. In the white neighborhoods, less than 3% of polling places were required to stay open late to accommodate long lines; in the nonwhite neighborhoods, 36% of polling places had to remain open at least an additional hour because of lines.

99.    The food and water prohibition will also harm individuals and organizations that engage in First Amendment-protected expressive conduct by distributing food or drink to voters waiting in line, including Plaintiffs NGP, Black Voters Matter, and Rise—each of which helped coordinate individuals who wanted to provide support in the form of food and drink to voters waiting to vote, provided such support themselves, or both.

100.   This blanket prohibition on people offering food or drink to voters advances no plausible election administration goal, exacerbates the burden of waiting in long lines, and disproportionately impacts Black voters.

101.  *Eighth*, while voters could previously cast provisional ballots in any precinct over the course of Election Day and have their votes counted for those contests that appear on their home precinct ballot, with the passage of the Voter Suppression Bill, the General Assembly has now prohibited the counting of any provisional ballot that was cast before 5:00 p.m. in  a precinct other than the one to which a voter is specifically assigned.

102.  This change is especially likely to disenfranchise Black voters, who are more likely than white voters to have moved within their county, making them more likely to erroneously present to vote in a precinct other than the one to which their current address assigns them. Black voters are also more likely to live in precincts that have been consolidated, and more likely to be assigned to polling places that serve multiple precincts.

103.  Further, many counties with substantial minority populations have seen polling places closed—or threatened with closure—in recent years. These events predictably create confusion about where a person should vote, and SB 202's new restrictions ensure the consequences will disproportionately be borne by Black voters.

104.  Voters without easy access to transportation or flexible schedules may be unable to correct the mistake and travel to the correct precinct in time to cast their

ballot—especially after having waited for hours in line to cast a ballot. Moreover, time and time again, voters have reported not being advised that they were in the wrong precinct to begin with; as a result, some voters may not even recognize their mistake.

105.   Moreover, the new restrictions arbitrarily lift when a voter presents at the wrong polling place after 5:00 p.m.; this exception alone demonstrates that the rejection of ballots voted out of precinct any time earlier in the day (including, by the letter of the law, at 4:59 p.m.) cannot legitimately be justified as an anti-fraud or elections "integrity" measure.

106.   *Ninth*, SB 202 subjects Georgia voters to unlimited challenges from fellow citizens, and local boards of registrars are now required to hold a hearing on any voter registration challenge  in the immediate weeks after the challenge is filed.

107.   Lawful voters targeted by indiscriminate challenges will now be forced to quickly arrange to defend their qualifications before a government board or risk disenfranchisement and removal from the registration rolls.

108.   *Finally*, the General Assembly has drastically compressed the timeframe for federal runoff elections from nine weeks to four weeks and cut the mandatory early voting period for all runoff elections from three weeks to, at most, a mere five days.

109.  The change eliminates the guarantee of early voting on weekends, which Black voters disproportionately rely on to cast their ballots. It will also make it significantly more difficult, and often impossible, for many electors to vote by mail during the limited runoff window.

110.  Collectively, these challenged provisions not only impose severe and unconstitutional restrictions on the voting rights of all Georgians, but they also disparately impact Black voters and effectively deny them an equal opportunity to participate in the electoral process and elect candidates of their choice—an outcome which the General Assembly was keenly aware of and intended.

**The Rushed Legislative Process and Pretextual Justifications for SB 202**

111.  The Voter Suppression Bill is the result of a rushed, opaque legislative process that was driven by the General Assembly's desire to restrict voting among Black, young, and Democratic voters—not by legitimate policy concerns.

112.  SB 202 was introduced in mid-February 2021. Over the course of just 36 days, the Bill was rushed through committee hearings and into final form, with limited opportunities for public input or testimony from interested parties.

113.  During that period, SB 202 grew from a short, two-page document to its final 98-page version, which imposes new and onerous restrictions on virtually every aspect of the elections process in Georgia.

40

114.   The evolution of the Bill was far from transparent. The General Assembly failed to make updates publicly available in a timely manner. At the same time, it repeatedly pressed ahead and held multiple committee hearings on new versions of the Bill, even when those versions had not yet been posted to the legislature's website, or had only just been posted, making it impossible for the public to meaningfully engage with, and lodge timely objections or raise concerns with, the proposed legislation.

115.   The process was so hurried that, on March 8, 2021, the Georgia Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections issued a public statement expressing "concern[] that the legislative process is proceeding at a pace that does not allow full examination of all the factors that must be considered. There is a need for responsible elections policymaking to be deliberate and evidence-based, not rushed."

116.   Lawmakers did not take the Task Force's advice. On March 25, the House of Representatives passed a substituted version of SB 202. The Bill was then rushed to the Senate, which passed it that same afternoon. Just a few hours later, Governor Brian Kemp signed SB 202 behind closed doors.

117.   The policy justifications for the Voter Suppression Bill are pretextual. For example, the sponsors of the Voter Suppression Bill cited a need to "address the

lack of elector confidence in the election system." SB 202 § 2(4). But as Secretary Raffensperger has acknowledged, Georgia's elections were "safe, secure, honest." Lieutenant Governor Geoff Duncan explained that the Voter Suppression Bill resulted from "the fallout" and "misinformation and sowing doubt" from former President Trump and Rudy Giuliani in the aftermath of the 2020 election.

118.   The Voter Suppression Bill also states that it is intended to "reduce the burden on election officials." *Id.* Yet many of its provisions do just the opposite. For example, SB 202 prohibits counties from accepting private grant funding, even though such funding helped pay for additional staffing at polling places and provided other support for election officials. It also requires counties to conduct almost-immediate hearings on an unlimited number of voter registration challenges, and it compresses the period in which voters can cure issues with their ballots. Contrary to the legislators' claims, these and other provisions will only *increase* the burdens on election officials, not alleviate them.

119.   Finally, the Voter Suppression Bill states that it is intended to "promot[e] uniformity in voting." *Id.* But the ways in which the Bill seeks uniformity are patently designed to *increase* white voter access while *restricting* access among Black and other minority voters.

120.   On the one hand, for example, SB 202 mandates early voting on two Saturdays prior to an election rather than just one. But that "expansion" of voting access mainly helps voters in whiter, more rural counties, since most Atlanta-area counties and other counties with large Black voter populations already offered multiple weekend advance voting days.

121.   On the other hand, however, SB 202 severely restricts the availability of drop boxes and effectively bans mobile voting units. Those restrictions will disproportionately burden Black and minority voters in urban areas like Fulton County, without affecting voters in whiter and more rural parts of the state.

122.   And instead of a uniform start date for early voting in runoff elections— previously the fourth Monday prior to the election—SB 202 leaves it to counties to begin early voting "[a]s soon as possible prior to a runoff[.]" § 28.

123.   In reality, SB 202 is a power grab designed to entrench control over all levels of the political process in Georgia.

124.   For instance, SB 202 radically changes the composition of the SEB. Under the Voter Suppression Bill, three of the five members of the SEB—a majority—are selected directly by the General Assembly. (Previously, the General Assembly selected only two of the members, and the Secretary of State held a third voting position.) The General Assembly retains particularly tight political control

over the newly-created position of chairperson, who does not have a set term of office and instead serves only until the General Assembly selects a replacement.

125.   The SEB also has new authority to "suspend" up to four county election superintendents at one time and appoint an individual replacement for each. *Id.* § 6(f). A replacement superintendent—who would be politically accountable to the SEB, not the voters in the county they serve—gains all of the superintendent's powers and duties. The Voter Suppression Bill specifically gives a temporary superintendent authority to make "all personnel decisions" for the election, including selecting the county's director of elections, the election supervisor, and all poll officers. *Id.*

126.   In this way, the SEB can exercise nearly plenary political control over local elections. In certain cases, the replacement superintendent even becomes "permanent" and cannot be removed from office by the local jurisdiction for nine months. *Id*. § 7(e)(2).

127.   The net result of these provisions, and others like them in SB 202, is a consolidation of power that reveals the real purpose behind SB 202: to burden voters (including, specifically, Black voters) and jurisdictions deemed to be unfavorable to the legislators who advanced the Voter Suppression Bill.

**Racial Discrimination and Voting in Georgia**

128.   The Voter Suppression Bill is hardly Georgia's first racially discriminatory voting practice. Georgia has a long and egregious history of implementing election laws that hinder Black and minority citizens' ability to participate equally in the political process.

129.   This history began shortly after the abolition of slavery, when Black men in Georgia first gained the right to vote and cast ballots in April 1868. After that election, the Georgia General Assembly passed a resolution that expelled 25 Black representatives and three Black senators. The General Assembly's resolution was based on the belief that the right of Black men to vote did not give them the right to hold office, and Black legislators were thus deemed ineligible to serve under Georgia's post-Civil War state constitution.

130.   In 1871, Georgia became the first state to enact a poll tax. At the 1877 state constitutional convention, the General Assembly voted to make the poll tax permanent and cumulative, requiring citizens to pay all back taxes before being permitted to vote. As a result, Black turnout in Georgia's next elections plummeted. The poll tax was not abolished until 1945, after it had been in effect for nearly 75 years.

131.   Other means of disenfranchising Georgia's Black voters followed: literacy tests, strict residency requirements, onerous registration procedures, voter challenges and purges, the deliberate slowing down of voting by election officials so that Black voters would be left waiting in line when the polls closed, the adoption of "white primaries," and the use of discriminatory redistricting processes.

132.   After the poll tax was repealed in 1945, voter registration among Black men and women significantly increased. As a result of these purposeful voter suppression tactics, however, not a single Black citizen served in the Georgia General Assembly between 1908 and 1962.

133.   As late as 1962, 17 municipalities and 48 counties in Georgia required segregated polling places. When the U.S. Department of Justice filed suit to end the practice, a local Bibb County leader declared that the federal government was ruining "every vestige of the local government."

134.   To date, no Black man or woman has been elected governor of Georgia and just one, Senator Raphael Warnock, has been elected to the U.S. Senate—in the same election that immediately preceded (and spurred) the passage of the Voter Suppression Bill.

135.   Because of its history of discrimination against racial minorities, Georgia became a "covered jurisdiction" under Section 5 of the Voting Rights Act

when Congress passed the landmark civil rights law in 1965, meaning any changes to Georgia's election practices or procedures were prohibited until either the U.S. Department of Justice or a federal court determined that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304.

136.   Between 1965 and 2013, after which the Supreme Court effectively barred enforcement of the Section 5 preclearance requirement, the federal government's independent oversight helped guard Georgia's minority voters against disenfranchisement and arbitrary and disparate treatment by the State in its election practices and procedures. While Section 5 was in effect, Georgia received more than 170 preclearance objection letters from the U.S. Department of Justice under Section 5 of the Voting Rights Act.

137.   Georgia's history of racially discriminatory voting practices is so extensive and well-established, courts have effectively taken judicial notice of it. *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past

discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560).

138.   Discrimination in the not-so-distant past can have reverberating effects. "[P]ast discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower numbers than whites." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984).

139.   In addition to Georgia's history of discrimination against minorities in voting and elections, political campaigns in Georgia have often relied on both explicit and implicit racial appeals. These appeals have continued into modern-day elections.

140.   For example, in the 2014 Democratic House of Representatives primary election in House District 105, an unidentified Republican firm reportedly conducted

a racially divisive robocall among likely Democratic voters in House District 105, asking if they would prefer to vote for "an Asian businessman or an African American swim mom." The poll was apparently referencing the two Democratic candidates in the primary race, Tim Hur, who is Asian-American, and Renita Hamilton, who is Black.

141.    In 2017, a member of the board of commissioners in Gwinnett County, the second most populous county in the state, called the late Representative John Lewis a "racist pig" and suggested that his re-election to the United States House of Representatives is "illegitimate" because he represents a majority-minority district.

142.    Also in 2017, the Republican mayor of Georgia's seventh-largest municipality, Roswell, insinuated that voters in Georgia's Sixth Congressional District—which is majority white and has been represented by white Republicans Newt Gingrich, Johnny Isakson, and Tom Price over the past three decades—would not vote for Democratic candidate (and now U.S. Senator) Jon Ossoff in the 2017 special election because he has an "ethnic-sounding" name. When describing voters in the Sixth District, the mayor said, "This is a mature voter base. If someone is going down the list, they're gonna vote for somebody who is familiar. . . If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim? Is he Lebanese? Is he

Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."

143.   In the 2018 gubernatorial election, a white supremacist organization targeted Democratic candidate Stacey Abrams, who would have been Georgia's first Black governor, with robocalls laced with explicitly racist language.

144.   During the 2020 presidential and senatorial campaign, racist tactics and attacks accelerated. For example, then-Senator David Perdue mispronounced then-Senator Kamala Harris's name, saying "Ka-*ma*-la, *Ka*-ma-la, Kamala-mala-mala, I don't know, whatever."

145.   The Perdue campaign had previously depicted his opponent, now-Senator Jon Ossoff, who is Jewish, with a longer and thinner nose, playing into anti-Semitic stereotypes.

146.   Meanwhile, the National Republican Senatorial Committee ran ads on social media urging their voters to "stand your ground" next to a photo of a white man sitting in the bed of a truck holding a gun, a reference to laws that have been used to justify the deaths of unarmed Black people.

147.   The ability of Georgia's Black citizens to participate in the political process has been further hindered by significant and disparate effects of

discrimination in housing, education, employment, health, criminal justice, and other areas which persist to this day.

148.   For example, the Georgia Department of Community Health has reported that minorities in Georgia have worse health status and more chronic health conditions than whites. Between 2013 and 2017, the infant mortality rate for Black babies was twice that of white babies.

149.   In 2019, the unemployment rate for Black people in Georgia was 5.3%, compared to only 2.4% among white people, according to the Economic Policy Institute. Those inequities have gotten worse during the current recession as across the country unemployment rates among Black workers decline at a slower rate than white workers. Unemployment rates spiked in May 2020—and Black workers' 16.8% unemployment rate was the highest of all racial groups.

150.   Homes in cities and neighborhoods in Georgia that have significant minority populations have lower values than homes located in predominantly white areas. Moreover, while real estate in Georgia has increased in value in those areas with small Black populations, home values have decreased in all zip codes in the Atlanta metropolitan area where the population is at least 40% Black.

151.   In education, the racial gap in graduation rates persist. In the 2019-2020 school year, 87% of white students graduated on time while just 81% of Black students did.

152.   In 2017, more than half of Georgia's prison population was Black, even though Black people made up only approximately 32% of the population

153.   The ongoing COVID-19 pandemic has only further highlighted the disparities between Black and white Georgians. A survey the Centers for Disease Control and Prevention conducted of Georgia hospitals in March 2020 found that more than 80% of COVID-19 patients were Black. A study from the Morehouse School of Medicine found that a 1% increase in a county's Black population was associated with a 2.5% increase in the county's confirmed cases of COVID-19. Dougherty County, Georgia, which is 70% Black, had the most deaths from COVID-19—more deaths than even Georgia's largest county, Fulton County, which has more than *eleven times* Dougherty County's population.

154.   These disparities, among others, are vestiges of Georgia's history of discrimination against its Black citizens, which continues to this day. The Voter Suppression Bill interacts with these social conditions to deny or abridge the voting rights of Black Georgians, and to deny Black voters in Georgia an equal opportunity to participate in the electoral process and elect candidates of their choice. Protestors

outside the Capitol recognized this, calling the Bill "Jim Crow 2.0." In fact, State Representative Park Cannon of Atlanta, a Black woman, was arrested by state troopers after knocking on Governor Kemp's office door to try to witness the bill signing.

## CLAIMS FOR RELIEF

## COUNT I

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Undue Burden on the Right to Vote**
**(Brought Against All Defendants)**

155.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 154, as though fully set forth herein.

156.   A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

157.   "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted). "And even when a law imposes only a

slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019).

158.   The Voter Suppression Bill inflicts severe burdens on Georgia's voters through each individual restriction and the cumulative effect of all the suppressive measures which impose barriers to voting absentee and in person.

159.   Absentee voters will encounter an identification requirement that denies them the ability to vote absentee unless they possess certain limited forms of identification or identification numbers; a narrowed window in which they can return their absentee ballot; restrictions on drop boxes that limit the availability of safe and secure methods of returning absentee ballots; and restrictions preventing election officials and organizations from even distributing absentee ballot *applications* or assisting voters in returning them.

160.   Georgians who vote in person are also targeted by the Voter Suppression Bill. It imposes a ban on mobile polling places used by thousands of voters in recent high-turnout elections, limiting the accessibility to voting locations and requiring many voters to travel longer distances and wait in long lines. The Bill also prohibits votes cast in the wrong precinct before 5:00 p.m. from being counted,

which all but ensures that in-person voters whose inflexible schedules prevent them from voting after 5:00 p.m. face a significantly greater risk of outright disenfranchisement—the most severe burden on their voting rights.

161.   To make matters worse for in-person voters, the Voter Suppression Bill prohibits anyone from giving food or drink to those waiting in line, which serves no legitimate purpose other than to maximize the burdens of voting in person.

162.   For those who navigate these hurdles, the Voter Suppression Bill subjects them to unlimited voter challenges, the result of which imposes substantial burdens on voters who are forced to prove their eligibility and subjects voters to ongoing abuse and intimidation.

163.   And for elections that proceed to a runoff, the Voter Suppression Bill dramatically limits the runoff voting period, as well as opportunities for early and mail-in voting, all of which makes it more difficult for Georgians to vote in person during the runoff election.

164.   No state interest justifies any of these restrictions, which individually and cumulatively burden the right to vote. Before the General Assembly passed the Bill, the Secretary had referred to Georgia's election administration as the "gold standard" due to the State offering absentee voting, early voting, and election-day voting options. But after that system facilitated record turnout in the 2020 general

election and the 2021 U.S. Senate runoff elections, the General Assembly acted swiftly to radically and unjustifiably punish the electorate by dramatically curtailing opportunities to vote.

165.   Absentee voter fraud in Georgia—the justification for these restrictive measures—is virtually non-existent. According to the Arizona State University Cronkite School of Journalism, there have been only eight instances of voter fraud in Georgia since 2000 that resulted in a plea, consent order, or conviction—a negligible rate of fraud in absentee voting totaling 0.00003%.

166.   Rather than promote public confidence in Georgia's elections and ensure election integrity, the Voter Suppression Bill will make voting more difficult, result in disenfranchisement, and shatter voter confidence in Georgia's electoral process. In short, the challenged provisions of the Voter Suppression Bill are not supported by any state interest sufficient to justify the resulting restrictions on the voting process, and they unduly burden the right to vote in violation of the First and Fourteenth Amendments.

## COUNT II

**Section 2 of the Voting Rights Act
52 U.S.C. § 10301, *et seq.*
Intentional Racial Discrimination & Discriminatory Results
(Brought Against All Defendants)**

167.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 154, as though fully set forth herein.

168.   Section 2 of the Voting Rights Act prohibits vote denial: the use of voting laws, policies, or practices, like absentee ballot procedures and qualifications, that deny, abridge, or otherwise limit Black voters' access or increase the burden for Black people to exercise the right to vote. 52 U.S.C. § 10301.

169.   Section 2 is violated where "the challenged methods of election either have a discriminatory purpose *or* effect." *Askew v. City of Rome*, 127 F.3d 1355, 1373 (11th Cir. 1997).

170.   Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Even where challenged legislation appears neutral on its face, discriminatory intent may be inferred by analyzing the context during which and by which the challenged provisions were enacted, and by reviewing the challenged provisions' disproportionate racial impact. *See id.* at 266–68.

57

171.   All of the relevant indicia demonstrate that a discriminatory purpose was a motivating factor in the passage of the Voter Suppression Bill. For example, the Bill was introduced after the historic registration of Black voters and the breakthrough success of candidates that Black voters supported. Legislative consideration of the Bill was rushed, opportunities for public comment and analysis were limited, and the stated rationales for the Bill were unfounded pretext. And the Bill surgically removed accommodations relied on by Black voters at every step of the voting process—including drop boxes, mobile voting units, and mandatory weekend voting for runoff elections—while erecting new impediments that will disproportionately burden Black voters—including restrictions on out-of-precinct provisional ballots and burdensome ID requirements.

172.   The Voter Suppression Bill also violates Section 2 under the "results" test, which examines whether "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

173.   This inquiry requires a "totality of the circumstances" analysis that includes factors such as:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or

political subdivision is racially polarized; the extent to which the State
or political subdivision has used voting practices or procedures that
tend to enhance the opportunity for discrimination against the minority
group, such as unusually large election districts, majority vote
requirements, and prohibitions against bullet voting; the exclusion of
members of the minority group from candidate slating processes; the
extent to which minority group members bear the effects of past
discrimination in areas such as education, employment, and health,
which hinder their ability to participate effectively in the political
process; the use of overt or subtle racial appeals in political campaigns;
and the extent to which members of the minority group have been
elected to public office in the jurisdiction.

*Id.* at 44–45.

174.   As detailed above, there is a long history of voting-related
discrimination against Black people in Georgia. Moreover, voting in Georgia is
highly polarized, and the shameful legacy of racial discrimination is visible today in
Georgia's housing, economic, and health disparities.

175.   In large part because of the racial disparities in areas outside of
voting—such as socioeconomic status, housing, and employment opportunities—
the Voter Suppression Bill disproportionately impacts Black voters and interacts
with these vestiges of discrimination in Georgia to deny Black voters an equal
opportunity to participate in the political process and/or elect a candidate of their
choice.

176.   Under the totality of circumstances, the Voter Suppression Bill abridges
and, in some cases, entirely denies the rights of Black voters, including Plaintiffs

Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin, as well as the Black

voters who make up the core membership and constituency of Plaintiffs NGP, Black

Voters Matter, and Rise.

## COUNT III

**First Amendment**
**U.S. Const. Amend. I, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Violation of the Rights to Freedom of Political Association and Expression**
**(Brought Against All Defendants)**

177.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through

154, as though fully set forth herein.

178.    The First Amendment to the United States Constitution, incorporated

to the states through the Fourteenth Amendment, protects the right of political

association and freedom of expression through voting. *See Shapiro v. McManus*, 577

U.S. 39, 46 (2015); *Vieth v. Jubelirer*, 541 U.S. 267, 314–15 (2004) (Kennedy, J.,

concurring in judgment).

179.    Under the First Amendment, a state government "has no power to

restrict expression because of its message, its ideas, its subject matter, or its content."

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (quoting *Police Dept. of*

*Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

180.    A law regulating speech that is adopted "because of disagreement with

the message [the speech] conveys," even if facially content-neutral, is

"presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Id.* at 163, 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

181.   Strict scrutiny thus applies to a law that regulates speech because of the government's disagreement with the speaker's political beliefs, expression, or association. *See Hand v. Scott*, 888 F.3d 1206, 1211–12 (11th Cir. 2018) (recognizing that a voting law "that was facially or intentionally designed to discriminate based on viewpoint—say, for example, by barring Democrats, Republicans, or socialists from reenfranchisement on account of their political affiliation—might violate the First Amendment").

182.   SB 202 was enacted immediately after Black voters, young voters, and Democratic voters saw their preferred candidates win Georgia's electoral votes in the November 2020 presidential election and both of Georgia's U.S. Senate races in the January 2021 runoff election.

183.   As detailed above, the General Assembly enacted the challenged provisions in SB 202 with the purpose of restricting these voters' ability to cast ballots for their preferred candidates in future elections on the basis of their viewpoint.

184.   None of the challenged provisions in the Voter Suppression Bill are narrowly tailored to serve a compelling government interest. They are therefore unconstitutional restrictions on speech under the First Amendment to the U.S. Constitution.

## COUNT IV

**First Amendment**
**U.S. Const. Amend. I, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Violation of the Rights to Freedom of Speech and Expression**
**(Brought Solely Against Gammage and Edwards)**

185.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 25, 36 through 66, 96 through 100, and 110, as though fully set forth herein.

186.   The First Amendment to the United States Constitution, incorporated to the states through the Fourteenth Amendment, protects the rights of free speech and expression—including "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988).

187.   Organizations and individuals, like Plaintiffs NGP, Black Voters Matter, and Rise, who plan to distribute, or coordinate the distribution of, food and drink to voters waiting in line engage in First Amendment-protected core political speech and expression by encouraging those voters to stay in line.

188. SB 202 unconstitutionally criminalizes protected speech and expression by making it a misdemeanor to "give, offer to give, or participate in the giving of any money or gifts, including, but not limited to, food and drink, to an elector." SB 202 § 33(a).

189. That provision unconstitutionally restricts individuals' and organizations' First Amendment rights, and it is not sufficiently related to any compelling, or even legitimate or important, government interest.

## COUNT V

**Civil Rights Act**
**52 U.S.C. § 10101, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Immaterial Voting Requirement**
**(Brought Against All Defendants Except Gammage and Edwards)**

190. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 35, 38 through 75, and 110, as though fully set forth herein.

191. The Civil Rights Act prohibits any person acting under color of law from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

192.   This provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003).

193.   SB 202 requires the rejection of any absentee application or ballot that fails to provide the elector's date of birth.

194.   "[A]n elector's year of birth is not material to determining the eligibility of an absentee voter." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018).

195.   The only conceivable purpose of the date-of-birth requirement is to confirm an elector's identity. But SB 202 already requires electors applying for and voting by absentee ballot to prove their identity with a unique identifier, such as a driver's license or state identification number.

196.   Because an elector's date of birth is not a unique identifier, its inclusion does not materially improve election officials' ability to confirm an elector's identity. If SB 202's driver's license or state identification number requirements are determined to be lawful, then the additional requirement that an elector provide a date of birth is entirely redundant.

197.   By requiring election officials to reject absentee applications and ballots solely on the basis of a missing or incorrect year of birth, SB 202 violates the Civil Rights Act.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

(a)   Declaring that the challenged provisions in the Voter Suppression Bill violate the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

(b)   Declaring that the challenged provisions in the Voter Suppression Bill violate Section 2 of the Voting Rights Act;

(c)   Declaring that the challenged provisions in the Voter Suppression Bill violate the First Amendment to the U.S. Constitution;

(d)   Declaring that the challenged provisions in the Voter Suppression Bill violate the Civil Rights Act;

(e)   Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing any of the challenged provisions of the Voter Suppression Bill;

(e)     Awarding Plaintiffs their costs, expenses, and reasonable

attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other

applicable laws; and

(f)     Granting any such other and further relief as this Court deems

just and proper.

Respectfully submitted, this 17th day of May, 2021.

Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlwafirm.com
sparks@khlawfirm.com

/s/ *Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Jacob D. Shelly*
Zachary J. Newkirk*
Jyoti Jasrasaria*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
unkwonta@perkinscoie.com
jshelly@perkinscoie.com
znewkirk@perkinscoie.com
jjasrasaria@perkinscoie.com

Laura Hill*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-3349
Facsimile: (206) 359-4349
LHill@perkinscoie.com

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., as an organization; LEAGUE OF WOMEN VOTERS OF GEORGIA, INC., as an organization; GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., as an organization; COMMON CAUSE, as an organization; LOWER MUSKOGEE CREEK TRIBE; THE URBAN LEAGUE OF GREATER ATLANTA, INC., as an organization, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Civil Action Case No. 1:21-cv-1259-JPB |
| Plaintiffs, | ) ) | **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | ) ) ) | |
| BRAD RAFFENSPERGER, in his official capacity of the Secretary of State for the State of Georgia, REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as members of the State Election Board, ALEX WAN, in his official capacity as Chairman of the FULTON County Registration and Elections Board, MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH NURIDDIN, and AARON JOHNSON, in their official capacities as Members of the FULTON County Registration and Elections Board, ALICE O'LENICK, in her official capacity | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **52 U.S.C. § 10301, 42 U.S.C. § 1983; First, Fourteenth and Fifteenth Amendments to the United States Constitution** |

as Chairman of the GWINNETT County )
Board of Registrations and Elections, )
WANDY TAYLOR, STEPHEN W. DAY, )
and GEORGE AWUKU, in their official )
capacities as Members of the GWINNETT )
County Board of Registrations and Elections, )
PHIL DANIELL, in his official capacity as )
Chairman of the COBB County Board of )
Elections and Registration, FRED AIKEN, )
PAT GARTLAND, JESSICA M. BROOKS, )
and DARRYL O. WILSON, JR., in their )
official capacities as Members of the COBB )
County Board of Elections and Registration, )
                                           )
 Defendants.                               )
                                           )
                                           )

---

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF**

## PRELIMINARY STATEMENT

1.     This is a voting rights lawsuit filed pursuant to Section 2 of the Voting

Rights Act of 1965 (52 U.S.C. § 10301) and 42 U.S.C. § 1983[1] to protect

fundamental rights protected by the First, Fourteenth, and Fifteenth Amendments

to the United States Constitution.  Plaintiffs seek prospective declaratory and

injunctive relief against Brad Raffensperger, in his official capacity as the Georgia

Secretary of State; Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and

Anh Le in their official capacities as members of the State Election Board; Alex

Wan, in his official capacity as Chairman of the Fulton County Registration and

Elections Board; Mark Wingate, Kathleen Ruth, Vernetta Keith Nuriddin, and

Aaron Johnson, in their official capacities as Members of the Fulton County

Registration and Elections Board; Alice O'Lenick, in her official capacity as

Chairman of the Gwinnett County Board of Registrations and Elections; Wandy

Taylor, Stephen W. Day, and George Awuku, in their official capacities as

Members of the Gwinnett County Board of Registrations and Elections; Phil

---

1. Plaintiffs' counsel served a 90-day notice letter pursuant to Section 8 of the
   National Voter Registration Act of 1993 (52 U.S.C. § 20507, 20510) ("NVRA")
   on Defendants Raffensperger and members of the State Election Board.  Once
   the 90-day notice period expires, Plaintiffs anticipate supplementing their
   claims with the NVRA claim.

Daniell, in his official capacity as Chairman of the Cobb County Board of

Elections and Registration; and Fred Aiken, Pat Gatland; Jessica M. Brooks, and

Darryl O. Wilson, Jr. in their official capacities as Members of the Cobb County

Board of Elections and Registration, enjoining the enforcement and

implementation of Georgia Senate Bill 202 ("SB 202"), an omnibus voter

suppression bill passed by the Georgia General Assembly on March 25, 2021 and

signed into law the same day by Georgia Governor, Brian Kemp.[2]

2.    SB 202 is the culmination of a concerted effort to suppress the

participation of Black, Latinx, Asian American, members of indigenous

populations and other voters of color by the Republican State Senate, State House,

and Governor.  In the last two decades, Georgia has undergone demographic

change, namely the increasingly large percentage of the electorate comprised of

Black voters and other voters of color.  As demonstrated by election analyses,

Black voters and voters of color usually provide strong support to Democratic

candidates.  These demographic changes and voting patterns have resulted in

corresponding political changes in Georgia.  After several cycles of Republican

---

2.  A copy of SB 202 as passed by the Georgia General Assembly on March 25, 2021 ("SB 202/AP") is available on the Georgia General Assembly's website at this link: https://www.legis.ga.gov/api/legislation/document/20212022/201498 (last checked 5/20/21).

dominance, Democratic statewide candidates almost prevailed in 2018; Democrats then won the race for President in 2020 and two Senatorial contests in 2021. Republican legislators' immediate response was a legislative attempt to suppress the vote of Black voters and other voters of color in order to maintain the tenuous hold that the Republican Party has in Georgia.  In other words, these officials are using racial discrimination as a means of achieving a partisan end.  This is intentional discrimination in violation of the United States Constitution and Section 2 of the Voting Rights Act.

3.     SB 202's restrictions include: (1) onerous and unnecessary ID requirements in order to apply for or return absentee ballots; (2) prohibiting public employees and public entities from sending out unsolicited absentee ballot applications to voters; (3) threatening private individuals and non-public entities with potentially large fines for sending absentee ballot applications; (4) delaying and compressing the time during which a voter can request or submit an absentee ballot; (5) giving county registrars unfettered discretion to limit early voting hours to 9 a.m. to 5 p.m. and to entirely eliminate Sunday early voting; (6) restricting the number of and access to absentee ballot drop boxes; (7) disenfranchising out-of-precinct voters; (8) targeting jurisdictions with large populations of Black voters and other voters of color by stripping the Secretary of State of his vote on the State

Election Board, replacing the Secretary of State with a voting member appointed by the General Assembly, and granting the State Election Board the power to effectively take over county boards; (9) encouraging the submission of "unlimited" numbers of voter challenges; (10) criminalizing the act of providing people waiting in line to vote with food and water; and (11) prohibiting the use of mobile voting units.

4.      These changes to Georgia voting laws are intended to suppress the vote of Black voters and other voters of color.  In the most recent elections in 2020 and 2021, voters of color used methods such as absentee and Sunday voting in numbers not seen before.  In response, the Georgia General Assembly enacted SB 202 to target and limit the means of voting that have been increasingly used by Black voters and other voters of color.

5.      Many of these provisions will inevitably lengthen and compound the problem of long lines and delays at polling locations by making absentee mail voting and in-person early voting harder.  SB 202 then further burdens and discourages voters from waiting in these long lines to vote by criminalizing the simple act of providing water or snacks to voters while they wait in line.  Black voters and other voters of color are disproportionately impacted by long lines and delays at the polls and stand to suffer most (and be disproportionately discouraged

from voting) when charitable organizations can no longer provide even water or snacks to those waiting to vote.

6.    SB 202 also threatens the right of voters of color to participate equally in the political process by encroaching on and threatening to eviscerate the power of county election boards—the very boards responsible for protecting that right.

7.    The provisions of SB 202, viewed individually and collectively, threaten the fundamental right to vote of all Georgians, but their impact will be felt most intensely by persons of color, which is precisely what the legislature intended.

8.    This Court should declare SB 202 unlawful and unconstitutional, and permanently enjoin its implementation and enforcement.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) and 52 U.S.C. § 10308(f) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the First, Fourteenth and Fifteenth Amendments to the United States Constitution, the Voting Rights Act of 1965 (52 U.S.C. § 10301), 42 U.S.C. § 1983, and the Civil Rights Act of 1964.  This Court likewise has jurisdiction pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

10.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11.    This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and under Local Rule 3.1 because, *inter alia*, several defendants reside in this district and this division and a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

## PARTIES

13.    Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP ("Georgia NAACP") is a non-partisan, interracial, nonprofit membership organization that was founded in 1941.  Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African Americans.  It is headquartered in Atlanta and currently has approximately 10,000 members.

14.    The Georgia NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote

8

voter registration, voter education, get out the vote ("GOTV") efforts, election protection, and census participation.

15. The Georgia NAACP has branches in counties across the state of Georgia that are involved in voter registration, voter assistance, voter education, election protection, grassroots mobilization, and GOTV efforts, including Sunday early voting events, such as "Souls to the Polls."

16. The Georgia NAACP has sought to prevent efforts to suppress or disenfranchise African American voters and has been involved in voting rights litigation in Georgia to vindicate their rights.

17. The Georgia NAACP engages in voter outreach efforts, including voter education on voting in-person during early voting, voting by mail and voting in person on election day.

18. The Georgia NAACP has engaged in GOTV campaigns. One of the key components of these campaigns is providing accurate information regarding mail-in ballots to the Georgia NAACP's membership and the rest of the public.

19. The Georgia NAACP has developed materials and worked with local NAACP branches to educate its members and the public about voting by mail, including providing information concerning the availability and location of mail ballot drop boxes during the 2020 general election and 2021 runoff election cycle.

The Georgia NAACP also developed messaging and materials regarding mail ballot drop box locations in particular counties.

20.   The Georgia NAACP has conducted text and phone banking programs and reached out to voters throughout Georgia to encourage voter participation and to educate the public about the voting process, including about voting by mail.

21.   The Georgia NAACP has supported in-person voting by providing food and/or drinks to voters who request such while waiting in long lines to vote. This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks.  The Georgia NAACP members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally. They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

22.   Many of the Georgia NAACP's members have voted by mail in the past and stand to be negatively impacted by the substantial changes to Georgia's vote by mail procedures that have been enacted as part of SB 202.  Many more will be impacted by the changes to the availability of absentee ballot drop boxes, changes to early voting times and days and the requirement of a sworn affidavit for

voters who go to the wrong precinct to vote prior to 5 p.m., as set forth in SB 202. Many Georgia NAACP members are at risk of being disenfranchised by the changes in SB 202.

23.    The Georgia NAACP has an interest in preventing the disenfranchisement of eligible voters, including its members and voters it may have assisted with navigating the voting process.

24.    Due to the substantial changes in absentee voting procedures, absentee ballot drop boxes, early voting periods, restrictions on out-of-precinct voting, criminalization of the expressive act of "line warming" activities such as supplying water and snacks to voters in line and the other changes caused by the enactment of SB 202, the Georgia NAACP will not only have to change its messaging to voters of color about these changes, but the Georgia NAACP will also have to divert considerable resources from its ongoing election protection, advocacy, and GOTV efforts to educate and assist eligible voters.

25.    The Georgia NAACP will also have to divert its resources to educate voters about the substantial changes to the mail voting process, and will have to respond to questions from voters who used a mail ballot drop box in the November 2020 election and will be confused by the fact that they are not available outside early voting locations in the future.

11

26.    The Georgia NAACP has traditionally provided transportation to the polls for voters on election day.  The Georgia NAACP will have to divert resources to physically transport voters to the county board of elections to drop off their mail ballots or to polling places or early voting locations to vote in person if they cannot vote by absentee ballot.  The nature and scope of the Georgia NAACP's voter assistance efforts will need to change if voters do not have access to a drop box or mail ballots are rejected due to the burdensome ID requirements and complicated changes for completing absentee ballot applications and returning absentee ballots.

27.    The Georgia NAACP's additional efforts to educate voters whose mail ballots are rejected due to the new ID requirements and other procedures will force the Georgia NAACP to have to divert substantial resources away from core activities such as voter registration and other efforts such as criminal justice work. This is due to the fact that the Georgia NAACP's resources are limited.

28.    Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia.  The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members.

12

29.    In addition to its main office in Atlanta, the GCPA has field offices in Athens, Albany, Augusta, Macon, Savannah, and LaGrange, Georgia where it is able to provide outreach and support to voters and prospective voters of color and underserved communities outside of the Metro Atlanta area.

30.    During the 2020 elections and the January 5, 2021 runoff cycle, the GCPA's voter outreach efforts were conducted in the greater Metro Atlanta region as well as throughout other areas of Georgia from the aforementioned field offices and covered approximately 88 counties in the state.

31.    The GCPA encourages voter registration and participation, particularly among Black and other underrepresented communities of color in Georgia.  The GCPA's support of voting rights is central to its mission.  The organization has committed, and continues to commit, time and resources to protecting voting rights through advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, GOTV efforts, election protection, census participation and litigation.

32.    The GCPA conducts voter registration drives, voter ID assistance, "Souls to the Polls" GOTV events during Sunday early voting and other GOTV efforts in Georgia that seek to encourage voter participation among Black and Brown voters and voters in historically underserved communities of color.  The

13

GCPA in coalition with other civic engagement organizations in Georgia also participates in voter education and voter empowerment programs.

33.    GCPA's voter education and empowerment programs have included, but were not limited to, educating prospective voters about how to register to vote and to confirm their registration status; educating voters about the options to vote in-person during advanced voting, in-person on election day and by mail via absentee ballot; providing information to voters about accessing absentee ballot drop boxes to cast their absentee ballots safely and securely, and helping voters to understand the new voting system implemented for the first-time during the 2020 election cycle statewide.

34.    The GCPA has also distributed civic education materials to voters and prospective voters; arranged for rides to the polls for voters; and supported the Georgia Election Protection field program in order to assist voters on the ground near polling sites.

35.    GCPA also participates in media interviews, sponsors Public Service Announcements (PSAs), places billboard ads, conducts phone banking, and engages in text message campaigns to educate voters and to encourage participation.

36.    GCPA has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks. GCPA members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.  They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

37.    The GCPA has an interest in preventing the disenfranchisement of eligible voters who now run the risk of becoming disenfranchised as a result of the new restrictions imposed by SB 202, including substantial and burdensome ID requirements for absentee by mail voting; limitations on early voting days and hours, including Sunday early voting; diminished availability of absentee ballot drop boxes except inside early voting locations during early voting hours, the lack of 24/7 hour access to absentee ballot drop boxes which renders them essentially useless to many voters; the criminalization of "line warming," activities, i.e., providing water and snacks to people in line to vote and other persons in the vicinity of polling locations; and other unreasonably burdensome restrictions imposed by these new voting changes on voters and election officials alike.

38.    SB 202 will substantially and negatively impact the GCPA's advocacy efforts now and in the future.  This law will inevitably cause Black voters and other voters of color negatively impacted by these new restrictions to lose faith that their votes will be counted on an equal basis as white voters.  This sense of futility will likely depress turnout in the future and make it more difficult for the GCPA to carry out its mission of encouraging Black voters, other voters of color and voters in underserved communities to register to vote, vote, and to help protect the rights of other Georgians to vote.

39.    Due to the substantial changes in existing Georgia election law and procedures, including the potential imposition of new criminal penalties and significant fines and fees, SB 202 has caused, and will continue to cause, the GCPA to divert a portion of its financial and other organizational resources to educating voters about these changes and assisting voters facing these new restrictions and burdens.

40.    As a result of the enactment of these new restrictions on voting in Georgia, the GCPA has, and will continue to have, fewer resources to dedicate to its other organizational activities, including voter registration drives, GOTV efforts and other projects, unless the Court enjoins implementation and enforcement of these new laws.

41.    Plaintiff LEAGUE OF WOMEN VOTERS OF GEORGIA, INC.

("League") is a nonpartisan political organization that has worked for the last 101

years to ensure that every person has the desire, the right, the knowledge and the

confidence to participate in our democracy.  The League's 13 local organizations

and nearly 700 members are dedicated to their mission of empowering voters and

defending democracy.

42.    From the League's inception, members have worked for good

government by studying issues, advocating for reforms, and, through the League's

Observer Corps, observing and reporting on the work of all levels of government.

The League is committed to registering voters, regardless of their political

affiliation, and is particularly proud of its work, with community partners, in

registering new American citizens at citizenship ceremonies.  The League is also

dedicated to voter education, through both candidate forums and the Vote411.org

voter guide.  Many League members also assist with GOTV efforts, poll watching,

and serving as vote review panelists.

43.    As part of its mission, the League advocates for expansion of voting

opportunities, including through absentee by mail voting, early in-person voting

and election day voting.  The League expends significant resources in furtherance

of its mission, including by organizing voter registration drives, educating the

17

public about the voting process, and assisting voters who have questions or need help navigating the voting process.  The League has seen a substantial increase in the number of its members and other individuals who turned out to vote by mail and during early in-person voting during the 2020 election cycle and January 5, 2021 Senate runoff elections.

44.    The League has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks. The League members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.  They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

45.    As a result of the risk of disenfranchisement due to new ID requirements for absentee by mail voting, the League must divert more resources toward educating voters about these new requirements, including, but not limited to, warning them of the risk of disenfranchisement if they fail to provide the required ID and other required information when applying or absentee ballots and when returning the ballots; answering questions from members of the public about

18

these new voting restrictions; and explaining how they impact their right to vote.  The League will need to devote significant staff time and funds to update standard training materials and informational booklets to reflect these sweeping changes.

46.   The League must divert these resources away from its regular advocacy, voter registration, fundraising, and other activities, affecting its ability to operate and function with respect to its normal activities.

47.   Plaintiff GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC. ("GALEO LCDF"); is a non-partisan, nonprofit corporation.  GALEO LCDF is one of the oldest, largest, and most significant organizations promoting and protecting the civil rights of Georgia's Latinx community.  GALEO LCDF has approximately 165 members across Georgia.

48.   GALEO LCDF's headquarters is located in Norcross, which is in Gwinnett County, and a substantial amount of GALEO LCDF's civic engagement, voter registration and GOTV work takes place in Gwinnett County and other Georgia counties.  This work includes organizing voter education, civic engagement, voter empowerment and GOTV events and conducting voter registration drives.  After Gwinnett County became a covered jurisdiction for Spanish under Section 203 in December 2016, GALEO LCDF has worked also

19

with the Gwinnett County Board of Registration and Elections in an effort to bring its procedures and election materials into compliance with the law's requirements.

49.   During the 2020 election cycle, GALEO LCDF also worked to address challenges facing Gwinnett County's Limited English Proficiency ("LEP") Spanish speaking voters as a result of the impact of the COVID-19 pandemic.

50.   GALEO LCDF sent bilingual mailers to Latinx Gwinnett County voters with information about the presidential primary as well as additional mailers after the primary was postponed due to COVID-19.

51.   GALEO LCDF also sent several rounds of bilingual mailers to all Latinx Georgia voters for both the General Election and the January 5, 2021 runoffs.  GALEO LCDF also ran paid advertisements on Spanish media (radio & TV) to promote voting and educate voters about voting for both elections.

52.   Due to the sweeping changes to many facets of voting that stand to disenfranchise Latinx, language minority voters and voters of color, GALEO LCDF will be forced to divert resources from its voter registration, existing voter education programs, GOTV activities and other programs to assist voters, particularly LEP voters and new Americans, in being able to navigate the many changes and challenges of SB 202 that will make it more burdensome for them to vote by absentee ballot, during early voting and in person on Election Day.

53.     Plaintiff COMMON CAUSE is a nonprofit corporation organized and existing under the laws of the District of Columbia.  It is one of the nation's leading grassroots democracy-focused organizations and has over 1.2 million members nationwide and chapters in 35 states, including 18,785 members and supporters in Georgia.  Since its founding in 1970, COMMON CAUSE has been dedicated to the promotion and protection of the democratic process, including the right of all citizens to vote in fair, open, and honest elections.  COMMON CAUSE, at the national level and in Georgia, conducts significant nonpartisan voter-protection, advocacy, education, and outreach activities to ensure that voters are registered and have their ballots counted as cast.

54.     In Georgia, COMMON CAUSE has increased its efforts in the areas of election protection, voter education, and grassroots mobilization around voting rights in the state.  COMMON CAUSE works on election administration issues with its coalition, much of which is represented by the other plaintiffs in the instant lawsuit.

55.     COMMON CAUSE, alongside other partners in Georgia, created a program to help recruit volunteers to monitor local board of elections meetings. COMMON CAUSE also works with these partners in election protection efforts during both midterm and presidential elections.  Through its volunteer recruitment

21

for poll monitors, COMMON CAUSE in Georgia monitors an average of five polling locations in 22 counties for a total of 110 polling places.  COMMON CAUSE in Georgia additionally engages in online petition drives, soliciting signatures from its members and supporters urging government officials to take certain actions.

56.   COMMON CAUSE in Georgia also works directly with voters who cast provisional ballots to help ensure their ballots can be counted.

57.   COMMON CAUSE has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks.  COMMON CAUSE members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.  They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

58.   During the 2020 election cycle, COMMON CAUSE in Georgia assisted some 6,000 voters who cast provisional ballots to cure those ballots so they could be counted—most were cast because the voter appeared at the wrong precinct.  As a result of the enactment of SB 202, COMMON CAUSE will divert

resources that it would have applied to other organizational and programmatic resources toward helping voters resolve provisional ballot issues, including provisional ballots cast due to voters appearing at the wrong precinct, often through no fault of their own.

59.    Plaintiff LOWER MUSKOGEE CREEK TRIBE is a state-recognized tribe located in Grady County on the southwest border of Georgia.  The tribal government is located in the old tribal town of Tama, which is located in Whigham, Georgia.  The tribe has an enrollment of approximately 2,700 members, most of whom live in rural southwest Georgia and northern Florida within a 150-mile radius to Whigham.  The tribe operates a civics education program for its members to encourage them to participate in the political process.  The tribe's members are disproportionately poor and likely to be affected by SB 202's cutback on voting by mail and criminalization of providing food and water to voters in line at the polls.

60.    The United States Census Bureau's 2019 Five-Year American Community Survey (ACS) estimates indicate that 41.6% of American Indians in Georgia do not have a computer at home and that American Indians in Georgia are 155% less likely than white Georgians to have a computer at home.  This makes it more likely that Georgia's American Indian voters, including members of the

LOWER MUSKOGEE CREEK TRIBE, will face significantly higher burdens complying with SB 202's absentee ballot provisions than white voters because they are less likely to have a computer, printer scanner or internet access at home. These resources are needed to obtain and print an absentee ballot application from the websites of the Secretary of State or county registrar and to print necessary ID documentation for the absentee ballot application and to include when returning a voted absentee ballot to their county registrar's office.

61.    Plaintiff, THE URBAN LEAGUE OF GREATER ATLANTA, INC. ("ULGA"), began operations in Atlanta in 1920 as an affiliate of the National Urban League which had been founded 10 years earlier as a multi-racial nonprofit organization working to promote civil rights and justice for people of color.  The mission of the ULGA was originally focused upon ending segregation and the oppression of African Americans through securing voting rights and equal access to education and economic opportunity for all people.

62.    Building on that legacy, the ULGA now helps citizens work toward economic stability through programs in education, entrepreneurship, jobs and training, housing, and community support and it has continued to strengthen its advocacy efforts for racial equity in the political process and in criminal justice.

24

63.    For many years, the ULGA and its public-private partners have sustained a robust effort to promote and protect access to the ballot box in Georgia. In 2020, the ULGA ramped up its GOTV initiatives through advocacy, mass communications, and direct outreach to citizens to encourage voter registration, voter education, election protection, and census participation.

64.    In tandem with its Young Professionals group and a variety of corporate and nonprofit partners, the ULGA conducted GOTV information drives on Georgia's options for in-person early voting, voting by mail and drop-box, and voting on election day.  This included widespread print and broadcast PSAs, social media outreach, phone banking, and interviews with media targeted to various audiences.

65.    Having the ability to vote by mail and via secure drop boxes markedly increased voter participation overall, and especially among younger Georgians, seniors and those working jobs that limited their options for early in-person or day of elections voting.  These measures also proved to increase voting among communities of color.

66.    However, SB 202 purposefully makes it harder for Black Georgians and other Georgians of color served by the ULGA's civic engagement, voter education and GOTV initiatives to cast ballots that will count as votes.

25

67.    As a result, the ULGA's work to re-educate voters about the new voting changes mandated by SB 202 will require a massive undertaking in order to assist voters in navigating the new restrictions, including those impacting drop box availability, ID requirements for absentee voting, and the new limitations on out of precinct voting, among other changes brought about with the enactment of SB 202.

68.    The ULGA will be forced to divert resources from its regular and emergency programs to find ways to reach voters who have the right to participate in democracy but cannot overcome the barriers placed by SB 202.  The ULGA will need to apply additional resources to identify those who need IDs, transportation, and absentee ballots along with ways to help voters ensure that their absentee ballots are counted.

69.    Further, the ULGA will have to determine how it can offer comfort to voters standing in the long lines (possibly in inclement or hot weather) without violating SB 202.  SB 202 will undoubtedly create long lines in urban enclaves or rural areas with limited polling places, which can discourage voter participation.

70.    In fact, SB 202 recreates many of the very impediments that elections officials successfully dismantled to make the 2020 fall elections and 2021 runoffs so well executed.

71.    Defendant BRAD RAFFENSPERGER is the Secretary of State of the State of Georgia and a non-voting *ex officio* member of the State Election Board. Pursuant to O.C.G.A. § 21-2-50, Secretary Raffensperger has broad authority as the state's chief election official in the administration and implementation of Georgia's election laws and regulations. These duties include, but are not limited to, training county registrars and superintendents; receiving, computing and certifying election returns; providing information to citizens regarding voter registration and voting; maintaining the state's active and inactive voter registration lists; certifying candidates as required by law; preparing and publishing all notices and advertisements as required by Georgia law regarding the conducting of elections; providing blank election forms to superintendents as other supplies; creating and programming ballots; and other duties as required by law. Secretary Raffensperger is also responsible for coordinating Georgia's compliance with the National Voter Registration Act of 1993 (52 U.S.C. § 20507, *et seq*).  SB 202 specifically tasks the Secretary of State with numerous responsibilities, including responsibility for making available Georgia's absentee ballot application form, which requires the voter to provide their date of birth, a Georgia driver's license or identification card (or copies of other specified documents).  Secretary Raffensperger is sued in his official capacity.

27

72.     Defendants REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, AND ANH LE are voting members of the State Election Board and are named herein in their official capacities.

73.     The duties of members of the State Election Board include: promulgating rules and regulations to "obtain uniformity" in the practices and proceedings of elections officials, "as well as the legality and purity in all . . . elections"; "formulating, adopting, an orderly conduct of primaries and elections"; promulgating rules and regulations to "define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote"; and investigating frauds and irregularities in elections.  *See* O.C.G.A. § 21-2-31. SB 202 specifically tasks the State Election Board with numerous responsibilities, including enforcing compliance with the new voter challenge provisions.  SB 202, §§ 15 & 16.

74.     Defendant ALEX WAN is the Chairman of the FULTON County Registration and Elections Board and is named herein in his official capacity. Defendants MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH NURIDDIN, and AARON JOHNSON are members of the FULTON County Registration and Elections Board and are named herein in their official capacities.

28

75.    The FULTON County Registration and Elections Board is responsible for administering elections in Fulton County.  *See, e.g.*, O.C.G.A § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee-balloting procedures); *id*. § 21-2-70 (describing the powers and duties of superintendents); *id*. § 21-2-381 (describing duties in relation to absentee ballot applications); *id*. § 21-2-384 (describing duties in relation to preparing and delivering absentee mail-in ballots). SB 202 specifically tasks county election officials with numerous responsibilities, including enforcing the new identification requirements for voting by absentee ballot, issuing absentee ballots during the compressed distribution periods, and holding hearings on voter registration challenges.  SB 202 §§ 15, 16, 25.

76.    Defendant ALICE O'LENICK is the Chairman of the GWINNETT County Board of Registrations and Elections and is named herein in her official capacity.  Defendants WANDY TAYLOR, STEPHEN W. DAY, and GEORGE AWUKU are Members of the GWINNETT COUNTY Board of Registrations and Elections and is named herein in their official capacities.

77.    The GWINNETT County Board of Registrations and Elections is responsible for administering elections in Gwinnett County.  *See, e.g.*, O.C.G.A

§ 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee-balloting procedures); *id*. § 21-2-70 (describing the powers and duties of superintendents); *id*. § 21-2-381 (describing duties in relation to absentee ballot applications); *id*. § 21-2-384 (describing duties in relation to preparing and delivering absentee mail-in ballots).  SB 202 specifically tasks county election officials with numerous responsibilities, including enforcing the new identification requirements for voting by absentee ballot, issuing absentee ballots during the compressed distribution periods, and holding hearings on voter registration challenges.  SB 202 §§ 15, 16, 25.

78.    Defendant PHIL DANIELL is the Chairman of the COBB County Board of Elections and Registration and is named herein in his official capacity. Defendants FRED AIKEN, PAT GARTLAND, JESSICA M. BROOKS, and DARRYL O. WILSON, JR. are Members of the COBB County Board of Elections and Registration and are named herein in their official capacities.

79.    The COBB County Board of Registrations and Elections is responsible for administering elections in Cobb County.  *See, e.g.*, O.C.G.A § 21-2-40(b) (designating boards of elections and registration with powers and duties of

election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee-balloting procedures); *id*. § 21-2-70 (describing the powers and duties of superintendents); *id*. § 21-2-381 (describing duties in relation to absentee ballot applications); *id*. § 21-2-384 (describing duties in relation to preparing and delivering absentee mail-in ballots).  SB 202 specifically tasks county election officials with numerous responsibilities, including enforcing the new identification requirements for voting by absentee ballot, issuing absentee ballots during the compressed distribution periods, and holding hearings on voter registration challenges.  SB 202 §§ 15, 16, 25.

## STATEMENT OF FACTS

### Georgia's History of Racial Discrimination in Voting

80.   Georgia has a long history of racially discriminatory voting practices. As one federal judge has found:

> The history of the states [sic] of segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof.  Generally, Georgia has a history chocked full of racial discrimination at all levels.  This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.

*Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994).  *See also, e.g.*, *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs*, 950 F.Supp.2d 1294, 1314-16 (N.D. Ga. 2013); *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) (noting that "we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases").

81.    As a result of this extensive and well-documented history of discrimination against racial minorities, Georgia was a "covered jurisdiction" under Section 5 of the Voting Rights Act, which required Georgia to get approval by the federal government for any changes to its election practices or procedures. This approval process allowed the federal government to review the proposed change to determine that it "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  52 U.S.C. § 10304.

82.    During the time that Section 5 of the Voting Rights Act applied, the federal government was required to intervene in Georgia's racially discriminatory voting practices 187 times.  And, as the U.S. Commission on Civil Rights, a bipartisan, independent agency found, among the states subject to preclearance under the Voting Rights Act, Georgia was the only state that had implemented

32

voting restrictions in *every category* the Commission examined:  strict requirements for voter identification; documentary proof of U.S. citizenship; purges of voters from voter registration rolls; cuts to early voting; and a raft of closed or relocated polling locations.

83.    After the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), invalidated the coverage provision that subjected Georgia to the preclearance requirement of the Voting Rights Act, Georgia immediately began to impose restrictions on voting rights designed to suppress Black votes and votes by other people of color.  Some examples of the many such restrictions are as follows.

84.    ***Exact Match Registration Requirements:***  Starting shortly before the 2008 election, the Georgia Secretary of State's office began implementing a policy where information on voter registration forms was compared to records on file with the Georgia Department of Drivers Services or Social Security Administration.  If the information did not match exactly—*e.g.*, if even a hyphen or apostrophe were different or an extra space was added—the registration was not accepted and the burden passed to the applicant to cure the "problem."  The U.S. Department of Justice objected to this "exact match" protocol, concluding that the "flawed system frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly,

33

erroneous burdens on the right to register to vote."  In 2010, despite repeated

warnings that the protocol would disproportionately burden eligible minority

applicants, the Georgia Secretary of State's office implemented a revised version

of the "exact match" system.  This revised system was codified into law by H.B.

268 and remained in effect until civil rights and other groups brought extensive

litigation that largely ended the practice in 2019.

85.   ***Photo Identification Requirements and Barriers:***  In 2005, Georgia

adopted a strict photo identification requirement for voting.  The 2005 photo ID

law required individuals lacking photo ID to pay $20 for a photo ID card or to sign

an affidavit declaring indigency.  Only after a federal court enjoined its original

photo ID bill did the Georgia Legislature revise its photo ID law in 2006 to allow

for more equal access to the necessary photo ID.

86.   While Georgia state law now allows for a "free" state-issued ID for

those who do not have one, driver's license offices in Georgia's Black Belt—21

contiguous and predominantly Black rural counties—are open two days per week

or fewer.  Additionally, studies show that the actual cost for "free IDs" typically

ranges from $75 to $175 after factoring in documentation, travel and waiting time.

87.   ***Voter Purges:***  Georgia aggressively purges registered voters from the

voter rolls at a rate much higher than most other states.  For example, Georgia

purged approximately 1.5 *million* voters between the 2012 and 2016 elections alone.  And in 2019 alone, more than 313 voters were removed on the grounds that they had moved—despite a subsequent analysis that showed that over 60% of the purged voters had not moved, and that the purges predominately impacted non-white voters in the Atlanta metropolitan region.  Voters are frequently removed merely because they did not manage to vote in prior elections, and these purges disproportionately affect Black voters and voters of color.

88.   ***Criminal Investigations:***  Georgia has launched numerous criminal investigations against voting organizers, focusing on those who register Black voters and other voters of color.  For example, in 2010, the Georgia Secretary of State's office aggressively pursued an investigation of a dozen Black voting organizers in Brooks County that led to a criminal prosecution.  The investigation followed the election of the county's first ever majority-Black school board, which was catalyzed by GOTV activists.  None of the organizers was convicted even though they were initially charged with more than 100 election law violations carrying penalties of more than 1,000 combined years in prison.  The Georgia Attorney General subsequently issued an opinion saying that the organizers' alleged crime—mailing absentee ballots by a third party—was permissible under state law (although SB 202 now tries to criminalize similar actions).

89.   ***Closures and Relocations of Polling Places, and Long Lines to Vote:***
Counties throughout Georgia have aggressively closed and relocated polling
locations despite an overall increase in registered voters.  One study found that
10% of Georgia's polling locations have closed since 2013.  Such closures and
relocations have disproportionately occurred in communities of color.

90.   As a result in part of these closures, Black voters and other voters of
color have been forced to wait in increasingly long lines in order to vote.  *See, e.g.*,
Stephen Fowler, *Why Do Nonwhite Georgia Voters Have To Wait In Line For
Hours? Too Few Polling Places*, Georgia Public Broadcasting, Oct. 17, 2020,
*accessible at* https://www.npr.org/2020/10/17/924527679/why-do-nonwhite-
georgia-voters-have-to-wait-in-line-for-hours-too-few-polling-pl.  According to
one study, Black voters are likely to wait 45% longer in line to vote than white
voters, with Black Georgians waiting an average of nearly one hour to vote while
white voters wait only six minutes.  In 2020, Black voters in Fulton County waited
over five hours to vote in primary elections, and some Fulton County voters waited
more than ten hours to cast a ballot during early voting for the general election.
Numerous studies have consistently shown that long lines deter people from
voting.

36

91.    SB 202 is the most recent incarnation of this long history of discriminatory voting practices in Georgia.

**Racial and Ethnic Demographics of Voting in Georgia**

92.    The Secretary of State of Georgia maintains detailed records as to the racial demographics of voting.  As a result, the Georgia legislature and its elected officials are well aware of the implications of making decisions as to voting on racial and ethnic minorities.

93.    In every presidential election since 2004, the share of registered voters who are white has decreased in Georgia:  from 68% in 2004, to 63% in 2008, to 59% in 2012, to 56% in 2016, to 53% in 2020.  During that same period, the cumulative share of registered Black, Latinx and Asian American/Pacific Islander ("AAPI") voters and voters who are members of indigenous tribes has increased.

94.    The percentage of the vote that the Republican Presidential candidate has received in Georgia has decreased in every election since 2004 with the exception of 2012.

95.    The 2018 statewide election in Georgia demonstrated how fragile the Republican Party's hold on the state was.  While Republican candidates won the races for Governor, Lieutenant Governor, Secretary of State, and Attorney

General, all of the winners received less than 52% of the vote and the Secretary of State election went to a run-off.

96.   In 2020, a Democratic candidate won the presidential election for the first time in Georgia since 1992, and two senatorial races were sent to run-offs, with both Democratic candidates winning in January 2021.  This was the first time a Democrat had won a United States Senate race in Georgia since 1996.

97.   Between 2016 and 2020, the share of registered voters who are white decreased from 56% to 53% and the percentage of voters who turned out who were white decreased from 61% to 58%.  These percentages stayed the same for the January 2021 run-off elections.  These 3 percentage point drops were determinative in who won the 2020 and 2021 elections.

98.   Election analysis demonstrates that Black voters and other voters of color usually provide strong support to Democratic candidates.  Members of the Georgia General Assembly are aware of this fact.

99.   As seen in the following graphs, even before the pandemic, Black, Latinx, AAPI and American Indian Alaska Native voters (referred to as "AIAN") in Georgia had made increasing use of voting by mail and early voting.  This trend increased significantly during the 2020 and 2021 elections because of the pandemic.











100.  Between the 2016 and 2018 general elections in Georgia, the
percentage of Black, Latinx, AAPI and indigenous tribe voters choosing to vote by
mail increased, while the percentage of White voters choosing to vote by mail
decreased somewhat.  White, Black, Latinx, AAPI, and indigenous voters all chose
to vote by mail at larger percentages during the 2020 and 2021 elections because of
the pandemic, with a greater percentage of Black and Asian voters choosing to
vote by mail than White voters.

101.  Mail ballots of voters of color are substantially more likely to be rejected than mail ballots by white voters.  According to one study, in Georgia's June 2020 primary, 0.9% of mail ballots cast by white voters were rejected, but mail ballots cast by Black, Latinx, and AAPI voters were rejected at a rate of 1.6%, 1.9%, and 2.4%, respectively.

102.  The significant use of early voting opportunities by persons of color in Georgia, and particularly Black voters, is due in substantial part to in-person early voting on Sunday where, because of "Souls to the Polls" programs, Black voters, who in the 2020 general election comprised approximately 30% of all registered voters in Georgia, accounted for 36.5% of early in-person Sunday voters, compared to 26.8% of early in-person voters on other days.  In comparison, 60% of voters who voted early on days other than Sunday were white; but whites comprised only 47% of in-person early voters on Sundays, despite comprising 53% of Georgia's registered voters.

103.  Black residents of Georgia are 88% more likely than white Georgians to be below the poverty level and 58% more likely than white Georgians to lack computer access in their homes, and, upon information and belief, as a result are less likely to possess the IDs required by SB 202, and more likely to encounter

technology access issues that would render the printing and copying requirements of SB 202 more burdensome on them.

104.  Latinx residents of Georgia are 91% more likely than white Georgia residents to be below the poverty level and 74% more likely than white Georgians to lack computer access in their homes, and, upon information and belief, as a result are less likely to possess the IDs required by SB 202, and more likely to encounter technology access issues that would make the printing and copying requirements of SB 202 more burdensome.

105.  Native Hawaiian Pacific Islanders are 100% more likely than white Georgians to lack computer access in their homes.

106.  Upon information and belief, Black and Latinx voters and other persons of color in Georgia are more likely than white voters in Georgia to hold jobs that do not give them the flexibility to take off from work during the time that early voting and drop boxes are available under the new restrictions of SB 202.

107.  Black and Latinx households in Georgia are substantially less likely than white households to own a vehicle, and Black and Latinx residents are more likely to have to use public transportation than white residents.  Upon information and belief, this means that Black and Latinx Georgia voters rely more heavily than white voters on easily accessible polling places.

108.  Since 2013, Georgia has experienced polling place closures, consolidations, and changing of locations of polling places, often in communities of persons of color.

109.  Persons of color are more likely than white voters to confront long lines to vote in Georgia when they vote in person.  Long lines are well-known to depress voter turnout.

110.  Voting in Georgia is highly racially polarized, with Black voters and other voters of color voting for Democratic candidates at far greater rates than white voters.

### The 2020 and 2021 Elections

111.  In 2020, Georgians voted for President, two U.S. Senators, and numerous other federal and state positions.  After none of the U.S. Senate candidates received the more than 50% vote necessary to avoid a runoff, Senate runoff elections were held in January 2021.

112.  The 2020 and 2021 elections saw record turnout among Georgia voters, as well as unprecedented enthusiasm for absentee, early, and drop box voting.

113.  To the apparent horror of politicians who had long sought to suppress Black and minority voters, this surge in voting was most pronounced in these exact

46

communities.  For example, there was a 25% increase in Black voter registration compared to 2016, and Black voters—who historically turned out for runoff elections at much lower rates than general elections—returned to vote in the runoff elections at a higher rate than white voters.

114.  Many of these Black and other minority votes came in the form of absentee and early voting.  In fact, nearly 30% of Black voters cast their ballot by mail, with Black voters accounting for almost 32% of absentee ballot requests.  In contrast, only roughly 24% of white voters voted through the mail.  Although white voters still made up a majority of mail voters in the 2020 general election, their share of the vote-by-mail electorate dropped from 67% in 2016 to 54% in 2020; the Black share, meanwhile, surged from 23% to 31%.

115.  Ultimately, the 2020 and 2021 elections resulted in, among other things, the election of the President preferred by Black Georgians, as well as the election of the first Black person to represent Georgia in the United States Senate, Reverend Raphael Warnock.

116.  Following these results there was a widespread effort to attack the integrity of Georgia's elections, including by repeated, baseless allegations of fraud and falsely casting doubts as to the integrity of mail-in votes and those that were received in drop boxes.  Many of these groundless allegations came from

former President Trump and his supporters, in an effort to overturn the results of the election.  However, while numerous plaintiffs brought litigation echoing these allegations, the results of this litigation consistently demonstrated that mail-in and drop box voting were safe and secure.  In fact, Secretary Raffensperger's office conducted a thorough investigation and audit into these claims of wrongdoing, ultimately finding no evidence to support the allegations.  As Secretary Raffensperger explained to the U.S. Congress, "there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia," and his office did not "see[] anything out of the ordinary scope of regular post-election issues."

### The Legislative History of SB 202

117.  In response to the record participation in the 2020 and 2021 elections—and, in particular, the record participation of Black voters and other voters of color—Republican legislators introduced a wave of proposed legislation in 2021, including SB 202.  This proposed legislation was grounded in baseless and often racially tinged claims of voter fraud and election irregularities.  Eleven such bills were proposed in Georgia itself.

118.  The procedure leading up to the passage of SB 202 was rushed and irregular.  Bills covering the same subjects, but with slightly conflicting provisions

were introduced in both houses of the Georgia legislature, sometimes in the same house.  Committee hearings were scheduled on the bills, but without posted agendas, and without ample notice to the public or opportunity for the public to view the proceedings without attending them in person.

119.  Throughout the hearings held on these bills, the legislators were repeatedly warned by community members and organizations that these bills, including SB 202 and predecessor bills with similar provisions, would adversely and disproportionately impact populations of persons of color.

120.  For example, at a February 19, 2021 hearing on a related bill that contained many of the same provisions that ultimately were incorporated into SB 202, representatives of the Georgia Coalition for the People's Agenda noted that "prohibiting of early voting on Sundays, and therefore the elimination of the Souls to Polls, feels like a direct attack on certain communities."

121.  At this same hearing, representatives from the Southern Poverty Law Center Action Fund warned legislators that these bills represented calculated attempts to adversely impact minority groups, and that provisions such as the photo ID requirement for absentee ballots would disproportionately impact racial minorities.

122.   There was a brief hearing on SB 202 during the first week of March, 2021 before the Senate Ethics Committee.  At this time, SB 202 was a scant two-pages long, and limited to the issue of distribution of absentee ballot applications. At that hearing, representatives of community groups alerted the Committee to the potential negative impact on such community groups of the civil penalties for distributing absentee ballot applications to certain voters.

123.   On March 17, 2021, at a hearing of the House Special Committee on Election Integrity, SB 202 was discussed, despite no agenda for the hearing being provided to the public until two hours before the hearing.

124.   At this March 17, 2021 hearing, community organizations and civil rights organizations, including from the Georgia Coalition for the People's Agenda, expressed multiple concerns to lawmakers about SB 202, including the lack of transparency and irregular process, as well as concerns about the bill taking local authority away from county election officials.

125.   On March 18, 2021—the very next day—SB 202 was amended, with a new substitute replacing it.  Representative Barry Fleming, Chair of the House Special Committee on Election Integrity, conducted a hearing of the House Special Committee on Election Integrity, despite not having a substitute bill ready to distribute, and instead described the changes to the bill without releasing new

50

language to the public.  Despite the fact that there were changes from the prior day,

Chairman Fleming also prohibited comment from organizations that had provided

comments on March 17, 2021.

126.  On March 19, 2021, two further substitutions to the bill were made

and released to the public.

127.  On March 22, 2021, an hour before a scheduled hearing of the House

Special Committee on Election Integrity on that same day, House leadership

shared the new 90-plus page version of SB 202 with Democratic members of the

Committee.  Chairman Fleming refused to take additional comment on the bill,

despite the substantial changes and the two additional March 19 substitutions.

128.  To recap the amendments:  when SB 202 was first passed over from

the Senate to the House on March 9, 2021, it was a 2-page bill that dealt only with

restrictions concerning individuals and third-party groups sending absentee ballot

applications to prospective voters.  In a matter of two weeks, the bill had grown to

over 90 pages covering a host of additional topics.

129.  During the debates on the House and Senate floors on SB 202, Black

legislators alerted their colleagues to the discriminatory impact SB 202 would have

on Black voters and other voters of color.

130.  The bill was put up for a full vote on March 25, 2021.

131.   Despite the requirements of Georgia law that bills having either a significant impact on expenditures of a state agency or at least a $5 million cost to local agencies must have a fiscal note attached, SB 202 contains no fiscal note. The failure to attach a fiscal note to the bill was raised on the Senate floor, but was summarily rejected by the President of the Senate.

132.   Throughout the debate on SB 202, its supporters used the pretextual—and self-created—disproven myth of voter fraud and non-existent election irregularities in the 2020 Georgia general election to attempt to justify their actions.  For example, Chairman Fleming of the House Special Committee on Election Integrity publicly likened absentee ballots to the "shady part of town down near the docks" where the "chance of being shanghaied" is significant.

### The Challenged Provisions of SB 202

133.   The final version of SB 202 is a 98-page omnibus bill which constitutes a major overhaul of Georgia's Election Code and voting procedures. These changes are summarized below.

134.   *New Burdens on Requesting and Casting an Absentee Ballot (Sections 25, 27, and 28):*  Georgia voters have cast absentee ballots by mail for decades.  Voting by mail provides significant benefits to voters, including those who work multiple jobs, are unable to get time off or arrange child care to vote, or

52

have difficulties arranging transit to polling places.  It also can alleviate some of the barriers to voting such as those caused by long lines at the polls and confusing changes to voting locations.  SB 202 adds a new and complicated absentee ballot application process, as well as burdensome new mandatory ID requirements when requesting and casting an absentee ballot.

135.  Under these new requirements, voters must include a Georgia driver's license number or Georgia State ID number on their absentee ballot application.  If they have neither, voters are required to provide a copy of a current utility bill, bank statement, government check, paycheck or other government document that shows the name and address of the voter.  These documents, along with other required identifying information, must be attached to their absentee ballot applications.

136.  Likewise, in order to actually cast an absentee ballot, a voter must now provide additional personal ID information on the absentee ballot mailing envelope.  This information includes their Georgia driver's license number or Georgia State ID number.  If the voter does not have a Georgia driver's license or Georgia State ID, they must provide the last four digits of their social security number or a copy of a current utility bill, bank statement, government check,

paycheck or other government document that shows the name and address of the voter.

137.  SB 202 also mandates voters provide their date of birth on absentee ballot applications and absentee ballot return envelopes, even though the date of birth of a voter is not "material to determining the eligibility of an absentee voter." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018).

138.  Nevertheless, SB 202 mandates penalizing voters who fail to include this immaterial information on their absentee ballot applications or when returning their voted ballot to the county registrars, leading to the disenfranchisement of voters who fail to cure this omission.  This disenfranchisement violates 52 U.S.C. § 10101(a)(2)(B), which prohibits the practice of disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

139.  Because voters, except those over the age of 65 or disabled, must make a new application for an absentee ballot for each election in an election cycle, voters are now required to provide this ID and date of birth information multiple times each and every election cycle.

54

140.  These provisions will disproportionately affect voters from minority communities, who are less likely to possess a current and valid form of government issued photo ID and who have less access to state offices that issue such IDs.  Compounding these issues, voters from minority communities are also less likely to have access to computers and internet in order to print out proof of identification.  These increased burdens will lead to a further increase in the rate at which the ballots of Black and other voters of color are rejected.  Moreover, these requirements expose absentee ballot applicants to potential fraud or identity theft.

141.  ***Prohibitions on the Proactive Mailing of Ballot Applications (Section 25):***  As discussed above, voters must file complicated and burdensome applications for every single election in order to receive an absentee ballot.  During the 2020 and 2021 elections, election officials in Fulton and DeKalb Counties sought to lessen some of these burdens by mailing absentee ballot applications to all eligible voters within county lines.  This proactive mailing of absentee ballot applications allowed voters, and particularly Black voters and other voters of color, better access to the voting process.  Likewise, private individuals and groups, such as the Plaintiffs, also assisted voters in obtaining absentee ballot applications.

142.  Now, SB 202 further compounds the burden on voting by prohibiting public employees and agencies from sending unsolicited absentee ballot

applications to voters.  Instead, voters must now specifically request an absentee

ballot application through the website of the Secretary of State, election

superintendent, or registrar.

143.  To further compound the issue, SB 202 also threatens private

individuals and non-public entities, such as the Plaintiffs, with a substantial risk of

incurring hefty criminal sanctions if they attempt to help voters request absentee

ballots.  If a person or entity sends an absentee ballot application to someone who

has already requested an absentee ballot or voted absentee, they can be fined—

despite the fact that many voters reported not receiving their absentee ballots after

making an initial request for one in the 2020 election cycle.

144.  SB 202 also creates additional, unreasonable burdens on organizations

and individuals who provide assistance to voters who wish to vote by absentee

ballots, including by: (1) prohibiting them from pre-filling the voter's information

on an absentee ballot application, even if the voter provides that information to the

person or organization sending the application; (2) prohibiting them from viewing

or handling completed absentee ballot applications, including by assisting a voter

to print, copy or fax a completed application in order to send the completed

application form to election officials; and (3) requiring individuals or organizations

to use the official absentee ballot application produced by the Secretary of State's

office when sending the application to voters, but compelling them to include a confusing disclosure on the form stating that the form was not sent by a government entity.

145.  These burdensome and baseless restrictions will disproportionately impact Black voters and other voters of color.  These voters are more likely to seek to vote by mail—and are more likely to face disparate burdens if they are forced to vote in person—but face heightened challenges accessing computers, the internet, and other resources that will now be necessary to successfully request, complete, and return absentee ballot applications.

146.  ***Delaying and Compressing Time Periods (Sections 27 and 28):***  SB 202 also delays and compresses multiple time periods related to voting that will disproportionately impact Black voters and other voters of color.

147.  *First*, while a voter could previously request an absentee ballot 180 days prior to the election in question, SB 202 limits the earliest that a voter can now request an absentee ballot to 79 days prior to the election.  Likewise, while the board of registrars was previously required to mail absentee ballots to eligible applicants between 45 to 49 days prior to many elections, SB 202 delays the issuance of absentee ballots to 25 to 29 days prior to a qualifying election.  And voters now must submit this absentee ballot request no later than 11 days prior to

the date of the election (instead of the previous deadline of the Friday immediately prior to an election).

148. *Second*, SB 202 shortens the runoff period to four weeks following the election that led to the runoff for stateside voters. This change significantly limits the ability of Georgians to register to vote or update their voter registration information before a runoff election and also significantly limits access to in-person early voting for runoff elections. For example, voters may only have a three-day early voting period if a runoff occurs during Thanksgiving week following a November general election. The ability to apply for and cast an absentee mail-in ballot during this reduced time period will also be challenging, if not impossible, for some voters—particularly lower income or hourly wage Black voters and other voters of color who are less able to take time off during their workday.

149. *Third*, SB 202 gives unlimited discretion to election boards to limit early voting hours to 9 a.m. to 5 p.m., and to two Saturdays before the election. And even if election boards want to expand those hours, they are prohibited from opening early voting before 7 a.m. or after 7 p.m., or for more than two Sundays. County boards of election are given unfettered discretion with no guidelines in determining whether to eliminate all Sunday early voting days.

150.  The compressed periods for requesting and submitting an absentee ballot will leave voters who become ill or have to travel out of the area in the lurch if they cannot vote during early voting and are unable to meet the earlier deadline to apply for a ballot.  It will disproportionately affect Georgian Black voters, who vote absentee at a higher rate than white voters, face longer lines and higher burdens if they are forced to vote in person, and have increased difficulty obtaining the necessary documentation and overcoming the other barriers to apply for an absentee ballot.  And, as Black and other minority voters' mail-in ballots are rejected at significantly higher rates than those of white voters, this shortened period to cure ballot issues will likewise disproportionately impact Black and other minority voters.

151.  The limitations on early voting hours similarly disproportionately affect Black and other minority voters.  These voters are more likely to have inflexible work, school, child care, or similar obligations that prevent them from voting between 9 a.m. and 5 p.m.  Likewise, Georgia Secretary of State statistics demonstrate that Black voters and other voters of color utilize Sunday early voting hours significantly more than white voters.  Black voters and other voters of color take part in GOTV efforts focused on Sunday early voting, including "Souls to the Polls" events hosted by Black churches and other faith-based organizations that

provide rides to the polls following church services or as part of their church fellowship activities.  As a result, the elimination or reduction of Sunday early voting under SB 202 discriminates against Black voters and other voters of color who utilize Sunday early voting hours at higher rates than white voters.  In contrast, while SB 202 adds a second required Saturday of early voting, most of the large, metropolitan counties that contain significant Black and other minority voters already offered multiple weekend days of early voting.  The counties that did not, and that therefore will increase voting access, are largely rural, predominately white counties.

152.  The provisions of SB 202 imposing new burdens on voting by absentee ballots and limiting access to early voting also will result in longer lines and delays at the polls on election day, particularly for Black voters and voters of color in Georgia who are more often than white voters impacted by lines and delays when voting on election day.

153.  ***Drop Box Limitations (Section 26):***  During the 2020 election, there were 330 drop boxes in Georgia—including 94 across the core Atlanta counties of Fulton, Cobb, DeKalb, and Gwinnett—where voters could securely vote.  These drop boxes were heavily used by Black and other minority voters; for example,

counties containing large Black populations averaged significantly more drop boxes than those with majority-white populations.

154.  Many of these drop boxes were outside of buildings, and county election administrators had discretion to keep drop boxes open after business hours and up until the polls closed.  These drop boxes were monitored via video surveillance to ensure that they were secure and safe.  The accessibility of these drop boxes provided meaningful voting access to voters who otherwise would have been deterred by long lines (which are particularly prevalent in majority Black and Brown precincts), prevented from accessing polling places while open due to work or other restrictions, or subject to other impediments.  As a result, in part, of the availability of these drop boxes, the rate of absentee ballots rejected for lateness decreased significantly.  The drop boxes were safe and effective, and there is no evidence that they were susceptible to voter fraud.

155.  SB 202 significantly limits the availability and accessibility of absentee ballot drop boxes in several ways.  Each of these new restrictions on the availability of drop boxes will disproportionately impact Black voters and other voters of color, as well as senior and physically disabled voters, who used absentee ballot drop boxes in large numbers to avoid having to wait in long lines and face unreasonable delays during in-person early voting and election day voting.

61

156.  *First*, while all counties would be required to have at least one drop box, the number of drop boxes per county would be limited to the lesser of one per every 100,000 "active registered voters" or one per advance voting location in the county.  This restriction will disproportionately and discriminatorily impact Black voters and other voters of color.  For example, the four core Atlanta counties, which contain a large percentage of the total Black population in Georgia, will go from 94 drop boxes in 2020 to no more than roughly 23 drop boxes in future elections.

157.  *Second*, SB 202 limits the placement of drop boxes to the interior of early voting locations and prohibits access to drop boxes outside of the hours that early voting is taking place.  SB 202 likewise limits the hours during which early voting can take place (and thus drop boxes can be open).  These limitations effectively render drop boxes useless to anyone other than voters who could already participate in early voting and eliminate virtually all benefits of drop boxes *vis a vis* normal early voting.  As Black voters are more likely to work multiple jobs or jobs with inflexible hours, they gained the most benefit from the previous flexibility of drop box hours and locations, and therefore will be disproportionately burdened by these restrictions.

158.  *Third*, SB 202 requires that drop boxes be under constant surveillance by an election official, licensed security guard, or law enforcement official.  This requirement presents serious concerns regarding voter intimidation for voters of color, who are frequently and unfairly the targets of law enforcement.

159.  ***Disenfranchisement of Out-of-Precinct Voters (Sections 34 & 35):*** Over the last decade, Georgia shuttered hundreds of voting precincts, many in predominantly Black or other minority neighborhoods.  These closures, as well as numerous other changes to voting locales, have confused voters and caused many to attempt to vote at the wrong precinct.  Prior to the enactment of SB 202, a voter who attempted to vote at the incorrect precinct within the same county where they were registered to vote could cast a provisional ballot, which would be counted for every race on that ballot in which the voter was qualified to vote.  SB 202 essentially disenfranchises these voters.

160.  Under SB 202, only voters who arrive to vote after 5 p.m. and sign an affidavit under penalty of perjury that they cannot get to their home precinct before the close of the polls will be able to cast a provisional ballot which will count with respect to the same contests on the voter's home precinct ballot.  All other voters who arrive at the incorrect precinct before 5 p.m. can cast a provisional ballot at the incorrect precinct, but none of their votes will count.  In order for their votes to

count, they will be required to vote at their home precinct, even if they cannot get to their home precinct by the time polls close.  The Board of Elections is tasked with reviewing the sworn statements submitted by the voters who cast provisional out-of-precinct ballots after 5 p.m., but it is unclear what the purpose of that review would be.

161.  Upon information and belief, the out-of-precinct voting prohibitions of SB 202 are more likely to disproportionately and negatively impact Black voters and other voters of color who are more frequently impacted by polling place closures and consolidations in majority-minority precincts than white voters in majority-white precincts, which often leads to voters being confused about the location of their correct precinct on election day.

162.  ***Punishments for Officials Who Defend Voters' Rights (Sections 5, 6, and 7):***  Apparently in retaliation for Secretary Raffensperger's defense of the integrity of the Georgia election system, SB 202 removes election-related powers from the Secretary of State.  The Secretary of State will no longer serve as the Chair or have a vote as a member of the State Election Board.

163.  Another provision of SB 202 allows the State Election Board and members of the General Assembly to take over county election offices.  Similarly, the county commissioner or members of the General Assembly could take action to

commence a performance review of election supervisors that could lead to their suspension.  Up to four election supervisors could be suspended at one time.  It is foreseeable that the takeover provision of SB 202 will disproportionately and negatively impact Black voters and other voters of color residing in counties with large percentages of minority voters, such as Fulton, DeKalb, Gwinnett, Clayton, Chatham, and others where the Republican members of the legislature fear the erosion of the tenuous hold on their majority party status and may use this procedure to challenge and reject legitimate ballots and disqualify eligible voters.

164.  ***Unlimited Challenges to Voters (Sections 15 and 16):***  SB 202 also encourages large-scale voter challenges and purges—including on the eve of elections when county registrars are otherwise focused on administering early voting and preparing for election day—by allowing for unlimited numbers of challenges to be made to the eligibility of voters by other registered electors in a county and mandating that county registrars conduct hearings on such challenges within ten days of receipt and allowing for the immediate removal of voters from the statewide voter registration list.

165.  SB 202 also provides that challenged voters be given only three days' written notice by mail of the hearings on the challenges, thereby making it difficult, if not impossible, for lower income and hourly wage Black voters, other

voters of color, senior voters, physically disabled voters and other voters who have other obligations during the hearing days and times to attend these hastily arranged hearings.  The minimal notice provisions authorized by SB 202, combined with the burden presented of unlimited challenges, also makes it unlikely that voters will actually receive the written notice prior to the hearing or be able to prepare adequately to rebut unfounded challenges and increases the likelihood that eligible voters will be disenfranchised on the eve of elections.

166.  ***Criminalization of Line Warming (Section 33):***  SB 202 also criminalizes "line warming," the expression of well-meaning individuals and organizations to support and encourage the act of voting in a non-partisan way by handing out water or snacks to ease the burden on voters standing in line for protracted periods to vote.  SB 202 bars such assistance within 25 feet of any voter standing in line to vote at any polling place, thereby restricting line warming expression for hundreds of feet outside of the entrances to polling places.

167.  These line warming restrictions will disproportionately affect Black and Brown voters, who are more likely to experience long lines and delays at the polls.  These provisions also subject individuals and organizations to criminal sanctions for engaging in the Constitutionally protected expressive conduct of distributing food and beverages to voters in line.

66

168.  ***Ban on Mobile Voting Facilities (Sections 20 & 26):***  Prior to SB 202, Georgia county election administrators were permitted to provide "mobile voting units," or movable or portable polling facilities used as supplemental polling locations both during early voting and on election day.  In 2020, two such mobile voting units were used in Fulton County, which is more than 44% Black and which has a history of long lines to vote and difficulties in obtaining an absentee ballot.  These two mobile voting units allowed more than 11,200 people to vote.  There is no evidence that the mobile voting units used in the 2020 election posed election security risks or created any additional administrative issues.

169.  SB 202 effectively bars such mobile voting units.  This prohibition was unmistakably intended to target the large Black population of Fulton County, and its enforcement will disproportionately harm Black and Brown voters.

## CLAIMS FOR RELIEF

## COUNT I

**42 U.S.C. § 1983 and 52 U.S.C. § 10301**
**(Discriminatory Purpose in Violation of the**
**Fourteenth and Fifteenth Amendments to the United States Constitution and**
**Section 2 of the Voting Rights Act, Against all Defendants)**

170.  Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

171. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

172. Both the Fourteenth and Fifteenth Amendments to the United States Constitution prohibit intentional racial discrimination by state actors.

173. Specifically, Section 1 of the Fourteenth Amendment provides that:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

174. Section 1 of the Fifteenth Amendment provides that:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

175. Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, in relevant part, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].

68

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

176. A violation of Section 2 of the Voting Rights Act may be based either on a finding of a discriminatory purpose behind the challenged governmental action or a finding of a discriminatory result from the challenged governmental action.

177. SB 202 was enacted with a racially discriminatory purpose in violation of Section 2 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments.

178. Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

179. The burdens of SB 202 are intended to, and will have, the effect of disproportionately and adversely affecting the right to vote of Black voters and other voters of color, including, but not limited to:

1)   Imposing onerous and unnecessary ID requirements on voters who submit applications for absentee ballots and when they return voted absentee ballots;

2)   Prohibiting public employees and public entities from sending out unsolicited absentee ballot applications to voters;

3)   Threatening private individuals and non-public entities with potentially large fines for sending absentee ballot applications with voter information filled in, without confusing and misleading statements, or to voters who are not currently registered to vote or who have already requested a ballot, received a ballot or voted a ballot;

4)   Delaying and compressing the time during which a voter can request or submit an absentee ballot;

5)   Giving county registrars unfettered discretion to limit early voting hours to 9 a.m. to 5 p.m. and to entirely eliminate Sunday early voting;

6)   Limiting the number of absentee ballot drop boxes and limiting access to absentee ballot drop boxes to locations inside early voting sites when advance in-person voting is taking place, rendering the drop

boxes virtually useless since voters can vote early in person at these

locations;

7) Prohibiting out of precinct voting before 5 p.m. without recognizing

the confusion and negative impact experienced by Black voters and

other voters of color from hundreds of polling place changes in

Georgia since the Supreme Court's decision in *Shelby County v.*

*Holder*;

8) Removing the voting power of the Secretary of State on the State

Elections Board, coupled with granting power to the State Election

Board to take over county election boards and targeting jurisdictions

with large populations of Black voters and other voters of color;

9) Encouraging the submission of large numbers of voter challenges by

using the term, "unlimited," in referring to elector challenges in

SB 202, and requiring the setting of hearings on the challenges within

ten days of their submission, with only three days mandatory written

notice of the challenge hearings to voters—making it difficult, if not

impossible, for voters to adequately prepare for the challenge

hearings—assuming voters even receive the written notice within

three days of the mailing of the hearing notices;

10) Criminalizing "line warming," which provides relief for voters forced to wait in long lines because of the other discriminatory voting changes imposed by SB 202; and

11) Prohibiting the use of mobile voting units.

180. Race was a motivating factor behind the enactment of SB 202.

181. SB 202 was enacted at a time when Black voters and other voters of color were making increasing use of means of voting that are being limited and restricted in SB 2020.

182. SB 202 was enacted immediately following elections in which the size of the population of Black voters and other voters of color, particularly when compared to the diminishing share of the white vote, had become larger in statewide elections.

183. In passing SB 202, the Georgia legislature deviated from procedural norms in its rushing the bill to passage, in its failure to provide adequate notice and opportunity to be heard and to view committee proceedings; in its speedy replacement of a 2-page bill with a 95-page bill without sufficient notice; and in its failure to include the required fiscal statement.

184. The purported justification for SB 202 was pretextual.

72

185.  The Chair of the House Committee on Public Integrity made culturally insensitive statements in connection with the passage of SB 202.

186.  The supporters of SB 202 were on notice of the foreseeability of the disparate impact of SB 202.

187.  There are less discriminatory alternatives to every aspect of SB 202, including simply maintaining the status quo, particularly given the complete lack of evidence of significant voter fraud.

188.  Defendants will be unable to prove that, SB 202 would have been enacted without race as a motivating factor.

189.  Implementation of SB 202 will irreparably harm Plaintiffs as well as Black voters and other voters of color by denying or abridging their right to vote.

190.  WHEREFORE, Plaintiffs pray for relief as set forth hereafter.

## COUNT II

### (Violation of Section 2 of the Voting Rights Act of 1965 52 U.S.C. § 10301, *et seq*.)

191.  Plaintiffs repeat and re-allege and incorporate by reference all prior paragraphs as if fully set forth herein.

192.  Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

193.  In determining whether a challenged voting practice violates the results prong of Section 2 of the Voting Rights Act, courts examine the "totality of the circumstances" and determine whether "the political processes … are [] equally open to participation by [members of a protected class] … in that its members have less opportunity than other members of the electorate to participate in the political process." *See e.g.*, *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1228 n.26 (11th Cir. 2005); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1197-98 (11th Cir. 1999).

194.  The challenged provisions of SB 202 violate the rights of Plaintiffs because they were adopted for the purpose of denying voters of color full and equal access to the political process.

195.  The disproportionate impact of these provisions, individually and collectively, is caused by present and past discrimination on account of race and ethnicity by the state of Georgia, as shown by the totality of the circumstances, including factors deemed relevant by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 36 (1986).

196.  Georgia has a long history of official discrimination in the jurisdiction that touched the right of minorities to register, vote, or otherwise participate in the electoral process, and the history of voting discrimination against Black residents in Georgia is well documented.  Georgia's history of racial discrimination in voting

is so long and deep that courts have taken judicial notice of it. *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995); *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F.Supp. 3d 1297, 1310 (M.D. Ga. 2018), *aff'd,* 979 F.3d 1282 (11th Cir. 2020).

197.  Voters of color in Georgia bear the effects of discrimination in education, employment, and health that hinder their ability to participate effectively in the political process.

198.  The policy behind the use of the voting practices in question is tenuous and pretextual.

199.  As a result of SB 202's requirements and prohibitions described above, individually and collectively, under the totality of the circumstances, the political process in Georgia is not equally open to participation to Black voters and other voters of color in that such citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

200.  The requirements and prohibitions of SB 202 described above constitute qualifications or prerequisites to voting within the meaning of Section 2 of the Voting Rights Act, and result in the denial or abridgement of the right to vote of U.S. citizens who are residents of Georgia on account of their race or color,

or membership in a language minority group, in violation of Section 2 of the

Voting Rights Act.

201.  Implementation of SB 202 will irreparably harm Black voters and

other voters of color.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT III

### 42 U.S.C. § 1983
### (Burden On The Fundamental Right To Vote
### First And Fourteenth Amendments)

202.  Plaintiffs repeat and re-allege each and every allegation contained in

all prior paragraphs, as if fully set forth herein.

203.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right

secured by the Constitution or the laws of the United States caused by a person

acting under the color of state law.

204.  The First and Fourteenth Amendments of the United States

Constitution protect the right to vote as a fundamental right.  The First

Amendment's guarantees of freedom of speech and association protect the right to

vote and to participate in the political process.

205.  SB 202 violates the First and Fourteenth Amendments' protection of rights to vote, thus giving Plaintiffs an actionable claim for the deprivation of those rights under 42 U.S.C. § 1983.

206.  The right to vote is a fundamental constitutional right also protected by both the due process and equal protection clauses of the Fourteenth Amendment.  *See*, *e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983).

207.  "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'"  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

208.  Even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009).  The more a challenged law burdens the right to vote, the closer the scrutiny courts will apply

when examining that law. *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014).

209.  The challenged provisions of SB 202 inflict substantial burdens on Georgia's voters, both through the individual restrictions and provisions and collectively through the combined effect of all of the restrictions and barriers.

210.  The burdens caused by these provisions, individually and collectively, are serious and substantial, and in some cases cause voters to risk being completely disenfranchised.

211.  No legitimate state interest justifies these significant restrictions and burdens.

212.  The purported goals of increasing confidence in elections or encouraging uniformity are pretextual at best, and in fact would be harmed by imposing the restrictions and requirements of SB 202.

213.  These restrictions could undermine, not restore, confidence in Georgia's elections, and would do so at the expense of imposing undue burdens on voters.

214.  The requirements and prohibitions in SB 202, individually and collectively, impose a substantial burden on the fundamental right to vote of Georgia citizens, and are neither justified by, nor necessary to promote, interests

put forward by the State that were not already being adequately protected by pre-existing criminal laws and election procedures.

215. These provisions will irreparably harm Black voters and other voters of color.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT IV

### 42 U.S.C. § 1983
### (Freedom of Speech and Association
### First And Fourteenth Amendments)

216. Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

217. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

218. The First Amendment to the United States Constitution, as applied by the Fourteenth Amendment, prohibits abridgement of freedom of speech.

219. SB 202 violates Plaintiffs' First and Fourteenth Amendment rights by restricting Plaintiffs' and their members' core political speech and expressive conduct—namely, encouraging voting through the distribution of absentee ballot applications in an effort to engage the public and voters and encourage them to

vote.  Plaintiffs therefore have an actionable claim under 42 U.S.C. § 1983 for the deprivation of those rights.

220.  By penalizing innocent errors in the distribution of absentee ballot applications, SB 202 will have a chilling effect on Plaintiffs' and their members' core political speech, without being narrowly tailored to meet a compelling state interest.

221.  As a result of SB 202, Plaintiff organizations will not be able to carry out a key aspect of their organizational mission.

222.  Because the restrictions in SB 202 and the potential penalties extend to Plaintiff organizations' members, their members' right of association is also jeopardized.

WHEREFORE, Plaintiffs pray for relief as set forth herein.

## COUNT V

### 42 U.S.C. § 1983
### (Freedom of Expressive Conduct and Speech in Providing Food and Drink First And Fourteenth Amendments)

223.  Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

224.  The First Amendment to the Constitution, as applied by the Fourteenth Amendment, prohibits abridgement of freedom of speech and expression.

225.  The provision of SB 202 that criminalizes "line warming activities" will chill protected expressive conduct and speech that supports of the act of voting by exposing to criminal prosecution those who provide sustenance to voters waiting in long lines.

226.  The Plaintiffs who have supported in-person voting in past elections by providing food and/or drinks to voters who request such while waiting in long lines to vote have done so without complaint or incident.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate or political party while providing such food and/or drinks.

227.  The Plaintiffs who provide this sustenance have done so as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.

228.  SB 202 restricts Plaintiffs' and their members' core political speech and expressive conduct in "line warming activities" and the restrictions on these acts of kindness are content based restrictions on speech and expression about a

particular subject matter (expressive support for voting) in a public forum.  It is also not supported by either a compelling (or even reasonable) governmental interest and is not narrowly tailored to any legitimate or compelling governmental interests.

229.  The kindness of providing food and drink in a non-partisan way to anyone who requests sustenance while waiting in a long line to vote does not exact political pressure or intimidation on voters.  Moreover, existing state and federal laws already prohibit improper interference, political pressure or intimidation of voters engaged in in-person voting.

230.  As a result of SB 202, the Plaintiff organizations who have engaged in "line warming" activities will not be able to carry out a key aspect of their organizational mission in supporting voters who wait in long lines to vote.

231.  Plaintiffs who seek to continue "line warming" in future elections cycles are chilled by the specter of criminal prosecution under the provisions of SB 202.

232.  Because the restrictions in SB 202 and the potential penalties extend to Plaintiff organizations' members, their members' right of association is also jeopardized.

WHEREFORE, Plaintiffs pray for relief as set forth herein.

## COUNT VI

## 52 U.S.C. § 10101, 42 U.S.C. § 1983
## (Immaterial Voting Requirement)

233.  Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

234.  52 U.S.C. § 10101(a)(2)(B) prohibits the practice of disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

235.  Section 25 of SB 202 provides that "[i]n order to confirm the identity of the voter, such [absentee ballot application] shall require the elector to provide his or her . . . date of birth," among other information, and that registrars or absentee ballot clerks "shall compare the applicant's . . . date of birth . . . with the information on file in the registrar's office."

236.  Section 27 of SB 202 mandates that absentee ballot envelopes require absentee voters to provide their date of birth, and Section 29 of SB 202 provides that the registrar or clerk "shall then compare the . . . date of birth entered on the absentee ballot envelope with the same information contained in the elector's voter registration records."  Section 29 of SB 202 also provides that the registrar or clerk

83

must reject the absentee ballot envelope "if the identifying information entered on the absentee ballot envelope does not match the same information appearing in the elector's information appearing in the elector's voter registration record, or if the elector has failed to furnish required information."

237. SB 202 violates Plaintiffs' rights under 52 U.S.C. § 10101(a)(2)(B). It mandates that Georgians provide information—and requires county election officials to reject absentee ballot applications and absentee ballots based on a failure to provide exactly matching information—that is not material to determining whether individuals are qualified to vote and not a unique voter identifier in order to successfully apply for and cast an absentee ballot.

238. **WHEREFORE**, Plaintiffs pray for relief as set forth herein.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.      Declare that the challenged provisions in SB 202 violate the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act's prohibitions on discriminatory purpose;

2.      Declare that the challenged provisions in SB 202 violate the results prong of Section 2 of the Voting Rights Act;

3.      Declare that the challenged provisions of SB 202 violate the First and Fourteenth Amendments to the United States Constitution as undue burdens on the right to vote;

4.      Declare that the challenged provisions of SB 202 violate the First and Fourteenth Amendments to the United States Constitution as undue burdens on the right to free speech and freedom of association;

5.      Declare that the challenged provisions of SB 202 violate the Civil Rights Act;

6.      Enjoin Defendants, their agents, officers, employees, successors, and all persons acting in concert with them from enforcing any of the challenged provisions of SB 202;

7.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10301 and other applicable laws; and

8.      Order any other relief that this Court deems just and proper.

Dated: May 28, 2021

> _/s/ Bryan L. Sells_
> Bryan L. Sells
> Georgia Bar No. 635562
> The Law Office of Bryan Sells, LLC
> PO Box 5493
> Atlanta, Georgia 31107
> Tel: (404) 480-4212
> Email: bryan@bryansellslaw.com

Jon Greenbaum*
Ezra D. Rosenberg*
Julie M. Houk*
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under
Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes*
Neil Oxford*
Gregory Farrell*
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Admitted pro hac vice

Counsel for Plaintiffs

**CERTIFICATE OF COMPLIANCE AND OF SERVICE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing

FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY

RELIEF has been prepared in Times New Roman 14, a font and type selection

approved by the Court in L.R. 5.1(C), and that I provided notice and a copy of the

foregoing using the CM/ECF system which will automatically send e-mail

notification of such filing to all attorneys of record.

Respectfully submitted this 28th day of May, 2021.

*/s/ Bryan L. Sells*
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC.
P.O. Box 5493
Atlanta, GA 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

*Counsel for Plaintiffs*

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

          v.

THE STATE OF GEORGIA; THE
GEORGIA STATE ELECTION
BOARD; and BRAD
RAFFENSPERGER, in his official
capacity as Georgia Secretary of State,

          Defendants.

Civil Action No.

## **COMPLAINT**

The United States of America, plaintiff herein, alleges:

1. In March 2021, the Georgia legislature enacted an omnibus election

bill known as Georgia Senate Bill 202 (2021) ("SB 202").  *See* Exhibit 1.  The

legislature passed the bill against the backdrop of:

- Georgia's history of discrimination against Black Georgians,

  demographic shifts in the state leading to an increase in the number of

  Black voters and other voters of color;

- A dramatic increase in Black Georgians' use of absentee voting

- Heavily publicized Black voter mobilization efforts (including efforts to overcome long lines in precincts serving Black voters); and

- Black Georgians' unprecedented recent successes in electing candidates of choice.

2.     In particular, SB 202's provisions:

- Prohibit government entities from mailing unsolicited absentee ballot applications and impose substantial fines on third-party organizations that send follow-up absentee ballot applications;

- Require most voters who lack certain identification numbers to photocopy another form of identification each time they request an absentee ballot, reduce the period of time in which voters may apply for an absentee ballot, and restrict the use and availability of drop boxes to return that ballot;

- Prohibit distributing food and water to voters waiting in line to cast their ballots; and

- Prohibit counting out-of-precinct provisional ballots unless they are cast after 5 p.m. on Election Day.

The Georgia legislature enacted SB 202 with knowledge of the disproportionate effect that these provisions (collectively, the "challenged provisions), both singly

and together, would have on Black voters' ability to participate in the political process on an equal basis with white voters.

3.      The Attorney General files this action pursuant to Sections 2 and 12(d) of the Voting Rights Act, 52 U.S.C. §§ 10301 & 10308(d), to enforce the voting rights guaranteed by the Fourteenth and Fifteenth Amendments to the United States Constitution.

4.      In this action, the Attorney General challenges portions of SB 202, which was signed into law on March 25, 2021, and makes significant changes to Georgia's election laws.

5.      In enacting SB 202, the Georgia General Assembly intended to deny or abridge the right of Black Georgians to vote on account of race or color.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201 and 52 U.S.C. § 10308(f).

7.      Venue is proper in this court under 28 U.S.C. §§ 90(a)(2) and 1391(b).

## PARTIES

8.      The Voting Rights Act authorizes the Attorney General to file a civil action on behalf of the United States of America seeking injunctive, preventive, and permanent relief for violations of Section 2 of the Act.  52 U.S.C. § 10308(d).

- 3 -

9.     Defendant Georgia is one of the states of the United States of America.

10.    Defendant Georgia State Election Board is the state agency responsible for promulgating rules and regulations relating to the election process in Georgia.

11.    Defendant Brad Raffensperger is the Georgia Secretary of State, the State's chief election officer, and since SB 202 went into effect, an ex officio non-voting member of the State Election Board.  His office oversees election activities in Georgia, including voter registration as well as the administration of state and federal elections.  He is sued in his official capacity.

## ALLEGATIONS

### Population and Voter Participation Data

12.    According to the 2010 Census, the State of Georgia had a total population of 9,687,653.  Of those individuals, 5,413,920 (55.9%) were non-Hispanic white, and 2,964,781 (30.6%) were non-Hispanic Black.

13.    According to the 2010 Census, the voting-age population of Georgia was 7,196,101, of whom 4,242,514 (59%) were non-Hispanic white, and 2,088,277 (29%) were non-Hispanic Black.

14.     According to the 2019 American Community Survey 1-Year Estimates, Georgia had 7,581,837 voting-age citizens, of whom 4,367,617 (57.6%) were non-Hispanic white, and 2,493,514 (32.9%) were Black.

15.     In the past three decades, Georgia's Black population has grown in size and in its proportion of Georgia's total population.  The number of Black residents increased 70.7 percent from 1990 to 2010 according to decennial Census counts, and Black residents' share of Georgia's total population increased from 26.8 percent of the population in 1990 to 30.6 percent in 2010.  According to 2010 and 2019 American Community Survey 1-Year Estimates, the number and proportion of Black residents continued to grow in those nine years:  Black population size increased by 13.9 percent and the Black proportion of Georgia's population increased to 31.9 percent.

16.     According to 2010 and 2019 American Community Survey 5-Year Estimates, 69 percent of the Black population growth in the past decade occurred in the Atlanta region, where nine of the ten counties with the greatest increase in Black population are located.

17.     Georgia's four most populous counties are Fulton, Cobb, DeKalb, and Gwinnett Counties.  They are located in the metro Atlanta area.  These four counties also contain the largest Black voting-age populations in Georgia.

- 5 -

18.     As of May 12, 2021, Georgia had 7,395,688 registered voters, of whom 3,896,526 (52.7%) were non-Hispanic white; 2,215,230 (30.0%) were non-Hispanic Black; 273,270 (3.7%) were Hispanic; 196,030 (2.7%) were Asian or Pacific Islander; and 18,465 (0.2%) were American Indian or Alaskan Native.

19.     According to data from the State, although the turnout rate among Black voters in Georgia has increased in recent elections, it continues to lag behind that of white voters.  For example, in the January 2021 runoff, 54.24 percent of Black registrants voted, compared to 64.11 percent of white registrants, a difference of 9.87 percentage points.  In November 2020, 59.97 percent of Black registrants voted, compared to 72.59 percent of white registrants, a difference of 12.62 percentage points.  In November 2018, 53.89 percent of Black registrants voted, compared to 62.18 percent of white registrants, a difference of 8.29 percentage points.

20.     The white share of the electorate has dropped in the past decade, from 66.3 percent in 2010 to 58.9 percent in 2018 and 58.2 percent in 2020.

21.     Black voters in Georgia have traditionally been less likely to vote by mail than white voters, but that began to change in 2018, when 6.89 percent of

Black voters, compared to 4.24 percent of white voters, cast an absentee ballot in the November election.[1]

22.     Absentee voting spiked in 2020, during the COVID-19 pandemic, particularly among Black voters.  In November 2020, 29.27 percent of Black voters cast an absentee ballot, compared to 23.88 percent of white voters.  In the January 2021 general election runoff, 27.65 percent of Black voters cast an absentee ballot, compared to 21.72 percent of white voters.

**Socio-Economic Data**

23.     Data from the American Community Survey show wide economic disparities between Black and white residents in Georgia.

24.     According to the 2019 American Community Survey 1-Year Estimates, 18.8 percent of Black residents in Georgia live in poverty, compared to 9.0 percent of non-Hispanic white residents.  Black residents in Georgia also have a lower per capita income ($24,215) than non-Hispanic white residents ($40,348).

25.     According to the 2019 American Community Survey 1-Year Estimates, the unemployment rate for Black residents in Georgia was almost twice the rate for non-Hispanic white residents (6.9% compared to 3.7%).

---

[1] Throughout this document, the terms "absentee ballot" and "absentee voting" are used to refer to absentee-by-mail voting.

26.     According to the 2019 American Community Survey 1-Year Estimates, Black residents in Georgia were less likely than non-Hispanic white residents to have a high school degree (87.9% compared to 91.2%) and less likely to have a Bachelor's degree or higher (24.8% compared to 36.5%).

27.     According to the 2019 American Community Survey 1-Year Estimates, Black residents in Georgia were more likely than non-Hispanic white residents to have moved within their county of residence in the preceding year (7.4% compared to 5.2%).

28.     According to the 2019 American Community Survey 1-Year Estimates, Black residents in Georgia were less likely than non-Hispanic white residents to have Internet access at home (80.4% with access compared to 87.4%).

29.     According to the 2015-2019 American Community Survey 5-Year Estimates, Black households in Georgia were more than three times as likely as non-Hispanic white households to lack access to a vehicle (12.9% with access compared to 3.9%).

**The State of Georgia's History of Discrimination**

30.     The history of official racial discrimination against Black citizens in Georgia with regard to voting is longstanding, well-documented, and recognized by Federal courts.  *See, e.g.*, *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548,

1560 (S.D. Ga. 1994) ("It is wholly unnecessary . . . to recount the voluminous

details of Georgia's history in this Order. . . Generally, Georgia has a history

chocked full of racial discrimination at all levels."); *Wright v. Sumter Cnty. Bd. of

Elections and Registration*, 301 F. Supp. 3d 1297, 1323-24 (M.D. Ga. 2018)

(finding that Georgia's history of discrimination impeded political participation

among Black Americans).

31.     Based on its history of racial discrimination, Georgia was subject to

the preclearance requirement of Section 5 of the Voting Rights Act when it was

enacted in 1965, by virtue of being covered under the formula set forth in Section

4(b) of the Voting Rights Act.  28 C.F.R. pt. 51 App.  Under Section 5, covered

jurisdictions were required to obtain preclearance from the United States Attorney

General or from a three-judge court of the United States District Court for the

District of Columbia prior to implementing any voting change.  52 U.S.C.

§ 10304(a).  Georgia remained subject to Section 5 until the decision of the

Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013).

32.     To obtain preclearance under Section 5, covered jurisdictions in

Georgia were required to demonstrate that voting changes "neither ha[d] the

purpose nor w[ould] have the effect of denying or abridging the right to vote on

account of race[,] color," or "member[ship] [in] a language minority group."  52

U.S.C. §§ 10304(a), 10303(f)(2).

33.    From 1968 to 2013, the Attorney General interposed objections under

Section 5 of the Voting Rights Act to at least 177 submissions in Georgia, finding

that either the State or one of the covered political subdivisions within the State

had failed to show that the proposed changes would not have the purpose or effect

of denying or abridging the right to vote on account of race or color or membership

in a language minority group.

34.    Since 1982, plaintiffs secured favorable outcomes in at least 74

lawsuits brought against governmental units in Georgia under Section 2 of the

Voting Rights Act, and that count is almost certainly underinclusive.  At least five

of these lawsuits resulted in reported judicial decisions; at least 69 were settled

favorably without a reported decision.

**Provisions of SB 202**

35.    SB 202 makes multiple significant changes to Georgia's election laws.

Among other changes, SB 202 alters existing law by (a) prohibiting governmental

entities from distributing unsolicited absentee ballot applications (SB 202 § 25);

(b) imposing onerous fines on civic organizations that distribute duplicate and

follow-up applications (§ 25); (c) requiring voters who do not have identification

issued by the Georgia Department of Driver Services to photocopy another form of identification in order to request an absentee ballot (§ 25); (d) limiting the period of time during which registrants can request absentee ballots (§ 25); (e) limiting the use of absentee ballot drop boxes (§ 26); (f) banning the distribution of food or drink to persons waiting in line to vote (§ 33); and (g) prohibiting jurisdictions from counting out-of-precinct provisional ballots if they were cast before 5 p.m. on Election Day (§ 34).

### A.   Government-Mailed Absentee Ballot Applications

36.    To encourage mail-in voting during the June 2020t primary election, the Secretary of State mailed absentee ballot applications to all of the (then) 6.9 million active registrants on the voter rolls.

37.    Absentee voting hit record levels in the June 2020 primary.

38.    The Secretary of State did not mail unsolicited absentee ballot applications prior to the November 2020 general election or the January 2021 runoff election, instead opting to create an online absentee ballot request system. Only voters with a State-issued driver's license or non-driver's license identification number could use this online system to request an absentee ballot.

39.    The Secretary's decision not to distribute unsolicited absentee ballot applications for the November 2020 and January 2021 elections followed criticism

from the Georgia House Speaker, David Ralston, who warned that mailing applications to all active registered voters would "drive up turnout."  Speaker Ralston further claimed that increased turnout would be "extremely devastating" to election outcomes that he favored.[2]

40.    SB 202 prohibits state and local governments from mailing absentee ballot applications to registered voters unless specifically requested by the voter or an authorized relative of the voter.  SB 202 § 25.

41.    Under SB 202, a request for an absentee ballot must be made in writing, using a form that is available on the Secretary of State's website, among other places.

42.    Under Georgia law, most voters must submit a new absentee ballot application for each election.  Only voters of "advanced age or disability," and overseas and military voters, are exempt from this requirement.  O.C.G.A. § 21-2-381(a)(1)(G).

## B.    Third-Party-Provided Absentee Ballot Applications

43.    In advance of the 2020 elections, civic engagement organizations provided registrants with blank absentee ballot applications to help ensure that they

---

[2]    *Live Call-In with House Speaker Ralston*, Fetch Your News TV (April 1, 2020), https://www.youtube.com/watch?v=NQz431l4qmQ.

would be able to vote if they chose to do so.  SB 202 now requires that private

entities distributing absentee ballot applications may send them "only to

individuals who have not already requested, received, or voted an absentee ballot,"

and imposes a penalty of up to $100 per duplicate absentee ballot application.

Senders who rely on information provided by the Secretary of State within five

days before they mail applications to registrants are not liable for violations of the

provision.  SB 202 § 25.

44.     Civic engagement organizations have criticized the new provisions,

noting that compliance will be burdensome; that the fines are substantial; and that

many registrants had not received an absentee ballot after making an initial request

prior to the 2020 elections and, in those instances, benefited from receiving

assistance with sending follow-up requests.

### C.     Identification Requirement for Requesting an Absentee Ballot

45.     Since 2006, in-person voters in Georgia have been required to show

photo identification.  *See* O.C.G.A. § 21-2-417.  Prior to SB 202, absentee voters

were exempt from this requirement.

46.     Instead, election officials would compare the signature on a voter's

absentee ballot envelope with the voter's signature in the voter file.

47.     SB 202 imposes new identification requirements at two stages of the

absentee voting process.

48.     First, at the request stage, voters must include on their absentee ballot

application the identification number from their Georgia driver's license or

personal identification card issued by the Georgia Department of Driver Services

(collectively "DDS-issued ID").  If they do not have DDS-issued ID, they must

provide a copy of another form of identification, such as a utility bill.  SB 202 §

25.

49.     Second, when returning their absentee ballot, voters must print their

DDS-issued ID number on the absentee ballot envelope.  If they do not have DDS-

issued ID, voters must print the last four digits of their Social Security number.  If

they do not have either DDS-issued ID or a Social Security number, voters must

include a copy of another form of identification, such as a utility bill, with the

absentee ballot.  SB 202 § 28.

50.     The option to provide the last four digits of the voter's Social Security

number, in lieu of a DDS-issued ID number, is not available when a voter requests

an absentee ballot.

51.     During the legislative debates on SB 241, a predecessor bill to SB

202, a sponsor described the bill as allowing voters to list the last four digits of

their Social Security number when requesting an absentee ballot.  When another legislator pointed out that the bill did not actually include that provision, the sponsor said that a future version of the bill would include it.

52.     During the legislative debate, supporters of SB 202 did not explain why the use of the last four digits of a voter's Social Security number was sufficient to verify identity when a voter returned a completed absentee ballot, but was not sufficient to verify identity when a voter requested an absentee ballot.

53.     In February 2021, when the legislature was considering adopting new election legislation, Gabriel Sterling, the Chief Operating Officer of the Georgia Secretary of State's office, publicly claimed through Twitter that 99.9 percent of Georgia voters had the last four digits of their Social Security numbers in the State's voter registration system.  Mr. Sterling also claimed that 97 percent of Georgia voters had driver's license numbers in the system.

54.     Data show, however, that Black Georgians are less likely to possess the DDS-issued ID number needed to request an absentee ballot than white voters, and that about 56 percent of the voters who do not have a driver's license number associated with their registration are Black (even though Black Georgians represent about 29 percent of registered voters).

- 15 -

### D.    Window to Request Absentee Ballots

55.    Before the passage of SB 202, registrants could request an absentee ballot as early as 180 days before an election and as late as four days before an election.  *See*, *e.g.*, Georgia Secretary of State, Elections Division, *Absentee Voting: a Guide to Registered Voters 2020*, at p. 5 (noting that voters may request absentee ballots "between 180 days prior to the election and the end of the business day on the Friday before Election Day").

56.    SB 202 shortens this request period.  Under SB 202, voters can begin requesting absentee ballots 78 days before the election, and the last day to request an absentee ballot is 11 days before Election Day.  SB 202 § 25.

57.    Because of changes made to the election calendar under SB 202, which now provides only 28 days between a primary or general election and the runoff, *see* SB 202 § 42, the new deadline results in a particularly short time period for requesting absentee ballots for runoff elections (*i.e.*, voters must request their absentee ballot for a runoff election by the 17th day after Election Day).

58.    In the November 2020 general election, Black voters were more likely than white voters to request absentee ballots between ten and four days before Election Day—a period of time that is closed to such requests under SB 202.  In

addition, of the absentee ballots requested during this period, those that were successfully cast and counted were disproportionately cast by Black voters.

59.     Black voters were also more likely to request an absentee ballot between ten and four days before the January 5, 2021 general runoff election. Again, of the absentee ballots requested during this period, those that were successfully cast and counted were disproportionately cast by Black voters.

### E.     Drop Boxes

60.     In response to concerns about COVID, the State Election Board passed an emergency rule for the June 9, 2020 primary election that allowed voters to return their absentee ballots in drop boxes. *See* State Election Board Rule 183-1-14-0.6-.14.  The drop boxes were required to be "on county or municipal government property generally accessible to the public," with a video recording device to monitor each location. *Id.* §§ (2) & (4).

61.     Drop boxes were available until the close of polls on Election Day, and many were accessible after hours in the days leading up to the election.

62.     The emergency rule was later extended to allow the use of drop boxes through the January 5, 2021 general runoff election.

63.     Drop boxes were widely used by voters during the November 2020 and January 2021 elections, particularly in the metro-Atlanta area.  For example,

Fulton County had 38 drop box locations in each election, and Gwinnett County had 23 in each election.

64.    According to the Cobb County Elections Director, 60 percent of the absentee ballots returned in Cobb County during the November 2020 election were placed in a drop box.[3]  After drop boxes' widespread use in the November 2020 election, some metro-Atlanta counties, like DeKalb County, added more drop boxes for the January 2021 runoff election.

65.    The rejection rate for late-arriving absentee ballots dropped substantially in 2020, compared to past elections.

66.    In recent elections, late ballots were disproportionately cast by Black voters.

67.    SB 202 requires each county to have one drop box, but limits additional drop boxes to "the lesser of either one drop box for every 100,000 active registered voters in the county or the number of advance voting locations in the county."  SB 202 § 26.

---

[3]  Julia Marnin, *Number of Election Ballot Drop Boxes Falls From 38 to 8 in Fulton County, Georgia*, Newsweek (Apr. 19, 2021, 3:27 PM), https://www.newsweek.com/number-election-ballot-drop-boxes-falls-38-8-fulton-county-georgia-1584803.

68.     Under SB 202, drop boxes must be located at early voting sites or the registrar's office.  Absent a declaration of emergency by the Governor, drop boxes must be stationed indoors.  In addition, drop boxes can only operate during voting hours, and must close permanently at the close of the early voting period, *i.e.* the Friday before Election Day.  The drop boxes must now also be under constant surveillance by an election official, law enforcement officer, or licensed security guard.  SB 202 § 26.

69.     Put differently, SB 202 limits the use of drop boxes to those times and locations where voters could opt to vote in person, instead.

70.     By requiring that drop boxes close permanently at the end of the early voting period, SB 202 also ensures that voters who attempt to return their absentee ballot in the three days before or on Election Day will no longer be able to use drop boxes as a reliable alternative to mailing their ballot.  This is particularly important in light of a federal court's finding that in 2018, 85% of absentee ballots rejected as untimely "arrived within seven (7) days [after] Election Day, implying that many were mailed either before or on Election Day."  *New Georgia Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1305 (N.D. Ga. 2020), *order stayed on other grounds by* 976 F.3d 1278 (11th Cir. 2020).

71.     SB 202's limits on the number of drop boxes that each county may deploy will cause a precipitous decline in drop box availability in the counties that are home to the largest number of Black voters in the State.  Specifically, SB 202 limits Fulton County to about eight drop boxes, Gwinnett County to about six, and DeKalb and Cobb Counties to about five each.

### F.      Food and Drink Distribution

72.     Before the passage of SB 202, various groups and organizations distributed food and water to persons waiting in long lines to vote.  These efforts were frequently run by Black-led community organizations to provide respite to waiting voters at majority-minority polling places, which have been disproportionately plagued by long lines.

73.      For example, according to one report, about two thirds of the polling places that remained open late during the June 2020 primary election to accommodate waiting voters were in majority-Black neighborhoods.

74.     SB 202 prohibits giving food and water to persons waiting in line to vote.  SB 202 § 33.  Poll workers may make "available self-service water from an unattended receptacle."  *Id.*

75.     SB 202 will prevent churches, non-profit organizations, and other groups from sharing food and water to encourage voters not to abandon long lines to vote due to hunger or thirst.

### G.     Out-of-Precinct Provisional Ballots

76.     Prior to the enactment of SB 202, voters could cast a provisional ballot at any precinct in the county in which the voters are registered, and the votes cast on such ballots were counted for all races in which the voters would have been eligible to vote if they had cast a regular ballot at the correct precinct.  *See* O.C.G.A. § 21-2-419(c)(2) (2020).  Georgia has counted such out-of-precinct provisional ballots since at least 2002.

77.     SB 202 prohibits local jurisdictions from counting such ballots if they were cast before 5 p.m. on Election Day.

78.     Under SB 202, voters casting an out-of-precinct provisional ballot after 5 p.m. must execute a sworn statement, witnessed by a poll official, stating the reason why the voters are unable to vote at their assigned precinct.  SB 202 § 34.

79.     Data from past elections indicates that prohibiting the counting of provisional ballots cast in the voter's county but outside the voter's assigned

precinct will mean the rejection of several thousand votes that would have been counted in prior elections.

80.    For a variety of reasons, including higher rates of residential mobility and less access to transportation among Black Georgians, Black voters can be expected to cast disproportionately more of these rejected ballots than white voters.

### SB 202's Historical Background

81.    SB 202's passage followed a series of historic wins by multiple Black-preferred candidates, a significant and well-publicized rise in Black political mobilization and voting strength, shifting racial demographics in the State, including an increase in the number of Black and Latino voters, and changes to the State's typical election procedures that resulted from the ongoing pandemic, including a notable increase in absentee voting.

82.    In 2020, the total Black population in Georgia was rising, particularly in the metro-Atlanta area, and Black Georgians constituted a growing share of the total population.

83.    Black voter turnout rose, not only in the 2018 midterm election and the 2020 presidential election, but also in the 2021 runoff election, compared to past runoff elections.  Indeed, Black turnout dropped less than white turnout between the November 2020 general election and the January 2021 runoff election,

which defied typical voting patterns for Black voters.  The notable turnout was a direct reflection of the increasingly successful Black-led mobilization efforts in Georgia that encouraged participation by voters of color and low-propensity voters.

84.    Black Georgians undertook substantial new efforts to harness their political power in 2018 when Stacey Abrams, a Black candidate, ran for governor. The 2018 election yielded high turn-out among Black voters and other voters of color and specifically encouraged their use of absentee ballots.

85.    During early voting and on Election Day in 2018, advocates and organizations helped to ensure that voters who faced long lines (often voters of color) had basic food and water.  Community leaders served free food at Pittman Park Recreation Center—a predominantly Black precinct in Fulton County where hundreds waited in long lines—to make sure their neighbors were not so hungry that they abandoned the line.

86.    As they had in 2018, civic organizations, churches, and advocacy organizations again helped to ensure that voters facing long lines in 2020 had food and water.

87.    At the same time, the ongoing pandemic had changed election processes in Georgia.  Chief among the pandemic-related changes was a dramatic increase in the use of absentee ballots.  The Secretary of State's efforts to open

access to absentee voting and the counties' encouragement of after-hours drop boxes as alternatives to returning absentee ballots by mail facilitated the rise of absentee voting.

88.    Black-led mobilization efforts also emphasized absentee voting.

89.    These mobilization efforts led to the popular public perception that Black voter turnout was increasing, driven in large part by absentee voting, and that this growing turnout was providing Black voters with increased opportunities to elect Black-preferred candidates of choice.

90.    In the November 2020 election, nearly 30 percent of Black voters in Georgia voted by absentee ballot, compared to fewer than 7 percent in 2018.

91.    The November 2020 general election in Georgia resulted in historic firsts that reflected significant demographic and political shifts in the State.  For example, Vice President Kamala Harris became the first Black and Indian-American Vice President ever elected.

92.    Reverend Raphael Warnock, who is Black, advanced to a runoff election against incumbent Senator Kelly Loeffler.

93.    Black political mobilization continued for the January 2021 runoff election.  Once again, many voters cast absentee ballots—including via drop

boxes—and voter mobilization organizations directed a great deal of effort at turning out Georgia's Black community.

94.     A record number of voters, nearly 4.5 million, cast ballots in the January runoff election, about 88 percent of the number who voted in the November general election.

95.     Some precincts, primarily precincts in Fulton County, saw an increase in turnout between the November 2020 and January 2021 elections.

96.      On January 5, 2021, with strong turnout among Black voters, the State of Georgia elected its first Black Senator, Reverend Raphael Warnock, and its first Jewish-American Senator, Jon Ossoff.

97.     This overall rise in Black political success occurred against the backdrop of virulent racial appeals.  Two years earlier, during the 2018 Georgia gubernatorial contest, a racist robocall referred to candidate Stacey Abrams as "Negress Stacey Abrams" and "a poor man's Aunt Jemima."

98.     Throughout the 2020 campaign, and particularly during the runoff for the U.S. Senate seats, there was a similar atmosphere.  One campaign ran a digital advertisement against Mr. Ossoff that included an anti-Semitic trope of an enlarged nose, and a U.S. Senate candidate mispronounced and mocked the pronunciation of

then-Senator Kamala Harris' first name during a campaign event, despite having been her Senate colleague for four years.

99.     One phone caller threatened to behead Reverend Warnock and referred to the church at which he is a pastor, Ebenezer Baptist—the church once pastored by Rev. Martin Luther King, Jr.—using a vile racial epithet.  The church had to filter comments on its social media pages given the significant number of racist comments relating to Rev. Warnock's candidacy.

100.   The historic contests in 2020 and 2021 in Georgia garnered significant media attention, particularly because of the success of Black-led mobilization efforts and the narrow margins in the presidential election.

101.   Legal requirements, combined with the increased use of absentee ballots, explained the delays in announcing the results of the November 2020 election.  For example, Georgia law requires that absentee ballots be tabulated no earlier than 7 a.m. on Election Day.  O.C.G.A. § 21-2-386(a)(5).  It also requires that voters be given until three days after the election to cure their rejected ballot. O.C.G.A. § 21-2-417(b) (giving provisional ballot voters three days to provide voter ID if they were unable to provide it at the polls); O.C.G.A. § 21-2-386(a)(1)(C) (giving absentee ballot voters three days to correct or address a rejected ballot).

102.   Still, despite a dearth of evidence, accusations of fraud around the absentee voting process and the tabulation of votes circulated widely.

103.   In the wake of the November 2020 general election, the country witnessed an unprecedented campaign to overturn the results of a presidential election.  Many of these exceptional events were focused on Georgia.

104.   On December 2, 2020, lawyers behind several lawsuits seeking to overturn presidential election results in multiple states hosted a press conference at a "Stop the Steal" event in Alpharetta, Georgia.  They reiterated unfounded claims of voter fraud, called on Georgia Governor Brian Kemp to be locked up, and encouraged voters to boycott the January runoff unless the Governor called a special session to change the State's election laws and procedures in response to their claims of an allegedly rigged election.

105.   A number of lawmakers in the Georgia Senate, who subsequently helped draft, promote, and pass SB 202, issued a statement in support of an unsuccessful lawsuit brought by the State of Texas asking the United States Supreme Court to overturn Georgia's election results.

106.   Misinformation resulted in threats to election workers.  In late November, an election recount observer recorded a Dominion Voting Systems employee in Gwinnett County and alleged that the employee, who is a racial

- 27 -

minority, was manipulating votes.  A GIF with a slow-swinging noose aimed at the worker was later created and death threats were made against the election worker.

107.   State and local election officials in Georgia consistently debunked allegations of widespread fraud, and conducted two statewide recounts pursuant to state law:  one initiated by the Secretary of State because of the closeness of the vote tallies in the presidential race, and a second done at the request of one of the presidential campaigns.

108.   Neither recount changed the outcome, and on December 7, the Secretary of State recertified the final 2020 presidential results.  The Secretary dismissed continuing concerns of fraud because "the evidence, the actual evidence, [and] the facts tell us a different story."[4]

109.   A barrage of lawsuits alleging voter fraud were brought, and although nearly all of the lawsuits were dropped, dismissed, or settled out-of-court, the issues raised in them became blueprints for the proposed election changes in the Georgia General Assembly's 2021-2022 Legislative Session.  These lawsuits often included allegations focused on counties containing significant numbers of Black voters and other voters of color.

---

[4] *Georgia Secretary of State Update on 2020 Election Results*, C-Span (Dec. 7, 2020), https://www.c-span.org/video/?507078-1/georgia-final-2020-presidential-recount-results.

110.   Some of the same attorneys involved in the lawsuits testified at state legislative committee hearings about election legislation that would eventually find its way into SB 202.  In particular, during a state Senate Judiciary subcommittee hearing in early December 2020, lawyers replayed misleading video footage of mostly Black Fulton County election workers tabulating ballots, alleging that the video contained evidence of voter fraud, although these allegations had already been debunked by the Secretary of State's office.  The lawyers also presented individuals who alleged, among other things, that absentee ballots had been cast fraudulently.  At least one member of the Senate Ethics Committee, the committee to which many of the election bills in the then-upcoming 2021-2022 Legislative Session were later referred, attended that hearing.

111.   In an April 2021 CNN Interview, Lt. Governor Geoff Duncan acknowledged that the momentum for SB 202 was fueled by the very misinformation sowed in those committee hearings.

**Legislative History and Enactment of SB 202**

112.   On January 11, 2021, six days after the runoff election, Georgia's 2021-2022 Legislative Session began.  The Session lasted for 40 legislative days, during which nearly 80 election-related bills were introduced and considered.

113.   Election-related bills had traditionally been referred to the Governmental Affairs Committee, but on January 7, Georgia House Speaker David Ralston announced a stand-alone, special committee on election integrity in Georgia.  The House referred its election bills to this special committee, chaired by Representative Barry Fleming.

114.   Rep. Fleming had already made his intentions for new election legislation clear in a November 15, 2020 op-ed for the Augusta Chronicle, in which he compared the "always-suspect absentee balloting process," to the "shady part of town down near the docks you do not want to wander into because the chance of being shanghaied is significant."[5]

115.   On February 17, 2021, SB 202 was introduced in the Senate with only white sponsors.  The bill was three pages.

116.   On March 3, 2021, the Senate Ethics Committee held a hearing on the three-page version of SB 202.  Chairman Max Burns introduced it as a "straightforward bill" to address confusion resulting from multiple absentee ballot applications being sent to voters.

---

[5]  Barry Fleming, *Guest Column: Republican Party wins on Election Day, and future is bright*, The Augusta Chronicle (Nov. 15, 2020), https://www.augustachronicle.com/story/opinion/columns/guest/2020/11/15/guest-column-republican-party-wins-on-election-day-and-future-is-bright/43155971/.

117.   SB 202 passed favorably out of the Committee on March 3.  On March 8, the Senate passed the three-page version of SB 202 with minimal floor debate.  It passed along party lines with no support from Black legislators.

118.   On March 17, Chairman Fleming introduced a substitute version of SB 202 at a hearing of the House Special Committee on Election Integrity.  The now 90-page bill included numerous sections from other elections bills.

119.   Rep. Burnough, a Black representative from Clayton County, said that she had not received the omnibus version of the bill until one hour before the hearing.  She also noted that Senator Burns, who sponsored the original version of SB 202, did not testify about any of the changes, as is customary for a bill substitute.

120.   Witnesses had minimal time to read and comment on the new version of SB 202 prior to the hearing.

121.   The Special Committee on Election Integrity met again the following day, March 18.  Rep. Burnough confirmed that the omnibus version of SB 202 was still not publicly available on the General Assembly's website.

122.   At this committee meeting, proponents of the bill alleged that absentee voting needed to be more secure.  Rep. Chuck Martin, a white

representative from Fulton County, remarked that absentee voting is "the portion of the voting process that is most open to foolishness."

123.  Most witnesses criticized the bill, citing, among other things, the bill's harmful impacts on voters of color.  Tonnie Adams, Heard County Elections Supervisor and Legislative Committee Chairman for the Georgia Election Officials Association, contended that SB 202's restrictions rendered drop boxes useless.

124.  Witnesses also expressed concern with procedural issues, including that the bill lacked a fiscal note and was not posted online, and that it was difficult to obtain permission to testify remotely.

125.  The House Special Committee met again on March 22 to discuss some amendments to the bill, and within an hour, the Committee voted favorably on its 90-page substitute to the original three-page SB 202.

126.  Numerous legislators continued to voice concerns about the bill.  Rep. Kimberly Alexander inquired about the lack of fiscal note, a legislative item traditionally attached to an omnibus bill.

127.  Rep. Burnough objected to the cap on the number of drop boxes a county may use, predicting that it would particularly hurt Fulton County, leading to long lines and reduced voting access.

128.   The subsequent House floor debate, held on March 25, lasted less than two hours.  Supporters insisted that the bill would restore integrity in the vote, while opponents noted that it would suppress the Black vote and that the voter fraud concerns were pretextual.

129.   Representatives also expressed process concerns.  Rep. Alexander reminded the House that officials from the Association County Commissioners of Georgia ("ACCG") testified that more time was needed to understand the fiscal and logistical impacts.  Rep. Debbie Bucker expressed concern that the legislative process had been so swift and the bill had contained so many changes, "the House website couldn't even keep up."

130.   Once again, legislators voted along party lines and the omnibus version of SB 202 moved to the Senate that same day.  No Black representative voted for the bill.

131.   The Senate floor debate began with a discussion over the lack of a fiscal note.  Lt. Governor Duncan eventually ruled that a fiscal note was not required, despite Senator Elena Parent pointing specifically to O.C.G.A. §§ 28-5-42 and 28-5-49 as requiring its inclusion because the bill clearly required certain State and county expenditures.

132.   Once again, legislators passed SB 202 along party lines, and no Black senator voted for the bill.

133.   Governor Kemp signed SB 202 later that same day, behind closed doors and before a group of supporters that did not include any people of color. When Rep. Park Cannon, who is Black, attempted to witness the signing, she was arrested.

### Passage of SB 202 was Motivated by Discriminatory Purpose

134.   SB 202 was enacted with the purpose of denying or abridging the right of Black Georgians to vote on account of their race or color.

135.   Against a history of voting discrimination in Georgia, demographic shifts in the voting population and changes in Black voters' participation and mobilization, and Black Georgians' unprecedented successes in electing candidates of choice, Georgia enacted SB 202 with knowledge of the disproportionate effect that numerous provisions, both singly and together, would have on Black voters' ability to participate in the political process on an equal basis with white voters.

136.   As outlined previously in this Complaint, race continues to be a significant and, oftentimes, decisive factor in the State of Georgia's electoral process in that:

(a).    Georgia's history of voting-related discrimination against Black
        voters is long-standing, well-documented, and judicially recognized;

(b).    Georgia has an extensive, judicially recognized history of racially
        polarized voting, which continues to the present day;

(c).    SB 202 compounds the discriminatory effects of racially polarized
        voting on racial minorities in Georgia by disproportionately reducing
        the probability that Black Georgians will be able to satisfy the State's
        new, restrictive criteria and be able to cast a ballot;

(d).    Georgia has used voting practices or procedures that enhance the
        opportunity for discrimination against Black voters;

(e).    Black Georgians continue to suffer the effects of official
        discrimination, including a history of discrimination in voting-related
        activities.  The continued effects of discrimination, including Black
        Georgians' markedly lower socioeconomic conditions relative to
        white citizens, hinder their ability to participate effectively in the
        political process;

(f).    Racial appeals have characterized a number of political campaigns in
        Georgia, including during the 2020 election cycle, which was
        immediately followed by the passage of SB 202;

- 35 -

(g).    Many elected officials in Georgia have not been responsive to the
        particularized needs of Black residents; and

(h).    The lack of evidence of voter fraud in the 2020 election cycle, and
        numerous statements from the Secretary of State's office debunking
        voter fraud claims, tend to undermine the justifications
        proffered by proponents of SB 202, providing evidence that the
        proffered rationales for the bill's provisions are tenuous.

137.    The impact of the challenged provisions, both individually and
collectively, will weigh more heavily on Black voters.

138.    Prior to voting to enact SB 202, members of the Georgia legislature
knew of the disproportionate effect the challenged provisions would have on the
ability of Black voters to participate equally in the franchise.

139.    The first five challenged provisions—which prohibit government
entities from distributing unsolicited absentee ballot applications, impose
substantial fines on third-party organizations that send follow-up absentee ballot
applications, require voters without a DDS-issued ID to copy another form of ID
when they request an absentee ballot, shorten the window to request an absentee
ballot, and limit the use of absentee ballot drop boxes—each make, and are

intended to make, absentee voting incrementally more burdensome and less accessible.

140.   Together, these five provisions introduce new impediments at every step of the absentee voting process: obtaining an application, completing and timely submitting the application, and timely returning a completed absentee ballot.

141.   The General Assembly adopted these changes after Black voters began disproportionately using absentee voting, and Black voters will be disproportionately impacted by each of these new obstacles.

142.   In addition, Black voters have been more likely than white voters to submit absentee ballot applications closer to Election Day, including during the final week of the request period, which SB 202 eliminates.

143.   Because Black voters are less likely than white voters to have a DDS-issued identification number associated with their voter record, they will be disproportionately burdened by the obligation to include a copy of an alternative identification when requesting an absentee ballot, particularly as the legislature chose not to permit voters to use the last four digits of their Social Security number when making requests for absentee ballots.

144.   In recent elections, Black voters have also been more likely than white voters to have an absentee ballot rejected because it arrived late.

145.   By reducing access to absentee voting at each step of the process—curtailing access to absentee ballot applications, imposing an early deadline and new identification requirement for requesting absentee ballots, and limiting access to drop boxes for timely return of completed ballots—SB 202 will push more Black voters to in-person voting, where they will be more likely than white voters to confront long lines, and where SB 202 imposes additional impediments to casting a ballot by banning the distribution of food and water to voters waiting in long lines and prohibiting the counting of most out-of-precinct provisional ballots.

146.   Because of socioeconomic conditions linked to past and present race discrimination, these additional burdens will weigh more heavily on Black voters. For example, because they are more likely to live in poverty and less likely to have Internet access than white Georgians, Black Georgians have less access to online methods for requesting an absentee ballot.  Because Black Georgians are less likely than white Georgians to have access to a vehicle, traveling to a registrar's office to obtain an application in person is also more burdensome.

147.   For similar reasons, traveling to the correct precinct after waiting in line at an incorrect precinct, or accessing one of the few drop boxes remaining in

metro-Atlanta counties under SB 202, will be disproportionately burdensome for Black voters.

148.   Thus, SB 202's provisions curbing access to absentee voting and making it more difficult to successfully cast a ballot in person will interact with historical and ongoing discrimination to disproportionately impair Black voters' opportunity to participate in the political process.

149.   All of the challenged provisions will have a cumulative negative effect on the ability of Black Georgians to participate in the political process.

150.   The Georgia Legislature voted to enact SB 202 with the knowledge of Georgia's history of voting discrimination against Black citizens and socioeconomic disparities experienced by Black citizens.

151.   The sequence of events leading to the enactment of SB 202 provides additional evidence that race was a factor in passing SB 202.

152.   In the years preceding SB 202, the Black proportion of the State's population grew steadily, and the white share of the electorate fell.  Black voters became disproportionately likely to vote via absentee ballot compared to white voters, and Black-led mobilization efforts received prominent press coverage.  This culminated in 2020 with Black Georgians achieving historic successes in electing their candidates of choice, including helping to elect the country's first Black Vice

President and electing the State's first Black U.S. Senator—each time defeating the candidate preferred by a majority of white voters.

153.  White legislators who supported SB 202 were aware of these trends as they were happening.

154.  In response to proliferating claims of voter fraud, two statewide recounts confirmed the November presidential election results, the Secretary of State's office rebuked voter fraud claims in no uncertain terms, and numerous lawsuits alleging voter fraud were dismissed or rejected by both federal and state courts.  Nonetheless, white state legislators persistently relied on these debunked allegations of voter fraud to justify their enactment of SB 202, even after being warned by other legislators about the disproportionately negative effects the bill would have on Black Georgians' ability to cast ballots.

155.  Despite the significance of the changes to existing election laws contained in SB 202, the House Special Committee on Election Integrity began debate on the new, 90-page omnibus version of the bill before it was publicly available on the General Assembly's website and over the objection of witnesses who had not been given the opportunity to review the bill prior to testifying.  One Representative on the committee said that she had not received the omnibus

version until just an hour before the hearing.  The Special Committee passed SB 202 five days later.

156.   This timeline severely limited opportunities for consideration and comment by interested members of the public.

157.   The legislative history of SB 202 indicates that the Georgia General Assembly departed from its normal procedural practice in passing the bill. Consideration of all election bills was stripped from the usual standing House committee and given instead to a Special Committee set up for that purpose, chaired by a representative who publicly recognized his goal of making absentee voting harder.  The Special Committee accepted from the Senate a three-page bill about duplicate absentee ballot applications and turned it into a 90-page omnibus bill, with minimal notice to either the public or other representatives.  The bill's original sponsor did not present the significant changes in the bill substitute to the Special Committee.  Despite several questions regarding the lack of a fiscal note, the inevitable state and county expenditures that the bill would necessitate, and state law provisions requiring fiscal notes for such expenditures, legislators declined to include a fiscal note with the omnibus bill.

158.   In the absence of relief under Sections 3(a) and (c) of the Voting Rights Act, 52 U.S.C. § 10302(a) & (c), providing for the assignment of federal

observers and court-ordered preclearance, Georgia will continue to violate the

Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth

Amendments in the future.

## **CAUSE OF ACTION**

### **Section 2 of the Voting Rights Act, 52 U.S.C. § 10301**

159.   The United States re-alleges and incorporates by reference the

allegations set forth in all prior paragraphs of this Complaint.

160.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits the

enforcement of any voting qualification or prerequisite to voting or any standard,

practice, or procedure that has either the purpose or the result of denying or

abridging the right to vote on account of race, color, or membership in a language

minority group.

161.   The challenged provisions of SB 202 were adopted with the purpose

of denying or abridging Black citizens' equal access to the political process, in

violation of Section 2.  These provisions include the following:

(a).    the ban on government entities mailing unsolicited absentee ballot

request forms to voters (Section 25);

(b).    onerous fines on third party groups that distribute duplicate or follow-

up absentee ballot request forms to voters (Section 25);

- 42 -

(c).    the requirement that voters who do not have a DDS-issued ID number associated with their voter registration record photocopy another form of ID in order to request an absentee ballot and are not permitted to use the last four digits of their Social Security number to verify their identity for such requests (Section 25);

(d).    the new deadline for requesting absentee ballots 11 days before Election Day (Section 25);

(e).    the cutback in the number of drop boxes permitted and the prohibition on using drop boxes after hours and in the days leading up to the election (Section 26);

(f).    the ban on groups providing food and water in a non-partisan way to voters facing long lines at the polls (Section 33); and

(g).    the prohibition on counting most out-of-precinct provisional ballots (Section 34).

162.    Due to disparities in social and economic conditions caused by historical and ongoing discrimination, including higher rates of poverty and unemployment, lower educational attainment, and less access to the Internet and transportation, Black voters will be disproportionately burdened by the challenged provisions of SB 202.

163.   For example, Black voters in Georgia have disproportionately voted by absentee ballot in recent elections, but SB 202 makes absentee voting less accessible by erecting new hurdles at every step of the process.  Together, these obstacles will push Black voters toward in-person voting, where they will be more likely than white voters to confront long lines, and where, because of SB 202, they will face additional impediments to successfully casting a ballot that will be counted.

164.   Further, the Georgia Legislature knew from debate within the General Assembly and witness testimony at hearings that SB 202 would harm Black voters, yet it rushed through a hasty process to pass SB 202 while relying on debunked and pretextual claims of voter fraud as a rationale.

165.   Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by implementing and enforcing the challenged provisions of SB 202.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that this Court enter an order:

1)  Declaring that challenged provisions of SB 202 (including the relevant portions of Sections 25, 26, 33, and 34) were adopted and are

being enforced with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution;

2)  Enjoining the Defendants, their agents and successors in office, and all persons acting in concert with them, from enforcing the requirements of the challenged provisions of SB 202 (including the relevant portions of Sections 25, 26, 33, and 34), and enjoining Defendants and their agents and successors in office from excessively limiting the number of absentee ballot drop boxes and prohibiting their availability after hours and in the days leading up to the election;

3)  Authorizing the appointment of Federal observers, pursuant to Section 3(a) of the Voting Rights Act, 52 U.S.C. § 10302(a), to observe elections in Georgia;

4)  Retaining jurisdiction and requiring certain new voting changes for Georgia be subject to a preclearance requirement pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c); and

5) Ordering such additional relief as the interests of justice may

require, together with the costs and disbursements in maintaining this

action.

Dated: June 25, 2021


KURT R. ERSKINE
Acting United States Attorney
Northern District of Georgia

LORI BERANEK
Civil Chief, Civil Division
Northern District of Georgia

*/s/ Aileen Bell Hughes*
_____
AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

PAMELA S. KARLAN
Principal Deputy Assistant
Attorney General
Civil Rights Division

*/s/ Jasmyn G. Richardson*
_____
T. CHRISTIAN HERREN, JR.
JOHN A. RUSS IV
JASMYN G. RICHARDSON
ERNEST A. MCFARLAND
ELIZABETH M. RYAN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
john.russ@usdoj.gov
jasmyn.richardson@usdoj.gov

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| VOTEAMERICA; VOTER PARTICIPATION CENTER; and CENTER FOR VOTER INFORMATION, | Civil Action No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia; REBECCA SULLIVAN, in her official capacity as Vice Chair of the STATE ELECTION BOARD; DAVID WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as members of the STATE ELECTION BOARD, | |
| Defendants. | |

Plaintiffs VoteAmerica, Voter Participation Center, and Center for Voter Information ("Plaintiffs") file this Complaint for Declaratory and Injunctive Relief against Defendants Brad Raffensperger, in his official capacity as the Georgia Secretary of State; Rebecca Sullivan, in her official capacity as Vice Chair of the

State Election Board; and David Worley, Matthew Mashburn, and Anh Le, in their official capacities as members of the State Election Board (collectively "Defendants"), and allege the following:

## INTRODUCTION

1.     In the most recent election cycle, Georgia voters turned out in record numbers, casting more than 5 million votes in the 2020 general election and nearly 4.5 million in the 2021 runoff elections, both representing record-breaking levels of voter turnout.

2.     Georgians' extraordinary levels of voter engagement in the 2020 and 2021 elections are remarkable because those elections occurred during the height of the COVID-19 pandemic, which disrupted daily operations and exacerbated burdens in all aspects of life, including civic participation in elections.

3.     Due in part to the dangers posed by COVID-19, more Georgians voted absentee in 2020 and 2021 than ever before. In the 2020 general election, Georgia voters cast 1,320,154 absentee ballots, and in the 2021 runoff elections, Georgia voters cast 1,070,596 absentee ballots. Both numbers broke all-time absentee voting records for general and runoff elections.

4.     Georgia's 2020 and 2021 elections were also conducted safely and securely. Georgia Secretary of State Brad Raffensperger affirmed that the election

was "secure, reliable and efficient," and after a statewide audit, concluded that there was no evidence that raised doubts about the outcome of the 2020 General Election. Governor Brian Kemp, Lieutenant Governor Geoff Duncan, and Georgia Voting Systems Manager Gabriel Sterling all repeatedly assured Georgian voters that the validity of the 2020 and 2021 elections were not in question and that their votes were accurately counted.

5.     After the 2020 General Election took place, several candidates for office, political parties, and other individuals filed numerous lawsuits seeking to challenge the validity of Georgia's election results. None of those lawsuits prevailed, and not a single court found evidence that the election results in Georgia were tainted by fraud or misconduct.

6.     Rather than celebrating Georgians' record-breaking turnout and success in conducting two secure elections in a span of two months, the Georgia General Assembly instead enacted Senate Bill 202 ("SB 202") through a secretive and extremely accelerated legislative process, with little to no opportunity for public input or review.

7.     SB 202 is an omnibus elections law that radically transforms Georgia's election systems in several ways that increase burdens on voters and others engaged in the political process.

8.      Among the many flawed provisions of SB 202 are several restrictions and prohibitions on the distribution of absentee ballot applications by third-party organizations. Those restrictions include: (1) a prohibition on prefilling absentee ballot applications, even where voters provide that information themselves, (2) a misleading disclaimer that is required to be attached to any absentee ballot application distributed by a non-governmental entity, and (3) an affirmative requirement to monitor an ever-changing list from the Secretary of State to avoid sending duplicate application forms to voters who have already requested, received, or cast an absentee ballot (together, "Ballot Application Restrictions"). SB 202 also imposes a $100 penalty *per duplicate application* sent to a voter who has already requested, received, or cast an absentee ballot.

9.      These new requirements are not only costly and burdensome on nonprofit organizations who work to encourage political participation and facilitate access to absentee voting for Georgians—in some cases they are impossible to comply with or would present such prohibitively expensive financial burdens that some groups, like Plaintiffs VoteAmerica, Voter Participation Center, and Center for Voter Information, may have no choice but to cease their operations in Georgia altogether.

10.     Nonprofit organizations like Plaintiffs VoteAmerica, Voter Participation Center, and Center for Voter Information have a First Amendment right to engage in political speech and expression by encouraging eligible Georgians to vote absentee and providing them with the information and resources to do so. SB 202 unnecessarily and severely burdens that right by stifling Plaintiffs' protected political speech, compelling them to engage in misleading and confusing speech mandated by the Government, and limiting their right to freely associate with others.

11.     Moreover, the Ballot Application Restrictions are unconstitutionally vague and overbroad, such that they violate Plaintiffs' First Amendment and Due Process Rights.

12.     Voting is paramount in our Constitutional system because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). And voter engagement speech is "core political speech," for which the protections of the First Amendment are at their highest. *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Nonprofit organizations like Plaintiffs, whose missions focus on expanding electoral participation and voter turnout through, *inter alia*, the distribution of absentee ballot applications, are an essential piece of our civic society. SB 202 unduly restricts Plaintiffs' ability to engage with Georgia voters with no countervailing justification for the restrictions.

13.     The challenged provisions of SB 202 violate the Constitution of the United States. They must be declared unconstitutional and their enforcement must be enjoined.

## JURISDICTION AND VENUE

14.     This action is brought under the United States Constitution. The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

15.     This Court has personal jurisdiction over each Defendant in their official capacity because each is a citizen of Georgia and their principal places of business are in the Atlanta Division of the United States District Court for the Northern District of Georgia.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendants in their official capacities reside in this District and all Defendants reside in Georgia, and because a substantial portion of the events giving rise to these claims occurred in the Northern District of Georgia.

## PARTIES

### *Plaintiffs*

17.     Plaintiff VoteAmerica is a 501(c)(3) nonprofit organization founded by a small team of elections and technology experts (including the founders of Vote.org and Vote.gov). VoteAmerica's core mission is to persuade and assist all eligible American voters to engage in the electoral process. It does so by providing access to trusted election information, open platform technology, and education programs to support and empower the most vulnerable voters to navigate the path to exercising their vote.

18.     A key component of Plaintiff VoteAmerica's civic engagement activity and speech is providing voters with information and resources to facilitate their applications for absentee ballots. The VoteAmerica website provides extensive guides and tools for voter registration, absentee or mail voting, and voting in person in each state. VoteAmerica's resource for absentee or mail voting in Georgia consists of a guide to absentee voting rules, including deadlines, identification requirements, and other instructions, as well as links to relevant election offices and other election resources.

19.     VoteAmerica's first and primary resource for absentee voting in Georgia is an interactive Absentee and Mail Ballot tool that allows electors to

provide their name, address, date of birth, email, and phone number to prepare an official absentee ballot application form with their provided information while also signing up for further voter engagement communications from VoteAmerica. After users complete their absentee ballot application using VoteAmerica's web tool, the partially prefilled (with information provided by the voter) absentee ballot application is sent to the voter to submit to their local election official, and the voter receives follow-up communications from VoteAmerica to provide them with information regarding that election and future elections. This Absentee and Mail Ballot tool is available to potential voters not only on VoteAmerica but also on partner websites that utilize VoteAmerica's tool, which it makes freely available. VoteAmerica staffs this tool with at least three researchers at all times to keep the information provided on the tool up-to-date.

20.   VoteAmerica seeks to reach the largest number of potential voters with its voter engagement message by pairing the tools and resources on its website with many other modes of speech, including peer-to-peer texting, campus engagement, billboards, digital ad campaigns, and other modes of communication to assist voters in all elements of the voting process. These communications guide voters to VoteAmerica's available online tools and resources. VoteAmerica also shares

graphics, messaging, and other communications products with partners to amplify its message further.

21.     VoteAmerica provides resources and communications to millions of voters in all fifty states, including Georgia. More than forty-eight thousand Georgia voters engaged with VoteAmerica's Absentee and Mail Voting tool during Georgia's most recent elections, including 46,732 voters during the November 2020 general election and 1,913 Georgia voters during the January 2021 Runoff Election. Additionally, more than 143,198 Georgia voters presently receive VoteAmerica's educational emails and reminder text messages. Further, VoteAmerica anticipates future growth in the number of Georgia voters who use its resources and plans to continue to send educational messages, assistance, and reminders about voting, including in upcoming local and state elections in 2021.

22.     In light of SB 202's restrictions on absentee ballot application distribution, VoteAmerica's model for communicating, associating, and engaging with Georgia voters will be upended. First, VoteAmerica will be required to append a confusing, misleading, and dissuading disclaimer to all Georgia applications it distributes. This will require VoteAmerica to expend and divert resources towards designing an application and ensuring that the application complies with SB 202's various requirements. Additionally, VoteAmerica will be required to divert

resources from other programs and initiatives to implement a costly mechanism to comply with SB 202's restrictions on who can receive an application from VoteAmerica and when. VoteAmerica will be reliant on what data becomes "available" from the Secretary of State and when. With respect to all of these elements, VoteAmerica will be forced to navigate vague and overbroad restrictions, some of which may prove wholly impossible to comply with in practice.

23.   To comply with SB 202, VoteAmerica would have to divert a significant portion of its limited programmatic and financial resources and spend hundreds of hours of staff time to develop a new matching algorithm to cross-reference each voter who engages with the Absentee and Mail Voting tool against the list provided by the Secretary of State. Developing this new tool would be necessary to attempt to mitigate the harmful impact of SB 202. To avoid the threat of civil sanctions or other penalties for potential mistakes, the algorithm would have to flag every voter who attempted to engage with the tool before the voter could submit an absentee ballot application request to VoteAmerica's system. Assuming VoteAmerica is able to develop such a system, VoteAmerica would then have to rely on the accuracy of the Secretary of State's list. VoteAmerica would then be forced to constantly update the data set upon which its algorithm would rely to ensure that it is using the most up-to-date information from the Secretary of State to verify that

no voters who have already applied for an absentee ballot use their service to complete and submit an additional absentee ballot application. No technology can guarantee the accuracy of the Secretary of State's list, especially if the list is not updated with any specific frequency. Furthermore, no technology would allow VoteAmerica to check if a voter has already submitted an absentee ballot application after that voter has already been sent an absentee ballot application via its Absentee and Mail Voting tool. When the Secretary of State's list is inaccurate or stale, voters will inadvertently submit a duplicate absentee ballot application using VoteAmerica's tool. Even if VoteAmerica expends significant resources to try and avoid this problem, through no fault of its own it will likely incur financial sanctions and risk more significant penalties due to inadvertent duplicate applications.

24.    The risk of a voter slipping through the cracks is prohibitively expensive. VoteAmerica predicts that the cost of assuming fines for each duplicate application could bankrupt the organization. VoteAmerica spends approximately thirty-three cents per voter through its Absentee and Mail Voting tool. That cost would increase by $100 per penalty for each duplicate absentee ballot application, a potential increase of more than 30,000 percent per application.

25.    Based on its assessment of the costs associated with complying with SB 202's requirements and the necessary risks of incurring penalties for inadvertent

distribution of duplicate applications, VoteAmerica estimates that complying with SB 202 would effectively preclude VoteAmerica from fulfilling its mission and encouraging and supporting Georgia voters.

26.     Plaintiff Voter Participation Center ("VPC") is a 501(c)(3) nonprofit, nonpartisan organization founded in 2003. VPC's mission is to provide voter registration, early voting, vote by mail, and get out the vote ("GOTV") resources and information to traditionally underserved groups, including young voters, voters of color, and unmarried women.

27.     Plaintiff Center for Voter Information ("CVI") is a 501(c)(4) nonprofit, nonpartisan organization and a partner organization to VPC. CVI's mission is to provide education and resources to eligible voters and encourage them to participate in democracy through means such as registering to vote, submitting absentee ballot applications, and voting.

28.     VPC and CVI focus their efforts on communicating with and encouraging their potential voters to increase their engagement with the political process and assist them in doing so. VPC and CVI have designed and implemented direct mail programs to send mass mailers to their target demographics with resources for eligible voters to submit voter registration applications and absentee ballot applications. In 2020 alone, through their direct mail programs and other voter

engagement activities, VPC and CVI sent approximately 83,005,908 vote-by-mail applications across the country, including 9,605,979 in Georgia. In 2018, VPC and CVI distributed 12,868,108 absentee ballot applications nationally, including 654,824 in Georgia.

29.    One of VPC's primary activities is to associate with traditionally underserved voters and communicate to them the information and resources necessary to submit absentee ballot applications.

30.    Likewise, CVI's primary activity is to associate with its targeted voters and communicate resources and assistance for them to submit absentee ballot applications.

31.    Both VPC and CVI include a cover letter with every absentee ballot application that explains the organization's mission, contains the instructions for submitting an absentee ballot application to the voter's local election official, and communicates a persuasive message and encouragement for the voter to request and cast an absentee ballot. VPC and CVI's mailers already disclose information identifying themselves as the sender and reminding recipients that they need not submit a new application if they have already requested or received an absentee ballot.

32.     In Georgia, VPC and CVI undertake these activities by first obtaining access to statewide voter registration files for the State of Georgia. VPC and CVI then send voters targeted mailers that include a cover letter, postage-paid envelope addressed to the voter's county election office, and an absentee ballot application obtained directly from the Georgia Secretary of State, which VPC and CVI typically prefill with some of the voter's information from their registration records. VPC and CVI sent 654,824 and 9,605,979 applications to Georgia voters during the 2018 and 2020 elections, respectively. These voter engagement efforts are remarkably successful. An estimated 30,119 Georgia voters submitted an absentee ballot application provided by VPC or CVI to their state or local election official in the 2018 election, and an estimated 576,487 voters did so for the 2020 general election. An additional 88,563 Georgia voters submitted an absentee ballot application provided by VPC or CVI for the 2021 runoff elections.

33.     VPC and CVI regularly work with state election officials in Georgia to ensure the accuracy of their direct mail programs before they distribute registration forms or absentee ballot applications to Georgia voters.

34.     Specifically, VPC and CVI coordinate with state election officials to review their direct mail materials and ensure that their absentee ballot applications and other information are current.

35.     VPC and CVI also periodically request updated voter records from state election officials to proactively remove voters from their mailing lists who have already requested or submitted an absentee ballot application.

36.     VPC and CVI regularly communicate with state elections officials in Georgia to ensure that their activities are consistent with Georgia law. To this end, neither VPC nor CVI have ever received a formal complaint about their activities in Georgia.

37.     To execute their direct mail programs, VPC and CVI pay for a professional printer to produce and send several mailers to their targeted eligible voters over the course of an election cycle. Because VPC and CVI's operations are nationwide in scope, they submit millions of printing requests at a time for mailers intended to be sent to potential voters in multiple states, including in Georgia. This ordering, printing, and sending process for mailers takes at least four weeks per mailing cycle, with up to one million individual mailers printed per day.

38.     VPC and CVI estimate that each individual mailer—which includes the cover letter, pre-stamped and pre-addressed envelope, and prefilled absentee ballot application—costs thirty-nine cents per mailer to produce.

39.   SB 202's absentee ballot application distribution restrictions would effectively shut down VPC and CVI's current absentee ballot application direct mail programs in the state of Georgia.

40.   Given the timelines for printing and mailing ballots and the scale at which VPC and CVI operate, it is impossible for VPC and CVI to comply with the absentee ballot application distribution restrictions in SB 202 without completely derailing their voter communication and engagement activities concerning absentee voting.

41.   SB 202's prohibition on engaging with potential voters by prefilling any of the absentee ballot application will also substantially alter both the method by which VPC and CVI communicate with Georgia voters and the content of that communication. Based on their past experience and internal research, VPC and CVI have concluded that voters are more likely to submit an application that is already partially prefilled with their information. If VPC and CVI are required to send blank applications, that would drastically reduce the efficacy of their direct mail program and their ability to further their pro-voting engagement message.

42.   VPC and CVI's objectives and intentions are to continue to engage and communicate with Georgia voters through their direct mail programs, but the costs of committing an inadvertent but essentially inevitable mistake while distributing

absentee ballot applications could make the undertaking prohibitively expensive. Because VPC and CVI mail millions of mailers to voters every election cycle, SB 202's $100 penalty per duplicate application would significantly increase the cost of their respective direct mail programs. Compared to the present thirty-nine cent cost to produce each mailer and communicate with potential voters, the potential $100 penalty associated with sending a duplicate mailer would represent a 25,000 percent cost increase per mailer.

43.     If SB 202 is not enjoined, VPC and CVI will likely have to stop their absentee ballot application direct mail program for the State of Georgia entirely.

### *Defendants*

44.     Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia and is sued in his official capacity. As the chief elections official of the State, he is responsible for overseeing and administering Georgia's election laws and regulations. *See* O.C.G.A. §§ 21-2-210, 21-2-50, 45-13-20; *see also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005). Defendant Raffensperger also issues guidance to Georgia's county election officials on a range of elections procedures and requirements. SB 202 assigns Defendant Raffensperger authority as Secretary of State to implement aspects of Georgia's absentee ballot application system. *See* SB 202, Section 25 (to be codified as O.C.G.A. § 21-2-381).

45.     Defendant REBECCA N. SULLIVAN is Vice Chair of the State Election Board of Georgia. Defendants DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE are members of the State Election Board of Georgia. Defendants Sullivan, Worley, Mashburn, and Le are sued in their official capacities. As Vice Chair and as members of the State Election Board, Defendants Sullivan, Worley, Mashburn, and Le are responsible for, *inter alia*, "promulgat[ing] rules and regulations so as to obtain . . . the legality and purity in all primaries and elections" and "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections[.]" O.C.G.A. § 21-2-31(1), (2). They are further responsible for "investigat[ing], or authoriz[ing] the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution." *Id.* at § 21-2-31(5). They are authorized to "employ such assistants as may be necessary" to conduct their responsibilities and to "take such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* at §§ 21-2-31(8), (10).

46.    SB   202   specifically   authorizes   Defendants   Sullivan,   Worley,
Mashburn, and Le, as members of the State Elections Board, to impose financial
sanctions on Plaintiffs for violations of the challenged provision of SB 202 which
restricts the sending of absentee ballot applications to those Georgians who may
have already requested, received, or voted an absentee ballot. Section 25 (to be
codified at O.C.G.A. § 21-2-381(a)(3)(B)). Likewise, SB 202 specifically authorizes
Defendants Sullivan, Worley, Mashburn, and Le, as members of the State Elections
Board, to "promulgate reasonable rules and regulations for the implementation of"
the remaining challenged provisions. *Id.* (to be codified at O.C.G.A. § 21-2-381(e)).

## FACTS

### *Legal Background*

47.    Any eligible voter in Georgia may vote by absentee ballot. O.C.G.A. §
21-2-380(b). To vote by absentee ballot, an eligible voter must submit an absentee
ballot application to the board of registrars or absentee ballot clerk in their county
no earlier than seventy-eight days prior to an election and no later than eleven days
before an election. SB 202, Section 25 (to be codified at O.C.G.A. § 21-2-
381(a)(1)(A)). This is a shorter timeframe for absentee ballot applications than under
prior Georgia law, which previously allowed applications anytime in the 180 days
before an election. *Id.*

48.    Officials at the state and local level participate in administering absentee voting. The Secretary of State coordinates absentee voting statewide by promulgating rules to establish uniform procedures and prescribe standard forms for printed materials including applications, ballots, ballot envelopes, return envelopes, and instructions to voters. *See* O.C.G.A §§ 21-2-383, 21-2-384(b); *see also* SB 202, Section 25 (to be codified at O.C.G.A 21-2-381(a)(1)(C)(ii)). Superintendents, registrars, and absentee ballot clerks administer absentee voting locally by, *inter alia*, printing the necessary materials, accepting and processing absentee ballot applications, providing ballots to eligible voters, receiving voted ballots, and ultimately accepting or rejecting voted ballots. *See* O.C.G.A §§ 21-2-381, 21-2-383, 21-2-384.

49.    The official absentee ballot application form promulgated by the Secretary of State of Georgia—the distribution of which is at the crux of this lawsuit—is publicly available online on the Secretary of State's website, on county election offices' websites, and on third-party websites.

### The 2020 and 2021 Elections

50.    Georgia held two statewide election days in 2020. Primary elections for offices including U.S. Senate, U.S. House of Representatives, Georgia Senate, and Georgia House of Representatives, among others, were held on June 9, with early

voting from May 18 to June 5. The general Presidential election was held on November 3, with early voting from October 12 to October 30. Georgia also held statewide runoff elections for U.S. Senate and Georgia Public Service Commission in 2021 on January 5.

51.   The 2020 and 2021 elections saw record turnout among Georgians of all political persuasions and, given the pandemic circumstances under which they were held, also experienced a steep increase in the use of absentee voting.

52.   More than 5 million Georgians voted in the November 2020 election (compared to 4.1 million votes in November 2016) and nearly 4.5 million Georgians voted in the January 2021 runoff elections thereafter.

53.   In November 2020, 1,320,154 Georgians voted absentee compared to 181,135 Georgians in November 2016. In the January 2021 runoff election, 1,070,596 absentee ballots were cast, accepted, and counted.

54.   In the aftermath of the November 2020 Presidential Election, there were untold numbers of baseless accusations of election malfeasance in an attempt to undermine the results of the election in Georgia.

55.   However, the integrity of the results of Georgia's 2020 and 2021 elections cannot be doubted. The results of the November 2020 election underwent numerous risk-limiting audits and ballot-by-ballot hand counts, all of which

confirmed the results and integrity of the election and disproved baseless accusations of irregularities. Despite a searching inquiry and substantial litigation, no evidence of voter fraud was uncovered. Indeed, a signature match audit in Cobb County found "no fraudulent absentee ballots" whatsoever, with a 99% confidence threshold.

### *Legislative History*

56.   The success and historic turnout of the 2020 and 2021 Georgia elections are due in large part to a concerted effort by a broad coalition of Georgians, community organizations, churches, civic participation groups, and others to encourage eligible voters to overcome existing barriers to political participation, educate voters on how to vote safely by mail, and assist voters in navigating the electoral process. Plaintiffs were part of this concerted and successful campaign to communicate with Georgia voters and provide them with the resources they needed to participate in the election.

57.   It is against this backdrop of enhanced voter engagement across the State, increased voter turnout, and increased utilization of absentee ballots that Georgia enacted SB 202.

58.   The increased participation and widespread agreement that Georgia's election ran safely and efficiently did not spark the pride in the democratic process that one might expect of our elected leaders. Rather, politicians and legislators

repeatedly indicated or openly announced that the motivation behind their renewed efforts to change Georgia's voting laws in the aftermath of the 2020 and 2021 elections was not to improve electoral administration but to suppress turnout and bolster the political advantage of the party in power.

59.    For example, the Chair of the Gwinnett County Elections Board stated: "They don't have to change all [the voting laws], but they've got to change the major parts of them so that we [Republicans] at least have a shot at winning." Georgia House Speaker David Ralston opposed providing every voter with an absentee ballot because it would "certainly drive up turnout." And Representative Barry Fleming, Chair of the House Special Committee on Election Integrity, penned an inflammatory op-ed that baselessly attacked absentee voting and likened it to being in the "shady part of town" where the "chance of being shanghaied is significant." Defendant Raffensperger's office recognized legislators' misguided efforts in February, stating: "At the end of the day many of these bills are reactionary to a three-month disinformation campaign that could have been prevented."

60.    The process by which SB 202 was enacted further demonstrates the Legislature's failure to engage in a good faith process designed to improve election administration. SB 202's final text was passed in a harried fashion marred by a lack of transparency and no time for testimony and deliberation. The secretive and rushed

passage of the bill gave no consideration to the damaging consequences of the constantly changing legislative text of SB 202 and its various companion bills that were ultimately consolidated into SB 202. Various versions of bills nearing one-hundred pages—many of whose provisions were included in SB 202—were released within hours of the legislative hearing, leaving the community and affected parties with little to no time to analyze the text. Indeed, even Defendant Raffensperger's Bipartisan Task Force issued a statement on March 8, 2021 warning that it was "concerned that the legislative process [was] proceeding at a pace that [did] not allow for full examination of all factors that must be considered."

61.    The final passage of SB 202 was no different than the process that preceded it. The substitute text of SB 202 was released on March 25, 2021. It was passed by the House and Senate and signed by the Governor in a closed door ceremony all on the same day. The result, as borne out by the challenged provisions discussed herein as well as many others, is not only voter suppression but also a dysfunctional, purely partisan legislative process.

### *Challenged Provisions*

62.    SB 202 is a sprawling 98-page omnibus law altering numerous Georgia election procedures—from access to water while waiting in line to vote, to hours for early voting, to the authority of local election officials to run their own elections.

Many provisions of SB 202 have already been challenged for their disparate impact on minority communities, substantial and unnecessary burdens on the right of all Georgians to vote, and intentional discriminatory motivation.

63.     Plaintiffs challenge the Ballot Application Restrictions: three discrete provisions of SB 202, all of which target Plaintiffs' core political speech and freedom of association by restricting their ability to encourage and assist Georgia voters to participate in elections by mail. Each of these provisions limit Plaintiffs' ability to speak and associate by distributing and assisting Georgia voters with absentee ballot applications.

64.     ***The Disclaimer Provision***. SB 202 requires Plaintiffs, and all similar persons or organizations that wish to "send" absentee ballot applications to "any elector" to not only utilize the Secretary of State's absentee ballot application form but also include a confusing and misleading disclaimer on that form. Thus, Plaintiffs must modify the Secretary of State's official form to "clearly and prominently disclose on the face of the form" the following language:

> This is NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot. It is being distributed by [insert name and address of person, organization, or other entity distributing such document or material].

Section 25 (to be codified at O.C.G.A. § 21-2-381(a)(1)(C)(ii)).

65.   SB 202 further requires the disclaimer be "(I) Of sufficient font size to be clearly readable by the recipient of the communication; (II) Be contained in a printed box set apart from the other contents of the communication; and (III) Be printed with a reasonable degree of color contrast between the background and the printed disclaimer." *Id.* (to be codified at O.C.G.A. § 21-2-381(a)(1)(C)(iii)). SB 202 fails to sufficiently explain these ambiguous requirements, providing no definition for "sufficient font size" or "reasonable degree of color contrast." *Id.* The requirements regarding the appearance of the disclaimer are vague and leave Plaintiffs to guess whether their disclaimer is compliant or violates the law, subjecting them to the risk of sanctions or other penalties.

66.   This disclaimer is inherently misleading and will be confusing to voters. SB 202 in one breath requires Plaintiffs to use an official government form to assist voters in applying to vote absentee—a requirement Plaintiffs do not challenge—and in another requires Plaintiffs to tell voters that this official form is, in fact, not official. Indeed, the current application for an absentee ballot—which Plaintiffs must use for this purpose—includes the official seal of the Secretary of State and is titled "Application for *Official* Absentee Ballot." *See* Exhibit 1 (emphasis added).

**Brad Raffensperger**
SECRETARY OF STATE

**APPLICATION FOR**
**OFFICIAL ABSENTEE BALLOT**

**PLEASE PRINT** (Failure to fill out the form completely could delay your application)
Date of Primary, Election, or Runoff: (MM/DD/YYYY) _____

And yet, Plaintiffs would be required to add a "clear[] and prominent" disclaimer contradicting this message on the very same page, stating that the document is, despite all appearances, "NOT an official government publication." Likewise, it requires Plaintiffs to indicate that the form is "NOT provided by any governmental entity," despite it being a government-prescribed form that is created, maintained, and published by the Secretary of State.

67.   Thus, SB 202 not only compels Plaintiffs to communicate a government-mandated message, but it requires them to do so in a misleading and incoherent manner. This disclaimer appears to have been designed to, and will have the effect of, dissuading voters from using absentee ballot application forms distributed by Plaintiffs. This contradictory and misleading disclaimer will lead voters to believe the form is illegitimate, undermine Plaintiffs' speech, and only serve to confuse voters rather than assist them. The compelled inaccurate speech disclaimer will impair the truthful message Plaintiffs seek to send to potential voters—*i.e.* you can vote absentee and can do so by using *this* appropriate official form we are providing you—and reduce the effectiveness of their speech, alter the

content of their voter engagement messages, and impede their ability to associate with voters.

68.   The disclaimer will also likely create confusion for local election officials processing absentee ballot applications. Plaintiffs' variable alterations of the Secretary of State's form to comply with this provision will create disuniformity and will likely lead to improper rejections of absentee ballot applications.

69.   The Disclaimer Provision also lacks any reasonable limits on its application. The disclaimer must appear on "*[a]ny* application for an absentee ballot sent to *any* elector by *any* person or entity." By its text, the Disclaimer Provision would apply even to the Secretary of State and other local election officials who are charged with creating and distributing this official form. But putting aside that absurdity, it applies regardless of whether the application is solicited or unsolicited by the elector and whether the person or entity is sending one application to one elector or one thousand applications to one thousand electors. It would apply to one neighbor sending an application to another upon their request.

70.   And because SB 202 fails to define "send," it leaves Plaintiffs to guess whether the Disclaimer Provision applies not only to postal mail but also email, fax, social media, any other electronic communications, or even in-person distribution. It is unclear whether it applies to the posting of the absentee ballot application on

Plaintiffs' websites or social media accounts. Such vagueness only compounds the First Amendment harms imposed by this confusing and intentionally dissuading government-mandated speech.

71.   The State has no compelling interest, or even rational basis, for requiring such a confusing, misleading, and voter-dissuading disclaimer on its official absentee ballot application form.

72.   There is no evidence that this disclaimer is addressing any real or meaningful problem of voter confusion arising from the distribution of absentee ballot applications.

73.   In any event, the SB 202 disclaimer is not meaningfully, and certainly not narrowly, tailored to address any such confusion. "If [Georgia] is concerned that the public is insufficiently informed or misinformed, then 'more benign and narrowly tailored options are available' than compelled speech. For example, the state could 'communicate the desired information to the public' itself through a public awareness campaign. If the [Georgia Secretary] of State is concerned that the public is confused about its role in [facilitating absentee voting], it is free to communicate with the public of its own accord." *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 730 (M.D. Tenn. 2019) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 800 (1988)).

74.   ***The Prefilling Prohibition.*** In addition to requiring Plaintiffs to place a misleading and dissuading disclaimer on all their voter engagement communications that include an absentee ballot application, SB 202 prohibits Plaintiffs from sending any absentee ballot applications that are "prefilled" with the elector's required information. Section 25 (to be codified at O.C.G.A. § 21-2-381(a)(1)(C)(ii)).

75.   This prohibition directly restricts the content of the communications Plaintiffs can send to electors; interferes with Plaintiffs' models for associating with, engaging with, and assisting voters; and reduces the effectiveness of Plaintiffs' speech and expressive conduct.

76.   This prohibition applies broadly, including where the application is solicited by the voter and where the voter provides the sender with the required information. It applies regardless of whether the sender is sending individualized applications in response to direct requests or mass applications on an unsolicited basis.

77.   The only exception to this rule is extraordinarily narrow: relatives authorized to request an absentee ballot for an elector and persons "signing as assisting an illiterate or physically disabled elector." This exception would do nothing to alleviate the burden, for example, on a disabled voter seeking to use the

services of Plaintiff VoteAmerica to receive an absentee ballot application—containing information that the voter themselves provided—that they could then simply sign and return to their local election office.

78.    Like the Disclaimer Provision, the Prefilling Prohibition fails to define "send," leaving Plaintiffs to guess whether the Prefilling Prohibition applies not only to postal mail but also email, fax, social media, any other electronic communications, or even in-person distribution.

79.    Furthermore, the Prefilling Prohibition bars the sending of any application "prefilled with *the elector's* required information" as set forth in SB 202. This vague language leaves Plaintiffs to guess whether prefilling is only prohibited if it includes *all* the required information or *any* of the required information.

80.    These uncertainties about the content and coverage of the Prefilling Prohibition put Plaintiffs in an especially difficult position given the threat of penalties and sanctions for failing to strictly adhere to the provision.

81.    The Prefilling Prohibition imposes serious harms on Plaintiffs' freedom of speech and freedom of association rights. Take, for example, the model for voter engagement and association employed by Plaintiff VoteAmerica. On VoteAmerica.com, any Georgia elector can visit the site, click "Request Your Mail-In Ballot" or "Request Your Absentee Ballot," provide their personalized

information, and receive a copy (either by email or mail or both) of the Georgia Secretary of State's Application for an Official Absentee Ballot pre-filled with the information they provided. In doing so, the elector also voluntarily agrees to receive further communications from VoteAmerica so that VoteAmerica builds a broad associational base with whom it can communicate further about political engagement and civic participation. If VoteAmerica can no longer provide this service to voters, one of its critical tools for association and political speech will be entirely undermined.

82.     Likewise, the Prefilling Prohibition would severely hinder Plaintiffs VPC and CVI, whose mass mailing programs rely on sending voters partially prefilled absentee ballot applications containing information provided by voters in their registration records. If VPC and CVI can no longer provide voters with prefilled applications, the effectiveness of their programs will be severely curtailed.

83.     The State has no compelling interest, or even rational basis, for so severely restricting the content and conveyance of Plaintiffs' political speech. The prohibition is both overbroad—for example, by prohibiting prefilling even where the voter provides the information and requests the application and thus the risk of error or voter confusion is low—and underinclusive, by allowing prefilling of

information that is not required but optional on the form but that might not correctly represent the voter's situation.

84.     Any attempt to submit fraudulent absentee ballot applications is already prohibited by Georgia law and criminally punishable. O.C.G.A. § 21-2-573. Likewise, local election officials are required to match the information on absentee ballot applications to the voter registration system to identify errors or anomalies. O.C.G.A. § 21-2-381(b)(1).

85.     There is no substantial evidence that this Prefilling Prohibition addresses any widespread problem of election administration arising from the distribution of absentee ballot applications. In any event, the SB 202 Prefilling Prohibition is not rationally, and certainly not narrowly, tailored to address any purported election administration problems.

86.     ***The Mailing List Restriction.*** In addition to requiring a government-mandated misleading disclaimer on its absentee ballot application communications, and restricting the remaining content of those communications, SB 202 also restricts *to whom* Plaintiffs can send absentee ballot applications. And it does so in a manner so restrictive that it will either impose enormous costs on Plaintiffs, force Plaintiffs to drastically reduce their voter engagement communications, or both.

87.    Specifically, SB 202 dictates that "All persons or entities, other than [election officials] that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff." Section 25 (to be codified at O.C.G.A. § 21-2-381(a)(3)(A)). Failure to comply with this restriction can result in a fine of up to $100 "per duplicate application that is processed by the county due to such violation." *Id.* (to be codified at O.C.G.A. § 21-2-381(a)(3)(B)). This is in addition to "all other possible sanctions" for violation of the election code. *Id.*

88.    This prohibition, once again, applies to any person or entity sending any elector an application for absentee ballot regardless of whether such application is solicited or unsolicited or the volume of applications the person or entity is sending. It introduces the term "mail" in addition to "send" without further definition, once again leaving Plaintiffs to guess whether that includes email or other similar electronic communications.

89.    The provision contains no exceptions to its prohibition on sending applications to individuals who may have "already requested, received, or voted an absentee ballot in the primary, election, or runoff." Thus, Plaintiffs cannot send *solicited* applications to electors that made an error on their prior request, had their

prior request rejected, or need a new application for any other reason.[1] Plaintiffs similarly cannot send *solicited* applications to individuals who may have already requested or received a ballot but are seeking additional applications for their family members.

90.     Presumably to facilitate compliance with this restriction, Section 25 of SB 202 further dictates that "[a]ny such person or entity shall compare its mail distribution list with the most recent information available about which electors have requested, been issued, or voted an absentee ballot in the primary, election, or runoff and shall remove the names of such electors from its mail distribution list." *Id.* It then provides a safe harbor for organizations that rely on "information made available by the Secretary of State within five business days prior to the date such applications are mailed." *Id.*

91.     But these provisions are riddled with vagaries and uncertainties that make compliance nearly or practically impossible. The "most recent information available" is undefined. It is unclear what makes information "available." For example, it's unclear whether information is "available" if Plaintiffs would have to

---

[1] During the March 3, 2021 Senate Ethics Committee hearing on SB 202, Senator Bo Hatchett proposed an amendment to SB 202 that would have limited the application of this restriction to only "unsolicited" applications. This change was not included in SB 202's final text.

request that information from each individual county and if Plaintiffs are relying on such data, how recent it must be to be the "most recent."

92.     These vagaries might be mitigated by the five-day safe harbor provision but nothing in SB 202 actually requires the Secretary of State to make all the necessary information available or do so on any regular timeframe. The election code contemplates lists of rejected absentee ballots, lists of absentee ballots sent to voters, and lists of received and certified absentee ballots. *See* O.C.G.A. §§ 21-2-384(d), 21-2-386(a)(1)(B), 21-2-386(a)(1)(E). But it does not specifically require a comprehensive list that includes all voters who have applied but not yet been sent an absentee ballot. And the election code requires maintenance of these lists at the individual county level rather than statewide level. While they must be available for public inspection, SB 202 does not require publication of that data in any particular manner, or publication at any regular interval. During testimony on SB 202, a representative from the ACLU of Georgia explained that at that time, requesting a voter list roll from the Secretary of State would cost $250 and take 1-2 weeks to arrive. As such, he urged legislators: "So when it comes to the accuracy of us or these organizations putting on a burden, we have to take into account what the Secretary of State is actually able to do and update at the proper time." This plea was rejected.

93.     Thus, Plaintiffs can only rely on this safe harbor if the Secretary of State happens to make this information available and does so in the five-day window prior to a mailing of absentee ballot applications. As a result, Plaintiffs' ability to communicate with *any* Georgia electors about absentee voter applications is wholly contingent on the Secretary of State's unfettered discretion and how often  Defendant Raffensperger provides information about who has requested, received, or voted an absentee ballot in an election. And without any standards for when and how the Secretary of State will make this list "available," there remains the real possibility that some preferred speakers might receive more timely responses than less preferred speakers.

94.     Even if the Secretary of State made a new list of individuals who had requested, received, or voted an absentee ballot in a given election available every day—an unlikely occurrence—the Mailing List Restriction would impose severe burdens on Plaintiffs' free speech and associational rights.

95.     *First*, the safe harbor provision only applies if Plaintiffs rely on data provided by the Secretary of State in the last five days. But preparing a large volume mailing—the means by which Plaintiffs VPC and CVI communicate—takes longer than five days. Thus, if Plaintiffs rely on the most recent information available from the Secretary of State in creating a mailing distribution list, it will be stale and

beyond the five-day safe harbor by the time the mailing is printed and ready to be sent for delivery. Indeed, a typical VPC or CVI mailing takes at least 20 days from when a list is provided to the vendor until the mailing is sent. This unreasonable five-day limitation would impose enormous costs on Plaintiffs' speech and substantially reduce the amount of speech they are able to deliver on a timely basis.

96.    To continue associating and communicating with potential voters in Georgia, Plaintiffs VPC and CVI would have to significantly alter the content of their absentee ballot application mailers, drastically reduce the scope of their absentee ballot application direct mail program, or incur prohibitively expensive costs to seek compliance and reduce the high risk of sanctions.

97.    For example, it is logistically impossible for VPC and CVI to both comply with SB 202's five-day safe-harbor provision—effectively requiring organizations to check against a moving-target list of voters who the Secretary of State reports have already requested their absentee ballot applications—and submit their orders to the printer on time to send the direct mailers.

98.    To comply with SB 202 and continue having even a circumscribed level of engagement with Georgia voters, VPC and CVI would have to check their mailers against the State's list after the mailers are already printed. In effect, VPC and CVI would have to first submit their order to the printer by reference to the Secretary of

State's then-current list of Georgia absentee voter statuses. After VPC and CVI's mailer print order is completed multiple weeks later, VPC and CVI would then have to expend significant resources to manually check the millions of printed and already paid-for direct mailers against the State's current absentee ballot list, which will unpredictably contain countless voters with updated absentee ballot statuses. To avoid sanctions or other steep penalties under O.C.G.A. § 21-2-573, VPC and CVI would have to guarantee absolute precision while manually removing any potential duplicate recipients from the printing order, and be forced to do so in five days' time or else start the process all over again. The diversion and drain of resources necessary to comply with the five-day safe harbor would overwhelm VPC and CVI, and dramatically impede their ability to communicate with Georgia voters.

99.    The Legislature was aware of the problems inherent in requiring civic engagement organizations to rely on the "most recent available information." Indeed, this was the topic of significant discussion during a March 3, 2021 hearing on SB 202. The "fix" of the five-day safe harbor provision was proposed by Senator Strickland, who seemed surprised that his off-the-cuff suggestion was so quickly adopted as legislative text. He noted: "I was thinking I was making stuff up as I went. Isn't that how laws are made," which led to laughter in the chamber, a "sausage" comment from the presiding officer, and then unanimous adoption of the

amendment. But the failure of the Legislature to think through an appropriate or reasonable timeline and safe harbor is no laughing matter. It has left Plaintiffs unable to exercise their First Amendment rights.

100.    *Second,* because the Mailing List Restriction applies even where the elector solicits an absentee ballot application, it would require Plaintiffs like VoteAmerica, which utilize technology to respond individually to requests for applications, to create a new technological solution that would reject requests for absentee ballot applications based on the "most recent available information"— whatever that may be—about who has requested, received, or voted an absentee ballot. Such a state-specific system, requiring frequent updates to the data relied upon, would be costly and onerous to implement. Once again, this unreasonable restriction imposes unnecessary costs on Plaintiffs' speech that will reduce the total quantum of speech they can deliver.

101.    The State has no compelling interest, or even rational basis, for so severely restricting the content of Plaintiffs' political speech. There is no substantial evidence that this Mailing List Restriction addresses any widespread problem of election administration or voter fraud arising from the distribution of absentee ballot applications. The election apparatus is already designed to identify duplicate applications to ensure that voters do not receive multiple absentee ballots.

102.   In any event, the Mailing List Restriction is not meaningfully, and certainly not narrowly, tailored to address any purported election administration problems or minimize the burden on Plaintiffs' speech. Instead, it imposes overbroad restrictions on who Plaintiffs can contact, fails to provide a reasonable mechanism for delivering the necessary information for compliance, and imposes an unrealistic timeline that would create enormous costs for Plaintiffs.

103.   Together and individually, these restrictions impose severe burdens on Plaintiffs' associational and free speech rights. Plaintiffs regularly engage in core political speech—encouraging civic engagement and participation, including through absentee voting—with Georgia electors. Indeed, this type of speech and voter engagement activity is core to all of their organizational missions. Yet, these restrictions require Plaintiffs to convey misleading speech that dilutes their message, limit the content of Plaintiffs' communications and handicap their ability to associate with and assist electors, and impose vague and unreasonable restrictions on *who* Plaintiffs can communicate with and when.

## CLAIMS FOR RELIEF

### First Claim for Relief: Free Speech
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

104.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-103 as if fully set forth herein.

105.  The First Amendment to the United States Constitution prohibits the government's abridgment of the freedom of speech.

106.  The First Amendment is applied to the states through the Fourteenth Amendment.

107.  SB 202 directly and severely burdens Plaintiffs' core political speech, which includes communications and expressive activities aimed at encouraging voters to participate in the political process through absentee voting.

108.  SB 202 restricts Plaintiffs' expressive conduct in sharing their belief in the capacity of the popular will to shape the composition and direction of the government. Advocating for that belief through Plaintiffs' endeavors to persuade Georgians to participate in the political process and assisting eligible voters to successfully request an absentee ballot is in itself a political and philosophical statement.

109.  Like the circulation of an initiative petition for signatures, engaging and assisting voters with the absentee ballot application process is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). Whether a citizen should participate in an election and exercise their right to vote by absentee ballot is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking" sanctions or other penalties. *See id*. at 421; *see also Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186–87 (1999) (quoting *Meyer*, 486 U.S. at 422).

110. SB 202's provisions in Section 25 impose onerous restrictions on distributing absentee ballot applications that are coupled with the threat of substantial penalties to heavily burden Plaintiffs' political expression. These requirements diminish Plaintiffs' ability to convey their message and further that message by engaging more individuals in the political process through absentee balloting.

111. The Disclaimer Provision is a severe burden on Plaintiffs' First Amendment rights. The provision will obscure Plaintiffs' intended message and dissuade voters from using the absentee ballot application form that Plaintiffs distribute. It undermines Plaintiffs' core political expression by altering and

dictating the content of their voter engagement communications. And it impairs Plaintiffs' speech by giving potential voters the incorrect impression that Plaintiffs' communications are in some way illegitimate or not in accord with government-prescribed processes.

112. The Prefilled Prohibition is a severe burden on Plaintiffs' First Amendment rights. The Prefilled Prohibition directly restricts the content of the communications Plaintiffs can send to electors. It entirely proscribes certain types of speech that Plaintiffs currently communicate and would plan to continue communicating to engage and assist voters. It also diminishes the effectiveness of Plaintiffs' speech and expressive conduct by eliminating a primary option that Plaintiffs use to advocate their message with voters who seek assistance obtaining and completing their absentee ballot application. *See Meyer*, 486 U.S. at 424 ("The First Amendment protects [the] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").

113. The Mailing List Restriction is a severe burden on Plaintiffs' First Amendment rights, restricting to whom Plaintiffs can communicate. The Mailing List Restriction's list comparison requirement and its impossible and arbitrary timeline to conduct that comparison will also impede Plaintiffs' ability to speak at all concerning Georgia's absentee ballot applications, much less at the scale of its

current outreach and voter assistance programs. It will necessarily reduce the quantum of speech Plaintiffs are able to deliver because it dramatically increases the logistical and monetary costs of every instance of Plaintiffs' expressive conduct made through mailer campaigns and direct outreach.

114. The Mailing List Restriction's onerous requirements and enormous costs, coupled with the substantial penalties, circumscribe Plaintiffs' core political expression and risk derailing their ability to communicate their message in Georgia. Given the large scale of Plaintiffs' absentee ballot application communications, imposing the steep financial penalties established in SB 202 would consume a large percentage of Plaintiffs' budgets and decimate their ability to conduct any of their civic work. Plaintiffs' fear of prosecution and desire to avoid inadvertent violations that would generate financial sanctions or other potential penalties will chill Plaintiffs' protected speech and force Plaintiffs to self-censor.

115. Together and individually, SB 202's burdensome provisions "reduce[] the voices available to convey political messages," *see Buckley*, 525 U.S. at 210 (Thomas, J., concurring), because they impair Plaintiffs' core organizational missions to speak with potential voters and encourage political participation through the use of absentee balloting.

116. SB 202's provisions in Section 25 also constitute content-based restrictions on speech because speakers who discuss absentee ballot applications such as Plaintiffs are subject to restrictions and penalties that other speakers are not.

117. Thus, the challenged provisions in SB 202 are subject to strict scrutiny review because they proscribe speech based on the identity of the speaker, operate as a content-based restriction on speech, and impede Plaintiffs' core political expression.

118. These challenged requirements are not narrowly tailored to serve any compelling state interest. Indeed, Section 25 of SB 202 does not actually advance any legitimate regulatory interest, and serves little purpose other than to dissuade civic organizations and individuals from engaging in activity and speech concerning absentee ballot application distribution.

119. The State's purported goals of increasing confidence in elections or encouraging uniformity are at best pretextual, and these restrictions are more likely to undermine than restore confidence in Georgia's elections.

120. These requirements heavily burden Plaintiffs' freedom of speech and are not rationally related to any legitimate government interests.

121.   Under the exacting scrutiny standard applied in *Meyer* and *Buckley*, or any other level of judicial scrutiny, the challenged provisions in Section 25 of SB 202 violate Plaintiffs' First Amendment free speech rights.

### Second Claim for Relief: Freedom of Association
#### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

122.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-121 as if fully set forth herein.

123.   The First Amendment to the United States Constitution prohibits government abridgment of the freedom of association. *Nat'l Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 430 (1963).

124.   SB 202 directly and severely burdens Plaintiffs' associational rights by preventing Plaintiffs from banding together with others to engage potential voters and assist community members to further participate in the civic community through absentee voting.

125.   SB 202's requirements in Section 25 will reduce the options and opportunities for Plaintiffs to associate with potential voters and jointly participate in meaningful civic activities.

126.   The Disclaimer Provision, for example, gives Plaintiffs' absentee ballot outreach the false impression of illegitimacy, which hinders Plaintiffs ability to associate with potential voters and develop a network for collective civic action.

127.   The Prefilling Prohibition likewise interferes with Plaintiffs' model for associating with voters through their effective absentee ballot application services. The provision eliminates the method by which Plaintiffs connect with Georgians at the absentee ballot application phase to gain a foothold with those voters for further association and group engagement for political expression.

128.   For example, Plaintiff VoteAmerica assists voters by prefilling the absentee ballot application with the information they provided online and, in doing so, the voters also voluntarily agree to receive further communications from VoteAmerica. This streamlined process enables VoteAmerica to build a broad associational base of Georgians with whom it can communicate further about civic participation. By eliminating this service to voters, the Prefilling Prohibition also eliminates one of Plaintiffs' critical tools for developing and enhancing its political association in the State.

129.   The Mailing List Restriction imposes a severe burden because it entirely prohibits Plaintiffs from associating with certain categories of voters concerning its absentee ballot application programs. In practice, the burdensome

Case 1:21-cv-03138-TNM   Document 16-3   Filed 09/29/22   Page 507 of 691

punitive sanctions attached to the Mailing List Restriction inhibit Plaintiffs from recruiting and associating with even potential voters who have not already requested, received, or voted an absentee ballot because of the fear of incurring penalties for any instance of inadvertent noncompliance with the statute.

130.   Together and individually, SB 202's restrictive provisions in Section 25 impose a severe burden on Plaintiffs' freedom of association and are subject to strict scrutiny.

131.   These requirements are not narrowly tailored to serve any compelling state interest. Indeed, these requirements do not advance *any* legitimate regulatory interest, and serve little purpose other than to hinder civic organizations from associating with voters concerning absentee ballot applications and other engagement in the political process.

132.   These requirements which impinge on Plaintiffs' associational rights are also not rationally related to any legitimate government interests.

133.   Under the exacting scrutiny standard applied in *Meyer* and *Buckley*, or any other level of judicial scrutiny, the requirements in SB 202 Section 25 violate the First Amendment's guarantee of freedom of association.

**Third Claim for Relief: Compelled Speech**
**(Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. §**
**1983)**

134.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-133 as if fully set forth herein.

135.   The First Amendment to the United States Constitution prohibits government abridgment of Plaintiffs' freedom of speech through government-compelled speech.

136.   SB 202's Disclaimer Provision undermines Plaintiffs' core political speech. It unconstitutionally forces Plaintiffs and other individuals or organizations that conduct absentee ballot application programs to speak for the government by making a disclaimer that Plaintiffs would not otherwise recite. The disclaimer constitutes speech (specifically, confusing, misleading, and dissuading speech), Plaintiffs object to the government imposing such speech upon them, and the speech will be readily associated with Plaintiffs and tied to their name when it is used on the absentee ballot application forms that Plaintiffs distribute.

137.   The SB 202 required disclaimer pejoratively emphasizes that the Plaintiffs' speech is "NOT an official government publication and was NOT provided to you by any governmental entity[.]" Such a disclaimer—prominently displayed—suggests that filling out an absentee ballot application is an activity that

should be done only in conjunction with the Secretary of State and undermines a voter's confidence that using Plaintiffs' services will be official and effective. This disclaimer will undermine the credibility of Plaintiffs, which are legitimate civic organizations that provide important services to eligible Georgia voters.

138.   This disclaimer, moreover, will not be accurate because SB 202 makes Plaintiffs use the State-prescribed form titled "Application for *Official* Absentee Ballot.".

139.   SB 202's Disclaimer Provision "is a content-based regulation of speech" because it is "compelling individuals to speak a particular message" that functions to "alter the content of their speech." *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (citations and internal alterations omitted). As such, it is subject to strict scrutiny. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d at 729–30.

140.   The Disclaimer Provision is not narrowly tailored to serve any compelling state interest; rather, this disclaimer serves no legitimate governmental function because there is no evidence that Georgians have been confused about the nature of community-based absentee ballot application activity. There is no indication that Plaintiffs or other similar voter engagement and assistance groups have suggested to application recipients that their community-based activity is done

in coordination with the Secretary of State or have misled anyone regarding the nature of their efforts. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d at 730.

141.   To the extent the government thinks that the disclaimer message required by SB 202 is needed, the government must speak for itself. The State must not co-opt Plaintiffs and other civic organizations to speak in furtherance of Georgia's own governmental message.

142.   The Disclaimer Provision is not rationally related to any legitimate government interest.

### Fourth Claim for Relief: Substantial Overbreadth
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

143.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-142 as if fully set forth herein.

144.   The First Amendment to the United States Constitution prohibits government abridgment of the freedom of speech through the enactment of substantially overbroad laws. *See FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1304 (11th Cir. 2017) (citing *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987)).

145.   SB 202's Disclaimer Provision, Prefilling Prohibition, and Mail List Restriction are all unconstitutionally overbroad laws because they regulate a sweeping amount of noncommercial political speech and constitutionally protected expressive conduct.

146.   The threat of penalties for violations of SB 202's ambiguous and overbroad provisions will impermissibly chill or present the substantial risk of chilling Plaintiffs' protected speech, such as Plaintiffs' speech informing voters about their right to request an absentee ballot and the process for doing so.

147.   The Disclaimer Provision is overbroad because it lacks any reasonable bounds on its application. The required disclaimer must appear on "*[a]ny* application for an absentee ballot sent to *any* elector by *any* person or entity.*" This expansive and open-ended language, is unconstitutionally overbroad.

148.   As the broadest absentee ballot application disclaimer requirement in the country—both in writing and application—the Disclaimer Provision would impede all of Plaintiffs' absentee ballot application activities in Georgia, regardless of whether the absentee ballot application is solicited or unsolicited by the elector. It would also expansively cover the most benign and commonplace scenarios of individual Georgians helping each other participate in the political process, such as one neighbor sending an application to another upon their request. Indeed, the

Disclaimer Provision is so deficiently and substantially overbroad that it could even paradoxically apply to the Secretary of State and other local election officials who are charged with creating and distributing the official absentee ballot application form.

149.   The Prefilled Prohibition is also unconstitutionally overbroad. The overbreadth of the provision would sweep in substantial protected First Amendment activity by applying regardless of whether the absentee ballot application distributor is sending individualized applications in response to isolated requests from voters or mass applications on an unsolicited basis. Such unconstitutional applications of the overbroad Prefilled Prohibition would also include a situation where the absentee ballot application is solicited by the voter and the voter themselves provides Plaintiffs with the required prefilled information.

150.   The Mailing List Restriction is likewise unconstitutionally overbroad, in part because it offers no exceptions or limiting principle to its prohibition on sending applications to individuals who may have "already requested, received, or voted an absentee ballot in the primary, election, or runoff." Accordingly, the ambiguous extensiveness of the restriction would over-inclusively prohibit Plaintiffs from sending solicited applications to electors that made an error on their prior

request, had their prior request rejected, or need a new application for any other reason.

151.   These overbroad provisions in SB 202 are full of uncertainties and risk a degree of capricious enforcement that will make Plaintiffs' compliance potentially impossible, and are therefore unconstitutional infringements on Plaintiffs' protected speech that do not survive First Amendment scrutiny.

**Fifth Claim for Relief: Vagueness**
**(Violation of Plaintiffs' First and Fourteenth Amendment Rights Pursuant to 42 U.S.C. §1983)**

152.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-151 as if fully set forth herein.

153.   The First Amendment to the United States Constitution prohibits the government's abridgment of freedom of speech due to the enactment of unconstitutionally vague restrictions. *See Jews for Jesus, Inc*., 482 U.S. at 576.

154.   Additionally, the Due Process Clause of the Fourteenth Amendment prohibits punitive sanctions for activity that are "so vague that [they] fail[] to give ordinary people fair notice of the conduct [they] punish, or so standardless that [they] invite arbitrary enforcement." *See Johnson v. United States*, 576 U.S. 591, 595 (2015). When penalties affect political expression, the "standards of permissible statutory vagueness are strict." *Button*, 371 U.S. at 432.

155.   The challenged provisions of SB 202 are substantially vague and violate Plaintiffs' rights under the First and Fourteenth Amendments.

156.   The Disclaimer Provision is ambiguous, in part because it fails to define the key word "send," a vague verb with potentially broad meaning that compels Plaintiffs to guess whether the disclaimer requirement applies beyond postal mail to include email, fax, social media, website posting, any other electronic communications, or even in-person distribution. Moreover, the physical specifications of the disclaimer are substantially vague because SB 202 fails to explain what constitutes "sufficient font size" or "reasonable degree of color contrast." Such vagueness issues only compound the First Amendment harms imposed by this confusing and intentionally dissuading government-mandated speech, and further expose Plaintiffs to the unpredictable and arbitrary risk of punishment despite their good faith efforts to comply.

157.   The Prefilling Prohibition is also substantially vague, in part because it similarly fails to define "send" and leaves Plaintiffs in the dark about whether the Prefilling Prohibition applies not only to postal mail but also to email, fax, social media, any other electronic communications, or even in-person distribution. The Prefilling Prohibition additionally bars Plaintiffs and other civic organizations from sending any absentee application "prefilled with *the elector*'s required information,"

which offers no guidance as to whether prefilling is only prohibited if it includes *all* the required information or *any* of the required information.

158.    The Mailing List Restriction is also substantially vague, and its constitutional deficiencies are acutely problematic given the heavy punitive sanctions attached to even inadvertent violations of that provision. For example, the restriction introduces the term "mail" in addition to "send" without further definition, once again setting Plaintiffs up to merely guess whether that includes email or other similar electronic communications. And its ambiguous terms appear to apply to any person or entity sending any elector an application for absentee ballot regardless of whether such application is solicited or unsolicited or the volume of applications the person or entity is sending. The "most recent information available" is undefined. It is unclear what makes information "available." In addition, Plaintiffs' good faith efforts to comply with the requirements may still not be enough because the provision makes reliance on the "most recent information available," with no clear provision in law for how, when, or where the Secretary of State must publish such information.

159.    Due to these vague provisions, SB 202 fails to give reasonable notice of what constitutes prohibited conduct to civic organizations and persons that

participate in First Amendment protected activities concerning absentee ballot applications, including Plaintiffs.

160.   The State has no compelling interest or even rational basis for requiring such confusing, misleading, and voter-dissuading disclaimers and restrictions for its absentee ballot application process that inhibit Plaintiffs' ability to speak.

161.   These provisions of SB 202 are therefore unconstitutionally vague under the Due Process Clause and the First Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A. Declare that the challenged provisions in Section 25 of SB 202 violate the First and Fourteenth Amendments, both facially and as-applied to Plaintiffs;

B. Preliminarily and permanently enjoin Defendants from enforcing the challenged provisions in Section 25 of SB 202, both facially and as-applied to Plaintiffs, and including the punitive sanctions contained therein;

C. Retain jurisdiction to render any and all further orders that this Court may deem necessary;

D. Award Plaintiffs their attorneys' fees and costs pursuant to statute; and

E. Grant such other and further relief that the Court deems just and proper.

Respectfully submitted this 7th day of April, 2021.

/s/ Robert B. Remar
Robert B. Remar (Ga. Bar No. 600575)
Katherine L. D'Ambrosio (Ga. Bar No. 780128)
ROGERS & HARDIN LLP
229 Peachtree Street NE
2700 International Tower
Atlanta, GA 30303
Tel: (404) 522-4700
Fax: (404) 525-2224
rremar@rh-law.com
kdambrosio@rh-law.com

Danielle Lang*
Jonathan Diaz*
Caleb Jackson*
Hayden Johnson*
Valencia Richardson^*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, D.C. 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
cjackson@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org

Counsel for Plaintiffs

* Pro Hac Vice applications forthcoming

^ Licensed to practice in Louisiana only;
Supervised by Danielle Lang, a member of the
D.C. Bar

# EXHIBIT 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **COALITION FOR GOOD GOVERNANCE, ADAM SHIRLEY, ERNESTINE THOMAS-CLARK, ANTWAN LANG, PATRICIA PULLAR, JUDY MCNICHOLS, JACKSON COUNTY DEMOCRATIC COMMITTEE, GEORGIA ADVANCING PROGRESS POLITICAL ACTION COMMITTEE, RYAN GRAHAM, RHONDA MARTIN, JEANNE DUFORT, AILEEN NAKAMURA, ELIZABETH THROOP, and BRADLEY FRIEDMAN,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**BRIAN KEMP, in his official capacity as Governor of the State of Georgia, BRAD RAFFENSPERGER, in his official capacities as Secretary of State and member of the Georgia State Elections Board, REBECCA N. SULLIVAN, ANH LE, MATTHEW MASHBURN, and SARA GHAZAL, in their respective official capacities as members of the Georgia State Election Board,**<br><br>**Defendants.** | **Civil Action No. 21-cv-02070-JPB** |

## <u>AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... i

I.    INTRODUCTION ............................................................. 1

II.    PARTIES ............................................................................ 8

    A.    Plaintiffs ............................................................... 8

    B.    Defendants—Members of the State Election Board .......................... 11

        1.    Voting Members of the State Election Board .......................... 11

        2.    Secretary of State Brad Raffensperger ..................................... 12

III.    JURISDICTION AND VENUE ..................................................... 13

IV.    APPLICABLE LAW ..................................................................... 14

    A.    United States Constitution ................................................. 14

        1.    Due Process Clause .................................................. 14

        2.    Equal Protection Clause ........................................... 18

        3.    First Amendment .................................................... 18

    B.    Federal Laws Providing Causes of Action ........................................ 20

        1.    42 U.S.C. § 1983 ...................................................... 20

        2.    Voting Rights Act, 52 U.S.C. § 10307 ................................... 20

        3.    Federal Declaratory Judgment Act, 28 U.S.C. § 2201 ............ 20

    C.    Georgia Constitution .......................................................... 21

        1.    Georgia's Requirement of Absolute Ballot Secrecy ............... 21

        2.    Georgia's Guarantee of Right to the Courts ........................... 21

        3.    Separation of Powers ............................................. 21

D. Georgia Election Code ........................................................................ 22

    1. Role of Superintendents ............................................................ 22

    2. Funding of Superintendents ...................................................... 26

    3. Conduct of Absentee-by-Mail Voting—Pre-SB202 ............... 26

    4. Conduct of In-Person Voting .................................................... 28

    5. Georgia's Open Meetings Act ................................................. 30

V. GENERAL ALLEGATIONS ......................................................................... 31

    A. 2020 Elections Prompted Legislative Backlash ................................. 31

    B. Provisions of Georgia's Senate Bill 202 Passed in 2021 .................. 33

        1. SB202's Election Takeover Provisions ................................... 33

        2. SB202's Election Takeover Provisions – Separately Functioning Boards *of Registration* ......................................... 39

        3. SB202's Superintendent-Reinstatement Provisions ............... 40

        4. SB202's Restrictions on Superintendent Boards' Access to Counsel ..................................................................................... 42

        5. SB202's Criminalization of Observing an Elector While Casting a Vote ......................................................................... 44

        6. SB202's Criminalization of Free Speech and Press ............... 45

        7. SB202's Absentee Voter Identification Provisions ("Relaxed Voter ID Rule") ........................................................................ 48

        8. Shortened Period for Applying for Absentee Ballots ("Impractical Application Deadline") ...................................... 49

    C. Context Within Which SB202 Takes Effect And Will Be Applied To Plaintiffs .......................................................................................... 52

        1. Georgia's Oversized Dominion BMD Touchscreens Unavoidably Compromise Ballot Secrecy ............................... 52

2. Georgia's Recent History of Voter Data Security Breaches.... 54

3. Covid-19 in Georgia ................................................................. 56

VI. SPECIFIC ALLEGATIONS OF THREATENED INJURY TO PLAINTIFFS .................................................................................... 57

A. Defendants' Intention to Enforce SB202's Provisions ...................... 57

B. Plaintiffs' Direct Standing.................................................................... 59

1. Plaintiff Coalition for Good Governance................................. 59

2. Plaintiff SHIRLEY.................................................................... 64

3. Plaintiff THOMAS-CLARK..................................................... 69

4. Plaintiff LANG ......................................................................... 71

5. Plaintiff PULLAR...................................................................... 74

6. Plaintiff MCNICHOLS.............................................................. 76

7. Plaintiff JACKSON COUNTY DEMOCRATIC COMMITTEE .................................................................................. 79

8. Plaintiff GEORGIA ADVANCING PROGRESS POLITICAL ACTION COMMITTEE........................................................... 80

9. Plaintiff GRAHAM.................................................................... 83

10. Plaintiff MARTIN...................................................................... 87

11. Plaintiff DUFORT ..................................................................... 91

12. Plaintiff NAKAMURA ............................................................. 95

13. Plaintiff THROOP ..................................................................... 98

14. Plaintiff FRIEDMAN............................................................... 101

C. Plaintiff CGG's Associational Standing .......................................... 103

1. Elements of CGG's Associational Standing .......................... 103

2.   Individual Standing of Plaintiff Members of CGG ............... 104

3.   Individual Standing of Non-Plaintiff Members of CGG ....... 105

D.   Plaintiff JCDC's Associational Standing ......................................... 111

1.   Elements of JCDC's Associational Standing ........................ 111

2.   Individual Standing of Plaintiff Members of JCDC ............. 111

3.   Individual Standing of Non-Plaintiff Members of JCDC ...... 111

E.   Plaintiff GAPPAC's Associational Standing ................................... 116

1.   Elements of GAPPAC's Associational Standing .................. 116

2.   Individual Standing of Plaintiff Members of GAPPAC ........ 116

3.   Individual Standing of Non-Plaintiff Members of GAPPAC 116

F.   Causation ......................................................................................... 119

G.   Redressability .................................................................................. 119

H.   Actual Controversy (Declaratory Relief) ........................................ 119

VII.   CLAIMS ................................................................................................. 120

A.   TAKEOVER PROVISION CLAIMS .............................................. 120

COUNT I ......................................................................................... 120

COUNT II ........................................................................................ 123

B.   INDIVIDUAL FEDERAL CLAIMS ............................................... 128

COUNT III ...................................................................................... 128

COUNT IV ...................................................................................... 130

COUNT V ........................................................................................ 134

COUNT VI ...................................................................................... 136

COUNT VII ..................................................................................... 137

COUNT VIII ...................................................................................... 140

COUNT IX........................................................................................... 141

COUNT X ............................................................................................ 143

COUNT XI........................................................................................... 145

COUNT XII ......................................................................................... 146

COUNT XIII ........................................................................................ 148

COUNT XIV ........................................................................................ 150

PRAYER FOR RELIEF ............................................................................. 151

This Amended Complaint is filed as a matter of right before any responsive pleading has been filed.  *See* Fed. R. Civ. P. 15(a); *Miller v. R. L. Conway*, 331 F. App'x 664, 665 (11th Cir. 2009).  The only changes that this Amended Complaint makes to the Complaint are as follows:  Governor Kemp is added as a defendant; Sarah Ghazal is substituted as a defendant for David Worley; the references to the Estimating Bans, defined below, are changed to include O.C.G.A. § 21-2-386(a)(2)(A); incorrect paragraph numbering after original page number 98 are corrected; and minor typographical errors are corrected.

## I.   INTRODUCTION

> When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.

*Yick Wo v. Hopkins*, 118 U.S. 356, 369–70 (1886).

This civil action, brought to obtain prospective declaratory and injunctive relief, seeks the aid of this Court to restore the sovereignty of the people of Georgia over their own elections.  With the adoption of Senate Bill 202 (Act 9), the government of the State of Georgia has not only imposed burdens on the constitutional rights of individual voters, but it has also subordinated a previously accountable system of election administration by local officials to the arbitrary

powers of a single state agency, the State Election Board (the "SEB")—an agency that is both newly empowered to intervene in and take over the local conduct of elections and (what is worse) newly insulated, by statutory design, from any effective external source of timely oversight capable of constraining its abuses.

Liberty requires at least three essential things—an unfettered right to vote, freedom of speech, and the meaningful separation of powers.  This lawsuit is necessary to preserve individual constitutional rights, and constitutional government, against the attacks that SB202 makes on these three pillars of liberty. First, the right to vote has long been recognized as a fundamental political right because voting is "preservative of all rights."  *Id.* at 370. Voting is a civil right whose exercise excuses the coercion that is inherent in all governance by granting to government the legitimacy of being a true agent of the people, selected by the people, "by whom and for whom all government exists and acts."  *Id.*  Voting also serves as the most reliable mechanism for checking and reversing abuses by government and for imposing accountability.

But voting does not occur in a vacuum.  Elections are organized events that permit the right to vote to be exercised within "reasonable and uniform regulations, in regard to the time and mode of exercising that right, which are designed to secure and facilitate the exercise of such right, in a prompt, orderly, and convenient manner."  *Id.* at 371.  When the administration of elections is made susceptible to

arbitrary and unaccountable intrusions that can be accomplished by the State

Election Board without it according any of the constitutionally required minima of

procedural due process, the individual right to vote is degraded and the legitimacy

of the government that elections produce is inevitably diminished.  Senate Bill 202

imposes unjustified—and constitutionally unjustifiable—burdens on voters' right

to vote, and on local officials' rights to procedural due process, that must be

enjoined.

Second, the freedom of speech is not only is an individual liberty, but also

an essential requirement for any system of elections that is designed to produce a

government that represents the people and purports to operate with the consent of

the governed.

> Whatever differences may exist about interpretations of
> the First Amendment, there is practically universal
> agreement that a major purpose of that Amendment was
> to protect the free discussion of governmental affairs.
> This of course includes discussions of candidates,
> structures and forms of government, the manner in which
> government is operated or should be operated, and all
> such matters relating to political processes.

*Mills v. Alabama*, 384 U.S. 214, 218–19 (1966).  Senate Bill 202 burdens activities

protected by the First Amendment freedoms of speech and association with the

specter of potential criminal prosecution in ways that cannot be justified.  "It is not

merely the sporadic abuse of power by the censor but the pervasive threat inherent

in its very existence that constitutes the danger to freedom of discussion."

*Thornhill v. Alabama,* 310 U.S. 88, 97 (1940).   These burdens must not be allowed to stand if the individual rights of the plaintiffs, and of other Georgians, are to be respected and if Georgia's elections are to be called fair and free.

Finally, the essential role of separation of powers in protecting the people's sovereignty over their government has been recognized since the founding of the Nation.  As James Madison noted in Federalist No. 51,

> In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself. A dependence on the people is, no doubt, the primary control on the government; but experience has taught mankind the necessity of auxiliary precautions.

Madison further observed that, "[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others."

In Georgia, in the context of elections, the separation of powers has, until now, been manifested in the local control of elections and in state constitutional prohibitions on a single body simultaneously exercising more than one of the legislative, judicial, and executive powers. Ga. Const. Art. I, § II, Para. III.  Senate Bill 202 destroys these components of the State's regime of separated powers by eliminating them as safeguards for the administration of Georgia's elections.  The

offensive provisions of the law that accomplish this destruction of the

constitutional order must be enjoined to preserve accountability and transparency

in Georgia's elections.

Specifically, the following provisions of SB202 are challenged in this action

and require relief from this Court:

- Provisions of SB202 that allow the SEB to remove county boards of

    elections and to take complete control of county election management by

    appointing an individual superintendent selected by the SEB.  These

    "Takeover Provisions" are being challenged because (a) per **COUNT I**, they

    violate the Plaintiff Board Members' procedural due process rights under the

    Fourteenth Amendment, (b) per **COUNT II**, they violate the Separation of

    Powers Clause of the Georgia Constitution and the Georgia Constitution's

    requirement that the General Assembly provide by law for the registration of

    all eligible voters, and hence constitute a violation of the Due Process Clause

    of the Fourteenth Amendment, and (c) per **COUNT III,** they constitute a

    burden on voting that is not justified by any sufficiently weighty government

    interest in violation of the Due Process Clause of the Fourteenth

    Amendment;

- O.C.G.A. § 21-2-568.1 (the "Elector Observation Felony") which makes it a

    felony to "intentionally observe an elector while casting a ballot in a manner

<div align="center">5</div>

that would allow such person to see for whom or what the elector is voting."
This provision violates the Due Process Clause of the Fourteenth
Amendment because (a) per **COUNT IV**, it is void for vagueness, (b) per
**COUNT V**, it constitutes a burden on voting that is not justified by any
sufficiently weighty government interest, and (c) per **COUNT VI**, it
constitutes unlawful intimidation in violation of 52 U.S.C. § 10307;

- The Gag Rule, O.C.G.A. § 21-2-386(a)(2)(B)(vii), which makes it a
misdemeanor for "monitors and observers" to communicate, among other
things, "any information that they see while monitoring the processing and
scanning of absentee ballots." Per **COUNT VII**, this provision violates the
First Amendment by criminalizing constitutionally protected speech;

- The Estimating Bans, O.C.G.A. § 21-2-386(a)(2)(A) & (B)(vii), which make
it a misdemeanor for "monitors and observers" to, among other things, tally,
tabulate, estimate or attempt to tally, tabulate, or estimate any votes on the
absentee ballots cast.  Per **COUNT VIII**, this provision violates the Due
Process Clause of the Fourteenth Amendment as it is void for vagueness;

- The Photography Ban, O.C.G.A. § 21-2-568.2 (2)(B), which makes it a
misdemeanor to "[p]hotograph or record the face of an electronic ballot
marker while a ballot is being voted or while an elector's votes are displayed
on such electronic market," or to "[p]hotograph or record a voted ballot."

6

This provision is being challenged because (a) per **COUNT IX**, it violates the First Amendment because it criminalizes constitutionally protected speech and (b) per **COUNT X**, it violates the Due Process Clause of the Fourteenth Amendment as void for vagueness;

- O.C.G.A. § 21-2-381(a)(1)(C)(i), the "Relaxed Voter ID Rule," which changes the identification that voters must provide to be issued an absentee ballot from a verifiable signature to the voter's name, date of birth, address, and voter's Georgia driver's license or identification number – all information that is publicly available.  This provision is challenged because, per **COUNT XI**, the new identification requirements and relaxed security processes invite massive fraud and vote dilution as well as identity theft, and hence constitute a burden on the right to vote that is not justified by any sufficiently weighty government interest in violation of the Due Process Clause of the Fourteenth Amendment; and

- O.C.G.A. § 21-2-381(a)(1)(A), the "Impractical Application Deadline Provision," which narrows the time within which a voter may apply for an absentee ballot to a period ranging only from 78 to 11 days prior to election day, rendering absentee voting impossible for many run-off elections, and restricts the actual application time further because there is currently no secure electronic transmission method as required by SB202.  The

imposition of this deadline for obtaining an absentee ballot is being challenged (a) because, per **COUNT XII**, it constitutes a burden on the right to vote that is not justified by any sufficiently weighty government interest in violation of the Due Process Clause of the Fourteenth Amendment, and (b) because, per **COUNTS XIII AND XIV**, it treats identified classes of voters differently than other, similarly situated votes, and therefore constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment.

The foregoing offensive provisions of SB202 should and must be enjoined by this Court individually and collectively to ensure that three essential pillars of liberty—the fundamental right to vote, freedom of speech, association and press, and separation of powers—together with the sovereignty of the people of Georgia over their government, continue to be preserved in the State of Georgia.

## II.   PARTIES

### A.   Plaintiffs

1.     Plaintiffs include non-profit organizations, county election board members, members of political parties, voters, election volunteers, advocates and journalists.  Each of the Plaintiffs is introduced below, with additional information about each set forth in Part VI – Specific Allegations of Threatened Injury to Plaintiffs.

2.      Plaintiff COALITION FOR GOOD GOVERNANCE ("CGG") is a non-profit corporation organized and existing under the laws of the State of Colorado.  Plaintiff CGG's purpose is to preserve and advance the constitutional liberties and individual civil rights of United States citizens, with an emphasis on the civil rights of its members that are exercised through their participation in public elections, and access to information about government activities through public meetings and public records.  Plaintiff CGG is a membership organization, with a membership that consists of both individuals and other non-profit organizations, residing in Georgia and other States.

3.      Plaintiff ADAM SHIRLEY ("SHIRLEY") is a resident of Athens-Clarke County, Georgia, a member of the Athens-Clarke County Board of Elections and Registration (the "Athens-Clarke County Board"), and a member of CGG.

4.      Plaintiff ANTWAN LANG ("LANG") is a resident of Chatham County, Georgia, a member of the Chatham County Board of Elections (the "Chatham County Board"), and a member of CGG.

5.      Plaintiff PATRICIA PULLAR ("PULLAR") is a resident of Clayton County, Georgia, a member of the Clayton County Board of Elections and Registration (the "Clayton County Board"), and a member of CGG.

9

6.     Plaintiff ERNESTINE THOMAS-CLARK ("THOMAS-CLARK") is a resident of Coffee County, Georgia, and a member of the Board of Elections and Registration of Coffee County (the "Coffee County Board").

7.     Plaintiff JUDY MCNICHOLS ("MCNICHOLS") is a resident of Jackson County, Georgia, a member of the Jackson County Board of Elections and Voter Registration (the "Jackson County Board"), and a member of CGG.

8.     Plaintiff JACKSON COUNTY DEMOCRATIC COMMITTEE ("JCDC") is a political party committee.  Plaintiff JCDC nominates two members for appointment to the Jackson County Board.

9.     Plaintiff GEORGIA ADVANCING PROGRESS POLITICAL ACTION COMMITTEE ("GAPPAC") is a non-profit organization.   Plaintiff GAPPAC is a membership organization with the purpose of increasing the election of Asian Americans and Pacific Islanders ("AAPI") to public offices in Georgia and advocating for the interests of AAPI voters.

10.     Plaintiff RYAN GRAHAM ("GRAHAM") is a resident of Fulton County, Georgia.  Plaintiff GRAHAM is Chair of the Libertarian Party of Georgia ("LPG").

11.     Plaintiff RHONDA MARTIN ("MARTIN") is a resident of Fulton County, Georgia.  Plaintiff MARTIN, a frequent poll watcher and mail ballot monitor, is on the Board of CGG.

12.     Plaintiff JEANNE DUFORT ("DUFORT") is a resident of Morgan County, Georgia, a Vice-Chair of the Morgan County Democratic Committee ("MCDC"), and a member of CGG.  Plaintiff DUFORT is a frequent poll watcher, mail ballot monitor, and vote review panelist.

13.     Plaintiff AILEEN NAKAMURA ("NAKAMURA") is a resident of Fulton County, Georgia.  Plaintiff NAKAMURA, a frequent poll watcher, is a member of CGG and GAPPAC.

14.     Plaintiff ELIZABETH THROOP ("THROOP") is a resident of DeKalb County, Georgia.  Plaintiff THROOP, a frequent poll watcher and mail ballot monitor, is a member of CGG.

15.     Plaintiff BRADLEY FRIEDMAN ("FRIEDMAN") is a radio broadcaster, journalist, and blogger, and has reported on Georgia election integrity and election security hundreds of times over the last almost twenty years.  Plaintiff FRIEDMAN publishes his blog, BradBlog.com ("The BRAD BLOG"), and hosts his weekday nationally syndicated radio show, "The BradCast."

B.     **Defendants—Members of the State Election Board**

1.     **Voting Members of the State Election Board**

16.     Defendants SARAH GHAZAL, REBECCA N. SULLIVAN, ANH LE, and MATTHEW MASHBURN are sued for prospective declaratory and injunctive relief in their official capacities as voting members of Georgia's State

11

Election Board (the "SEB").   At the appropriate time, Plaintiffs will join as a defendant the yet-unappointed Chair of Georgia's State Election Board. Together with any successors in office automatically substituted for any of them as Defendants by operation of Fed. R. Civ. P. 25(d), Defendants GHAZAL, SULLIVAN, LE, and MASHBURN are hereinafter collectively referred to as the "SEB Voting Members."

17.     The SEB Voting Members collectively exercise the power vested in the SEB to enforce compliance with the Georgia Election Code, including the unconstitutional takeover provisions of SB202 that are challenged in this lawsuit. *See* O.C.G.A. §§ 21-2-33.1, -32.

### 2.     **Governor Brian Kemp**

18.     Defendant BRIAN KEMP is the Governor of the State of Georgia. Defendant KEMP is responsible for law enforcement in Georgia and has the chief executive power of the state, Ga. Const. Art. 5, § 2.  Defendant KEMP signed the challenged statutes into law on March 25, 2021.  Defendant KEMP, including any successor in office automatically substituted for him as a defendant by operation of Fed. R. Civ. P. 25(d), is sued in his official capacity as Governor.

### 3.     **Secretary of State Brad Raffensperger**

19.     Defendant BRAD RAFFENSPERGER ("RAFFENSPERGER") is Georgia's Secretary of State.  RAFFENSPERGER, including any successor in

office automatically substituted for him as a Defendant by operation of Fed. R. Civ. P. 25(d), is sued in his official capacities as Secretary of State and as a non-voting member of the SEB for prospective declaratory and injunctive relief.

20.     As Secretary of State, Defendant RAFFENSPERGER is a non-voting, *ex officio* member of the SEB, O.C.G.A. § 21–2–30(d) (2021), and "shall, upon request of the State Election Board, provide any and all necessary support and assistance that the State Election Board, in its sole discretion, determines is necessary to enforce [the Georgia Election Code] or to carry out or conduct any of its duties," O.C.G.A. § 21–2–33.1(h) (2021).

## III.   JURISDICTION AND VENUE

21.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress threatened deprivations, under color of state law, of rights secured by the United States Constitution.

22.     This Court has subject-matter jurisdiction over each of the prospective claims for declaratory and injunctive relief raised in this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), § 1343 (jurisdiction over civil rights actions), § 1367 (supplemental jurisdiction), § 2201 (jurisdiction to grant declaratory relief) and § 2202 (jurisdiction to grant relief ancillary to declaratory judgment).

23.     Venue lies in the Northern District of Georgia pursuant to 28 U.S.C.
§ 1391(b) because multiple defendants reside in this judicial district and all
defendants are residents of Georgia and a substantial part of the events or
omissions giving rise to the Plaintiffs' claims occurred or are threatened to occur in
this judicial district.

## IV.    APPLICABLE LAW

### A.    United States Constitution

#### 1.    Due Process Clause

24.     The Due Process Clause of the Fourteenth Amendment to the United
States Constitution provides that no State shall "deprive any person of life, liberty,
or property, without due process of law."

##### a)    Substantive Due Process / Fundamental Right to Vote

25.     Fundamental rights such as the right to vote may not be unjustifiably
burdened or undermined without violating the substantive protections of the Due
Process Clause.

26.     The right of all eligible citizens to vote in public elections is a
fundamental right of individuals.

27.     "[S]tate laws and patterns of state action that systematically deny
equality in voting," *Burton v. Georgia*, 953 F.2d 1266, 1269 (11th Cir. 1992), and
"state laws whose very design infringes on the rights of voters," *Curry v. Baker*,
802 F.2d 1302, 1314 (11th Cir. 1986), violate substantive due process.

14

28.     In addition, "episodic events that, despite non-discriminatory laws may result in the dilution of an individual's vote" and which "go well beyond the ordinary dispute over the counting and marking of ballots" also violate substantive due process "if the election process itself reaches the point of patent and fundamental unfairness." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986).

29.     Conditioning the right to vote on a voter's consent to public disclosure of sensitive personal information, i.e. "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote," substantially burdens the fundamental right to vote in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

b)     **Substantive Due Process / Violation of State Law**

30.     Violations of state statutory or constitutional law implicating the very integrity of the electoral process constitute a denial of substantive due process under the Fourteenth Amendment to the U.S. Constitution. *Gonzalez v. Governor of Georgia,* 978 F.3d 1266, 1271 (11th Cir. 2020); *Duncan v. Poythress,* 657 F.2d 691 (5th Cir. 1981).

c)     **Procedural Due Process**

31.     The Due Process Clause also protects individuals against the deprivation or abrogation by a State of underlying substantive liberty and property

15

interests without the use of procedures that satisfy "constitutionally mandated due

process minima."   *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994).

32.     The liberty protected by the Fourteenth Amendment's Due Process

Clause encompasses:

> the right of the individual to contract, to engage in any of
> the common occupations of life, to acquire useful
> knowledge, to marry, establish a home and bring up
> children, to worship God according to the dictates of his
> own conscience, and generally to enjoy those privileges
> long recognized at common law as essential to the
> orderly pursuit of happiness by free men.

*Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  The right to seek a public office—

and to hold that office, once it has been obtained—is such a liberty interest. *Becton*

*v. Thomas*, 48 F. Supp. 2d 747, 757 (W.D. Tenn. 1999).

33.     "The fundamental requirement of due process is the opportunity to be

heard and it is an 'opportunity which must be granted at a meaningful time and in a

meaningful manner.'" *Parratt v. Taylor*, 451 U.S. 527, 540 (1981).

34.     "It is axiomatic that, in general, the Constitution requires that the state

provide fair procedures and an impartial decisionmaker before infringing on a

person's interest in life, liberty, or property."  *McKinney v. Pate*, 20 F.3d 1550,

1561 (11th Cir. 1994).

35.     Predeprivation procedures are fair for purposes of the Due Process

Clause if they "require predeprivation notice and hearing in order to serve as a

16

check on the possibility that a wrongful deprivation would occur." *Parratt v. Taylor*, 451 U.S. at 538.

36.     Where adequate predeprivation process is impossible or impracticable for a State to provide, procedural due process may instead be satisfied by the State affording individuals a postdeprivation "means of redress for property deprivations satisfying the requirements of procedural due process." *Parratt v. Taylor*, 451 U.S. at 537.

37.     The Fifth Amendment's guarantee of procedural due process also protects against laws that are "so vague that [the law] fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *United States v. Matchett*, 837 F.3d 1118, 1140 (11th Cir. 2016) (citing *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

### d)     **Due Process – Criminal Laws Void for Vagueness**

38.     Under the Due Process Clause of the Fourteenth Amendment, a state penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352 (1983). "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that]

17

allows policemen, prosecutors, and juries to pursue their personal predilections.'"
*Id.* (citation omitted).

## 2. **Equal Protection Clause**

39.    The Equal Protection Clause of the Fourteenth Amendment to the
United States Constitution provides that, "[N]or shall any State . . . deny to any
person within its jurisdiction the equal protection of the laws."  U.S. Const.
Amend. XIV.

40.    "The right to vote is protected in more than the initial allocation of the
franchise. Equal protection applies as well to the manner of its exercise. Having
once granted the right to vote on equal terms, the State may not, by later arbitrary
and disparate treatment, value one person's vote over that of another." *Bush v.
Gore,* 531 U.S. 98, 104-05 (2000).

41.     The Equal Protection Clause is violated when similarly situated
people are treated differently without constitutionally adequate justification.

## 3. **First Amendment**

42.    The First Amendment to the United States Constitution provides that,
"Congress shall make no law . . . abridging the freedom of speech . . . or the right
of the people . . . to petition the government for a redress of grievances." U.S.
Const. Amend. I.

### a)   Freedom of Speech and of the Press

43.    To be constitutional, legislative restrictions on speech that "depend on

what is said" are "content-based restrictions" that "receive strict scrutiny" and must

be "narrowly tailored to serve compelling state interests." *Otto v. City of Boca*

*Raton*, 981 F.3d 854, 861 (11th Cir. 2020). "Laws or regulations almost never

survive this demanding test . . . . Forbidding the government from choosing

favored and disfavored messages is at the core of the First Amendment's free-

speech guarantee." *Id.* at 862.

44.    "The freedom of speech and of the press guaranteed by the

Constitution embraces at the least the liberty to discuss publicly and truthfully all

matters of public concern without previous restraint or fear of

subsequent punishment." *Thornhill,* 310 U.S. at 101–02.

### b)   Right to Petition the Government

45.    "The First Amendment right to petition the government for a redress

of grievances includes a right of access to the courts." *DeMartini v. Town of Gulf*

*Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019); *see also Bill Johnson's Rests. v.*

*NLRB*, 461 U.S. 731, 741 (1983).

46.    Interfering with a person's freedom to invoke the judicial process

violates the right of access to the courts.  *Robles v. Kane*, 550 F. App'x 784, 787

(11th Cir. 2013).

19

**B.     Federal Laws Providing Causes of Action**

1.     **42 U.S.C. § 1983**

47.   Section 1983 provides in pertinent part that,

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress[.]

42 U.S.C. § 1983.

2.     **Voting Rights Act, 52 U.S.C. § 10307**

48.   Section 10307 provides:

> No person, whether acting under color of law or
> otherwise, shall intimidate, threaten, or coerce, or attempt
> to intimidate, threaten, or coerce any person for voting or
> attempting to vote. . . .

52 U.S.C. §10307.

3.     **Federal Declaratory Judgment Act, 28 U.S.C. § 2201**

49.   The Declaratory Judgment Act provides in pertinent part that,

> In a case of actual controversy within its jurisdiction, . . .
> any court of the United States, upon the filing of an
> appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be
> sought. Any such declaration shall have the force and

> effect of a final judgment or decree and shall be
> reviewable as such.

28 U.S.C. § 2201(a).

## C. Georgia Constitution

50.     The Georgia Constitution provides that, "Legislative acts in violation

of [the Georgia] Constitution or the Constitution of the United States are void, and

the judiciary shall so declare them."  Ga. Const. Art. I. § II, Para. V (2021).

### 1.   Georgia's Requirement of Absolute Ballot Secrecy

51.      The Georgia Constitution provides: "Elections by the people shall be

by secret ballot."  Ga. Const. Art. II, § I, Para. 1.

### 2.   Georgia's Guarantee of Right to the Courts

52.     The Georgia Constitution provides that, "No person shall be deprived

of the right to prosecute or defend, either in person or by an attorney, that person's

own cause in any of the courts of this state."  Ga. Const. Art. I, § I, Para. XII.

### 3.   Separation of Powers

53.     The Georgia Constitution provides that, "The legislative, judicial, and

executive powers shall forever remain separate and distinct; and no person

discharging the duties of one shall at the same time exercise the functions of either

of the others except as herein provided."  Ga. Const. Art. I, § II, Para. III.

54.     "A statute will be held unconstitutional as an improper delegation of

legislative power if it is incomplete as legislation and authorizes an executive

board to decide what shall and what shall not be an infringement of the law, because any statute which leaves the authority to a ministerial officer to define the thing to which the statute is to be applied is invalid." *Howell v. State,* 237 Ga. 95, 95 (1976).

### D.   Georgia Election Code

#### 1.   Role of Superintendents

55.   The General Assembly creates county boards of elections and boards of election and registration by local Act.  O.C.G.A. § 21–2–40.  All such boards must have at least three members. *Id.*  Such boards conduct their duties in public and operate under Georgia's Open Meetings laws. O.C.G.A § 50-14-1.

56.   Under the Georgia Election Code, elections in counties and municipalities are conducted by "superintendents."  O.C.G.A § 21–2–70 to –77.

57.   Under the Georgia Election Code, boards of registration conduct voter registration and issue absentee ballots.  O.C.G.A. §21-2-212.  In most counties (approximately 119), the duties of the election superintendent and the board of registration are combined into one board with the duties of elections and registration.

58.   For counties, prior to the enactment of SB202, "superintendent" meant, "Either the judge of the probate court of a county or the county board of elections, the county board of elections and registration, the joint city-county board

22

of elections, or the joint city-county board of elections and registration, if a county has such." O.C.G.A. § 21–2–2(35)(A) (2020).

59.    Each board created by local Act to serve as a superintendent is an authority created by state law and thus has a separate identity as an instrumentality of the state and is a public corporation. *See* O.C.G.A. § 50–4–3(c).

60.    For Georgia's larger counties, a superintendent board typically consists of a collection of individuals who are separately appointed to the board for fixed terms by different stakeholders.  The stakeholders typically include both major political parties as well as the governing body of the county.  In some counties, a Superior Court judge must appoint one or more members of the county board. The superintendent board is therefore generally not a creature of the county's elected governing authority.

61.    In Athens-Clarke County, for example, the Board of Elections consists of five individual board members, each of whom serves a four-year term—one member appointed by the Athens-Clarke County Republican Committee, one by the Athens-Clarke County Democratic Committee, and three by the Athens-Clarke County Commission.[1]

---

[1] *See* Board of Elections Members, https://www.accgov.com/249/Board-of-Elections-Members  (last visited May 14, 2021).

62.     In Fulton County, the Fulton County Board of Registration and
Elections ("Fulton County Board") consists of five individuals who are appointed
slightly differently: Republicans appoint two members, Democrats appoint two
members, and the Fulton County Board of Commissioners appoints one member,
who serves as the chair.

63.     In Chatham County, the Chatham County Board of Elections
("Chatham County Board") consists of four elected members (two from each major
party), and the chair is appointed by the four elected members. The separate
Chatham County Board of Registrars, responsible for voter registration and
absentee ballot issuance, is a five-member non-partisan board nominated by a
grand jury and appointed by the Superior Court under O.C.G.A. § 21-2-212.

64.     Boards of registrars conduct voter registration activities, update voter
records, accept and approve absentee ballot applications and issue absentee mail
ballots.  As noted above, most counties combine the duties of registration and
election in a single board, while others (fewer than 40) maintain separate boards of
registration.

65.     Georgia law does not provide a general mechanism to be used for the
removal of entire boards acting as election "superintendents" or registrars. Instead,
the local Acts that create these boards typically establish, on a jurisdiction-by-
jurisdiction basis, a mechanism for individual *members* of the board to be

24

removed, generally only for cause, and after judicial review.  For example, the local Act establishing the Athens-Clarke County Board of Elections and Registration provides that,  "All members shall be subject to removal from the board at any time for cause after notice and hearing, in the same manner and by the same authority as provided for removal of registrars." 1993 Ga. Act 216, § 5(c); O.C.G.A. § 21–2–212(a) (member of the board of registration ("registrars") can be removed by a superior court judge "at any time for cause after notice and hearing").  Similarly, the local Act establishing the Board of Elections and Registration of Jackson County provides that, "Each member of the board . . . shall be subject to removal from the board by the chief judge of the Superior Court of Jackson County at any time, for cause, after notice and hearing."  2011 Ga. Act 34, § 6. Elected Chatham County Board of Elections members can be removed only for cause and after a jury trial. 1984 Ga. Law No. 1194 § 2(g) and O.C.G.A. 15-6-82(c).

66.    Both before and after the enactment of SB202, Georgia law provided several ways for the SEB to compel superintendents to comply with the Georgia's Election Code, including by issuing orders, assessing fines, entering public reprimands, requiring restitution, requiring superintendents and others to attend training, and taxing a superintendents and others with the costs incurred by the SEB as part of such enforcement actions.  O.C.G.A. § 21–2–33.1(a) (2020).

67.    Where these measures are not sufficient, Georgia law also permits the

SEB to seek judicial relief against a superintendent in the superior court of any

county in which fraud or other illegal conduct has occurred or is likely to occur.

O.C.G.A. § 21–2–32(a) (2020). In such judicial actions brought or intervened in by

the SEB,

> If, in the opinion of the judge presiding over such cause,
> adequate relief cannot otherwise be granted to assure
> compliance with said laws, rules, and regulations, the
> judge may enter such order concerning the conduct of
> such election or primary which he or she shall deem
> necessary to assure compliance, including the right to
> require such election or primary to be held under the
> supervision of the State Election Board.

O.C.G.A. § 21–2–32(f) (2020).

### 2.    **Funding of Superintendents**

68.    Georgia law provides that,

> The governing authority of each county or municipality
> shall appropriate annually and from time to time, to the
> superintendent of such county or municipality, the funds
> that it shall deem necessary for the conduct of primaries
> and elections in such county or municipality and for the
> performance of his or her other duties under this
> chapter[.]

O.C.G.A. § 21–2–71.

### 3.    **Conduct of Absentee-by-Mail Voting—Pre-SB202**

69.    SB202 made changes to the Georgia Election Code's provision

governing the conduct of absentee-by-mail voting.

70.     Prior to the enactment of SB202, Georgia voters could apply for an absentee-by-mail ballot up to 180 days before the date of a primary, election, or runoff, and no application deadline was specifically stated, having the effect of permitting voters with unforeseen last-minute circumstances preventing them from voting at the polling place to apply for absentee ballots.  O.C.G.A. § 21–2–381(a)(1)(A) (2020).

71.     Prior to the enactment of SB202, a valid absentee ballot application required "sufficient information for proper identification of the elector; the permanent or temporary address of the elector to which the absentee ballot shall be mailed; the identity of the primary, election, or runoff in which the elector wishes to vote; and the name and relationship of the person requesting the ballot if other than the elector" and the voter's mark or signature.  O.C.G.A. § 21–2–381(a)(1)(C) (2020), (F).

72.     Prior to the enactment of SB202, a voter's eligibility to be issued an absentee ballot required the registrar or absentee ballot clerk to compare "the identifying information on the application with the information on file in the registrar's office and, if the application is signed by the elector, compare the signature or mark of the elector on the application with the signature or mark of the elector on the elector's voter registration card."  O.C.G.A. § 21–2–381(b)(1) (2020).  Prior to the enactment of SB202, absentee ballot applicants were not

27

required to provide a Georgia driver license number or other state issued

identification number in combination with a full date of birth to be eligible to be

issued an absentee ballot, and the application was previously verified using the

voter's individual signature or mark on file.  Signatures are the long-accepted,

most secure standard for voter verification, used in at least 32 states, and three

more states require witness signatures.

73.     Prior to the enactment of SB202, issued absentee ballots could be

mailed to voters by the registrars or absentee ballot clerk as late as two days prior

to election day.  O.C.G.A. § 21–2–384(a)(2) (2020).

### 4.     Conduct of In-Person Voting

74.     Both before and after the enactment of SB202, Georgia law required

that the "equipment used for casting and counting votes in county, state, and

federal elections shall be the same in each county of this state and shall be

provided to each county by the state, as determined by the Secretary of State."

O.C.G.A. § 21–2–300(a)(1) (2020).  Electronic ballot marking devices are not

required for municipal elections.

75.     The voting system furnished by the State must be "a uniform system

of electronic ballot markers and ballot scanners." O.C.G.A. § 21–2–300(a)(3)

(2020).

76.     Such "electronic ballot marker" devices — or "BMDs"— are required to be used by in-person voters on election day and by all absentee voters casting their ballots in person prior to election day in county, state or federal elections. O.C.G.A. § 21–2–300(a)(2) (2020); O.C.G.A. § 21–2–383(c) (2020).

77.     O.C.G.A. § 21-2-379.22(5) provides: "No electronic ballot marker shall be adopted or used" unless they "[p]ermit voting in absolute secrecy so that no person can see or know any other elector's votes."  Further, pursuant to O.C.G.A. § 21-2-70(13), superintendents have a duty to "conduct all elections in such manner as to guarantee the secrecy of the ballot."

78.     The BMDs chosen by the Secretary of State of Georgia and used statewide are a model manufactured by Dominion Voting Systems.  The system includes a touchscreen that is so large that the electoral choices of any voter using the BMD are plainly visible to any person with corrected eyesight within at least twenty to thirty feet with a line of sight to the voting touchscreen, violating voters' rights to vote in "absolute secrecy."  Because of the vulnerability of the BMD system to hacking, and therefore the need for continual monitoring, curtains and closed-door voting booths cannot be properly used as a privacy shield around BMD voting stations.  Wrap-around privacy shields provided by the Secretary of State do not protect the secrecy of the voters' choices.

79.     Figure 1 below is a true and correct copy of a photograph of voters seen at a polling place at Varnell gymnasium on January 5, 2021, in Dalton, Georgia, and typical of polling place setups across the state.



© Paul Hennessy/NurPhoto via Getty Images   Voters are seen at a polling place at Varnell gymnasium on January 5, 2021 in Dalton, Georgia, USA. Paul Hennessy/NurPhoto via Getty Images

**Figure 1.  Dalton, Georgia**

5.     **Georgia's Open Meetings Act**

80.     Both before and after the enactment of SB202, superintendents were "agencies" subject to the Georgia Open Meetings Act.  O.C.G.A. § 50–14–1(a)(1) (2020) (defining "agency" to mean, among other things, "Every . . . board, . . . office, . . . or similar body of each such county, municipal corporation, or other political subdivision of the state.").

81.     Agencies subject to the Open Meetings Law may only formulate, present, discuss, or vote upon "any official business, policy, or public matter" at a

"meeting," which means "the gathering of a quorum of the governing body of an agency" that is "open to the public" and that is held "after due notice of the meeting and compliance with the posting and agenda requirements of this chapter." O.C.G.A. § 50–14–1(a)(3)(A) (2020), (b)(1).

82.    "All votes at any meeting shall be taken in public after due notice of the meeting and compliance with the posting and agenda requirements of this chapter."  O.C.G.A. § 50–14–1(b)(1) (2020).

83.    "Any resolution, rule, regulation, ordinance, or other official action of an agency adopted, taken, or made at a meeting which is not open to the public as required by [the Open Meetings Act] shall not be binding."  O.C.G.A. § 50–14–1(b)(2) (2020).

84.    "Any person who knowingly and willfully conduct[s] or participat[es] in a meeting in violation of [the Open Meetings Act] shall be guilty of a misdemeanor and upon conviction shall be punished by a fine not to exceed $1,000.00."  O.C.G.A. § 50–14–6 (2020).

V.    GENERAL ALLEGATIONS

A.    2020 Elections Prompted Legislative Backlash

85.    SB202's introductory Section 2 states that there was a loss of voter confidence because of the manner in which 2020 elections were conducted, prompting the enactment of the bill. Indeed, there may have been a loss of voter

31

confidence resulting from end-to-end failures in election administrative processes, from the State's malfunctioning voter database and pollbooks to lapses in absentee balloting protocols and voting system tabulation irregularities. Georgia's 2020 election administration was heavily criticized in the press and remained a topic of unflattering national headlines throughout most of the year.

86.     However, rather than addressing the underlying systemic deficiencies in election administration and the voting system, the General Assembly enacted measures in SB202 to conceal ongoing problems, muzzling the press and poll monitors by criminalizing long-accepted norms of citizen oversight of elections. Further, the General Assembly granted powerful authority to the SEB to seize unilateral partisan control of locally run election and voter registration administrations and then authorizing these public functions, upon SEB takeover, to be conducted behind closed doors.

87.     Despite the proclamation of Section 2 (17) of SB202 that the new law made "the changes required to Georgia's election system to make it easy to vote and hard to cheat," widespread mail ballot fraud, never experienced in Georgia, now becomes alarming easy. Yet, absentee mail ballot voting becomes impossible for some voters because of excessively narrowed application deadlines.  Most alarming, however, is the severe curtailment of polling place voting that will be caused by the intimidating prospect of voters being accused of a felony offense by

merely glancing around the polling place when the touchscreen voting system is in use. The challenged provisions have the opposite of the stated purpose; it is now "hard to vote and easy to cheat" in Georgia.

### B.    Provisions of Georgia's Senate Bill 202 Passed in 2021

88.    On March 25, 2021, Governor Brian Kemp signed into law Senate Bill 202 (Act 9) ("SB202"), which comprehensively revised the Georgia Election Code.   A true and correct copy of SB202, from Westlaw, is attached hereto as Exhibit A.

### 1.    SB202's Election Takeover Provisions

89.    SB202 empowers the State Election Board to "suspend[2] county or municipal superintendents and appoint an individual to serve as the temporary superintendent in a jurisdiction."  O.C.G.A. 21–2–33.2(f) (2021).  (As used herein, the provisions that govern the SEB's substitution of its own individual appointee as a superintendent, or a board of registration, or a municipality's superintendent, are collectively referred to as SB202's "**Takeover Provisions**.")

90.    SB202's Takeover Provisions provide, in pertinent part, as follows:

---

[2] SB202 uses the terms "suspend" and "suspension," O.C.G.A. §§ 21–2–33.2 (c),(e), as well as the term "removal," which is used to describe the initial action after a preliminary hearing, O.C.G.A. § 21–2-106(c), and the final removal of the suspended superintendent, O.C.G.A. §§ 21–2–33.2(e).

(a) The takeover of a local superintendent's responsibilities by the SEB's temporarily (or permanently) appointed individual superintendent is "extraordinary relief."  O.C.G.A. § 21–2–33.2(a) (2021).

*Superintendent Removal Upon Petition and Performance Review*

(b) The SEB may "pursue the extraordinary relief" of a takeover "following a recommendation based on an investigation by a performance review board." O.C.G.A. § 21–2–33.2(a) (2021).

(c) Performance review board investigations occur either at the instigation of the SEB upon its own motion, O.C.G.A. § 21–2–107(a) (2021), or upon a request transmitted to the SEB by "the governing authority of the county or municipality, as applicable," O.C.G.A. § 21–2–33.2(a) (2021), O.C.G.A. § 21–2–106(a)(1) (2021), or by members of the jurisdiction's state legislative delegation. O.C.G.A. § 21–2–106(a)(2)–(3) (2021).

(d) Following its investigation, a performance review board "shall issue a written report of its findings" that "shall include such evaluations, judgments, and recommendations as it deems appropriate."  O.C.G.A. §§ 21–2–106(b), –107(c) (2021).

*Superintendent Removal Upon SEB Motion*

(e) The SEB may also "pursue the extraordinary relief" of a takeover "on its own motion."  O.C.G.A. § 21–2–33.2(a) (2021). This SEB action does not

require a performance review or even a new investigation.  *See* O.C.G.A. §
21–2–107(d) ("the findings of . . . *any* audit or investigation performed by the
State Election Board may be grounds for *removal* of one or more local
election officials pursuant to Code Section 21-2-33.2" (emphasis added).

(f) Once the SEB has moved itself to initiate takeover proceedings against a
superintendent or received a petition from a performance review board
recommending that the SEB do so, the SEB "shall conduct a preliminary
investigation to determine if sufficient cause exists to proceed to a full
hearing on the petition."  O.C.G.A. § 21–2–33.2(b) (2021).

(g) In the event that a petition for a performance review has been initiated by a
third party via petition to the SEB, the SEB's "preliminary investigation
shall be followed by a preliminary hearing which shall take place not less
than 30 days nor more than 90 days after the Secretary of State receives the
petition."  O.C.G.A. § 21–2–33.2(b) (2021). There is no stated required
notice period for a takeover action when initiated by the SEB.

(h) At the *preliminary* hearing, the SEB "shall determine if sufficient cause
exists to proceed to a full hearing on the petition or if the petition should be
dismissed."  O.C.G.A. § 21–2–33.2(b) (2021).

(i) "Following the preliminary hearing," (but apparently without a "full
hearing," which the law mentions, *id.,* but never provides for), the SEB

35

"may suspend a county or municipal superintendent if at least three members

of the board find, after notice and hearing" that:

> (1) By a preponderance of the evidence, a county or
> municipal superintendent has committed at least three
> violations of this title or of State Election Board rules and
> regulations, in the last two general election cycles; and
> the county or municipal superintendent has not
> sufficiently remedied the violations; or

> (2) By clear and convincing evidence, the county or
> municipal superintendent has, for at least two elections
> within a two-year period, demonstrated nonfeasance,
> malfeasance, or gross negligence in the administration of
> the elections.

O.C.G.A. § 21–2–33.2(c) (2021).

(j) The SEB may rely on its own findings from "*any* audit or investigation," it

has conducted as grounds for removal of a "local election official."

O.C.G.A. § 21–2–107(d) and § 21-2-106(c)(emphasis added).  Alternatively,

instead of making its own findings under O.C.G.A. § 21–2–33.2(c), the SEB

may simply rely upon the findings of a performance review board as

"grounds for the removal" of "local election officials under Code Section

21–2–33.2." O.C.G.A. §§ 21–2–106(c), –107(d) (2021).[3]

---

[3] "Local election official" means a county board of elections or board of elections
and registration, a probate judge fulfilling the role of election superintendent, or a
municipal election superintendent.  O.C.G.A. § 21–2–105 (2021).

(k) "If the State Election Board makes a finding in accordance with" O.C.G.A. §

21–2–33.2(c), then the SEB "may suspend the superintendent or board of

registrars with pay and appoint an individual to serve as the temporary

superintendent," but there is no provision for the appointment of an

individual to serve as the temporary board of registrars.  O.C.G.A. § 21–2–

33.2(e)(1)(2021).

(l) The individual appointed by the SEB need not possess the qualifications

ordinarily required for an election superintendent. O.C.G.A. § 21–2–

33.2(e)(1) (2021) ("The temporary superintendent who is appointed shall be

otherwise qualified to serve or meet the necessary qualifications within three

months of appointment.").

(m)    The individual appointed by the SEB:

> shall exercise all the powers and duties of a
> superintendent as provided by law, including the
> authority to make all personnel decisions related to any
> employees of the jurisdiction who assist with carrying
> out the duties of the superintendent, including, but not
> limited to, the director of elections, the election
> supervisor, and all poll officers.

O.C.G.A. § 21–2–33.1(f) (2021).

(n) "At no time shall the State Election Board suspend more than four county or

municipal superintendents." O.C.G.A. § 21–2–33.2(g) (2021).

(o) Although SB202 refers in multiple places to the SEB's appointee as the "temporary superintendent," O.C.G.A. § 21–2–33.1(f) (2021), –33.2(e)(1), –33.2(e)(2), the law provides that, if the "suspended superintendent or registrar does not petition for reinstatement within the allotted time period, his or her suspension shall be converted into permanent removal," at which point the "temporary superintendent shall become a permanent superintendent" by operation of law "subject to removal by the jurisdiction not less than nine months after his or her appointment." O.C.G.A. § 21–2–33.2(e)(2)(2021).

(p) SB202 also implies that a mechanism exists for the "jurisdiction" to remove "the permanent superintendent" "after the expiration of the nine-month period following the appointment," O.C.G.A. § 21–2–33.2(e)(3) (2021), but there is no "jurisdiction" that could exercise such and power and SB202 creates no such mechanism.

(q) Moreover, no other provision of Georgia law establishes any process that could plausibly be invoked to remove an SEB-appointed superintendent. The existing provisions of law that address the removal of superintendent board members—i.e., the local Acts that preceded SB202—generally provide for removal only of individual members of a superintendent board, not the entire superintendent body itself, and these provisions further only

permit removals for cause, which is generally adjudicated by the superior court of the county.

(r) SB202's "permanent superintendent" thus appears to become literally a permanent superintendent if a suspended superintendent fails to achieve reinstatement, unless the SEB determines, "at any time after the expiration of the nine-month period following the appointment," "that the jurisdiction no longer requires a superintendent appointed under this Code section," in which case "any provisions of local or general law governing appointment of the superintendent shall govern the appointment of the superintendent." O.C.G.A. § 21–2–33.2(e)(4) (2021).

(s) The legal status of the "suspended board" is unclear given that the board is no longer the superintendent, and a suspended board has no authority in law to meet, make decisions, or to act.

### 2. SB202's Election Takeover Provisions – Separately Functioning Boards *of Registration*

91.     As alleged above, some counties (like Chatham) have a board of registration that is separate from the county's board of election.

92.     Unlike a board of election, or a combined board of election and registration, a separate board of registration is not a "superintendent" under Georgia law, O.C.G.A. § 21–2–2 (35) (2021), or a "local election official" under

SB202.  O.C.G.A. § 21–2–105 (2021).  Thus, SB202 states that the SEB may "suspend the superintendent *or* board of registrars."  O.C.G.A. § 21–2–33.2(e) (2021) (emphasis added).  Though SB202 explicitly allows for the removal of a board of registrars, it does not provide for the replacement of the board of registration with an appointee, as it does for the replacement of a "superintendent," leaving no one to perform a removed board of registration's duties.  *Id.*

93.     The findings that the SEB must make to permit any suspension in the first place apply only to superintendents.  O.C.G.A. § 21–2–33.2(c) (2021).  Though SB202 gives the SEB the power to remove registrars, there are no standards relating to registrars or their duties.

94.     SB202 also makes no provision for the performance of duties or the reinstatement of a board of registration that has been removed or suspended by the SB202.  *Id.*

### 3.   **SB202's Superintendent-Reinstatement Provisions**

95.     SB202 provides that a "suspended superintendent" (but not a suspended board of registration) may seek reinstatement as follows:

> Any superintendent suspended under this Code section may petition the State Election Board for reinstatement no earlier than 30 days following suspension and no later than 60 days following suspension. In the event that a suspended superintendent or registrar does not petition for reinstatement within the allotted time period, his or her suspension shall be converted into permanent removal, and the temporary superintendent shall become

> a permanent superintendent subject to removal by the
> jurisdiction not less than nine months after his or her
> appointment.

O.C.G.A. § 21–2–33.2(e)(2) (2021).

96.   If a suspended superintendent petition for reinstatement:

> the State Election Board shall conduct a hearing for the
> purpose of receiving evidence relative to whether the
> superintendent's continued service as superintendent is
> more likely than not to improve the ability of the
> jurisdiction to conduct elections in a manner that
> complies with this chapter.

O.C.G.A. § 21–2–33.2(f)(2021).  When this provision is invoked, the

"superintendent" will be the SEB's appointee.  In other words, the standard for

reinstatement of a "suspended superintendent" looks not to the conduct of the

suspended superintendent while in office, but rather to the continued service of the

"superintendent," which is the SEB's appointee.

97.   SB202 further provides that,

> The suspended superintendent shall be given at least 30
> days' notice prior to such hearing and such hearing shall
> be held no later than 90 days after the petition is filed in
> accordance with Chapter 13 of Title 50, the 'Georgia
> Administrative Procedure Act,' except that the State
> Election Board shall have the power to call witnesses and
> request documents on its own initiative.

O.C.G.A. § 21–2–33.2(f) (2021).

98.   Finally, SB202 provides for judicial review of the SEB's

reinstatement decision as follows,

41

> If the State Election Board denies the petition, it shall be deemed a final agency decision under Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act,' and it may be appealed in a manner consistent with Code Section 50-13-19. The Attorney General or his or her designee shall represent the interests of the State Election Board in any such judicial review.

O.C.G.A. § 21–2–33.2(f) (2021).

99.   Judicial review under the Georgia Administrative Procedure Act takes place in the superior court, O.C.G.A. § 50–13–19(a)-(b).  But judicial review will be impossible as a practical matter, because the suspended board of elections will no longer be able to function legally as a public body during its "suspension" or after its "removal."  Further, as a non-natural corporate legal person, the suspended superintendent may only appear through licensed legal counsel,  O.C.G.A. § 15-19-51(a)(1), which SB202 simultaneously frustrates by prohibiting the use of public funds for litigation and also prohibiting superintendents from receiving private funding.

### 4.   SB202's Restrictions on Superintendent Boards' Access to Counsel

100.   SB202 renders completely illusory any suspended superintendent board's or board of registration's ability to contest its suspension, petition for reinstatement, and appeal a denial of reinstatement by preventing corporate superintendents and registrars from paying for or accepting donated services of legal counsel.

101.   SB202 prohibits any local government from expending "any public funds for attorney fees or expenses of litigation relating to the proceedings initiated pursuant to" the Takeover Provisions "except to the extent such fees and expenses are incurred prior to and through the recommendation of the State Election Board as provided in subsection (c) of this Code section[.]" O.C.G.A. § 21–2–33.2(g) (2021).[4]  This language is confusing, at best, because O.C.G.A. § 21–2–33.2(c) contains no reference to any "recommendation" of the SEB.  The clear import of SB202's prohibition on a local government's use of public funds for litigation relating to proceedings initiated pursuant to the Takeover Provisions is to bar counties and municipalities from paying for legal counsel to advise superintendents or registrars about and actively litigate on behalf of superintendents and registrars (or themselves) against an SEB "takeover" of a local election board.

102.   At the same time, SB202 also prohibits individual election board members, pro bono attorneys, and outside organizations from paying for legal work to oppose a SEB takeover by providing that, "No superintendent shall take or accept any funding, grants, or gifts from any source other than from the governing authority of the county or municipality, the State of Georgia, or the federal

---

[4] SB202 provides that nothing in this prohibition "shall be construed to prohibit an insurance provider from covering attorneys' fees or expenses of litigation under an insurance policy."  O.C.G.A. § 21–2–33.2(g) (2021).

government." O.C.G.A. § 21–2–71(b) (2021). A similar SB202 provision bans

boards of registration from accepting such funding. O.C.G.A. §21-2-212(f) (2021)

103.   SB202 also prohibits counties and municipalities from using their

power of the purse to restrain or control the conduct of the SEB's appointee.   To

this end, SB202 provides that,

> When the State Election Board exercises its authority
> under subsection (f) of Code Section 21-2-33.1, the
> jurisdiction involved shall not diminish or reduce the
> funds already budgeted or appropriated by the
> jurisdiction pursuant to Code Section 21-2-71 and shall
> pay any necessary and reasonable funds over that
> amount, as determined by the temporary superintendent,
> to faithfully carry out their obligations under Code
> Section 21-2-70.

O.C.G.A. § 21–2–33.2(i) (2021).

### 5.   SB202's Criminalization of Observing an Elector While Casting a Vote

104.   O.C.G.A. § 21–2–568.1 (2021), the Elector Observation Felony

provision, states:

> (a) Except while providing authorized assistance in
> voting under Code Section 21-2-409 and except for
> children authorized to be in the enclosed space under
> subsection (f) of Code Section 21-2-413, no person shall
> intentionally observe an elector while casting a ballot in a
> manner that would allow such person to see for whom or
> what the elector is voting.
>
> (b) Any person who violates the provisions of subsection
> (a) of this Code section shall be guilty of a felony.

105.   Notably, long-standing Georgia law already makes it a felony to go "into the voting compartment or voting machine booth while another is voting" or to interfere "with any elector marking his or her ballot" or to disclose "to anyone how another elector voted, without said elector's consent."  O.C.G.A. § 21-2-568.

### 6.   SB202's Criminalization of Free Speech and Press

106.   SB202 also requires that the "processing and scanning of absentee ballots" "shall be open to the view of the public," O.C.G.A. § 21–2–386(a)(2)(B) (2021), but then simultaneously prohibits "monitors and observers," which would include the press, under penalty of misdemeanor, O.C.G.A. § 21–2–598, from:

> (ii) Using or bringing into the room any photographic or other electronic monitoring or recording devices, cellular telephones, or computers;
>
> (vi) Tallying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast; and
>
> (vii) Communicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other than an election official who needs such information to lawfully carry out his or her official duties.

O.C.G.A. § 21–2–386(a)(2)(B) (2021).  *See also* O.C.G.A. § 21–2–386(a)(2)(A) (2021) (related estimating ban).

107.   O.C.G.A. § 21–2–568.2 (2)(B) (2021) (the "Photography Ban") also criminalizes photography in certain ill-defined circumstances:

> (a) It shall be illegal for any person to use photographic or other electronic monitoring or recording devices, cameras, or cellular telephones, except as authorized by law, to:
>
> (1) Photograph or record the face of an electronic ballot marker while a ballot is being voted or while an elector's votes are displayed on such electronic marker; or
>
> (2) Photograph or record a voted ballot.
>
> (b) Any person who violates subsection (a) of this Code section shall be guilty of a misdemeanor.

108.   The Photography Ban directly conflicts with another provision of SB202, O.C.G.A. §50-18-71(k)(2021), which confirms that images of voted ballots are public records under the Georgia Open Records Act.  Thus, SB202 provides that it is a crime to take a photograph of a document (an image of a voted ballot) that is itself a public record under Georgia law.

109.   Figure 2 is a true and correct copy of a scanned, voted, hand-marked absentee ballot and Figure 3 is a true and correct copy of a scanned, voted, BMD ballot:



Figure 2, Scanned Hand Marked Absentee Ballot Image



Figure 3 Scanned BMD ballot

### 7.   SB202's Absentee Voter Identification Provisions ("Relaxed Voter ID Rule")

110.   Effective July 1, 2021, SB202 degrades the pre-existing identification information that voters must provide to the government to be issued an absentee ballot.  The Relaxed Voter ID Rule, O.C.G.A. 21–2–381(a)(1)(C)(i) (2021), mandates that the Secretary of State's absentee-ballot request form "shall require the elector to provide his or her name, date of birth, address as registered, address where the elector wishes the ballot to be mailed, and the number of his or her Georgia driver's license or identification card."

111.   SB202 allows a registrar or absentee ballot clerk to "verify the identity of the applicant" for an absentee ballot by comparing "the applicant's

name, date of birth, and number of his or her Georgia driver's license or

identification card . . . on the application with the information on file in the

registrar's office."  O.C.G.A. 21–2–381(b)(1) (2021).

112.   In the same bill section that added the Relaxed Voter ID Rule, SB202

eliminated the previous well-established requirements for a registrar or absentee

ballot clerk to verify the identity of the absentee ballot applicant by comparing the

signature or mark on the application with the signature or mark on the elector's

voter registration card.  *See* 2021 Ga. Act 9, SB202, lines 1063–65 (strikeouts).

113.   As a result of the Relaxed Voter ID Rule, any person who possesses a

voter's name, birthdate, and driver license or identification card number, which are

easily available, can now submit a mailed or online application in the name of that

voter for an absentee ballot.  The imposter applicant will be verified as that voter

based solely on the three items of information and will be issued the ballot that

belongs to that voter at whatever address the imposter specifies in the absentee

ballot request.

8.   **Shortened Period for Applying for Absentee Ballots ("Impractical Application Deadline")**

114.   SB202 drastically shortens the period during which absentee-by-mail

ballots may be applied for.  Under prior law, absentee ballots could be applied for

from 180 days before election day, with no specific application deadline.   The

Impractical Application Deadline O.C.G.A. § 21–2–381(a)(1)(A) (2021), changed

the law to provide a much narrower application window that opens only 78 days prior to election day and that closes 11 days prior to election day.

115.   The shortened period for applications for absentee mail ballots creates at least three categories of constitutional problems.  First, voters who encounter unforeseen emergencies within 11 days of Election Day will be disenfranchised because there is no hardship waiver of the 11- day deadline.  Examples of voters who would be disenfranchised include voters who had serious accidents or illnesses, were quarantined, bereaved, or called for National Guard duty, emergency medical work, or unanticipated jury duty. The effective date of the Impractical Application Deadline is July 1, 2021 and it will begin to disenfranchise voters during the July 13, 2021 runoff elections.

116.   Second, runoffs for state offices are frequently determined and announced on the same day as the Secretary of State's deadline for certification of the election, with such certification occurring 17 days after the election. O.C.G.A. §21-2-499(b). Runoffs occur 28 days after Election Day, creating not even one day to timely apply for an application for a ballot for a runoff announced on the deadline for applying. Voters requiring absentee ballots will be disenfranchised by the abbreviated deadline, beginning with the July 13 runoff elections.

117.   Third, to meet the 11-day deadline without submitting an application by email, which must await the development of a secure transmission method as

50

explained below, the voter must mail the application well ahead of the 11-day deadline, causing an unnecessary burden on the voter, considerably reducing the time available to apply for an absentee ballot.

118.   Virtually all other states have provisions for voters in such unforeseen circumstances to obtain a mail ballot just as Governor Kemp did, indicating that there is no compelling state interest in preventing voters in such circumstances from voting.

119.   Absentee ballot applications may be transmitted by voters to the county registration officials in person or via electronic transmission, mail, or facsimile. O.C.G.A §21-2-381(a)(1)(A). The General Assembly apparently recognized the heightened risk of identity theft with the increased requirements of transmitting extensive personal identifying information on the application and required that the Secretary "develop a method to allow secure electronic transmission of such form." O.C.G.A. §21-2-381(a)(1)(C)(i).

120.   Although the provisions of the new ballot application procedures are effective July 1, 2021, the development and implementation of a secure email or other electronic transmission method of transmission are likely to require months or years of development and implementation in 159 counties. Until then, the ballot application time is significantly compressed as voters will need to mail or deliver their applications in person to meet the 11-day deadline. Mailing the application

could add several days to the voters' application completion and submission date, furthering the unreasonable burden on voters, particularly in the event of a runoff, announced within about 11 or 12 days of the runoff election.

### C.   Context Within Which SB202 Takes Effect And Will Be Applied To Plaintiffs

121.   The recent history of Georgia elections present circumstances that render the provisions of SB202 that are challenged herein unconstitutional as those provisions will be applied to certain of the Plaintiffs.

### 1.   Georgia's Oversized Dominion BMD Touchscreens Unavoidably Compromise Ballot Secrecy

122.   In April 2019, Georgia enacted HB316, a law that mandated the adoption and implementation of a new uniform statewide voting system using electronic touchscreen ballot marking devices ("BMDs"). HB316 also required that BMDs provide "absolute secrecy" in voting. O.C.G.A. §21-2-379.22.

123.   The oversized Dominion BMD touchscreen displays voter selections in such a way that they are clearly discernible to a person with normal vision who has a line of sight to the screen from any distance at which other people are likely to be located within a polling place. *See* Figures 4, 5 and 6, *infra.*

124.   Use of the Dominion BMD touchscreens in polling places after their late 2019 adoption quickly demonstrated that the giant touchscreens destroy the privacy of the voting experience for voters who use BMDs because those voters'

electoral choices are clearly visible to election workers, poll watchers, the press, public observers, and other voters in the polling place

125.   Recognizing the problem, the Secretary of State published illustrations for how election workers should set up polling places to attempt to decrease privacy violations.  However, the Secretary's illustrations proved to be incapable of solving the problem caused by the giant BMD touchscreens and have failed to preserve ballot secrecy for voters using the BMDs for in-person voting.

126.   More traditional methods for protecting secrecy of the ballot for BMD voters, such as booths and privacy screens, cannot be used because of the technological vulnerabilities of the Dominion BMD voting system.  Booths and privacy shields cannot be used, for example, because the machines have been shown in litigation to be vulnerable to hacking exploits that can be accomplished through the simple act of a surreptitious insertion of a USB stick into an open USB port, either on the BMD or on its attached printer, during the act of voting.  To guard against this known vulnerability, the BMDs must remain fully visible to election workers at all times to prevent the voting equipment from being compromised. In fact, poll workers are required under Georgia's election code to monitor the machines for tampering, which requires watching the activity at the machines.  State Election Board Rule 183-1-12-.11(4).

127.   During legislative hearings Senator Michael Dugan, a co-sponsor of

SB202, acknowledged that the large touchscreens violated voting privacy, but also

made clear his approval of making the observation of such displays a felony.[5]

128.   Not only will the loss of ballot secrecy have a chilling effect on voting

participation, but SB202 threatens voters and observers at the polling places with

being subjected arbitrarily to a felony charge for "intentionally observing" a

voter's touchscreen display of votes, although the observation may be unavoidable.

2.   **Georgia's Recent History of Voter Data Security Breaches**

129.   From at the early 2000's until at least December 31, 2017, the Center

for Election Services ("**CES**") was housed at Kennesaw State University to

assisting the Secretary of State with managing Georgia's election system. CES was

moved to the Secretary of State's office in 2018.

130.   Acting under contract as the Secretary of State's agents, CES at KSU

hosted an enormous assemblage of sensitive information critical to the safe and

secure operation of Georgia's voting system. Among this information was the

entire voter registration database for Georgia's millions of registered voters.  This

database contained every registered voter's name, driver license or state

---

[5] Senate Ethics Committee hearing, March 1, 2020
https://www.youtube.com/watch?v=jC0x7lchU3Q.

identification number, full or partial social security number, full date of birth, and residence address.

131.   The information hosted on the CES/SOS server was not authorized to be publicly accessible.  But between at least August 2016 and March 2017, and likely for a much longer period of time, this server—and all the files on it, including the voter registration database—was fully accessible to any computer user with Internet access.

132.   In late August 2016, cybersecurity researcher Logan Lamb ("Lamb") used an automated script to access the publicly available files hosted on the CES/SOS elections server at KSU.  Upon inspecting the files his script had downloaded, Lamb discovered that they included the voter registration database containing voting histories and personal registration information of every Georgia voter.  Lamb's subsequent investigation revealed that the files his script downloaded had been publicly exposed for so long that Google's automated search engine had actually cached (i.e., saved digital backup copies of) the pages containing many of them, meaning that these approximately 6 million voter files are still available likely from numerous sources. Thus, the personal voter registration information of millions of registered Georgia voters—including driver license numbers and birthdates—has been freely available "in the wild" for at least four years as of the filing of this Amended Complaint.

### 3.   **Covid-19 in Georgia**

133.   The ongoing COVID-19 pandemic continues to affect Georgia elections in significant ways.

134.   Georgia's Governor Brian Kemp first declared a Public Health State of Emergency in response to the pandemic on March 14, 2020.  He has subsequently extended the Public Health State of Emergency and imposed a number of restrictions on common activities through an evolving series of executive orders.

135.   On April 23, 2021, Governor Kemp issued his most recent renewal of the ongoing Public Health State of Emergency, which extended the period of emergency until May 30, 2021.

136.   Under the currently applicable restrictions imposed by Governor Kemp, individuals exposed to or themselves contracting COVID-19 are required to self-quarantine for a period of fourteen days.

137.   This quarantine period potentially conflicts with the right to vote if it occurs near an election.  A voter who is exposed to COVID close to Election Day, and must therefore self-quarantine, is rendered unable to vote in person and must instead apply for and obtain an absentee ballot to vote.

138.   Governor Kemp himself was exposed to COVID shortly prior to the November 2020 general election and was required to apply for an absentee ballot

on the Friday before Election Day. Governor Kemp's absentee ballot application was duly processed over the weekend before Election Day, and his absentee ballot arrived the Monday before Election Day, enabling Governor Kemp to vote and preventing him from being disenfranchised in the November 2020 election.[6]  Had the absentee ballot rules enacted by SB202 been in place, Governor Kemp (and doubtless many other Georgians in his same situation) would have been disenfranchised in the November 2020 election.

## VI.   SPECIFIC ALLEGATIONS OF THREATENED INJURY TO PLAINTIFFS

### A.   Defendants' Intention to Enforce SB202's Provisions

139.   Defendants who are SEB Voting Members, acting in their official capacities as voting members of the State Election Board, intend to enforce the laws established by SB202, including each provision of SB202 that is challenged herein as unconstitutional.

140.   Defendant RAFFENSPERGER intends to "provide any and all necessary support and assistance that the State Election Board, in its sole discretion, determines is necessary to enforce [the Georgia Election Code] or to

---

[6] https://www.ajc.com/politics/politics-blog/kemp-receives-absentee-ballot-while-in-quarantine-will-vote-after-all/LIUXJBW4O5AK5MQQLNBVWVUU34/  (last visited Apr. 28, 2021).

carry out or conduct any of its duties" established by SB202, including enforcing each provision of SB202 that is challenged herein as unconstitutional.  O.C.G.A. § 21–2–33.1(h) (2021).

141.   Defendant RAFFENSPERGER and members of his staff have repeatedly stated that certain county boards of elections are "habitual offenders," are "failing," and that, if given the necessary authority, Defendant RAFFENSPERGER will intervene in such counties' election management.

142.   Defendant RAFFENSPERGER and the Defendants who are SEB Voting Members have prejudged the Fulton County Board, in particular, to be one of the first superintendents targeted for suspension and removal by the SEB under SB202's Takeover Provisions based on violations of the Election Code that occurred before SB202 was even enacted. During the legislative consideration of SB202, legislators and RAFFENSPERGER were aware that the SEB already had at least 27 pending cases against the Fulton County Board investigating election law violations.  Secretary RAFFENSPERGER is investigating Fulton County voting records for the June and August 2020 elections to determine whether at least 123 voters may have voted twice. The SEB's findings in these pre-existing cases, along with numerous Fulton cases previously heard over the last two election cycles, will count as "any audit or investigation" under the Takeover Provisions

and may be invoked immediately by the SEB as grounds for the suspension or removal of the Fulton County Board.

143.   Defendant RAFFENSPERGER and his staff do not intend to implement the "method to allow secure electronic transmission" of absentee ballot request forms that is called for by SB202, O.C.G.A. § 21–2–381(a)(1)(C)(i) (2021), in time for that method to be utilized to handle absentee ballot applications in all 159 counties of Georgia during any elections to be held in 2021.

**B.   Plaintiffs' Direct Standing**

144.   Enforcement of the challenged provisions of SB202 threatens each Plaintiff with real and immediate injuries-in-fact that are neither conjectural, hypothetical, nor contingent, including the following:

1.   **Plaintiff Coalition for Good Governance**

145.   Plaintiff CGG is a non-profit corporation organized and existing under the laws of the State of Colorado.

146.   Plaintiff CGG's purpose is to preserve and advance the constitutional liberties and individual civil rights of United States citizens, with an emphasis on preserving and protecting the civil rights of its members that are exercised through their participation in public elections and oversight of government activities.

147.   Plaintiff CGG is a membership organization, with a membership that consists of both individuals and other organizations, residing in Georgia and other

States.  Individuals and organizations become members of Plaintiff CGG by providing their contact information and indicating a desire to associate with the organization. Members donate money, contribute time, and share information and intelligence with the organization to the extent they are able and motivated to do so. Members receive informational communications from Plaintiff CGG and benefit from Plaintiff CGG's facilitation and coordination of members' individual participation in civic activities that serve the organization's purpose, such as poll watching and ballot monitoring, auditing election results, participating in CGG-sponsored educational seminars, and publishing opinion pieces. Members utilize Plaintiff CGG as a resource to answer a wide range of questions about voting rights, voting processes, open meetings law, public records law, recalls, petition processes, election legislation, poll watcher training, and how to navigate election issues and challenge election law violations that they encounter.

148.   Plaintiff CGG serves its purpose in a variety of ways, including, for example, by providing information and education to its members; by serving as a non-partisan educational and informational resource for the public, county election officials, poll watchers, press, campaigns, candidates, and political parties; by monitoring nationwide developments in election law and technology; by providing speakers for events at educational institutions; by providing commentary from its leadership on election issues; by collaborating in voting rights and election

integrity initiatives with other nonpartisan nonprofits and academics; by developing and sharing research and investigation of reported election problems with the press, public and other members of the election-integrity community; by routinely formally proposing election rule-making to the Georgia State Election Board; by drafting proposed election-related legislation; and by facilitating and coordinating the engagement of members and prospective members as non-partisan participants in the electoral process through poll watching, attendance and participation at public meetings of county election boards, and other civic activities.

149.   Plaintiff CGG's leaders seek to develop and maintain relationships with individual board members of Georgia county boards of election and election directors and frequently communicate with them regarding election administration policies and decisions.

150.   Plaintiff CGG, acting on its own behalf, has direct organizational standing to bring each of its claims for prospective declaratory and injunctive relief that are stated herein.

151.   The Challenged Provisions of SB202 impair Plaintiff CGG's ability to engage in its own projects by forcing the organization to divert resources in response.

152.   Specifically, all voter education and advocacy projects in North Carolina related to voter privacy problems and electronic voting system security have been deferred or curtailed immediately to undertake this action.

153.   CGG's project to provide subject matter expertise to a non-profit organization plaintiff challenging North Carolina's voting system certification had to be dramatically curtailed in order to address the harmful impacts of SB202.

154.    CGG's project to prepare Georgia poll watcher training materials related to voting system technology has also been postponed in order to undertake this legal action.

155.   Because of the need to focus on the challenge to SB202, CGG had to decline recent requests to assist in the preparation of advocacy materials urgently needed to challenge Colorado's legislative efforts to adopt certain types of internet voting.  This project would have been undertaken except for the urgency of this action to address SB202.

156.   As a result of the need to challenge SB202, CGG had to reduce its time commitment and scope of its leadership role in planning and co-hosting a national election security seminar for election officials.

157.   CGG had to decline invitations to work with other non-profit organizations to craft proposed amendments to HR1 and SB1 in order to devote resources to challenging SB202.

158.    CGG's Executive Director was unable to assist in the Windham, New Hampshire audit of the November 2020 election anomalies, because of undertaking the challenge of SB2020.

159.    Projects to write opinion pieces concerning Georgia's need for post-election auditing standards for submission to certain Georgia community newspapers have been reduced and deferred because of the need to take this legal action, as have plans for follow up educational webinars regarding SB202 for Georgia's county election officials because of the required diversion of resources for this legal action.

160.    CGG's project to draft, at the request of individual lawmakers, proposed Georgia legislation for improved election transparency have been deferred and reduced because of the resources required to focus on this legal action.

161.    Management of CGG has diverted considerable time from the day-to-day operations and the above-mentioned projects to raise funds for legal fees and expenses for this legal action, considerably beyond its previously anticipated 2021 fund raising requirements.

162.    The SB202 challenge also required CGG resources to be diverted from the following: the overhaul of CGG's website; preparation of newsletters to donors about CGG projects on voter privacy and election security; educational

efforts geared to municipal election superintendents and city councils on the need for hand marked paper ballot voting systems.   This substantial and continuing diversion of CGG's resources is further described below by Plaintiff DUFORT and Plaintiff THROOP, both CGG volunteers.

### 2.   **Plaintiff SHIRLEY**

163.   Plaintiffs SHIRLEY, LANG, PULLAR, THOMAS-CLARK, and MCNICHOLS have protected property interests in their positions as members of county election boards that are protected by the Fourteenth Amendment.  *See DeKalb County Sch. Dist. v. Ga. Bd. of Educ.*, No. 1:13-CV-544-RWS, 2013 U.S. Dist. LEXIS 29535, at *8–9, 2013 WL791266 (Mar. 4, 2013) (citing *Bd. of Educ. v. Allen*, 392 U.S. 236, 241 n.5 (1968); *Finch v. Miss. State Med. Ass'n, Inc.*, 585 F.2d 765, 773 (5th Cir. 1978)).

164.   Plaintiff SHIRLEY was appointed to his current term as a member of the Athens-Clarke County Board in December 2020 by the Athens-Clerk County Commission.  The Athens-Clarke County Board is a combined board with duties of a board of registration (O.C.G.A. §21-2-212) and duties of an election superintendent (O.C.G.A. §21-2-70). As a member Athens-Clarke County Board, Plaintiff SHIRLEY receives compensation for each meeting of the board that he attends in his official capacity. Plaintiff SHIRLEY's current term expires on December 31, 2024.

165.   Plaintiff SHIRLEY participates in all meetings of the Athens-Clarke County Board which are conducted in public, generally broadcast on the internet, with a formal agenda and publicly available board meeting materials. The meetings routinely permit public comment on election-related matters.

166.   Plaintiff SHIRLEY, as a member of the Athens-Clarke County Board, is facing the real threat of removal by the SEB under the Takeover Provisions of SB202.  Within the two election cycles preceding the date of filing of this Complaint, the SEB has brought proceedings to sanction the Athens-Clarke County Board for alleged election law violations which the SEB may claim are sufficient to support the findings described in O.C.G.A. § 21–2–33.2(c). In March 2020, the SEB found the Athens-Clarke County Board in violation of the requirement for uniform voting equipment when the Athens-Clarke County Board adopted the use of hand marked paper ballots to provide ballot secrecy in the face of the failure of the BMD touchscreen units to provide for ballot secrecy. The findings, along with findings in other recent and pending investigations, expose the Athens-Clarke County Board to immediate suspension or removal by the SEB at any time on the SEB's own motion.

167.   If the SEB follows through on its expressed intention to suspend or remove superintendents with existing violations, such as the Athens-Clarke County Board, Plaintiff SHIRLEY will be injured because he:

65

- will be subjected to deprivation of his personal property and liberty interest in his role as a member of the Athens-Clarke County Board without any predeprivation due process right to notice and an opportunity to be heard;

- will be deprived of postdeprivation due process because SB202 only permits a corporate superintendent such as the Athens-Clarke County Board, and not its constituent individual members, to seek reinstatement;

- will be deprived of the ability to have his interests represented by the Athens-Clarke County Board itself, since SB202 renders removed corporate superintendents incapable of meeting, making decisions and taking actions (such as petitioning the SEB for corporate reinstatement) as a public body and in compliance with the Georgia Open Meetings Law;

- will be deprived of the ability to have his interest represented by counsel for the removed Athens-Clarke County Board itself, since SB202 prohibits public funds from being used to contest a suspension or removal and also prohibits superintendents from accepting private funds or gifts that could be used for such purposes;

- will be deprived of income as a result of being unable to attend the Athens-Clarke County Board meetings in an official capacity (the basis for SHIRLEY's compensation as a board member), because the Athens-Clarke County Board will itself be unable to meet while suspended or removed;

66

- will be deprived of the due process benefits of 1993 Ga. Act 216, § 5(c) and
  O.C.G.A. § 21–2–212(a), which together provide that members of the
  Athens-Clarke County Board are removable from office only for cause after
  notice and a hearing and only by the judge of the superior court; and

- will be deprived of the due process benefits of O.C.G.A. § 21–2–32(f),
  which mandates a judicial process that must be followed by the SEB before
  the SEB can directly supervise the official election duties undertaken by a
  superintendent like Athens-Clarke County Board.

168.   Plaintiff SHIRLEY, who frequently observes election operations such as absentee ballot processing in his capacity as a member of the Athens-Clarke County Board, will be injured by SB202's prior restraints on his First Amendment right of free speech and right to petition the government, which are imposed under penalty of misdemeanor by O.C.G.A. § 21–2–386(a)(2)(B)(vii) (the Gag Rule).

169.   Plaintiff SHIRLEY is registered to vote and is an eligible elector of the State of Georgia and Athens-Clarke County and intends to vote in all upcoming elections for which he is eligible to vote.

170.   Plaintiff SHIRLEY, in his personal capacity as a voter, is threatened with imminent injury in the event he votes in person during upcoming elections. Additionally, when he visits the polling place as a member of the Athens-Clarke Board, he is threatened with the same injury.  Specifically, each time he enters the

polling place, Plaintiff SHIRLEY will see other voters voting on giant BMD touchscreens, which will expose Plaintiff SHIRLEY to felony prosecution for violating SB202's Elector Observation Felony, which prohibits "intentionally observ[ing] an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting." O.C.G.A. § 21–2–568.1 (2021).

171.   Plaintiff SHIRLEY's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

172.   Plaintiff SHIRLEY, in his personal capacity as a voter, is threatened with a substantial risk that his ballot—and thus his right to vote—will be stolen from him by someone in possession of his driver license and date of birth, since these two pieces of personal information are in circulation as a result of lapses of security by the Georgia Secretary of State.  This injury is threatened because SB202 eliminated the previous absentee-by-mail signature verification check and adopted in its place the applicant's provision of these two pieces of information as the sole means of authenticating a voter's request for an absentee-by-mail ballot. Should he choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff SHIRLEY will be compelled "to consent to the

68

possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

173.   Plaintiff SHIRLEY, in his personal capacity as a voter, is also threatened with imminent injury by SB202's narrowing of the time within which to apply for an absentee-by-mail ballot for a runoff election, when the announcement of a runoff election will not be made in some elections until the deadline for applying for a runoff mail ballot.

### 3.   **Plaintiff THOMAS-CLARK**

174.   Plaintiff THOMAS-CLARK was appointed to the Coffee County Board and her current term expires in 2022.  As a Coffee County Board member, Plaintiff THOMAS-CLARK receives compensation for her work as a board member.  In addition, in her role as Chair of the Coffee County Board, Plaintiff THOMAS-CLARK assists the election staff in numerous administrative election-related activities.

175.   Plaintiff THOMAS-CLARK participates in all meetings of the Coffee County Board which are conducted in public with a formal agenda and publicly available board meeting materials.  The meetings routinely permit public comment on election-related matters.

176. Defendant RAFFENSPERGER recently announced that the Coffee County Board, of which Plaintiff THOMAS-CLARK is a member, is under investigation, and that counties under investigation for loss of chain of custody of ballots will be brought before the State Election Board for prosecution. The Coffee County Board is exposed to immediate suspension or removal by the SEB at any time on the SEB's own motion.

177. If the SEB follows through on its expressed intention to suspend or remove superintendents that it claims have existing violations, such as the Coffee County Board, Plaintiff THOMAS-CLARK will be injured in the same manner alleged above for Plaintiff SHIRLEY.

178. Plaintiff THOMAS-CLARK is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

179. Plaintiff THOMAS-CLARK is registered to vote and is an eligible elector of the State of Georgia and Coffee County and intends to vote in all upcoming elections for which he is eligible to vote.

180. Plaintiff THOMAS-CLARK's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

181.   Plaintiff THOMAS-CLARK, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff THOMAS-CLARK will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process.  *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

182.   Plaintiff THOMAS-CLARK, in her personal capacity as a voter, and when she visits polling places in her role as a board member, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLE.

183.   Plaintiff THOMAS-CLARK, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

### 4.   **Plaintiff LANG**

184.   Plaintiff LANG's current term on the Chatham County Board started in January 2019 and ends December 31, 2022.  As a Chatham County Board

member, Plaintiff LANG receives monthly compensation for his service on the board.

185.   Plaintiff LANG participates in all meetings of the Chatham County Board which are conducted in public with a formal agenda and publicly available board meeting materials. The meetings routinely permit public comment on election-related matters.

186.   If the SEB follows through on its expressed intention to suspend or remove superintendents that it claims has existing violations, such as potentially the Chatham County Board, Plaintiff LANG will be injured in the same manner alleged above for Plaintiff SHIRLEY.

187.   Plaintiff LANG is threatened with injuries arising from SB202's prior restraints on his First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) (2021) in the same manner as is alleged above for Plaintiff SHIRLEY.

188.   Plaintiff LANG is registered to vote and is an eligible elector of the State of Georgia and Chatham County and intends to vote in all upcoming elections for which he is eligible to vote.

189.   Plaintiff LANG's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

190.   Plaintiff LANG, in his personal capacity as a voter, is threatened with a substantial risk that his ballot – and thus his right to vote – will be stolen from him in the same manner as is alleged above for Plaintiff SHIRLEY.  Should he choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff LANG will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process.  *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

191.   Plaintiff LANG, in his personal capacity as a voter, and when he is visiting the polling places in his role as a Chatham County Board member, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

192.   Plaintiff LANG, in his personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

193.   In his personal capacity as a voter, Plaintiff LANG is threatened with injury because SB202 permits the SEB to remove the Chatham County Board of Registrars without cause, but does not permit the SEB to appoint a replacement to handle the registration and absentee ballot issuance duties.  Plaintiff LANG, like

73

all other voters, will suffer from the lack of a functioning department to manage voter registration and absentee ballot issuance.

### 5.   **Plaintiff PULLAR**

194.   Plaintiff PULLAR's current term as a member of the Clayton County Board expires in 2022.  Plaintiff PULLAR receives compensation for each meeting she attends of the Clayton County Board in her official capacity.

195.   Plaintiff PULLAR participates in all meetings of the Clayton County Board which are conducted in public with a formal agenda and publicly available board meeting materials.  The meetings routinely permit public comment on election-related matters.

196.   Within the two election cycles preceding the date of filing of this Complaint, the SEB has conducted at least 48 alleged incidents of Clayton County voters double voting, and one investigation of violations of the Georgia Election Code by the Clayton County Board.  The findings in these investigations, along with findings in any other recent and pending investigations, expose the Clayton County Board to the risk of immediate suspension or removal by the SEB at any time on the SEB's own motion.

197.   If the SEB follows through on its expressed intention to suspend or remove superintendents that it claims has existing violations, such as potentially

the Clayton County Board, Plaintiff PULLAR will be injured in the same manner alleged above for Plaintiff SHIRLEY.

198.   Plaintiff PULLAR is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(viii) in the same manner as is alleged above for Plaintiff SHIRLEY.

199.   Plaintiff PULLAR is registered to vote and is an eligible elector of the State of Georgia and Clayton County and intends to vote in all upcoming elections for which he is eligible to vote.

200.   Plaintiff PULLAR's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

201.   Plaintiff PULLAR, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff PULLAR will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of

substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

202.   Plaintiff PULLAR, in her personal capacity as a voter, and as she observes polling place activities as a Clayton Board member, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

203.   Plaintiff PULLAR, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

### 6.   **Plaintiff MCNICHOLS**

204.   Plaintiff MCNICHOLS' current term as a member of the Jackson County Board expires on January 31, 2023.  Plaintiff MCNICHOLS is compensated for her service on the Jackson County Board.

205.   Plaintiff MCNICHOLS participates in all meetings of the Jackson County Board which are conducted in public with a formal agenda and publicly available board meeting materials.  The meetings routinely permit public comment on election-related matters.

206.   On behalf of the Jackson County Board, Plaintiff MCNICHOLS participates in the processing of Jackson County's mail ballots, including the collection of mail ballots from the drop boxes.  If she detects any problems, her

practice is to inform the Jackson County elections staff and to alert Pete Fuller, the Chairman of Plaintiff JDCD.

207.   Within the two election cycles preceding the date of filing of this Complaint, the SEB has brought at least three cases against the Jackson County Board, of which Plaintiff MCNICHOLS is a member, alleging violations of the Georgia Election Code. The Secretary of State is conducting an investigation alleging double voting by 5 Jackson County voters in August 2020.  The findings in these cases, along with findings in other recent and pending investigations, expose the Jackson County Board to immediate suspension or removal by the SEB at any time on the SEB's own motion.

208.   If the SEB follows through on its expressed intention to suspend or remove superintendents with existing violations, such as the Jackson County Board, Plaintiff MCNICHOLS will be injured in the same manner alleged above for Plaintiff SHIRLEY.

209.   Plaintiff MCNICHOLS is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

210.   Plaintiff MCNICHOLS is registered to vote and is an eligible elector of the State of Georgia and Jackson County and intends to vote in all upcoming elections for which she is eligible to vote.

211.   Plaintiff MCNICHOLS's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

212.   Plaintiff MCNICHOLS, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff MCNICHOLS will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

213.   Plaintiff MCNICHOLS, in her personal capacity as a voter and as she visits polling places in her role as a Jackson Board member, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

214.   Plaintiff MCNICHOLS, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the time within which to apply for absentee-by-mail ballots in the same manner as is alleged above for Plaintiff SHIRLEY.

### 7.   Plaintiff JACKSON COUNTY DEMOCRATIC COMMITTEE

215.   Plaintiff JCDC has the right under Georgia law to appoint two members of the Jackson County Board, who help protect the interests of JCDC's candidates and members and ensure transparent and accurate elections.

216.   Within the two election cycles preceding the date of filing of this Complaint, the SEB has conducted multiple investigations involving allegations of violations of the Georgia Election Code by the Jackson County Board.   The findings in these investigations, along with findings in other recent and pending cases, expose the Jackson County Board to the risk of immediate suspension or removal by the SEB at any time on the SEB's own motion.

217.   If the SEB follows through on its expressed intention to suspend or remove superintendents with existing violations, such as the Jackson County Board, Plaintiff JCDC:

- will be deprived of its current and future appointments to the Jackson County Board without any pre-deprivation due process right to notice and an opportunity to be heard;

- will be deprived of post-deprivation due process because SB202 only permits a corporate superintendent such as the Jackson County Board, and not appointers of the superintendent's constituent individual members, to petition for the superintendent's reinstatement;

- will be deprived of the due process benefits of local Acts and O.C.G.A. § 21–2–212(a), which together provide that members of the Jackson County Board are removable from office only for cause after notice and a hearing and only by the judge of the superior court; and

- will be deprived of its ability to participate in the public formulation of decisions by the public authority responsible for administering Jackson County elections since any appointee of the SEB, by virtue of being an individual, will be exempted from the transparency requirements of the Georgia Open Meetings Law.  Plaintiff JCDC has direct organizational standing to bring each of its claims for prospective declaratory and injunctive relief.

### 8.   Plaintiff GEORGIA ADVANCING PROGRESS POLITICAL ACTION COMMITTEE

218.   GEORGIA ADVANCING PROGRESS POLITICAL ACTION COMMITTEE ("GAPPAC") is a non-profit organization incorporated in 2017. GAPPAC is organized as a qualified state and local political organization pursuant to IRC Section 527 and Georgia's Ethics in Government Act.

80

219.   Plaintiff GAPPAC is a membership organization with the purpose of advancing the representation and advancement of Asian Americans and Pacific Islanders ("AAPI") to elected office in Georgia, and elected officials who advocate for AAPI issues.

220.   Plaintiff GAPPAC's members are concentrated in Gwinnett, Fulton, Cobb, DeKalb, and Forsyth Counties in Georgia.

221.   Plaintiff GAPPAC's members dedicate a significant portion of their volunteer efforts to help AAPI voters whose primary language is not English by translating voting and mail ballot instructions. GAPPAC also helps its members and others who are AAPI voters to properly and timely request and return mail ballots, which are popular with AAPI voters who may prefer to take their time to translate and study their ballot in their home, without the time pressure of a polling place.  GAPPAC also assists its members and others who are AAPI voters in curing mail ballots rejected by officials for discrepancies that may have been caused by the voter's misunderstanding of the instructions.

222.   Plaintiff GAPPAC prepares video and printed voter education materials in multiple languages to help its members and others who are AAPI voters to participate in the voting process.

223.   GAPPAC, acting on its own behalf, has direct organizational standing to bring each of its claims for prospective declaratory and injunctive relief.

224.   Plaintiff GAPPAC has diverted, and will continue diverting, organizational resources away from its other projects to counteract the Defendants' enforcement of SB202's unconstitutional provisions.

225.   Specifically, GAPPAC serves a community of voters that includes many fairly new voters and voters whose native language is not English. Massive changes in SB202's rules for voting, particularly the new dangerous threat of a felony accusation for seeing the touchscreen vote choices of other voters, requires significant and immediate diversion of resources for educational outreach to voters to explain the new rules and deadlines, and help voters understand how to try to participate and protect themselves from these wrongful threats, and from mail ballot disenfranchisement.  Such efforts must start immediately to address SB202's unconstitutional provisions, some of which will be in effect as early as May 24 when early voting begins for various June 15 elections.

226.   Educational efforts must include how to vote by mail under the new deadlines and how to take precautions to reduce the high risk of identity theft. Educational materials must be updated and produced in multiple languages. Additional funds must be raised to pay for these unplanned educational efforts. Such efforts are diverting GAPPAC resources from its day-to-day activities such as candidate and issue advocacy.   GAPPAC will also continue to divert resources to obtain legal advice relating to the preparation of the educational material and to

communications to the Gwinnett Board of Elections to urge it to protect voters from disenfranchisement because of SB202, and defend itself against takeover threats. GAPPAC management is diverting resources to contact potential vendors regarding determining the costs for the unplanned overhauling its educational materials required by the changes created by SB202.

227.   This litigation and the unanticipated voter education effort will divert resources from GAPPAC's planned core activities of recruiting AAPI candidates, campaigning for AAPI candidates, advocacy for GAPPAC's key issues, and helping new AAPI voters get registered to vote in anticipation of the upcoming November municipal elections and the 2022 midterm elections.

### 9.   **Plaintiff GRAHAM**

228.   Plaintiff GRAHAM in his role as the Chair of the Libertarian Party of Georgia ("LPG") recruits and appoints poll workers and mail ballot monitors who observe the conduct of elections across the State.  The primary focus of LPG in poll watching is voting system security, accuracy, and operations, as well as efforts to improve voter privacy.  LPG poll watchers and mail ballot monitors report to Plaintiff GRAHAM about observed election irregularities, election administration problems, ballot secrecy violations, and election security deficiencies.  Plaintiff Graham relies on these reports to inform what actions he must take as a Chair to protect the interests of the Libertarian Party in Georgia.  Plaintiff Graham intends

to continue to perform these activities in 2021 and in future elections to the extent permitted by law.

229.   Plaintiff GRAHAM is already being injured by SB202, as experienced poll watchers and mail ballot observers whom he has appointed in the past to observe election activities are expressing hesitancy to act as such observers because they fear allegations of "intentionally observing" displayed votes, leading to criminal prosecution.

230.   Plaintiff GRAHAM wishes to appoint experienced poll watchers and monitors for the upcoming June 15, 2021 elections, including the House District 34 election in Cobb County, in which there is a Libertarian candidate. Early voting for that election begins May 24, 2021, with mail ballot processing permitted to being on May 31, 2021.  Experienced poll watchers are hesitant and fearful of retribution from the Secretary of State, as many have previously publicly criticized the BMD voting system after observing for LPG in the polling places.

231.   Plaintiff GRAHAM wishes to appoint mail ballot monitors in upcoming elections, including the June 15, 2021 elections for which mail ballot processing begins May 24, 2021.  Monitors observe mail ballot processing to protect LPG's interest in fair elections and to protect the interests of its candidates, members and Georgia voters.  Such appointed monitors are threatened with injuries arising from SB202's prior restraints on their First Amendment right of

84

free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY. GRAHAM's efforts to appoint monitors is harmed by the threatened harm to the monitors.

232.   Plaintiff GRAHAM will be deprived of the information required to act on mail ballot processing problems or discrepancies because of restraints on his monitors' exercise of free speech.

233.   In his role as Chair of LPG it is important that Plaintiff GRAHAM be able to monitor the decision-making of the county election boards across the state. Upon the takeover of any county board of elections, Plaintiff GRAHAM will lose his ability to monitor the election management process on behalf of the LPG and to make informed decisions to protect the interests of the party, its candidates and its members.

234.   Plaintiff GRAHAM is a registered Fulton County voter.  Given the Defendants' stated intentions to suspend or remove superintendents like the Fulton County Board of Registration and Election ("the Fulton County Board"), Plaintiff GRAHAM is threatened with injury in the form of the deprivation of his right to attend and participate in public meetings of the Fulton County Board at which election administration and governance decisions for Fulton County voters will be decided.

235.   Plaintiff GRAHAM's Georgia driver's license and date of birth were disclosed to unknown person in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

236.   Plaintiff GRAHAM generally chooses to vote in person during early voting, and is now subject to the risk of felony allegations merely by glancing around the polling place.

237.   In the November 2020 general election, the Defendant Secretary of State permitted absentee ballot applicants to submit online applications that did not require pen and ink signatures but did require the applicant to provide a Georgia driver license number and date of birth. In other words, the Secretary conducted what was effectively a trial run of SB202's absentee ballot request provisions, requiring sensitive personal identifying information to be transmitted.

238.   In the November 2020 general election Plaintiff GRAHAM went to the Fulton County Metropolitan Library polling place during early voting and was told that records showed he had applied for and been issued a mail absentee ballot. Plaintiff GRAHAM had not done so and insisted on being able to vote in the polling place.  Officials gave him two choices—either not vote, or sign a form affidavit that stated (falsely) that he had requested an absentee ballot but wished to vote in person instead.  Plaintiff GRAHAM objected to being forced to sign a false

affidavit to exercise his fundamental right to vote.  Plaintiff GRAHAM has never been told why official records recorded him as requesting an absentee ballot.

239.   It is not known whether Plaintiff GRAHAM'S identity was stolen for purposes of obtaining a fraudulent mail ballot causing GRAHAM to be inaccurately told that he had requested a mail ballot. GRAHAM'S experience demonstrates the real threat of mail ballot identity theft when widely available identification numbers and dates of birth can be used to obtain a ballot.  Should he choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff GRAHAM will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process.  *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

### 10.   **Plaintiff MARTIN**

240.   Plaintiff MARTIN is registered to vote and is an eligible elector of the State of Georgia and Fulton County and intends to vote in all upcoming elections for which she is eligible to vote.

241.   Plaintiff MARTIN is a frequent poll watcher and mail ballot monitor appointed to that role by Plaintiff GRAHAM.  Plaintiff MARTIN routinely attends the Fulton County Board meetings, generally reviews the board materials available to the public, and frequently offers comments and recommendations during the

board's public comment period.  Plaintiff MARTIN has repeatedly filed formal

complaints or declarations in litigation regarding the failure to protect the secret

ballot and various election security violations. She has been publicly critical of the

secret ballot violations on local television news.[7]

242.   Within the 12 months preceding the date of filing of this Complaint,

the SEB has instituted investigations for election law violations (wrongly) alleged

to have been committed by Plaintiff MARTIN.  These baseless investigations show

the SEB's willingness to arbitrarily and unjustifiably abuse its powers to retaliate

against its critics, such as Plaintiff MARTIN.

243.   Plaintiff MARTIN, in her personal capacity as a voter, is threatened

with prosecution for the Elector Observation Felony in the same manner as is

alleged above for Plaintiff SHIRLEY.

244.   Plaintiff MARTIN will also be deterred from continuing poll

watching activity so long as she is at risk of being arbitrarily accused of a felony

for intentionally observing a voter's selections on the touchscreen voting machines.

245.   Plaintiff MARTIN will be deterred from continuing mail ballot

processing monitoring activities so long as she cannot report mail balloting

---

[7] https://www.11alive.com/article/news/georgia-voting-privacy/85-01f0e401-7864-46ec-9389-ac88323f6254  (last visited Apr. 29, 2021).

discrepancies or findings to anyone other than the superintendent, which makes the activities of little value.

246.   Plaintiff MARTIN will be deterred from continuing to monitor mail ballot processes so long as she can be accused of "estimating" or "attempting to estimate" any of the votes on absentee ballots cast" by any election official who dislikes her presence. O.C.G.A.§ 21–2–386(a)(2)(A); O.C.G.A. § 21–2–386(a)(2)(B)(vi).

247.   As both an election observer and a voter, Plaintiff MARTIN is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) (2021) in the same manner as is alleged above for Plaintiff SHIRLEY.

248.   Secretary RAFFENSPERGER has clearly indicated his desire to intervene in Fulton County's election administration, a goal echoed by members of the General Assembly in advocating for the passage of SB202.

249.   Given the Defendants' stated intentions to suspend or remove superintendents like the Fulton County Board, Plaintiff MARTIN is threatened with injury in the form of the deprivation of her right to attend and participate in public meetings of the Fulton County Board at which election administration and governance decisions for Fulton County voters will be decided.

250.    Plaintiff MARTIN's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

251.    Plaintiff MARTIN, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff MARTIN will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

252.    Plaintiff MARTIN, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY. MARTIN has repeatedly had problems obtaining a timely absentee ballot from Fulton County, despite properly applying weeks in advance. The narrowed window for application, and the inability to securely transmit applications electronically, makes it likely that MARTIN will be injured by an inability to obtain an absentee ballot, particularly in runoff elections, and will be forced to choose between voting in person with the associated risk of a felony accusation or not voting.

90

11. **Plaintiff DUFORT**

253.   Plaintiff DUFORT is registered to vote and is an eligible elector of the State of Georgia and Morgan County and intends to vote in all upcoming elections for which she is eligible to vote.

254.   Plaintiff DUFORT is a Vice-Chair of the Morgan County Democratic Committee ("MCDC").  In this role, Plaintiff DUFORT recruits and supervises poll watchers and mail ballot monitors who observe the conduct of elections in Morgan County.  The MCDC's poll watchers and mail ballot monitors report to Plaintiff DUFORT about observed election irregularities, election administration problems, and election security deficiencies.

255.   Plaintiff DUFORT regularly attends the meetings of the Morgan County Board of Elections and Registration (the "Morgan County Board").  Plaintiff DUFORT generally reviews the board materials available to the public, and frequently offers comments and recommendations during the board's public comment period.  Plaintiff DUFORT personally knows each of the members of the Morgan County Board and often calls or meets with them to offer information and suggestions and to lodge objections to decision made by the Morgan County Board.

256.   Plaintiff DUFORT also routinely acts as a poll watcher and mail ballot monitor herself on behalf of the MCDC.  Plaintiff DUFORT has repeatedly

filed formal complaints or declarations in litigation regarding the failure to protect the secret ballot, and challenging various election security violations.

257.   Plaintiff DUFORT will be deterred from continuing poll watching activity so long as she is at risk of being accused of a felony for intentionally observing a voter's selections on the touchscreen voting machines.

258.   Plaintiff DUFORT will be deterred from continuing to monitor mail ballot processes so long as she can be accused of "estimating" or "attempting to estimate any of the votes on absentee ballots cast" by any election official who dislikes her presence. O.C.G.A.§ 21–2–386(a)(2)(A); O.C.G.A. § 21–2–386(a)(2)(B)(vi). These vague prohibitions constituting misdemeanors subject Plaintiff DUFORT to arbitrary enforcement in her role as a mail ballot monitor.

259.   Plaintiff DUFORT will be deterred from continuing mail ballot processing monitoring activities so long as she cannot report mail balloting discrepancies or findings to anyone other than the superintendent, which makes the activities of little value.

260.   Plaintiff DUFORT routinely serves on the mail ballot Vote Review Panel in Morgan County, a bi-partisan team that reviews mail ballots with vote marks not easily interpreted by the scanners. In that role, she has discovered and reported systemwide problems in scanner accuracy, resulting in some scanner improvement, but also ongoing litigation. The Gag Rule, making such reporting a

misdemeanor, will prohibit DUFORT from publicly reporting such problems in the future.

261.   The threat of criminal prosecution will impair Plaintiff DUFORT's ability to observe polling places and mail ballot processing and fulfill her responsibilities to recruit and appoint watchers and monitors on behalf of the Morgan County Democratic Committee.

262.   As both an election observer and a voter, Plaintiff DUFORT is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

263.   Plaintiff DUFORT, in her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

264.   Plaintiff DUFORT's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

265.   Plaintiff DUFORT, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should

she choose to vote absentee by mail, without a truly secure transmission method

for applications first being implemented by Defendant RAFFENSPERGER,

Plaintiff DUFORT will be compelled "to consent to the possibility of a profound

invasion of privacy when exercising the fundamental right to vote" in violation of

substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

266.   Plaintiff DUFORT, in her personal capacity as a voter, is threatened

with injury arising from SB202's restriction of the window for absentee-by-mail

ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

267.   Plaintiff DUFORT is a frequently requested speaker for organizations

focused on voting rights, voter education, and election security. In her role as an

active member of CGG, she frequently speaks on behalf of CGG on these topics.

After the enactment of SB202, she has had to divert her volunteer time from other

CGG activities to devote to education and litigation efforts related to SB202,

creating injury to CGG's planned activities.   Such planned but now deferred CGG

activities include reviewing the accuracy of the tabulation of Morgan County

scanned ballot images in the 2020 elections, drafting proposed election rules for

CGG's SEB rule-making advocacy efforts, analyzing county election cost

increases related to the BMD voting system, and fundraising for CGG.

12.   **Plaintiff NAKAMURA**

268.   Plaintiff NAKAMURA is registered to vote and is an eligible elector of the State of Georgia and Fulton County and intends to vote in all upcoming elections for which she is eligible to vote

269.   Plaintiff NAKAMURA is frequently appointed by Plaintiff GRAHAM as a poll watcher and mail ballot monitor and has repeatedly filed formal complaints or declarations in litigation regarding the failure to protect the secret ballot and various election security violations. She has been publicly critical of the secret ballot violations in her public comments at SEB meetings and Fulton County Board of Elections meetings.

270.   Plaintiff NAKAMURA does not intend to continue poll watching activity so long as she is at risk of being accused of a felonious act of intentionally observing a voter's selections on the touchscreen voting machines.

271.   Plaintiff NAKAMURA does not intend to continue mail ballot processing monitoring activities so long as she cannot report mail balloting discrepancies or findings to anyone other than the superintendent, which makes the activities of little value.

272.   Plaintiff NAKAMURA does not intend to continue to monitor mail ballot processes so long as she can be accused of the misdemeanor of "estimating"

95

or "attempting to estimate any of the votes on absentee ballots cast" in violation of O.C.G.A. §21-2-386(a)(2)(B)(vi).

273.   Given the high risk of SEB takeover of the Fulton County Board, Plaintiff NAKAMURA risks losing her right, which she frequently exercises, to monitor and participate in the Fulton County Board's public meetings to personally and on behalf of CGG advocate for fair, secure and transparent elections.

274.   As both an election observer and a voter, Plaintiff NAKAMURA is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

275.   Plaintiff NAKAMURA, in her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

276.   Plaintiff NAKAMURA's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

277.   Plaintiff NAKAMURA, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY.

Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff NAKAMURA will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

278.   Plaintiff NAKAMURA, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.  NAKAMURA has repeatedly had problems obtaining a timely absentee ballot from Fulton County, despite properly applying weeks in advance. The narrowed window for application, and the inability to securely transmit applications electronically, makes it likely that NAKAMURA will be injured by an inability to obtain an absentee ballot, particularly in runoff elections, and will be forced to choose between voting in person with the associated risk of a felony accusation or not voting.

279.   Plaintiff NAKAMURA has not, to her knowledge, ever contracted COVID-19.  Because of chronic health conditions she remains at substantial risk of doing so, particularly in the case of variant surge, in which case she will be required to quarantine herself immediately. The same is true of surges in influenza

97

or other communicable diseases. If this happens during the eleven days prior to an election, Plaintiff NAKAMURA will be unable to vote in person and will be rendered unable to vote altogether because SB202 prohibits voters from obtaining an absentee ballot during the eleven or more days prior to election day, taking into account that email applications without a secure transmission option will require application at least two weeks prior to election day.

### 13. **Plaintiff THROOP**

280.   Plaintiff THROOP is registered to vote and is an eligible elector of the State of Georgia and Fulton County and intends to vote in all upcoming elections for which she is eligible to vote.

281.   Plaintiff THROOP is frequently appointed by Plaintiff GRAHAM as a poll watcher and mail ballot monitor and has repeatedly filed formal complaints or declarations in litigation regarding the failure to protect the secret ballot and challenging various election security violations.

282.   Plaintiff THROOP routinely attends the meetings of the DeKalb County Board of Elections and Registration (the "DeKalb County Board").   She reviews the public materials and interacts with board members to offer suggestions and options, or to lodge objections to policies that fail to secure DeKalb's elections or ensure fair access to the polls.

283.   Plaintiff THROOP does not intend to continue poll watching activity so long as she is at risk of being accused of a felonious act of intentionally observing a voter's selections on the touchscreen voting machines.  Plaintiff THROOP, in her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

284.   Plaintiff THROOP does not intend to continue mail ballot processing monitoring activities so long as she cannot report mail balloting discrepancies or findings to anyone other than the superintendent, which makes the activities of little value.

285.   Plaintiff THROOP does not intend to continue to monitor mail ballot processes so long as she can be accused of the misdemeanor of "estimating" or "attempting to estimate any of the votes on absentee ballots cast." (O.C.G.A. §21-2-386(a)(2)(B)(vi).

286.   As both an election observer and a voter, Plaintiff THROOP is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

287.   Secretary Raffensperger announced his view that DeKalb performed in an "unacceptable" way in June 2020 and opened an investigation into the DeKalb County Board's conduct of the election. The SEB had 6 pending DeKalb cases and investigations as of the April 28, 2021 SEB meeting, and was investigating 137 cases of alleged double voting in DeKalb's June and August 2020 elections

288.   Given the high risk of SEB takeover of the Dekalb County Board, Plaintiff THROOP, as a DeKalb County voter, is subject to losing the right she frequently exercises to monitor and participate in the DeKalb County Board's public meetings to personally to advocate for fair, secure and transparent elections.

289.   Plaintiff THROOP 's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

290.   Plaintiff THROOP is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff THROOP will be compelled "to consent to the possibility of a profound invasion of privacy when

exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

291.   Plaintiff THROOP, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

292.   Plaintiff THROOP is an active volunteer for CGG and often undertakes graphic design projects for CGG's educational materials.  After the enactment of SB202, she has had to divert her volunteer time from other CGG activities, such as assisting in the updating of CGG's website, to prepare CGG educational materials for Georgia election officials relating to the challenged provisions of SB202, to meet with concerned citizens to explain the local impact of SB202, and to help organize this lawsuit.

### 14.   **Plaintiff FRIEDMAN**

293.   Plaintiff FRIEDMAN, a journalist, will be injured by SB202's prior restraints on his First Amendment right of free speech and freedom of the press which is imposed under penalty of misdemeanor by the Gag Rule, O.C.G.A. § 21–2–386(a)(2)(B)(ii) and (vii) (2021), and Photography Ban, O.C.G.A. §21-2-568(a).

294.   Under SB202, FRIEDMAN be prohibited from reporting mail balloting discrepancies or security concerns that he or The BRAD BLOG or the BradCast journalists may personally observe as members of the press.

295.   In addition, Plaintiff FRIEDMAN will be injured because the party-appointed observers he has relied on to supply first-hand accounts, such as Plaintiff DUFORT, are prohibited under penalty of misdemeanor from reporting their observations to Plaintiff FRIEDMAN.

296.   The enforcement of the Photography Ban will prohibit Plaintiff FRIEDMAN and his associates from bringing photographic equipment into the mail ballot processing operation, a traditional place from which press photographers and reporters document the process of the election.

297.   In recent elections, thousands of press photos were widely published of anonymous voted mail ballots from the mail ballot workrooms and audit rooms in Fulton County, and video recorded interviews were conducted with officials while at work in those rooms.

298.   Plaintiff FRIEDMAN and field reporters he would otherwise engage will be deterred from observing or photographing polling place activity so long as reporters are at risk of being accused of a felony for observing a voter's selections on the touchscreen voting machines.

299.   Plaintiff FRIEDMAN will be deterred from monitoring mail ballot processes so long as reporters can be accused of the misdemeanors of "estimating" or "attempting to estimate any of the votes on absentee ballots cast" by any election official.   O.C.G.A.§ 21–2–386(a)(2)(A); O.C.G.A. § 21–2–386(a)(2)(B)(vi).

300.   Plaintiff FRIEDMAN is already injured by SB202 because the criminalization of constitutionally protected activity has a chilling effect on his exercise of First Amendment rights.

301.   Plaintiff FRIEDMAN is threatened with injuries arising from SB202's prior restraints on his First Amendment right of free speech and right of freedom of the press.

### C.   Plaintiff CGG's Associational Standing

#### 1.   Elements of CGG's Associational Standing

302.   At least one of CGG's members has standing to sue each Defendant on each of CGG's claim in the member's own right.

303.   The interests CGG seeks to protect are germane to CGG's organizational purpose.

304.   The prospective injunctive and declaratory relief requested by CGG does not require the participation of CGG's individual members in this lawsuit.

2.  **Individual Standing of Plaintiff Members of CGG**

305.   Plaintiffs GRAHAM, DUFORT, NAKAMURA, THROOP, LANG,

SHIRLEY, PULLAR, THOMAS-CLARK, MCNICHOLS, and MARTIN are

members of Plaintiff CGG who have standing to sue in their own right due to their

threatened injuries-in-fact alleged above.

306.   Within the 12 months preceding the date of filing of this Complaint,

the SEB and Defendant RAFFENSPERGER have conducted investigations for

election law violations alleged to have been committed by Plaintiff CGG's

executive director, by CGG board member Plaintiff MARTIN, and by an expert

witness who has testified in Court proceedings at Plaintiff CGG's request.  The

strained allegations in these investigations smack of retaliation for CGG's

litigation activities against the SEB related to election security and voter privacy.

Because of this recent history of baseless investigations and enforcement

proceedings against Plaintiff CGG's members, Plaintiff CGG's members have

reasonable fears that the new, stronger criminal prohibitions established by SB202

will be invoked by the Defendant Secretary and SEB to harass and intimidate

Plaintiff CGG's members to discourage their activities that scrutinize the voting

system and election procedures.

### 3.  Individual Standing of Non-Plaintiff Members of CGG

307.   Plaintiff CGG has numerous members who not named as Plaintiffs in this litigation but who are registered Fulton County and DeKalb County voters. Given the Defendants' stated intentions to suspend or remove superintendents like the Fulton and DeKalb County Boards, Plaintiff CGG's members who are Fulton and DeKalb County voters are threatened with injury in the form of the deprivation of their right to attend and participate in public meetings of the Fulton County Board and the DeKalb County Board at which election administration and governance decisions for Fulton County and DeKalb County voters will be decided.

308.   Each of CGG's members who is a registered voter is threatened with injuries arising from SB202's prior restraints on their First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

309.   Each of CGG's members who is a registered Georgia voter, in his or her personal capacity as a voter, if they chose to or are forced to vote in person, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

310.   Each of CGG's members who is a registered voter and whose personal information has been exposed as a result of the Secretary of State's data security failures is threatened with a substantial risk that his or her ballot—and thus his or her right to vote—will be stolen in the same manner as is alleged above for Plaintiff SHIRLEY. Should its members choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff CGG's members will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

311.   Each of CGG's members who is a registered Georgia voter and who wishes to vote in person, but experiences unforeseen medical or employment demands in the 11 days prior to election day causing then to be absent from the polls, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA

312.   Each of CGG's members who is a registered Georgia voter and who is vulnerable to contracting COVID-19, or to being exposed to someone with COVID-19, is threatened with injury arising from SB202's restriction of the

window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

313.   Each of CGG's members who are registered electors in counties with a separately operating board of registration is threatened with injury arising from SB202's grant of authority to the SEB to remove the board of registration without cause and without the ability to appoint a replacement registrar in the same manner as is alleged above for Plaintiff LANG.

314.   Plaintiff CGG has members who desire to exercise their constitutional right to cast an absolutely secret ballot, which is generally unavailable in the polling places where BMDs are used and wish to vote a secret ballot by absentee ballot.

315.   Plaintiff CGG has members who desire to vote in special June 15, 2021 vacancy elections and will avoid going to the polling place because of the risk of wrongfully being accused of a felony.

316.   Plaintiff CGG has at least one member who is a candidate in the House District 34 special election on June 15, 2021 and is concerned about intimidation of supporters because of the risk of being accused of the felony of observing touchscreen displays.

317.   Plaintiff CGG has elderly members who find it physically necessary to vote by absentee mail ballot because of the difficulty of travel to polling places,

standing in polling place lines, and using the polling place equipment.  They are

faced with the threat of innocently seeing votes on a touchscreen and being

charged with a felony.   If these members do not receive an automatic roll-over

ballot, these members will be unable to obtain a mail ballot for a state office runoff

because the deadline for an absentee mail ballot application occurs on the same day

that the need for a state runoff is determined, providing no reasonable window for

requesting a mail ballot.

318.   Plaintiff CGG has at least one member who is a student at an out-of-

state university. She and similarly situated students will be unable to vote by

absentee mail ballot in state office runoff elections because the deadline for the

ballot application occurs on the same day that the related election is certified and

the need for the runoff election is determined. Even when the runoff is announced

earlier, given the requirement to mail or deliver a ballot application in person (until

a secure electronic transmission method is available), students in distant states will

be unable to apply by mail before the 11-day deadline.

319.   Plaintiff CGG has a number of members who have routinely applied

for absentee ballots by submitting their applications via email to assure prompt

delivery of their application. Until the Secretary of State's secure transmission

method can be developed and installed, the members will have even less time to

submit a timely application. The secure transmission method is essential given the

new requirements that the voter submit driver's license numbers and full date of birth on the application. Without a truly secure transmission method being implemented, members who seek to vote absentee by mail will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

320.   Plaintiff CGG has a number of members whose health is impaired because of immune system diseases making them particularly susceptible to health risks during the current pandemic conditions. For many of CGG's members with such health conditions, a reliable, secure, and timely system of mail balloting is essential to their exercise of the franchise.

321.   Plaintiff CGG has a number of members whose Georgia driver's license numbers and dates of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server that occurred in 2016 and 2017.

322.   Plaintiff CGG has a number of members who have been publicly protesting the enactment of SB202 and have been actively involved in seeking SB202 sponsor Representative Barry Fleming's removal as county or city attorney in certain jurisdictions that he represents. These members now face the likely increased risk of being investigated for the felony act of "intentionally" observing

others' votes on the oversized touchscreens when they vote in the polling place. Several members, some of them African American, now fear entering the polling place to vote, for fear that another voter, official, or observer seeking retribution may falsely allege intentional observation---an allegation against which the voter cannot defend.

323.   Plaintiff CGG has members who are voters in counties with separate boards of registration subject to removal without cause and risk the loss of functioning voter registration and absentee balloting activities.

324.   Plaintiff CGG has several members including officers, who regularly act as poll watchers and mail ballot processing observers on behalf of political parties or candidates. As such, they have submitted multiple declarations detailing election discrepancies and security issues to the Court in other cases and provided public comment in such cases. These members, like the members who have protested SB202 and fear retribution, are also concerned about targeted enforcement of the punitive law, fearing that they may be charged with felonies for simply looking toward the machines in conjunction with their duties to watch for tampering and machine malfunctions. Member poll watchers expect that the risk of alleged felonies will cause them to curtail their volunteer poll-watching duties.

325.   Because of the foregoing threatened injuries, each of CGG's members described above would have standing to sue in their own right.

### D.   Plaintiff JCDC's Associational Standing

#### 1.   Elements of JCDC's Associational Standing

326.   At least one of JCDC's members has standing to sue each Defendant on each of JCDC's claim in the member's own right.

327.   The interests JCDC seeks to protect are germane to JCDC's organizational purpose.

328.   The prospective injunctive and declaratory relief requested by JCDC does not require the participation of JCDC's individual members in this lawsuit.

#### 2.   Individual Standing of Plaintiff Members of JCDC

329.   Plaintiff MCNICHOLS is a member of Plaintiff JCDC who has standing to sue in her own right due to her threatened injuries-in-fact alleged above.

#### 3.   Individual Standing of Non-Plaintiff Members of JCDC

330.   Plaintiff JCDC has numerous members who not named as Plaintiffs in this litigation but who are registered Georgia and Jackson County voters.

331.   Each of JCDC's members who is a registered voter is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–

386(a)(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

332.   Each of JCDC's members who is a registered voter, in his or her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

333.   Each of JCDC's members who is a registered voter and whose personal information has been exposed as a result of the Secretary of State's data security failures is threatened with a substantial risk that his or her ballot—and thus his or her right to vote—will be stolen in the same manner as is alleged above for Plaintiff SHIRLEY. Should its members choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff JCDC's members will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

334.   Each of JCDC's members who is a registered Georgia voter and who wishes to vote in person, but experiences unforeseen medical or employment demands in the 11 days prior to election day causing then to be absent from the polls, is threatened with injury arising from SB202's restriction of the window for

absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

335.   Each of JCDC's members who is a registered voter and who is vulnerable to contracting COVID-19, or to being exposed to someone with COVID-19, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

336.   Members of Plaintiff JCDC, including its Chairman, Larry "Pete" Fuller, frequently attend the meetings of the Jackson County Board, review the board meeting materials, and take advantage of the public comment period to advocate for the JCDC's policy positions or to raise concerns about discrepancies and problem areas, including unlawful efforts to remove eligible voters from the voter rolls.

337.   Plaintiff JCDC has members whose Georgia driver's license and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's election server in 2016 and 2017.

338.   Plaintiff JCDC appoints poll watchers and who observe the conduct of elections in Jackson County.  In addition, Chairman Fuller routinely visits polling places on behalf of the JCDC to ensure that any problems are reported to the Jackson County Board.  Chairman Fuller and JCDC's appointed watchers are

threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

339.   Plaintiff JCDC has individual voter members who will be threatened with, and intimidated by, the allegation of the felonious activity of "intentionally observing" a display screen.

340.   Plaintiff JCDC's ability to appoint poll watchers given the threat of the allegation of felonious observation while poll watching will undoubtedly have a chilling effect on the recruitment of watchers, impairing JCDC's ability to protect its members and candidates interests by monitoring polling places.

341.   Plaintiff JCDC's has the right to appoint mail ballot monitors to observe mail ballot processing to protect JCDC's interest in fair elections and to protect the interests of its candidates, members and Jackson County voters.  Such appointed monitors are threatened with injuries arising from SB202's prior restraints on their First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) and (vii) (2021) in the same manner as is alleged above for Plaintiff SHIRLEY.

342.   Plaintiff JCDC will be deprived of the information required to act on mail ballot processing problems or discrepancies because of its monitors' restraints on free speech.

343.   Plaintiff JCDC anticipates experiencing difficulty recruiting mail ballot monitors because of SB202's prohibition on monitors reporting problems or discrepancies to JCDC.

344.   Plaintiff JCDC's members are threatened with injury arising from SB202's restriction of the time within which to apply for absentee-by-mail ballots, including for a runoff, in the same manner as is alleged above for Plaintiff SHIRLEY.

345.   SB202's restriction of time to apply for mail ballots, and the impossibility of doing so in certain runoffs, creates injury to JCDC's efforts to inform its voters of the complex rules, and to help get its candidates elected.

346.   Plaintiff JCDC's resources are being diverted from its day-to-day operating activities and advocacy for its candidates to engage in this legal action to protect its interests. Further, JCDC is diverting resources and will continue to do so to educate its voters on the complex changes in the law that will impact how and when they vote. Resources will be required to be diverted to attempt to explore mitigating strategies to the voter intimidation that is certain to be experienced because of the threat of felony allegations for observing display screens in the polling place.

347.   Because of the foregoing threatened injuries, each of JCDC's members described above would have standing to sue in their own right.

115

### E.     Plaintiff GAPPAC's Associational Standing

#### 1.     Elements of GAPPAC's Associational Standing

348.   At least one of GAPPAC's members has standing to sue each Defendant on each of GAPPAC's claim in the member's own right.

349.   The interests GAPPAC seeks to protect are germane to GAPPAC's organizational purpose.

350.   The prospective injunctive and declaratory relief requested by GAPPAC does not require the participation of GAPPAC's individual members in this lawsuit.

#### 2.     Individual Standing of Plaintiff Members of GAPPAC

351.   Plaintiff NAKAMURA is a member of Plaintiff GAPPAC who has standing to sue in her own right due to her threatened injuries-in-fact alleged above.

#### 3.     Individual Standing of Non-Plaintiff Members of GAPPAC

352.   Plaintiff GAPPAC has numerous members who are not named as Plaintiffs in this litigation but who are registered Gwinnett and Fulton County voters.  Given the Defendants' stated intentions to suspend or remove superintendents like the Fulton County Board, Plaintiff GAPPAC's members who are Fulton County voters are threatened with injury in the form of the deprivation of their right to attend and participate in public meetings of the Fulton County

Board at which election administration and governance decisions for Fulton County voters will be made.

353.   Each of GAPPAC's members who is a registered voter is threatened with injuries arising from SB202's prior restraints on their First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

354.   Each of GAPPAC's members who is a registered voter, in his or her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

355.   Each of GAPPAC's members who is a registered voter and whose personal information has been exposed as a result of the Secretary of State's data security failures is threatened with a substantial risk that his or her ballot—and thus his or her right to vote—will be stolen in the same manner as is alleged above for Plaintiff SHIRLEY.

356.   Each of GAPPAC's members who is a registered voter and who is vulnerable to contracting COVID-19, or to being exposed to someone with COVID-19, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

357.   Each of GAPPAC's members who is a registered Georgia voter and who wishes to vote in person, but experiences unforeseen medical or employment demands in the 11 days prior to election day causing then to be absent from the polls, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

358.   Plaintiff GAPPAC has a number of members whose Georgia Driver's License numbers and Dates of Birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server that occurred in 2016 and 2017.

359.   Plaintiff GAPPAC has members who are frightened to go to the polling place because of the threat of purposely false and menacing felony allegations against them as Asian Americans, alleging that they "intentionally observed" another voter's touchscreen machine.

360.   GAPPAC, acting on behalf of members who are threatened with imminent injury-in-fact and who would have standing in their own right, has associational standing to bring each of its claims for prospective declaratory and injunctive relief.

118

361.   Because of the foregoing threatened injuries, each of GAPPAC's members described above would have standing to sue in their own right.

## F.   Causation

362.   Each of the foregoing threatened injuries-in-fact to the Plaintiffs alleged for purposes of standing is occurring, or is likely to occur, because and as a result of the Defendants' intended enforcement of SB202's unconstitutional provisions.

## G.   Redressability

363.   Each of the foregoing threatened injuries-in-fact to the Plaintiffs alleged for purposes of standing will be, or is likely to be, avoided in whole or in part if the Plaintiffs are granted the prospective declaratory and injunctive relief requested by this Complaint.

## H.   Actual Controversy (Declaratory Relief)

364.   Each of the foregoing threatened injuries-in-fact to the Plaintiffs alleged for purposes of standing establishes the existence of a substantial continuing controversy between Plaintiffs and Defendants, who have adverse legal interests.  Each of the threatened injuries-in-fact is sufficient to entitle the Plaintiff who is threatened by it to seek and obtain declaratory judgment pursuant to 28 U.S.C. § 2201.

## VII.  CLAIMS

365.   As used in the following counts, the "Board Member Plaintiffs" are Plaintiffs LANG, PULLAR, MCNICHOLS, SHIRLEY AND THOMAS-CLARK; the "Voter Plaintiffs" are the Board Member Plaintiffs and Plaintiffs CGG, JCDC, GAPPAC, GRAHAM, MARTIN, DUFORT, NAKAMURA, and THROOP.

### A.    TAKEOVER PROVISION CLAIMS

### COUNT I

### Violations of Procedural Due Process
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (The Board Member Plaintiffs against All Defendants)

366.   The foregoing Paragraphs 1 to 365 are incorporated and restated here.

367.   The Board Member Plaintiffs are members of county boards which are "superintendents" under Georgia law.

368.   The Board Member Plaintiffs have protected property and liberty interests in their tenure as members of the county boards.

369.   SB202's Takeover Provisions violate the Board Member Plaintiffs' rights under the procedural protections of the Fourteenth Amendment Due Process Clause of the U.S. Constitution because the Takeover Provisions, among other things:

- do not provide superintendent board members with the constitutional minima of predeprivation notice and hearing prior to the removal of the superintendent board members from office;

- do not provide superintendent board members in their individual capacities with any postdeprivation remedy for obtaining reinstatement to office after a removal;

- do not provide the superintendent board members acting through their county boards with any meaningful postdeprivation remedy for obtaining reinstatement because organizations that are parties to administrative hearings and superior court proceedings must be represented by counsel, but the Takeover Provisions bar any county board from engaging or paying for any counsel to represent them.

370.   SB202 also violates procedural due process in that it allows the SEB to remove board members, like the Board Member Plaintiffs, based upon the action or inaction of other current board members, or other former board members, and not upon the action or inaction of the board members themselves.

371.   County board members like the Board Member Plaintiffs are entitled, at a bare minimum, prior to any deprivation of their liberty and any property interests in their public office, to adequate notice of the grounds for suspension or removal, the right to be heard in a full public hearing and to address the merits of

the issues presented to an impartial tribunal, written findings based on substantial evidence of their own action or inaction, judicial review, meaningful rights to appeal, and the right to engage counsel at their employer county's expense.

372.   County board members like the Board Member Plaintiffs are also entitled to a postdeprivation remedy, including adequate notice, the right to be heard in a public hearing and to address the merits of the issues presented, written findings based on substantial evidence of their own action or inaction, judicial review, and the right to engage counsel at their employer county's expense.

373.   The Board Member Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

374.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Board Member Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Board Member Plaintiffs that entitles the Board Member Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Board Member Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT II
## Violations of Substantive Due Process
## (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (The Board Member Plaintiffs and the Voter Plaintiffs against All Defendants)

375.   The foregoing Paragraphs 1 to 365 are incorporated and restated here.

376.   Violations of state statutes or constitutional laws implicating the very integrity of the electoral process constitute a denial of substantive due process under the Fourteenth Amendment to the U.S. Constitution.

377.   The Takeover Provisions constitute a delegation of legislative functions to the executive in violation of the Separation of Powers Clause of the Georgia Constitution, Ga. Const. Art. I, § II, Para. III.

378.   Under Georgia law, the Georgia General Assembly has the authority to determine the election management body for each of Georgia's 159 counties by local acts.  O.C.G.A. § 21-2-40.  Pursuant to this authority, the General Assembly has in 127 counties created three to five member boards of elections, or boards of election and registration, as the "superintendents."  In the remaining 32 counties, by default, the county probate judge is the superintendent, and a board of registration conducts voter registration the issuance of absentee ballots.  O.C.G.A. §§ 21-2-212, 21-2-35(A).

379.   To change the election management body for a particular county, the General Assembly must pass a new local act amending the prior law.

380.   Determining the election management body for a county is a legislative function, belonging solely to the General Assembly

381.   Although determining the election management body for a particular county is a legislative function, the Takeover Provisions grant to the SEB the power to determine and change the election management body for any of Georgia's 159 counties. Unlike the legislative process, in the SEB's takeover process changing the election management body, citizens are afforded little notice of such an important and drastic change and are granted no rights to participate in the public hearing.  Under the Takeover Provisions, the SEB may exercise this power by making an unreviewable finding that a county or municipal superintendent has "committed at least three violations" of Georgia's election laws *or* the State Election Board Rules, regardless of the materiality of the law allegedly violated or the circumstances of their alleged violation.  Thus, when it is exercising its power to appoint a replacement supervisor for a county superintendent, the SEB is exercising the functions of the legislature, in contravention of the Separation of Powers Clause of the Georgia Constitution.

382.   SB202 allows the SEB to takeover a county election superintendent upon a finding of three violation of Election Board Rules, which include minor offenses, as examples, the following:

- failure to print an individual badge for each poll watcher. Rule 183-1-13-.04;

- failure to swear in voting system programmers. Rule 183-1-12-.17;

- failure to conduct an hourly sweep of each voting station to find any unauthorized materials left behind. Rule 183-1-12-.11(3));

- equipment storage room exceeded 80% humidity on rainy day. Rule 183-1-12-.04(2).

383.   The threshold for triggering the SEB's power to replace a county election superintendent is so low that the SEB for all practical purposes has the power to select whatever counties it wants to take over and to rapidly change and remove the entire election management body of any county in Georgia at will.

384.   In addition, the SEB is itself empowered to make the very Election Rules, the violation of which triggers the SEB's power to exercise its (executive) enforcement functions.   This too constitutes an unconstitutional delegation to the SEB of legislative power and a prohibited conflation of executive and legislative functions.

385.   SB202 further gives the SEB the power to select any county that has a separate board of registration and remove such a board for no reason, with no

provision for the appointment of a substitute board of registration, which would shut down voter registration and stop the issuance of absentee ballots.  Granting the power to the State Election Board to effectively halt voter registration, registration changes, and absentee balloting is a power that the General Assembly does not have and certainly may not delegate.

386.   Giving those in control of the State Government the power, through the SEB, to select the county election superintendents and remove (but not replace) boards of registrars threatens the very integrity of the electoral process in Georgia. The SEB's appointee, who will not be accountable to anyone, will have the power to make many decisions that can influence citizens' access to the polls and the outcome of an election.   For example, the appointee will have the power to determine how many early and election day polling places there will be, where they will be located, how much voting equipment to allocate to each site, whether the county will offer Sunday voting or extended early voting hours, and how each polling place will be staffed.  In addition, the appointee will have the power to determine which mail ballots to reject for arriving too late, and which provisional ballots to count, and, ultimately, whether to certify the election results. Appointees replacing a combined board of registration and elections will have the unilateral power to hear and decide challenges to voter eligibility, a duty heretofore carefully

delegated to a public body required to conduct deliberative public hearings on such challenges.

387.   Because delegating this power to the SEB violates the Separation of Powers Clause of the Georgia Constitution and implicates the very integrity of the electoral process, the Takeover Provisions constitute a denial of substantive due process under the Fourteenth Amendment to the U.S. Constitution.

388.   The Takeover Provisions also violate Article II, Section 1, Paragraph II of the Georgia Constitution, which provides: "The General Assembly shall provide by law for the registration of voters."

389.   As discussed above, the Takeover Provisions allow the SEB to *remove* a board of registration but do not provide any mechanism for the SEB (or anyone else) to *replace* a board of registration.  The Takeover Provisions thus give the SEB the power to *stop* the registration of voters in a particular county by removing the board of registrars, rather than providing for the registration of voters, as the Georgia Constitution requires.

390.   Plaintiffs, as residents of counties where the local superintendent is at substantial risk of being targeted by Defendants' invocation of the Takeover Provisions, are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

391.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the substantial risk that Plaintiffs' local superintendent will be targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## B.   INDIVIDUAL FEDERAL CLAIMS

### COUNT III

**Violations of Substantive Due Process
& Fundamental Right to Vote
(U.S. Const. Amend. XIV)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(Voter Plaintiffs against All Defendants)**

392.   The foregoing Paragraphs 1 to 365 and 376 to 391 are incorporated and restated here.

393.   In counties where boards of registration are separate from boards of election, boards of registration handle absentee ballot issuance, application acceptance, ballot issuance, and ballot acceptance, and then turn the accepted absentee ballots over to the election superintendent for counting.

394.   By permitting the SEB to remove, but not replace, boards of registration, the Takeover Provisions give the SEB the power to disenfranchise voters who, in good faith reliance upon Georgia laws providing for absentee voting, decide to vote absentee in a county where the SEB has decided to remove, but cannot replace, the board of registration.

395.   The Takeover Provisions allowing the SEB to remove, but not replace, a board of registration violate the fundamental right to vote that is protected by the substantive application of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by imposing a burden on voting that is not justified by any sufficiently weighty government interest.

396.   These provisions of SB202 are unconstitutional on their face and as applied to the Voter Plaintiffs.

397.   The Voter Plaintiffs, as residents of counties where the local superintendent is at substantial risk of being targeted by Defendants' invocation of the Takeover Provisions, are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

398.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the substantial risk that Plaintiffs' local superintendent will be targeted by such enforcement, creates an actual controversy between

129

Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

WHEREFORE, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

### COUNT IV

### Violations of Substantive Due Process & Fundamental Right to Vote (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (Voter Plaintiffs against All Defendants)

399.   The foregoing Paragraphs 1 to 365 are incorporated and restated here.

400.   SB202's "Elector Observation Felony" provision makes it a felony to "intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting." O.C.G.A. § 21–2–568.1 (2021).

401.   Given the large size of the Dominion BMD touchscreens, and small size of many polling places, it is frequently not possible to vote in person without appearing to commit this felony.

402.   Figure 4 is a true and correct photograph of the inside of the Gwinnett Elections Office polling place in Gwinnett County, Georgia, taken in early voting in the March 2020, Presidential Primary.

130



**Figure 4.  Gwinnett Elections Office Polling Place**

403.   Figure 5 is a true and correct photograph taken by an Atlanta Journal

Constitution photographer of the inside of the Cartersville polling place, in

Cartersville, Georgia, taken in early voting in October 2019, during the November

2019 election.



**Figure 5.  Cartersville, Georgia Polling Place**

404.   Figure 6 is a true and correct photograph of the inside of the State

Farm Arena polling place in Fulton County, Georgia, taken in October 2020,

during early voting for the General Election.



People cast their ballots during early voting for the presidential elections at State Farm Arena in Atlanta, Ga., October 12, 2020.

(Chris Aluka Berry/Reuters)

**Figure 6.  State Farm Arena**

405.   Any of the thousands of voters who entered these polling place to vote could have been charged with the felony of "intentionally observ[ing] an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting." *Id.*  Had the Elector Observation Felony Felony Provision been in effect, they could not have voted in these polling places without a substantial risk of arrest.

406.   Had the Elector Observation Felony Provision been in effect, dozens of members of the press and hundreds of poll workers could also have charged with a felony merely by entering these polling places.

407.   The Elector Observation Felony Provision violates the fundamental right to vote that is protected by the substantive application of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by imposing a burden on voting that is not justified by any sufficiently weighty government interest.

408.   The Elector Observation Felony Provision is unconstitutional on its face and as applied to the Voter Plaintiffs.

409.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

133

410.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT V

### Violation of Due Process – Void for Vagueness
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (Voter Plaintiffs against All Defendants)

411.   The foregoing Paragraphs 1 to 365 and 400 to 410 are incorporated and restated here.

412.   SB202's Elector Observation Felony provision violates Due Process because it is void for vagueness in that it potentially criminalizes any action in a polling place, or even mere entry into a polling place, where elector's choices on the oversized Dominion BMD touchscreens are clearly displayed for anyone to see.

413.   The Elector Observation Felony provision encourages arbitrary and discriminatory enforcement and permits a standardless sweep that allows State officials to pursue their personal agendas in violation of Due Process.

414.   This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

415.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

416.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT VI

### Unlawful Voter Intimidation
### (52 U.S.C. § 10307)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (Voter Plaintiffs against All Defendants)

417.   The foregoing Paragraphs 1 to 396, 400 to 410, and 412 to 416, are incorporated and restated here.

418.   SB202's Elector Observation Felony Provision can be invoked to selectively criminalize mere entry into a polling place or even approaching a polling place with large windows.  The mere existence of the law will intimidate voters.

419.   The provision unlawfully intimidates voters because it gives law enforcement officials the authority to charge voters arbitrarily and capriciously for the felony intentionally observing another elector's screen.

420.   The provision also subjects voters to intimidation from persons who are not governmental authorities.  Any person who is hostile to the voter – for any reason – can plausibly allege that the voter intentionally observed another elector voting.

421.   Most voters have limited ways to defend themselves against arbitrary and capricious enforcement of such an allegation.

136

422.   The Defendants' intended enforcement of SB202's Elector Observation Felony accordingly will constitute unlawful voter intimidation under color of law in violation of 52 U.S.C. § 10307.

423.   This provision of SB202 is unlawful on its face and as applied to the Voter Plaintiffs.

424.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

425.   Defendants' intended enforcement of SB202's unlawful provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

### COUNT VII

**Violation of First Amendment
(U.S. Const. Amend. I)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(All Plaintiffs against All Defendants)**

426.   The foregoing Paragraphs 1 to 365 are incorporated and restated here.

137

427.   Each Plaintiff intended, until enactment of SB202, to serve as a "monitor" or "observer" under O.C.G.A. § 21–2–386(a)(2)(B)(vii), (the Gag Rule) which prohibits "monitors" and "observers," under penalty of criminal misdemeanor, from "[c]ommunicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other than an election official who needs such information to lawfully carry out his or her official duties."

428.   Plaintiffs do not challenge restrictions on the disclosure of information about tallies of contests, including vote tally estimates and trends that a monitor or observer obtains observing the processing of absentee ballot before the close of the polls.  SB202, however, criminalizes far more, and includes *any* information about absentee ballot processing or scanning.

429.   For example, if a monitor or observer (including the public and members of the press) witnessed scanning machine malfunctions, unsecured ballots, mishandling of ballots, or improperly rejected ballots, such information must not be concealed from the Secretary of State, law enforcement, interested parties and the public.   Under SB202, however, if the monitor or observer reported such discrepancies to someone other than the election official who was responsible

138

for the failure, the monitor or observer would be potentially guilty of a criminal misdemeanor.

430.   The communications criminalized by SB202 occupy the core of protection afforded by the First Amendment; they penalize conduct that constitutes protected speech and petitioning of the government.

431.   SB202's prohibition on protected speech is a prior restraint that violates the First Amendment to the U.S. Constitution.

432.   This provision of SB202 is unconstitutional on its face and as applied to the Plaintiffs.

433.   Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

434.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT VIII

### Violations of Due Process – Void for Vagueness
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (All Plaintiffs against All Defendants)

435.   The foregoing Paragraphs 1 to 365 are incorporated and restated here.

436.   The Estimating Bans, O.C.G.A. § 21–2–386(a)(2)(A) & (B), make it a misdemeanor for "monitors and observers" to, among other things, tally, tabulate, estimate, or attempt to tally, tabulate, or estimate, "whether partial or otherwise, any of the votes on the absentee ballots cast."

437.   The Estimating Bans violate due process because they criminalizes the act of thinking about or attempting to think about a tally or tabulation, without the requirement of any external manifestation or communication of such thoughts.

438.   The Estimating Bans are void for vagueness because they do not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited.

439.   The Estimating Bans are void for vagueness because they encourages arbitrary and discriminatory enforcement and permit a standardless sweep that allows election officials and other state actors to pursue their personal predilections.

440.   These provisions of SB202 are unconstitutional on their face and as applied to the Plaintiffs.

441.   Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

442.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

### COUNT IX

**Violation of First Amendment
(U.S. Const. Amend. I)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(All Plaintiffs against All Defendants)**

443.   The foregoing Paragraphs 1 to 365 are incorporated and restated here.

444.   The Photography Ban, O.C.G.A. §21-2-568.2 (2)(B), makes it a misdemeanor to "[p]hotograph or record the face of an electronic ballot marker while a ballot is being voted or while an elector's votes are displayed on such electronic market," or to "[p]hotograph or record a voted ballot."

141

445.   The Photography Ban violates the First Amendment because it criminalizes constitutionally protected speech.  Photographs of election officials counting ballots and of voters in the act of voting has been an expected element of routine election press coverage for well over 100 years across the world.

446.   SB202's prohibition on protected speech is a prior restraint that violates the First Amendment to the U.S. Constitution.

447.   This provision of SB202 is unconstitutional on its face and as applied to the Plaintiffs.

448.   Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

449.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT X

### Violations of Due Process – Void for Vagueness
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (All Plaintiffs against All Defendants)

450.   The foregoing Paragraphs 1 to 365 and 444 to 449 are incorporated and restated here.

451.   The Photography Ban is void for vagueness because it does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited.

452.   The only reasonable prohibition on photography in polling places, ballot counting operations, ballot adjudication, or election audits is one that specifically and narrowly prevents the photography of electronic or hand marked legible votes on ballots that can be connected to a specific voter. The vague ban on photographing or "recording" a "voted ballot" is unjustified by any legitimate government interest, given the fact that ballots are required to be "absolutely secret" where no one may know who cast any individual ballot. For over 100 years, press photographers have published pictures of voted ballots and voters standing at voting machines, but with appropriate prohibition on capturing the votes on the face of the machine in the pre-BMD rare instance that another voter's votes could be seen.

453.    The Photography Ban is void for vagueness because it encourages arbitrary and discriminatory enforcement and permits a standardless sweep that allows election officials and other state actors to pursue their personal predilections. It may ensnare citizens conducting routine activities who have no intention of or ability to connect a voter and a ballot. For example, required video surveillance of polling places may capture images of ballots and faces of touchscreens. Video interviews of poll officials in the polling place or mail ballot processing locations may easily capture innocuous but prohibited images of voted ballots and machines.

454.    This provision of SB202 is unconstitutional on its face and as applied to the Plaintiffs.

455.    Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

456.    Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT XI

### Violations of Substantive Due Process
### & Fundamental Right to Vote
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (By the Voter Plaintiffs against All Defendants)

457.   The foregoing Paragraphs 1 to 365 are incorporated and restated here.

458.   The Relaxed Voter ID Rule, O.C.G.A. § 21-2-381(a)(1)(C)(i),
changes the identification that voters must provide to be issued an absentee ballot
from a verifiable signature to the voter's name, date of birth, address, and voter's
Georgia's driver's license or identification.

459.   Because of the massive breaches of the Secretary of State's election
servers in the past, the information that is now required to obtain one or more
absentee ballots which will be accepted and counted is available to anyone bent on
voting illegally.  As a consequence, there is a substantial risk that the Voter
Plaintiffs will be disenfranchised.

460.   This provision violates the fundamental right to vote that is protected
by the substantive application of the Due Process Clause of the Fourteenth
Amendment to the U.S. Constitution by imposing a burden on voting that is not
justified by any sufficiently weighty government interest.

145

461.   This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

462.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

463.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT XII

**Violations of Substantive Due Process
& Fundamental Right to Vote
(U.S. Const. Amend. XIV)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(By the Voter Plaintiffs against All Defendants)**

464.   The foregoing Paragraphs 1 to 365 and 458 to 463 are incorporated and restated here.

146

465.    SB202's unreasonable narrowing of the absentee-by-mail ballot application window violates the fundamental right to vote that is protected by the substantive application of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by imposing a burden on voting that is not justified by any sufficiently weighty government interest.

466.    The ability to vote by absentee ballot is essential for many voters because of the traditional reasons of age, health, travel, or employment related conflicts.

467.    Georgia voters who desire to exercise their constitutional right to a secret ballot are not offered that option in the polling place and must vote by absentee ballot, making it crucial that absentee ballots are fully available to all voters.

468.    Given the intimidation of the polling place as a result of the threat of prosecution for the Elector Observation Felony, all voters must be given a fair opportunity to obtain an absentee ballot.

469.    The 11-day pre-election day deadline denies the right to vote by absentee ballot in most recounts for elections in which the Secretary of State certifies the election result on the certification deadline.

470.   The 11-day pre-election day deadline denies the right to vote to voters who experience unexpected conflicts and cannot be present at the polling place to vote.

471.   This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

472.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

473.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

### COUNT XIII

### Violation of Equal Protection Clause
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (By the Voter Plaintiffs against all Defendants)

474.   The foregoing Paragraphs 1 to 365, 458 to 463 and 465 to 473 are incorporated and restated here.

475.   SB202's narrowing of the absentee-by-mail ballot application window violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because, it treats identifiable classes of voters differently than other, similarly situated voters and creates a substantial risk that some voters' votes will be less effective as a result.

476.   The identifiable classes of voters who are disadvantaged by the narrowed window for mail ballot applications include:

- voters requiring an absentee ballot in a state office runoff;

- voters wishing to exercise their right to vote a secret ballot;

- voters who are intimidated by the risk of the Elector Observation Felony;

- voters who encounter unforeseen medical, employment, or civic duty obligations after the 11-day deadline;

- voters who must mail their runoff election ballot applications from long distances; and

- voters who are at a high risk of COVID-19 infection and cannot be vaccinated or who are quarantined.

477.   This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

478.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

479.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT XIV

### Violation of Equal Protection Clause
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (By the Voter Plaintiffs against All Defendants)

480.   The foregoing Paragraphs 1 to 365, 458 to 463, 465 to 473, and 475 to 479 are incorporated and restated here.

481.   SB202's narrowing of the absentee-by-mail ballot application window violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because, in the circumstances of the present COVID-19 pandemic, restricting the pre-existing window for absentee-by-mail voting exposes an

identifiable class of voters to arbitrary and disparate risk of being completely disenfranchised.

482.   This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

483.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

484.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.    Enter a judgment finding and declaring that the challenged provisions of SB202 violate the U.S. Constitution or 52 U.S.C. § 10307, or both, on their face and as applied to the Plaintiffs.

B.      Enter a preliminary and permanent injunction prohibiting Defendants from enforcing the challenged provisions of SB202;

F.      Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing Orders;

G.      Grant the Plaintiffs an award of their reasonable attorney's fees, costs, and expenses incurred in this action pursuant to 42 U.S.C. § 1988; and

H.      Grant the Plaintiffs such other relief as the Court deems just and proper.

The 11th day of June, 2021.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Cary Ichter* |
| Bruce P. Brown | Cary Ichter |
| Georgia Bar No. 064460 | Georgia Bar No. 382515 |
| BRUCE P. BROWN LAW LLC | ICHTER DAVIS LLC |
| 1123 Zonolite Rd. NE | 3340 Peachtree Road NE |
| Suite 6 | Suite 1530 |
| Atlanta, Georgia 30306 | Atlanta, Georgia 30326 |
| (404) 881-0700 | (404) 869-7600 |
| bbrown@brucepbrownlaw.com | CIchter@Ichterdavis.com |
| | |
| */s/ Greg K. Hecht* | */s/Shea E. Roberts* |
| Greg K. Hecht | Shea E. Roberts |
| Georgia Bar No. 003860 | Georgia Bar No. 608874 |
| HECHT WALKER, P.C. | GIACOMA ROBERTS & DAUGHDRILL LLC |
| 205 Corporate Center Dr. | 945 East Paces Rd. |
| Suite B | Suite 2750 |
| Stockbridge, Georgia 30281 | Atlanta, Georgia 30326 |
| (404) 348-4881 | (404) 924-2850 |
| greg@hmhwlaw.com | sroberts@grdlegal.com |

<u>CERTIFICATE OF SERVICE AND CERTIFICATE OF COMPLIANCE WITH
LOCAL RULE 5.1</u>

Pursuant to N.D. Ga. L.R. 5.1(C), I certify that the foregoing was prepared

using Times New Roman 14 font.  I electronically filed this using CM/ECF, thus

electronically serving all counsel of record.

This 11th day of June, 2021.

<div style="margin-left:40%">

<u>*/s/ Bruce P. Brown*</u>
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700
bbrown@brucepbrownlaw.com

</div>

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, *et al.,*<br><br>　　*Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.,*<br><br>　　*Defendants.* | CIVIL ACTION<br><br>FILE NO. 1:21-CV-01333-JPB |

## STATE DEFENDANTS' CONSOLIDATED[1] STATEMENT ON CONSOLIDATION OF SB 202 CASES

**I.     The SB 202 Cases involve common questions of law and fact and should be consolidated.[2]**

Consolidation is available if "actions before the court involve a common question of law or fact." Fed. R. Civ. P. 42(a). The Eleventh Circuit also encourages "trial judges to 'make good use of Rule 42(a) . . . in order to expedite the trial and eliminate unnecessary repetition and confusion.'" *Hendrix v.*

---

[1] In accordance with the Court's December 9, 2021 minute order in this case, this same consolidated statement is filed in all eight of the SB 202 cases covered by the Court's order with only the caption changed for each case.

[2] State Defendants have conferred with Intervenor-Defendants, who also support consolidation.

*Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985) (quoting *Dupont v. Southern Pacific Co.*, 366 F.2d 193, 195 (5th Cir. 1966)).

These eight SB 202 cases share common questions of law or fact—in fact, many of them challenge the same practices, as the chart below demonstrates:

| Topic area of challenge | NGP | Sixth AME | NAACP | Vote America | AAAJ | CBC | CGG | US |
|---|---|---|---|---|---|---|---|---|
| **ABSENTEE BALLOTS** | | | | | | | | |
| Identification requirements for absentee ballot applications | X | X | X | | X | X | X | X |
| Limiting absentee ballot application harvesting | | | | | X | | | |
| Timeframes for requesting and receiving absentee ballots | X | | | | X | X | X | |
| Prohibition on governments mailing unsolicited absentee ballot applications | X | | X | | X | | | X |
| Penalties for sending absentee-ballot applications after voter already requested/voted a ballot | X | X | X | X | X | | | |
| Use of drop boxes for returning absentee ballot | X | X | X | | X | X | | |
| Disclaimer on absentee-ballot applications | | | | X | | | | |
| Prohibition on prefilled absentee-ballot applications | | | | X | | | | |

2

| Topic area of challenge | NGP | Sixth AME | NAACP | Vote America | AAAJ | CBC | CGG | US |
|---|---|---|---|---|---|---|---|---|
| Date of birth on absentee ballot envelope | X | | | | | | | |
| | | | | | | | | |
| **IN PERSON VOTING** | | | | | | | | |
| Changes to out-of-precinct provisional ballots | X | X | X | | | X | | X |
| Limitations on interactions with voters in line | X | X | X | | | X | | X |
| Limitations on mobile voting units | X | X | | | | X | | |
| Expansion of hours of early voting | | | X | | | | | |
| Penalties for violating ballot secrecy | | | | | | | X | |
| | | | | | | | | |
| **ELECTION ADMINISTRATION** | | | | | | | | |
| Removal of Secretary from SEB | | | X | | | | | |
| SEB authority over local election officials | | | X | | | X | X | |
| Timeline for early voting in runoff elections | X | X | | | | X | | |
| Prohibition on observations and estimating during tabulation | | | | | | | X | |
| Prohibition on photographing ballots | | | | | | | X | |
| | | | | | | | | |
| **VOTER REGISTRATION** | | | | | | | | |
| Clarification on number of voter challenges | X | X | X | | | | | |

While State Defendants recognize that there are a variety of legal

theories (including that the practices cumulatively violate various constitutional and statutory provisions), the questions of *fact* about each practice will be similar.[3] For example, all cases challenge absentee-ballot processes from SB 202 and all but two challenge in-person voting processes from SB 202. Consolidating these cases will not "adversely affect[] the substantial rights" of any party. *Wright v. Dougherty Cty.*, 358 F.3d 1352, 1354 (11th Cir. 2004) (quoting *Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 760 (11th Cir. 1995)). As discussed below, consolidating these cases will also result in efficiencies to expedite the handling of this case and eliminate repetition.

## II.   The timeline of 2022 elections favors consolidation.

The timeline for the 2022 elections should also be a factor. A copy of the Secretary of State's 2022 State Elections and Voter Registration Calendar is attached as Exhibit A. Several dates are worth noting. First, while the general primary and nonpartisan general election is set for May 24, 2022, the voting process effectively begins on March 7, 2022 when voters may begin applying for absentee ballots. O.C.G.A. § 21-2-381(a)(1)(A). Registrars can then begin to send absentee ballots to voters on April 5, 2022. O.C.G.A. § 21-2-384(a)(2). In-

---

[3] In challenges to Florida's election legislation, the Florida district court consolidated the cases for discovery purposes and later consolidated the cases for trial. See *League of Women Voters of Florida Inc. v. Lee*, Case No. 4:21-cv-00186-MW-MAF, ECF Nos. 92 (June 17, 2021) and 365 (Dec. 8, 2021).

person early voting for the general primary begins on May 2, 2022. O.C.G.A. § 21-2-385(d)(1)(A).

The June 21, 2022 primary runoff election faces similar timelines, with the deadline for submitting an absentee ballot application of June 10, 2022, O.C.G.A. § 21-2-381(a)(1)(A), and in-person early voting beginning on June 13, 2022, O.C.G.A. § 21-2-385(d)(1)(B).

The voting process for the November 8, 2022 general election begins on August 22, 2022 when voters can apply for an absentee ballot. O.C.G.A. § 21-2-381(a)(1)(A). Absentee ballots can be mailed to voters beginning on September 20, 2022, with early voting beginning on October 17, 2022.

## A.   Availability of relief.

Since SB 202's passage, State Defendants have been implementing its provisions, including redesigning the absentee-ballot application, updating training materials for county election superintendents and registrars (and training them), and instituting a performance audit of at least one county's election processes. As the Court is aware, Plaintiffs seek major changes in those election processes. Any orders altering Georgia's statutory structure would require significant effort and place additional burdens on county election officials in their efforts to recruit and train pollworkers, which remains a challenge. *See* Atlanta-Journal Constitution, *Election depends on hiring many*

5

*new poll workers across Georgia*, https://www.ajc.com/politics/election-depends-on-hiring-many-new-poll-workers-across-georgia/UPWQRQ6KXFAENAZFCBPSK6KTYI/ (Aug. 26, 2020).

As this Court is further aware, there are times when "an impending election is imminent and a [s]tate's election machinery is already in progress." *Coal. for Good Governance v. Kemp*, Case No. 1:21-cv-02070-JPB, ECF No. 37 (July 7, 2021). This Court has recognized the peril of changing rules between an election and a runoff. *Id*. Consolidation will minimize duplication of effort and help reach a resolution of this case to bring certainty for election officials.

### B.    Unique burdens on election officials in 2022.

In addition to the normal duties of an election year, election officials have once-in-a-decade responsibilities in 2022. The General Assembly recently passed new redistricting plans for the state House of Representatives, state Senate, and Congressional districts that now await the Governor's signature. Local legislation to update boundaries for county commission and school board districts will be considered by the General Assembly beginning in January.

During early 2022, county and state election officials will be reassigning voters to new districts based on those changes—a process that only happens once every ten years. The time devoted to discovery in this case will take time away from the time election officials need to carry out their statutory

responsibilities. This likewise counsels in favor of consolidating the cases, so that duplication of effort and its required staff time can be avoided. For example, instead of the Secretary's office sitting for eight distinct Rule 30(b)(6) depositions on largely overlapping topics, the discovery process could proceed on a more efficient basis for all election officials if the cases are consolidated. Avoiding duplication also reduces the risk that these cases will affect the ability of election officials to administer the 2022 elections.

## III.   Advantages of a consolidated discovery process.

A consolidated discovery process offers distinct advantages, but the scope of discovery will also be relevant to the timeline for these cases. State Defendants offer several examples that might be of assistance to the Court and the parties.

### A.   Discovery in other voting cases in the Northern District.

Other voting cases in this Court have taken two distinct paths for discovery. First is the path trod by *Fair Fight Action v. Raffensperger* (1:18-cv-05391-SCJ), which was a wide-ranging challenge to Georgia election practices, and *Curling v. Raffensperger* (1:17-cv-02989-AT), which focuses on election technology. In those cases, plaintiffs sought extensive electronically stored information, requiring the review and production of hundreds of thousands to millions of pages of records. Both cases also saw dozens of experts between

7

them. And discovery took a long time—discovery opened in *Fair Fight Action* on July 15, 2019 [*FFA* Doc. 79, p. 2] and motions for summary judgment were not filed until June 29, 2020 [Doc. 441]. Likewise in *Curling*, discovery opened on May 21, 2019 [*Curling* Doc. 375, p. 61] and is still ongoing.

On the other side of the equation are *Georgia Coalition for the People's Agenda v. Raffensperger* (1:18-cv-04727-ELR), which deals with a single election practice, and *Rose v. Raffensperger* (1:20-cv-02921-SDG), which challenged the method of election for Public Service Commissioners. In each of those cases, discovery was targeted and primarily drew on expert testimony, allowing a much-more-efficient completion of the discovery process, including completion of all discovery in four months in *Rose*.

Consolidating these cases and requiring Plaintiffs to combine and narrow their discovery efforts provides the best path for reaching resolution of these cases. That being said, as the Court noted in its analysis of Plaintiffs' requirements to prove their standing allegations, State Defendants will still require discovery about each organizational and individual plaintiff—but that must take place regardless of consolidation.

**B.    Options for streamlining discovery.**

Consolidation also offers the Court several options for streamlining the discovery process.

8

First, consolidation offers the ability to have combined document requests in a centralized database for all plaintiffs to access. In a consolidated discovery proceeding, the Court should require Plaintiffs to negotiate a limited number of document requests with accompanying search terms that would cover all the areas required for discovery. That would allow State Defendants to make a single review for privilege and responsiveness to document requests instead of requiring State Defendants to respond to document requests in each case, which could conceivably octuple the amount of attorney time required.

Second, the Court should take a page from mass-tort litigation and select individual SB 202 cases on certain topics for bellwether treatment. Bellwether trials can "assist in maturation of any given dispute by providing an opportunity for coordinating counsel to organize the products of pretrial common discovery, evaluate the strengths and weaknesses of their arguments and evidence, and understand the risks and costs associated with the litigation." THE PROBLEM OF MULTIDISTRICT LITIGATION: Bellwether Trials in Multidistrict Litigation, 82 Tul. L. Rev. 2323, 2338 (2008). For example, one case would be the bellwether on absentee-ballot processes and another would deal with in-person processes.[4] This kind of approach would avoid duplication

---

[4] For instance, *AAAJ* and *NGP* substantially overlap with other cases raising challenges to absentee voting.  For in-person voting, *NGP*, *Sixth AME*, and

of effort and could form a central repository of documents and data that could narrow further litigation on the remaining cases after the bellwether case moves forward.

Third, the Court can limit the number of experts on each topic area. If the cases were not consolidated and each involved four experts, that would mean more than 30 expert reports and depositions would have to be conducted on largely overlapping topics. Consolidation and limitations on experts in each subject area would promote efficiency in the process of litigating these actions.

Fourth, the Court should hold a discovery conference with the parties as soon as possible to ensure efficiency in the discovery process.

## CONCLUSION

This Court should consolidate all eight SB 202 cases, at least for purposes of discovery, and place reasonable limits on discovery to avoid duplication and undue burden in a year when State Defendants have numerous and important duties regarding the 2022 elections. Consolidation offers the best path to a resolution of the issues raised by Plaintiffs—and the certainty needed for voters and election officials.

---

*NAACP* overlap with all cases.  Similarly, for election administration claims, *CBC* overlaps with several other cases.  And for claims related to voter registration, *NGP*, *Sixth AME*, and *NAACP* raise similar claims

Respectfully submitted this 14th day of December, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**Office of the Georgia Attorney General**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Gene C. Schaerr*
gschaerr@schaerr-jaffe.com
Erik Jaffe*

11

ejaffe@schaerr-jaffe.com
H. Christopher Bartolomucci*
cbartolomucci@schaerr-jaffe.com
Brian J. Field*
bfield@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC  20006
Telephone: (202) 787-1060
Fax: (202) 776-0136
* Admitted *pro hac vice*

*Counsel for State Defendants*

12

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing STATE DEFENDANTS' CONSOLIDATED STATEMENT ON CONSOLIDATION OF SB 202 CASES has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

<div align="right">

*/s/Bryan P. Tyson*
Bryan P. Tyson

</div>

13