**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STATE OF GEORGIA, *et al.*, | |
|     Plaintiffs, | Case No. 1:21-cv-3138 (TNM) |
|        v. | |
| UNITED STATES DEPARTMENT OF JUSTICE, | |
|     Defendant. | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION**
**TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.     Georgia Does Not Contest the Adequacy of the Search or That CRT Released All
Reasonably Segregable Information. ................................................................. 2

II.    CRT Properly Withheld Information Pursuant to the Deliberative Process Privilege
and Attorney Work-Product Components of FOIA Exemption 5. ..................... 3

      A.     The Withheld Documents Satisfy the Threshold Requirement of Exemption
5 Because the Common Interest Group Served as Consultants to CRT When
Discussing Shared Litigation Topics. ..................................................... 3

      B.     Other than Exemption 5's Threshold Requirement, Georgia Does Not
Challenge CRT's Deliberative Process Privilege Withholdings. ........... 8

      C.     CRT's Withholdings Pursuant to the Attorney Work-Product Doctrine Are
Likewise Justified. ................................................................................. 8

           1.     The Two Emails from July 27 and July 28, Relating to a July 28
Phone Call Resulting in the Memorialization of the Common
Interest Agreement, Are Properly Withheld. ............................... 9

           2.     CRT and the Other Members of the Common Interest Group Share
a Common Interest in Prevailing in Their Challenges to SB 202 and
Enforcing Federal Voting Rights Laws. .................................... 11

                a.     *There Is No Requirement That Entities Limit Themselves to
Precisely the Same Legal Theories to Receive the Protection of the
Common Interest Rule.* ................................................... 12

                b.     *The United States and the Rest of the Common Interest Group More
Than Meet This Threshold Because They Bring Many of the Same
Claims and Challenge Many of the Same Provisions of SB 202.* . 13

                c.     *Georgia's Counterarguments Fail.* ................................ 16

      D.     Foreseeable Harm Would Result from Compelling CRT to Reveal Its
Confidential Communications with the Common Interest Group to Its
Litigation Adversary. ........................................................................... 18

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**CASES**

*Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*,
 174 F.R.D. 609 (M.D. Pa. 1997)............................................................... 12

*Bowles v. Nat'l Ass'n of Home Builders*,
 224 F.R.D. 246 (D.D.C. 2004)................................................................. 16

*Brnovich v. Democratic Nat'l Comm.*,
 141 S. Ct. 2321 (2021)............................................................................ 14

*DOI v. Klamath Water Users Protective Ass'n*,
 532 U.S. 1 (2001)...................................................................................... 5

*Frontier Refin., Inc. v. Gorman-Rupp Co.*,
 136 F.3d 695 (10th Cir. 1998) ................................................................. 16

*Hickman v. Taylor*,
 329 U.S. 495 (1947)................................................................................ 19

\* *Hunton & Williams v. DOJ*,
 590 F.3d 272 (4th Cir. 2010) ..................................................... 4, 6, 7, 10

*In re Zetia (Ezetimibe) Antitrust Litig.*,
 No. 2:18MD2836, 2019 WL 6122011 (E.D. Va. Oct. 3, 2019) ............. 10

*Jud. Watch, Inc. v. Dep't of Transp.*,
 950 F. Supp. 2d 213 (D.D.C. 2013)....................................................... 4, 5

*Lawyers' Comm. for Civ. Rts. Under L. v. DOJ*,
 No. 18-cv-167, 2020 WL 7319365 (D.D.C. Oct. 16, 2020),
 *report and recommendation adopted*, 2021 WL 1197730 (D.D.C. Mar. 30, 2021)......... 5, 7, 17

*MobileMedia Ideas LLC v. Apple Inc.*,
 890 F. Supp. 2d 508 (D. Del. 2012)........................................................ 11

\* *Pub. Citizen, Inc. v. DOJ*,
 111 F.3d 168 (D.C. Cir. 1997)............................................................... 4, 5

*Ryan v. DOJ*,
 617 F.2d 781 (D.C. Cir. 1980)................................................................... 4

\* *United States v. AT&T Co.*,
 642 F.2d 1285 (D.C. Cir. 1980)................................................... 7, 12, 17

*United States v. Gonzalez*,
  669 F.3d 974 (9th Cir. 2012) ............................................... 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977).............................................................. 14

## INTRODUCTION

Georgia and its Secretary of State (collectively, Georgia) filed this suit seeking communications between its litigation adversary (the United States) and other plaintiffs with whom the United States shares a common interest (the Common Interest Group) regarding the various lawsuits brought by the United States and the rest of the group to challenge Georgia's election law (also referred to as SB 202). Georgia does not dispute that the withheld documents contain discussions of litigation strategy and material that would reveal the agency's deliberative process in making litigation decisions. Nor does Georgia dispute that the United States and the Common Interest Group entered into common interest agreements and memorialized them on two separate occasions. Nor does Georgia dispute that nearly all of the Common Interest Group plaintiffs bring a shared claim challenging Georgia's law under Section 2 of the Voting Rights Act—just like the United States. Instead of disputing any of these things, Georgia argues that it should be able to obtain two emails sent in the day before the first memorialization of the common interest agreement, and that the members of the Common Interest Group do not demonstrate a common interest because the legal claims brought in each lawsuit are not 100% identical.

