**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**GEORGIA, *et al.*,**

                Plaintiffs,

                v.

**UNITED STATES DEPARTMENT OF JUSTICE,**

                Defendant.

</td><td>

Case No. 1:21-cv-03138 (TNM)

</td></tr>
</table>

**<u>MEMORANDUM OPINION</u>**

Georgia revised its election procedures following the 2020 presidential election. Soon after, the Department of Justice began working with private organizations and individuals to block the changes through multifaceted litigation. Concerned, Georgia submitted a Freedom of Information Act (FOIA) request to understand the depth the Department's collaboration with third parties. DOJ produced many documents but withheld some under an exemption to FOIA that protects certain internal agency records from disclosure.

This case does not concern the merits of Georgia's election laws. Rather, it presents the narrow question of whether FOIA's internal deliberation privilege extends to documents shared with non-governmental litigants. Because DOJ has not met its burden to show that the withheld emails fall within an exemption to FOIA, the Court will grant Georgia summary judgment.

**I.**

This is a lawsuit about eight lawsuits. Following the 2020 elections, Georgia enacted the Election Integrity Act of 2021, or Senate Bill 202 ("SB 202" or "the Act"). According to Georgia, "[t]he changes made in this legislation . . . are designed to address the lack of elector confidence in the election system on all sides of the political spectrum, to reduce the burden on

1

election officials, and to streamline the process of conducting elections in George by promoting uniformity in voting."  SB 202 § 2(4).  But according to DOJ and various private entities, the law unduly restricts voting rights in violation of various federal laws.

In total, nearly 60 private parties sued Georgia challenging the Act.  They include the Georgia NAACP, VoteAmerica, the Georgia Advancing Progress Political Action Committee, several churches, individuals, and even a sorority chapter.  Within two months of enactment, these parties formed seven groups.  And each group filed a separate suit in the Northern District of Georgia.[1]  DOJ then filed its own lawsuit challenging parts of the Act.  *See United States v. Georgia*, No. 21-cv-2575 (N.D. Ga. filed June 25, 2021) (ECF No. 1).  Afterward, DOJ and the private plaintiffs began collaborating in their litigation against SB 202.  *See* Def.'s Mot. for Summ. J. (Def.'s MSJ) at 2–3, ECF No. 14-1.

In July 2021, DOJ and plaintiffs' counsel in seven of the eight cases exchanged an email stating that the parties "share a common interest in the successful prosecution of this litigation, and that they may share (but are not required to share) privileged communications and other litigation material between and among them without waiving attorney-client privilege, the work product protection or any other privilege or protection."  Decl. of John A. Russ, IV (Russ Decl.) ¶ 8 & Ex. 2, ECF No. 14-4.  That email noted that the agreement included "any other counsel associated with [the recipients], in the suits they have filed challenging the Georgia law known

---

[1]  *See The New Ga. Project v. Raffensperger*, No. 21-cv-1229 (N.D. Ga. Filed Mar. 25, 2021); *Georgia State Conf. of the NAACP v. Raffensperger*, No. 21-cv-1259 (N.D. Ga. Filed Mar. 28, 2011); *Sixth Dist. of the Afr. Methodist Episcopal Church v. Kemp*, No. 21-cv-1284 (N.D. Ga. filed Mar. 29, 2021); *Asian Ams. Advancing Just.-Atlanta v. Raffensperger*, No. 21-cv-1333 (N.D. Ga. filed Apr. 1, 2021); *VoteAmerica v. Raffensperger*, No. 21-cv-1390 (N.D. Ga. filed Apr. 7, 2021); *The Concerned Black Clergy of Metro. Atlanta, Inc. v. Raffensperger*, No. 21-cv-1728 (N.D. Ga. filed Apr. 27, 2021); *Coal. for Good Governance v. Raffensperger*, No. 21-cv-2070 (N.D. Ga. filed May 17, 2021).

as SB 202." *Id.*  Later, plaintiffs in all the lawsuits entered into a formal common interest

agreement with DOJ.  *Id.* ¶ 10 & Ex. 3.

Although each lawsuit challenges SB 202, DOJ and the private plaintiffs adopted

different strategies.  The various lawsuits differed in their challenges and requested relief.  DOJ

alleged only discriminatory purpose under § 2 of the Voting Rights Act.  *See* Def.'s Resp. to

Pl.'s Statement of Undisputed Material Facts (Def.'s SMF) ¶¶ 17–18, ECF No. 18-2.  The

private organizations each brought various constitutional claims.  *See id.* ¶ 18.  And some groups

alleged violations of other federal statutes, including the Americans with Disabilities Act, the

Rehabilitation Act, and the Civil Rights Act of 1964.  *See id.*  Two of the private complaints did

not include claims under the Voting Rights Act at all.  *See id.*  Those that did bring § 2 claims

argued for liability based on discriminatory effects, but DOJ argued for liability based solely on

discriminatory intent.  *See id.* ¶¶ 17, 19.

Georgia moved to dismiss each case, and the Northern District of Georgia denied those

motions.  Afterward, the district court consolidated six of the eight cases, including DOJ's, for

discovery purposes.  *See* Order at 9, *In re Georgia Senate Bill*, No. 21-mi-55555 (N.D. Ga. Dec.

23, 2021) (Russ. Decl., Ex. 4) (reasoning that the actions involve "mostly the same facts and

legal issues").  But two of the cases were not consolidated.  The Northern District found that

"there are important distinctions between" those cases and the consolidated cases.  *Id.* at 7.  And

it found that consolidation could prejudice those plaintiffs with "burdensome discovery unrelated

to their claims."  *Id.*

Now to the substance of this case.  Georgia submitted a FOIA request to DOJ, seeking

records related to DOJ's suit challenging SB 202.  *See* FOIA Request, Decl. of K. Kagle (Kagle

Decl.), Ex. A, ECF No. 14-5.  Relevant here, Georgia requested:  "All communications

discussing [SB 202] exchanged between DOJ personnel and the following individuals or representatives of the following non-governmental entities from November 3, 2020, through the date of the search."[2]  *Id.* at 2.  The request named 62 organizations and individuals, almost all of whom are plaintiffs or plaintiffs' counsel in the various suits against SB 202.  *Id.* at 2–4; *see* Russ Decl. ¶ 18.

After DOJ failed to respond within the statutory period, Georgia sued.  *See* Compl. ¶¶ 24–28, ECF No. 1.  DOJ then conducted searches and processed potentially responsive records.  Russ Decl. ¶ 21.  One division produced 23 pages with redactions under Exemption 6. Decl. of Vanessa Brinkman (Brinkman Decl.) ¶ 9–10, ECF No. 14-6.  And another produced 596 pages in full and 282 pages with redactions under FOIA Exemptions 5, 6, and 7.  Kagle Decl. ¶ 28; *see id.*, Ex. E (*Vaughn* index).  That division also withheld 112 pages in full under Exemption 5.  *See id.* ¶ 30; *Vaughn* Index.  Georgia now challenges some of DOJ's withholding under Exemption 5.  It does not dispute the adequacy of the searches or the Exemption 6 and 7 withholdings.