The Civil Rights Division (CRT) of the Department of Justice, whose Voting Section is responsible for leading the lawsuit brought by the United States, endeavored to provide the most transparent possible response to Georgia's request. CRT ultimately produced hundreds of pages of documents with redactions and withheld only six documents in full. CRT's redactions and withholdings at issue here were based in the attorney work-product and deliberative process privilege portions of Exemption 5.

Through its attorney work-product withholdings, the Government seeks only the ordinary litigation privileges that other parties enjoy when they enter into common interest agreements to

pursue aligned litigation. These ordinary litigation privileges protect litigants from being required to disclose their legal strategies, legal research, and other work product to their litigation opponents, which is precisely what Georgia seeks here.

Through its deliberative process privilege withholdings, which Georgia barely challenges, the Government likewise seeks only to protect material which would reveal CRT's decisionmaking process regarding litigation decisions in the ongoing lawsuit, which falls within the core of Exemption 5's protection. Accordingly, the Court should grant Defendant summary judgment.

## ARGUMENT

### I. Georgia Does Not Contest the Adequacy of the Search or That CRT Released All Reasonably Segregable Information.

Georgia has indicated that it does not challenge the adequacy of searches conducted by CRT or DOJ's Office of Information Policy. Pls.' Mem. Supp. Cross-MSJ (Pls.' MSJ) at 9 n.3, ECF No. 15-1; Pls.' Resp. to Def.'s SUMF ¶¶ 1-9, ECF No. 15-2. Accordingly, for the reasons previously stated, Mem. Supp. Def.'s MSJ (Def.'s MSJ) at 6-12, ECF No. 14-1; Def.'s SUMF ¶¶ 1-9, ECF No. 14-2, summary judgment is appropriate for Defendant on the adequacy of the search.

Likewise, Georgia does not contest that CRT released all segregable portions of responsive records. Def.'s MSJ at 27-28. Indeed, given that the segregation of factual and non-factual material is not required for material covered by the attorney work-product doctrine, Def.'s MSJ at 28, the fact that CRT provided redacted versions to Georgia demonstrates CRT's commitment to transparency. Overall CRT produced hundreds of pages of redacted material and withheld only six records in full, which needed to be withheld in full because they contained litigation strategy and plans and legal research. *See Vaughn* Index (attached to Def.'s MSJ as Ex. E to the Kagle

Decl., which is Ex. 2) (see entries for records GA000618, GA000671, GA000702, GA000839, GA000872, and GA000942).

## II. CRT Properly Withheld Information Pursuant to the Deliberative Process Privilege and Attorney Work-Product Components of FOIA Exemption 5.

### A. The Withheld Documents Satisfy the Threshold Requirement of Exemption 5 Because the Common Interest Group Served as Consultants to CRT When Discussing Shared Litigation Topics.

Contrary to Georgia's argument, Pls.' MSJ at 18-22, CRT's cooperation with the other members of the Common Interest Group to develop litigation strategy, share legal research, and coordinate around witnesses fits well within the consultant corollary to Exemption 5's threshold "intra-agency" requirement. Numerous cases addressing the consultant corollary have established that it is not disqualifying for the "consultant" to have its own interests, in addition to the shared interest with the government. If Georgia were correct that coordination with an outside entity for the purpose of advancing common litigation interests fell outside Exemption 5, it would endanger the government's ability to maintain the ordinary litigation privileges enjoyed by other parties.[1] As the Fourth Circuit explained in finding that Exemption 5's threshold requirement was met where the government communicated with others in the pursuit of common litigation interests:

> Under [plaintiff's] reading, however, the decision of a party, here the government, to partner with others in the conduct of litigation would somehow subject that party to the loss of its most basic civil discovery privileges—namely, the attorney-client and attorney work product privileges. This is a sweeping view, and its impact on the government's ability to conduct complex and multi-faceted litigation would be

---

[1] The logical conclusion of Georgia's argument could impede even court-ordered coordination between the government and other litigants. Although Georgia has shaped its litigation strategy in an attempt to cabin its argument to "communications [CRT] exchanged before the December 23, 2021 consolidation order," Pls.' MSJ at 18, if Georgia were correct (which it is not) that Exemption 5 does not cover CRT's communications with the outside litigants, that could also frustrate CRT's ability to coordinate litigation even when ordered to do so by a court, regardless of when consolidation occurred.

staggering. We have made clear that the government was entitled not to favored treatment under Exemption 5, but simply to a level playing field.

*Hunton & Williams v. DOJ*, 590 F.3d 272, 277-78 (4th Cir. 2010).

Georgia acknowledges that *some* communications between the government and outsiders will satisfy the requirements of the consultant corollary, Pls.' MSJ at 18, but argues that the communications at issue here between CRT and the other members of the Common Interest Group do not because the other members of the Common Interest Group are "pursuing [their] own interests rather than advising the agency," Pls.' MSJ at 19; *see also* Pls.' MSJ at 18-22.