## II.

FOIA requires federal agencies to disclose nonexempt information to the public upon request.  *See, e.g.*, *Jud. Watch, Inc. v. FBI*, 522 F.3d 364, 365–66 (D.C. Cir. 2008).  FOIA exemptions "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976) (cleaned up).  In line with

---

[2]  Georgia also requested "[a]ll communications between DOJ personnel and members of Congress (or their staff) . . . that discuss [SB 202]" and "[a]ll internal guidance documents that DOJ uses to determine when, in DOJ's opinion, a provision of a state's election law violates the [Voting Rights Act]."  FOIA Request at 4–5.  Those requests are not at issue here.

that policy, courts construe FOIA exemptions "narrowly" and consider their applicability de novo. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

Agencies have the burden of showing that documents fall into one of the enumerated exemptions. *See id.*; 5 U.S.C. § 552(a)(4)(B). An agency may carry its burden through affidavits alone. *Wolf*, 473 F.3d at 374. But an agency fails to meet its burden when the record contains contradictory evidence. *See id.* Likewise, an agency loses if its affidavits fail to "describe the justifications for nondisclosure with reasonably specific detail." *Id.* (cleaned up).

Summary judgment is proper if "there is no genuine dispute of any material fact" so that the "movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court reviews the record de novo. 5 U.S.C. § 552(a)(4)(B). And it views the facts and draws all inferences "in the light most favorable to the requester." *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). Most FOIA cases resolve on summary judgment. *See Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020).

### III.

Georgia argues that DOJ improperly withheld its communications with the private plaintiffs under Exemption 5.[3] That exemption protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5); *see also DOI v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 6 (2001). Georgia argues that Exemption 5 does not apply for two reasons. First, the communications sought are not properly considered "inter-agency" or "intra-agency." Second, DOJ has not shown that it made those communications under a common

---

[3] Georgia does not challenge DOJ's Exemption 5 withholdings made after the Northern District of Georgia's consolidation order. *See* Pls.' Cross-Mot. for Summ. J. (Pls.' MSJ.) at 8 n.2, ECF No. 15.

interest agreement with a common legal interest.  Circuit precedent and FOIA's text teach that Georgia is correct on both scores.

### A.

First, the text.  The Court starts with "a careful examination of [FOIA's] ordinary meaning and structure."  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (interpreting FOIA exemption); *see also Citizens for Responsibility & Ethics in Wash. (CREW) v. DOJ*, No. 21-5276, 2023 WL 1113218, at *9 (D.C. Cir. Jan. 31, 2023) ("Our consideration of [a FOIA exemption] starts with its text.").  Exemption 5 shields from disclosure certain "inter-agency or intra-agency memorandums or letters."  5 U.S.C. § 552(b)(5).  With certain exceptions not relevant here, FOIA defines "agency" to mean "each authority of the Government of the United States."  *Id.* § 551(1).  This "includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government[,] . . . or any independent regulatory agency."  *Id.* § 552(f); *see also Klamath*, 532 U.S. at 9.

Though FOIA defines "agency," it does not define "inter-agency or intra-agency."  Thus, the Court "ask[s] what that term's ordinary, contemporary, common meaning was when Congress enacted FOIA in 1966."  *Food Mktg. Inst.*, 139 S. Ct. at 2362.   "Inter" means "between" or "among."  *Webster's Third New International Dictionary of the English Language* (*Webster's Third*) 1176 (1961).  So "inter-agency . . . memorandums or letters" are communications that are exchanged "between" or "among" different agencies.  The private litigants here are admittedly not federal agencies.  *See* 5 U.S.C. §§ 551(1), 552(f)(1).  So the communications between them and DOJ cannot be deemed "inter-agency."

That leaves only "intra-agency."  The prefix "intra" means "within."  *Webster's Third* 1185.  So "intra-agency" describes something that is found or generated "within" a federal agency.  The Supreme Court has recognized as much.  The Court noted that "the most natural meaning of 'intra-agency memorandum'" is a communication "that is addressed both to and from employees of a single agency."  *Klamath*, 532 U.S. at 9.  Put differently, the ordinary meaning of Exemption 5 excludes communications to or from non-agency parties.  *Accord id.* ("[N]either the terms of the exemption nor the statutory definitions say anything about communications with outsiders.").

This reading is confirmed by the "structure of the law itself."  *Food Mktg. Inst.*, 139 S. Ct. at 2364.  Exemption 5 says nothing about communications with private parties.  But other parts of FOIA expressly permit the withholding of information generated by outsiders.  Exemption 4, for instance, protects certain "information obtained *from a person* [that is] privileged and confidential."  5 U.S.C. § 552(b)(4) (emphasis added).  And Exemption 8 provides that FOIA permits withholding of "reports prepared by, *on behalf of*, *or for the use of*" certain agencies.  *Id.* § 552(b)(8).  Congress thus knew how to draft an exemption that shielded outside communications from disclosure.  If Congress intended Exemption 5 to do the same, then it would have said so.  But it did not.

So, Exemption 5, as "ordinarily interpreted," does not protect DOJ's communications with private litigants from disclosure.  *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 201 (D.C. Cir. 2014) (Kavanaugh, J.) (cleaned up).

It is "textually possible," however, to read Exemption 5 to encompass outsiders "acting in a governmentally conferred capacity."  *DOJ v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting).  So the Court's inquiry continues.  As acknowledged in *Klamath*, *see* 532 U.S. at 9,

some circuits, including the D.C. Circuit, have "go[ne] beyond" the ordinary meaning of Exemption 5. *Pub. Emps.*, 740 F.3d at 201. Those circuits have expanded its reach to protect documents generated by non-governmental parties in limited circumstances. *See Klamath*, 532 U.S. at 9; *but see Lucaj v. FBI*, 852 F.3d 541, 548–49 (6th Cir. 2017) (finding consultant corollary conflicts with the text of Exemption 5); *Rojas v. FAA*, 989 F.3d 666, 673–74 (9th Cir. 2021) (en banc), 989 F.3d at 683–90 (Wardlaw, J., concurring in part and dissenting in part) (dissenting from decision to recognize consultant corollary); *id.* at 693–98 (Bumatay, J., concurring in part and dissenting in part) (same). The so-called "consultant corollary" has been used to treat some "comments solicited from nongovernmental parties" as agency records. *McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011).