This overly restrictive view is incompatible with D.C. Circuit precedent, which makes clear that there is no requirement that the consultant lack an interest of its own. In *Ryan*, the senators consulted unquestionably had their own views and interests with respect to "their procedures for selecting and recommending potential [judicial] nominees," yet the court found the consultant corollary applied. *Ryan v. DOJ*, 617 F.2d 781, 784 (D.C. Cir. 1980). In *Public Citizen*, the court acknowledged that the President's powers regarding presidential records "constitute[d] an independent interest" in the records question under consultation, but the court nonetheless held that the communications at issue were subject to Exemption 5. *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168, 171 (D.C. Cir. 1997). And several recent cases in this circuit reflect that the consultant corollary applies where agencies consult with Congress to develop new legislation, Def.'s MSJ at 17, a scenario in which Congress clearly has its own interest.

The correct rule is thus that "[w]hen communications between an agency and a non-agency aid the agency's decision-making process and the non-agency did not have an outside interest in obtaining a benefit that is at the expense of competitors, the communication *must* be considered an intra-agency communication for the purposes of FOIA Exemption 5." *Jud. Watch, Inc. v. Dep't of Transp.*, 950 F. Supp. 2d 213, 218-19 (D.D.C. 2013) (emphasis added).

4

These conditions are satisfied here. CRT consulted with the other members of the Common Interest Group to further the Voting Rights Act lawsuit brought by the United States by developing litigation strategy, sharing legal research, and discussing potential approaches to the litigation. *See, e.g.*, Russ Decl. ¶¶ 28-29, 40 (attached to Def.'s MSJ as Ex. 1). The Common Interest Group memorialized their agreements in several common interest agreements. Russ Decl. ¶¶ 8-10, 25-26.

While the other members of the Common Interest Group no doubt also had an interest in the success of their own lawsuits, that in no way erases the benefit to CRT of the consultation. The court in *Public Citizen* correctly criticized as a "false dichotom[y]" the plaintiff's contention that "[b]ecause there are other aspects to the relationship," the relationship "cannot be consultative for purposes of Exemption 5." *Pub. Citizen*, 111 F.3d at 171; *see also Jud. Watch, Inc. v. Dep't of Transp.*, 950 F. Supp. 2d at 219 n.4 (upholding the application of Exemption 5 because "[t]he fact that both agency and non-agency may have mutually 'solicited' each other's assistance . . . does not obscure the fact that agency solicitation nevertheless occurred").

The only limitation supported in the case law is that the consultant may not be a self-interested advocate seeking a limited benefit from the government at the expense of others. *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 n.4 (2001). Here the members of the Common Interest Group are working together to advance their cases against a common adversary, not seeking any limited benefit from CRT. Even if CRT's decision to file suit against Georgia could be construed as such a "benefit," the United States had already brought suit at the time of all relevant communications here, and thus that decision was not open for lobbying. *See Lawyers' Comm. for Civ. Rts. Under L. v. DOJ*, No. 18-cv-167, 2020 WL 7319365, at *24 (D.D.C. Oct. 16, 2020) (noting that the Solicitor General's coordination with the Ohio Attorney General to defend

an Ohio statute did not violate the *Klamath* requirement because the Solicitor General had already decided to defend the law prior to the communications at issue), *report and recommendation adopted*, 2021 WL 1197730 (D.D.C. Mar. 30, 2021).

Indeed, other courts have found the consultant corollary satisfied where the United States coordinated with outsiders to advance its litigation interests, where the outsiders were engaged in their own, parallel litigation. In *Hunton & Williams*, the Fourth Circuit concluded that the consultant corollary covered communications between the United States and the manufacturer of the BlackBerry device, where DOJ filed a statement of interest and ultimately intervened in patent suit against the manufacturer due to the governmental interest in the continued availability of BlackBerries. 590 F.3d 272. The Fourth Circuit was not troubled by the fact that the manufacturer obviously also had its own interest in the outcome of the litigation. *See id.* at 282-83 ("[T]here can be no doubt that the government had determined that it was in the public interest for [the manufacturer] to succeed in its efforts to constrain the scope of injunctive relief entered in the BlackBerry litigation. . . . And the agreement between [the manufacturer] and DOJ in November 2005 makes it clear that [the manufacturer] and DOJ had committed to working together to achieve that goal. As a result, Exemption 5 properly applies to communications made pursuant to that agreement. It does not matter that [the manufacturer] was motivated by the commercial benefit that would accrue to it if it succeeded in opposing the BlackBerry injunction while the government was motivated by concern for the public interest. What matters is that there was a unity of interest in preserving a non-disruptive pattern of governmental BlackBerry use . . . .").

Georgia argues that *Hunton* is not analogous because in *Hunton* the government and the outsider "had a common interest in challenging the same preliminary injunction," Pls.' MSJ at 21 n.8, but here CRT and the rest of the Common Interest Group have a shared interest in prevailing

in their lawsuits challenging SB 202, enforcing the Constitution and federal voting laws, and ensuring that the state of Georgia complies with its duties under those and other laws. Russ Decl. ¶¶ 25-26, *see infra* Part C.2. Similarly, a court in this circuit held that the Solicitor General's coordination with the Ohio Attorney General fit within the consultant corollary where both were engaged in litigation defending an Ohio statute, because the Ohio Attorney General could still be considered a "neutral consultant" to the Solicitor General. *Lawyers' Comm.*, 2020 WL 7319365, at *20; *see also id.* ("On one end, of course, is the teaching of *Klamath* that an entity's interest in receiving a limited government benefit over others will bar it from being considered a neutral consultant. The other end is less well-defined. It seems clear that some level of self-interest is allowable.").