*Klamath* is the leading case in this area.[4] It held that Exemption 5 did not shield documents that Indian tribes had given to an agency. *See* 532 U.S. at 12. The Court began by emphasizing that Exemption 5 "is not [meant] to protect Government secrecy pure and simple." *Id.* at 9. Rather, "the first condition of Exemption 5"—that "the communication must be 'inter-agency or intra-agency'"—"is no less important than" the requirement that the communication fall within a traditional civil discovery privilege. *Id.*

The Court noted that Exemption 5 does not "say anything about communications with outsiders." *Id.* Still, it recognized that some circuits had found such communications may qualify. *See id.* "Assuming without deciding that the consultant corollary was valid," *Pub. Emps.*, 740 F.3d at 201, the Court explained that lower courts had applied the doctrine when "the consultant functions just as an employee [of the agency] would be expected to do," 532 U.S. at 11. *See also id.* at 10 (noting courts taking "the more expansive reading" of Exemption 5

---

[4] Indeed, the Supreme Court has not revisited the doctrine since it decided *Klamath* in 2001.

"[t]ypically . . . have held that the exemption extends to communications between Government agencies and outside consultant hired by them."). So a consultant represents neither "an interest of its own" nor "the interest of any other client when it advises the agency that hires it." *Id.* at 10–11.

The Court found that the tribes were not "enough like the agency's own personnel." *Id.* at 12. And because of that, their communications did not count as "intra-agency." *See id.* The "dispositive point" was that "the apparent object of the Tribe's communications is a decision by an agency of the Government to support a claim by the Tribe that is necessarily adverse to the interests of competitors." *Id.* at 14. Because the tribes worked with the agency with their own interest in mind, it was not "textually possible" to consider the tribes "intra-agency." *Id.* at 9 (cleaned up). Put differently, a "beneficiary" is a different beast than a "paid consultant" or agency employee. *Id.* at 15. And the agency's "interest in frank communication," while important, was not "a sufficient justification" to treat self-interested tribes the same as neutral consultants under Exemption 5. *Id.* at 11–12. The Court found "no textual justification for draining the [intra-agency] condition of independent vitality." *Id.* at 12.

"[A]t the least," *Klamath* excludes certain parties from the consultant corollary exception. *See id.* at 12 n.4. "[A]n interested party seeking a Government benefit at the expense of other applicants" will not count. *Id.* The Court did not, however, decide what—if anything—qualifies for the exception. As another court in this district noted, "the Court found that self-advocacy at others' expense was preclusive." *Ctr. for Int'l Env't Law v. Off. of the U.S. Trade Rep.*, 237 F. Supp. 2d 17, 25 (D.D.C. 2002). But it never said whether "an outside consultant must be devoid of a definite point of view when the agency contracts for its services." *Klamath*, 532 U.S. at 10.

Citing *Klamath*, DOJ contends that the "only limitation" on the consultant corollary's application is that "the consultant may not be a self-interested advocate seeking a limited benefit from the government at the expense of others."  Def.'s Opp'n at 5, ECF No. 17.  Instead, communications need only aid the agency's deliberative process.  *See id.* at 4.  The Court disagrees.  DOJ's proposed rule would extend the consultant corollary beyond its breaking point by exempting many communications with private actors that are not fairly considered "intra-agency."  The Circuit's post-*Klamath* precedents—and "FOIA's mandate of broad disclosure"— impose a higher burden.  *Klamath*, 532 U.S. at 16.

## B.

Recall the overarching question.  Is a purported consultant "enough like the agency's own personnel to justify calling their communications 'intra-agency?'"  *Id.* at 12; *see also Rojas v. FAA*, 989 F.3d 666, 673–74 (9th Cir. 2021) (en banc) (looking to "whether the consultant acted in a capacity functionally equivalent to that of an agency employee").  And remember that DOJ must provide "detailed and specific information" showing that its withholding qualifies. *Campbell v. DOJ*, 164 F.3d 20, 30 (D.C. Cir. 1988) (cleaned up).

Circuit precedent teaches that three principles guide this inquiry.  Most important— following *Klamath*—is whether the agency presented evidence that the private parties are sufficiently disinterested to be "analogous to government consultants."  *Nat'l Inst. Of Mil. Justice v. DOD (NIMJ)*, 512 F.3d 677, 682 (D.C. Cir. 2008).  Second, a party is more likely to be considered a consultant if the agency solicited the communications.  *See, e.g.*, *Ryan v. DOJ*, 617 F.2d 781, 790 (D.C. Cir. 1980).  Third, a private party is more likely to be a consultant when the agency seeks its expertise.  *See, e.g.*, *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1161–62 (D.C. Cir. 1987).

None of these three principles is necessarily dispositive.  But the Court finds that DOJ fails to show *any* of them.

## 1.

Consider first whether DOJ has shown that the private plaintiffs and their lawyers are not self-interested.  *Klamath* emphasized that a "consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it."  532 U.S. at 10–11.  A consultant's "only obligations are to truth and its sense of what good judgment calls for."  *Id*. at 11.  In this regard, "the consultant functions just as an employee would be expected to do."  *Id.* Put differently, a private party acts like a consultant only when it communicates with the agency in service of the United States' interests, not its own.

And since *Klamath*, the Circuit "has consistently reiterated the principle that the outside consultant must be a neutral party who is not representing its own interests."  *Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 380 F. Supp. 3d 45, 54 (D.D.C. 2019).  In *NIMJ*, for example, the court "acknowledge[d] that disinterested outside consultants 'may be [considered] . . . intra-agency'" in some cases.  512 F.3d at 685 (quoting *Klamath*, 532 U.S. at 12).  There was "no dispute" that the purported consultants "were not pursuing interests of their own so as to run afoul of *Klamath*'s concern."  512 F.3d at 685.

Similarly, in *McKinley*, the Circuit held that non-agency Federal Reserve Bank of New York functioned as a consultant to the Federal Reserve Board.  There, the Bank "did not represent an interest of its own, or the interest of any other client, when it advised the Board." 647 F.3d at 223 (cleaned up); *accord Greenspan v. Bd. of Governors of Fed. Reserve Sys.*, No. 21-cv-1968, 2022 WL 17356879, at *7 (D.D.C. Dec. 1, 2022) (holding that bank staff acted as consultants to Federal Reserve Board).  It was significant that the Bank "is an 'operating arm' of

the Board," and that the Bank's interest did not "diverge[]" from the Board's because both "share a common goal" under the statute. *McKinley*, 647 F.3d at 337.

If there was any doubt, *Public Employees for Environmental Responsibility* expressly recognized that the consultant corollary does not apply when the private party has a personal stake in the outcome of the agency's deliberative process. *See* 740 F.3d at 201–02. The Circuit explained that, "[i]n the wake of *Klamath*," it has "confined the consultant corollary to situations where an outside consultant did not have its own interests in mind." *Id.*; *see also Klamath*, 532 U.S. at 10–11 (a consultant does "not . . . communicat[e] with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant"). Thus, courts applying the consultant corollary must focus on whether the agency has shown that the private party was sufficiently disinterested in its communications with the agency.