Georgia also argues that members of the Common Interest Group could not have served as consultants to CRT because "election litigation and litigation strategy" are "squarely in DOJ's ken." Pls.' MSJ at 22 (second quotation cleaned up and citation omitted). While CRT's litigators undoubtedly have expertise in "election litigation and litigation strategy," that does not mean that the interests of the United States are not further advanced when they can coordinate with other groups to share research or analysis, develop ideas, reduce resource burdens, and harmonize arguments. *See, e.g.*, Russ Decl. ¶¶ 29, 31. That such coordination among attorneys is often beneficial is, of course, the rationale for the common-interest exception to waiver principles.

Accordingly, the United States should not be required to denigrate the quality of its own lawyering in order to maintain the same ordinary litigation privileges that other litigants enjoy. *See, e.g.*, *United States v. AT&T Co.*, 642 F.2d 1285, 1300 (D.C. Cir. 1980) ("The Government has the same entitlement as any other party to assistance from those sharing common interests, whatever their motives."); *Hunton & Williams*, 590 F.3d at 278 ("Nothing in the 'inter-agency or

intra-agency' language in Exemption 5 demands that the government, alone among all litigants, be stripped of civil discovery privileges when it has done nothing more than communicate with other litigating parties with whom it shares a singular and unitary litigation interest.").

**B. <u>Other than Exemption 5's Threshold Requirement, Georgia Does Not Challenge CRT's Deliberative Process Privilege Withholdings.</u>**

Other than its objections regarding the threshold requirement of Exemption 5, *see supra* Part II.A, Georgia does not contest the propriety of CRT's withholdings pursuant to the deliberative process privilege portion of Exemption 5. Georgia does not contest that the withheld material is predecisional in that it preceded CRT's ultimate decisions about how to advance the Georgia voting lawsuit, nor does Georgia contest that the withheld material is deliberative in that it reflects the give-and-take of CRT's decisionmaking process regarding litigation decisions in the Georgia voting lawsuit. Def.'s MSJ at 24-27. Accordingly, Georgia concedes that if the threshold requirement is met, then CRT is entitled to summary judgment on its deliberative process privilege withholdings, which would resolve the propriety of most of CRT's withholdings.

**C. <u>CRT's Withholdings Pursuant to the Attorney Work-Product Doctrine Are Likewise Justified.</u>**

As an initial matter, other than the two issues discussed below relating to the earliest two withheld emails and the common interest among the Common Interest Group, Georgia does not challenge CRT's withholdings pursuant to the attorney work-product doctrine. To put it differently, Georgia does not dispute that the withheld material includes litigation strategy material prepared by attorneys relating to the ongoing lawsuits of the type that would generally satisfy the attorney work-product doctrine. Def.'s MSJ at 21-24; *see also* Russ Decl. ¶ 28 (noting that the withheld materials include discussions of "legal strategy, potential witnesses, types of discovery needed, division of labor in a case that would likely be consolidated, and the efficient presentation of the case," as well as "legal research and attorney notes" and "related communications among

Department attorneys and the Common Interest Group regarding litigation strategy"). As discussed below, neither of Georgia's objections is well-founded, and summary judgment is thus appropriate for Defendant on the attorney work-product doctrine withholdings.

### 1. The Two Emails from July 27 and July 28, Relating to a July 28 Phone Call Resulting in the Memorialization of the Common Interest Agreement, Are Properly Withheld.

Georgia's first argument is that CRT should not be permitted to withhold under Exemption 5 documents that precede the July 28, 2021 email memorializing the common interest agreement. Pls.' MSJ at 9-12.

As an initial matter, the set of responsive documents contains only *two* such emails with Exemption 5 withholdings that date from before the July 28, 2021 email: one email sent at 9 AM on July 28, 2021 (earlier in the day than the later email memorializing the common interest agreement), and one email sent on July 27, 2021. Both emails were produced to Georgia with redactions.[2] *See, e.g.*, GA000705 (the 9 AM July 28 and July 27 emails appear at GA000707-08), attached as Exhibit A.

The first of these emails, from July 27, is labelled at the top "COMMON INTEREST COMMUNICATION," GA000708 (emphasis in original), indicating that the parties on the email understood their communications to be privileged and confidential due to their shared common interest, even if the common interest agreement had not yet been memorialized in writing. It is further apparent from the face of both emails, even in their redacted form, that the redacted portions of both email discuss the agenda for the upcoming July 28 phone call—the same call that was

---

[2] Because these two emails are included in the conversation history of multiple different email chains, they appear multiple times in CRT's productions. *Cf.* Pls.' MSJ at 11 (listing multiple bates numbers in CRT's *Vaughn* index that include dates prior to July 28—all of these entries relate to the same two emails).

immediately followed by the July 28 email memorializing the common interest agreement. Specifically, the July 27 email opens "Here is a proposed agenda for tomorrow's call," followed by a redaction, and the 9 AM July 28 email states "Look forward to discussing later today with everyone. We're also interested in discussing [. . . .]," followed by a redaction. *See* GA000707-08.