On this record, DOJ has not shown that the plaintiff groups acted as disinterested parties in their communications with it. That is, it has not met its burden to prove that its co-litigants lacked private (and possibly divergent) interests in teaming up with the federal government. DOJ candidly concedes that its litigation partners' interests in collaborating with it extend beyond merely assisting the agency. *See* Def.'s Opp'n at 5 (admitting plaintiff groups "no doubt also had an interest in the success of their own lawsuits"). So the purported consultants do not necessarily play the same role as outside counsel retained by an agency to provide independent legal advice. DOJ's "consultants" have skin in the game because they also challenge SB 202.

It is not just that these outsiders had "a definite point of view." *Klamath*, 532 U.S. at 11. DOJ has failed to show that these groups provided independent advice to the United States and did not work to advance their own causes. DOJ asserts that *it* consulted the interest groups "to

12

further the Voting Rights Act lawsuit brought by the United States by developing litigation strategy, sharing legal research, and discussing potential approaches to the litigation."  Def.'s Opp'n at 5 (citing Russ Decl. ¶¶ 28–29, 40).  But DOJ has not shown that *the interest groups* teamed up with DOJ to further the United States' distinct interests rather than their own.  DOJ has produced no evidence from any of the entities or individual plaintiffs attesting to their purpose in working with DOJ.  Nor are there declarations from any of the groups' lawyers describing the nature and intent of their work with the agency.

More, DOJ's own evidence raises the likelihood that the groups' interests do diverge from the United States'.  Unlike DOJ, the private litigants each brought constitutional claims.  *See* Def.'s SMF ¶¶ 17–19. They also challenged different provisions of the law.  *See id.*  DOJ responds that the interest groups could not be seeking to sway the Department because the United States had sued by the time of the communications at issue.  Def.'s Opp'n at 5.

That is not enough.  After all, the withheld communications "comprised discussions in advance of the Department's ultimate litigation decisions."  Russ Decl. ¶ 40; *see also id.* ¶ 28 (withheld records "concern[ed] positions that might be taken in the litigation"); Def.'s MSJ at 26 ("[T]he Voting Section . . . continues to face a number of decisions regarding litigation strategy and how to proceed with its case.").  This suggests that DOJ's final litigation positions were not necessarily immune to lobbying.

More, as noted, there is no evidence from any of the interest groups contextualizing their purpose in collaborating with the federal government.  And the private plaintiffs' lawyers' ethical obligations are to those plaintiffs.  That is, the lawyers with whom DOJ collaborated have a duty to advocate for their own clients' interests, not the United States'.  Thus, on this record, it is unclear whether the plaintiff groups and their lawyers "did not represent an interest of [their]

13

own, or the interest of any other client," when advising DOJ.  *McKinley*, 647 F.3d at 337
(cleaned up).

DOJ's failure to show that its litigation partners were sufficiently disinterested makes it
difficult to see how the withheld communications fit within even an expansive reading of
Exemption 5.  *See Pub. Emps.*, 740 F.3d at 201–02 (explaining that the Circuit has "confined the
consultant corollary to situations where an outside consultant did not have its own interests in
mind.").  And the other considerations are just as unhelpful for DOJ.

**2.**

The second key consideration is evidence of agency solicitation.  On top of showing
neutrality or objectivity, the Circuit's post-*Klamath* precedents have required an agency invoking
the consultant corollary to show that the withheld communications "were solicited by a U.S.
agency in the course of its deliberative process."  *Pub. Emps.*, 740 F.3d at 201; *see also Ryan*,
617 F.2d at 790 ("When an agency record is submitted by outside consultants as part of the
deliberate process, *and it was solicited by the agency*, we find it entirely reasonable to deem the
resulting document to be [protected by Exemption 5].") (emphasis added); *see also Klamath*, 532
U.S. at 11 ("in the typical cases . . . the consultant . . . advises the agency that hires it").  And the
Circuit has suggested that a lack of agency solicitation will preclude application of the consultant
corollary.

For instance, in *NIMJ*, the Court "reli[ed] . . . on formal agency solicitation of advice" to
conclude the agency met its burden.  512 F.3d at 687; *see also Klamath*, 532 U.S. at 11 ("[I]t was
[the agency's] formal solicitation of their advice . . . that created a consultant relationship and
made them analogous to agency employees.").  The same is true in *McKinley*.  There, the Court
addressed plaintiff's argument that "the Board failed to show it solicited the withheld material

from the [Bank] as [Circuit] precedent requires."  647 F.3d at 223 (citing *NIMJ*, 512 F.3d at 684;

*Ryan*, 617 F.2d at 790).  Only after determining that the agency's evidence "adequately

demonstrate[d] that the Board solicited the material from the [Bank]" did the Court conclude that

the consultant corollary applied.  *Id.*  So application of the consultant corollary appears to require

evidence of agency solicitation under Circuit precedent.[5]  *Id.*

Here, nothing in the record suggests that DOJ solicited the private entities for assistance

in litigating its case against Georgia.  All that is known is that at some point DOJ and plaintiffs'

counsel in the various cases challenging SB 202 agreed to work together, and that understanding

was later memorialized in a common interest agreement.  *See* Russ Decl. ¶¶ 8–9.  The record is

silent as to whether the partnerships here were "generated by [its] initiative" or if the interest

groups first lobbied DOJ for help.  *Ryan*, 716 F.2d at 208.

And when asked at oral argument, DOJ did not even purport to have solicited assistance.

Instead, DOJ explained that the "formalized [common interest] agreement here and the fact that

the universe of people is limited to just the plaintiffs in these lawsuits provides more than

adequate safeguards for solicitation."  Hr'g Tr. at 7.  This is not persuasive.  Nor is it enough

under D.C. Circuit precedent.  That a common interest agreement exists between DOJ and a few

parties does not mean, or even suggest, that it was DOJ that solicited input from the interest

---

[5]  DOJ contends that evidence of agency solicitation is not required under *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005).  *See* Tr. of Mot. Hr'g (Hr'g Tr.) at 47–48. The Court is unconvinced.  *Judicial Watch*, which pre-dated *NIMJ* and *McKinley*, applied Exemption 5 to communications between various agencies and the National Energy Policy Development Group, a body whose "sole function is to advise and assist the President."  *Id.* at 129.  The court's application of the consultant corollary relied heavily on the unitary structure of the Executive Branch.  *See id.* at 129–31.  There, "what matter[ed] is whether a document will expose the pre-decisional and deliberative processes of the Executive Branch."  *Id.* at 131. Outside that unique context, *Judicial Watch* does little to advance DOJ's position.

15

groups rather than the other way around.  So DOJ has not met its burden of showing that it solicited the interest groups' assistance as Circuit law has seemed to "require."  *McKinley*, 647 F.3d at 223.