As Georgia acknowledges, a common interest agreement need not be memorialized in writing to be effective. *See* Pls.' MSJ at 12 ("While agreement need not assume a particular form, . . . ." (quoting *Hunton & Williams*, 590 F.3d at 285)). *See also Hunton & Williams*, 590 F.3d at 287 ("The common interest doctrine requires a meeting of the minds, but it does not require that the agreement be reduced to writing or that litigation actually have commenced."); *United States v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012) ("[I]t is clear that no written agreement is required, and that a [joint defense agreement] may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are or potentially may be codefendants or have common interests in litigation."). Accordingly, it is not disqualifying that the two emails precede the memorialization of the agreement on July 28.

Courts have upheld the application of the common interest privilege to documents exchanged prior to memorialization by looking at other indicia of the parties' mutual understanding, including the closeness in time to the eventual memorialization. *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18MD2836, 2019 WL 6122011, at *3 (E.D. Va. Oct. 3, 2019) (upholding the application of the common interest privilege to a document sent prior to the parties memorializing a Common Interest Agreement given the "close alignment" of the communicators and their "mutual concern regarding potential disputes" on the topic, which was demonstrated by other documents from a similar time period including a common-interest legend);

*MobileMedia Ideas LLC v. Apple Inc.*, 890 F. Supp. 2d 508, 518 (D. Del. 2012) (finding that documents exchanged six months before the entities memorialized a common interest agreement could be privileged).

Here, such additional indicia demonstrate that the two emails were subject to the common interest rule. The first email in the chain is labelled "COMMON INTEREST COMMUNICATION." Both emails were sent extremely close in time to the written memorialization, and the face of both emails demonstrates that their content relates to the July 28 phone call where the parties discussed common interests, and which ultimately resulted in the memorializing of the agreement later on July 28. These indicia suffice to demonstrate that the senders and recipients of the emails mutually understood that they would be kept confidential as attorney work product shared pursuant to a common interest agreement.

> **2. CRT and the Other Members of the Common Interest Group Share a Common Interest in Prevailing in Their Challenges to SB 202 and Enforcing Federal Voting Rights Laws.**

The United States and the rest of the Common Interest Group share several common interests. For one, they share an interest in prevailing in their various lawsuits against Georgia concerning its voting law. Russ Decl. ¶ 26. In addition, and relatedly, they share an interest in "enforcing the U.S. Constitution and federal voting rights laws" as well as "ensuring that the State of Georgia complies with its obligations under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, Section 2 of the Voting Rights Act, the Americans with Disabilities Act, and other federal voting rights laws." Russ Decl. ¶ 25. Contrary to Georgia's arguments, Pls.' MSJ at 12-17, these shared interests more than suffice to demonstrate that CRT and the Common Interest Group are sufficiently aligned that they can share attorney work-product information pursuant to their common interest agreements without waiving privilege.

*a.  There Is No Requirement That Entities Limit Themselves to Precisely the Same Legal Theories to Receive the Protection of the Common Interest Rule.*

In analyzing whether parties sharing attorney work-product information are closely aligned enough to not waive the privilege, the D.C. Circuit has explained that: "'common interests' should not be construed as narrowly limited to co-parties.  So long as transferor and transferee anticipate litigation against a common adversary on the same issue or issues, they have strong common interests in sharing the fruit of the trial preparation efforts."  *AT&T*, 642 F.2d at 1299; *Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 174 F.R.D. 609, 634 (M.D. Pa. 1997) ("The interests of the parties need not be identical, and may even be adverse in some respects.").  Because the purpose of the work-product doctrine is "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent," waiver of the work-product doctrine should not found lightly, and "[a] disclosure made in the pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege."  *AT&T*, 642 F.2d at 1299.

Elaborating on the requirement that a disclosure be "not inconsistent" with maintaining confidentiality, the D.C. Circuit explained that "[t]he existence of common interests between transferor and transferee is relevant to deciding whether the disclosure is consistent with the nature of the work product privilege" because "with common interests on a particular issue against a common adversary, the transferee is not at all likely to disclose the work product material to the adversary."  *Id.*  In other words, the existence of common interests is relevant not for some talismanic reason, but because it demonstrates that the recipient of the privileged material is not likely to further disclose the information to litigation adversaries.  This rationale supports the conclusion that common interests exist here.  Clearly, given the Common Interest Group's execution of common interest agreements and understanding of confidentiality, Russ Decl. ¶ 39,

as well as the course of this lawsuit, disclosure of attorney work-product material among the Common Interest Group was not likely to lead to disclosure to a litigation adversary.

There is no requirement that aligned litigants limit themselves to replicating precisely the same claims or precisely the same legal theories in order to enjoy confidential communications regarding the shared core of their common interest. Indeed, much of the benefit of engaging in coordinated litigation brought by different plaintiffs, who may have different injuries or be able to highlight different aspects of a legal issue, would be lost if entities were required to challenge only identical provisions in order to maintain privilege.