**3.**

The last indicator that the consultant corollary should apply is expertise.  This is often tied to solicitation.  Courts have applied the consultant corollary in cases "involv[ing] the solicitation of advice from a discrete group of experts."  *NIMJ*, 512 F.3d at 687; *see, e.g.*, *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1125 (D.C. Cir. 1989) (noting consultants were "expert scientists" who helped "evaluate the readiness of agency work for publication"); *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168, 171 (D.C. Cir. 1997) (explaining consultants were former Presidents who "clearly qualifie[d] as . . . expert[s] on the implications of disclosure of presidential records"); *Judicial Watch*, 412 F.3d at 130 (noting consultants were "Executive Branch officials who play important roles in the formulation of policy").

Indeed, the consultant corollary was first developed *because* "[t]he Government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely and without fear of publicity."  *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971); *see also CNA Fin.*, 830 F.2d at 1162 ("[F]ederal agencies occasionally will encounter problems outside their ken, and it clearly is preferable that they enlist the help of outside experts skilled at unraveling their knotty complexities.").

DOJ has not shown that it received advice "from a discrete group of excerpts."  *NIMJ*, 512 F.3d at 688.  Though not dispositive, this too suggests that the interest groups here are different in kind from the outsiders the Circuit has previously recognized as falling within the

consultant corollary.  This is not a instance when an agency "encounter[ed] problems outside their ken" and was required to "enlist the help of outside experts."  *Formaldehyde Inst.*, 889 F.2d at 1162 (cleaned up).  Challenges to election laws are squarely within DOJ's ken.  It "undoubtedly ha[s] expertise in election litigation and litigation strategy."  Def. Opp'n at 7.  Indeed, the Court cannot imagine a group of lawyers less in need of assistance to enforce federal voting laws than the specialists in DOJ's Civil Rights Division.

In sum, DOJ has not shown that the private plaintiffs and their lawyers advised the agency with only the United States' interests in mind, nor has it shown that it solicited those groups for their expertise.  Thus, taken together, DOJ has not met its burden to prove that the withheld communications are "intra-agency" within the meaning of Exemption 5.

## C.

DOJ's primary response is that "there is no requirement that the consultant lack an interest of its own."  Def.'s Opp'n at 4.  In support, it points to *Ryan* and *Public Citizen*, both decided before *Klamath*.

The consultants in *Ryan* and *Public Citizen* are a far cry from the private litigants here.  *Ryan* involved questionnaires that DOJ sent to senators about how they chose judicial nominees. 617 F.2d at 784.  Because the "consultants" in *Ryan* were members of Congress, it was "more reasonable to consider their comments 'inter-agency or intra-agency.'"  *NIMJ*, 512 F.3d at 690 (Tatel, J., dissenting).  More, as in *Ryan*, this Court "cannot overlook the fact that the documents [t]here were generated by an initiative from [DOJ]."  *Ryan*, 617 F.2d at 790.  DOJ has not made that showing here.

And *Public Citizen* concerned requests for letters sent by former Presidents Reagan and H.W. Bush to the National Archives and Records Administration about their presidential papers.

In finding the letters to be within Exemption 5, the court explained that "[t]wo circumstances make the application of this doctrine to the disputed records peculiarly appropriate." 111 F.3d at 170. The first "peculiar[]" aspect of *Public Citizen* is that the consultants were former Presidents, not private entities. And a former President is not similarly situated to average citizens. He "retains aspects of his former role," notably the ability to assert executive privilege. *Id.*; *cf. Comm. on Ways & Means, U.S. House of Reps. v. U.S. Dep't of Treasury*, 575 F. Supp. 3d 53, 73–77 (D.D.C. 2021), *aff'd,* 45 F.4th 324 (D.C. Cir. 2022). Second, the Presidential Records Act expressly *required* the agency *to solicit* the former Presidents' advice.[6] *See id.*

No such peculiarities are present here. Private plaintiffs and their lawyers are not similarly situated to senators and former Presidents. And, unlike in *Ryan* and *Public Citizen*, DOJ has not shown that it solicited expert assistance from the non-agency consultants. So these cases do not suggest that records generated by private parties should enjoy the same broad degree of exemption from disclosure given to certain communications of senators and former Presidents.

More significantly, *Ryan* and *Public Citizen* both predate the sea change brought by *Klamath*. A freewheeling approach to the consultant corollary that discounts a private party's self-interest is not compatible with *Klamath* and its progeny.

To be sure, *NIMJ* "affirmed post-*Klamath* the continuing validity of the *Ryan* line of cases." 512 F.3d at 684. But *NIMJ* also cautioned that *Klamath* "expressed concern . . . with regard to the potential self-interests of the 'consultants' involved in those cases." *Id.* at 685.

---

[6] On this point, DOJ appears to acknowledge that solicitation is relevant to the consultant corollary analysis. *See* Hr'g Tr. at 12 ("What matters [in *Public Citizen*] is that there is this purpose for which the agency is soliciting their input, and on that one purpose, the agency is going to be able to make use of it.").

More, *NIMJ* expressly declined to rule on "the extent to which either *Ryan* or *Public Citizen* may have extended Exemption 5 beyond its permissible scope based on their peculiar facts." *Id.*; *see also Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 380 F. Supp. 3d 45, 54 (D.D.C. 2019) (noting *Klamath* "singled out [*Ryan* and *Public Citizen*] as arguably extending beyond typical examples of the consultant corollary"). At any rate, these cases do not undermine the Circuit's present ringfencing of the consultant corollary "to situations where an outside consultant did not have its own interests in mind." *Pub. Emps.*, 740 F.3d at 201–02.

### D.

At bottom, DOJ's argument leans heavily on *Hunton & Williams v. Department of Justice*, 590 F.3d 272 (4th Cir. 2010). There, a divided panel of the Fourth Circuit found that the consultant corollary encompassed litigation-related communications between DOJ and the manufacturer of the BlackBerry phone. The court found that it "d[id] not matter that [the manufacturer] was motivated by the commercial benefit that would accrue to it if it succeeded in opposing the BlackBerry injunction while the government was motivated by concern for the public interest." *Id.* at 282. But *Hunton* neither binds nor persuades this Court.

*Hunton* erred by failing to give "independent vitality" to Exemption 5's threshold "intra-agency" requirement. *Klamath*, 532 U.S. at 12. It reasoned that the withheld "communications can be considered 'intra-agency' for the simple reason that the outside attorney or consultant is collaborating with an agency in the agency's pursuit of the public interest." 590 F.3d at 280. In other words, the existence of a common legal interest between an outsider and agency is alone sufficient to make that outsider's communications "intra-agency." But, as will be explained in below, *see infra* Section IV, this merely describes the common interest doctrine. That doctrine

"permits parties whose legal interests coincide to share privileged materials with one another" without waiving privilege.  *Id.* at 277.

 *Klamath* teaches that merely satisfying the requirements of the common interest doctrine cannot bring communications within the scope of Exemption 5.  The Supreme Court explained that an agency's "interest in frank communication" does not provide a "sufficient justification" to "ignore[] the first condition of Exemption 5."  532 U.S. at 11–12.