> b. *The United States and the Rest of the Common Interest Group More Than Meet This Threshold Because They Bring Many of the Same Claims and Challenge Many of the Same Provisions of SB 202.*

Georgia argues a lack of common interest because some of the Common Interest Group members have brought different claims. However, there is substantial overlap in the claims brought—six of the Common Interest Group cases, including that of the United States, include claims under Section 2 of the Voting Rights Act.[3] That some of the Common Interest Group members have brought additional claims does nothing to diminish the shared interest of the entire Common Interest Group in succeeding on the Voting Rights Act claims or in obtaining relief

---

[3] *Compare* Compl. ¶¶ 159-65, *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. June 25, 2021), ECF No. 1 (attached to Pls.' MSJ as Field Decl. Ex. 6) (raising claims under Section 2 of the Voting Rights Act), *with* 1st Am. Compl. ¶¶ 118-22, *Asian Americans Advancing Justice-Atlanta v. Raffensperger*, No. 1:21-cv-1333 (N.D. Ga. Apr. 27, 2021), ECF No. 27 (attached to Pls.' MSJ as Field Decl. Ex. 1) (same); Compl. ¶¶ 173-78, *Concerned Black Clergy of Metro. Atlanta, Inc. v. Raffensperger*, No. 1:21-cv-1728 (N.D. Ga. Apr. 27, 2021), ECF No. 1 (attached to Pls.' MSJ as Field Decl. Ex. 2) (same); 1st Am. Compl. ¶¶ 329-33, *Sixth District of the AME Church v. Kemp*, No. 1:21-cv-1284 (N.D. Ga. May 24, 2021), ECF No. 83 (attached to Pls.' MSJ as Field Decl. Ex. 3) (same); 1st Am. Compl. ¶¶ 167-76, *The New Ga. Project v. Raffensperger*, No. 1:21-cv-1229 (N.D. Ga. May 17, 2021), ECF No. 39 (attached to Pls.' MSJ as Field Decl. Ex. 4) (same); 1st Am. Compl. ¶¶ 191-201, *Ga. State Conference of the NAACP v. Raffensperger*, No. 1:21-cv-1259 (N.D. Ga. May 28, 2021), ECF No. 35 (attached to Pls.' MSJ as Field Decl. Ex. 5) (same).

against SB 202. Furthermore, some of the additional constitutional claims will overlap substantially in terms of relevant evidence and the applicable legal standard with the Section 2 claims. *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) (noting that the standard used in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) for violation of the Fourteenth Amendment is also used to evaluate plaintiffs' Section 2 claim).

Similarly, the lawsuits brought by the Common Interest Group have a large degree of overlap in which provisions of SB 202 they challenge. For example, multiple of the lawsuits challenge the same provisions that the United States challenges: changes to absentee ballot procedures, the counting of out-of-precinct provisional ballots, limitations on drop boxes, and prohibitions on providing food or other relief to voters waiting in line.[4]

---

[4] *Compare* Compl. ¶¶ 35-80, *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. June 25, 2021), ECF No. 1 (attached to Pls.' MSJ as Field Decl. Ex. 6) (challenging changes to absentee ballot procedures, the counting of out-of-precinct provisional ballots, limitations on drop boxes, and prohibitions on providing food or other relief to voters waiting in line), *with* 1st Am. Compl. ¶¶ 82-117, *Asian Americans Advancing Justice-Atlanta v. Raffensperger*, No. 1:21-cv-1333 (N.D. Ga. Apr. 27, 2021), ECF No. 27 (attached to Pls.' MSJ as Field Decl. Ex. 1) (challenging changes to absentee ballot procedures and limitations on drop boxes); Compl. ¶¶ 110-32, 143-62, *Concerned Black Clergy of Metro. Atlanta, Inc. v. Raffensperger*, No. 1:21-cv-1728 (N.D. Ga. Apr. 27, 2021), ECF No. 1 (attached to Pls.' MSJ as Field Decl. Ex. 2) (challenging changes to absentee ballot procedures, the counting of out-of-precinct provisional ballots, limitations on drop boxes, and prohibitions on providing food or other relief to voters waiting in line); 1st Am. Compl. ¶¶ 249-67, 269-73, *Sixth District of the AME Church v. Kemp*, No. 1:21-cv-1284 (N.D. Ga. May 24, 2021), ECF No. 83 (attached to Pls.' MSJ as Field Decl. Ex. 3) (challenging changes to absentee ballot procedures, the counting of out-of-precinct provisional ballots, limitations on drop boxes, and prohibitions on providing food or other relief to voters waiting in line); 1st Am. Compl. ¶¶ 68-81, 85-105, *The New Ga. Project v. Raffensperger*, No. 1:21-cv-1229 (N.D. Ga. May 17, 2021), ECF No. 39 (attached to Pls.' MSJ as Field Decl. Ex. 4) (challenging changes to absentee ballot procedures, the counting of out-of-precinct provisional ballots, limitations on drop boxes, and prohibitions on providing food or other relief to voters waiting in line); 1st Am. Compl. ¶¶ 134-45, 153-61, 166-67, *Ga. State Conference of the NAACP v. Raffensperger*, No. 1:21-cv-1259 (N.D. Ga. May 28, 2021), ECF No. 35 (attached to Pls.' MSJ as Field Decl. Ex. 5) (challenging changes to absentee ballot procedures, the counting of out-of-precinct provisional ballots, limitations on

Due to the significant overlap in the Common Interest Group lawsuits' claims and provisions challenged, coordination among the group is helpful regarding legal research on common theories, as well as factual investigation into shared questions. For example, many members of the Common Interest Group challenge provisions of SB 202 that relate to identification requirements for absentee voting, which will likely involve similar evidence regarding the types of identification that voters typically possess and the barriers voters will encounter under the new process.