 *Hunton*'s conflation of the common interest doctrine with the threshold "intra-agency" requirement effectively did just that.  And it did so explicitly, stating that it is "clear that the [common interest] doctrine is relevant to the question of whether the document qualifies as 'inter-' or 'intra-agency,' not to the question of whether it is privileged."  590 F.3d at 280.  This bootstrapping is not correct as a matter of logic or doctrine.

 "The existence of common interests between [parties] is relevant to deciding whether disclosure is consistent with the nature of the . . . privilege."  *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980).  So the common interest doctrine is relevant only to the second condition of Exemption 5, which requires that the communication "fall within the ambit of privilege against discovery."  *Klamath*, 532 U.S. at 8.  The doctrine cannot be used to escape the textual requirement that consultants under Exemption 5 must be "enough like the agency's own personnel to justify calling their communications 'intra-agency.'"  *Id.* at 12.

 The *Hunton* majority's analysis was informed more by policy concerns than *Klamath* or Exemption 5's text.  *See, e.g.*, 590 F.3d at 278 ("Allowing disclosure here would impair an agency's ability to prepare effectively for litigation with private parties."); *id.* ("Congress's whole purpose in drafting Exemption 5 was thus not to have FOIA . . . place an agency at a serious disadvantage vis-à-vis private parties who are free of any FOIA constraints."); *id.* at 279

("[I]n the absence of coordination, the government—or any party whose interests align with the government's—might find its position strafed inadvertently by 'friendly fire.'").  Apparently because of these concerns, *Hunton* shoehorned the common interest doctrine into the narrow consultant corollary exception to Exemption 5's rule that only intra-governmental communications can be withheld.  DOJ now asks this Court to do the same.  In asking this Court to follow *Hunton*, DOJ stresses the consequences of allowing FOIA to disturb "the government's ability to maintain the ordinary litigation privileges enjoyed by other parties."  Def.'s Opp'n at 3.

But federal agencies are not ordinary litigants.  They possess unmatched resources and staggering power to enforce the thousands of statutes and regulations of their own making.  These prerogatives come with strings.  Agencies are subject to FOIA and "require[ed] . . . to adhere to a general philosophy of full agency disclosure."  *DOJ v. Tax Analysts*, 492 U.S. 136, 142 (1989) (cleaned up).  Thus, if FOIA's disclosure obligations temper an agency's ability to litigate with private parties in secret, this is a feature, not a bug.  FOIA "was obviously expected and intended to affect Government operations."  *Klamath*, 532 U.S. at 16.  "Congress had to realize that not every secret under the old law would be secret under the new."  *Id.*

The Circuit's decision in *CREW v. DOJ* underscores the point.  *CREW* considered Exemption 4, which allows withholding of confidential commercial or financial information obtained from private parties.  *See* 5 U.S.C. § 552(b)(6).   The Circuit explained the exemption "does not cover all information the public disclosure of which could inflict commercial harm."  2023 WL 1113218, at *5.  Here too, Exemption 5 does not automatically extend to all privileged communications the release of which could affect the Government in litigation.  Like Exemption 4, Exemption 5's "text, especially when read in statutory context, confirms as much.  Unlike other FOIA exemptions enacted at the same time," it "does not make potential consequences of

21

disclosure an explicit ground for withholding." 2023 WL 1113218, at *5. Exemption 5 "contrasts markedly with Exemption 7(A), for instance, which protects certain law enforcement records to the extent their production 'could reasonably be expected to interfere with enforcement proceedings.'" *Id.* (citing 5 U.S.C. § 552(b)(7)(A)). FOIA may complicate DOJ's ability to maintain discovery privileges when it chooses to partner with private litigants. But that does not give courts license to rewrite the statute.

More still, even if this Court were moved by DOJ's policy concerns, ruling for the agency in this case would require the Court to extend the consultant corollary beyond even *Hunton*'s overly capacious conception of the doctrine. *Hunton* is not on all fours with this case, and the Court is unconvinced that DOJ would prevail under its logic.

*Hunton* involved a single issue in a single lawsuit. It concerned the scope of an injunction after a liability finding. *See* 590 F.3d at 275. Critical to the court's reasoning was that DOJ had "done nothing more than communicate with other litigating parties with whom it shares a *singular and unitary* litigation interest." *Id.* at 278 (emphasis added); *see also id.* ("It is that convergence of interests that entitles the government to communicate within the terms of the Exemption."). As discussed below, DOJ has not shown that it has a "singular and unitary litigation interest," *id.*, with each of the various private litigants because the separate suits contain distinct claims and legal theories.

*Hunton* involved a very different situation. DOJ "share[d] a unitary interest in achieving a litigative outcome and result" with a single private litigant. "The point," *Hunton* explained, "is that there is no conflict of interest when it comes to advancing the public's interest because the outsider stands to gain personally only if the public's interest is vindicated." *Id.* at 280. But

here, where the private litigants seek different relief under different laws, DOJ has not made that same showing.

Of course, even if *Hunton* were factually similar to this case and the Court found its logic persuasive, the Court is still not free to disregard binding Circuit precedent. The purported consultant in *Hunton* was admittedly "acting in its own interest." 590 F.3d at 287. Yet as explained already, "this Circuit does require that outside consultants 'lack an independent interest,'" *Am. Oversight*, 380 F. Supp. 3d at 54, in line with *Klamath*. *See also Pub. Emps.*, 740 F.3d at 201–02. So to the extent that *Hunton* suggests that an outsider's self-interest can be ignored when that interest overlaps with the agency's, that is not the law in this circuit. Nor is it consistent with *Klamath*.

DOJ has not carried its burden to show that the interest groups fall within the consultant corollary exception to Exemption 5.

## IV.

Georgia argues that, even if the communications are considered "intra-agency," Exemption 5 nonetheless does not apply. Recall that exemption protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). So, in addition to the threshold internality requirement, an agency invoking that exemption must show the withheld communication would be "normally privileged in the civil discovery context." *Nat'l Lab. Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Relevant here, these privileges include the deliberative process and attorney work-product privileges. *Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Att'ys*, 844 F.3d 246, 249 (D.C. Cir. 2016).