Georgia's restrictive proposed rule would not only hurt the interests of the United States, but would also result in additional burdens on witnesses and the court system. By coordinating regarding their shared interests, the Common Interest Group was able to reduce burdens on witnesses (from duplicative investigations or interviews) and the judge (from hearing duplicative evidence). *See, e.g.*, Russ Decl. ¶¶ 28-29.

Further demonstrating that the United States shares an interest in the other challenges to SB 202 and in enforcing federal voting rights law, the United States filed a Statement of Interest on July 26, 2021—before the United States and Common Interest Group memorialized their common interest agreement in the July 28 email—in one of the other cases brought by a member of the Common Interest Group. Statement of Interest of the United States, *Georgia State Conference of the NAACP v. Raffensperger*, No. 1:21-cv-1259 (N.D. Ga. July 26, 2021), ECF No. 55; *see also id.* 2 & n.2 ("[A]rguments in this Statement of Interest also apply to motions to dismiss

---

drop boxes, and prohibitions on providing food or other relief to voters waiting in line); Compl. ¶¶ 64-103, *VoteAmerica v. Raffensperger*, No. 1:21-cv-1390 (N.D. Ga. Apr. 7, 2021), ECF No. 1 (attached to Pls.' MSJ as Field Decl. Ex. 7) (challenging changes to absentee ballot procedures); Am. Compl. ¶¶ 110-120, *Coalition for Good Governance v. Kemp*, No. 1:21-cv-2070 (N.D. Ga. June 11, 2021), ECF No. 14 (attached to Pls.' MSJ as Field Decl. Ex. 8) (challenging changes to absentee ballot procedures).

filed in other SB 202 cases before this Court.").  The Statement of Interest addressed both Section 2 of the Voting Rights Act and Section 101 of the Civil Rights Act of 1964.  *See id.* at 1 (stating that "the United States has a substantial interest in ensuring proper interpretation of Section 2 and Section 101").

    *c.  Georgia's Counterarguments Fail.*

    The cases cited by Georgia fall short of identifying any such rule that perfect identity is required, and indeed, many address situations that are not at all analogous to this case.  Georgia quotes *Bowles v. National Association of Home Builders.*  Pls.' MSJ at 13.  In that case the court rejected the common interest theory regarding negotiations over a licensing agreement because the two entities were "adverse" over the issue; the two entities "anticipate[d] at least the possibility of litigation between them over the issue"; and the two entities "sought advice from [their] counsel during this period" about how to limit the influence of the other.  *Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 251-52 (D.D.C. 2004).  That is quite different than the sitution here— Georgia makes no suggestion that the United States and the Common Interest Group anticipated adverse litigation between each other on a Voting Rights Act issue or anything similar.  Similarly, the Tenth Circuit case cited by Georgia, Pls.' MSJ at 13, involved the court rejecting "a novel twist to the 'common interest' doctrine" where one party argued that the "'common interest' doctrine can also act as a sword to overcome the work product doctrine."  *Frontier Refin., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 705 (10th Cir. 1998).  Needless to say, that novel argument is not advanced by either party here.

    Georgia also misunderstands *Lawyers' Committee for Civil Rights Under Law*.  Georgia argues that the case stands for the proposition that "a shared desire to see the same outcome in a legal matter . . . is insufficient to bring a communication . . . within the common interest rule."

Pls.' MSJ at 14 (second alteration in Georgia's brief, internal quotation marks omitted). But what the court actually said is that such a mere shared interest in the abstract, *absent any actual common interest agreement*, is insufficient. In other words, the case is about the importance of consummating a common interest agreement, which the Common Interest Group here did. *See Lawyers' Comm.*, 2020 WL 7319365, at *27 ("[A] shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within [the common interest rule]. Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." (citation omitted)).

Finally, the *AT&T* case cited by Georgia, Pls.' MSJ at 13, stands for the proposition that the claims and legal theories of those with a common interest can be "overlapping" and need not be completely identical. *See AT&T*, 642 F.2d at 1300 ("[The private litigant] shares common interests with the United States, in the sense that they are proceeding on overlapping antitrust issues against a common adversary, AT&T. The United States and [the private litigant] shared common interests in developing legal theories and analyses of documents on which to proceed on those issues where they both made the same antitrust claims against AT&T."). Indeed, the D.C. Circuit noted that its holding would "further[] the purpose of the work product privilege" by allowing the private litigant to "contribute the fruit of its analysis to the Government on *those issues common to their two cases*," *id*. at 1300 (emphasis added), inherently recognizing that not all issues would be common between the cases.