DOJ invokes both privileges to justify its Exemption 5 withholdings.  *See* Def.'s MSJ at 21–27.  But sharing otherwise privileged communications with third parties generally waives any existing privilege.  *See, e.g.*, *AT&T*, 642 F.2d at 1299.  So, in the ordinary case, DOJ could not maintain privilege for its communications with the private plaintiff groups and their lawyers. Here, however, DOJ invokes the common interest doctrine.  As noted above, this is an exception to the waiver rule that permits "shared or jointly created material[s]" to remain protected from discovery in some cases.  *Minebea Co., Ltd. v. Papst*, 228 F.R.D. 13, 16 (D.D.C. 2005).  For the doctrine to apply, DOJ must show that the withheld communications (1) satisfy the traditional requirements of the applicable privilege, and (2) were disclosed based upon a common legal interest and under an agreement to pursue a joint defense.  *Id.*

DOJ contends that it memorialized a common interest agreement with the plaintiff groups, and thus that the deliberative process and work-product privileges continue to protect the withheld communications from disclosure under the common interest doctrine.  Georgia does not dispute that the withholdings satisfy the ordinary requirements of the deliberative process and work-product privileges.  Rather, Georgia argues that, for at least some of communications, DOJ has not met its burden to show a common interest agreement was in place.  More, Georgia argues that all of the withheld communications fall outside the common interest doctrine—and thus Exemption 5—because DOJ did not establish that it shared a sufficiently similar legal interest with each of the outside entities.  On this record, DOJ has not shown that the common interest doctrine shields the emails at issue.

## A.

The Court first considers Georgia's argument that DOJ failed to show that a common interest agreement was in place at the time certain withheld communications were made.  DOJ

says that its common interest agreement was memorialized in several places. The earliest one is a July 28, 2021, email between DOJ and plaintiffs' counsel. It stated that the parties "share a common interest in the successful prosecution of this litigation, and that they may share (but are not required to share) privileged communications and other litigation material between and among them without waiving the attorney-client privilege, the work product protection or any other privilege or protection." Rosenberg Email, Ex. 2, Russ Decl. Though Georgia does not challenge that this email established the existence of a common interest agreement, it contends that DOJ has not met its burden to show an agreement was in place before that. And some of DOJ's Exemption 5 withholdings predate this email.

Georgia first points to inconsistencies in DOJ's evidence about when an agreement was allegedly formed. In its motion for summary judgment, DOJ points only to the July 28, 2021, email as evidence that an agreement was in place. *See* Def.'s MSJ at 3. But its declaration from Killian Kagle, head of Civil Rights Division's FOIA unit, states that "[t]here was a 'meeting of the minds' among [DOJ's Civil Rights] Division and the external entities regarding the lawsuit filed by [DOJ] . . . against the State of Georgia on June 25, 2021"—the day DOJ sued. Kagle Decl. ¶ 33. DOJ has thus posited two dates as the genesis of the common interest agreement without clarifying the discrepancy. *Compare* Def.'s Reply at 9–11 *with* Pls.' Reply at 10–11.

The Court agrees with Georgia that, based on DOJ's filings, it lacks evidence to find the existence of a common interest agreement as early as June 2021. Notably, Kagle relies on the "separate declaration describing the common interest privilege among the parties and its applicability to the exemptions in this" case that "is being submitted by [Civil Rights Division's] Voting Section." *Id.* And that declaration—the Russ Declaration—does not indicate, or even suggest, that a meeting of the minds occurred on June 25. *See* generally Russ Decl. Instead, the

Russ Declaration focuses solely on the July 28 email.  So the Court cannot conclude that an agreement was in place by June 25, 2021.  DOJ therefore has a problem for withheld communications sent before July 28.

DOJ attempts to salvage protection of its pre-July 28 communications by arguing that they immediately precede the email memorializing the common interest agreement.  There are two responsive records that predate that July 28 email.  Both are emails that DOJ produced with redactions.  The first, sent on July 27, says, "COMMON INTEREST COMMUNICATION" at the top, and opens, "Here is a proposed agenda for tomorrow's call."  *See Vaughn* Index, GA00707–08.  The second email was sent at 9:00 a.m. the next day and states in response, "Look forward to discussing later today with everyone."  *Id.*  And the referenced call is the one that preceded the July 28 email memorializing the common interest agreement.  *See* Def.'s Opp'n at 10–11.  These are "indicia," DOJ says, that "demonstrate that the senders and recipients of the emails mutually understood that they would be kept confidential . . . pursuant to a common interest agreement."  *Id.* at 11.

These "indicia" are insufficient.  They do not establish that the communications were made under an existing, rather than inchoate, common interest agreement.  That an email purports to be a "common interest communication" does not, on its own, show that an "agreement has been proved to exist," much less that "the scope of the agreement is clear." *Minebea*, 228 F.R.D. at 16.  To be sure, and as Georgia concedes, *see* Pls's MSJ at 15, a common interest agreement need not be in writing.  *See also Minebea*, 228 F.R.D. at 16.  The problem for DOJ is that the possibility of future joint litigation does not mean the parties "clearly and specifically agreed in some manner to pool information for a common goal."  *Id.* (cleaned up).

The unredacted portions of the emails no doubt suggest that the parties contemplated an *eventual* common interest agreement—perhaps to be sorted out on a conference call that afternoon.  But the evidence does not show that there was a meeting of the minds *before* the call that preceded the email recognizing and memorializing their shared understanding.   For this independent reason, DOJ must release the Exemption 5 withholdings that predate the July 28 email.

## B.

Georgia makes another argument about why Exemption 5 does not apply, this time with respect to all the challenged withholdings.  According to Georgia, DOJ has not met its burden to show that it had a sufficiently similar legal interest with each of the private plaintiff groups to invoke the common interest doctrine.  Georgia is correct.

Recall that the Northern District of Georgia ordered in December 2021 that six of the eight cases challenging SB 202 be consolidated to facilitate discovery.  For Exemption 5 to apply here, DOJ must show that the withheld communications exchanged before Judge Boulee's consolidation order were "designed to facilitate a common legal interest."  *Minebea*, 228 F.R.D. at 16.

Though the common interest doctrine is not "limited to co-parties," it is stringent.  The doctrine requires "a strong identity of interests."  *Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 252 n.7 (D.D.C. 2004).  So "[s]eparately represented clients do not, by the mere fact of cooperation . . . impliedly undertake to exchange all information concerning [a] matter of common interest."  Restatement (Third) of the Law Governing Lawyers § 76 cmt. c (2000).  As the Circuit has explained, the parties must "anticipate litigation against a common adversary *on the same issue or issues*."  *AT&T*, 642 F.2d at 1299 (emphasis added)*; see also Frontier Refin.,*

*Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 705 (10th Cir. 1998) (holding interest must "be identical, not similar").

DOJ has not made that showing here. The plaintiff groups and DOJ did not merely bring separate lawsuits against SB 202. The groups, and DOJ, brought substantively different lawsuits asserting separate claims under separate legal theories. In its suit, for example, DOJ challenges SB 202 only as having a discriminatory purpose in violation of the Voting Rights Act. Def.'s SMF ¶ 17. Yet the other lawsuits variously allege that SB 202 violates the First, Fourteenth, and Fifteenth Amendments, the Americans with Disabilities Act, the Rehabilitation Act, and the Civil Rights Act of 1964. *Id.* And of those suits that did include claims under the Voting Rights Act, the private plaintiffs alleged discriminatory effects. But DOJ's allegations were limited to discriminatory purpose. *Id.* ¶¶ 17, 19. In other words, DOJ and the private plaintiffs were not a united front in their litigation against the Act. Nor did they employ the same weapons or seek the same objectives.