Georgia also suggests that cases being "at different procedural postures," Pls.' MSJ at 15, may prevent a common interest. Georgia offers no authority or explanation for this theory, which is largely irrelevant given that here six of the Common Interest Group cases, including that of the United States, have been consolidated for discovery and are thus at the same procedural posture.

In any event, it is unclear why cases being at different stages would negate a common interest (particularly given that litigants may not always be able to control the progress of litigation).

Nor is Georgia correct that "under DOJ's theory, it may conceal nearly all communications it exchanges with every interest group engaged in trying to block common-sense election laws like SB 202." Pls.' MSJ at 17. First, because Georgia has in fact received hundreds of pages of communications in this case, subject only to redactions where necessary to preserve privileged material. And second, the attorney work-product doctrine only applies to material prepared in anticipation of litigation, which would provide a limitation on any future withholdings.

*    *    *

Accordingly, communication of attorney work-product material among the Common Interest Group does not waive its privilege.

### D. Foreseeable Harm Would Result from Compelling CRT to Reveal Its Confidential Communications with the Common Interest Group to Its Litigation Adversary.

As Defendant has previously explained, Def.'s MSJ at 23-24, 27, compelling it to reveal the withheld communications—which include its litigation strategy in the Georgia voting lawsuit and its decisionmaking process therefor—would foreseeably harm the United States.

The ability to coordinate confidentially with the other members of the Common Interest Group "allows counsel for the United States to consider steps that will promote the most efficient and effective presentation of its case without needlessly burdening the judge with duplicative testimony, or unnecessarily burdening witnesses with uncoordinated outreach or questioning." Russ Decl. ¶ 29. This coordination is itself "necessary to efficiently and effectively litigate the SB 202 litigation." Russ Decl. ¶ 30. Revealing the withheld information would hurt the government's litigating position in the ongoing Georgia voting case by "provid[ing] insight to the SB 202 defendants on the Department's litigation strategy in ongoing litigation," Russ Decl. ¶ 32, as well

18

as "foreseeably harm the Department's interests by reducing the Department's ability to effectively and candidly deliberate on [ ] litigation strategy issues," Russ Decl. ¶ 41.

Requiring disclosure of the withheld information would also have further negative effects in the future, by causing aligned parties to refuse to coordinate with the United States, depriving government litigators of the chance to harmonize their arguments, share legal research, and develop and execute coordinated legal strategies. *See, e.g.*, Russ Decl. ¶ 32 (revealing the withheld communications would "harm future cooperation among the plaintiffs"); Russ Decl. ¶ 31 (revealing the withheld information would "hav[e] a chilling effect on the coordination efforts of the Common Interest Group in the ongoing litigation"); Russ Decl. ¶ 34 (revealing the withheld information "would cause grave injury to the United States' ability to pursue complex litigation involving multiple plaintiffs"); Russ Decl. ¶ 41 ("My opinion is that, absent the expectation that the withheld communications would be kept confidential, the Department and others in the Common Interest Group would not have been able to communicate openly about litigation strategy in the cases concerning SB 202. Accordingly, disclosure would impede the Department's ability to consult with counsel sharing a common interest about such litigation strategy issues, which would harm the Department's decision-making processes in shared litigation matters by reducing the free flow of information and coordination among entities sharing a common interest.").

In keeping with both of these rationales, courts have long recognized the benefits to parties and the court system of maintaining the attorney work-product doctrine. *See Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947) ("Were [attorney work-product] materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. . . . Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. . . . And the interests of the clients and the cause of justice

would be poorly served."). And these considerations weigh the heaviest where, as here, the litigation discussed is ongoing. Indeed, here the FOIA requestor seeking CRT's litigation-related communications is itself the litigation adversary.

Georgia's only argument that foreseeable harm would *not* occur is that, because Georgia has opted not to seek records dating from after the Northern District of Georgia district court ordered various of the Georgia voting lawsuits consolidated for discovery purposes, the United States would not be harmed by the release of the withheld information. Pls.' MSJ at 17 n.6; Pls.' MSJ at 8 & n.2. Not so. The numerous foreseeable harms that Defendant has identified are not limited in time to the period after the consolidation. Indeed, as the dates of the records at issue here demonstrate, the Common Interest Group had already been discussing litigation strategy well before the December 2021 consolidation. *Cf.* Russ Decl. ¶ 8 & Ex. 2 (members of the Common Interest Group memorialized a common interest agreement in July 2021). Nor has the common interest portion of the attorney work-product doctrine ever been limited to *court-ordered* collaboration.

## **CONCLUSION**

For the above reasons and for the reasons stated in its motion for summary judgment, Defendant respectfully requests that this Court grant its motion for summary judgment and deny Georgia's cross-motion for summary judgment.

Dated: October 20, 2022            Respectfully submitted,

                                                 BRIAN M. BOYNTON
                                                 Principal Deputy Assistant Attorney General

                                                 ELIZABETH J. SHAPIRO
                                                 Deputy Director

*/s/ Rebecca  Kopplin*
REBECCA KOPPLIN
Trial Attorney (California Bar No. 313970)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C.  20005
Telephone:  (202) 514-3953
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Defendant*