DOJ's primary response is that these differences do not take away from "the shared interest of the interest Common Interest Group in succeeding on the Voting Rights Act claims or in obtaining relief against SB 202." Def.'s Opp'n at 13. DOJ emphasizes that the lawsuits brought by DOJ and the private plaintiff groups, though different, have a "substantial overlap" in the claims brought and the provisions challenged. *Id.* at 13–14. More, DOJ notes that some of the additional constitutional claims absent from the United States' lawsuit will "overlap" with respect to relevant evidence and the legal standard applicable to the Section 2 claims. *Id.*

The Court need not decide whether the common interest doctrine requires a total identity of interests to apply, or whether partially overlapping claims and legal theories is sufficient to invoke the doctrine. *Cf. Frontier Refin.*, 136 F.3d at 705 (explaining interests must "be identical,

not similar"). This is because DOJ overstates how much the different lawsuits "overlap." Critically, some of the private plaintiff groups do not bring *any* claims that overlap with those brought by the United States. As DOJ concedes, two of the suits (*VoteAmerica* and *Coalition for Good Governance*) do not allege that SB 202 violates the Voting Rights Act at all. *See* Def.'s Opp'n at 13 & n.3; Def.'s SMF ¶¶ 17–18. So, even at a high level of generality, it is not the case that DOJ and the private plaintiff groups each share an interest "in succeeding on the Voting Rights Act claims." Def.'s Opp'n at 13.

This absence of claims under the Voting Rights Act is fatal to DOJ's reliance on the common interest doctrine. The Circuit has been clear. The parties must "anticipate litigation against a common adversary *on the same issue or issues*" for the doctrine to apply. *AT&T*, 642 F.2d at 1299 (emphasis added). DOJ contends that *AT&T* instead holds that "the claims and legal theories of those with a common interest can be 'overlapping' and need not be completely identical." Def.'s Opp'n at 17 (citing *id.* at 1300). This may be so, but DOJ has not persuasively explained how the *VoteAmerica* and *Coalition for Good Governance* suits involve "claims overlapping those made by" DOJ. *AT&T*, 642 F.2d at 1299. Those actions lack any claims under the Voting Rights Act.

Thus, at the least, the common interest doctrine does not protect the communications between DOJ and these two groups. And by disclosing communications to them, DOJ waived any privilege that could have attached vis-à-vis the other plaintiff groups. *See Minebea*, 228 F.R.D. at 16; 1 McCormick on Evid. § 93 (8th ed. July 2022 update) ("Even where the privileged matter is privately revealed, or authorized to be revealed, to a third person, waiver has generally

resulted and this conclusion may be supported by analogy to the cases which deny privilege when a third person is present at the consultation.").

The Court's conclusion is reinforced by the Northern District's decision not to consolidate the cases without Voting Rights Act claims.  After Judge Boulee directed the parties to inform him of their position on consolidation, the *VoteAmerica* and *Coalition for Good Governance* plaintiffs *objected* to consolidation.  *See* Consolidation Order at 6.  Those plaintiffs argued that "the issues of fact and law in their specific cases are distinct in significant respects and will not require the same type and scope of discovery as the claims alleged in the" other cases.  *Id.*  Judge Boulee agreed.  He explained that "there are important distinctions between the Objecting Cases" and the others, "most notabl[y] . . . the lack of allegations of race discrimination."  *Id.* at 7.  On the other hand, allegations of discrimination "arguably predominate" in the other complaints.  *Id.*  In these circumstances, it is hard to see how DOJ and the *VoteAmerica* and *Coalition for Good Governance* plaintiffs "anticipate litigation against a common adversary on the same issue or issues."  *AT&T*, 642 F.2d at 1299 (emphasis added).

DOJ also contends that the United States' filing of a Statement of Interest in one of the other cases shows that the United States shares an interest in the other challenges to SB 202.  Def.'s Opp'n at 15; Statement of Interest of the United States, *Georgia State Conf. of the NAACP v. Raffensperger*, No. 21-cv-1259 (N.D. Ga. July 26, 2021), ECF No. 55; *see also id.* at 2 n.2 ("[A]rguments in this Statement of Interest also apply to motions to dismiss filed in other SB 202 cases before this Court.").  But that Statement of Interest only concerns the United States' interest in ensuring "enforcement of Section 2 of the Voting Rights Act of 1965 . . . and Section 101 of the Civil Rights Act of 1964."  Statement of Interest of the United States at 1.  If anything, this suggests that the United States does not share an interest—or perhaps has a

divergent interest—in the parties' constitutional and other statutory claims.[7]  And *VoteAmerica*

does not involve a claim under either the Voting Rights Act or the Civil Rights Act of 1964.  *See*

Compl., *VoteAmerica v. Raffensperger*, No. 21-cv-1390 (N.D. Ga. filed April 6, 2021).  So the

Statement of Interest does little to cure the absence of any overlapping, much less identical,

claims in *VoteAmerica*'s complaint.[8]

## V.

FOIA was enacted "to pierce the veil of administrative secrecy and to open agency action

to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (cleaned

up).  In drafting Exemption 5, Congress created a narrow exception to FOIA that shields some

internal *agency* deliberations and litigation materials from public disclosure.  Allowing the

Government to withhold communications with private co-litigants "is not what Congress had in

mind when it protected citizens' right to be informed about what their government is up to."

*CREW*, 2023 WL 1113218, at *8 (cleaned up).

---

[7]  The Court also notes that DOJ did not move to intervene in any of the cases that the private plaintiff groups filed.  This further undermines DOJ's contention that it shared a protected legal interest with the other plaintiffs.  *Cf. Hunton*, 590 F.3d at 275 (finding common interest doctrine applicable when "DOJ filed a motion to intervene in the district court proceedings, which was granted").

[8]  Georgia also argues that it wins because DOJ has not met its burden to prove that disclosure would cause foreseeable harm to an "interest protected by" Exemption 5.  5 U.S.C. § 552(a)(8)(A)(i).  The Court disagrees.  DOJ has shown that revealing the withheld communications would hurt the Government's litigation against SB 202 by "provid[ing] insight to the SB 202 defendants on the Department's litigation strategy in ongoing litigation."  Russ Decl. ¶ 32.  More, the record reflects that disclosure would "hav[e] a chilling effect on the coordination efforts of the Common Interest Group in the ongoing litigation."  *Id.* ¶ 31.  This is enough for DOJ to surmount the foreseeable harm bar.  *See Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 109–10 (D.D.C. 2021) (surveying caselaw).

For these reasons, the Court finds that the records Georgia seeks are not exempt from disclosure under FOIA Exemption 5.  Thus, the Court will deny DOJ's motion for summary judgment and grant Georgia's cross-motion for summary judgment.

Dated: February 20, 2023                         _____
                                                 TREVOR N. McFADDEN, U.S.D.J.